COMMONWEALTH OF MASSACHUSETTS


SUFFOLK, SS.                          SUPERIOR COURT
                                      CRIMINAL BUSINESS
                                      No. SUCR00-10994


*********************************
                              *
                              *
                              *
COMMONWEALTH OF MASSACHUSETTS *
                              *
                              *
                              *
           vs.                *
                              *
                              *
OWEN MCCANTS                  *
                              *
*********************************

                    Before: Spurlock, RAJ
                    Suffolk Superior Court
                    Boston, Massachusetts
                    Date: May 23, 2001
                    Motion to Suppress


APPEARANCES:

David Deakin, Assistant District Attorney

Mark Shea, Counsel for Owen McCants


****************************************
COPYING OF THIS TRANSCRIPT IS PROHIBITED.
ALL COPIES TO BE OBTAINED FROM
CERTIFYING COURT REPORTER
****************************************


                    DALE MARIE CULLINAN
                 OFFICIAL COURT REPORTER, RET.

2

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Harry Byrne | 3 | 24 | | |
| Paul Downey | 38 | 43 | | |
| Christopher Curtin | 44 | | | |
| John McDonough | 47 | 53 | | |
| Polly Taylor | 66 | 71 | 88 | |
| Ruby Williams | 89 | 93 | 108 | |

## E-X-H-I-B-I-T-S

| Exhibit 1-MTS | Return of Service | Page 52 |
|---|---|---|
| Exhibit 2-MTS | Photograph/hat | Page 59 |
| Exhibit 3-MTS | Photograph/shirts | Page 60 |
| Exhibit 4-MTS | Photograph/initials | Page 65 |
| Exhibit 5-MTS | Affidavit/Taylor | Page 82 |

3

|      |   |                                                             |
|------|---|-------------------------------------------------------------|
| 1    |   | PROCEEDINGS                                                 |
| 2    |   | THE COURT:  Call your first witness in the                  |
| 3    |   | warrantless search.                                         |
| 4    |   | MR. DEAKIN:  Certainly, Your Honor.  The                    |
| 5    |   | Commonwealth call Sergeant Harry Byrne.                     |
| 6    |   | HARRY BYRNE, JR., SO SWORN                                   |
| 7    |   | DIRECT EXAMINATION                                          |
| 8    | Q | (by Mr. Deakin)  Sergeant Byrne, can you please             |
| 9    |   | identify yourself and spell your first and last name        |
| 10   |   | for the court reporter.                                     |
| 11   | A | My name is Harry A. Byrne, Jr.  That's H-a-r-r-y; B-        |
| 12   |   | y-r-n-e.                                                    |
| 13   | Q | How are you employed?                                       |
| 14   | A | I'm a sergeant on the Boston Police Department.             |
| 15   | Q | Were you on duty on Thursday, the late evening              |
| 16   |   | hours just before midnight, Thursday, July 13, 2000?        |
| 17   | A | Yes; I was.                                                 |
| 18   | Q | And what station were you working in?                       |
| 19   | A | Area D14, Brighton/Allston station.                         |
| 20   | Q | And what was your duty that evening?                        |
| 21   | A | I was the Patrol Supervisor.                                |
| 22   | Q | Did you at some point respond to the area of 34             |
| 23   |   | Fidelis Way in Brighton?                                     |
| 24   | A | Yes; I did.                                                 |

4

| 1 | Q | If you could just summarize, what did you respond |
| 2 | | there for? |
| 3 | A | A lost or missing child. |
| 4 | Q | When you got to the scene had the child been |
| 5 | | recovered? |
| 6 | A | Not at that time; no. |
| 7 | Q | At some point after you got there was the child |
| 8 | | found? |
| 9 | A | Yes; she came home.  She came back to the area. |
| 10 | Q | What happened to her after she came back? |
| 11 | A | She was -- the state she was in, she was |
| 12 | | hysterical.  I put her in a marked Boston Police car |
| 13 | | with her mother and her mother's boyfriend and she |
| 14 | | was whisked off to St. Gabriel's where the EMT's had |
| 15 | | set up an ambulance and people to check her out. |
| 16 | Q | Did you speak to her directly at that time when she |
| 17 | | came back? |
| 18 | A | No; I did not. |
| 19 | Q | Were you in communication periodically with people |
| 20 | | who were speaking to her after she was taken to a |
| 21 | | more secure place? |
| 22 | A | Yes. |
| 23 | Q | And that was by radio? |
| 24 | A | Yes, and face to face. |

1    Q    At some point after the girl in this case was found

2         or came back did you receive information from other

3         officers regarding the identification of a possible

4         suspect in the case?

5    A    Yes; I did.

6    Q    Let me ask you first, do you know or as best you

7         recall, about what time was it when the little girl

8         came back?

9    A    I got there around 11:30.  I'd say she came back

10        probably between 12:30: and quarter to one.

11   Q    How long after she came back was it that you got

12        information regarding identification of a possible

13        suspect?

14   A    About 15 minutes to a half-hour, maybe.

15   Q    So, that would put it in a range of somewhere

16        between 1:00 and 1:30 that you got that information?

17   A    Right.

18   Q    Whom did you receive that information from?

19   A    After the little girl was taken to the hospital

20        there was still a large crowd left at 34 Fidelis

21        Way.  They had made threats to a gentleman who had

22        brought the little girl home earlier in the night.

23             We went back to disperse the crowd.  As we were

24        dispersing the crowd, two of my officers brought a

6

1          girl up to me who said that -- made reference to her

2          uncle.

3     Q    Can you describe this girl?

4     A    She was a Black female.  I'd say she was probably -

5          she appeared between 16 and 18 years old.  She had

6          said to me that she was afraid that her uncle was

7          going to be hurt or killed by the crowd and if we

8          could talk to him.

9     Q    Did she tell you anything about whether she thought

10         her uncle might have been involved in the abduction

11         of the girl?

12    A    She said that he was arrested in the past for rape

13         of a child.

14    Q    Did she tell you anything about how he had been

15         acting that evening?

16    A    Just that he had just come home and that he was up

17         in the apartment.

18    Q    Did she take you to an apartment?

19    A    She brought us up to an apartment at 34 Fidelis

20         Way.

21    Q    Apartment 545?

22    A    Yes; it was.

23    Q    Did you go into that apartment?

24    A    She asked us to come in.  We went in and we spoke

1           to an older woman, Miss Isaac, I think it was.

2    Q    The girl who let you into the apartment, she said

3           that she was Owen McCants' niece; is that right?

4    A    She said she was the niece.  She didn't mention any

5           names.

6    Q    She just referred to him as her uncle?

7    A    Right.

8    Q    Who was with you, what police officers were with

9           you, when you went upstairs with this young woman to

10          the apartment?

11    A    I had Officer Dan McDonald, Officer Paul Downey;

12         Officer Chris Curtin; Officer Mike McManus; Officer

13         William Kelley; Officer Arthur Witkins.  There could

14         have been more, Sergeant Robert Merner.

15    Q    So, a number of people went up to the apartment?

16    A    Right.

17    Q    You said there was an elderly woman in the

18         apartment when you got there?

19    A    There were actually two older women.  One appeared

20         to be very old, like in her late eighties, maybe.

21         The other woman, I'd say she was probably in her

22         seventies.

23    Q    Did you at some point learn the names of those two

24         women?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What was the older woman's name? |
| 3 | A | Miss Isaac, that's all I know.  And Miss Polly |
| 4 | | Taylor was the other woman. |
| 5 | Q | And the younger of the two or the one who appeared |
| 6 | | younger was named Polly Taylor? |
| 7 | A | Yes. |
| 8 | Q | At that point, when you first entered the |
| 9 | | apartment, did you see anyone else in the apartment? |
| 10 | A | Well, when we came in the niece said that her uncle |
| 11 | | was in his room and he came out. |
| 12 | Q | Where did you see him come out from? |
| 13 | A | He came out from a back area of the apartment. |
| 14 | Q | Did you know him at that time? |
| 15 | A | No. |
| 16 | Q | Do you see the man in court today that you saw |
| 17 | | coming out of the back room of that apartment? |
| 18 | A | Right there. |
| 19 | | MR. DEAKIN:  May the record indicate the |
| 20 | | witness has identified the defendant, Owen McCants? |
| 21 | | THE COURT:  Yes. |
| 22 | Q | Before he came out did you have any conversation |
| 23 | | with Miss Isaac or Polly Taylor? |
| 24 | A | I didn't; no. |

1    Q    Did anyone have conversation with them in your
2         presence before he came out?
3    A    They could have.
4    Q    When he came out from the back area of the
5         apartment describe his appearance?
6    A    He was in the process of getting dressed.  It
7         looked like he was drying off.
8    Q    What made you say he looked as if he was drying
9         off?
10   A    He had, like, he looked like he had water on him or
11        maybe sweat or whatever.
12   Q    Was he fully clothed at the time he came out from
13        back?
14            THE COURT:  Excuse me, what does this have to
15        do with why we're here?
16            MR. DEAKIN:  It has to do with the consent
17        issue, that the defendant invited them into the
18        room.
19            THE COURT:  Why don't we get to that.
20            MR. DEAKIN:  Fine, I'll get to that.  Your
21        point is well taken, Your Honor.
22   Q    Did you speak to him in the apartment when he came
23        out?
24   A    Yes.

1    Q    Well, did you advise him of his Miranda Rights?

2    A    Yes; I did.

3    Q    At what point in speaking to him did you advise him

4         of his Miranda Rights?

5    A    I asked him if I could talk to him and he said

6         sure.  I said before I talk to you I said you're not

7         under arrest; you don't have to talk to me.  But I'd

8         like to read you your Miranda Rights.

9    Q    Did you then advise him of his rights under

10        Miranda?

11   A    Yes; I did.

12   Q    After advising him of those rights did you speak to

13        him, did you start to question him?

14   A    Yes.

15   Q    What was the subject of your questioning, just

16        generally?

17   A    I just asked him where he was.

18   Q    At some point as you were questioning him -- where

19        was this conversation taking place?

20   A    It was in where the eating area was in the

21        apartment.

22   Q    Sort of a common area in the apartment?

23   A    Right.

24   Q    Did he suggest at any point moving the conversation

```
1              to a different location?
2                   MR. SHEA:  Objection.
3                   THE COURT:  Sustained.
4     Q     Did your conversation continue in that eating area?
5     A     No; he asked us if we could come into the bedroom
6           in the back.
7     Q     He asked you?
8     A     Right.
9     Q     Do you recall how he asked you?
10    A     He motioned for me to follow him into the room.
11    Q     And you're making, for the record, sort of a
12          summonsing motion with your hand?
13                  MR. DEAKIN:  Can the record reflect that
14          motion, Your Honor?
15                  THE COURT:  Yes.
16    A     Yes.
17    Q     Did you follow him to a room?
18    A     Yes; I did.
19    Q     Did anyone else go with you into the room the
20          defendant took you in?
21    A     Yes.
22    Q     And who was that?
23    A     Sergeant Merner, Officer Downey, Officer McDonald,
24          Officer Kelley and Officer Witkins stayed at the
```

1              door.

2      Q     In the door?

3      A     In the doorway.

4      Q     What kind of a room was it ----

5                  THE COURT:  The question was who went into the

6              room with you?

7                  THE WITNESS:  Sergeant Merner, Officer Kelley,

8              Officer McDonald, Officer Downey and Officer Witkins

9              straddled the doorway.

10     Q     When you got into the room could you see and

11             observe the room, what it looked like?

12     A     Yes.

13     Q     What kind of a room was it?

14     A     It was a single bedroom, not too big, maybe 12 by

15             13, maybe.

16     Q     Did it have furniture in it?

17     A     It had a bed, a bureau, a desk, a coat rack with

18             some hooks on it, that type thing.

19     Q     Did you speak to the defendant in that room for a

20             period of time?

21     A     Yes; I did.

22     Q     As you were speaking to him did anything in the

23             room attract your attention?

24                 MR. SHEA:  Objection to the leading nature.

1          THE COURT:  Sustained.

2     Q    What did you observe when you were in the room?

3     A    When I went into the room I observed to my right a

4          shirt, that fit the description that we had obtained

5          from witnesses, hanging on a hook.

6     Q    What kind of a shirt was it?

7     A    It was a green, short-sleeve shirt.

8     Q    That attracted your attention for what reason?

9     A    Just that it was damp.  It appeared damp.

10    Q    I think you said it matched a description?

11    A    Yes.

12    Q    Who had given you that description?  When I say you

13         I mean you or other police officers?

14    A    We got that description from three young girls who

15         had given us a description of a guy that earlier in

16         the evening was hiding in the bushes at 34 Fidelis

17         Way.

18    Q    Did you also get that description through any

19         channels, from the victim herself?

20    A    Yes.

21    Q    What else, if anything, attracted your attention?

22    A    On the desk, which was the next thing after the

23         coat-rack-type object, I observed a round mirror

24         with what appeared to be a white-powdery substance

14

1    on it.  There was a dollar bill which appeared

2    rolled up.

3  Q  What in particular attracted your attention about a

4    white-powdery substance on a mirror?  Why was that

5    significant?

6  A  The victim stated that the man made her put some

7    white stuff up in her nose.

8  Q  During the abduction?

9  A  Yes.

10  Q  What, if anything else, attracted your attention?

11  A  There was a brandy snifter with a brown-colored

12    liquid.

13  Q  Where was that located?

14  A  That was to the left of the mirror with the white

15    powder substance.

