

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
NO. · SUCR2000-10994

COMMONWEALTH OF MASSACHUSETTS

v.

OWEN McCANTS

---

Friday, April 19, 2002
Before: Spurlock, J.
Boston, Massachusetts
Day 2 - Hearing re Motions

---

MARYANN MCDONALD
Official Court Reporter
617.788.6180

2

APPEARANCES:


David Deakin
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
617.619.4000
                Counsel for the Commonwealth


Mark Shea
Attorney at Law
875 Massachusetts Avenue
W. Cambridge, MA 02139
627.864.3943
                Counsel for the Defendant

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

-None-

EXHIBITS

| NUMBER | PAGE |
|--------|------|

-None-

4

PROCEEDINGS

1

2

3        THE CLERK: In the matter of *Commonwealth v.*

4   *Owen McCants*, 2000-10994.  A jury has been impaneled

5   in this case, and the matter is on for Commonwealth's

6   motions and defendant's motions.

7              Who wishes to proceed first?

8              MR. SHEA: Whatever is the Court's pleasure.

9              MR. DEAKIN: Whatever you prefer.

10             THE CLERK: We'll start with the defendant's

11   motions, perhaps his motion to renew his motion to

12   suppress.

13             THE COURT: So, defendant's motion to renew

14   his motions to suppress.

15             MR. SHEA: Yes, Judge.  At the time of the

16   motion to suppress the Court did not have information

17   regarding Harry Byrne, who was the lead detective on

18   this case.  Well, at the time he wasn't charged and

19   indicted in the federal court, but he has since been

20   charged in the federal court with civil rights

21   violations and witness tampering.

22             Now, in the motion to suppress there were

23   disputes about credibility.  And in that hearing, one

1    of the key points in terms of credibility was after

2    Mr. McCants was taken from Christine Isaac's

3    apartment, was the door sealed up and no one entered

4    prior to a search warrant being obtained from which

5    they then took clothing of Mr. McCants which provides

6    the DNA evidence in this trial.

7            And evidence was taken from Detective Byrne

8    that the door was sealed up pretty much immediately

9    after Mr. McCants was taken away, and that no other

10   officers entered the room.

11           Polly Taylor, who is going to be a

12   Commonwealth witness in the trial regarding Mr.

13   McCants' handwriting, I believe, and other issues in

14   this case, who they have presented as credible

15   regarding the handwriting, testified at that hearing

16   that police did enter Mr. McCants' room after he had

17   been taken away, that the police officer was seen to

18   leave with a bag the size of about a lunch bag.  She

19   doesn't know what was in the lunch bag.  And that

20   basically was the testimony.

21           There was also testimony from Ruby Williams

22   about the police entering the room and taking items

23   from the room.

24           The Court, I believe, in its rulings, found

1      Detective Byrne to be credible, as well as the other

2      officers who testified, and ruled against us on the

3      motion to suppress.

4              Given this new information regarding

5      Detective Byrne, and particularly the allegation of

6      witness tampering, I think it does go to his

7      credibility.  I'd ask the Court to consider re-

8      opening the motion to suppress.

9              THE COURT: Okay.  The motion is denied.

10             All right.  Motion in limine to sequester

11     witnesses.  That's allowed.

12             MR. DEAKIN: Your Honor, if I could ask that

13     one exception be made to that.  Susan Dye is an

14     investigator in the district attorney's office.  She

15     is on the witness list.  She has done a very small

16     number of what I'd call clerical tasks, in terms of

17     being involved in mailing a letter to the FBI, for

18     example.  But her presence would be enormously

19     helpful to me in coordinating the witnesses, and, you

20     know, things that have to go on during trial.  I

21     don't think defense counsel actually objects to this.

22             THE COURT: Okay.

23             MR. DEAKIN: But she's not going to be a

24     witness on any disputed issue of fact.

1              THE COURT: So, what's her name?

2              MR. DEAKIN: Susan Dye.  She's present in

3    court.

4              THE COURT: Except Susan Dye.  How do you

5    spell her last name?

6              MR. DEAKIN: D-y-e.

7              THE COURT: All right.  Motion in limine

8    precluding ████████ from testifying about

9    defendant's alleged confession.

10             MR. SHEA: Basically, in discovery turned

11   over to me, there was a statement that essentially

12   laying out that she wasn't always crystal clear about

13   her identification, or having identified the right

14   person.  And that when did she become certain, her

15   identification was correct is when she was told he

16   had confessed.

17             And I don't want her to make a statement

18   that there was a confession if the handwriting -- if

19   the letter purported to be from my client comes into

20   evidence, it's for the jury to decide whether it's a

21   confession.  And it's unclear that one of the

22   disputes at trial will be even if that letter is to

23   get into evidence (sic).

24             MR. DEAKIN: No objection to this, your

1    Honor.

2              THE COURT: All right.

3              MR. DEAKIN: Your Honor, I'd just note for

4    the record, should the defendant's counsel open the

5    door on cross, I would ask the Court to revisit the

6    ruling.

7              THE COURT: I will, if they open it.

8              Motion in limine to prohibit the

9    Commonwealth witnesses from mentioning hearsay 9-1-1

10   calls.

11             MR. SHEA: Well, Judge, I do believe that

12   the Commonwealth intends to try and introduce the 9-

13   1-1 call.  It is hearsay.  I assume they're going to

14   argue that it's an excited utterance exception.  I

15   would just say that it is cumulative -- if one were

16   to believe it meets that exception.  It is

17   cumulative, unnecessary, highly prejudicial, highly

18   inflammatory.  It leads to people's minds closing

19   out.  Part of what we observed yesterday --

20             THE COURT: Hang on.  Hang on.  Just a

21   minute.  Excuse me.

22             Do you intend to introduce the 9-1-1 call?

23             MR. DEAKIN: Yes, your Honor.  Made by Polly

24   Talyor, we believe within a minute or so of the

9

1    abduction of the girl that she views as her

2    granddaughter, great-granddaughter.

3              THE COURT: And what's the 9-1-1 call say?

4              MR. DEAKIN: I have transcripts of it, your

5    Honor.   They've been provided to defense counsel

6    previously.

7              The significance of it from the

8    Commonwealth's point of view is that -- may I

9    approach?

10             As you can see, it's a fairly short

11   transcript.   I think the call, the entire call took

12   two minutes and 27 seconds.   In it Polly Taylor makes

13   the statement about having heard her great-

14   granddaughter ▮▮▮ ▮▮▮▮▮ trying to call to her,

15   but having her mouth mumble, her cries mumbled.

16             Since that time Polly Taylor has talked

17   about these things in general terms, but your Honor

18   heard her testify.   She's an elderly woman.   Her

19   memory, in some respects, is quite good, and in other

20   respects, is quite limited.   And she makes a very

21   specific comment about what she heard and observed in

22   the stairwell, which are strongly corroborative of

23   what ▮▮▮▮▮▮ said happened to her, and

24   corroborate ▮▮▮▮▮▮▮ credibility, as well as

1    her ability to observe events and describe them

2    accurately.

3              So I would expect that to be strongly

4    corroborative of ███████████.

5              MR. SHEA: Judge, for one, Polly Taylor, I

6    expect will be testifying.   ██████████████ will be

7    testifying.

8              THE COURT: Well, look, I'm going to reserve

9    on this until I hear some -- see how the evidence

10   unfolds at trial.  Don't mention it in your opening

11   statement.

12             MR. DEAKIN: I'm sorry?

13             THE COURT: I said don't mention it in your

14   opening statement.

15             MR. DEAKIN: Yes, your Honor.

16             THE COURT: Motion in limine to preclude the

17   Commonwealth from introducing defendant's prior

18   conviction for cocaine possession.

19             MR. SHEA: I have been informed, your Honor,

20   that Mr. Deakin intends to attempt to introduce, even

21   if my client does not take the stand, his prior

22   conviction for possession of cocaine.

23             THE COURT: Okay.  Hang on.  How does that

24   come in, Mr. Deakin?