16  Q  Why did the brandy snifter attract your attention?

17  A  The victim also told me that the man made her drink

18    a brown liquid that tasted funny.

19  Q  During the abduction of her?

20  A  During the abduction.

21  Q  What, if anything else, did you notice?

22  A  I knew the victim's name, her first name.  And on a

23    piece of paper on the desk her name was spelled out

24    on a piece of paper with a phone number.

| | | |
|---|---|---|
| 1 | Q | What was actually spelled out on the paper? |
| 2 | A | ███ , ██████ . |
| 3 | Q | ███ ? |
| 4 | A | Yes. |
| 5 | Q | And what is the victim's first name? |
| 6 | A | ███ , ██████ . |
| 7 | Q | What, if anything else, attracted your attention? |
| 8 | A | The bureau drawer, the top drawer, was open. |
| 9 | | Hanging down right on the top drawer of the bureau |
| 10 | | was a stocking that you could pull down over your |
| 11 | | face. |
| 12 | Q | Why did that attract your attention? |
| 13 | A | The victim said that the man had a stocking over |
| 14 | | his face. |
| 15 | Q | Did you notice anything else that attracted your |
| 16 | | attention at that time? |
| 17 | A | I can't recall. |
| 18 | Q | Is your memory exhausted on that point? |
| 19 | A | Yes. |
| 20 | Q | If I show you your police report would that help |
| 21 | | refresh your memory as to whether there are any |
| 22 | | additional items? |
| 23 | A | Yes. |
| 24 | | MR. DEAKIN:  With the Court's permission? |

1              THE COURT:  Yes.

2    Q    If you have a memory now?

3    A    There was a sharp, dark-colored sharp object.

4         There was a chisel.  But the victim said the man put

5         a sharp object to her throat.

6    Q    As you were noticing these items could you tell --

7         were you able to determine in your own mind whether

8         any of the other officers observed it as well?

9    A    I can't speak for them, but they told me later that

10        they saw all the similar things.

11   Q    How long was your conversation with the defendant

12        in that room?

13   A    Maybe five minutes, tops.

14   Q    What happened when -- how did it end?

15   A    I told Mr. McCants that we were leaving.  First, I

16        asked him -- when I asked him a couple of questions,

17        I asked him why all those people outside of 34

18        Fidelis Way either wanted to hurt him or kill him.

19             He said he didn't know.  I said we're leaving.

20   Q    When you said you were leaving what did you say, if

21        anything, to him about what was going to happen to

22        him?

23   A    That's what he asked me.  He asked me what was

24        going to happen to him.  I said, well, if you want

1       you can come down to the station with us.  If you

2       want, I'll have a couple of my guys drive you down

3       the station and you can wait down there and I'll

4       come down and talk to you in about a hour, hour and

5       a half, because I'm busy here getting this all taken

6       care of up here.

7   Q   Did you say anything to him at that time about

8       whether he was under arrest?

9   A   I told him he wasn't under arrest.

10  Q   What did he say when you offered him the option of

11      coming with you?

12  A   He asked if he could go with the police and I said

13      sure.

14  Q   What did you say?

15  A   I said sure.  They'll drive you down there.

16  Q   Was he escorted out of the building by police

17      officers?

18  A   Yes.

19  Q   Was he restrained in any way at that time,

20      handcuffs, leg irons, anything like that?

21  A   No.

22  Q   No restraints?

23  A   No restraints.

24  Q   Was he, in fact, taken to the police station?

1   A    Yes.

2   Q    As he was being escorted out of the building by

3        police officers what were you doing?

4   A    I was just up in the apartment.  I had informed

5        Miss Isaac and Miss Taylor that I was going to leave

6        two policemen at the door.

7            At which time I cordoned off with yellow crime

8        tape the room.

9   Q    Where did you get the yellow crime tape?

10  A    One of the officers brought it up from downstairs.

11  Q    And you yourself cordoned off the room?

12  A    Yes; I did.

13  Q    Did you post two officers at that time to watch the

14       room?

15  A    There were two officers posted until they executed

16       the search warrant.

17  Q    And that was the following day?

18  A    Yes.

19  Q    And was that under your orders that two officers be

20       posted?

21  A    Yes.

22  Q    Now, at the time that you cordoned off the room, it

23       was the room where you had been speaking with the

24       defendant; is that right?

1   A   Yes.

2   Q   At the time you cordoned off the room had you

3       removed any item of any description from that

4       bedroom?

5   A   Nothing was taken out of that bedroom.

6   Q   Did any of the other officers who were with you in

7       the room or had left the room take anything from

8       that room?

9   A   No.

10          MR. SHEA:  Objection, if he knows or observed.

11          THE COURT:  Overruled.

12  Q   Was anybody left in the room when you cordoned it

13      off?

14  A   No.

15  Q   Did you give instructions to the two officers that

16      you left?  First of all, who were the two officers

17      that you left?  Did you answer that already?

18  A   It was Officer Paul Downey and Dan McDonald.

19  Q   Did you give them instructions about who could be

20      admitted to that room?

21  A   I told them nobody can come up unless they have a

22      search warrant.

23  Q   To your knowledge, until the warrant was executed

24      the following day, to your knowledge did anybody

| | | |
|---|---|---|
| 1 | | remove anything from that room? |
| 2 | A | As far as I know, no. |
| 3 | Q | Was anything logged in evidence before the search |
| 4 | | warrant was executed? |
| 5 | A | No. |
| 6 | Q | After you cordoned off the room and left the two |
| 7 | | officers what did you do? |
| 8 | A | I went downstairs.  We dispersed the crowd and I |
| 9 | | went back to the station to start my report. |
| 10 | Q | Before you went back to the station did you receive |
| 11 | | any information about a motor vehicle that was |
| 12 | | suspect to be involved, used in this crime? |
| 13 | A | Right.  The victim said the man took her away in a |
| 14 | | car. |
| 15 | | MR. SHEA:  Objection. |
| 16 | | THE COURT:  Overruled. |
| 17 | Q | Did you learn anything about an automobile that was |
| 18 | | thought perhaps to have been the automobile used in |
| 19 | | the crime? |
| 20 | A | Yes.  The victim --- |
| 21 | Q | I understand that, was your attention drawn by |
| 22 | | anybody to an automobile that matched that |
| 23 | | description? |
| 24 | A | Right.  Officer Kelley ---- |

| | | |
|---|---|---|
| 1 | | MR. SHEA:  Objection. |
| 2 | | THE COURT:  Overruled. |
| 3 | A | Officer Kelley and Officer Witkins had talked to |
| 4 | | somebody out in the parking lot who said that this |
| 5 | | car had just pulled up.  And the car fit the |
| 6 | | description. |
| 7 | Q | Where was the car when you saw it? |
| 8 | A | It was in the side parking lot at 34 Fidelis Way. |
| 9 | Q | And that's a parking lot assigned to that building, |
| 10 | | 34 Fidelis Way? |
| 11 | A | Yes. |
| 12 | Q | Do you recall what make and model it was? |
| 13 | A | I think it was a Pontiac, but I'm not 100 percent |
| 14 | | sure. |
| 15 | Q | What, if anything, did you instruct should be done |
| 16 | | with that car? |
| 17 | A | I had Officer Witkins and Officer Kelley cordon |
| 18 | | that off with yellow crime scene tape.  They sat on |
| 19 | | the car until they were relieved by two other |
| 20 | | officers. |
| 21 | Q | When you say sat on, do you mean guarded the car? |
| 22 | A | Right. |
| 23 | Q | They didn't literally sit on it? |
| 24 | A | Right.  They guarded the car until it was towed |

1          away by the crime scene.

2     Q    Did you or anyone else to your knowledge enter the

3          car at any point that evening?

4     A    They had made a routine NCIC check of the plate,

5          VIN number.  I don't remember.

6     Q    Did anyone go in the car, open the door and look

7          inside?

8     A    I don't know.

9     Q    You did not?

10    A    No.

11    Q    To your knowledge, what happened to the car?

12    A    The car was towed to Boston Police Headquarters.

13    Q    Was a search warrant later executed in that car?

14    A    Yes.

15    Q    At some point that early morning did you return to

16         the bedroom area of apartment 545, that evening?

17         Did you return that morning after you left?

18    A    No.  Not that I remember.

19    Q    Did you meet with Detective McDonough at some point

20         that evening?

21    A    I met with him sometime that evening, but I don't

22         remember where I met him.  I think I met him right

23         at 34 Fidelis, right outside the front door of the

24         whole complex.

1    Q      Do you recall whether you went with him to that

2           room, the bedroom, at that time?

3    A      I don't remember.

4           MR. DEAKIN:  Nothing further.

5           THE COURT:  Defendant?  Why don't we get to the

6           point about whether or not something was taken from

7           that room without a warrant.

8           MR. SHEA:  I believe, Judge, I'll cover the

9           same area the Commonwealth covered.

10          THE COURT:  No, you won't because in my reading

11          of your affidavit this was the purpose of the motion

12          that was filed.  And I'm considering assessing costs

13          against you for doing this.

14          Move to the point of whether or not something

15          was taken from that room without a warrant because

16          that is the only basis upon which you can file a

17          motion to suppress on a warrantless search.

18          MR. SHEA:  Judge, before, I would think, you

19          would start to consider assessing costs against me,

20          you would hear from the witnesses for the defense.

21          THE COURT:  Excuse me, that's why I'm asking

22          you to move to the point.

23          MR. SHEA:  We know what he's going to respond

24          to that, don't we, Judge?

1      THE COURT:  We don't.  If you assume that's

2   what's going to happen, let this witness step down

3   and you present your witnesses that contradict him.

4      MR. SHEA:  No, I'll go at it.

5      THE COURT:  No, you won't.  Present witnesses

6   that will contradict him.

7      MR. SHEA:  I would like the opportunity to

8   cross examine.  It is my client's Constitutional

9   right, and I don't think it's outrageous for me to

10  say that I'm interesting in covering some of the

11  same ground that the district attorney covered.

12     THE COURT:  I want you to present evidence that

13  there was a search of that room without a warrant.

14  You have an affidavit attached from a Ruby Williams

15  that indicates that.

16     MR. SHEA:  I will do that as soon as I get at

17  the credibility of this officer, as well.  I assume,

18  since it's going to be a test of credibility in this

19  case, that I would be doing well in my craft to try

20  and get at this officer's credibility.

21     THE COURT:  So, question him about the removal

22  of items.

23                    <u>CROSS EXAMINATION</u>

24   Q    (by Mr. Shea)  You first encountered Mr. McCants

1           when he was standing in the kitchen?

2     A     In the eating area of the apartment.  It's one big

3           room, kitchen, dining room, living room.  That's

4           what it appeared to me.

5     Q     And you were with -- you named six officers, five

6           officers in addition to yourself?

7     A     Right.  Do you want me to name the officers again?

8     Q     If you would.

9     A     It was me, Sergeant Merner, Officer Kelley, Officer

10          Witkins, Officer McDonald, Officer Downey, Officer

11          Curtin, Officer McManus.  There was at least eight.

12    Q     And they were in that apartment with you?

13    A     Correct.

14    Q     So, initially in the kitchen there are eight

15          officers, Mr. McCants and the two elderly women;

16          correct?

17    A     In the large room.  It's one big room.  It's all

18          one room, the kitchen, the dining area, living room.

19          That's what it appeared to me.

20    Q     Are you describing it as a large room?

21    A     It's a number of rooms, but there are not no walls

22          dividing it.

23    Q     Is there, in fact, a table that seats about two or

24          three people?  A kitchen that you can't eat in?

1   A   Maybe if you gave me a picture I could refresh my

2       memory.

3   Q   So, then your testimony was that Mr. McCants

4       gestured for you to follow him back to his room?

5   A   Yes.

6   Q   This was a room in which you said in plain view,

7       once you were there, there was a substance you

8       believed to be cocaine on a mirror?

9   A   A white-powdery substance.

10  Q   You wrote in your report you believed it to look

11      like cocaine; right?

12  A   I'd have to see my report.

13  Q   So, there was a white powder on a mirror?

14  A   Yes, sir.

15  Q   There was a brandy snifter; correct?

16  A   Yes, one of those round glasses with a stem on it

17      with a brown liquid in it.

18  Q   You say that with these objects in plain view this

19      gentleman just told you come on back in my room,

20      eight police officers?

21  A   That's what he did.

22  Q   In your experience -- how long have you been a

23      police officer?

24  A   Since 1980.

1    Q      Is it unusual for someone to invite eight police

2           officers back into a room with an illegal narcotic

3           sitting out on a glass mirror?

4                  MR. DEAKIN:  Objection.

5                  THE COURT:  Sustained.  You've already told me

6           that it wasn't a narcotic.

7                  MR. SHEA:  But I think he's presenting that

8           idea.

9                  THE COURT:  He said it was a white powder

10          substance on a mirror.  If in fact it is not a

11          narcotic, why wouldn't he invite them in the room?

12   Q      You took pictures of the room; correct?

13   A      I didn't; no.

14   Q      Do you have those pictures with you today or do the

15          other officers?

16   A      The Detective Sergeant has those.

17   Q      And you've described this as a room that's 12 by

18          13?

19   A      I'm just guessing that's the size of it.

20   Q      And in that room there were -- all eight officers

21          went into that room with one of them standing in the

22          threshold; correct?

23                 MR. DEAKIN:  Objection, the number eight.

24                 THE COURT:  Sustained.

1    Q    How many of the officers went into the room?

2    A    I went in, Sergeant Merner, Officer Kelley, Officer

3         Downey, Officer McDonald and Officer Witkins

4         straddled the door.  So, five.