1          MR. DEAKIN: Your Honor, I filed a

2     memorandum of law on this.  It's actually the tail

3     end of my memorandum of law on my motion to impeach

4     the defendant with his prior conviction, should he

5     testify.

6          THE CLERK: I have it.

7          MR. DEAKIN: Your Honor, I know, has a copy

8     of that.

9          Your Honor, this is the situation in this

10    case.  ██████████████ says that when she was abducted

11    that she was taken to a location where the defendant

12    gave her something to drink, something to smoke, and

13    something to snort.  She believed that she was given

14    alcohol to drink.  She's not sure what she was given

15    to smoke.  And she's not sure what she was given to

16    snort, except that it was a white or yellowish

17    powder, and when she shorted it and it burned her

18    nose.

19         The defendant was found -- the search

20    warrant executed on the defendant's apartment or

21    bedroom shortly thereafter located alcohol and

22    marijuana.  It did not turn up cocaine.  The police

23    had seen a white powdery substance on a mirror on his

24    dresser which they thought looked like cocaine.

1    Testing of that came back negative.  It was not

2    cocaine; it was some other white powdery substance.

3          The defendant, in a letter that he wrote to

4    Polly Taylor two weeks later, explained that he

5    wouldn't have done what he did if he were in his

6    normal mind, but that he had had an addiction to

7    cocaine and alcohol and sometimes used marijuana to

8    heighten the high.

9          I expect defense counsel will argue that

10   there was no cocaine found on the defendant's person,

11   in his automobile or in his bedroom, all of which are

12   true.  I expect, however, that his conviction will

13   show that in December of 1999, roughly seven months

14   prior to the alleged crime in this case, he was

15   arrested for and ultimately convicted of possession

16   of a Class B substance, to wit: cocaine.

17         That evidence would show that he was --

18   that he had access to and knowledge of cocaine

19   shortly before the incident alleged in this case.

20   Additionally, your Honor -- and I think this is the

21   subject of another one of the defendant's motions in

22   limine, but I think it makes sense to argue it here

23   now -- the defendant -- there was a man by the name

24   of Alfonso Southerland, who is the grandfather of the

1   victim in this case, and he views himself as the

2   defendant's brother, because they were both raised,

3   in their adolescence by Polly Taylor, although they

4   are not blood relatives.  And Alfonso Southerland is

5   prepared to testify that in the months leading up to

6   the crime alleged in this indictment, that he

7   observed the defendant, on several occasions, use

8   cocaine.

9           I expect the defense will argue there's no

10  evidence that he possessed cocaine on the night in

11  question, which is accurate, but I think the jury --

12  it's fair for the jury to know that as he states in

13  his own letter, he, in fact -- established that he

14  used cocaine, or possessed cocaine, in the months

15  leading up to the crime.

16          And I think his conviction is prima facia

17  evidence of that fact; he's been convicted beyond a

18  reasonable doubt of possessing cocaine, and that

19  that's admissible for that purpose.  I'm not arguing

20  -- so that the Court is clear, I'm not arguing that

21  any of his other convictions are admissible

22  substantively, in any event, even if he does testify,

23  or admissible substantively at all even if he does

24  testify.

1          But the possession of cocaine charge, I

2     think, is admissible to show knowledge of an access

3     to.   Likewise, your Honor, the defendant just

4     recently pleaded guilty to a charge of possession of

5     Class D substance, marijuana, in Brookline District

6     Court.   I think that might have been the case that

7     he's now incarcerated in Norfolk House of Correction.

8               THE COURT: Class C.

9               MR. DEAKIN: Pardon?

10               THE COURT: Class C, right?

11               MR. DEAKIN: Class D.

12               THE COURT: D.   D.   D.

13               MR. DEAKIN:  And I would argue, although I

14     haven't set it out in my motion, that that conviction

15     would be admissible under the same theory.

16               THE COURT: All right.

17               MR. DEAKIN: But I just learned about that

18     conviction yesterday.

19               THE COURT: All right.   The motion's

20     allowed.

21               Motion in limine precluding testimony about

22     -- well, I'll revisit it if he opens the door.   If

23     defense counsel opens the door.

24               Motion in limine precluding testimony about

1   white powder found in defendant's room.

2                    MR. SHEA: Your Honor, similarly, the white

3   powder found in his room is an attempt to make him

4   look like this is the white powder that he had,

5   allegedly had, with the young girl.  The main problem

6   being that it's not cocaine.  They did drug certs.

7   It's not a drug.

8                    And, so, the fact that someone has white

9   powder in their room is not probative.  It is

10  prejudicial, and it should be kept out.

11                   THE COURT: Motion denied.

12                   Motion in limine precluding Denise Wilson

13  from characterizing the actions of the defendant.

14                   I mean, she can say what she saw, but she

15  can't use words about what he was trying to do.  She

16  can say what she saw.

17                   MR. DEAKIN: To the extent I object at all,

18  your Honor, I'd ask you to reserve on it.  See,

19  because trying to blend in -- acting paranoid, I

20  would agree, is not something that you could perhaps

21  argue without, you know, characterizing.  But trying

22  to blend in, I would suggest is the kind of thing

23  that, if there's a foundation for it, that's for the

24  Court to rule on when she testifies.

1    Benjamin Haughey, or any other witness, Did you see a

2    photo array?  Did you show Benjamin Haughey a photo

3    array?  Did you show him a lineup?  or anything like

4    that.

5              THE COURT: All right.  The motion is

6    allowed.

7              MR. SHEA: Just to be clear, and I am

8    allowed to argue that he didn't see Mr. Haughey

9    identify the defendant.

10             THE COURT: All right.  Motion in limine

11   precluding Shirley Braithwaite from characterizing

12   the actions of the defendant.

13             I'll reserve on that one, too, until I see

14   what the testimony is going to be.

15             MR. SHEA: Judge, the reason I'm asking for

16   these motions is to try and point out problem areas

17   that are in the police report before they get on the

18   stand, so that these women can be told don't say the

19   thing you said to the police.

20             It's not like --

21             THE COURT: Well, that's what he's going to

22   do.  And then if he presents it in a way or sets a

23   foundation that allows it to come in, he can come to

24   side bar first before he asks that question.

19

1          Motion in limine precluding ████████████

2     and Nicky ███████ from testifying about the

3     defendant's alleged prior rape of Nicky ███████.

4               MR. DEAKIN: We have an agreement, your

5     Honor, that that may be allowed.  And I'd just ask

6     the record to reflect that I will not be seeking to

7     introduce that testimony in any fashion.  But should

8     the defendant open the door, and I can envision a

9     world where that might happen, I'd ask the Court to

10    reconsider the motion at that time.

11              THE COURT: All right.  Motion in limine

12    precluding Alphonso Southerland from testifying about

13    the past actions of the defendant.

14              MR. SHEA: I'm sorry.  Could you just read

15    that one again.  I was speaking to my client.

16              THE COURT: Alphonso Southerland from

17    testifying about the past actions of the defendant.

18              MR. SHEA: Oh, yes.  There's three levels to

19    that.  We are agreed on one; the sex acts part.

20    There's two others.  He believed or thinks my client

21    may have had keys to Polly Taylor's apartment.

22              THE COURT: Well, let me ask this: Can he

23    testify that he saw him with the key to Polly

24    Taylor's apartment and go in it?

1         MR. DEAKIN: He can't, your Honor.  But what

2    he can testify to is on at least one occasion when

3    he, Alphonso Southerland, was outside the building,

4    the defendant buzzed Polly Taylor -- I'm sorry.

5    Buzzed Alphonso Southerland up from Polly Taylor's

6    apartment.  And when he came up, Alphonso Southerland

7    came up there, the defendant was alone in Polly

8    Taylor's apartment.

9         THE COURT: Well, he can testify to that,

10    but he can't testify that he had keys to the

11    apartment.