5    Q    Five went in and one straddled the door?

6    A    Right.

7    Q    Does that mean, since he was straddling the door,

8         that the door remained opened?

9    A    The door was open.

10   Q    Did it remain open?

11   A    Yes.  As far as I recall, it did.

12   Q    Now, you said that a green, short-sleeve shirt was

13        hanging.  Where was that hanging?

14   A    That was to the right of the door.

15   Q    That short-sleeve shirt had been described as being

16        worn by the alleged perpetrator?

17   A    Yes.

18   Q    The short-sleeve shirt, is that the one described

19        by ████   ███████?

20   A    Yes.

21   Q    Now, you said you saw a sharp object, a chisel;

22        correct?

23   A    Yes.

24   Q    That was not what was described by ████   ███████;

1          was it?

2    A     I'd have to see my report.  All she told me, that I

3          recall, it was a dark, sharp object.

4    Q     Did you receive any further description of the

5          object?

6    A     I don't remember if I did or not.

7    Q     Do you recall writing in your report that she said

8          that a knife had been held to her throat?

9    A     I'd have to read my report to refresh my memory.

10   Q     Just read this to yourself.  Does that refresh your

11         recollection?

12   A     Yes; it does.

13   Q     In the report it said she had told you it was a

14         knife; correct?

15   A     Right.

16   Q     You say you told Mr. McCants the crowd outside was

17         interested in killing him?

18   A     The crowd outside had made threats that they were

19         going to hurt or kill him.

20   Q     They want to kill you, I think, was your testimony;

21         right?

22   A     Right.  Well, that's what I said to him; yes.

23   Q     Then you said we're leaving; right?

24   A     That's what I said; right.

1    Q    Wasn't that sequence intended to get Mr. McCants to

2         go with you?

3    A    He didn't have to go with us if he didn't want to.

4         I told him that.

5    Q    I mean, Officer, you basically conveyed to him the

6         picture of being torn limb by limb by an angry crowd

7         or he could leave with you; correct?

8    A    Right, but they had also threatened another man, a

9         good samaritan, earlier that they were going to kill

10        him until we straightened that out.

11   Q    Did you offer to take the good samaritan down to

12        the station?

13   A    No, because we straightened it out right there and

14        they left him alone.

15   Q    Mr. McCants, did you straighten that out with

16        people?

17   A    There was no talking to them.

18   Q    So, Mr. McCants then left with you, is your

19        testimony; correct?

20   A    He went down to the station on his own accord with

21        the police officers.

22   Q    Not his own accord, he was with two police

23        officers; correct?

24   A    There was actually more than two.  They were all

31

```
 1            leaving the building and I offered to get him a ride
 2            to the station for his own safety.
 3     Q      He was surrounded by how many officers as he left
 4            the building?
 5     A      I don't remember how many.  But I know there's news
 6            footage and other footage that was taken.
 7     Q      How many officers went in the car with him?
 8     A      Probably, just two.
 9     Q      When he went down to the police station he wasn't
10            told to wait out in the lobby; correct?
11     A      I don't know where he waited.  I don't know where
12            they had him wait.  He would still be in danger if
13            he waited in the lobby if the people came down to
14            the lobby.  It's less than a mile from Fidelis Way.
15     Q      Did you anticipate the angry mob coming down to the
16            lobby to get Mr. McCants, the lobby of the police
17            station?
18     A      Well, over the years being on the police department
19            anything is possible.
20     Q      Mr. McCants was placed in a cell; wasn't he?
21     A      No; he wasn't placed in a cell.
22     Q      When you next went to see him was he in a cell?
23     A      Yes.
24     Q      When did you next see him?
```

1   A   When I had called the station and told them to

2       place him under arrest.

3   Q   So, you don't know where he was placed when he was

4       brought to the police station?

5   A   I don't have the exact time, but he was brought to

6       the police station on his own accord for his own

7       protection.

8       Further investigation told me I was going to

9       place him under arrest.

10  Q   At the time that Mr. McCants was leaving Fidelis

11      Way, did you offer to bring Mr. McCants to another

12      address?

13      THE COURT:  What does this have to do with a

14      motion to suppress on a warrantless seizure of

15      evidence?

16      MR. SHEA:  Well, it has to do with the idea

17      that Mr. McCants consented and that he wasn't under

18      arrest at the time that the search took place.

19      THE COURT:  Assume for the sake of argument

20      that he's under arrest.

21      MR. SHEA:  If you assume he's under arrest when

22      they take him out of there, then I don't have any

23      further to go on that particular point.

24      THE COURT:  If you assume that you don't have

1    any -- present any evidence of taking.

2     MR. SHEA:  That comes later.

3     THE COURT:  When are we going to get to that

4    point?  That's what I'm concerned with, at least

5    from your motion as you wrote it.

6     MR. SHEA:  I'm concerned with it.

7  Q  Who put the yellow police tape up on the door?

8  A  I did.

9  Q  Were you the last officer out of the room?

10  A  Yes.

11  Q  It's your testimony today that no items were taken

12    from that room?

13  A  None, while I was there.

14  Q  The five officers who were in the room, including

15    yourself, did look around the room while you were in

16    the room; correct?

17  A  Yes.

18  Q  And you brought in that number of officers so you

19    could look around the room; correct?

20  A  No.

21  Q  In fact, you had that many officers with you to

22    coerce Mr. McCants into going along with what you

23    wished?

24  A  No.

```
 1      Q    You had eight officers enter at this time ----
 2                MR. DEAKIN:  Objection, the number eight.
 3                THE COURT:  Sustained.
 4      Q    Didn't you in fact guide Mr. McCants back to his
 5           room?
 6      A    No.
 7      Q    Didn't you in fact have Mr. McCants go back in that
 8           room with all those officers?
 9      A    No.
10      Q    Did you have five officers in the room with Mr.
11           McCants because that's where you thought the mob was
12           coming to?
13      A    No.
14      Q    So, you didn't have the five officers in the room
15           to search, that's your response; correct?
16      A    Correct.
17      Q    And you didn't have the five officers in the room
18           to protect Mr. McCants from the mob; correct?
19      A    Correct.
20      Q    What was your purpose in bringing five officers
21           into that room, sir?
22      A    My own safety.
23      Q    You were armed; correct?
24      A    Correct.
```

```
1    Q    Each of those officers was armed; correct?

2    A    Correct.

3    Q    You were the first person to interview █████

4         █████ ; correct?

5    A    Yes.

6    Q    You notified Sergeant Detective McDonough to

7         respond?  You stopped your interview and contacted

8         Detective John McDonough; correct?

9    A    Correct.

10   Q    He then was in the presence of the child and her

11        mother; correct?

12   A    Correct.

13   Q    Was there any time that you know of that the child

14        was not in the presence of a Boston Police Officer?

15   A    I can't be sure on that.  I don't know.

16   Q    To the best of your knowledge?

17   A    That there wasn't a police officer with her?

18   Q    Yes.

19   A    From the time she came back, what I recall, we put

20        her right into the marked cruiser, brought her over

21        to St. Gabriel's where the EMT's checked her out.

22             There was police with her.  There was a female

23        police officer with her in the ambulance while she

24        was being interviewed, you know, for health reasons.
```

1        At which time we found out there had been a
2    sexual assault.  They notified me.  I notified the
3    Sexual Assault Unit, Sergeant McDonough responded.
4        I would say, to the best of my knowledge, that
5    there was a Boston Police Officer with her from the
6    time she came back up until she was at the Hospital.
7  Q    What time ----       .
8  A    I don't have the specifics.  Just in that time
9    frame, say 1:30 to whatever time she got out of the
10    hospital.
11  Q    And was a police officer assigned to be with her at
12    the hospital?
13        MR. DEAKIN:  Objection.
14        THE COURT:  Sustained.
15        MR. SHEA:  Nothing further.
16        THE COURT:  Anything else?
17        MR. DEAKIN:  No, Your Honor.
18        THE COURT:  You may step down.
19        MR. DEAKIN:  Your Honor, if I may, I intended
20    to call, to corroborate that nothing was taken at
21    that time, Officer ----
22        THE COURT:  You have the burden of proof if a
23    search occurred.  So far I haven't heard that a
24    search occurred.

1          MR. DEAKIN:  I agree.

2          THE COURT:  I assume from his affidavit that he

3     filed that there will be some evidence.

4          MR. DEAKIN:  I just wanted to direct the

5     Court's attention to an issue that hasn't come up

6     yet that I think the Court will confront later on

7     another defendant's motion.

8          The defendant is moving to suppress ████

9     ████████, the victim, identification of the

10    defendant on television.

11         His argument is, summarizing his argument,

12    there was an unlawful arrest at apartment 545.  That

13    as a result of that unlawful arrest, video footage

14    was taken of the defendant coming out of the

15    apartment building.

16         THE COURT:  Where is that motion?

17         MR. DEAKIN:  That's before you, Your Honor.

18         MR. DEAKIN:  Come to think of it, Your Honor,

19    there's no motion to that effect before the Court.

20    There is a memorandum of law to that effect.

21         If the motion is not before me why am I hearing

22    it?

23         MR. DEAKIN:  I think defense counsel may be

24    able to enlighten you.

1          MR. SHEA:  I think it's included as fruit of

2     the poisonous tree.  I would look to argue it at

3     another time.

4          MR. DEAKIN:  If we're arguing it at another

5     time then I don't need to call the officer.  I

6     apologize to the Court.  He's included as a fruit of

7     the poisonous tree in his motion to suppress the

8     evidence seized, the warrantless search.

9          In other words, it's very convoluted; I don't

10    understand myself.  But he has argued that her

11    identification is fruit from the poisonous tree.  If

12    he wants to defer that motion to another date, I

13    will certainly not need to call the officer.

14         MR. SHEA:  Judge, I have my two witnesses.

15    There are also a number of photographs that were

16    just produced today of Mr. McCants' room.  I'd like

17    the lunch break to go through them.

18         THE COURT:  See you all at 2:00

19              (recess)

20         MR. DEAKIN:  Your Honor, the Commonwealth would

21    call Officer Paul Downey.

22              PAUL DOWNEY, SO SWORN

23              DIRECT EXAMINATION

24    Q    (by Mr. Deakin)  Officer, could you state your name

1              and spell your last name for the Court.

2    A     Sure.  Office Paul J. Downey, D-o-w-n-e-y.

3    Q     How are you employed?

4    A     I'm employed as a police officer for the City of

5              Boston.

6    Q     Were you on duty at approximately midnight between

7              Thursday, July 13th and Friday, July 14, 2000?

8    A     Yes; I was.

9    Q     Were you dispatched to the scene of an alleged

10             crime at 34 Fidelis Way in Brighton?

11   A      That is correct.

12   Q     At some point during your activities there were you

13             asked by Sergeant Byrne to come to apartment 545, an

14             apartment occupied by Christine Isaac?

15   A     Yes.

16   Q     When that happened can you describe, well, first of

17             all.  Was it Sergeant Byrne who asked you to come

18             there?

19   A     Yes; it was.  He was the kilo-908 that evening.

20   Q     Did you go with him there?

21   A     Yes; I did.

22   Q     Describe what happened?  Did anyone go with you,

23             any civilian besides yourself and the  other

24             officers?

1    A    No; it was myself, Officer Dan McDonald and

2         Sergeant Byrne.

3    Q    And what did he ask you to do there?

4    A    At that time he had asked me to secure what he was

5         considering a preliminary crime scene at the time.

6    Q    What kind of crime scene was that?

7    A    This was a crime scene which was within an

8         apartment, this particular apartment 545.  It

9         involved the front doorway leading into a bedroom.

10   Q    Did someone secure that room in some way at that

11        time?

12   A    Yes.  We put yellow police caution tape, do-not-

13        cross tape across the doorway.

14   Q    Did you know where the occupant of that bedroom was

15        at the time you were securing it?

16   A    Yes; it was my understanding he was taken -- he was

17        down at the police station.  He had left the

18        premises.

19   Q    Who actually taped off the room?

20   A    Officer Dan McDonald and myself.

21   Q    After the room was taped did Sergeant Byrne give

22        you any instructions about what to do regarding the

23        room?

24   A    He instructed by myself and Officer McDonald to

41

1        standby there and to await relief, that there would

2        be other officers coming to relieve us.

3    Q   Did you give you any instructions about whether

4        anyone should come in or out of the room?

5    A   I'm sorry, he did say that no one should enter the

6        room whatsoever.

7    Q   And did you and your partner stay there after you

8        taped up the room?

9    A   Yes.

10   Q   Did Sergeant Byrne leave at some point?

11   A   He did.

12   Q   Were there other people in the apartment where you

13       were guarding the room the entry to the room?

14   A   Yes; there were other people in the living room

15       area.

16   Q   Who were those people, if you know?

17   A   The occupant of the apartment who lived there, an

18       elderly woman.   I believe her last name was Isaac.

19       And there was another woman, I believe.   Her name

20       was Miss Williams, who was visiting with Miss Isaac.