12         MR. DEAKIN: He can also testify that

13    Christine Isaac, who lived next door, an elderly

14    woman who lived next door, with whom the defendant

15    was staying during the relevant period, kept a key to

16    Polly Taylor's apartment in a table in an area to

17    which the defendant had access.

18         In other words, he can testify that the

19    defendant had access to Christine Isaac's key.

20         THE COURT: To the extent that he can

21    testify to what he saw the defendant do or where he

22    knew a key to be kept, fine.  But he can't say that

23    he knew that the defendant had a key.

24         MR. DEAKIN: I don't think we were proposing

1    that he would testify to that.  He would testify that

2    the defendant had access to the key that Christine

3    Isaac had.  I think it's a question of fact for the

4    jury whether the defendant knew it.

5              THE COURT:  Yeah.  I mean....

6              MR. SHEA:  Well, for one, in the police

7    report he testifies he thinks he had a key to Polly

8    Taylor's apartment.  And obviously the inference one

9    cannot -- I'm saying they should not be asking him to

10   draw the inference because he saw my client in Polly

11   Taylor's apartment once, he buzzed him in,

12   obviously....

13             THE COURT:  He's not going to draw any

14   inference other than -- I mean, that's for the jury

15   to decide whether or not there's an inference to be

16   drawn that he could have gotten a key or had a key,

17   depending upon what the facts are.

18             I mean he can testify to what he could

19   observe with his five senses, but beyond that, no.

20             MR. SHEA:  I'm just -- the reason I'm

21   getting at it is your question was quite accurate and

22   pointed and important, which is did he ever see him

23   with a key to Polly Taylor's apartment.  The answer

24   to that is no, which they're trying to dance around

22

1    here.  And that's why --

2            THE COURT: Well, you can ask him that on

3    cross-examination and he'd have to say no.  But what

4    I've just said was that he can't testify that he had

5    a key to Polly Taylor's apartment.

6            MR. SHEA: Thank you.  Now, the final part

7    is the cocaine, saw him using cocaine in the past.

8    Obviously, that's an attempt to smear my client.

9            THE COURT: Well, how does he know he was

10   using cocaine?

11           MR. DEAKIN: Because he was with him at the

12   time.  And he was sniffing a white powdery substance.

13   I mean, obviously, he can't testify that he did a

14   chemical analysis.

15           THE COURT: Fine.

16           MR. DEAKIN: But I think that given the

17   victim in this case said she was abducted --

18           THE COURT: I understand.  He can testify to

19   what he saw.

20           MR. SHEA: I'd object to this, Judge.  I

21   mean, this is an attempt where they're inviting, I

22   think, you to participate in reversible error, to try

23   and close up one hole they feel they have in their

24   case, which is the cocaine.

23

1              THE COURT: Wait a minute.  When did he seek

2      to do this?

3              MR. DEAKIN: In the spring and summer months

4      leading up to July 13th of 2000.

5              THE COURT: He can testify to what he saw.

6      I mean....

7              MR. SHEA: Let me just be clear for the

8      record, that in the Commonwealth's memo, where it

9      asks to let in the prior conviction for cocaine –

10             THE COURT: Right.

11             MR. SHEA:  -- and it's using the similar

12     theory on this, I assume, they cite the *Commonwealth*

13     *v. Ford* case, 18 Mass. Appeals Court.  They write:

14             "The jury could properly draw an inference

15     that the defendant, 'possessed or had access to a

16     supply of'" then they put in parenthesis,

17     "'(cocaine)... a short time before the crime.'" *Poor*

18     18 Mass. Appeals Court 490.

19             I invite the Court to read *Poor.*  That is a

20     case not involving cocaine, which the Commonwealth is

21     a little bit misleading in its memo.  It's a case

22     involving a bombing.  And it's a case involving

23     someone having an explosion that took place three

24     days prior in the same area.  A bombing involves

24

1    chemicals, putting things together, certain

2    knowledge, certain scientific basis.

3            The idea that someone knows how to snort

4    cocaine, frankly, that's a bad joke that they're

5    trying to introduce this.  There are many people who

6    know how to snort cocaine.  There's people -- I mean,

7    it is absolutely not anything akin to a bombing three

8    days earlier.  And to say that at some time in the

9    past he had seen him snorting cocaine, so he can get

10   in pattern of conduct to show he knew how to use

11   cocaine, it's not for that at all.  It's to smear my

12   client as a cocaine user who drugged a young girl so

13   he could close up the jury's mind, again, and the

14   very difficulty that we had yesterday, which is to

15   keep them, have them have an open mind in a case that

16   they're trying about a rape and kidnap and drugging

17   of an eleven-year-old girl.

18           THE COURT: Motion denied.

19           MR. SHEA: Note my objection.

20           THE COURT: All right.  Motion in limine to

21   preclude the Commonwealth from impeaching the

22   defendant's credibility with evidence of prior

23   convictions.  I mean, that depends on whether your

24   client is going to take the witness stand, or not.

1          MR. SHEA: Your Honor, I'll reserve on that

2     one.  But there's two following that are similar

3     along -- that deal with prior convictions.

4          THE COURT: The physical introduction of the

5     defendant's record as evidence.  And motion to

6     sanitize defendant's records.

7          Those, you want to reserve on?

8          MR. SHEA: Yes.

9          THE COURT: Motion for limiting instruction

10    on fresh complaint testimony, which I will give when

11    we have a fresh complaint witness.

12         MR. DEAKIN: Your Honor, just to note, and

13    we can address it with my memo, in at least two of

14    the cases -- and I'm aware of the Court's

15    restrictions on not piling on the fresh complaint --

16    but in two cases, I would argue, the fresh complaint

17    statements I intend to argue in my motion are also

18    admissible substantively as spontaneous utterances.

19         Should the Court agree with the

20    Commonwealth on that motion, then I would argue that

21    a fresh complaint instruction not be given, because

22    if the Court agrees that, in fact, they're admissible

23    substantively as spontaneous utterances, they would

24    not be subject to the restriction on fresh complaint.

1          THE COURT: Well, that depends on how you're

2     offering them.

3          MR. DEAKIN: Understood.

4          THE COURT: But I'll have to see that.  But

5     as far as -- if they are fresh complaint, I will give

6     a limiting instruction.

7          Motion in limine regarding reference to

8     term "disclosure."

9          MR. SHEA: Yes.  I object to the use of the

10    term "disclosure."

11         THE COURT: What's the disclosure you object

12    to?

13         MR. SHEA: Well, it's just the term itself

14    connotes, as I put in the body of this, the

15    revelation of truth that someone has...

16         THE COURT: All right.  Motion denied.

17         MR. SHEA: Note my objection.

18         THE COURT: Motion in limine refusing to

19    give a handwriting exemplar.

20         MR. SHEA: I'm not sure if this is in

21    dispute by the Commonwealth.

22         MR. DEAKIN: Well, it is and it isn't, your

23    Honor.  The Commonwealth concedes, right up front --

24    I thought the motion -- ordinarily, obviously, the

1    defendant's refusal to cooperate with -- to provide

2    evidence can't be mentioned.  And the Commonwealth

3    doesn't dispute that.

4              What happened in this case is really

5    unusual.  As your Honor knows there was a letter --

6              THE COURT: Well, he refused to give a --

7              MR. DEAKIN: He refused to give a

8    handwriting exemplar --

9              THE COURT: But he wrote the letter.  But

10   you say he wrote the letter.

11             MR. DEAKIN: Right.  And I believe the

12   Commonwealth would prove that beyond any conceivable

13   doubt.

14             The situation is this, your Honor.  I

15   brought the motion, which I think your Honor has

16   before you, to prohibit the defense from commenting

17   to the jury in any way about the absence of a

18   handwriting analysis in this case.

19             To give the Court some background on

20   this --

21             THE COURT: Well, I understand that.  I

22   mean, you can't ask -- I mean, if he wants -- let's

23   put it this way.  He can't argue that there's no

24   handwriting analysis if your client refused to give

1          the handwriting exemplar.