21   Q   That's Ruby Williams?

22   A    That is correct.

23   Q   Was there anybody else who came in during the time

24       that you were guarding that room?

```
1    A    Yes.  There was the woman who lived next door, Miss
2         Taylor.  She had come in once or twice to check on
3         Miss Isaac.  I guess she was her caretaker.
4    Q    That's Polly Taylor?
5    A    That is correct.
6    Q    How long did you stand guard in that area, that
7         room?
8    A    It was about one hour before our relief came.
9    Q    During that one hour period did anyone, by anybody
10        I mean civilians, police, anybody, go in to or out
11        of that room?
12   A    No.
13   Q    Including you and your partner who were guarding
14        it?
15   A    No; that's correct.  Nobody did.
16   Q    So, I'm assuming that no one took anything out of
17        that room during the time that you were guarding it;
18        is that right?
19   A    No; nothing was taken from the room.
20   Q    Do you recall who it was who relieved you?
21   A    Yes; it was Officer Curtin, Christopher Curtin, and
22        his partner McManus.  I'm not sure of Officer
23        McManus' first name.
24   Q    Just to be clear, during the time that you were
```

1    there no one came into or out of that room?

2  A    That is correct.

3       MR. DEAKIN:  Nothing further.

4       THE COURT:   Defendant.

5                  CROSS EXAMINATION

6  Q    (by Mr. Shea)  When you arrived Owen McCants was

7       already gone; is that correct?

8  A    When I went upstairs with the Sergeant?

9  Q    Yes.

10  A    When I went upstairs with the Sergeant, again, we

11       brought the yellow tape.  Officer McDonald had that.

12       And the Sergeant instructed us to tape the doorway

13       area.  He was not in the apartment when we went up

14       there.

15  Q    To the best of your knowledge, he had already been

16       taken down to the police station?

17  A    That is correct.  He left the area.  He was out of

18       the apartment.  He was not in the apartment when we

19       went back up to tape it

20       MR. SHEA:  Nothing further.

21       THE COURT:  You may step down.

22       MR. DEAKIN:  The Commonwealth calls Chris

23       Curtin.

24                  CHRISTOPHER CURTIN, SO SWORN

1                              <u>DIRECT EXAMINATION</u>

2     Q     (by Mr. Deakin)   Officer, would you identify

3           yourself, please, and spell your name for the court

4           reporter.

5     A     I'm Officer Christopher Curtin, C-u-r-t-i-n.

6     Q     How are you employed?

7     A     Boston Police out of District 14.

8     Q     That's Allston/Brighton?

9     A     Yes; it is.

10    Q     Were you on duty on the early-morning hours of

11          Friday, July 14, 2000?

12    A     Yes; we start the shift on the 13th at quarter to

13          twelve.

14    Q     Fifteen minutes before midnight?

15    A     Yes.

16    Q     Were you called at some point to the area of 34

17          Fidelis Way in Brighton?

18    A     Yes.

19    Q     At some point were you instructed to go to

20          apartment 545 in that building?

21    A     Yes; I was.

22    Q     Who instructed you to do that?

23    A     Sergeant Byrne.

24    Q     What instructions did he give you about what you

1            should do there?

2    A      Originally?  The first time we went to the

3           apartment?

4    Q      I'm actually interested in specifically when you

5           may have relieved somebody standing guard.

6    A      Yes; I was relieving Officer Downey at around 4:00

7           a.m. just to secure the apartment.

8    Q      About 4:00?

9    A      Yes.

10   Q      When you got there to the apartment what did you

11          see?

12   A      Just the woman who lives at the apartment and the

13          two officers.

14   Q      Do you recall her name?

15   A      No; I don't at this time.

16   Q      Where were the two officers?

17   A      Just sitting around, standing around the kitchen

18          table.

19   Q      Did you notice anything about one of the bedrooms?

20          Did you notice crime scene tape?

21   A      Yes; there was crime scene tape at the bedroom

22          door.

23   Q      Was anyone with you?

24   A      Yes, Officer McManus.

```
 1    Q    What's his first name?

 2    A    Michael.

 3    Q    Did you relieve Office Downey and the other officer

 4         who was with him?

 5    A    Yes, Officer McDonald.

 6    Q    How long did you stand guard over that room?

 7    A    Approximately, three hours.

 8    Q    So, that would bring you to about 7:00 a.m.?

 9    A    7:00 a.m.

10    Q    Did anyone else other than the woman in the

11         apartment who lived there, did anyone come or go

12         while you were in there?

13    A    Yes, one woman who lives diagonally across the hall

14         came in to make sure the woman who resided there had

15         her medicine.

16    Q    How long did she stay there?

17    A    She was there about five minutes.

18    Q    Were there any other women besides those two?

19    A    No; no one else.

20    Q    Did you have instructions from Sergeant Byrne or

21         anyone else about who should be allowed into or out

22         of the room that was taped off?

23    A    Yes, no one in or out of that room.

24    Q    From the time you relieved Officer Downey, you and
```

1         your partner relieved Officer Downey and his

2         partner, until the time you left at approximately

3         7:00 a.m. did anyone enter or exit that room?

4    A    No.

5    Q    So, I'm assuming you didn't see anyone take

6         anything out of that room?

7    A    No.

8              MR. DEAKIN:  No further questions.

9              MR. SHEA:  Nothing, Your Honor.

10             THE COURT:  You may step down.

11             MR. DEAKIN:  The Commonwealth would call

12   Sergeant Detective John McDonough.

13                  JOHN MCDONOUGH, SO SWORN

14                  DIRECT EXAMINATION

15   Q    (by Mr. Deakin)  Can you identify yourself, please,

16        and spell your last name for the court reporter?

17   A    Yes.  I'm Sergeant Detective John McDonough.  My

18        last name is spelled M-c-D-o-n-o-u-g-h.  I'm a

19        Boston Police Officer with the Sexual Assault Unit.

20   Q    Were you on duty or on call in the early morning

21        hours of Friday, July 14, 2000?

22   A    Yes; I was.

23   Q    Were you called to the area of 34 Fidelis Way on

24        report of a crime?

1    A    Yes; I was.

2    Q    At approximately what time did you respond there?

3    A    About 2:00 a.m., sir.

4    Q    At some point did you speak with Sergeant Harry

5         Byrne?

6    A    Yes; I did, sir.

7    Q    Is that the same Harry Byrne that testified earlier

8         this morning in this matter?

9    A    Yes; it is.

10   Q    Just yes or not, did Sergeant Byrne brief you on

11        the information that he had at that time?

12   A    Yes.

13   Q    At some point after you arrived did Sergeant Byrne

14        direct you to a bedroom in apartment 545, an

15        apartment occupied by Christine Isaac?

16   A    Yes.

17   Q    Describe the bedroom that he directed you to, what

18        you saw?

19   A    He directed us to a room which was off of the

20        kitchen.  It was a bedroom, an occupied bedroom.

21   Q    Could you see into the bedroom when he directed you

22        there?

23   A    No; I could not.

24   Q    Why is that?

1    A    The bedroom door was closed.  This is on the night

2         of the incident, sir?

3    Q    Prior.

4    A    Prior.  It was a room, the door was closed, covered

5         by yellow police tape.  In other words, not covered,

6         but crossed with police tape.

7    Q    Were there officers there standing guard at that

8         time?

9    A    There were a number of officers in the apartment

10        and in the hall; yes.

11   Q    Did you enter, that night, at that time, did you

12        enter that bedroom or the room behind the door at

13        all?

14   A    No; I did not.

15   Q    When you left that area was the crime scene tape

16        still in place?

17   A    Yes; it was.

18   Q    Did you subsequently seek and obtain a warrant to

19        search that bedroom?

20   A    Yes.

21   Q    I'm going to show you something that's been marked

22        Exhibit A, a photocopy of something marked Exhibit

23        A.  I'm going to ask you just to look through it and

24        tell me if you can identify it?

1   A   Yes; I can, sir.  It's a search warrant affidavit

2       of mine.

3   Q   This is a photocopy of your affidavit in support of

4       the search warrant?

5   A   Yes.

6   Q   Do you recall -- a warrant was issued as a result

7       of your affidavit?

8   A   Yes; it was.

9   Q   Did you execute that warrant?

10  A   Yes; I did.

11  Q   When was that?

12  A   That was on the same day in the evening about 9:00

13      p.m.  That would be Friday evening.

14  Q   When you got there to execute the warrant what was

15      the condition of the door that you had seen with the

16      crime scene tape earlier that morning?

17  A   The door was secured with the tape in front of it

18      as I had last seen it earlier in the morning that

19      day.

20  Q   Did you detect any difference in the condition of

21      the crime scene tape when you had seen it much

22      earlier that morning?

23  A   No.

24  Q   To your knowledge, from the time that you saw the

```
1              door -- well, first of all let me ask you, were

2              there still officers guarding the door when you came

3              back after getting the search warrant?

4         A    There was an officer; yes.

5         Q    To your knowledge, between the time you saw the

6              door first and when you came back to serve the

7              warrant, had anybody gone into or out of that room?

8         A    Not to my knowledge.

9         Q    Can you describe -- well, did you remove items at

10             that time pursuant to the search warrant?

11        A    Yes; we did.

12        Q    Can you list for the Court the items that you

13             seized?

14        A    Yes, if I could read from the search warrant list?

15                  THE COURT:   Yes.

16        A    Myself and the search party removed two vials of

17             brown-colored liquid; a small mirror with a white

18             substance believed to be cocaine; a nylon stocking

19             shaped like a cap; a piece of paper with the letters

20             ███████   spelled on it and a phone number; a green,

21             short-sleeve shirt; a green, long-sleeve shirt; one

22             wrapped Durex condom found in the pocket of the

23             long-sleeve, green shirt; a hammer holder wrapped in

24             gray duct tape; a quart size, half-filled bottle of
```

1    Brugel Rum; a small plastic bag of a green leafy

2    substance believed to be marijuana; a package of E-Z

3    Wider rolling papers; a green hat; two pieces of

4    mail addressed to Owen McCants to 34 Fidelis Way; a

5    piece of mail from the Capitol One Company with

6    handwriting on it; a roll of gray duct tape.

7  Q    If I may, did you complete a return of the officers

8    serving the search warrant?

9  A    Yes; I did.

10  Q    And do you have the original of that return?

11  A    Yes, sir.

12  Q    Is this the return that you made?

13  A    Yes, sir.

14        MR. DEAKIN;  I move to introduce this as

15    Exhibit 1.

16        MR. SHEA:  No objection.

17            (Exhibit 1-MTS, So Marked)

18  Q    Detective, what did you do with all the items that

19    you took out of the apartment pursuant to the search

20    warrant?

21  A    It was logged in with the Boston Police Crime Lab.

22  Q    Aside from the items -- well, did you take anything

23    out of that apartment that's not listed here on the

24    return?

1    A    No; I did not.

2    Q    Are you aware of any evidence logged in in this

3         case other than items seized in a search warrant of

4         an automobile?  Putting those aside for a moment,

5         are you aware of any items logged in in this case

6         that were taken from the defendant's bedroom, the

7         bedroom you searched, that are not listed on this

8         return?

9    A    No.

10        MR. DEAKIN:  I have no further questions.

11                    CROSS EXAMINATION

12   Q    (by Mr. Shea)  Who accompanied you on the search of

13        the room?

14   A    Lieutenant Detective Gary French; Sergeant

15        Detective Lorraine Henshaw; Detective John J. Joyce;

16        Police Officer Butler from District 14 and Police

17        Officer Flemmi from the Identification Unit.

18   Q    When you say Identification, what is that?

19   A    Our ID Unit.  He came to take pictures.

20   Q    Who directed Officer Flemmi to work?

21   A    Myself and Lieutenant French.

22   Q    I take it you wanted him to take photos of the

23        evidence at the scene?

24   A    Yes, sir.

54

1   Q   And it's logical to believe that you would have him

2       take photos of the most relevant pieces of evidence?

3   A   Yes, sir.

4   Q   Did you direct him to take photos of the particular

5       evidence you wanted photographed?

6   A   Yes.

7   Q   And one of the items you would like to have seen

8       photographed was the green hat; correct?

9   A   Yes.

10  Q   Do you know if a photo was taken of the green hat?

11  A   I do not, sir.

12  Q   You brought some photos with you today; correct?

13  A   Yes.

14  Q   And you gave them to Mr. Deakin?

15  A   Yes.

16  Q   And you were kind enough to share them with me, as

17      well; right?

18  A   Yes.

19  Q   To the best of your knowledge, is that the entirety

20      of all the photos that were taken at the scene that

21      day?

22  A   Yes.

23  Q   Now, in your return you list that two different

24      green shirts were taken from the scene?

55

1    A    Yes.

2    Q    And one of those is described as a short-sleeve

3         shirt, green shirt?

4    A    Yes.

5    Q    And the other is described as a long-sleeve, green

6         shirt?

7    A    Yes.

8    Q    Could you first describe the short-sleeve, green

9         shirt?

10            MR. DEAKIN:  I object to this line of

11        questioning.  I'm not sure what it has to do with a

12        warrantless search.

13            MR. SHEA:  I will make it very clear if you

14        give me a little room.