2                    MR. SHEA: Right.  I'm not trying --

3                    THE COURT: As long as we understand that.

4                    So, the motion in limine is allowed, but

5          you cannot argue that you don't have a handwriting

6          analysis.

7                    MR. SHEA: Understood.

8                    THE COURT: Motion in limine to prohibit the

9          Commonwealth witness from testifying about the stamp

10         or other markings on the envelope of letter allegedly

11         written by the defendant.

12                   MR. SHEA: I'm told by Mr. Deakin that they

13         intend to -- that on the letter that is the one in

14         dispute here, that there's a stamp from the jail that

15         my client was incarcerated at at the time.

16         Obviously, they're seeking to use the stamp to say it

17         makes sense that, if he's there, the stamp would be

18         on the letter.

19                   My argument is that it's hearsay and it

20         doesn't fall within any exception that I could find.

21                   THE COURT: What's hearsay?  Let me see the

22         stamp.

23                   MR. DEAKIN: Your Honor, I'm not sure that I

24         have a copy of the letter.  Oh, yes, I do, your

1    Honor.  This is a photocopy, it's not the original.

2              THE COURT: So, what's the mark that you say

3    would be hearsay?

4              MR. SHEA: The stamp itself.

5              MR. DEAKIN: I've turned to the page -- this

6    stamp is actually on the back of the envelope, but

7    it's on a separate page.

8              THE COURT: I see it.

9              So, the stamp that says, "This

10   correspondence is mailed from the Suffolk County

11   Sheriff's Department facility.  The contents have not

12   been evaluated.  Department is not responsible for

13   its contents."

14             And what's the objection to it?

15             MR. SHEA: Well, it's hearsay.  And it's

16   prejudicial.  And it's prejudicial because it shows

17   that my client is incarcerated, which we prefer to

18   not have the jury know; we go to some trouble to hide

19   it from them during these proceedings that he's

20   incarcerated.

21             So it has the prejudice of having him

22   incarcerated, which puts on the presumption that some

23   judge thought there was enough legitimacy to these

24   charges to keep him incarcerated.  That is damaging

1    to our ability to try the case fairly.

2            The other thing is that it is hearsay that

3    doesn't fall within any exception.  I'll be frank; my

4    initial thought was, well, maybe they're going to try

5    and get it in as a business entry or something.  But

6    business entries, the document is stamped and kept.

7    This isn't any such thing.

8            So, I would ask that it be excluded.

9            THE COURT: Motion denied.

10            MR. SHEA: Note my objection.

11            THE COURT: Assuming that they lay the basis

12    for it or the foundation for it to be presented to

13    the jury.

14            MR. SHEA: Well, I assume that basis would

15    be that the individual who put the stamp on it would

16    be called.

17            THE COURT: No, not necessarily.  I mean,

18    the issue is whether or not your client ever wrote

19    the letter.  And they're using that as -- it's

20    limited to whether or not your client wrote the

21    letter, and for the jury to determine whether or not

22    it was your client who wrote the letter.

23            Motion in limine to prohibit evidence of

24    other prior bad acts.  Which other ones are you

1       referring to?

2               MR. SHEA: Well, at this point, it was the

3       cocaine, prior conviction for cocaine, that they were

4       going to attempt to get in.  I'm now told they're

5       going to try and get in the marijuana one.  I assume

6       that that one will be kept out, as well.

7               THE COURT: Well, the marijuana, I'm not

8       going to allow in.

9               MR. DEAKIN: Just -- the prior conviction

10      for marijuana.  There is actually marijuana found in

11      his room.

12              THE COURT: All right.  Prior conviction for

13      marijuana.

14              MR. SHEA: I don't know if there were any

15      other bad acts that we haven't covered yet that the

16      Commonwealth is intending to use.

17              MR. DEAKIN: Your Honor, I, in discovery,

18      almost two years ago, gave the defendant a list of

19      the defendant's prior convictions that we would seek

20      to introduce should he testify.  That's a separate

21      issue.  I also gave him notice of several prior bad

22      acts that we were contemplating seeking to introduce.

23      However, we're not seeking to introduce any of the

24      prior bad acts listed in discovery or any other bad

32

1   acts, with the exception of the cocaine conviction

2   and marijuana conviction that the Court has excluded.

3   So I don't anticipate any other prior bad acts

4   besides those.  I'm not aware of any.

5            I think the motion should be allowed.

6            MR. SHEA: Thank you.

7            THE COURT: Motion in limine, complainant's

8   testimony that she not be allowed to testify that she

9   told other people who are not offered as fresh

10  complaint witnesses.

11           MR. SHEA: Well, it would be allowing her to

12  -- I mean, if these people -- if it turns out that

13  they're prior inconsistent statements to these

14  people, that would be one thing.  But if they're an

15  attempt to pile on, in terms of build her own

16  credibility by stating the number of people, it has

17  the same effect of too many fresh complaint

18  witnesses, which strengthens and confirms, and makes

19  more certain the testimony of what another witness

20  would say.

21           THE COURT: Okay.  Motion denied.

22           MR. SHEA: Note my objection.

23           THE COURT: Motion in limine to exclude

24  reference to complaining witness as "victim" is

1    allowed.

2              So tell your witnesses coming in here not

3    to refer to her as "the victim."  Refer to her by

4    name or....

5              Motion in limine regarding fresh complaint

6    evidence.

7              MR. SHEA: There are a number of different

8    levels.  We might be better served by going through

9    that at a later point, because I'm disputing the

10   fresh complaint evidence should even come in.

11             THE COURT: Well, why?

12             MR. SHEA: Why?

13             THE COURT: Yeah.

14             MR. SHEA: Well, historically, fresh

15   complaint evidence has been allowed in because, as

16   the courts have said, an unfortunate --

17             THE COURT: Well, let me ask you this:

18   Refresh my memory on this.  When this -- this

19   allegedly took place when?

20             MR. DEAKIN: It took place -- she was taken,

21   allegedly taken at 11 o'clock at night on Thursday,

22   July 13th of 2000.  She was taken to one location, or

23   three different locations.

24             THE COURT: Okay.  And when was the report

34

1    made?

2              MR. DEAKIN: Well, she says he left her at

3         the place where he assaulted her, and told her he

4         would come back and get her.  She remained there for

5         a period of time.  She thinks a half hour to an hour.

6         And then when he didn't come back, she made her way

7         back home, which took her, she would estimate, about

8         ten minutes.  And she made the report at that time.

9              THE COURT: So how would that be fresh

10        complaint in terms of -- why would that be -- fresh

11        complaint generally comes up when there's been a

12        delay of days or weeks or months or years or

13        something.

14             MR. DEAKIN: Well, your Honor, that's when

15        it gets controversial.  Because there's a question of

16        how fresh.  But the case law is very clear that when

17        there's a rape that happens and there's immediate

18        reporting, that that's admissible fresh complaint.

19        That's not controversial·at all.

20             THE COURT: I'm just saying that in the past

21        my experience has always been -- that's why I'm

22        reaching for my book, to see, is that it's always,

23        for the most part been -- it's been days or weeks.

24        And you're saying it can be just an hour or so and

1    still be fresh complaint?

2            MR. DEAKIN: Absolutely.  That's the -- the

3    classic fresh complaint is when somebody is raped and

4    immediately goes and says, I've been raped, I've been

5    raped.

6            That's the black letter, no doubt about it

7    fresh complaint.  The cases that the Court is

8    thinking about is the case where -- where children

9    are involved and we haven't set any outer limit on

10    fresh complaint, but the fact that -- I mean, the

11    cases are clear --

12            THE COURT: It doesn't just have to be a

13    child.

14            MR. DEAKIN: No, it doesn't just have to be

15    a child.  The point is that they let fresh complaint

16    go even longer where children are involved.  But,

17    clearly, where a sexual assault victim reports

18    immediately or within minutes or hours --

19            THE COURT: It's still up to the jury to

20    decide whether or not it's fresh.

21            MR. DEAKIN: Correct.  Absolutely.  And that

22    would be the Court's instruction.