15            THE COURT:  Go ahead.

16   Q    Could you describe the short-sleeve shirt?

17   A    Yes; I believe it was a green work shirt.

18   Q    And the shade of the shirt?

19   A    Dark green.

20   Q    And the shade of the long-sleeve shirt?

21   A    Dark green.

22   Q    Were they identical in shade?

23   A    I don't believe so.  I'm not sure.

24   Q    But they had different shades?

| | | |
|---|---|---|
| 1 | A | They may have. |
| 2 | Q | To the best of your memory as you testify here |
| 3 | | today, did they have a different shade of color? |
| 4 | A | Sir, I don't know. |
| 5 | Q | Did you fill out the face of the search warrant for |
| 6 | | which you applied? |
| 7 | A | Yes; I did. |
| 8 | Q | Did you type in what property you would be seeking |
| 9 | | to retrieve in the search? |
| 10 | A | Yes. |
| 11 | Q | Could you read into the record exactly what |
| 12 | | property you were seeking to seize? |
| 13 | A | "A green shirt with a condom in the breast pocket; |
| 14 | | a nylon stocking; a green wool cap; a piece of paper |
| 15 | | with the first four letters of the victim's name; a |
| 16 | | brandy"...it says sniffer, it should be snifter, |
| 17 | | "containing a dark-color liquor." |
| 18 | | "A roll of gray duct tape; a black-handled |
| 19 | | knife and a white powder substance believed to be |
| 20 | | cocaine, a controlled substance." |
| 21 | Q | Now, correct me if I'm wrong, Officer, but I |
| 22 | | believe you listed nine items that you would be |
| 23 | | seeking to seize? |
| 24 | A | I'm not sure of the number, sir.  But what I wrote |

1       is what we intended to retrieve.

2            MR. DEAKIN:  I object to this line of

3       questioning.  Defense counsel has not made it clear,

4       in my view, how this has anything to do with the

5       question of a warrantless search.

6            THE COURT:  Sustained.

7            MR. SHEA:  What I would like to make clear is

8       that it appears there are nine items listed that

9       they're seeking to take.  The return, which has

10      already been put into evidence by the Commonwealth,

11      includes fifteen.  That would mean that they seized

12      six items above and beyond what they had listed in

13      the search warrant.

14           If they are not listed in the search warrant,

15      they are seized without the warrant.

16           MR. DEAKIN:  Your Honor, I think it's very

17      clear under the law that that's an argument that

18      goes to the question of whether the warrant and

19      search went beyond the scope of the warrant that was

20      authorized.

21           It has nothing to do with a warrantless search.

22      A beyond a scope question is not a warrantless

23      search question.  It's a question first of the

24      warrant validity and then, if they had filed a

58

1          warrant and the Commonwealth submits they clearly

2          did, is what they seized outside of the specific

3          scope of the warrant.  That's all a question on the

4          four corners of the affidavit.  It has nothing to do

5          with this hearing.

6                    THE COURT:  Sustained.

7     Q    I'm going to show you the photos you brought with

8          you today.  Sifting through those photos could you

9          pull out and show us when you reach the green hat?

10    A    I went through the photos.  I don't think there's a

11         picture of the green hat.

12    Q    So, there's no picture of the green hat in those

13         photos?

14    A    If you want me to go through every one, I will,

15         sir.  But I don't believe there is.  I've looked

16         through the pictures a number of times.

17    Q    If you're comfortable testifying under oath,

18         without going through them any further, that there

19         is no green hat in those photos?

20    A    I'll go through them, sir.

21                   MR. DEAKIN:  I'm going to object again.  It's

22         not clear to me, making the assumption that there is

23         no photo of the green hat, what that has to do with

24         the question of whether there was a warrantless

1        search and seizure.

2             MR. SHEA:  Can we go to side-bar and I'll make

3        it very clear.

4             THE COURT:  Overruled.  He can go through the

5        photos.

6    A   There's a picture here of the green hat, along with

7        the chisel and the hammer.

8    Q   This is the green hat?

9    A   It looks like a green hat, sir.  I think it's a

10       green hat.

11   Q   Is it a partial photograph?

12   A   It's a partial photograph; yes, sir.

13            MR. SHEA:  Could this be marked as defense

14       exhibit one.

15            MR. DEAKIN:  No objection.

16            THE COURT:  Exhibit two.

17                 (Exhibit 2-MTS, So Marked)

18   Q   From the same photos could you please pick out the

19       nylon stocking that's shaped like a cap?

20   A   There is not one.

21   Q   I'm showing you a picture of a green shirt?

22   A   Yes, sir.

23   Q   A picture of a green shirt?

24   A   I believe it's two green shirts.

60

```
 1                    MR. SHEA:  Could this be marked?

 2                    MR. DEAKIN:  No objection.

 3                        (Exhibit 3-MTS, So Marked)

 4        Q    So, it's your testimony that that photograph is of

 5             two green shirts?

 6        A    Yes, sir.

 7        Q    And the two green shirts, one·is the long-sleeve

 8             shirt and the other is the short-sleeve shirt?

 9        A    Yes, sir.

10        Q    Now, in the face of the search warrant it said you

11             were looking to seize a black-handled knife;

12             correct?

13        A    Yes,  sir.

14        Q    And no black-handled knife was seized?

15        A    No.

16        Q    You testified at the Grand Jury that you had been

17             told by         that a black-handled knife was the

18             type of knife held against her throat; correct?

19        A    Yes.

20        Q    Did you seize from the scene anything else that you

21             felt might have caused the cut on -- that might have

22             been held against         throat?

23        A    Well, a lot of things could have been held against

24             her throat, sir.  As far as a knife, we did not.
```

```
 1                     Is that what you're asking me, sir?

 2     Q    No.  I'm asking you if you seized any other object,

 3          sharp object, that you felt might have been held

 4          against her throat that she may have mistaken for a

 5          knife?

 6     A    No.

 7     Q    You were not present when Mr. McCants was

 8          originally approached; right?

 9     A    No.

10     Q    You were called by Detective Byrne?

11     A    No, our Operations Division.

12     Q    At any point did you receive a call from Detective

13          Byrne?

14     A    No.  In the course of the night, sir, or before I

15          responded?  I'm not quite sure of the question.

16     Q    During the course of the night?

17     A    We conversed a number of times.

18     Q    Did he ask you to come and interview ████ ██████?

19     A    No.

20     Q    Did you at some point go to ----

21               MR. DEAKIN:  Objection as to what relevance

22          this has to a warrantless search.

23               THE COURT:  Sustained.

24     Q    Asking about the room, when you open the door to
```

1       the room where does the door back up into when it's

2       open?

3    A   I believe the door went to the right, against the

4       wall I believe; I'm not sure.

5    Q   Doesn't it in fact, let me show ----

6           MR. DEAKIN:  Objection, relevance.

7           THE COURT:  Sustained..

8           MR. SHEA:  It's relevance is what could be

9       observed in the room, not during their final search,

10      but during the initial search.  It's a claim of

11      plain view by the five officers.

12          THE COURT:  All right, go ahead.

13   Q   Showing you that picture, is that a fair and

14      accurate representation of the door of Owen McCants'

15      room as best you remember?

16   A   Well, as far as this picture is concerned, sir,

17      this door opens to the right.  I'm not quite sure if

18      this is even to his room because I can't tell from

19      that.  It was showing the ground here.

20          But this door opens to the right.  I think

21      there is a picture that shows the police tape would

22      be on the door handle, that it does open to the

23      right.

24          MR. DEAKIN:  Your Honor, I'd object and move to

1      strike.  Even if it goes to plain view, the issue is

2      was there a search that was without a warrant.

3           The Commonwealth is suggesting that they were

4      invited into the defendant's room.  There has been

5      no evidence to the contrary on that.

6           Then defense counsel, all their affidavit

7      suggests is that at some time after they left the

8      room and before they came back with a search warrant

9      that officers went in and searched without a

10     warrant.

11          So, what could and could not be in plain view

12     is an issue for trial, I suggest, but not for this

13     motion.

14         THE COURT:  Go ahead.

15  Q  This is a picture of the police tape on a door that

16     opens to the left; correct?

17  A  Correct.

18  Q  Isn't that, in fact, Christine Isaac's room?

19  A  I believe it is.

20  Q  Was Christine Isaac's room sealed off?

21  A  No.

22  Q  When the door for Owen McCants' room opens doesn't

23     it, in fact, block the rack and the closet from view

24     when it's open?

```
 1    A    I'm not sure.  Once again, the rack to the closet,
 2         I'm not sure what you mean, sir.
 3    Q    The rack from which you took the picture of the
 4         shirt and took the shirts into custody?
 5    A    I don't know if it blocked it, sir.
 6    Q    Well, when you were taking the evidence into
 7         custody did you close the door so you could get at
 8         it?
 9    A    The door was moved.  Once we were in we had a
10         warrant to the room.  So, as far as manipulating the
11         door to help us in our search, I'm sure it was moved
12         at different times, sir.
13    Q    Was it moved so you could gain access to the closet
14         and the rack?
15    A    I would assume so, sir.
16    Q    Showing you the photo with the scrap of paper with
17         the four letters,          , and a phone number.
18              That doesn't look like a partial name; does it?
19              MR. DEAKIN:  Objection.
20              THE COURT:  Sustained.
21    Q    There's a phone number on that piece of paper, the
22         photo of the piece of paper; correct?
23    A    There are seven numbers; yes, sir.
24    Q    Did you at any point call that phone number?
```

1          MR. DEAKIN:  Objection, relevance.

2          THE COURT:  Sustained.

3          MR. SHEA:  The relevance is they're using it as

4    reason for the search, the initial officers, as

5    reason for the search.

6          If it's found to be a warrantless search, just

7    go with me for a second, I'd like to be able to

8    argue that I showed that it was a warrantless search

9    without probable cause.  That's what I'm trying to

10   get at with this.

11         THE COURT:  Sustained.

12         MR. SHEA:  May I just move this into evidence.

13         MR. DEAKIN:  Objection as to relevance.  It's

14   not its authenticity.  I'll withdraw the objection.

15         (Exhibit 4-MTS, So Marked)

16   Q    Just to go back, the nylon stocking shaped like a

17        cap would be an important piece of evidence in this

18        case; wouldn't it?

19   A    Yes, sir.

20   Q    And it's part of the description of what the

21        perpetrator was wearing; correct?

22   A    Yes.

23   Q    And you brought the photographer with you

24        specifically to photograph important pieces of

```
1              evidence; correct?

2        A     Yes.

3                    MR. SHEA:  Nothing further.

4                    MR. DEAKIN:  The Commonwealth rests on this

5              motion.

6                    THE COURT:  Okay, you may step down.

7                    MR. SHEA:  The defendant would call Polly

8              Taylor.

9                          POLLY TAYLOR, SO SWORN

10                         DIRECT EXAMINATION

11       Q     (by Mr. Shea)  Good afternoon.  Miss Taylor?

12       A     Hello.

13       Q     Over here.  I'll be asking you questions first and

14             then Mr. Deakin will ask you some questions; okay?

15                   Please state your name, spelling your last name

16             for the record?  Can you hear me all right?

17       A     I hear you, but I can't quite understand.

18       Q     Okay, you need to say your name.

19       A     My name?

20       Q     Yes, please.

21       A     P-o-l-l-y;  T-a-y-l-o-r.

22       Q     And where do you live?

23       A     I live at 34 Fidelis Way in Brighton.

24       Q     How long have you lived there?
```

```
 1    A    I've lived there, maybe, 15 to 20 years.  I've

 2         lived there a long time.

 3    Q    Do you know Owen McCants?

 4    A    Yes.

 5    Q    How do you know Owen McCants?

 6    A    I've known him every since he was 16.  He came to

 7         live with me.

 8    Q    And do you know ▇▇▇▇▇▇▇▇▇▇?

 9    A    Yes.

10    Q    How do you know ▇▇▇▇▇▇▇▇▇▇?

11    A    I knew her through her father.

12    Q    Bringing you back to July, last July.

13    A    Last July?

14    Q    Yes.  Was ▇▇▇▇▇ staying with you last July?

15    A    I didn't quite understand.

16    Q    Was ▇▇▇▇▇▇▇▇▇ staying with you last July?

17    A    Oh, ▇▇▇▇▇ stayed with me last July?

18    Q    Yes.

19    A    Yes; I think so, off and on.

20    Q    Bringing you back to last July, do you remember

21         when there was a search for ▇▇▇▇, when all the

22         police came to try to find ▇▇▇▇?

23    A    I didn't quite understand.

24    Q    Do you remember the night when all the police came
```

```
 1              looking for ████?
 2      A       Uh-huh.
 3      Q       Do you remember that?
 4      A       Yes.
 5      Q       Who is your neighbor at your apartment?
 6      A       At my apartment?
 7      Q       Yes, who was your neighbor?
 8      A       My aunt.
 9      Q       Was Christine Isaac your neighbor?
10      A       Yes.
11      Q       How did you help out Christine?
12      A       How did I help out her?
13      Q       Yes.
14      A       Well, she wasn't too well.  She suffered with a bad
15              heart.  I would help her do things.
16      Q       Was Owen staying at her place?
17      A       Yes.
18      Q       The night that all the police were looking for
19              ████, do you remember them coming to Christine's
20              looking for Owen?
21      A       Yes.
22      Q       What do you remember when the police came?
23      A       What do I remember when they came?
24      Q       Yes, to Christine's looking for Owen.
```

1    A    They were all in the room and looked around.

2    Q    Who did they go in the room with?

3    A    Yes.

4    Q    Who did they go in the room with?

5    A    Well, I was with Christine.

6    Q    At some point did Owen leave with the police?

7    A    Did he live with them?

8    Q    Leave?

9    A    Yeah.

10           MR. DEAKIN:  Objection.

11           THE COURT:  Go ahead.

12   Q    What did you observe after Owen left with the

13        police?

14   A    What did I observe?

15   Q    Yes, what did you see?

16   A    All I know is he went with the police.

17   Q    What did you observe with Owen's room after the

18        police left with Owen?

19   A    Well, what was there they took it out.  I don't

20        know what they took out of his room.