23            THE COURT: And what's your objection to

24    this, Mr. Shea?

1              MR. SHEA: Well, my objection is that it's

2       usually been allowed because there's been some belief

3       that people who make rape allegations are not

4       believed.  And the Court has allowed fresh complaint

5       in because of a perceived prejudice against rape

6       victims.

7              We're not dealing with a he said/she said,

8       date rape kind of situation here where a fresh

9       complaint -- where the courts have carved out fresh

10      complaint evidence for.  I mean, we're basically

11      dealing with the question of did my client do this.

12             Now, I'm not going to say that there might

13      not be questions about what actually happened in

14      terms of penetration, because I've been turned over

15      exculpatory evidence along those lines.

16             But we also have difficulties there in that

17      if the witness' testimony is changing, and it is, it

18      has on a few different occasions, as to exactly what

19      happened, and the Commonwealth's aware of this, and

20      as far as I can tell has met their obligations as to

21      that in turning me over the changes in testimony.

22      That presents a problem with fresh complaint right

23      there.  Because it has to track the witness'

24      testimony.  And if it's different, it's not fresh

37

1    complaint testimony.

2              So, how they intend to --

3              THE COURT: Well, then they don't get to

4    testify to it, if it goes beyond the complainant's

5    testimony.

6              MR. SHEA: Well, that's why I'm proposing a

7    voir dire of any fresh complaint witness prior to

8    their being allowed to testify on fresh complaint, to

9    see if it even is.  I don't think it's necessary in

10   this case.

11             THE COURT: All right.  All right.  Motion

12   denied.

13             MR. SHEA: While we're on that, I know it's

14   different, but Mr. Deakin has brought a motion to

15   allow fresh complaint, which, I assume, I'm

16   interpreting, you just are allowing.  But the other

17   thing he's trying to do is to introduce this evidence

18   substantively as an excited utterance.

19             Now, here we have a case where the person

20   is testifying on her own, so it's not that we have a

21   witness who is chosen --

22             THE COURT: Well, wait a minute, wait a

23   minute.  If -- I mean, aren't those mutually

24   exclusive grounds.  If it's fresh complaint, it can't

1    come in substantively.  But, if it's excited

2    utterance, it can.

3         So, what you want me to do is instruct the

4    jury on both?

5         MR. DEAKIN: No, your Honor.  They're not

6    mutually exclusive.  What I'm seeking to do is as to

7    her mother and as to Officer Tahisha Skeen, who her

8    mother -- she ran into her mother's arms and began,

9    her mother said, What happened?  What happened?  And

10   she began telling her what happened while she was

11   crying and she had just come back.

12        They put her into a police car and took her

13   to an ambulance, and I won't bore the Court, but she

14   continued to tell her mother, while she was still in

15   the heat of the moment, what had happened.

16        THE COURT: All right.

17        MR. DEAKIN: She was then placed in an

18   ambulance where Officer Tahisha Skeen asked her

19   questions, and she continued to recount the events.

20   It came out kind of disjointed; she had cocaine in

21   her system at the time, so it's not totally

22   surprising that she was a little bit disjointed.  She

23   was an 11-year-old girl.

24        My contention is that the statements to her

39

1       mother and, I think, also to Tahisha Skeen are

2       spontaneous utterances falling within that exception

3       to the hearsay rule, and are admissible

4       substantively.

5               If the Court agrees with that contention,

6       and I recognize that's the question to the Court,

7       obviously, I would ask the Court to instruct the jury

8       that they may consider the statements as substantive

9       evidence of the defendant's guilt.

10              If the Court concludes that they do not

11      meet -- if either one or both does not meet the

12      spontaneous utterance standard, then I would ask the

13      Court to instruct on the limited use.  I would

14      instruct the Court to instruct the jury on fresh

15      complaint.

16              THE COURT: So, they are mutually exclusive.

17              MR. DEAKIN: I think they're mutually

18      exclusive, but I don't think -- right.  I guess I

19      wasn't --

20              THE COURT: So it's one or the other.

21              MR. DEAKIN: It's one or the other.  And I

22      would ask the Court to evaluate spontaneous utterance

23      first, because it allows a substantive admission.

24      And then if the Court  --

40

1          THE COURT: So, if it comes in as

2    spontaneous utterance, then you're not offering fresh

3    complaint witnesses.

4          MR. DEAKIN: Well, I would still ask the

5    Court to allow Dr. Elisabeth Schainker from the

6    hospital, and, potentially, Sergeant Detective

7    McDonough, also at the hospital, be allowed to

8    testify as fresh complaint witnesses.  That will be

9    four, I know.

10         THE COURT: If those other two statements

11   come in as excited utterances, no, I'm not going to

12   allow the others to talk about it as fresh complaint

13   witnesses.

14         MR. DEAKIN: I understand.

15         THE COURT: I'll have to deal with that as I

16   hear the testimony unfold.

17         MR. SHEA: I'd ask that we do a voir dire

18   out of the presence --

19         THE COURT: Pardon me?

20         MR. SHEA: I'd ask that we do a voir dire

21   out of the presence of the jury before the excited

22   utterance -- to determine if --

23         THE COURT: Well, he has to lay the

24   foundation before it can come in as an excited

41

1    utterance.  You don't have to do that outside the

2    hearing of the jury.

3              MR. SHEA: Well, I mean I think there's some

4    interesting --

5              THE COURT:  What I have to know is not what

6    the statement is, but when the statement was made and

7    under what conditions it was being made.

8              MR. SHEA: Well, I would just point out so

9    it's clear before we get there that there's a police

10   report by Harry Byrne, which seems to -- doesn't

11   mention Officer Skeen being present with the child

12   early on.  It says the child returns to the mother,

13   he then has the child go to the mother, and the

14   boyfriend into a vehicle with Officers Murray and

15   Merner.  Apparently no statement is made to them.

16             Then he's interviewing the child.  She

17   allegedly says, "'He touched me down there.'  At this

18   time I stopped the interview."

19             Now, how are they going to say that

20   anything from that point on is an excited utterance?

21             THE COURT: Then maybe it's not.  But, you

22   know --

23             MR. SHEA: That's why I would like to have

24   an opportunity to have it done outside of the

1       presence of the jury.  And I would just point out to

2       the Court that they may be being too clever by half

3       because they're setting the groundwork for not having

4       to use Detective Byrne if the Court rules on his

5       problems in the federal court adversely.

6               MR. DEAKIN: Your Honor -- I'm sorry, your

7       Honor.  I'm not finding where -- defense counsel is

8       ignoring the 9-1-1 report that Sergeant Byrne did, in

9       which he writes that --

10              THE COURT: Excuse me.  I don't think I have

11      to do a hearing outside of the jury.  Either you lay

12      the foundation for it to come in as excited

13      utterance, or you don't.

14              MR. DEAKIN: Understood.

15              MR. SHEA: The only thing I would point out

16      -- I'm not arguing this further -- is again what Mr.

17      Deakin is inviting the Court to do, as he did with

18      the cocaine, is to take fresh complaint witnesses,

19      couch them as something else, not give a fresh

20      complaint instruction, which would be, again,

21      problematic.

22              THE COURT: It depends upon what happened.

23              MR. SHEA: I'd just point out that that is

24      what -- what he's really trying to do by drawing a

43

1   distinction between these two things is to stop the

2   Court from giving a fresh complaint instruction.

3        THE COURT:  And they can do that, if the

4   statement is an excited utterance.

5        MR. SHEA: I'm just saying, again, he's

6   inviting these to be reversible error.

7        THE COURT: Okay.  Then he'll have to try

8   the case all over again.

9        So the motion to conduct a voir dire of all

10  witnesses is denied.

11       Motion for voir dire regarding letter

12  allegedly written by defendant to Polly Taylor.

13       MR. SHEA: Well, obviously, this letter

14  purportedly --

15       THE CLERK: It's the Commonwealth's

16  memorandum.