21   Q    When did you see them taking things out?

22   A    When he left out they went in and they took a lot

23        of stuff.  I don't know what it was.

24   Q    After Owen left you saw the police go in the room

1           and take a lot of stuff?

2     A     Yes.

3     Q     But you don't know what it was?

4     A     No; I don't know what it was.

5           THE COURT:  Why don't we find out how long,

6     when it took place.  Because we know the stuff was

7     taken after he left.

8     Q     After they took the stuff ----  How long after Owen

9           left did you see the police go in and take stuff?

10    A     Right after he left.

11    Q     After they took the stuff, after Owen left, did you

12          see them do anything to the door?

13    A     No.

14    Q     Did they tape up the door?

15          MR. DEAKIN:  Objection, leading.

16    A     Did they tape up the door?

17    Q     Yes.

18    A     No one went in there.

19    Q     When you went over to Christine's to check on her

20          did you see any officers who were stationed by the

21          door?

22    A     See an officer?

23    Q     Police officers stationed by the door?

24    A     Oh, close the door?

1    Q    Yes.

2    A    Yes.

3    Q    And that was after Owen was gone?

4    A    Yes.

5         MR. SHEA:  Nothing further.

6                        CROSS EXAMINATION

7    Q    (by Mr. Deakin)  Good afternoon, Miss Taylor.  You

8         know me, my name is David Deakin and I'm an

9         assistant district attorney.

10             Miss Taylor, are you living at 34 Fidelis Way

11        right now?

12   A    Yes.

13   Q    Who lives there with you right now?

14   A    No one.

15   Q    So, you're not living with Ruby Williams?

16   A    Huh?

17   Q    Do you live with Ruby Williams?

18   A    William?

19   Q    Ruby Williams?

20   A    I've been with her since I've been sick.  But I

21        still have my apartment.

22   Q    How long have you been sick?

23   A    Since about nine months or more.

24   Q    And I'm sorry to ask you, what's the nature of your

1          illness?  What are you sick with?  What's the matter
2          with your health?
3    A     I had a terrible virus that I couldn't get rid of.
4          So I was at the hospital for a little while.
5    Q     Has that sickness left you with some difficulty
6          remembering things?
7    A     No; I still remember.
8    Q     Is there any chance that you're confused at all
9          about what happened when that night?
10   A     Confuse me?
11   Q     About what happened when?  Like what order things
12         happened in?
13   A     No; I remember.
14   Q     First of all, let me ask you, did you raise Owen
15         McCants after he was 16 years old?  How long did he
16         live with you after he came to live with you when he
17         was 16?
18   A     How long did I live with him?
19   Q     How long did he live with you?
20   A     Oh, live with me.  Oh, he was with me -- he came to
21         live with me when he was 16.
22   Q     How long did he stay living with you?
23   A     How long?
24   Q     How long after that did he live with you?

```
 1    A    Oh, he stayed with me for quite a while.

 2    Q    How many years did he stay with you?

 3    A    How many years?  He was 16 when I took him in and

 4         he stayed there until he got his own place.

 5    Q    About how long?

 6    A    Quite a few years.

 7    Q    Did you come to view him as a son to you?

 8    A    A who?

 9    Q    Did you look at him as your son, as if he were your

10         son?

11    A    I didn't quite understand.

12    Q    Did he treat you as if you were his mother?

13    A    Yes.

14    Q    So you and he are very close?

15    A    Right.

16    Q    Mr. McCants' lawyer asked you some questions about

17         the night when ████ was missing.

18    A    Uh-huh.

19    Q    Do you remember that night?

20    A    Right.

21    Q    Do you remember when the police came to Christine

22         Isaac's apartment was that before or after ████

23         came back?

24    A    That was -- I don't quite remember.  Say that
```

1      again.

2   Q   When the police came to Christine Isaac's apartment

3       looking for Owen McCants, was that before or after

4       ██████ came back?

5   A   I think that was before.

6   Q   Before she came back?

7   A   Yes.

8   Q   Are you pretty sure about that?  About what time

9       was it when the police came?

10  A   What time it was?

11  Q   Yes.

12  A   Not too long after Owen left.  I don't know exactly

13      the time.

14  Q   No, no; I think you may have misunderstood my

15      question.

16          What time was it when the police first came to

17      Christine Isaac's apartment to look for Owen

18      McCants?

19  A   Oh, what time was it?

20  Q   What time was it?

21  A   I don't remember exactly what time it was.

22  Q   Do you remember if it was before midnight or after

23      midnight?

24  A   They came after he left.

| | | |
|---|---|---|
| 1 | Q | Who was in Christine Isaac's apartment when the |
| 2 | | police came looking for Owen? |
| 3 | A | Christine. |
| 4 | Q | Anybody else? |
| 5 | A | Pardon me? |
| 6 | A | There was Christine.  Anybody else? |
| 7 | A | No. |
| 8 | Q | Were you there when they came looking for Owen? |
| 9 | A | When they came looking for him? |
| 10 | Q | Yes. |
| 11 | A | Yes. |
| 12 | Q | And Christine was there? |
| 13 | A | Right. |
| 14 | Q | Was anybody else there? |
| 15 | A | No. |
| 16 | Q | When they came looking for Owen did they find him |
| 17 | | there? |
| 18 | A | Yes. |
| 19 | Q | And did they talk to him? |
| 20 | A | Did they talk to him? |
| 21 | Q | Yes. |
| 22 | A | As far as I know.  I don't know what they talked |
| 23 | | about. |
| 24 | Q | Why is it that you don't know what they talked |

1           about?

2    A    Well, they was in the room.

3    Q    Whose room?

4    A    They was in the room, Owen's.

5    Q    Do you know how they wound up being in the room

6           where Owen was?

7    A    How did the officer?

8    Q    Wound up in that room where Owen stayed?

9    A    I guess they was questioning him about something.

10    Q    Do you know whether they asked to go into his room

11           or whether Owen McCants asked them to come into his

12           room to talk?

13    A    I don't know.

14    Q    You don't know?

15    A    No.

16    Q    Are you sure that you don't know?

17    A    I don't know.

18    Q    How many police officers went into Owen McCants'

19           room with him to talk?

20    A    I'm sure it was two of them; it might have been

21           three.  I'm not sure.

22    Q    How long were they in there?

23    A    Not too long.

24    Q    Where did the police and Owen go after they came

```
 1          out of the room?

 2    A     Where did they go?

 3    Q     Yes.

 4    A     Where did they take him?

 5    Q     Yes.

 6    A     They took him -- I don't know where they took him.

 7    Q     But they left with him?

 8    A     Yes.

 9    Q     Was he wearing handcuffs or anything when they left

10          with him?

11    A     No.

12    Q     Were they holding him or did they drag him out?

13    A     No.

14    Q     They just walked out together?

15    A     They walked out.

16    Q     Were there any police officers left in the room

17          after Owen left?

18    A     Yes; there was a couple in there.

19    Q     How long after Owen left -- you said police

20          officers went back into his room after he left?

21    A     After he left?

22    Q     After he left?

23    A     Well, they was in there, but I don't know exactly

24          how long it was.
```

1    Q    Were they in his room or just in the apartment?

2    A    Well, Christine; he was with Christine.

3    Q    Who was with Christine?

4    A    Yes.  In his place where he was staying.

5    Q    In his bedroom?

6    A    Yes.

7    Q    How many police officers went into his bedroom

8         after Owen left?

9    A    I'm sure it was two; it could have been more.

10   Q    Do you remember what they looked like?

11   A    No.

12   Q    Do you remember if they were men or women?

13   A    What?

14   Q    Were they male police officers, men or women?

15   A    Yes; they were men.

16   Q    Were they white or Black?

17   A    They were white.

18   Q    All of them?

19   A    Yes.

20   Q    Do you remember if they were tall or short?

21   A    One of them was tall; one was a little taller than

22        the other one.

23   Q    Was either of them very big or fat or anything like

24        that?

1    A    No; just regular size.  Not fat.

2    Q    Do you think you'd recognize them again if you saw

3         them?

4    A    Huh?

5    Q    Would you recognize them again if you saw them?

6    A    Would I recognize them?

7    Q    Yes.

8    A    I'm not sure would I recognize them or not.  I was

9         too upset.

10   Q    What did they take out of Owen McCants' room right

11        after Owen McCants left?

12   A    They had a bag, a brown bag.  What it was, I don't'

13        know what they took out of there.

14   Q    Was it a big, brown bag?  A shopping bag?

15   A    It was good size, not that big.  Maybe like this.

16   Q    Like the size of a lunch bag?

17   A    Yes.

18   Q    And do you know if they had that bag with them when

19        they went in?

20   A    I don't remember whether they had it or not.

21   Q    What drew your attention to that bag?  What made

22        you look at the bag?

23   A    What did they have in the bag?

24   Q    No; what made you notice the bag?

1    A    The bag?

2    Q    Yes.

3    A    Well, I had to notice it because they came by me.

4    Q    Which officer had the bag?

5    A    Which one had it?

6    Q    Yes.

7    A    I don't remember which one had it.

8    Q    You don't know what was in the bag; is that right?

9    A    No.

10   Q    So, how do you know what was in the bag was

11        something they took out of Owen's room?

12   A    I don't know what was in the bag.

13   Q    So, you don't know whether what was in the bag came

14        from Owen's room or not; isn't that right?

15   A    I don't know.

16   Q    The police officers who came into the room after

17        Owen left and went into his room, that you say went

18        into his room, did they ask you any questions or

19        talk to you?

20   A    No.

21   Q    Did they ask you about some keys?

22   A    How did I eat?

23   Q    No, did the officers who went into his room after

24        Owen left, did they ask you about some keys, keys,

81

1          like to open a door, keys?

2     A    Oh, I don't know nothing about no keys.

3     Q    But did they ask you something about keys?

4     A    After they went in, yes.

5     Q    After they went in they asked you?

6     A    I think it was after; yes.

7     Q    Are you sure that they had a brown bag when they .

8          left?

9     A    Yes; it was a brown bag.  I don't know what was in

10         it, but that's what it was.

11    Q    Did the lawyer for Owen McCants come to you about

12         six weeks ago to ask you questions about this?

13    A    Did he come to me?

14    Q    Yes.

15    A    No.

16    Q    So, this gentleman here, did he come to where you

17         live to ask you questions?

18    A    Yes; he did.

19    Q    Did he have you sign something, a statement about

20         it?

21    A    Yes.

22    Q    Did you write out the statement or did somebody

23         else right it out?

24    A    I don't know if I wrote it out or not, to tell you

1       the truth.

2               MR. DEAKIN:  Your Honor, may I approach.  Can I

3       ask that this be marked for identification?

4               (A for Identification, So Marked)

5    Q  Miss Taylor, I'm going to ask you to take a look at

6       this.  Do you recognize that?

7    A  Yes, but I still don't know what they took out.

8    Q  Did you write that out yourself?

9    A  No.

10   Q  Did someone write that out for you?

11   A  Yes.

12   Q  Is that your signature there at the bottom?

13   A  Right.

14              MR. DEAKIN:  I'm going to ask that this be

15      marked.

16              (Exhibit 5-MTS, So Marked)

17   Q  Miss Taylor, since you came home from the hospital

18      you've been living with Ruby Williams; is that

19      right?

20   A  Yes.

21   Q  And Ruby Williams is Owen McCants' sister; is that

22      right?

23   A  Right.

24   Q  Now, you said that ▮▮▮▮▮▮▮▮▮▮ was staying with

1          you off and on in July of last year?

2     A    Yes.  That's before this happened.

3     Q    When did this happen?

4     A    When did it happen?

5     Q    Yes.

6     A    I don't remember the date when it happened.

7     Q    Do you remember if it was summer, fall or winter?

8     A    Like the spring, I think.  It wasn't cold.

9     A    Do you remember if it was warm or hot?

10    A    Maybe warm.

11    Q    ███████████, who was 11 years old when she was

12         staying with you, her mother is Rasheena (phonetic)

13         ██████; right?

14    A    Right.

15    Q    Are you very close with Rasheena ████████?

16    A    Am I what?

17    Q    Close with her?

18    A    Yes.

19    Q    Before all this happened, did you use to see

20         Rasheena ████████ a lot?

21    A    Did I see who?

22    Q    Rasheena ████████?

23    A    Yes, 'cause she was sick.

24    Q    Did she leave her daughter, ██████, with you for a

1          couple of summers to live with you and go to summer

2          camp?

3      A   Yes.

4      Q   And you would see her every week when she dropped

5          ███ off and picked her up; is that right?

6      A   Yes.

7      Q   So, you would see her at least once a week back

8          then; is that right?

9      A   Huh?

10     Q   You used to see her at least once a week?

11     A   Who?

12     Q   Rasheena ███?

13     A   Huh?

14     Q   Rasheena, ███ mother?

15     A   Oh, yeah.

16     Q   You used to see her at least once a week; is that

17         right?