17       THE COURT: Go ahead.

18       MR. SHEA:  -- written by my client is, you

19  know, a critical issue in the case.  And there are a

20  number of issues on it.  Was it written by him?  Is

21  it a confession?  The Commonwealth's memorandum says

22  that the letter would come in because even an

23  equivocal statement is admissible against the

24  defendant.

1            Again, I would draw the Court's attention

2      to the cases that they cite, *Commonwealth v. Pruit*

3      (phonetic) is the first one they cite.  That one

4      involves ineffective assistance of counsel.

5            It quotes two other cases, which I went

6      back and read.  In those statements which were made

7      under police questioning and in response to questions

8      about whether the person had committed the offense.

9      In the one case the response was, "Probably."  In the

10     second case, a murder, the person said he didn't

11     know, he could have done it, and went on to say he

12     was under the influence of substances.

13           Both of those, what the courts allowed was

14     the questioning itself by the police and those

15     responses, which are far less equivocating than

16     what's in this letter.

17           So, on all sorts of levels there's a need

18     for a hearing outside the presence of the jury.  Is

19     it an equivocal response.or not?  Is it a confession?

20     Is it even written by my client?  Which is the issue

21     of the fingerprints.  Can it be identified by the

22     party, because they have to identify it as his

23     writing through someone?  I anticipate that they'll

24     us Polly Taylor, perhaps other people they believe

1    are familiar with my client's handwriting.

2              That should be done outside the presence of

3    the jury.

4              THE COURT: All right.  Motion denied.

5              Motion to voir dire --

6              MR. SHEA: I'd like to make a record on

7    that, Judge, because what is going to happen is in

8    having to argue these things in the presence of the

9    jury is going to put me in a position of making this

10   letter of great importance.  And they'll see me

11   attempting to keep it out.  And if it then comes in,

12   I'm put in a position of trying to minimize something

13   that they've just seen me make great efforts to keep

14   out, which is exactly why it should be voir dired

15   outside of their presence.

16             THE COURT: Motion denied.

17             Motion for voir dire of child witness to

18   determine competency to testify..

19             How old is the child?

20             MR. DEAKIN: She's 13 now.  And I don't

21   think there's any case law in Massachusetts that even

22   hints that absence of very unusual circumstance even

23   hints at a competency hearing.

24             THE COURT: All right.

1          MR. SHEA: I haven't had an opportunity to

2     interview the individual, though I've been by and

3     attempted to.  So I'd bring this motion in caution,

4     because if the Commonwealth is representing there's

5     no competency issue, I want them on the record doing

6     that, in case it turns out there is.

7          MR. DEAKIN: Your Honor --

8          THE COURT: Competency to testify is whether

9     or not she can remember what took place.

10         MR. DEAKIN: And also that she understands

11    the difference between the truth and a lie.

12         THE COURT: Right.

13         MR. DEAKIN: And, your Honor, I would just

14    note for the record --

15         THE COURT: There are a lot of people who

16    understand the difference between truth and still lie

17    when they get on the witness stand.

18         Motion's denied.

19         MR. DEAKIN: If·I may just make a record on

20    this point, just in the event....

21         Defense counsel has a tape of an extensive

22    interview three days after the assault.  Clearly, if

23    he thought there was a question of competency, he

24    could present that tape to the Court.

1           THE COURT: Motion for voir dire regarding

2      identification procedures.

3           MR. SHEA: Well, Judge, for one, I brought a

4      motion to suppress identification in this case, which

5      the Court denied without a hearing.  I would like

6      some knowledge of identification procedures.  There

7      is --

8           THE COURT: I thought the identification was

9      made when she was watching television one morning.

10          MR. SHEA: Well, you know, we get all sorts

11     of different things.  You know, I mean, we get -- I

12     believe they're going to testify that she told her

13     mother when she got in the car.  That's what her

14     mother's going to testify.  But then I've been turned

15     over a statement that she's not sure that she ever

16     told her mother when she got in the car.

17          THE COURT: Well, that's not an

18     identification, that's a statement that might be

19     inconsistent with the identification she later made.

20          MR. SHEA: Then there's a statement at the

21     bail hearing, my client's original bail hearing, made

22     by Mr. Deakin that the identification was made at the

23     noontime news.  Then we have a statement that she

24     made it while watching television the following

48

1      morning, in the presence of her mother.

2              So....

3              MR. DEAKIN: Your Honor, I object

4      strenuously to what defense counsel just said.  This

5      goes back to the bail hearing, and I objected at that

6      time.  At the time of the bail hearing I disclosed

7      information that was available to the Commonwealth.

8      And I subsequently, within minutes, learned in a

9      little bit more in detail about when she made this

10     television identification, and I turned that over to

11     defense counsel.

12             I made that representation roughly 12 hours

13     after the crime was committed, and after a very short

14     time I had to discuss the matter.

15             The point of fact is this: The victim's

16     mother testified in the grand jury that she asked her

17     daughter, immediately upon entering the police car,

18     when her daughter came back, "Was it Sonny?"  And her

19     daughter said, "Yes."   .

20             Her daughter, during trial preparation, at

21     one time said she had difficulty remembering that.

22             THE COURT: That's not an identification

23     procedure.

24             MR. DEAKIN: I agree. The only

49

1      identification -- there are no identification

2      procedures used in this case.  The reason for that is

3      that the girl identified him on the television --

4                  THE COURT: The motion is denied.

5                  MR. SHEA: Note my objection, Judge.

6      Because identification is our entire case here.  We

7      haven't been able to do a motion to suppress, even

8      though the clearly highly prejudicial idea that she

9      could identify him off of a TV tape that shows him

10     surrounded by about eight cops.  We're not allowed to

11     test that.

12                 Now, we can't even, before she identifies

13     him at trial, test the identification to find out

14     what it even is.  Because, you know, meaning no

15     particular insult to Mr. Deakin, it's been changing a

16     bit, how it happened.

17                 THE COURT: And that's exactly the point.

18     There was no identification procedure conducted by

19     the police in this case.·

20                 Motion denied.

21                 MR. SHEA: Note my objection.  There is an

22     inclusive in that there is another individual -- I

23     believe it's Denise Wilson -- who says that she

24     identified my client, and it's in the police report.

1        And I don't believe we had a disagreement on out-of-

2        the-presence-of-the-jury, finding out how she had

3        been -- identified my client.

4                MR. DEAKIN: I don't have any objection to

5        that.  I think the answer is going to be that she

6        said she knows him and saw him there.

7                THE COURT: Fine.  All right.  Where are the

8        Commonwealth's motions? .

9                MR. DEAKIN: Your Honor, I brought the

10       following motions.  A motion for a view, which I

11       gather the Court has allowed.

12               THE COURT: Yes.

13               MR. SHEA: I'm objecting to it.

14               THE COURT: Pardon me?

15               MR. SHEA: I'm objecting to it.  It's not

16       necessary.  I don't think it lends anything to

17       this --

18               THE COURT: Objecting to the view?

19               MR. SHEA: Yes..

20               THE COURT: All right.  Overruled.  We'll

21       have a view.

22               THE CLERK: Do I have your motion for a

23       view?

24               MR. DEAKIN: You do.  I gave you --

1          THE COURT: It's around somewhere.  We'll

2     find it.

3          MR. DEAKIN: I can produce another copy.

4          THE CLERK: Sure.

5          MR. DEAKIN: You know what, I'm sorry.

6     Paul, my mistake.  I did not include the motion for a

7     view.  For some reason I left it out of the packet I

8     submitted to the Court.

9          And, your Honor, the next motion that I

10    brought was a motion -- it's a memorandum of law,

11    actually, regarding the admission of the defendant's

12    letter.  Just to clarify some points that defense

13    counsel made on that score.

14          THE COURT: The letter that was sent to Ms.

15    Taylor?

16          MR. DEAKIN: Correct.

17          THE COURT: If you lay the foundation, it

18    comes in.

19          MR. DEAKIN: Right.

20          THE COURT: But you have to lay the

21    foundation.  I can't sit here and tell you that the

22    letter is going to come in.