18     A   Oh, yes.

19     Q   How long have you been living with Ruby Williams?

20     A   I think not quite a year.

21     Q   Almost a year?

22     A   Yes.

23     Q   Have you seen Rasheena ███ at all during that

24         year?

```
1    A    During that year?

2    Q    During that year since you've been living with Ruby

3         have you seen Rasheena        ?

4    A    Did I see     a?

5    Q    Rasheena,         mother?

6    A    Oh, Christine; yes.  Rasheena is sick.

7    Q    After Owen McCants was arrested did he write you a

8         letter from jail?

9    A    He did.

10   Q    I'm going to show you a copy of something and ask

11        you if you recognize this?

12             MR. SHEA:  I object to this.

13             MR. SHEA:  I object to this, Judge.

14             MR. DEAKIN:  It goes to bias.

15             MR. SHEA:  It's irrelevant.  What Mr. Deakin is

16        really seeking to do is something we now have

17        motions on for compelling handwriting from my

18        client, attempts to get IRS documents. They're all

19        attempts to get this particular document into

20        evidence against my client.

21             This is not the appropriate forum for it.  Mr.

22        Deakin, I think, has a motion for the deposition of

23        Miss Taylor that he intends to bring before the

24        Court which is for just this purpose.
```

1           But this is not the purpose for this hearing.

2           THE COURT:  Well, what does the letter say?

3           MR. DEAKIN:  Should we go to side-bar for this,

4     Your Honor?  I can tell you.  There's a portion of

5     the letter that says, "So, now that you know the

6     reality of what is going to happen if I am

7     convicted, are you still willing to help the police

8     and D.A. try to convict me or encourage ▇▇▇▇ to

9     help them?

10          "Can you honestly say that from the depth of

11    your soul you, ▇▇▇▇, Nicky and the rest of the

12    family....."

13          THE COURT:  You may ask the question.

14          MR. SHEA:  If I could just be heard on the

15    follow-up to that.  I think it's important to note

16    that this letter was turned over by Polly Taylor to

17    the police.  I think that that is a clear indication

18    that she wasn't in any way affected by it in terms

19    of trying to help my client.

20          THE COURT:  You may ask you that on redirect.

21          MR. SHEA:  Note my objection.

22    Q     Miss Taylor, do you recognize this letter?  Is this

23    a letter that Owen wrote?  I'm asking you if you

24    know what this letter is?

1    A    I don't know.  I really don't remember.

2    Q    Do you know Owen McCants' handwriting?

3    A    Not particularly.

4    Q    Miss Taylor, do you remember testifying in the

5         Grand Jury almost a year ago?

6    A    Yes.

7    Q    Do you remember me showing you a letter in the

8         Grand Jury and asking you if you had turned it over

9         to the police?

10   A    The letter that he wrote?

11   Q    Yes.

12   A    Uh-huh.

13   Q    And you saw a letter when you were testifying at

14        the Grand Jury?

15   A    Yes; I did see it.

16   Q    Did you tell me when you testified in the Grand

17        Jury that it was Owen McCants' handwriting?

18   A    Yes.

19   Q    I'm sorry, did you say yes or no?

20   A    This was the note.

21   Q    In that letter did Owen McCants write to you, "So

22        now that you know the reality of what is going to

23        happen if I am convicted, are you still willing to

24        help the police and D.A. to try and convict me or to

88

1   encourage ████ to help them?

2       "Can you honestly say that from the depths of

3   your sole you, ████ and Nicky and the rest of the

4   family would rather have me die in prison than get

5   professional help?

6       "I am praying that you all would not rather

7   have me die.

8       "So, again, Aunt Polly, I am asking you to

9   please seriously consider everything I said within

10  your letter.  Then ask yourself if you have it

11  within your heart to do as Jesus would have us do at

12  times like this, to forgive, show mercy and have

13  compassion for a family member who is inflicted with

14  an illness."

15      MR. SHEA:  Is there a question.

16  Q   Did he write that to you in the letter?

17  A   Yes.

18      MR. DEAKIN:  No further questions.

19                  REDIRECT EXAMINATION

20  Q   (by Mr. Shea)  Are you here telling the truth today?

21      MR. DEAKIN:  Objection.

22      THE COURT:  Overruled.

23  Q   Are you here to tell the truth today?

24  A   Oh, yes.

1              MR. SHEA:  Nothing further.

2              THE COURT:  Let me ask you a question.  Can you

3      hear me, Miss Taylor?  Can you hear me?

4              THE WITNESS:  Yes; I hear you.

5              THE COURT:  Did you ever see any tape on Owen

6      McCants' door?

7              THE WITNESS:  I didn't quite understand you?

8              THE COURT:  Did you ever see any tape on Mr.

9      McCants' door?

10             THE WITNESS:  Did they tape the door?

11             THE COURT:  Yes.

12             THE WITNESS:  After?

13             THE COURT:  Yes.

14             THE WITNESS:  Yes; it was closed.

15             THE COURT:  Thank you.

16             MR. SHEA:  Ruby Williams, please.

17                     RUBY WILLIAMS, SO SWORN

18                       DIRECT EXAMINATION

19     Q    (by Mr. Shea)  Good afternoon.

20     A    Ruby Williams.

21     Q    Spell your last name, please.

22     A    W-i-l-l-i-a-m-s.

23     Q    Where are you living?

24     A    16 Fidelis Way.

| 1  | Q | How long have you lived there? |
|----|---|---|
| 2  | A | Seventeen years. |
| 3  | Q | Who are you living with currently, ma'am? |
| 4  | A | Who I live with now? |
| 5  | Q | Yes. |
| 6  | A | I live by myself.  My aunt lives with me for the |
| 7  |   | time being. |
| 8  | Q | And your aunt is Polly Taylor? |
| 9  | A | Yes. |
| 10 | Q | And Owen McCants is your brother? |
| 11 | A | Yes. |
| 12 | Q | Now, bringing your attention to last July, July |
| 13 |   | 13th and 14th, when the police were looking for |
| 14 |   | ███████████; do you remember that evening? |
| 15 | A | Yes. |
| 16 | Q | Were you at Christine Isaac's apartment when the |
| 17 |   | police came up looking for your brother Owen? |
| 18 | A | Yes; I was. |
| 19 | Q | What did you observe? |
| 20 | A | Well, Owen was in his room and they went in there. |
| 21 |   | They got some things out of there. |
| 22 | Q | Now, when you say they went in there, who do you |
| 23 |   | mean by they? |
| 24 | A | The policemen. |

1    Q    How many?

2    A    About six.

3    Q    How long were they in there?

4    A    Oh, gosh.  Well, they was back and forth all that

5         night and most of that day, the next day.

6    Q    How long were they in the room?

7    A    How long was they in the room?

8    Q    With Owen?

9    A    Oh, boy.  I'd say about twenty minutes to a half-

10        hour; probably was a half-hour.

11   Q    With Owen?

12   A    Yes.

13   Q    And after that period of time what did you observe?

14   A    They brought him out and said they wanted to

15        question him, take him down for questioning.  And

16        the next thing I know they arrested him.  Then they

17        stayed.  Some stayed and some went and they brought

18        some stuff out.

19   Q    Who brought stuff out?

20   A    The policeman.

21   Q    When?

22   A    That same night.

23   Q    How long after Owen had left?

24   A    He wasn't gone but -- I don't think he was gone

1       about a half-hour, really.

2    Q   What happened after that?  What did you see them

3       take?

4    A   I don't know what all they really take, to tell you

5       the truth.  But they took some stuff out of there.

6       I had went over to my aunt's house and stayed until

7       about 5:00 that morning.

8    Q   Where is your aunt's house?

9    A   My aunt lives next door.  Her apartment is 546.

10   Q   And Christine's apartment was?

11   A   545.

12   Q   Did you ever observe them put out any police tape?

13   A   Yes; they put a piece of yellow stuff around Owen's

14      door to keep people out.

15   Q   When did they do that?

16   A   Right after they carry him out.  They went in there

17      and carried the stuff out that they wanted.

18   Q   Just to be clear, did they put the tape up after

19      they carried the stuff out or before they carried

20      the stuff out?

21   A   No, after.

22   Q   Did they leave a police officer there once they

23      taped up the door?

24   A   Yes; they did.  The policeman came, like, taking

1       shifts.

2    Q   Shifts guarding the door?

3    A   Yes.

4    Q   After Owen left and you saw the police go into the

5        room and then they taped it, after they taped the

6        door did you ever see another police officer go in

7        that room?

8    A   They could have.

9    Q   Not they could have, did you ----

10   A   Yeah, they went back and forth in the room.

11   Q   Did they go back into the room after the police

12       tape was on the door?

13   A   Yes; they did.

14   Q   Now, Polly Taylor is staying with you; correct?

15   A   Yes.

16   Q   Did you ask her to help your brother in this case?

17   A   No; I didn't.  No; I didn't say nothing to my aunt

18       about helping my brother in this case.

19       MR. SHEA:  Nothing further.

20                   CROSS EXAMINATION

21   Q   (by Mr. Deakin)  Miss Williams, what were you doing

22       that night before all this started, before ███ was

23       missing?

24   A   What I was doing?

94

1    Q    Yes.

2    A    I was home in my bed asleep.

3    Q    And Rasheena ▮▮▮▮▮ came to your apartment looking

4         for ▮▮▮; didn't she?

5    A    Yes; she did.

6    Q    And she spoke to a young woman, a girl, who was in

7         your apartment; is that right?

8    A    She spoke to my granddaughter.

9    Q    Whose name is Michelle?

10   A    Yes.

11   Q    Michelle was there at that time?

12   A    Right.

13   Q    What time was that?

14   A    I think it was about 11:00, 11:30.  I really don't

15        know because I had just went -- my granddaughter

16        came in the room and told me that somebody, that

17        Nicky was at the door.

18             And I got up and then I say what was wrong.

19        And she say ▮▮▮ was missing.  I say what.  Then I

20        jump -- I remember jumping up out of my bed.  And I

21        called up my aunt and she was crying.  And I asked

22        her what was wrong and she was telling me.

23   Q    And your granddaughter, you think that was about

24        11:00 or 11:30?  By the way, when you refer to

1        Nicky, that's Rasheena's nickname; is that right?

2    A   Yes.

3    Q   Nicky is Rasheena ██████?

4    A   Yes.

5    Q   Did you talk to Rasheena when she came to your

6        house?

7    A   · No; I didn't.  I didn't see her.

8    Q   Had you seen Owen McCants that night?

9    A   Yes; I did.

10   Q   When did you see him?

11   A   It was early.  He came to the house about 8:30.

12       Then he had came back again around about 11:00.

13       Because me and him walk around my aunt's house

14       together.

15   Q   He came to your house about 11:00 or 11:30?

16            MR. SHEA:  Objection.

17   A   It could be earlier.

18            MR. SHEA:  Don't answer the question.

19            THE COURT:  Overruled.

20            MR. SHEA:  Judge, what's the relevance to this?

21            THE COURT:  Pardon me?

22            MR. SHEA:  The relevance of whether she took a

23       walk with her brother that evening.

24            THE COURT:  Is this before or after?

1          MR. SHEA:  This is before the search.

2          THE COURT:  How does this help me?

3          MR. DEAKIN:  I'm not sure, Your Honor.

4     Frankly, I'm finding the witness' answers

5     contradictory.  It appears she's saying before?

6          THE COURT:  Before, sustained.

7  Q .  How long was Rasheena in your apartment?

8  A     Just like I say, I was asleep.

9          MR. SHEA:  Objection.

10         THE COURT:  Excuse, what does this have to do

11    with the motion?

12         MR. DEAKIN:  It has to do with the time that

13    she said in her affidavit certain things happened.

14         THE COURT:  Where is the affidavit?

15         MR. DEAKIN:  It's Exhibit F.

16         MR. SHEA:  The testimony of the Commonwealth's

17    own witness was that Ruby Williams was there when he

18    went into the kitchen.

19         I didn't realize that there was a dispute as to

20    whether she's there.

21         MR. DEAKIN:  There's a dispute as to the

22    quality of her memory.  I think I'm entitled to

23    probe that.

24         MR. SHEA:  As to whether she took a walk with

```
 1            her brother earlier in the evening ----
 2                 MR. DEAKIN:  I'll withdraw it.  I'll move
 3            along, in the interest of time.
 4       Q    Did you at some point go to Christine Isaac's
 5            apartment?
 6       A    Yes; I did.
 7       Q    What time was that?
 8       A    With my brother.  Between that time, 11:00.
 9       Q    And you went there with your brother?
10       A    Yes; I did.  Me and him walk in there together.
11       Q    How did you meet up with your brother when you got
12            out of bed?
13       A    How did I meet up with him?  He was at my house.
14       Q    You're testifying that Owen McCants was at your
15            house when Rasheena ▇▇▇▇ came there?
16       A    I don't know whether he was at my house when
17            Rasheena was there or not.  Just like I said, me and
18            him walked around the corner together.
19       Q    Let me try to understand.  Rasheena came to your
20            house; is that right?
21       A    Yes, but she did not come in.
22       Q    Was Owen McCants in your house at that time or not?
23       A    He could have been because he have a key to my
24            house.  He had a key to my house.
```

```
 1                    THE COURT:  The question is was he there, not
 2              could he have been?
 3        A     Yes; he was there.  Because when I got up he was
 4              there and me and him walk around my aunt's house to
 5              see what was going on.
 6        Q     So, it's your testimony that after Rasheena came to
 7              your house you walked with Owen McCants to Christine
 8              Isaac's house?
 9        A     Yes; she had came to my door.  She did not come in
10              my house.  And I asked my granddaughter who was at
11              my door and she told me Rasheena, which was Nicky.
12        Q     And then you and Owen McCants walked from there to
13              Christine Isaac's apartment?
14        A     Yes, as a matter of fact, Owen had called over
15              there, also, on his cellular phone that same night.
16        Q     And how long did it take you to get from your house
17              to Christine Isaac's apartment?
18        A     Oh, God.  Well, we live right around the corner.
19              I'd say at least ten minutes.
20        Q     Did you stay in Christine Isaac's apartment from
21              then until the police came looking for Owen McCants?
22        A     Yes.  I was there.
23        Q     Did Owen McCants stay in Christine Isaac's
24              apartment from the time you went there with him
```

1        until the time the police came looking for him?  Did

2        he stay in Christine Isaac's apartment?