23          MR. DEAKIN: Understood.  I understand.

24    It's a memorandum of law for the Court, basically to

1      refute what defense counsel's suggesting.

2                 THE COURT: What's the next motion?

3                 MR. DEAKIN:  A motion to impeach the

4      defendant with his prior convictions, which, I guess,

5      the Court has said you were going to defer on.

6                 THE COURT: Right.

7                 MR. DEAKIN: A motion to preclude Simon

8      Cole's testimony, the fingerprint expert, which, I

9      gather, we're going to address on Monday.

10                 THE COURT: We're going to do it on Monday.

11                 MR. DEAKIN: A motion to admit the victim's

12      statements as spontaneous utterances, or, if not, as

13      fresh complaint, which I believe the Court has

14      addressed.

15                 THE COURT: Right.

16                 MR. DEAKIN: A motion to admit expert

17      medical testimony.

18                 THE COURT: That's Dr. Newton?

19                 MR. DEAKIN: Dr. Newton.

20                 THE COURT: All right.  Allowed.

21                 MR. SHEA: Well, Judge, I would object.  And

22      I'm objecting not -- I'm not objecting that Dr.

23      Newton cannot testify.  I am objecting that initially

24      in their argument they say that the Commonwealth

1    intends to elicit from Dr. Newton testimony that "in

2    the absence of evidence of physical injury, the lack

3    of such evidence does not necessarily lead to the

4    medical conclusion that the child was not abused."

5    Citing *Commonwealth v. Federico*, and a number of

6    cases.

7              Now, the problem there is case law in

8    support of that.  They go on to say, "Dr. Newton will

9    testify that in many cases, perhaps even the majority

10   of cases in which girls are penetrated vaginally,

11   pelvic examinations produce no physical evidence of

12   penetration."  For which there are no case law cites.

13   And there's a reason there's no case law.  Because

14   the doctor is going farther there than the case law

15   allows.  And I would ask the Court not to allow that.

16              THE COURT: All right.  Overruled.

17              MR. SHEA: Note my objection.

18              MR. DEAKIN: Your Honor, motion for the

19   defendant to conform his appearance to his appearance

20   at the time, as of Thursday, July 13th.  I want to

21   note for the Court that I gave defense counsel notice

22   of this motion about ten days ago, in the hopes that

23   he would agree to it, and the defendant would conform

24   his appearance.

1          The reason for that is this, your Honor:

2     ████████████, who the Court knows was 11 years old

3     when she was abducted, identified "Sonny," that is,

4     the name by which she knows the defendant, as he

5     appeared on that day.  She will be asked to make an

6     in-court identification.  And I've attached to the

7     motion a copy of the booking photograph, which shows

8     that the defendant with much shorter, fairly close-

9     cropped hair, and no facial hair.

10         THE COURT: Well, it's much shorter than it

11    is now.

12         MR. DEAKIN: Much shorter.

13         THE COURT: And he doesn't have facial hair.

14         MR. DEAKIN: And again, no facial hair.  I

15    can't tell actually in the booking photograph whether

16    he has no facial hair or very, very light stubble.

17         THE COURT: It's a light beard.  Light

18    stubble beard.  Whatever.

19         MR. DEAKIN: And I think the video tape

20    confirms that, your Honor.

21         MR. SHEA: I'm a little confused.  Because

22    the case law is that you can only ask him to change

23    his appearance if they're attempting to give him a

24    lineup.  It doesn't say for an in-court

1    identification of the defendant sitting at counsel

2    table with nobody else around.

3              THE COURT: This one, I'll take under

4    advisement and I'll let you know on Monday.

5              MR. SHEA: I'd just point out that in

6    reading the case, which is often a good thing to do

7    when the Commonwealth cites them, because they don't

8    accurately portray them always --

9              THE COURT: I said I'd take it under

10   advisement.  I'll let you know on Monday.

11             MR. SHEA: Thank you.

12             THE COURT: Commonwealth, anything else?

13             MR. DEAKIN: Yes.  Well, I think we've

14   already addressed effectively Commonwealth's motion

15   to preclude the defendant from referring in any way

16   to the lack of a handwriting analysis in this case.

17             THE COURT: Right.

18             MR. DEAKIN: So that I gather that's been

19   allowed?

20             THE COURT: Yes.

21             MR. DEAKIN: And then the final one that

22   I've brought -- actually, if I may, your Honor, one

23   issue on the letter, just to clarify so I know what

24   the Court's ruling is, the Commonwealth will seek to

1    introduce the fact of the defendant's incarceration

2    at the time -- well, from the time of the crime until

3    the time the letter was received.  We don't need to,

4    obviously, go beyond that.

5              THE COURT: All right.

6              MR. DEAKIN: Because it relates to where the

7    letter was mailed from.

8              Then, finally, your Honor, there's the

9    question of the Commonwealth's motion to preclude any

10   reference to -- in any fashion, to Harry Byrne's

11   pending federal indictment.

12             And the Commonwealth brings this motion

13   under what it believes to be the clear weight of the

14   case law, which is that as a general matter -- and

15   I'm quoting now from my memorandum -- "Generally, an

16   arrest, indictment, or the pendency of charges in

17   some other form is not, as such, a basis for

18   impeaching a witness."  That's the general rule.

19             Now, it's clear from the case law, first of

20   all, that the Court does have discretion to deviate

21   from the general rule under certain circumstances.

22   It is also clear under the case law that there are

23   basically two ways that a defendant -- and I'm citing

24   now from -- the standard is -- I'm citing from

1    *Commonwealth v. Mallan* (Phonetic), which I provided a

2    copy to the Court; it's 29 Mass. App. at 378.

3    "Before the Court should admit such evidence the

4    defendant is required to furnish some persuasive

5    explanation when the arrest might indicate the

6    witness' bias or motive to lie."

7              That's one of the things that this kind of

8    evidence can be used for. It's specifically bias or

9    motive to lie in this case.

10             The other thing that I would concede that

11   the evidence could be used for, if the proper

12   foundation were laid were it to show a pattern of

13   conduct that, you know, as we often do with

14   defendant's, frankly, with prior bad acts, where we

15   argue that there's a pattern of conduct that amounts

16   to a signature, you know, and the person acted in

17   conformity with that pattern.

18             Addressing the second one first.  There is

19   no suggestion in this case of police misconduct.

20   What defense counsel has tried to argue suggests

21   police misconduct was Polly Taylor's statement that,

22   after the police took Owen McCants out, they went

23   back in the bedroom and brought something out in a

24   bag she described as the size of a lunch bag.

1    She couldn't describe who brought it out,

2    which police officer, whether he was white or black,

3    tall or short.  She believes it was a man.  And

4    that's it.

5    Ruby Williams, who allegedly was there at

6    the same time, your Honor will recall from the

7    testimony, supplied that several officers brought

8    arm-loads of items out of his bedroom.  Arm-loads of

9    items out of his bedroom.  But she, too, couldn't say

10   who did it, or what was in it, or anything else.

11   That is the sum total of the allegations of

12   police misconduct in this case.  Even if the Court

13   accepts that that could arguably be misconduct, there

14   is no suggestion at all that Harry Byrne had any

15   participation in that, that he had any knowledge of

16   that, had any responsibility for that, or was, in

17   fact, even there.

18   There is no credible -- there is no

19   evidence that Harry Byrne did anything in this case

20   at all.  None.

21   The defense now says Harry Byrne, after he

22   testified and after he wrote his reports, after he

23   testified in the grand jury, after he testified

24   before this Court in May at the motion to suppress,

1    in September allegedly beat a young man while he was

2    in his custody and allegedly, apparently, asked other

3    officers not to testify about it.  He was then

4    indicted in federal court.

5              There is absolutely no connection between

6    the incident that happened well over a year after

7    this incident and this incident.  None.  Defense

8    counsel hasn't even suggested any connection.

9              THE COURT: Let me hear from defense

10   counsel.