3    A   Yes; he was.

4    Q   What was he doing?

5    A   He was in his room.

6    Q   So, you don't know what he was doing?

7    A   No; I don't know what he was doing in his room.

8    Q   How much time went by from the time that you went

9        to Christine Isaac's apartment until the time the

10       police came looking for Owen?

11   A   When I went over there with my brother, I was over

12       there when the policemen came, arrived.

13   Q   How much time went by from the time that you got to

14       Christine's?

15   A   It wasn't long.  I'd say about ten minutes after we

16       walk in the house.

17   Q   Ten minutes?

18   A   Yes; it could be less.  But I estimate that.

19   Q   And you think that Rasheena          came to your

20       apartment at 11:00 or 11:30?

21   A   It could have been about that time.

22   Q   How many officers came looking for Owen McCants?

23   A   It was about six or more.

24   Q   Was anybody with them that you knew?

1   A   That I knew?  The policemen?

2   Q   Yes.

3   A   No.

4   Q   So, your granddaughter Michelle wasn't with them?

5   A   No; my granddaughter wasn't with them.

6   Q   And there was no young woman who is Owen McCants's

7       niece with them?

8   A   That's his niece.

9   Q   Michelle.  She was not with them?

10  A   Right.  No; she was not with them.  Unless she was

11      in the hallway.

12  Q   So, she might have been in the hallway; you don't

13      know?

14  A   Yes.

15  Q   Who let the officers into Christine Isaac's

16      apartment?

17  A   Who let the officers in?  The door was standing

18      open.  Her door was open.

19  Q   When the officers came in where was Owen McCants?

20  A   He was in his room.

21  Q   Did he come out at some point?

22  A   They went in his room.  I don't know what they was

23      doing back there, but the next thing I know, they

24      had brought him out.

1    Q    Did they talk to him in the eating area before they

2         went into his room?

3    A    No; they did not.

4    Q    Were you there in sort of the living room?

5    A    I was in the dining room.  Her dining room is

6         before you get to his bedroom.  When you walk in her

7         apartment there's a long hallway and then the dining

8         room.

9    Q    How long were the officers in his room with him?

10   A    I don't think it was ten minutes, really.

11   Q    Could you hear what was being said in there?

12   A    No.

13   Q    When they came out was he in handcuffs, Owen

14        McCants?

15   A    No; he wasn't in handcuffs at the time.  They say

16        they're taking him down for questioning.

17   Q    Was anybody holding onto him, his arms, his

18        shoulders?

19   A    Yes; there was quite a few around him.

20   Q    Was anybody holding him?

21   A    Holding him?

22   Q    Yes.

23   A    Not that I can remember.

24   Q    Was anybody touching him, as far as you can

1               remember?

2      A     Well, they had their arms, you know, around him;

3             yes.

4      Q     They were touching him?  They were holding him?

5      A     Yes.

6      Q     Are you sure about that?

7      A     I'm positive.  They said they was taking him down

8             for questioning.

9      Q     Could you hear what they were saying to him?

10     A     No; I did not hear what they were saying to him in

11            his bedroom.  When they was in the dining area they

12            said that they were taking him down just to question

13            him.

14                 Then my son had called down there and then they

15            say they were going to arrest him.

16     Q     You said some of the officers went out with him and

17            some stayed; is that right?

18     A     Yes.

19     Q     How many officers went out with him?

20     A     I'd say about ten or more.

21     Q     Ten of them went out with him?

22     A     It could have been more.

23     Q     How many of them stayed?

24     A     It was about six or more stayed and some comes,

103

1        like, groups, different groups come to watch the

2        place.

3    Q   I'm just asking right when they took him out, how

4        many police officers stayed?  Right at that time

5        when they took him out?

6    A   I'd say about ten.

7    Q   Ten of them stayed?

8    A   Yes, it could be less; whatever.

9    Q   Could it have been as few as two?

10   A   No; no, no, no.

11   Q   The ones who stayed, were they men or women?

12   A   They were all men.  I didn't see no women.

13   Q   White or Black?

14   A   They was all white, as far as I saw.  Unless there

15       was some Blacks there when I wasn't there.  I mean,

16       I wasn't there all the time at the next day.

17   Q   I'm just asking right at the time when they took

18       Owen?

19   A   As far as I seen it was all white.

20   Q   How many of those people went back into his room?

21       You said some of them went back into his room to get

22       stuff out?

23   A   Yes.

24   Q   How many went in the room?

1    A    About ten, I guess.  Probably it was more than

2          that.

3    Q    And they were carrying stuff out in their arms like

4          this?

5    A    Yes; they was.

6    Q    A lot of stuff?

7    A    Yes; they was carrying different things out.  For

8          what, I don't know.

9    Q    But you can't remember a single item that they had

10         in their hands?  Ten police officers come out with

11         arm-loads of stuff and you don't remember a thing

12         they had in their hands?

13   A    No; I did not remember what all they had in their

14         hand.  They had brown bags and stuff.

15   Q    How many brown bags?

16   A    About two, I think.

17   Q    Were they big brown bags, small brown bags?

18   A    They was big.

19   Q    How big?  Show with your hands.

20   A    They were some like a shopping bag.

21   Q    You're indicating a shopping bag.  You said there

22         were two of those?

23   A    Yes.

24   Q    What did the other officers have in their hands?

1    A    They had, just like I said, they had different
2         things.
3    Q    Now, after those officers left then you said other
4         officers came and taped up the room?
5    A    Yes.
6    Q    How many officers taped up the room?
7    A    About five or ten, whatever.  And they took shifts.
8         Different ones come, different ones go in and out.
9    Q    And that went on for the rest of the day?
10   A    That went on all that night until the next day
11        sometime.  What time, I don't know the next day.
12   Q    The officers stood in shifts outside the door?
13   A    Outside the door?
14   Q    Outside the bedroom door?
15   A    Yes.
16   Q    Were they there to make sure, as far as you could
17        tell, that no one went in or out?
18   A    Yes; they were changing shifts.
19   Q    But I mean, in and out of the bedroom?
20   A    Yes; they were going in and out of the bedroom for
21        a while.  How long that last, I don't know.  They
22        could be going in there all night, I don't know.
23   Q    Now, the attorney for Owen McCants came to talk to
24        you about this about six weeks ago; is that right?

1    A    Yes.

2    Q    Did he ask you questions about what happened?

3    A    Yes.

4    Q    Did he have you sign an affidavit?

5    A    Yes.

6    Q    I'm going to show you a copy of this.  Is this a

7         copy of the affidavit that he asked you to sign?

8    A    Uh-huh.

9    Q    Did you write that affidavit?

10   A    No; I didn't write it.

11   Q    But you signed it?

12   A    Yes.

13   Q    Who wrote it?

14   A    He did.

15   Q    The defense lawyer did?

16   A    Yes.

17   Q    This man right here?

18   A    Yes.

19        MR. DEAKIN:  May the record reflect she's

20        indicating defense counsel?

21        THE COURT:  Yes.

22   Q    When you wrote this affidavit you said, "A few

23        other officers remained and searched his room."  Is

24        that right?

1     A    Yes.

2     Q    And by a few you meant ten or so?

3     A    It could be about ten.

4     Q    And you said they took some property from his room

5          and left with it; is that right?

6     A    Yes.

7     Q    But you couldn't say then what the property was;

8          could you?

9     A    No; and I still can't say what it was.  All I know

10         is they took some things out of his room.  What they

11         was, I don't know.

12    Q    You didn't say anything in the affidavit about

13         paper bags; did you?

14    A    Paper bags, I had seen a paper bag, two paper bags.

15    Q    How long has Polly Taylor lived with you?

16    A    How long my aunt live with me?

17    Q    Yes.

18    A    She came out of rehab in March.

19    Q    So, she's lived with you since March?

20    A    Yes.

21    Q    Two or three months, give or take?

22    A    Yes.

23    Q    Has she seen Rasheena ███████ since she came to

24         live with you?

1    A    No; she haven't.  This is the first time she's seen

2         her today.

3    Q    Today out in the hallway?

4    A    Right.

5         MR. DEAKIN:  No further questions.

6                    <u>REDIRECT EXAMINATION</u>

7    Q    (by Mr. Shea)  The affidavit that I wrote, did I

8         write down what you told me?

9    A    Yes; you did.

10   Q    Didn't I have you read it over before you signed

11        it?

12   A    Yes.

13   Q    The affidavit you wrote, actually, that wasn't the

14        same day that I came and saw Polly; correct?

15   A    No; it was not.

16   Q    It was way before then?

17   A    Right; it sure was.

18        MR. SHEA:  Nothing further.

19        THE COURT:  You may step down.

20        Any other witnesses?

21        MR. SHEA:  No, Your Honor.

22        THE COURT:  I'll take it under advisement.  If

23   you want to submit a memorandum.

24        MR. SHEA:  There is one outstanding thing that

1    Mr. Deakin is aware of that we have some difference

2    on how to proceed dealing with.

3        News stations were at the scene.  Basically,

4    I'm trying to get footage.  I had subpoenaed what

5    videos they took at the scene and they sent myself,

6    and I think Mr. Deakin ended up getting some, too,

7    basically the news clips that were on tv.

8        What I'm looking to get, actually, is all the

9    rough tapes to see if there is any tape of the

10   police actually carrying something out of the

11   apartment that was captured on film.

12       At this point I haven't been able to get those

13   tapes.

14       THE COURT:  Have you subpoenaed them?

15       MR. SHEA:  I did subpoena them.  What they

16   did -- I don't know if they thought I was an ego-

17   maniac or what, but basically they just gave me the

18   tapes of the stuff on tv.  I'm not really interested

19   in those.

20       THE COURT:  What did you tell them you wanted?

21       MR. SHEA:  I asked for everything but I think

22   that was a mistake.  So, that's where we're at,

23   having to work that out still.

24       MR. DEAKIN:  Your Honor, not knowing the entire

1   substance, I agreed with my brother to hold this

2   open for a reasonable period of time after the last

3   hearing for him to seek those tapes if he could find

4   them.

5        I issued subpoenas to all the local stations

6   for copies of all footage taken whether broadcast or

7   not on or after July 13, 2000 in connection with

8   that case and that location.

9        What I got back from all the stations was what

10  was broadcast.  I called one of the stations to find

11  out where the raw footage was and they said they

12  don't save it beyond -- well, they don't save it for

13  anything like the amount of time that had past

14  before we made out request for the footage.

15       That's one station.  My expectation is there is

16  no raw footage.  Apparently, the custom in the

17  industry is they don't save that very long.

18       We do have all the broadcast footage.  I think

19  it's undisputed that there are pictures of police

20  coming out with Owen McCants without anything in

21  their hands.

22       I would suggest at this point, Your Honor,  the

23  Court decide the motion on the evidence before it.

24       If my brother uncovers new evidence at some

1      point down the line and asks you to reconsider based

2      on that evidence, I wouldn't object.

3          At this point we have a trial date in August

4      and I would ask the Court to act on the motion based

5      on the evidence before it.

6          THE COURT:  Your position is what?

7          MR. SHEA:  My position is I would like it to be

8      held open until we see if we can get the raw

9      footage.

10         THE COURT:  I tell you what, you submit your

11     proposed findings and rulings of law by Thursday of

12     next week, May 31st.

13         As far as keeping it open, you know the date.

14     If you come up with something else between now and

15     then you can certainly submit it.

16         MR. SHEA:  When I got the date, to be fair, I

17     pointed it out this problem and Mr. Deakin went

18     along at that time.

19         THE COURT:  The thing is he's probably right,

20     they don't have it.  If you find that they do then

21     you can bring it back again.

22         MR. DEAKIN:  Your Honor, just so the record is

23     clear, we've addressed defense counsel's motion on

24     the alleged warrantless search of the apartment.

1    There are also motions to suppress based on the four

2    corners of the warrants.

3         THE COURT:  On the papers.

4         MR. DEAKIN:  Then there's one remaining motion,

5    as I see it, before the Court which is the

6    warrantless search of the automobile which I think

7    the only showing defense counsel is prepared to make

8    is that they towed the car, which turned out to be

9    Owen McCants' car, from the scene to a lot and held

10   it pending ----did they seize any evidence from

11   the car?

12        MR. DEAKIN:  They did after getting a warrant

13   and going in.

14        I don't think it's disputed that they didn't

15   seize any evidence until they got a warrant and

16   entered the car.  They just impounded the car

17   pending a warrant.

18        MR. SHEA:  I don't have any witnesses.

19        MR. DEAKIN:  I think the Court could decide

20   that motion based on the undisputed state of the

21   facts.

22        MR. SHEA:  That's true.  I don't have any

23   witnesses.

24        Is it possible to get a little longer time

113

1          frame for filings?

2                    THE COURT:  June 11th.

3                    THE CLERK:  File it in the First Session.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

114

```
1                          CERTIFICATE

2            I, Dale Marie Cullinan, do hereby certify that the

3        following record, pages 1 to 113, inclusive, is an

4        accurate transcript to the best of my knowledge,

5        skill and ability.

6

7

8                          DALE MARIE CULLINAN

9                OFFICIAL COURT REPORTER, RET.

10               Dale Cullinan

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```