11             MR. DEAKIN: Pardon me?

12             THE COURT: Let me hear from defense

13   counsel.

14             MR. SHEA: Well, I'm going to suggest that

15   there is police misconduct in this case, and that is

16   part of my critical component to my defense in this

17   case.  Looking at the dispute over whether Harry

18   Byrne had anything to do with things.  He testifies

19   as the motion to suppress.  He had the room cordoned

20   off.  He had the two officers put there.  After he

21   cordoned off the room, was anything taken out of that

22   room?  No.

23             Was anyone left in the room while you

24   cordoned it off?  No.

1       He's the lead investigator in this case.

2   Polly Taylor is going to testify that that room

3   wasn't cordoned off.  And she's going to testify to

4   this while she's up there testifying for the

5   Commonwealth on the letter, I assume.  And she's

6   going to say that officers were left in the room,

7   that officers went in the room, and that officers

8   left with a bag, taking things out of the room.

9       Now, she can't say what was in the bag, but

10   what becomes really interesting, when we get to the

11   DNA.  The DNA evidence, and I expect the

12   Commonwealth's expert will acknowledge this and my

13   expert will talk about it, is that the green shirt

14   that is the key piece of evidence they take out of

15   that room with the DNA has the blood of ███████

16   on it, supposedly has the DNA of my client, that's

17   the Commonwealth's point.  It has a third person's

18   DNA on it.  A third person.

19       That's critical.  And that's a lot of what

20   this case rises and falls on is to show that there

21   was police misconduct in the handling of evidence,

22   and how things were taken from that room, that

23   they're lying about whether things were taken from

24   that room.  And we're going to show that there's a

1     mystery third-person's DNA on the shirt.  We're also

2     going to show, I believe, that there's a third

3     fingerprint in the car; something along those lines

4     was turned over to me.

5              So that is critical to the case.  And Harry

6     Byrne is the fellow in charge of all of the evidence

7     and the investigation.  The same Harry Byrne who's

8     now in federal court under indictment for what?

9     Witness tampering, and civil rights violations.

10             Now, so, in terms of whether there is any

11     suggestion of police misconduct, let me be very

12     clear.  I'm going to build a lot of my case around

13     police misconduct in this case.  Before I even heard

14     of Harry Byrne I was going to use that on the DNA and

15     with Polly Taylor.

16             THE COURT: And that's the basis for your

17     wanting to introduce the indictment in federal court

18     against Harry Byrne?

19             MR. SHEA: There's two more points.  One, in

20     the Giontzis case, 47 Mass. Appeals Court, 450,

21     there's -- it's a little bit different.  But the

22     expert witness in that is alleged to have spoliated

23     evidence.  The Commonwealth sought to introduce that

24     against him in another case in which he testified.

1          The Court said,"If true, an expert's
2     mishandling of evidence in another case would be
3     relevant to the jury's assessment of his skill as an
4     expert."
5          I think that that's similar to this, where
6     Harry Byrne, who has tampered with witnesses in
7     another case that he was in charge of, okay, is the
8     person in charge of this case, and I intend on
9     showing that he tampered, lied about the access of
10    police, and how he ran the investigation is similar
11    to that, his mishandling of this case should come in.
12    And the courts have found that with an expert that is
13    so, and I think it should be the same with a
14    detective in charge of an investigation.
15          And, lastly -- well, not lastly.  But the
16    Court -- the Commonwealth seeks to cite the Ellis
17    case to say that this shouldn't come in, but if you
18    read the Ellis case, as I would ask you to do, the
19    Court says that one, what Ellis is is a motion for
20    new trial.  And it's a motion for new trial asking
21    for the Court to revisit the suppression of
22    identification due to the conviction of those
23    officers.
24          And the Court basically says, "It is well-

1    established that newly discovered evidence that tends

2    to merely impeach the credibility of a witness will

3    not ordinarily be the basis of a new trial."  That's

4    far different than what we have here.  And it doesn't

5    say that they wouldn't have allowed them to impeach

6    their credibility at trial with this.

7             And in that case they say given the absence

8    of evidence, by affidavit or otherwise, suggesting

9    that the subject detectives procured false evidence

10   in connection with the investigation of this

11   defendant, they don't say that it's enough for a new

12   trial.

13            But what I'm telling you is that with Polly

14   Taylor's testimony, I intend to show that they

15   procured false evidence.  And given that I have the

16   ability to show, whether the jury believes it or Mr.

17   Deakin believe it, that's up in the air, I

18   acknowledge, but I am going to put in evidence that

19   false evidence was taken by these police.  And,

20   therefore, what the Court said in *Ellis* is that it

21   would be relevant in that case.

22            MR. DEAKIN: Your Honor, if I may....

23            THE COURT: Excuse me.  He hasn't finished.

24            MR. SHEA: The other point being from

1    *Commonwealth v. Henson*, 394 Mass. 584.  "When a

2    possibility of bias exists, however, even if remote,

3    the evidence is for the jury to hear and evaluate.

4    The possibility of the prosecution witness is hoping

5    for favorable treatment on a pending criminal charge

6    is sufficient to justify inquiry concerning bias even

7    if the Commonwealth has offered no inducements to the

8    witness."

9              THE COURT: And those are the bases?

10             MR. SHEA: Those are the bases.

11             THE COURT: All right.  The motion's denied.

12             MR. DEAKIN: The Commonwealth's motion is

13   denied?

14             THE COURT: His motion to introduce it is

15   denied.

16             MR. DEAKIN: Thank you, your Honor.

17             THE COURT: All right.  Anything else?

18             MR. DEAKIN: Just for the clarity of the

19   record, the defendant may not refer to Harry Byrne's

20   pending indictment?

21             THE COURT: Yes.

22             MR. DEAKIN: Your Honor, I would ask one

23   other thing.

24             MR. SHEA: Just note my objection.

1          THE COURT: Yes.

2          MR. DEAKIN: I would ask for guidance from

3     the Court on one matter, your Honor.  Harry Byrne, as

4     the Court probably guesses, is on leave, nonpaid

5     leave, because of his pending indictment.  What I

6     propose to do is to ask him on direct examination,

7     Are you currently with the Boston Police Department?

8     and have him say, I'm on leave.

9          I would then ask that defense counsel not

10    be allowed -- perhaps I'll simply ask him where he

11    was assigned.  I think what I'll actually do, your

12    Honor -- I apologize for misspeaking -- I'll simply

13    ask him, Were you working as a police sergeant on

14    Thursday, July 13th?

15         I would ask that it be clear that defense

16    counsel may not say, Are you currently on unpaid

17    leave?

18         THE COURT: Yes.  Yes.

19         MR. DEAKIN: Thank you, your Honor.

20         THE COURT: All right.  Anything else?

21         THE CLERK: No.

22         THE COURT: So, Monday morning at 9 a.m. so

23    we can -- who are the witnesses Monday?

24         MR. DEAKIN: Your Honor, it's -- defense

1    counsel's witness is Simon Cole.  Mr. Simon Cole.

2    And then, depending on the Court's ruling on my

3    preliminary motion, that he not be qualified as an

4    expert.  If we have to go further than that, it would

5    be Dr. -- sorry, not doctor -- Stephen Meagher, from

6    the Federal Bureau of Investigation.

7                  THE COURT: All right.

8                  THE CLERK: That will be at nine o'clock.

9    Because the other matter will be on Thursday morning,

10   that I was talking about previously.

11

12                  (Whereupon, the court adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

67

1                           CERTIFICATE

2

3

4              I, Maryann McDonald, Official Court

5       Reporter, do hereby certify that the foregoing

6       record, pages 1 to 66 inclusive, is a true and

7       accurate transcript of my system tapes, to the best

8       of my knowledge, skill and ability.

9

10

11

12                    _Maryann McDonald_

13

14              Maryann McDonald, Notary Public

15

16

17

18              My Commission Expires: April 1, 2005

19

20

21

22              The foregoing certification does not apply

23       to any copy unless under the direct control and/or

24       supervision of the certifying reporter.