COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
NO. SUCR2000-10994

COMMONWEALTH OF MASSACHUSETTS

v.

OWEN McCANTS

---

Monday, April 22, 2002
Before: Spurlock, J.
Boston, Massachusetts
Day 3 - Trial

---

MARYANN MCDONALD
Official Court Reporter
617.788.6180

2

APPEARANCES:

David Deakin
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
617.619.4000
          Counsel for the Commonwealth


Mark Shea
Attorney at Law
875 Massachusetts Avenue
W. Cambridge, MA 02139
627.864.3943
          Counsel for the Defendant

3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Simon Cole | | | | |
| (By Mr. Shea) | 13 | | 112 | |
| (By Mr. Deakin) | | 67 | | |

EXHIBITS

| NUMBER | | PAGE |
|---|---|---|
| 1 | Article of Dr. James Wayman | 66 |

4

1                          PROCEEDINGS

2

3                  THE COURT OFFICER: Be seated.

4

5     SIDE-BAR CONFERENCE:

6                  THE COURT: Juror Ellis, on  -- when did we

7         impanel this?

8                  MR. DEAKIN: Thursday.

9                  THE COURT: Thursday.  So it must have been

10        Friday.  Got a call from her school.  I guess she was

11        in some kind of program over there that's different

12        than just being in a regular school and going five

13        days a week.  I guess her parents stand to lose about

14        ten grand if she misses more than a couple of days.

15                 So, you want to bring her out?

16                 MR. SHEA: Wait one moment.

17                 THE COURT: Hang on.  You've got to uncuff

18        him.

19                 MR. SHEA: I thought it was going to be the

20        pregnant lady.

21                 THE COURT: No.  She has a schedule we're

22        going to have to conform to.  There are certain days

23        that she needs to get out at certain times to be at

24        doctor's appointments.  So....

5

1          MR. SHEA: Okay.

2          THE COURT: But let me tell both of you

3   this: Have more witnesses than you think you're going

4   to need on any given day.

5          MR. SHEA: I can do that.

6          THE COURT: You're Katherine Ellis?

7          THE JUROR: Uh-huh.

8          THE COURT: And you're a student at

9   Northeastern?

10          THE JUROR: Yes.

11          THE COURT: So what is this Mr. Hanover

12   calling me about?

13          THE JUROR: Because he's telling me I can't

14   be a sophomore next year, basically, if I miss

15   school.  But I'm not -- my parents are, like, really

16   upset with that school anyway.  I'm not even going

17   back there next year.  But he's telling me that I

18   can't be a sophomore.  He's, like, I've got to make

19   up all the work --

20          THE COURT: That what?

21          THE JUROR: That I'd have to make up all the

22   work for the two weeks, which is fine.  And I told

23   him that was fine.  And then he told me, but, the

24   classes that I'd miss are only offered at certain

6

1      times, so I wouldn't be able to be a sophomore till

2      the spring.

3                THE COURT: What classes is he talking

4      about?

5                THE JUROR: I think he's just talking about

6      English, basically.  'Cause every other class is

7      offered, that I'm in right now, is offered all year

8      round.

9                THE COURT: So, how do you feel about this?

10               THE JUROR: It doesn't -- I don't care.  I'm

11     interested in this case.  I just don't want to have

12     it held against me as to not be able to be -- to have

13     to repeat the full year again.

14              THE COURT: Is that what they're saying

15     they're going to do?

16              THE JUROR: Huh?

17             THE COURT: Are they going to make you --

18             THE JUROR: I don't know what he's saying.

19     He was basically just, like, the classes that you're

20     going to lose the credits in are only offered at

21     certain times of the year.  So you wouldn't be

22     considered a sophomore until the spring.  I don't

23     understand how he can do that.

24            THE COURT: Me either.

1          THE JUROR: Like, my uncle's a lawyer and he

2   even said, he's, like, I would go into -- he's, like,

3   I would send your parents into that school.  Like, I

4   don't understand how he could say that to me.

5          THE COURT: Why don't you step back for a

6   second.

7          I'm of the opinion that right now there's

8   going to be a big fight between her and her school

9   and I don't know if I want to get in the middle of it

10   at this point in time.  Although, I am going to deal

11   with that school after this trial is overwith,

12   primarily because we do draw a lot of jurors from the

13   schools around here.

14          Unless one of you really wants her, I'll

15   let her go at this point.

16          MR. DEAKIN: My view, Judge, is -- well, I

17   withdraw my remark.  I'd follow the Court's judgment

18   on it.

19          MR. SHEA: Well, she's interested in the

20   case.  We found someone who seems to have no

21   background.  So, it seems like a good juror to have.

22          THE COURT: So, do you want her?

23          MR. SHEA: I do, but I don't want to end up

24   having her having to repeat sophomore year.  I mean,

1    I would leave it to her discretion.  If she wants to

2    stay.

3                MR. DEAKIN: That's basically what I was

4    going to say, too.

5                THE COURT: All right.

6                THE CLERK: Ms. Ellis.

7                THE COURT: If you want to stay as a juror,

8    I'll deal with the school.

9                THE JUROR: Okay.

10               THE COURT: All right.  So, tomorrow morning

11   at 9 a.m.

12               THE JUROR: Okay.

13               THE COURT: And you can tell Mr. Hanover.

14               THE JUROR: Sure.  I'm going to have to go

15   talk to him right now.  So I'm just going to tell him

16   I'm doing it?

17               THE COURT: That I said that you're staying,

18   and he cannot penalize you for it.

19               THE JUROR: Okay.

20               THE COURT: And if they try to penalize you,

21   we'll take it up with the school.

22               THE JUROR: Okay.  Thank you.

23                (End of side-bar conference.)

24

1          THE COURT: What's next this morning?

2          THE CLERK: What are we doing this morning?

3          MR. DEAKIN: Your Honor, the main part of

4     the business is that the Commonwealth filed a motion

5     to preclude the testimony of defendant's proposed

6     expert Simon Cole on fingerprint evidence.  The

7     defendant also has a proposed expert on DNA evidence

8     that we have not filed any such motion with respect

9     to his expertise.

10          And the defense has filed a motion to

11     exclude the Commonwealth's fingerprint evidence

12     entirely on *Daubert* grounds.

13          THE COURT: Right.

14          MR. DEAKIN: The one thing I would ask, your

15     Honor, and this could involve some fairly lengthy,

16     obviously, hearing, somewhat lengthy --

17          THE COURT: Wait, wait, wait.

18          MR. DEAKIN: The Commonwealth has an oral

19     motion that I should have addressed on Friday, and I

20     apologize for not doing so.

21          I gave defense counsel notice that in

22     addition to the Sergeant Byrne situation, which your

23     Honor has resolved the motion in limine on Sergeant

24     Byrne's pending indictment, the individual who

1    photographed the search warrant of the defendant's

2    bedroom, he's a photographer; that's all he did was

3    take the pictures, which defense counsel has and he

4    intends to use to his own advantage.  It's Officer

5    Michael Flemmi.

6            As your Honor probably knows, Officer

7    Flemmi is on trial in federal court under indictment

8    charging that he assisted his brother, Stephen,

9    commonly known as "The Rifleman," Flemmi in a

10   criminal enterprise.

11           I would ask your Honor to adopt the same

12   reasoning as to Michael Flemmi as your Honor adopted

13   as to Harry Byrne.

14           THE COURT: Well, let's get this fingerprint

15   stuff out of the way first.

16           MR. DEAKIN: I just wanted to make the Court

17   aware.

18           THE COURT: Now, there's two different

19   issues here.  One is whether or not fingerprint --

20   the idea or the science of fingerprinting is junk

21   science and therefore shouldn't be offered in court,

22   and that would require a *Daubert* hearing.  The other

23   one is whether or not Mr. Cole, Dr. Cole, can be

24   qualified as an expert.  Is that correct?

1      MR. SHEA: Yes.

2      THE COURT: So, why don't we decide the

3 issue of whether or not fingerprinting is a science

4 that can be offered under *Daubert*.

5      MR. DEAKIN: That's fine, your Honor.  The

6 Commonwealth's position, which, I gather, the Court

7 may have rejected implicitly in the in-court

8 statement, is that given the --

9      THE COURT: I haven't rejected anything.  I

10 want to know --

11      MR. DEAKIN: I understand.

12      THE COURT:  -- what is the basis for saying

13 -- I mean, the defendant's basis for saying that

14 fingerprinting is not a recognized science?

15      MR. SHEA: Well, even in the -- well, one

16 place we're saying it's not a recognized science

17 would be in Judge Pollak's decision.

18      THE COURT: Hang on a second.  Don't you

19 have to offer evidence on this?  Or do you?  I'm

20 asking.

21      MR. SHEA: Certainly.  I'd offer Simon Cole

22 as a witness.

23      THE COURT: Okay.  So, it's your turn.

24      MR. SHEA: Fine.  We would call Simon Cole

1    to the stand.

2              THE COURT OFFICER: Face the clerk and raise

3    your right hand, please.

4              THE CLERK: Do you solemnly swear the

5    testimony you are about to give this Court in the

6    matter now in hearing is the whole truth and nothing

7    but the truth, so help you God?

8              THE WITNESS: Yes, I do.

9              MR. DEAKIN: Your Honor, could I mention one

10   thing just so the record is clear.  Defense counsel

11   and I agree if Commonwealth's expert should he be

12   required to testify, Stephen Meagher, from the

13   Federal Bureau of Investigation is present in the

14   courtroom, and defense counsel doesn't object to

15   that.  I will also agree that Dr. Cole would be

16   present when Stephen Meagher testifies.

17             THE COURT: Fine.

18             MR. DEAKIN: I should also note that four

19   members, I believe, of the Boston Police Department

20   Fingerprint Unit are present in the courtroom.

21   Detective Margaret Murphy, Officer Rosemary

22   McLaughlin, and Officer Laurie --

23             THE COURT: I need all of this to decide

24   this issue?

13

1          MR. DEAKIN: No, no.  Two of them, your

2     Honor, are potential witnesses in the case.

3     Although, I think defense counsel would agree it

4     won't offer much of anything in the way of

5     inculpatory evidence.

6          I ask that as experts they be allowed to

7     remain, despite the sequestration order.

8          THE COURT: Fine.

9

10          SIMON COLE, SWORN

11          DIRECT EXAMINATION

12   Q   (By Mr. Shea) Good morning.

13   A   Good morning.

14   Q   Please state your name, spelling your last name for

15       the record.

16   A   Simon Cole, C-o-l-e.

17   Q   Okay.  And what's your profession?

18   A   I'm an historian and a sociologist of science and

19       technology.

20   Q   Okay.  And can you give the judge a description of

21       your educational background?

22   A   Yeah.  I have a bachelor's degree of history from

23       Princeton University, and a Ph.D. in science and

24       technology studies from Cornell University.

1    Q    And what is science and technology studies?

2    A    It's an interdisciplinary field comprising history,

3         sociology, policy studies, and philosophy, all of

4         science and technology.

5    Q    And in getting that degree, did you do a dissertation

6         or thesis?

7    A    I did.

8    Q    Okay.  And what was that in?

9    A    That was a history of fingerprint identification and

10        other criminal identification technologies.

11   Q    And how did you get interested in that study?

12   A    I was on a research project to study the sociology of

13        DNA, forensic DNA evidence in a courtroom.  I became

14        interested in comparing the questions we were asking

15        about DNA to how those questions were resolved about

16        fingerprint identification when it was a new form of

17        evidence.

18   Q    And who funded that study?

19   A    That initial study was -- it was funded by the

20        National Science Foundation.  I was -- the funding,

21        of course, went to the professors, and I was a

22        research assistant for one semester on that project.

23        And then that generated further interests that I kept

24        up during graduate school.

```
 1   Q    And that dissertation you did, was that published?

 2   A    The dissertation is published by University

 3        Microfilms, what was called University Microfilms in

 4        Ann Arbor, and it's now called Bell and Howell.  That

 5        doesn't mean published like it's in bookstores, it

 6        just means it's made available through University

 7        Microfilms.

 8   Q    Now, did that dissertation eventually grow into a

 9        book?

10   A    Yes, it did.  I revised the dissertation.  I added

11        further material, including material from some

12        journal articles that I wrote, and that was published

13        as a book called *Suspect Identities* by Harvard

14        University Press.

15   Q    And what was the subtitle to *Suspect* --

16   A    *A History of Fingerprinting and Criminal*

17        *Identification.*

18   Q    And that was published by Harvard University Press?

19   A    That's right.

20   Q    Okay.  And how is it determined it would be

21        published?

22   A    It -- you -- I submitted it to -- submitted the

23        manuscript, original manuscript, to the editor.  She

24        showed some interest in pursuing it.  She sends it to
```

1    anonymous peer reviewers.  They make recommendations

2    about whether to publish it.  For example, the first

3    anonymous peer reviewer said it needed further work.

4    I did further work.  It was sent out again to two

5    more reviewers.  They give reviews.  These were more

6    positive.  Then it goes to an editorial board at the

7    Press, at Harvard, called the Syndics, for some

8    reason, and then they make their decision to publish

9    it.

10   Q    Okay.  And is that something that comes with an

11        academic press?

12   A    Right.  A trade press would not send it out to

13        reviewers.

14   Q    Okay.  And you said it was an anonymous peer review.

15        Why is that important?

16   A    The tradition in academia of anonymous peer review is

17        meant to -- it's as a safeguard to hope that the peer

18        reviewers will feel free to express their opinions

19        honestly and candidly, and not be afraid that if you

20        know who they are someone's going to get back at them

21        for something.

22   Q    And could you tell the judge about your employment

23        background?

24   A    Yeah.  If I may refer to my CV?

1    Q    Sure.

2    A    After finishing graduate school, I was a post-

3         doctoral fellow for two years at the Institute for

4         Health, Health Care Policy and Age and Research at

5         Rutgers University.  After that, I worked at an

6         information technology firm called Visual Networks.

7         After that, I was freelancing and consulting.  The

8         main consulting project being another National

9         Science Foundation grant, which I was a consultant

10        on, run by Cornell and by Harvard on voting

11        technologies in the 2000 presidential election.

12             Subsequent to that, I am currently -- I

13        have a grant from the National Science Foundation, a

14        year-long grant that's run through Cornell, just for

15        a sociological study of fingerprinting and DNA, and

16        their controversies in the courtroom.

17   Q    And do you have an appointment at John Jay College in

18        New York?

19   A    Well, that's a courtesy appointment.  I'm not a paid

20        or I'm not on the faculty, but I'm a scholar in

21        residence.

22             THE COURT: Excuse me.  In what area?

23             THE WITNESS: The department I'm in is the

24        Department of Law, Police Science, and Criminal

1    Justice Administration.

2              THE COURT: So, do you teach that?

3              THE WITNESS: No.  I was going to teach this

4    semester.  The course got cancelled.  I'm doing the

5    research for the grant.  And I use an office there, I

6    use the library, I interact with the faculty.  I'm

7    giving a presentation later this week there to the

8    faculty at a seminar.

9              THE COURT: Okay.

10   Q    And have you held teaching positions?

11   A    I -- during graduate school I was a teaching

12   assistant and instructor.  While I was a post-doc I

13   did some adjunct teaching at Burrough of Manhattan

14   Community College, which is part of the City

15   University of New York.  So, those aren't again,

16   faculty positions, those are sort of temporary part-

17   time teaching positions.

18   Q    Okay.  And aside from the book, have you had other

19   articles published?

20   A    Yes.  I think I mentioned earlier that I folded a

21   couple of journal articles into the book.  The ones

22   which are of relevance here are one called *Witnessing*

23   *Identification, Latent Fingerprint Evidence and*

24   *Expert Knowledge*, published in a journal called

1    *Social Studies of Science*, 1998; an article called

2    *What Counts for Identity: The Historical Origins of*

3    *the Methodology of Latent Fingerprint Identification,*

4    published in a journal called *Science in Context* in

5    1999; and I am currently in the process of writing an

6    article on the history of fingerprint identification

7    for a book called *Advances in Automatic Fingerprint*

8    *Recognition*, an edited volume.

9              I've published a commentary in the Brooklyn

10   Law Review called *Lessons from the Past for the*

11   *Genetic Future*.   That's Fall 2001.

12             Another article that's in press called

13   *Fingerprint Identification and the Criminal Justice*

14   *System: Historical Lessons for the DNA Debate.* That

15   will be in another edited volume.

16   Q    And have you been qualified to testify as an expert

17        in any courtroom?

18   A    I have been qualified in a number of *Daubert* hearings

19        like this one.   Subsequent to one of those, at least

20        one of those *Daubert* hearings, I was qualified to

21        testify at the trial.   I have not yet testified at

22        the trial.

23   Q    And that trial is pending?

24   A    I believe so.   There was a mistrial, and I'm not sure

1      where they are with that now.

2   Q   Okay.  And how many times have you been qualified to

3      testify at the *Daubert* hearings?

4   A   If I may refer, again.  I testified in a *Daubert*

5      hearing in *United States v. Byron Mitchell* in 1999 in

6      the Federal Court in the Eastern District of

7      Pennsylvania.  I testified in *People of New York v.*

8      *James Hyatt* in Kings County, New York.  And I

9      testified in *People of Colorado v. Robert Hood.*  That

10     was in 2002 in Colorado.

11  Q   Okay.

12  A   All those are *Daubert* or *Frye* type hearings.

13          MR. SHEA: Judge, at this time, I'd offer

14     Mr. Cole as an expert in the study of science and

15     technology, the history of fingerprints, and to

16     testify about the reliability of fingerprinting, and

17     whether or not fingerprinting is, indeed, a science.

18          THE COURT: Well, he can testify as a

19     historian.

20          MR. SHEA: Well --

21          THE COURT: I mean, I haven't heard him say

22     anything about examining fingerprints or knowing

23     anything about fingerprint examination, other than as

24     a historian.

1    So, if you want to inquire in those areas,

2    you may.

3            MR. SHEA: Okay.

4  Q    Now, your degree and your profession is the study of

5       science and technology as you defined it, correct?

6  A    That's correct.

7  Q    Okay.  And what scientific method is it you use?

8  A    I do not use a scientific method.  I'm a historian

9       and a sociologist.

10  Q    Okay.

11  A    So I use the methods of history and sociology.

12  Q    Okay.  So do you study the way that scientists

13       generate knowledge?

14  A    That's correct.

15  Q    Okay.  Now, in your study of the history of

16       fingerprints, what comparison and research have you

17       done involving interviews, literature?

18  A    My study was primarily a historical literature-based

19       study.  That means I went historically and tried to

20       look at the professional literature of fingerprint

21       examiners to understand -- and the legal literature

22       to understand how the technique was developed, how it

23       was vouched for in court, how it was received in

24       court, how it's various propositions were argued for

22

1         and accepted.

2    Q   Okay.  And did you start back at the beginning of

3         fingerprinting?

4    A   I started even further back with photography --

5    Q   Okay.

6    A   Mid nineteenth century.

7    Q   Okay.  Taking us back to the beginning of not

8         photography, but fingerprinting, when were

9         fingerprints first brought into the criminal

10       justice system?  Not in the United States, but in

11       general.

12   A   In the 1890s was when fingerprinting was first

13       developed as a method of criminal -- of keeping

14       criminal records.

15           There were few, occasional uses of it for

16       crime solving prior to that, and subsequent to that,

17       and then, a few years later, the technique of

18       forensic fingerprint identification developed.

19   Q   Okay.  And who was the person who first developed the

20       idea of using fingerprinting for identification?

21   A   Well, it all depends on how you define it.  It

22       depends on whether you mean record-keeping; it

23       depends on what you mean by -- you know, whether you

24       mean forensics or record-keeping, whether you mean --

1             what ideas in particular you mean they developed.

2                 So I can give a long list.

3   Q   Well, take us through each thing.  The development of

4             forensics would involve what?

5   A   The development of forensics would involve taking

6             this idea that you're going to link an impression of

7             a finger tip from a crime scene to somebody's finger

8             via a -- usually an inked fingerprint.  That the

9             earliest that I found that actually done was in

10           Albany, New York in the late 1850s.

11               But it was just done and not, you know,

12           published or disseminated as an idea.  It was then,

13           apparently, done in the 1870s by a Scotsman named

14           Henry Faulds that was -- he published that he did

15           this in the *Journal of Nature.*  It took a few years

16           for that to germinate.  Again, there were discussions

17           in the literature how we could use these to solve

18           crimes.  Some scientific literature and so on. Then

19           it develops as a record-keeping technique in the

20           1890s, and becomes more sort of standard practice in

21           police departments.

22               The record-keeping people who were keeping

23           fingerprint records developed, as a sideline, the

24           application of forensic fingerprint evidence.

24

1    Q    And in what countries did it first develop?

2    A    Well, the main countries were India and Argentina,

3         where it began -- the record-keeping systems were

4         developed.  Again, there are sporadic things in other

5         countries, like the people I mentioned in the United

6         States; Henry Faulds was in Japan.  But I regard

7         India and Argentina as the true sort of cradles in

8         fingerprint evidence.

9    Q    Okay.  And what kind of methods were used to identify

10        fingerprints?

11    A    The methods were to examine the crime scene

12        fingerprint and the known fingerprint and to find

13        similarities between them, and from that to offer an

14        opinion that they must come from the same source

15        finger.

16             It was an examination of those two things.

17    Q    Now, taking us up to about 1993/1994, from the

18        inception of fingerprint evidence, was there a

19        methodology used in England?

20          MR. DEAKIN: Objection to that question.

21        It's vague.  I'm not sure what --

22          MR. SHEA: Well, meaning -- I'll try and be

23        a little clearer.

24    Q    The methodology, at some point, involved

1       identification of points, correct?

2   A   Yes.   The early methodology in the 1890s was we will

3       take what was posited by Francis Galton, a

4       statistician at the time, and he was saying we would

5       take these things that are now known as points,

6       sometimes known as Galton points, after him, which

7       today would be known as ridge endings and

8       bifurcations, and we'll match those from the latent

9       print to the known print.   And by matching those

10      points, we'll establish that they must come from the

11      same source.   And so that essentially was the method.

12              They then developed the question of how

13      many of those points do you need to declare that

14      these must come from the same source.   And there was

15      no real -- it was sort of vague.   There was no real

16      standard.   After a few years, around 1910, that sort

17      of period, people in the literature began trying to

18      come up with a set number, say, this is what should

19      be the number.

20              And then there were debates of what the

21      proper number should be, essentially.

22  Q   Okay.   And just to go back, a latent print is...?

23  A   A latent print is a crime scene print.   A print from

24      the crime scene.

1    Q    And known prints --

2    A    A known print would be the print on the fingerprint

3         card.  Today it would be the scanned print.  It would

4         be a print that you know came from the suspect

5         because somebody saw it taken from the suspect.  So

6         you're comparing a known versus an unknown.

7    Q    Okay.  And about what year did they first start to

8         adopt standards in terms of Galt (sic) points of

9         identification?

10   A    I believe -- I think around 1910, Locard came up with

11        standard -- a three-tiered standard.

12   Q    Okay.

13   A    Over 12 points meant you could have a certain

14        identification.  Between eight and 12 points you

15        could have a certain identification if, in the

16        judgment of the examiner, they though it was enough.

17        Less than eight, you shouldn't do.

18   Q    Okay.

19   A    That was when it was the only standard.  Then other

20        standards were promulgated and so on.

21   Q    Now, working from there, what standard was adopted in

22        England in terms of number of points?

23   A    England, a few years later, adopted a 16-point

24        standard.

1    Q    Meaning there needed to be 16 Galt (sic) points of

2         identification?

3    A    Right.  And the idea was officially you would not go

4         to court with fewer than 16.  You would report to the

5         investigating officers that the print was

6         inconclusive, if you had fewer than 16.

7    Q    Okay.

8    A    I believe they've bent that rule on occasion, but

9         that was the rule.

10   Q    And in other locales in Europe?

11   A    Other locales would have other numbers: 12, seven,

12        eight, and so on.

13   Q    Okay.  Now, back here in the United States...?

14   A    Back here in the United States you might have

15        agencies or individual examiners that would have a

16        point standard, but there was no national standard

17        because we don't have national law enforcement.  So

18        there was no national body setting down a standard.

19   Q    Okay.  And to your knowledge, from your studies,

20        there were different standards in different

21        jurisdictions?

22   A    Yes.

23   Q    In your study of what is science and what isn't, and

24        what is a valid scientific method, have you come to

1    an opinion as to whether or not the technique of

2    fingerprint comparison meets the criteria for what is

3    science?

4                    MR. DEAKIN: Objection.

5                    THE COURT: Sustained.

6    Q    Now, going on from -- up until about 1993, what was

7         the point standard, the way that you understood

8         fingerprint evidence to be used in court?

9    A    Up until 1993?

10   Q    Yes.

11   A    The point standard in the United States was gradually

12        replaced by a philosophy that there should not be a

13        point standard.

14                    It's difficult to date when that occurred

15        in practice.  Officially, it was adopted as a policy

16        by the International Association for Identification

17        in 1973.  They adopted a policy that there should not

18        be a legislated point standard.  There should be --

19        instead of a point standard, the judgment of the

20        examiner as to how many -- how much matching detail

21        is necessary.

22   Q    It should be left to the examiner?

23   A    That's correct.

24   Q    Did they lay out a particular test that the examiner

 1              was to use?

 2    A    No.  The test was the judgment of the examiner.

 3    Q    And, so -- and could you describe what the IAI is?

 4    A    Yeah.  It's a professional organization of -- its'

 5         the leading professional organization for fingerprint

 6         examiners.  It also includes other forensic

 7         techniques of trace evidence, and so on.

 8    Q    Okay.  Now, could you define for us "what is

 9         science"?

10              MR. DEAKIN: Objection.

11              THE COURT: As to "what is science"?

12              MR. SHEA:  What is the definition of "what

13         is science."

14              THE COURT: Overruled.

15              THE WITNESS:  I'm sorry.  I can answer?

16              THE COURT: Yes.

17    A    It's very difficult to define "science."

18    Q    Okay.

19    A    I think you can come up with a consensus definition

20         that it involves subjecting your hypotheses to

21         experiment and testing, that it appeals to evidence

22         rather than authority.  Making a proposition.

23    Q    And are you familiar with the *Daubert v. Merrell Dow*

24         *Chemical* case?

30

1     A    I am.

2     Q    Okay.  And can you refresh us as to what the Supreme

3            Court's definition in *Daubert* of what the Supreme

4            Court considers science to be?

5     A    Yes.  The Supreme Court, in that decision, also said

6            that defining "science" was very difficult, and that

7            -- and they did not define it strictly.  They offered

8            flexible guidelines.

9     Q    Okay.

10    A    And those guidelines were testing the scrutiny of the

11          scientific community as expressed through things like

12          peer review publication, standards and error rate,

13          and general acceptance.

14    Q    Now, in looking at the standard adopted by the IAI

15          since 1973, and taking us through *Daubert*, could you

16          tell us how it applies -- applying the four standards

17          in *Daubert*, how that works with the standard adopted

18          in '73?

19                MR. DEAKIN: Objection.

20               THE COURT: Overruled.

21    Q    You can answer.

22    A    The chief problem with that 1973 policy would, I

23          think, be on the standards criterion, in that in

24          doing away with the point standard, the standard that

```
 1          they have posited is not a standard.  The standard

 2          being the "I know enough matching detail is however

 3          much I think is enough," is a circular standard.  So

 4          it relies entirely on just the judgment of the

 5          examiner.  There's no standard external to the mind

 6          of the examiner to say what a fingerprint match

 7          should consist of.  When is it that you have enough

 8          matching detail to conclude that it's a match?

 9               You can't look outside the mind of the

10          examiner for some kind of standard as to what that

11          is.

12     Q    Now, to be clear, in the points of identification

13          standard, when an expert testified, depending on the

14          jurisdiction, say, England, if they testified it was

15          a match under their standard, one would understand

16          that they had 16 points of identification.  Is that

17          fair to say?

18     A    That's correct.  But those standards had a problem,

19          as well, in that they didn't have any --

20               MR. DEAKIN: Objection.  That's

21          nonresponsive.

22               THE COURT: Sustained.

23     Q    Okay.

24     A    That's correct.
```

32

1    Q    Okay. And currently, since the standard is adopted

2          in 1973 in the U.S., is there -- there's no clear

3          minimum; is that fair to say? No minimum standard

4          for how a latent print matches with a known print.

5    A    That's correct. The standard is the expert judgment

6          of the examiner.

7    Q    And that -- and the problem with that is...?

8    A    The problem with that, again, is that there's not a

9          standard. It's not an objective standard. It just

10        is the opinion of the examiner. There's no measure

11        that we can go from one examiner to the other and say

12        what is it that constitutes a fingerprint match?

13    Q    Meaning that when looking at a latent print and an

14        unknown print, the point at which each of -- the

15        individual examiner decides that it is a match, we

16        don't know at what point in time each examiner

17        reaches that conclusion; is that correct?

18    A    That's correct. Or what point in seeing matching

19        detail that they reach that conclusion.

20               What a standard would be with having some

21        kind of standard for how much matching detail you

22        need, and then the examiner would look for matching

23        detail until they cross that threshold. There is no

24        threshold. It's just when the examiner thinks

33

1       they've crossed some kind of vaguely-defined

2       threshold.

3   Q   Okay.  Now, you had mentioned that there were

4       difficulties with the point identification method.

5       Could you tell us what some of those difficulties

6       were in specific cases?

7   A   The difficulty with the point standard was that they

8       were just made up based on expert's intuitions as to

9       what a good standard should be.  So they weren't

10      based on any kind of empirical research or studies of

11      the variability of friction ridge detail and

12      fingerprint pattern.  They were just based on

13      intuition.

14          I think -- and so point standards were

15      regarded by the community as unscientific.  And

16      that's why that 1973 resolution was passed. And I

17      think -- I've reviewed the government's witnesses'

18      powerpoint -- he has a very nice demonstration of why

19      they're --

20          MR. DEAKIN: Objection.  Unresponsive.

21          THE COURT: Sustained.

22  Q   Has there been a study of the variability in friction

23      ridge detail?

24  A   No.  There has been no such study of the inherent --

34

1 no such study of the inherent underlying variability

2 of fingerprint identification -- of -- sorry -- of

3 human friction ridge pattern.

4 Q Okay.  And now going back to the specific

5 difficulties with point identification, tell us --

6 tell the Court about the Richard Jackson case in

7 Pennsylvania.

8 A That wouldn't have to do with points, because that

9 would have operated under the U. S. standard of no

10 scientific -- of no standard, no set standard.

11 Q Okay.  Recently, in England, the Shirley McKie

12 case --

13 A Yes.

14 Q Could you tell the Court about that?

15 A That was a case in which there was a 16-point

16 standard in operation and two misidentifications.

17 Well, erroneous identifications, matches, of a latent

18 fingerprint to a known fingerprint, to the wrong

19 finger occurred with the 16-point standard in place.

20  So that illustrated a problem with the 16-

21 point standard.

22 Q Who was Shirley McKie?

23 A Shirley McKie was a police officer in that case that

24 was tried for perjury.

1    Q    And what's the background?

2    A    Because her -- because her -- a latent print from the

3         victim's home was matched to her print, and she

4         testified that she had not been inside that home.  So

5         she was tried for perjury.

6    Q    And the upshot of what happened as a result of the

7         McKie case?

8    A    There was a review of that match, and I think it was

9         important as a precipitating event in encouraging the

10        United Kingdom to abandon the 16-point standard and

11        switch, essentially, to the American system of no

12        minimum standard.

13             Again, it sounds funny that you make the

14        mistake with a 16-point standard, so your response is

15        to have no standard, but the argument was that the

16        16-point standard was flawed, that it gave the

17        fingerprint examiners a false sense of security, and

18        that it was better to switch to the American system.

19   Q    Now, prior to the McKie case, the 16-point -- of all

20        the systems that function on a point-identification

21        standard, 16 points was about the upper limit,

22        correct?

23   A    It was pretty -- yeah.  There may have been higher,

24        but it was pretty high.

1    Q    And so when it all came crashing down in the McKie

2         case, that was pretty much the end of that standard?

3              MR. DEAKIN: Objection to the form of that

4         question.

5              THE COURT: Sustained.

6    Q    After it was discovered that there was an error and

7         they had identified the wrong person in the McKie

8         case, that was the end of the use of 16-point

9         standard?

10   A    In Britain.

11   Q    In Britain.

12   A    In Britain.  After a review.  It may mean that they

13        were going to do it anyway; there were some people

14        that wanted to do it.  But it certainly seems to have

15        hastened the process.

16   Q    Okay.  Is there any jurisdiction in which the point-

17        identification standard is still used?

18   A    I believe that many of the European countries still

19        use, still base their matches on having a certain

20        number of points.

21   Q    And was point identification used in different

22        jurisdictions in the United States, as well?

23   A    Yeah.  Historically, fingerprint examiners would come

24        into court and say, you know, we have a minimum

1            standard of eight or ten or twelve points in our

2            jurisdiction, and that's why I've concluded that it's

3            this person's print.

4    Q    Now, I mentioned the Richard Jackson case before, and

5            you said that that was not based on the point

6            standard.  So, in the Richard Jackson case in

7            Pennsylvania, was that the use of the IAI standard?

8    A    Yes.  As far as I know.  One of the examiners was an

9            IAI-certified examiner.

10    Q    And could you take us through the apparent

11            misidentification in that case?

12    A    That was a case where a man was convicted of murder

13            based almost entirely on fingerprint evidence.  Three

14            examiners testified that it was his print.  One of

15            them IAI certified.  The defense retained experts.

16            Those experts said that it was not his print.  They

17            went to trial.  He was convicted.

18               And then, through a process that I don't

19            know all the details of, they got both the IAI and

20            the FBI to review the match.  They concluded that it

21            was not his print.  And after a long process, he was

22            released from prison.  The IAI examiner was

23            decertified.

24    Q    Okay.  And in the Caldwell case in Minnesota.

38

```
 1    A    The Caldwell case in Minnesota, another case of

 2         misidentification.  What turned out to be erroneous

 3         identification testified to by three IAI-certified

 4         examiners; two for the prosecution, one for the

 5         defense.  In a subsequent trial of the confederate,

 6         the co-defendant, examiners discovered that it was an

 7         erroneous identification.  And then exposed this and

 8         they went back to court.

 9    Q    And what happened to those three IAI-certified

10         experts?

11    A    They were decertified, as well.

12    Q    And at the time -- a certification under the IAI, was

13         that the use of the ACE-V system, if you know?

14    A    At which time?

15    Q    The time of their certification.

16    A    No.  The term "ACE-V" was not in use in the Caldwell

17         case in the early '80s, late '70s.

18    Q    Okay.  And what does the term "ACE-V" refer to?

19    A    The term "ACE-V" is the term that's now being used

20         for the methodology of forensic fingerprint

21         identification.

22    Q    Okay.  And when did that term first come into use, as

23         far as you know?

24    A    As far as I can tell, it first appeared in print
```

1   around 1994.

2   Q   And is that around the time of the Supreme Court

3       decision in *Daubert*?

4   A   Yes, it is.

5   Q   I'm going to go back a little bit.  Now, you said

6       that you don't believe that fingerprint comparison is

7       a science because it's not tested, it's a hypothesis.

8           Can you explain what you mean by that?

9   A   What I mean by that is that the hypothesis that needs

10      to be tested is a fingerprint examiner can reliably

11      match a latent or crime scene fingerprint to a known

12      fingerprint to the exclusion of all other source --

13      all other possible source fingers in the world.

14          That's the question that we need to test.

15      Can they do that?  How do we know whether they can do

16      that?  How good are they at doing that?  And that

17      question has never been subjected to scientific or

18      empirical testing.

19  Q   And so to call something scientific knowledge, it's

20      fair to say it would have derive from a scientific

21      method.

22  A   Yes.

23  Q   And as far as you can tell, there doesn't appear to

24      be a scientific method to any standard for

40

1      identification under fingerprints.

2    A    That's right.

3    Q    Now, you said that it's never been tested.  Is it

4         possible to test the fingerprint hypothesis?

5    A    Well, it's not clear.  And I can't pretend to know

6         the answer.  I think as this debate has evolved, some

7         people said it would be very difficult, other people

8         say it's not that hard.  Because it's a pattern

9         recognition process that takes place in the

10        examiner's head, there may be difficulties in testing

11        it.

12             But I think that studies could be conducted

13        of how -- of whether these guys can do what they say

14        they can do.  Of the underlying validity of that --

15        you would have to first define the method that

16        they're using, and make it uniform and standardize

17        it, and then determine whether they can -- that

18        method does what it says it can do.

19   Q    And at any point in your reading of the literature,

20        transcripts of prior court hearings, anything

21        involving fingerprints, have you seen a method

22        defined that meets scientific rigors?

23   A    I'd say that the method as it has been described does

24        not meet scientific standards because of the problem

41

1        I just described, that the criterion for a match

2        remains the expert judgment of the examiner.  It's

3        unobjective.

4    Q   Okay.  And so there is, fair to say, subjectivity in

5        each phase of the test, of the purported method?

6    A   I would say that it"s a subjective method, or a

7        subjective process.

8    Q   In fingerprint work they have attempted to see if

9        similar print -- if they can find prints that match

10       exactly that are from different people.  They have

11       purported -- actually, has a study ever been done

12       where they attempt to match prints from different

13       people to one another in an exact way?

14   A   No.  I'm not aware of such a study.

15   Q   Okay.  Has any study been done involving

16       misidentification?  Meaning that rather than trying

17       to have something match exactly, to see that whether

18       given a print, whether that print can be

19       misidentified as someone else's print?

20   A   No.  There has been no such study.

21   Q   In testimony in court, fingerprint examiners present

22       a conclusion; is that fair to say?  Yes, it matches;

23       no, it doesn't?

24   A   Yes.

42

1    Q    And has there been any test devised to test their

2         conclusions, that you've ever seen?

3    A    No.

4    Q    And is there a way that could be done?

5              MR. DEAKIN: Objection.  Asked and answered.

6         It's the same question he asked.

7              THE COURT: Sustained.

8    Q    Is there a way of testing giving fingerprint --

9         fingerprint examiners and their results?

10             THE WITNESS: I can answer?

11             THE COURT: Yes.

12   A    You could test it under simple laboratory conditions.

13        So it wouldn't be testing whether they're correct in

14        actual cases, because in a case you don't know

15        whether the person -- nobody knows whether the person

16        really did it or not.

17             So you would test it in a test that

18        simulates the actual process of latent fingerprint

19        identification.

20   Q    And are you aware of that having been done?

21   A    No.

22   Q    In terms of error rates with the methodologies, under

23        the current U. S. system as adopted by the IAI, is

24        there any way to test error rates?

```
 1   A   There is a way to test error rate.  I don't think
 2       that the error rate has been adequately measured.
 3   Q   Okay.  Have they -- to your knowledge, have they ever
 4       measured error rates?
 5   A   There have been -- proficiency tests have been
 6       conducted, and I think there's debate over whether
 7       they accurately are -- you know, are adequate
 8       measures of the error rate in the profession, the
 9       broad-based error rate in the profession, which would
10       be the question you would want to know under Daubert.
11                And I think, it would be my opinion, that
12       the proficiency tests conducted so far are not an
13       adequate measure of the error rate of fingerprint
14       identification as the process is practiced in the
15       United States.
16   Q   And what is the debate over those proficiency tests?
17   A   The debate would concern a number of things such as
18       how difficult the proficiency tests are, who's
19       conducting the proficiency tests, and whether they're
20       the right body to conduct them.  Who takes the
21       proficiency tests, under what conditions they're
22       taken, whether they're properly designed to find out
23       the scientific question that we're trying to answer.
24       Those would be the issues.
```

1    Q    Okay.  Specifically as relates to proficiency tests

2          and the FBI, are you aware of a debate about those

3          tests?

4    A    That was most heavily debated in the hearing in the

5          Plaza case, which is a recent federal case.

6    Q    And what was the point -- who was the critic of the

7          proficiency test?

8    A    The defense introduced three critics, three

9          witnesses.  One, a fingerprint examiner who argued

10        that the tests were not difficult enough to simulate

11        a --

12   Q    And who was this individual?

13             MR. DEAKIN: Objection on hearsay grounds.

14             THE COURT: Sustained.

15             MR. DEAKIN: Move to strike his answer.

16             THE COURT: Stricken.

17   Q    Out of the Plaza hearing, what critiques of the FBI's

18        proficiency tests came out of that hearing?

19   A    The critique was that the tests were not difficult

20        enough, that they were poorly designed.

21   Q    And in terms of difficulty, meaning -- in fingerprint

22        examination, the prints are not always pristine; is

23        that fair to say?

24   A    That's correct.

45

```
1    Q    And so the fingerprint cards are not always perfect,

2         correct?

3    A    That's correct.  But the bigger problem is that the

4         latent fingerprints are not of comparable quality to

5         the inked print.

6    Q    Okay.  And in designing a proficiency test, is that a

7         critical component?

8    A    I think that would be a critical component.

9    Q    And in the proficiency tests that were critiqued,

10        that were done by the FBI, it was found that -- what

11        was the finding?

12             MR. DEAKIN: Objection.  Unless this is from

13        his knowledge.

14             THE COURT: Sustained.

15   Q    Now, fingerprint examiners have claimed to have two

16        separate categories of error rate, correct?

17   A    They have claimed that in hearings that I've

18        attended, yes.

19   Q    And what are those two categories?

20   A    Methodological error rate and practitioner error

21        rate.

22   Q    Okay.  And in your knowledge, how are those error

23        rates broken up?

24   A    The theory is that practitioner error rate is human
```

1    error, and methodological error rate is some kind of

2    theoretical error rate that excludes human errors.

3    Q    Okay.  Now, the methodological rate of error, the

4         method involves the human being at each step; is that

5         correct?

6    A    That's correct.

7    Q    And so that they put any error down to the

8         practitioner?

9              MR. DEAKIN: Objection as to the leading.

10             THE COURT: Sustained.

11   Q    Who did they put the errors down to in evaluating the

12        error rates?

13   A    If you separate errors in these ways, it appears that

14        all errors that occur are attributed to practitioner

15        error rate.  Thus, no errors are attributed to

16        methodological error rate.

17   Q    And what is the flaw in that thinking?

18   A    Well, so the methodological error rate is kind of

19        silly.  I mean, you have no potential that you're

20        ever going to include an error in it, so it's always

21        going to remain zero.  So, it's not very scientific

22        to talk about such a rate that you're characterizing

23        by caveat as a zero.

24             The concept of separating error rate in

47

1    this way is not something that I think would be

2    accepted in the scientific community.

3    Q    Okay.  Could you tell the judge about the

4         Collaborative Testing Service and their proficiency

5         exams?

6    A    The Collaborative Testing Service conducted a number

7         of proficiency exams beginning, I believe, in 1995,

8         through the present day, in the area of latent

9         fingerprint analysis.

10   Q    Okay.  And the first test in 1995, could you tell us

11        about that?

12   A    The first test in 1995 reported what was considered

13        by everyone as shockingly high.

14             MR. DEAKIN: Objection, your Honor, as to

15        hearsay.  Foundation for this -- he's just talking

16        about studies, he's not talking about results,

17        without any basis at all.

18             THE COURT: Sustained.

19   Q    Have you reviewed the Collaborative Testing Service's

20        exams or studies of the Collaborative Testing Service

21        exams conducted annually beginning in 1995?

22   A    I've reviewed what I can get my hands on.  They're

23        not publicly available.  You have to subpoena them.

24        So I don't have complete records on all those tests.

1       I have some of them.  I have cover sheets of some of

2       them, without the full report.

3   Q   Okay.  And what is the goal of a proficiency test?

4   A   The goal of a proficiency test is to measure whether

5       an individual examiner is proficient in the method

6       that they're applying.  The competence of that

7       examiner, if you will.

8   Q   In applying the science, the alleged science?

9   A   That's correct.

10  Q   Okay.  And in reviewing the Collaborative Testing

11      Service studies that you have managed to get your

12      hands on, what results did you find?

13              MR. DEAKIN: Objection as to foundation.

14              THE COURT: Sustained.

15  Q   Did you review the Collaborative Testing Service's

16      test from 1995?

17  A   I did review that test.

18  Q   Okay.  And in reviewing that test, what did you find?

19              MR. DEAKIN: Objection.  Well, withdrawn.

20  Q   On that test 48 false positives were reported.

21              MR. DEAKIN: Objection.  Motion to strike,

22      without foundation.

23              THE COURT: Well, he said he reviewed it, he

24      reviewed the tests that were done.

49

1          MR. DEAKIN: It's not clear, your Honor,

2     that he's doing anything besides stating the results

3     of what the test showed.   I think defense counsel is

4     trying to avoid the problem of saying do you have any

5     idea who conducted the tests, who took the test,

6     under what conditions, those kind of things.   There's

7     no basis, at this point, for him reporting results

8     that have nothing to do with his own research.

9          THE COURT: Sustained.

10    Q    Well, as far as you know, who conducted the test from

11         1995?

12    A    The Collaborative Testing Service conducted the test.

13    Q    And who had hired them to conduct the test?

14    A    I believe that ASCLD, the American Society of Crime

15         Lab Directors hired them to conduct the test.

16    Q    And what were they hired to test?

17    A    Latent fingerprint examination.

18    Q    And were they testing the proficiency of examiners in

19         latent fingerprint identification?

20    A    That's certainly what they described that they were

21         doing.

22    Q    And what were the results of their testing?

23         MR. DEAKIN: Objection, your Honor.   He

24    could read that off the cover sheet of the study.

1    There's still no foundation here.  Understanding he

2    doesn't have to do the study, but he has to, I think,

3    lay a foundation for how the study was conducted in

4    order to report the results.  Otherwise, anybody

5    could read that.

6              THE COURT: Mr. Shea.

7              MR. SHEA: It's relevant to whether

8    fingerprints are "a science."  One of the things

9    *Daubert* looks at is proficiency testing, and whether

10   the "method" holds up under the rigors of some kind

11   of testing.

12             Dr. Cole has examined some of the prior

13   testing to see how they held up under these

14   proficiency tests.

15             THE COURT: Overruled.  Go ahead.

16   Q    And what were the results of the 1995 test?

17   A    The most significant results in terms of false

18        positives, which is the thing that one would be most

19        concerned about, was that 48 false positives were

20        reported on that test.  That's 4 percent of all the

21        comparisons that were conducted.  That 34 of the

22        total number of examiners conducting the tests

23        reported at least one false positive.  That's 22

24        percent of the examiners who took the test.

1    Q    Now, tell us -- just going through, what's a false

2         positive?

3    A    A false positive means you've matched the latent

4         print to an inked print that it does not, should not,

5         be matched to a finger that was not the source of

6         that print. It's a misidentification, an erroneous

7         identification. It's what you'd be concerned about

8         because it could lead to a false conviction.

9    Q    So it's essentially identifying the wrong guy as the

10        perpetrator.

11   A    That's correct.

12   Q    And is that considered the most serious of errors

13        within the fingerprint field?

14   A    Yes.

15   Q    And there are also false negatives, correct?

16   A    Right. A false negative would mean the person's

17        print was in there and you failed to match it to that

18        print. The consequence down the line would be

19        letting a guilty person -- letting a guilty person

20        slip through the cracks.

21   Q    Okay. Now, to be fair, in the years since then,

22        they've conducted further testing, correct?

23   A    That's correct.

24   Q    And there have been improvements in the error rates?

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | Okay.  Have you ever seen any number attached -- |
| 3 | | we've established that there's a number that the IAI |
| 4 | | has stated for error rate of the method is zero.  Is |
| 5 | | that fair? |
| 6 | A | Not the IAI, but fingerprint examiners that testified |
| 7 | | in hearings like this one. |
| 8 | Q | Okay.  Have you ever seen anyone place a figure on |
| 9 | | the human error rate? |
| 10 | A | No.  Not a figure.  Words like "bandishingly small." |
| 11 | Q | Okay.  Yet, the materials that you've reviewed from |
| 12 | | the Collaborative Testing Service do, in fact, show |
| 13 | | error rate. |
| 14 | A | If you -- if you accept that they are accurate |
| 15 | | measures of an error rate. |
| 16 | Q | Okay. |
| 17 | A | Which, I think, you know, could be debated from |
| 18 | | either side. |
| 19 | Q | Okay.  Those who support the current ACE-V standard, |
| 20 | | do they acknowledge an error rate? |
| 21 | A | They acknowledge this so-called practitioner error |
| 22 | | rate. |
| 23 | Q | Okay.  To which there is no number associated? |
| 24 | A | That's right. |

53

1    Q    Okay.  Now, how does that compare to how science

2         would measure an error rate?

3    A    Science in this case would design a proficiency test

4         that as accurately as possible measured conditions

5         under which this process is applied in real life, and

6         would apply it to the practitioners who either try to

7         have the population that took the test mirror the

8         population that actually applies the method in real

9         life, and do this many times till you've got a

10        statistically significant number of tests, and then

11        you would approach a sort of industry-wide error

12        rate.

13   Q    Now, in the proficiency testing that was done --

14             THE COURT: Excuse me.  Excuse me.

15             So are you saying that because -- I guess I

16        don't understand what you're saying.

17             You say there's an error rate in terms of

18        taking fingerprints or identifying fingerprints?

19             THE WITNESS: Yes.  I'm saying that you need

20        to measure the error rate in applying the

21        methodology.

22             THE COURT: So does that mean that

23        fingerprint analysis is not a science because there

24        is an error rate?

54

1          THE WITNESS: No.  You just have to measure

2    the error rate and report the error rate.

3          THE COURT: So you say it's not a science

4    because they haven't measured the error rate?

5          THE WITNESS: Among other things.

6          THE COURT: And what are the other things? ·

7          THE WITNESS: Well, I·think the other thing

8    would be a validation study.  A validation study

9    would come before the error rate.

10          THE COURT: Validation in terms of how many

11    times they've identified someone successfully?

12          THE WITNESS: In terms of does the method

13    really work.

14          THE COURT: Well, what is it about this

15    method that you find doesn't work?

16          THE WITNESS: That we don't know when

17    they're justified in declaring a match.

18          THE COURT: Have you ever examined

19    fingerprints?

20          THE WITNESS: No. I don't examine

21    fingerprints.

22          THE COURT: So, you're objection to it is

23    based solely upon what you're read in books and

24    literature?

55

 1           THE WITNESS: Yes.  I'm reading their

 2      professional literature as to how they describe the

 3      method and what they think vouches for their

 4      reliability in what they do.

 5           THE COURT: And you say they're all wrong?

 6           THE WITNESS: I'm saying that there isn't

 7      something in the literature that establishes how we

 8      know whether they're right.

 9           THE COURT: Okay.

10   Q   Well, to address some of the Judge's concerns, let's

11       go to the ACE-V standard.

12   A   Okay.

13   Q   They have -- it's broken out into a purported Level

14       1, 2, and 3; is that correct?

15   A   The levels, 1, 2, and 3 are different from the ACE-V.

16   Q   Okay.  Well, explain the ACE-V and how that each

17       level lends itself to subjectivity.

18   A   ACE-V stands for Analyze, Compare, Evaluate, Verify.

19       That's the process of analyzing a latent print.

20       Evaluate is when they make the determination that I

21       have enough matching detail between these two prints

22       to conclude that they must come from the same finger.

23       That process, as it's described, is a subjective

24       determination of the examiner.

1          Since that's the output of the process, the

2      process is subjective.

3  Q   Meaning there's no stated threshold -- the point

4      standard, flawed as it was, you could review what the

5      points of identification were, correct?  And see if

6      the person reached that number of points, correct?

7  A   You could review if, in your judgment, there were

8      that many, that number of points there.

9  Q   Right.  So, flawed as that was, since it's been

10      pretty much thrown out in most jurisdictions, one

11      could put the examiner to the test of saying show us

12      the particular points of identification you see

13      between the latent and the known print, correct?

14  A   Yes, theoretically.  I mean, you could get into

15      debates about I see this point and I don't, but....

16  Q   Right.  So different examiners could differ over

17      whether there were, in fact, points of

18      identification.

19  A   Certainly.

20  Q   And that's what came out in some of the cases where

21      there were misidentifications.

22          MR. DEAKIN: Objection as to the leading.

23      Counsel is not testifying.

24          THE COURT: Overruled.

57

1   Q   And that's what came out in some of the cases with

2       misidentification.

3   A   Yes.  As well as the study done in England where they

4       sent out a print and said how many matching points do

5       you see, and there were variations, again.

6   Q   Now, the ACE-V standard, there is not that ability;

7       is that fair to say?

8   A   That's correct.

9   Q   And so explain to greater detail the subjectivity

10      involved.  How it can be different for each

11      examiner --

12           THE COURT: Excuse me.  Excuse me.  He

13      doesn't need to go into greater detail.  If it's

14      subjective, it's subjective.

15           MR. SHEA: Okay.

16   Q   Now, the ACE-V, would you consider that a scientific

17      method?

18   A   No.

19   Q   And why not?

20   A   Because it's subjective, because it doesn't have a

21      standard, and because it hasn't been tested.

22   Q   Okay.  And is there literature on the ACE-V standard?

23   A   Yes.

24   Q   And what literature is that?

58

1    A    There's probably literature that I don't know about.

2         I mean, it was described in a 1994 article by

3         Tutthill.  I think that David Ashcroft's recent book

4         *Quantitative/Qualitative Friction Ridge Analysis*

5         describes this method, as well.

6    Q    And is there an ongoing debate within the scientific

7         community about ACE-V?

8    A    Yes.

9    Q    And is there an ongoing debate within the fingerprint

10        community about ACE-V?

11   A    Yes.

12   Q    And is some of that debate whether it is, in fact, a

13        "scientific method"?

14   A    Yes.

15   Q    Now, do you believe that fingerprint examiners

16        constitute a scientific community?

17   A    I believe they constitute a practitioner community,

18        not a scientific community.

19   Q    Okay.  And what would be required for them to be a

20        scientific community?

21   A    Well, to be doing science.

22   Q    And you believe they're not doing science for the

23        reasons you've already testified to?

24   A    Yes.

59

1  Q   Okay.  Now, is the technique of fingerprint

2      comparison generally accepted in the broader

3      scientific community?

4  A   I think that it is debated within the broader -- I

5      think that the broader scientific community is

6      largely indifferent to it.  It's beginning to pay

7      more attention.  I think that there are a number of

8      scientifically-informed people who are educating

9      themselves on this process and saying that this

10     doesn't meet the standards of science.

11 Q   Okay.  And have you reviewed articles regarding

12     whether it meets the standard of science?

13 A   Yes.

14 Q   And what have you found in those reviews?

15            MR. DEAKIN: Objection.

16            THE COURT: Overruled.

17 Q   Particularly Mr. Stoney's literature.

18 A   People from the various peripheral communities to

19     fingerprint examiners have published articles arguing

20     that fingerprint identification is not, as currently

21     practiced, a scientific method.  For example, Dr.

22     Stonewall published a number of articles to that

23     effect.

24 Q   And Michael Saks, as well?

60

1    A    Yes.

2    Q    And who is Michael Saks?

3    A    He is a psychologist and a law professor who is

4         published in this area.

5    Q    And what is his view?

6    A    What is his...?

7    Q    View of fingerprint examination?

8    A    Similarly, it doesn't constitute science.

9    Q    And for what reason?

10   A    More or less as I've described.  Not tested, doesn't

11        have a standard.

12   Q    Okay.  Is there other literature published by

13        scientists who agree with your opinion that

14        fingerprint identification is not a science?

15   A    Yes.  There's some psychologists.  Ralph Haber and

16        Lynn Haber who have given a conference paper -- it's

17        not a published paper -- arguing that there aren't

18        any studies, that it hasn't been tested.

19             There's an article by two forensic

20        scientists named Christof Champode and Ian Evett who

21        argue that as current practice, it is not scientific.

22   Q    Similarly, James Starrs --

23   A    James Starrs has testified and spoken to the effect

24        that he does not believe that it's scientific.

1   Q    And who is James Starrs?

2   A    A professor of law and forensic science at George

3         Washington University, editor of a newsletter called

4         *Scientific Sloothing Review* that covers scientific,

5         forensic scientific issues.

6   Q    And is he associated in any way with the American

7         Academy of Forensic Science?

8   A    I believe he's a fellow of the American Academy of

9         Forensic Science.

10   Q    Who is David Grieve?

11   A    David Grieve is a fingerprint examiner, and the

12         former editor of the *Journal of Forensic*

13         *Identification*.

14   Q    And what is his opinion on the topic?

15   A    I think that David Grieve's opinion is that it is

16         scientific.

17   Q    Now, David Grieve is formerly associated with the

18         IAI?

19   A    He is associated with the IAI.

20   Q    Okay.

21   A    He was formerly the editor of their journal.

22   Q    And is he the editor of their journal any longer?

23   A    No.  Not to my knowledge.

24   Q    And what precipitated -- I'll withdraw that.

62

1                 Now, at some point, did the National

2    Institute of Justice prepare a grant proposal for the

3    testing of fingerprint identification?

4    A   Yes, they did.

5    Q   And what happened with this grant proposal?

6    A   This grant proposal requested -- was a requested

7    grant proposing studies validating the reliability

8    and individuality of friction ridge -- the

9    reliability of the identification process and the

10    individuality of the friction ridges themselves.

11    Q   Now, do you have a copy of that with you today?

12    A   I do.

13    Q   And what is it they sought to have tested?

14    A   They sought to have tested basic research to

15    determine the scientific validity of individuality in

16    friction ridge examination, based on measurement of

17    features, quantification, and statistical analysis.

18    And procedures for comparing friction ridge

19    impressions that are standardized and validated.

20    Q   Why is this significant?

21    A   Well, it's significant in that it's a statement that

22    procedures for comparing friction ridge impressions

23    that are standardized and validated are needed, and

24    therefore do not exist, and that basic research to

1           determine the scientific validity of individuality

2           and friction ridge examination is needed, and

3           therefore does not exist.

4                 And that is my impression, as well, that

5           those things do not exist.

6     Q     Okay.  And so as far as you know, what this grant was

7           calling for, there are no pre-existing studies.

8     A     That's correct.

9     Q     And what happened to this grant proposal?

10    A     This grant proposal, you know, was not funded.

11    Q     Okay.  There's something referred to as the 50K test,

12          50K study.  I'm sorry.

13    A     Yes.

14    Q     And is that -- that's something referred to by

15          fingerprint examiners?

16    A     It's referred to occasionally in the literature.

17          I've heard about it most often at hearings like this

18          one, at scientific meetings.

19    Q     Okay.  And it's -- that study has been used to

20          validate the reliability of fingerprint comparisons?

21    A     It's been offered -- well, no.  It's been offered to

22          validate the uniqueness of friction ridges.

23    Q     Okay.  And can you explain to the judge how that

24          procedure, the 50K study, was done?

64

1    A    I can, if you want.  It would be better to have the

2         person who conducted it, explain it.

3    Q    Sure.  That would be fine.

4              What problems do you see with the test, the

5         50K study?

6    A    The methodology of the 50K study has been criticized

7         in the literature by a number of different people.

8    Q    Okay.

9    A    They've pointed out flaws in its methodology.

10   Q    And do you have that literature with you?

11   A    I have some of it.

12   Q    Okay.  And what literature do you have with you that

13        is critical of the 50K study?

14   A    Well, for example, I have an article by James Wayman

15        entitled *When Bad Science Leads to Good Law: The*

16        *Disturbing Irony of the Daubert Hearing in the case*

17        *of U.S. v. Byron Mitchell,* that argues, for example

18        -- that describes it as a flawed methodology.

19   Q    And --

20   A    That the government very strongly biased any results

21        in the government's favor.

22   Q    And what do you see as the flaw in the methodology?

23   A    Well, again, I take it -- I'm not a statistician, and

24        therefore not well-qualified to criticize the

1    methodology.  So what I see as the flaw, as a

2    sociologist, is that it has not been published, but

3    published literature by credible sources have

4    described it as flawed.  So I take that as

5    significant.

6  Q   Okay.  What is some of the other published literature

7      besides Mr. Wayman's article?

8  A   An article by Champode and Evett, who I mentioned

9      before, critical of the study.

10 Q   And what is their criticism of the study?

11 A   They criticize it on the same basis that Wayman does,

12     that it misrepresents the forensic process in that it

13     uses the same impression of a finger as a comparison

14     rather than two different impressions of the same

15     finger, which is what you do in forensics.

16          They also criticize it on statistical

17     grounds.

18 Q   And what is that?

19 A   In terms of the final numbers that were generated by

20     that study arguing that those numbers are not

21     justified by the data that went into the study.

22          It appears that I don't have the Champode

23     and Evett with me.  I thought that I did.

24          MR. SHEA: I'd ask to enter Dr. Wayman's

1     article into evidence.

2            MR. DEAKIN: No objection, your Honor.

3            THE COURT: All right.

4                 (Whereupon, article of Dr.

5                 James Wayman marked and

6                 admitted into evidence as

7                 Exhibit No. 1.)

8   Q   The 50K study, what is your opinion -- what is it

9     being held out as proving about fingerprint

10    identification?

11  A   That they're unique.

12  Q   Okay.  And is that the extent of what the study is

13    used for?

14  A   I believe so.

15  Q   Okay.  What other issues do you see as problematic

16    with the fingerprint identification procedures?

17           MR. DEAKIN: Objection as to vagueness and

18    generality.

19           THE COURT: Overruled.  He can answer.

20  A   I think that we've covered it pretty well.  We don't

21    know how they know what they claim to know.

22           THE COURT: Okay.

23  Q   Are there any other publications or articles or

24    studies you would like to inform the judge about

67

1    regarding fingerprint examination?

2    A    No.

3              MR. SHEA: Nothing further.

4              MR. DEAKIN: Your Honor, may I approach?

5              THE COURT: Yes.

6              MR. DEAKIN: May I have Exhibit 1?  When the

7    Court's through with it, may I have it?

8              THE COURT: Sure.  But why don't you go

9    ahead.

10             MR. DEAKIN: Thank you.

11

12                    CROSS-EXAMINATION

13   Q    (By Mr. Deakin) Dr. Cole, toward the end of your

14        examination by Mr. Shea, you cite an article by a

15        Professor Wayman; is that right?

16   A    Yeah.

17   Q    Is he qualified to offer an opinion in this field, in

18        your view?

19   A    Yes.

20   Q    Do you respect him as an authority in this field?

21             THE COURT: Wait, wait, wait, wait, wait.

22        Offer an opinion about what?  About a fingerprint?

23             THE WITNESS: No.  He would not be qualified

24        to offer an opinion about a fingerprint, he would be

1            qualified to offer an opinion about it's scientific

2            validity.   He's an expert in biometrics.

3    Q    So he would be qualified to offer an opinion about

4            the validity of fingerprint analysis.

5    A    Yes.

6    Q    And you would respect his opinion in that field; is

7            that right?

8    A    I would respect his opinion.

9                 MR. DEAKIN: Your Honor, may I borrow

10           Exhibit 1.  I apologize for interrupting the Court's

11           reading.

12    Q    So, in your view of his assessment, he is a weighty

13           authority in his assessment of the 50K study; is that

14           right?

15                MR. SHEA: Objection to the hyperbole.

16                THE COURT: Overruled.

17    Q    Is that correct?

18    A    Yes.

19    Q    And he is a weighty authority on the subject of the

20           validity of fingerprint identification evidence.

21    A    He's a significant authority.

22    Q    Whom you respect.

23    A    Yes.

24    Q    So, no doubt, you respect his opinion when he says,

1          "In September, the U.S. Court of Appeals released

2      their findings in the *Daubert* hearing of the U.S. v.

3      Mitchell case, holding that fingerprinting meets the

4      necessary criteria for admissibility as evidence.

5      This is the correct decision.  Fingerprinting is an

6      established science subjected to peer review and

7      publication with general acceptance and standards for

8      its practice.  Error rates are difficult to measure

9      precisely because they are so low, so I am pleased

10     with the outcome."

11          You would respect those views, as well, I

12     have no doubt, Dr. Cole?

13   A   I respect those views.  I don't agree with them, but

14     I respect them.

15   Q   Dr. Cole, you say you began working on or studying

16     the history and sociology, essentially, of

17     fingerprint evidence in 1993 as a graduate student;

18     is that right?

19   A   That's right.

20   Q   Since then, you have worked -- and I hope I'm

21     accurately characterizing your CV -- as a teaching

22     assistant at Cornell University in the fall of 1993

23     and the spring of 1994.

24   A   That's contemporaneous with being in graduate school.

70

1   Q   Understood.  And you were employed in that respect;

2       is that right?

3   A   Yes.

4   Q   You taught two classes.

5   A   Yes.

6   Q   One each semester.

7   A   Yes.

8   Q   You taught the history of science; is that right?

9   A   No.  That's -- you're mischaracterizing my CV.  At

10      Cornell I taught a course called Technoculture, and a

11      course called History of Technology, and a course

12      called Electrical and Electronic Revolution.

13  Q   None of those have any specific focus on

14      fingerprints; is that right?

15  A   No.

16  Q   In the spring of 1995 you were also, again, an

17      instructor at Cornell University.

18  A   If I may just --

19  Q   Please.  You can have that in front of you, if it

20      will make it easier for you.

21  A   That was the course Technoculture that I referred to

22      earlier.

23  Q   In the fall of 1997 you were an adjunct lecturer at

24      the Bureau of Manhattan -- at the Burrough of

1    Manhattan Community College, part of CCNY; is that

2    right?

3  A    CUNY, right.

4  Q    CUNY.   Teaching the History of Science and

5    Technology.

6  A    Yes.

7  Q    Without any specific -- your teaching didn't have any

8    specific focus on fingerprint identification; is that

9    right?

10  A    That's right.

11  Q    In 1997 to 1999 you were a post-doctoral fellow at

12    the Institute for Health, Health Care Policy and

13    Aging Research at Rutgers University; is that right?

14  A    That's right.

15  Q    And you were studying mental health services and

16    systems research training program; is that -- you

17    were in a mental health services and systems research

18    training program; is that right?

19  A    That's right.

20  Q    That had nothing to do with fingerprint analysis; is

21    that right?

22  A    That's right.

23  Q    In 2000 you worked as a visualization architect at

24    Visual Networks in New York.

72

1    A    That's right.

2    Q    Again, nothing to do with fingerprint analysis at

3         all; is that right?

4    A    That's right.

5    Q    In 2001 you described yourself as freelancing.  You

6         were a consultant at the Kennedy School at Harvard,

7         studying voting technologies in the 2000 presidential

8         election; is that correct?

9    A    Yes.

10   Q    And that had nothing to do with fingerprint

11        technology; is that right?

12   A    Yes.  But that was not a full-time position.

13   Q    But over the last nine years, since you have

14        testified you've studied fingerprint evidence, it's

15        apparent that you've spent a significant amount of

16        time studying and teaching other things as well; is

17        that correct?

18   A    Yes.  Because my general field is --

19   Q    I'm asking if it's correct.  If I'd like an

20        explanation, I'll ask you.  If defense counsel wants

21        one, he can ask you, as well.

22             Your doctoral thesis, you say, was

23        published on the microfiche at Cornell University; is

24        that right?

| | | |
|---|---|---|
| 1 | A | Published -- not at Cornell.  By University of |
| 2 | | Microfilms. |
| 3 | Q | Okay.  By University of Microfilms.  Other than that, |
| 4 | | it was not published; is that correct?  As you |
| 5 | | pointed out, it wasn't published by a book publisher |
| 6 | | or anything like that. |
| 7 | A | I just want to be clear that a revision of it was |
| 8 | | published by the -- |
| 9 | Q | But the thesis, itself, was not, right? |
| 10 | A | No. |
| 11 | Q | Okay.  You've published two articles on fingerprints |
| 12 | | in peer review journals, you testified on direct; is |
| 13 | | that right? |
| 14 | A | Yes. |
| 15 | Q | One was published in the *Social Studies of Science*, |
| 16 | | that journal? |
| 17 | A | That's correct. |
| 18 | Q | That's not a technical journal; is that right? |
| 19 | A | Not a what journal?  Sorry? |
| 20 | Q | A technical journal. |
| 21 | A | It's a sociology journal. |
| 22 | Q | Right.  It's not a scientific journal, it's a social |
| 23 | | scientific journal. |
| 24 | A | Yes. |

74

| | | |
|---|---|---|
| 1 | Q | Okay.  And you've published one in a journal called |
| 2 | | *Science in Context*; is that right? |
| 3 | A | That's correct. |
| 4 | Q | Again, not a technical journal, a sociological |
| 5 | | journal. |
| 6 | A | Or a historical journal, yes. |
| 7 | Q | You wrote a book called *Suspect Identities: A History* |
| 8 | | *of Fingerprinting in Criminal Identification*, right? |
| 9 | A | Right. |
| 10 | Q | It has how many chapters? |
| 11 | A | Twelve. |
| 12 | Q | Okay.  The first eleven of those chapters deal with |
| 13 | | the history of fingerprint identification; is that |
| 14 | | right? |
| 15 | A | Yes. |
| 16 | Q | And it covers -- those chapters cover the period from |
| 17 | | 1700 to World War II; is that right? |
| 18 | A | Yes. |
| 19 | Q | Okay.  Two hundred -- those chapters, of the 311 |
| 20 | | pages of your book, 258 of them concern the history |
| 21 | | of fingerprint identification; is that right? |
| 22 | A | Yes. |
| 23 | Q | Leaving, if my math is correct, 53 pages in the final |
| 24 | | chapter, which is entitled *Fraud, Fabrications, and* |

75

1    *False Positives*; is that correct?

2    A    That's the second to last chapter.

3    Q    Okay.  But that's where the meat of your discussion

4         of misidentification is; is that right?

5    A    Of misidentification.

6    Q    Yes.

7    A    There's a little discussion earlier of historical

8         misidentification.

9    Q    But I'm talking about contemporary issues in

10        misidentification.  That's where it is?

11   A    Yes.

12   Q    Now, you will agree with me that of the three, fraud

13        fabrications, and false positives, the first two have

14        nothing to do with what we're talking about here; is

15        that right?  Fraud and fabrications?

16   A    That's right.  In the *Daubert* --

17   Q    Right.  Because any science is subject to fraud or

18        fabrication.  If people act fraudulently, then

19        science is really -- well, maybe not powerless, but

20        fraud and fabrication have nothing to do with error

21        rates; is that right?

22            Well, I'll withdraw that question.

23            Okay.  So, what we're talking about here,

24        of the three, fraud, fabrication, and false

1        positives, we're talking about false positives and

2        false negatives and misidentifications; is that

3        right?

4    A    Yes.  As well as the scientific grounding of the

5        whole thing.

6    Q    Well, I guess what I'm getting at is every time

7        somebody is correctly identified by fingerprint

8        evidence, no one should be concerned about that

9        evidence going to a jury; is that right?

10         Let's put aside the scientific objections

11       for a moment.  We're not concerned about correct

12       identifications; is that right?

13   A    I don't understand the question.

14   Q    All right.  Let me just go back to make sure we

15       understand.  The testimony at the *Daubert* hearing we

16       are not concerned with fraud or fabrications.  Those

17       are things that are outside the realm of what we're

18       talking about in your testimony; is that right?

19   A    I agree with that.

20   Q    Now, for your book, you, I assume, did a thorough

21       study of the legal and forensic literature; is that

22       right?

23   A    I did as thorough as I could.

24   Q    Okay.  How many times, since fingerprint evidence has

1      begun to be used in a forensic context, how many

2      times has it been introduced at criminal trials in

3      the United States of America?

4   A   I have no idea.

5   Q   How many times has it been introduced in criminal

6      trials world-wide?

7   A   I have no idea.

8   Q   How many times in the -- well, strike that.

9          How many cases did you read?

10  A   I read at least 30, 40 appellate decisions on

11      fingerprint evidence.

12  Q   Thirty or 40.  And what percentage, would you

13      estimate, of the total number of cases where

14      fingerprint evidence has been introduced in evidence

15      in the United States, does that comprise?

16  A   Well, a very small number.  Because where -- if I may

17      explain?

18  Q   I just asked you what percentage.

19  A   I have no idea.  Because I have no -- trials aren't

20      reported in the reports.

21  Q   What percentage of appellate decisions did the 30 or

22      40 -- where fingerprint evidence was introduced did

23      the 30 or 40 appellate decisions that you read

24      comprise?

78

1   A   Well, as many as I could find in the certain more

2       crucial period, say, up to World War II.

3   Q   What percentage of appellate decisions that you read

4       -- of the 30 or 40 that you read, what percentage is

5       that of the appellate decisions that discuss the

6       issue of fingerprint identification?

7   A   I don't know the total number of appellate decisions,

8       so I can't answer your question.

9   Q   So it was not a scientific study that you made of the

10      literature; is that right?

11  A   I was not trying to do a scientific sampling of the

12      appellate decisions.

13  Q   Have you, in the course of your research, in any

14      source, found any evidence of identification errors

15      by Boston Police Department Fingerprint

16      Identification Unit analysts?

17  A   No.

18  Q   Okay.  Have you found, in the course of your

19      research, any evidence of errors of Federal Bureau of

20      Investigations Latent Fingerprint analysts?

21  A   No.

22  Q   How many cases -- in how many cases was evidence

23      introduced at trial of fingerprint identifications

24      made by Boston Police Department Fingerprint

1          Identification Unit personnel?

2    A     I have no idea.

3    Q     And in how many cases has evidence of fingerprint,

4          latent fingerprint identification evidence been --

5          identifications been made by Federal Bureau of

6          Investigation personnel been introduced at trial?

7    A     I have no idea.        .

8    Q     Okay.  So, in each case, there are -- you are aware

9          of zero errors in some unspecified number of trials;

10         is that right?

11              MR. SHEA: Objection.

12              THE COURT: Overruled.

13   A     Yes.

14   Q     Are you aware -- how many cases of false positive --

15         and I'm going to ask you now about the -- let's say

16         the English-speaking world.  So we can get a broad-

17         enough sample.

18              How many cases of false positive

19         identifications are you aware of that have resulted

20         in convictions?

21   A     I think probably four.

22   Q     Four.

23   A     Yeah.

24   Q     Do you have any estimate of how many cases

1          fingerprint evidence was introduced against

2          defendants who were subsequently convicted in the

3          English-speaking world since fingerprint evidence has

4          been used?

5    A    No, I do not.

6    Q    It's a pretty large number; isn't that right?

7    A    Yes.

8    Q    I'm going to come back to that issue in a minute, but

9          I want to ask you -- I asked you -- you started

10         working fingerprints in 1993, right.  And we talked

11         about some of your employment since that time.

12              By the way, let me go back and ask your

13         current grant runs -- when does your current grant

14         run out, the one that you're working on now?

15    A    September 30.

16    Q    Of this year?

17    A    Yes.

18    Q    All right.  And do you have an appointment, a faculty

19         appointment or an academic appointment for the fall?

20    A    I do not.

21    Q    So you'll be back to freelancing in the fall, as far

22         as you know now?

23              MR. SHEA: Objection.

24              THE COURT: Overruled.

1    A    Yeah.

2    Q    You've written, if I may say, quite a bit since 1993,

3         I would say.  You've published quite a bit.

4    A    Thank you.

5    Q    In July of 2000, for example, you published an

6         article entitled *From the Sexual Psychopath Statute*

7         *to Meaghan's Law, Psychiatric Knowledge and the*

8         *Diagnosis, Treatment, and Adjudication of Sex*

9         *Criminals in New Jersey in 1949 and 1999*; is that

10        right?

11   A    Yes, I did.

12   Q    Okay.  That was published in the *Journal of the*

13        *History of Medicine and Allied* Sciences.

14   A    That's right.

15   Q    That, again, is not a technical journal; is that

16        right?

17   A    It's a history journal.

18   Q    Nothing -- that article had absolutely nothing to do

19        with fingerprints; is that right?

20   A    That's right.

21   Q    Given the topic, a 50-year survey of psychiatric

22        knowledge and the diagnosis and treatment and

23        adjudication of sex criminals in New Jersey, I would

24        assume it required a fair amount of research.

82

1   A   Yes, it did.

2   Q   Took up quite a bit of time.

3   A   Yes, it did.

4   Q   In November of 1996 you published *Which Came First,*

5       *The Fossil or the Fuel* in the *Journal of Social*

6       *Studies of Science*; is that right?

7   A   That's right.

8   Q   Not a technical journal?

9   A   It's the same journal we discussed earlier.

10      Sociology.

11  Q   And that article had nothing to do with fingerprint

12      identification evidence; is that right?

13  A   That's right.

14  Q   Again, assuming a study of fossil fuels, it took

15      quite a bit of time to prepare that article, didn't

16      it?

17  A   Yes, it did.

18  Q   In the spring of 1995 you wrote an article entitled

19      *Do Androids Pulvarize Tiger Bones to use as*

20      *Aphrodisiacs*; is that correct?

21  A   That's when the article was published.  The research

22      was done years prior to that.

23  Q   Okay.

24  A   Because the academic publishing process is slow.  I

1        just want to be clear on that.

2    Q    Okay.

3    A    So that work would have preceded my fingerprint

4        research.

5    Q    Again, not a technical journal.

6              MR. SHEA: Objection as to the relevance.

7              THE COURT: Overruled.

8    Q    It's not a technical journal; is that right?

9    A    No.

10   Q    And nothing in your article about fingerprints; is

11       that correct?

12   A    No.

13   Q    Now, you are not a qualified fingerprint examiner,

14       are you?

15   A    No.

16   Q    You are not -- have you ever been trained as a

17       fingerprint examiner?

18   A    No.

19   Q    Have you ever held any certifications as a

20       fingerprint examiner?

21   A    No.

22   Q    You didn't examined the fingerprints in question in

23       this case, did you?

24   A    No.

```
 1    Q    By your own acknowledgment, you have a "minimal
 2         knowledge" of how to compare latent fingerprints;
 3         isn't that right?
 4    A    Yes.
 5    Q    Did you speak with the latent fingerprint examiners,
 6         any of them, in this case?
 7    A    No.
 8    Q    Now, fingerprint identification has been recognized
 9         as a science for years; isn't that right?
10    A    Yes.  In courts and so on, yes.
11    Q    And courts have recognized fingerprint evidence as a
12         science for years, right?
13    A    Yes.
14    Q    And society has recognized fingerprint evidence as a
15         science for years; is that correct?
16    A    Yes.
17    Q    Now, you are not a scientist, are you?
18    A    I'm a social scientist.  I don't think that's the
19         same as a scientist.
20    Q    All right.  So you are not a scientist, are you?
21    A    No.
22    Q    You are primarily a historian and social scientist;
23         isn't that right?
24    A    That's right.
```

1    Q    You study the history of science.

2    A    That's right.

3    Q    You haven't done any quantitative or statistical

4         studies on latent fingerprint identification, have

5         you?

6    A    No.

7    Q    Because you are not qualified as a statistician, are

8         you?

9    A    No.

10    Q    You're not qualified as a biologist, are you?

11    A    No.

12    Q    You're not qualified as a biometrician, are you?

13    A    No.

14    Q    You're research involves reading legal cases,

15         correct?   I mean your research on fingerprint

16         evidence.   Reading legal cases?   Yes?

17    A    Yes.

18    Q    Reading professional literature published in journals

19         by fingerprint examiners.

20    A    Fingerprint examiners and other people interested in

21         fingerprint identification.

22    Q    Reading books by fingerprint examiners and other

23         people interested in fingerprint identification.

24    A    Yes.

86

1    Q    Reading technical manuals?

2    A    Yes.

3    Q    Reading scholarly articles.

4    A    Yes.

5    Q    You have done, by your own description, a small

6         amount of field work on fingerprint identification;

7         is that right?

8    A    That's right.

9    Q    Which involved watching examiners in a police crime

10        lab.

11    A    That's right.

12    Q    In which city did you do that?

13    A    I agreed to keep them anonymous as part of -- since

14        it was social science research.

15    Q    I see.  It was a midwestern city; is that right?

16    A    Yes.

17    Q    How long did you spend watching them do this?

18    A    About a day-and-a-half.

19    Q    A day-and-a-half.

20    A    Yeah.

21    Q    And that's the extent of how long you have directly

22        observed the ACE-V system in operation; is that

23        right?

24    A    Well, they didn't describe it as the ACE-V system.

1       So I guess I haven't observed the ACE-V system at

2       all.

3  Q   Were they using the same system that is now described

4       as the ACE-V system?

5  A   No.  It didn't appear to be what this man described

6       as the ACE-V system.

7  Q   But you spent a day-and-a-half doing it.

8  A   Yes.

9  Q   You also have exchanged some -- in your own words --

10      "some e-mail with fingerprint examiners"; is that

11      right?

12  A   Yeah.  Uh-huh.

13  Q   And in your words, "a small e-mail survey of

14      fingerprint examiners"; is that right?

15  A   Yeah.

16  Q   Your research here, I mean your specific research,

17      did not involve studies of error rates, did it?

18  A   No.

19  Q   And you've never conducted testing of fingerprint

20      methodology.

21  A   No.

22  Q   You've never measured, you've never been involved in

23      the measuring of fingerprint methodology; is that

24      right?  Is that right?

88

```
 1    A    The measuring of -- I don't know what you mean.

 2    Q    You haven't done any biometric statistical or

 3         proficiency testing in measuring fingerprint

 4         evidence.

 5    A    No, I have not.

 6    Q    Now, you have cited in your direct testimony a 1995

 7         test by the Collaborative Testing Service; is that

 8         right?

 9    A    Yes.

10    Q    Who runs that?  Who runs the Collaborative Testing

11         Service?

12    A    It is the Collaborative Testing Service.   It's a

13         company.

14    Q    Who runs it?

15    A    I don't know.

16    Q    You have no idea who is in charge of this company?

17    A    No.

18    Q    Who works for the company?

19    A    I don't -- I once spoke to one person there.  I don't

20         even remember his name.

21              MR. SHEA: Objection.  It's a little

22         overbroad.

23              THE COURT: Overruled.

24    Q    Who is responsible for evaluating the test results
```

1        that were reported in that test?

2    A    I believe that they had an advisor committee that was

3        responsible for reviewing the results.

4    Q    Who was on it?

5    A    Fingerprint examiners.

6    Q    What were their names?

7    A    I don't have the test with me.

8    Q    As a matter of fact, you can't tell me who was on

9        that committee of your own knowledge, can you?

10    A    Well, if I had the test in front of me, I could tell

11        you.  It's listed on --

12    Q    And you don't have the test in front of you, right?

13    A    No, I don't.

14    Q    So you can't tell me.

15    A    I cannot tell you.

16    Q    Thank you.  Now, is it correct that until 1997 --

17        actually, is it correct that anybody, you, me, or

18        anyone else, could buy the test that the

19        Collaborative Testing Service puts out to test

20        fingerprint examiner proficiency?

21    A    I don't know.

22    Q    You don't know?

23    A    No.

24    Q    And is it correct that until 1997 the Collaborative

1          Testing Service received, scored, and reported the

2          results of any test that was sent to it after being

3          purchased?

4   A   I don't know.

5   Q   Are you aware that in a 1995 test by the

6          Collaborative Testing Service, tests were purchased

7          by college students who had never received training

8          in fingerprint identification, were completed by

9          those same college students, were submitted to the

10        CTS, were reported as part of the results of the 1995

11        Collaborative Testing Service survey?

12  A   No, I am not aware of that.

13  Q   Do you have any reason to think that's not true?

14  A   Well, I haven't seen --

15             MR. SHEA: Objection.  If he's not aware,

16        he's not aware.

17             THE COURT: Sustained.

18  Q   Are you aware that before 1997 that at least one

19        agency purchased one copy of the test, then

20        photographed the sample latent or the test latent

21        fingerprints and then circulated it to numerous

22        examiners within its agency?

23  A   No, I am not aware of that.

24  Q   In subsequent tests after 1997, error rates dropped

1            precipitously; isn't that correct?

2    A    I'd say they dropped precipitously after 1995.

3    Q    And they dropped at 3 percent; isn't that correct?

4    A    Yeah.

5    Q    Now, did FBI fingerprint analysts participate in the

6            CTS study?

7    A    I believe that they did.

8    Q    You believe that they did.  You don't know for sure?

9    A    I know for sure, because I reviewed the Plaza

10          decision in which they presented evidence of their

11          results on such tests.

12    Q    Did the Boston Police Department fingerprint analysts

13          participate in the test?

14    A    That, I do not know.

15    Q    Do you know whether all the -- among the group of

16          trained analysts who participated in the CTS study,

17          do you know whether they are all experienced, well-

18          trained analysts or certified analysts?

19    A    That is not reported in the test.

20    Q    So you don't know.

21    A    No.

22    Q    Okay.  Were all the examiners who participated in the

23          test from the United States?

24    A    That is not reported in the test.

```
 1    Q    So you don't know.

 2    A    No.

 3    Q    How many examiners were from foreign countries?

 4    A    I just said I don't know.

 5    Q    Okay.  How many of the examiners were trained at all?

 6         How many of the respondents to the test in 1995 were

 7         trained at all?

 8    A    I just said I don't know.

 9    Q    So you would agree, would you not, that if a

10         substantial proportion of the people taking that test

11         were not, in fact, trained fingerprint examiners,

12         that the result as to error rate would be invalid;

13         isn't that correct?

14    A    That would be a problem with those results.

15    Q    And you don't vouch for the accuracy or reliability

16         of those tests, do you?

17    A    No.  I thought that's what I said in my direct.

18    Q    I'm just making sure I understood you.  You don't

19         vouch for the accuracy or reliability of that test,

20         do you?

21    A    No.

22    Q    In fact, you've said in previous testimony, "It's

23         just out there"; is that right?

24    A    I don't recall that particular statement.
```

93

1    Q    Would it refresh your memory if I showed you a copy

2         of the prior transcript, your statement?

3    A    Sure.

4    Q    Did you testify in the fall of last year in *People v.*

5         *James Hyatt*, in the state of New York?

6    A    I did.

7    Q    And were you asked, in that case, about the study

8         that -- about the study that I've been asking you

9         about, the CTS study?

10         MR. DEAKIN: I'm at page 74, Mark.

11    Q    Were you asked about that study?

12    A    Yes.

13    Q    And were you asked: The Collaborative Testing Service

14         that you mentioned before, who runs that -- well,

15         strike that.  You were talking about that, and you

16         said that you -- do you know the qualifications of

17         the person who runs that service.

18         And you answered: "I don't know.  Again,

19         I'm not vouching for that test, I'm just saying

20         that's the only test that's out there."

21         Is that correct?  I direct your attention

22         to lines 15 and 16.

23    A    That's correct.

24    Q    And is that a correct statement of your understanding

1        of that test?

2    A   My understanding of that test is that it is not

3        adequate to measure the error rate of the individual

4        practitioner or of the industry in general.

5    Q   Are you aware of internal proficiency testing results

6        conducted by the Federal Bureau of Investigation?

7    A   I am.

8    Q   Can you describe those tests?

9    A   Only in a limited fashion.

10   Q   Give it your best shot.

11   A   Okay.  The FBI presented evidence in the Plaza case

12       that they conducted internal proficiency testing of

13       their own examiners since 1995, and that they got

14       very high, very good results.  Very low error rate.

15   Q   What were their results?

16   A   I believe there were no errors on that internal test

17       and there was -- sorry.  No false positives, that is.

18       And only one false positive on the CTS test during

19       that period.

20   Q   Have you reviewed those internal tests conducted by

21       the FBI?

22   A   I have reviewed a cover sheet reporting the test.  I

23       haven't seen the actual test.

24   Q   Have you ever asked to see the actual test?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Have you ever asked to have somebody, a qualified |
| 3 | | fingerprint examiner, look at those tests? |
| 4 | A | I have not, but somebody had. |
| 5 | Q | I'm asking what you've done. |
| 6 | A | No, I have not. |
| 7 | Q | You wouldn't be qualified to review the results of |
| 8 | | those tests, in any event, would you? |
| 9 | A | No, I wouldn't. |
| 10 | Q | Now, you've talked about errors.  You talked about |
| 11 | | the Jackson case, you talked about the McKie case, |
| 12 | | and I think you talked about -- I'm trying to |
| 13 | | remember the name of the case in Minnesota -- the |
| 14 | | Caldwell case; is that right? |
| 15 | A | Yes. |
| 16 | Q | Those were cases in which fingerprint examiners made |
| 17 | | errors; is that correct? |
| 18 | A | Yes. |
| 19 | Q | Those are three out of the four cases you said when |
| 20 | | you were thinking about how many cases in the |
| 21 | | English-speaking world that had been shown -- that |
| 22 | | were convictions that resulted at least in part from |
| 23 | | incorrect fingerprint identifications. |
| 24 | A | Well, no, because I wouldn't include the McKie |

1       because she was acquitted.

2   Q   Okay.  So that's two of the four, plus McKie, right?

3   A   Jackson, Caldwell, one of the prints in the McKie

4       case, Asbury.

5   Q   Now, how were the errors in those cases caught?

6   A   They were caught by other fingerprint examiners.

7   Q   By other fingerprint examiners who, in your view,

8       correctly opined that the fingerprints in the cases

9       in question did not match the latent fingerprints

10      that had been sought; is that correct?

11  A   That's right.

12  Q   And you put a great deal of faith in the opinions of

13      those examiners who excluded the defendant in those

14      cases as the possible source of those fingerprints;

15      isn't that right?

16  A   Well, it's not so much that I put faith in it, it's

17      that it's the only thing we have to go on.

18  Q   Well, you certainly accept their view when they say

19      that these people are not the source of those

20      fingerprints.

21  A   When the entire fingerprint community -- I --

22  Q   Finish that answer.  When the entire fingerprint

23      community....

24  A   -- argues that a print has been misidentified, I give

1             that some weight.

2    Q    Thank you.  You give it weight when the entire
3             fingerprint community argues that a print has been
4             misidentified.

5    A    Yes.

6                    THE COURT: What about when they say it has
7             been identified?

8                    THE WITNESS: I would give that some weight,
9             too, but that doesn't make it science.

10    Q    The -- your research, in the course of your research,
11             did you survey defense attorneys, criminal defense
12             attorneys, across the country about how easily --
13             about how easy or difficult it was for them to locate
14             fingerprint examiners to consult with them?

15    A    I did not.

16    Q    That would have been helpful in your research,
17             wouldn't it?

18    A    That wasn't the question that I was trying to answer.

19    Q    But knowing how readily defense attorneys could call
20             upon experts to examine fingerprints would have been
21             helpful in your research, wouldn't it?

22    A    It would have been a useful piece of information, but
23             it was not a high priority for the kind of study that
24             I was trying to do.  And it would have been extremely

1    difficult and time consuming and costly to do.

2  Q  It would have been difficult to do and costly and

3    time consuming, so you didn't do it.

4  A  It was not a high priority for me in terms of the

5    expenditure of my resources.

6  Q  Dr. Cole, do you have any evidence to suggest that

7    any two people have ever had identical fingerprints,

8    even including people having identical prints on

9    their own fingers?

10  A  No.

11  Q  No.  Are you aware of scientific studies going back

12    to 1918 that have at least purported to demonstrate,

13    statistically, that the likelihood of two people

14    having identical fingerprints is astronomically

15    small?

16        MR. SHEA: Objection.  First, he states that

17    Dr. Cole is not a statistician, and now he's asking

18    him to comment on statistical --

19        THE COURT: He asked him was he aware of a

20    study.

21        MR. SHEA: About --

22        MR. DEAKIN: Which is what defense counsel

23    did throughout --

24        THE COURT: Did he ever read one?

1    Q    Are you aware of the studies that purport to

2         demonstrate the uniqueness of fingerprints?

3    A    I am aware of statistical studies.

4    Q    Are you aware of the study of by Wentworth and Wilder

5         in 1919 called *Personal Identification*?

6    A    I'm aware that that study exists.

7    Q    Was the conclusion of that study that, to a

8         statistical certainty, no two fingerprints are

9         identical?

10   A    I don't -- you know, I'll take your word for it.

11   Q    So you don't have any reason to dispute that; is that

12        right?

13   A    No.

14   Q    Are you aware of the study by Cummins and Minlow in

15        1943 entitled *Fingerprints: Palm and Soles*?

16   A    I believe that's a book.

17   Q    All right.  And it was the conclusion, part of the

18        conclusion of that book that, to a statistical

19        certainty, no two fingerprints are identical?

20   A    Yes.

21   Q    Are you aware of a study called, *Probablistic* -- by

22        Kingston in 1964 called *Probablistic Analysis of*

23        *Partial Fingerprint* Patterns?

24   A    I'm aware that it exists.

1    Q    Is the conclusion of that study that, to a

2         statistical certainty, no two fingerprints are

3         identical?

4    A    I don't know.  I haven't read that study.

5    Q    Any reason to dispute that conclusion?

6    A    No.

7    Q    Are you aware of the study by Osterberg (phonetic) in

8         1977 called *Development of a Mathematical Formula for*

9         *the Calculation of Fingerprint Probabilities Based on*

10        *Individual* Characteristics?

11   A    Again, same answer.  I'm aware that it exists.

12   Q    Any reason to dispute the conclusion that it

13        demonstrates -- purports to demonstrate that, to a

14        statistical certainty, fingerprint -- human

15        fingerprints, no two human fingerprints are

16        identical?

17   A    Again, I have no reason to dispute that it purports

18        to demonstrate that.

19   Q    Are you aware of a study by Sclove in 1979 called *The*

20        *Occurrence of Fingerprint Characteristics as a Two-*

21        *Dimensional Process*?

22   A    I'm aware that it exists.

23   Q    Okay.  And do you have any reason to dispute that

24        it's conclusion is that no two human fingerprints are

1    identical?

2  A  No.

3  Q  Are you aware of a study by the same individual, the

4     following year, in 1980, called *The Occurrence of*

5     *Fingerprint Characteristics as a Two-Dimensional*

6     *Poisson* -- I think it's pronounced Poisson -- *Process*

7     by Sclove?

8  A  By Sclove, again.

9  Q  I'm sorry.  Sclove.

10  A  I'm aware that a study by Sclove exists.

11  Q  Are you -- and any reason to dispute the conclusion

12     that -- any reason to dispute -- do you have any

13     reason to dispute that it's purported conclusion is

14     that no two human fingerprints are identical?

15  A  No.

16  Q  You cited to a Dr. Stoney in your direct testimony.

17     Are you aware of his study called *The Quantitative*

18     *Assessment of Fingerprint Individuality*?

19  A  Yes.

20  Q  And was Dr. Stoney's conclusion in that article in

21     1985 that statistically no two human fingerprints are

22     identical?

23  A  I don't know whether it was.

24  Q  Any reason to dispute that conclusion?

1    A   No.

2    Q   Are you aware of the studies by Stoney and Thornton

3         in the following year, 1986, called *The Critical*

4         *Analysis of Quantitative Fingerprint Individuality*

5         *Models*?

6    A   I am much more aware of that article than of the

7         previous ones that you mentioned.

8    Q   Any reason to dispute its purported conclusion that

9         no two human fingerprints are identical?

10   A   I don't think that that's the conclusion.

11   Q   Does it contribute to that conclusion?  Does it

12       purport to --

13   A   No.   That article says that all the previous

14       statistical models that you studied, that you

15       mentioned, have not been empirically tested.

16   Q   Okay.  Now, are you aware of Champode and Guest, an

17       editorial called *Probable Identifications* in the

18       *Journal of Forensic Identification* in 1995?

19   A   Champode and Guest?

20   Q   Guest.  I'm sorry, just Champode.

21   A   Can you read the title again?

22   Q   *Probable Identifications*, in the *Journal of Forensic*

23       *Identification*.

24   A   Yes.

1   Q   Okay.  And it's the conclusion of that editorial that

2       no two human fingerprints are identical?

3   A   I can't recall the conclusions of articles.

4   Q   Are you aware of an article called *On the*

5       *Individuality of Fingerprints* by Pencante and

6       Provactor and Jane in 2001?

7   A   I haven't been able to get hold of that article.

8   Q   And are you aware of the conclusions of that article?

9   A   No, I'm not.

10   Q   Now, the Lockheed Martin 50K fingerprint study

11       compared 50,000 known fingerprints -- 50,000 known

12       fingerprints to themselves; is that right?  Using the

13       AFIS computer model?

14   A   Again, on direct I suggested your own witness would

15       better testify to his own study.

16   Q   Understood.

17   A   But that's my understanding, yes.

18   Q   That resulted in 2.5 billion comparisons, computer

19       comparisons; is that right?  Fifty thousand times

20       50,000?

21   A   Yes.

22   Q   And in those 2.5 billion comparisons, none of the --

23       well, put it this way: After running those, none of

24       the 50,000 fingerprints were found to be identical to

```
 1            any of the other 50,000 fingerprints; isn't that

 2            right?

 3     A      That's right.

 4     Q      There are how many million fingerprints on record in

 5            the FBI's computerized database?

 6     A      Well, again, your witness would be a better --

 7     Q      Does 42 million sound like --

 8     A      -- voice for the FBI.

 9     Q      Forty-two million --

10     A      Forty-two million sets of fingerprints?

11     Q      Yes.

12     A      Okay.

13     Q      Does that sound about right?

14                 MR. SHEA: Judge, I'd object here.  I mean,

15            basically, the information is coming from Mr. Deakin,

16            expecting my client to answer yes to something he's

17            already said he doesn't have the knowledge of.

18                 MR. DEAKIN: If he wants to stipulate that

19            he doesn't have the knowledge about the FBI's

20            computerized fingerprint system, your Honor, I'll

21            accept that stipulation.

22                 MR. SHEA: Well, no.  He asked the question,

23            Do you know how many files are in the database?  I'm

24            assuming that the FBI's database grows with each day
```

1      of crime or fingerprints sent to them.

2             So someone from the FBI who will be

3      testifying seems like the logical individual to

4      testify about the current state of their database.

5             THE COURT: Overruled.

6   Q  Does 42 million sound about right?

7   A  I think it's better for me to say I don't know how

8      many fingerprints are in the FBI's database.

9   Q  They contain records from all 50 states; is that

10     right?

11  A  Yes.

12  Q  How many -- do you have an estimate of how many

13     fingerprints are in computerized databases in law

14     enforcement agencies world wide?

15  A  I do not.

16  Q  But it's many, many more millions; isn't that right?

17  A  I said I didn't have an estimate.

18  Q  And the computers in those law enforcement agencies

19     are capable of doing searches at sort of a

20     preliminary level to try to identify matches; isn't

21     that right?

22  A  I think that's a good way of describing it.

23  Q  And they can do billions of such comparisons on a

24     daily basis; isn't that right?

1    A    I don't know how many comparisons they can do on a

2           daily basis.

3    Q    To your knowledge, to date, have any two people's

4           fingerprints ever been shown to be identical to one

5           another?

6    A    No.

7    Q    There have been studies, have there not, of identical

8           twins, correct?

9    A    Yes.

10   Q    Several studies; isn't that right?

11   A    Yes.

12   Q    And in all of those studies, identical twins have

13          been shown to have different fingerprints from each

14          other; isn't that correct?

15   A    Yes.

16   Q    That is, each twin has ten separate and distinct

17          fingerprints; is that right?  No two similar to each

18          other?

19   A    That's right.

20   Q    And then, when you compare the ten fingers of one

21          twin to the ten fingers of another twin, those are

22          all unique fingerprints; isn't that correct?

23   A    Yes.

24   Q    Even though those twins share the identical DNA,

1       correct?

2    A   Yes.

3    Q   In the Robert Mitchell case, when you testified in

4        the *Daubert* hearing, you were not permitted to

5        testify as an expert before the jury; isn't that

6        correct?

7    A   That's correct.

8    Q   Actually, let me stop for one second. I want to go

9        back to one thing you mentioned about error rates.

10               Can you tell me the error rate for algebra?

11   A   I don't think -- it's kind of a vague question.

12   Q   Okay. There are a number of mathematical problems

13       that need to be solved using a mathematical method

14       called algebra; isn't that right?

15   A   Yes.

16   Q   And if one presumes -- let's say one does 100 algebra

17       equations, solves 100 algebra equations. If one

18       assumes a perfect mathematician, that is a perfect

19       solver who never makes mistakes, the error rate for

20       algebra would be zero; isn't that correct? The method

21       never makes mistakes.

22               MR. SHEA: Judge, my client -- my expert,

23       Dr. Cole, has not held himself out to be an expert on

24       algebra or mathematics. In fact, when asked about

1      that, he's answered, clearly, that he is not.

2              MR. DEAKIN:  He's an expert -- he says he's

3      an expert on the history of science.  I think he's

4      familiar with algebra and mathematics, your Honor.

5              MR. SHEA: Well, I think there's a clear --

6              THE COURT: Sustained.

7              MR. SHEA: --.dispute over whether

8      mathematics is science.

9              THE COURT: Sustained.

10   Q   You would agree with me, would you not, that there

11       are processes or methods that have no error rate to

12       them; isn't that correct?

13   A   I'm not -- you mean inherently have no error rate, or

14       haven't measured their error rate?

15   Q   Inherently have no error rate.

16   A   Inherently have no error rate.  Give me an example.

17   Q   If I wanted to find out what happened to a penny

18       every time I dropped it from a height like this, if I

19       dropped it 100 times correctly, it would hit the

20       ground 100 times; isn't that correct?

21   A   Correctly in what sense.

22   Q   If my experiment was to find out if a penny dropped

23       from this height were to hit the floor if I dropped

24       it without influencing its direction in any way, just

1       simply released it from this height, it would hit the

2       floor 100 times; isn't that correct?

3   A   Yeah, barring unforseen circumstances.

4   Q   Barring unforseen circumstances, it would hit the

5       floor 100 times.

6           If, however, instead of releasing the penny

7       I shot it in a rocket up into space, it would not hit

8       the ground, presumably; isn't that right?

9           MR. SHEA: Objection.  I fail to see where

10      we're headed.

11          THE COURT: We're going into space.

12          MR. DEAKIN: What I'm trying to point out,

13     your Honor, is simple.  The witness has said --

14          THE COURT: Excuse me.  Excuse me.

15          Look, I did not believe that he was

16     entitled to a *Daubert* hearing.  I'm doing this out

17     of an abundance of caution, to let him put on the

18     record --

19          MR. DEAKIN: Understood, your Honor.

20          THE COURT:  -- what it is that he thinks

21     that would have me believe that fingerprint testimony

22     is not allowable in court.

23          MR. DEAKIN: I'll move on, your Honor.

24   Q   In the Mitchell case, you were not permitted to

1      testify before the jury; is that correct?

2   A   I believe I already said that that was correct.

3   Q   You were consulted in the California case of *People*

4      *v. Robert Nawi*, N-a-w-i; isn't that right?

5   A   I was not consulted.

6   Q   The parties stipulated to the record in the Mitchell

7      case as the record before them in that case; isn't

8      that correct?

9   A   I was not aware of that, no.

10  Q   You -- defense counsel sought a motion to subpoena

11     you and pay expert witnesses for you to testify;

12     isn't that correct?

13             THE COURT: So is this on the issue of

14     whether or not he's an expert?

15             MR. DEAKIN: Correct.

16             THE COURT: I mean, he's an expert on

17     something.  But I don't think on fingerprint

18     analysis.  So....

19  Q   You've never testified -- well, let me just ask you

20     quickly.  The case that resulted in a mistrial that's

21     pending, the Colorado case --

22  A   Yes.

23  Q   -- did that case proceed to an end?  Went to the jury

24     and then resulted in a mistrial?

1   A   No.  I think it mistried in the middle.

2   Q   And you've never testified before a jury at all, have

3       you?

4   A   No.

5               MR. DEAKIN: Nothing further, your Honor.

6               THE COURT: Mr. Shea.

7               MR. SHEA: Is it possible we could take a

8       very brief recess?

9               THE COURT: No.  I want to finish this.

10      Let's go.

11              MR. SHEA: Okay.

12              THE COURT: Mr. Shea, let me see you at side

13      bar for a second.

14

15  SIDE-BAR CONFERENCE:

16              THE COURT: Your client is talking to you.

17      Is that because he has to go to the bathroom?  Is

18      that what the break was --

19              MR. SHEA: Yes.

20              THE COURT: All right.  We'll take a break.

21              MR. SHEA: Thank you.

22              (End of side-bar conference.)

23

24              THE COURT: All right.  We're going to take

1     a short recess.

2                   (Recess at 12:31 p.m.)

3

4                   THE COURT OFFICER: All rise, please.  This

5     Court is back in session.  Please be seated.

6                   THE COURT: All right, Mr. Shea.

7

8                   REDIRECT EXAMINATION

9     Q   (By Mr. Shea) Dr. Cole, do you dispute the uniqueness

10        in fingerprints?

11    A   I do not dispute that all fingerprints are unique in

12        the strict sense of the word "unique."  Meaning that

13        there is some difference between each person's

14        fingertip and ever other person's fingertip.

15    Q   And is the question really whether all fingerprints

16        are identical to one another or whether, based on the

17        information, there can be a misidentification?

18    A   I think the question that we need to know about

19        forensic fingerprint identification is not whether

20        two fingerprints might be identical to one another,

21        that is exactly identical in every respect.  The

22        question is whether two fingerprint -- impressions

23        from two different fingers, from two different

24        people, might be similar enough that they might fool

1      a fingerprint examiner using the process that they

2      use.  And that's the question that we need to

3      understand and that has not been adequately studied

4      or answered.

5   Q  Dr. Wayman's study, Exhibit No. 1, you said you

6      respect but disagreed with his opinion.  In what way

7      to you disagree?

8   A  Well, I don't agree that it's good science.

9            THE COURT: Well, he didn't either.  He

10     didn't either.

11           THE WITNESS: He thought the study was not

12     good science, but that fingerprint identification,

13     itself, is good science.

14           THE COURT: He thought --

15           THE WITNESS: He thought the 50K study was

16     bad.

17           THE COURT: Let me see the article, No. 1.

18           "I am pleased with the outcome.  I am

19     saddened, however, that the government's case had to

20     rest on such shoddy science.  I certainly prefer to

21     see good law resulting from good science."

22           THE WITNESS: So, Judge, I think he's saying

23     that he's glad that they won the *Daubert* hearing --

24           THE COURT: Right.

1          THE WITNESS:   -- but that it rested on

2     shoddy science.

3          THE COURT: Right.   That's what he said.

4          THE WITNESS: It would be more correct to

5     say he thinks it should be admissible, but that it's

6     shoddy science.

7     Q    And in reviewing Dr. Wayman's work, you were saying

8          that the government, in that 50K study, had failed to

9          show that there were error rates, even below one in

10         1,097; is that correct?

11         THE COURT: Are we going to analyze that

12    article, now?

13         MR. SHEA: Just -- that will be it.  I'll go

14    on.

15    A    Well, why don't I just read what he says.

16    Q    Certainly.

17    A    "I am of the group that do not agree that the

18         required assumptions about fingerprints hold so

19         precisely that error rates on the order even of one

20         in a billion can be ascertained, let alone one in ten

21         to the 97th."

22    Q    The other thing, and I'll move on from that article

23         after this, he talked about how the fingerprints were

24         cropped in that individual case, correct?

1    A    That's right.

2    Q    And how is that important?

3    A    That they simulated a latent print by cropping an

4         inked print.  And he was arguing that that was not a

5         good way to study a latent print.  You should make a

6         latent print, you should simulate a latent print.

7    Q    Now, does the cropping --

8              THE COURT: So, wait a minute.  So when you

9         talk about cropping, you mean the latent print was a

10        partial?

11             THE WITNESS: Yeah.  To simulate a latent

12        print.

13             THE COURT: So then they compared it with

14        one that was also partial?

15             THE WITNESS: Sorry?

16             THE COURT: So the comparison was done with

17        one that was cropped.

18             THE WITNESS: That's correct.  And the

19        quality of an inked print, generally, than the

20        quality of a latent print.  So even cropped, he

21        thought it had too high a quality, too high a

22        clarity.

23   Q    To be identifiable or a comparable --

24   A    To simulate what happens when you have a latent print

1    where the quality is not as -- usually not as good as

2    an inked print.

3  Q    Now, in --

4              THE COURT: So, wait, wait, wait, wait.

5              A latent print is not as good as an inked

6    print?  Is that what you just said?

7              THE WITNESS: In terms of the amount of

8    information that you have in it.

9              THE COURT: So, the fingerprints that are

10   gathered from crime scenes are always latent

11   fingerprints, right?

12             THE WITNESS: That's right.

13             THE COURT: So, how would you ever compare

14   them if you couldn't work with latent fingerprints?

15             THE WITNESS: Well, you compare one print

16   with limited information to a print where you have

17   very good information.

18             THE COURT: So you compare the latent with

19   the inked print.

20             THE WITNESS: That's right.

21             THE COURT: So, what's the problem with

22   that?

23             THE WITNESS: There's no problem.  If you

24   want to then study that process, if you want to do a

1     study to see how reliable that process is, you need

2     to then take a print with poor information and

3     compare it to a print with good information.  He's

4     arguing that the print with poor information, they

5     made it a little poorer by cropping it, but they

6     didn't make it poorer by making it latent, as it

7     were --

8             THE COURT: Okay.

9             THE WITNESS: -- by having it dusted and

10    lifted, as opposed to being inked directly onto the

11    card.

12            THE COURT: All right.

13   Q   And how to crop a copy of a print involves

14     subjectivity, doesn't it?

15   A   Well, in that study they --

16   Q   Not in that study.  But in the cropping of a

17     fingerprint, to match -- to try and match up with a

18     latent, that involved a subjective decision by the

19     analyst, correct?

20   A   Well, yeah, but I don't have a problem with the

21     decision made in cropping.  I mean, to do a study,

22     you would just have to decide to crop it in a certain

23     way.

24   Q   I'm not talking about studies.  I'm trying to show

1     the subjectivity entering at every level of the

2     fingerprint --

3               MR. DEAKIN: Objection.  Outside the scope

4     of cross.

5               THE COURT: Sustained.

6    Q    Now, are you familiar with the decision in *Pollak* --

.7    *U.S. v. Plaza?*  I'm sorry.

8    A·   I am familiar --

9               MR. DEAKIN: Objection.  Outside the scope

10    of cross.  Never mentioned.

11              THE COURT: Okay.  As I said before, I do

12    not believe that I needed a *Daubert* hearing on

13    fingerprint evidence.  And out of an abundance of

14    caution, I'm giving him the opportunity to present

15    any information that he believes that will require me

16    to have the government to go forward.

17              So, go ahead, Mr. Shea.

18   Q    In that case, even after the decision of March 13th,

19    what was the finding of the Court as to whether

20    fingerprint identification was a science?

21   A    The Court said -- may I read from the decision?

22              The Court said, "ACE-V, the system of

23    fingerprint identification that links the witnesses

24    and their counterparts in other countries, is not, in

1   my judgment, itself, a science.  But it's claim on

2   the attention of the courts derives from the fact

3   that it is rooted in science."

4   Q   Now, taking you back to the cross-exam, it said that

5       you observed fingerprint analysis for a day-and-a-

6       half in the mid-West.  And you were asked if you

7       observed ACE-V, and you said you didn't believe so.

8            What system did you observe?

9   A   I don't think there was a name to the system.  They

10      were just looking at fingerprints at that time.

11  Q   And what did you observe them to do as they looked at

12      the fingerprints?

13  A   Well, they looked at fingerprints and compared them.

14      When they talked about how they know when they could

15      make a match, they talked in terms of points.

16  Q   And does the FBI still, at some level, talk in terms

17      of points?

18  A   They talk about points as a quality assurance

19      mechanism.

20  Q   And how many points are necessary in terms of quality

21      assurance?

22  A   Well, we should ask the government's witness.  But I

23      believe it's -- I believe I've heard the number 12.

24  Q   Now, you were asked about the cases in which there

1    have been mistaken fingerprints, false positives, in

2    trials.  And you were then asked about whether, in

3    fact, fingerprint experts weren't the people who got

4    called into question, the original identification,

5    correct?

6  A    That's right.

7  Q    Is there any other way in which to attack a mistaken

8    fingerprint identification?

9  A    I think what you're asking is whether there's any

10    other way of exposing a fingerprint

11    misidentification; if there's any other way that we

12    would know that a fingerprint misidentification has

13    occurred.

14  Q    Right.

15  A    And that's the problem that I'm concerned about, the

16    ones that aren't exposed by defense experts or so

17    on.

18         And it's not -- theoretically there are

19    mechanisms, such as finding another person who you're

20    convinced committed the crime, or, say, today, DNA

21    that would expose a misidentification.  But I think,

22    in general, if someone's convicted on fingerprint

23    evidence, there's not much other evidence that could

24    come in and trump it, and convince you that someone

1    was wrong about the fingerprint evidence.

2           If there's fingerprint evidence against

3    you, you'll be convicted, and no one would believe

4    that it was a misidentification.

5    Q   Do you hold yourself out as a mathematician?

6    A   I do not.

7    Q   Are you privy to the internal tests run by the FBI?

8    A   I think I described how privy I was.  I've seen what

9    -- part of what they've submitted to the defense in

10   discovery, but that's it.

11   Q   And what did you find about -- what were you made

12   aware of about the internal testing of the FBI?

13   A   Well, through the testimony given in *Plaza*, I was

14   made aware that the defense experts had serious

15   reservations about those tests.  Such as that they

16   were too easy, and that they were poorly designed,

17   and that they were not designed to answer the

18   questions that one would want to know about forensic

19   fingerprint evidence.

20   Q   And in Judge Pollak's decision in the Plaza case, on

21   page 48 --

22          MR. DEAKIN: Would the Court want a copy of

23   it?  The decision?

24          THE COURT: Is it in evidence?

1           MR. DEAKIN: No, it's not in evidence.  I

2       was going to move to introduce it, but....

3    A    Okay.  I have it.

4    Q    What did the Court find in terms of the factor of

5       testing --

6           MR. DEAKIN: Your Honor, I object.  I'd ask

7       counsel submit the opinion to the Court.  This Court,

8       your Honor, is in as good a position to assess what

9       the Court found as this witness is.

10          MR. SHEA: That would be fine.  Given it's

11      before the Court, I won't do any questions on it.

12          THE COURT: Pardon me?

13          THE COURT: Given that it's now before the

14      Court, I won't go further with the questioning

15      because you can read it yourself.

16          Nothing further.

17          MR. DEAKIN: Nothing further, your Honor.

18          THE COURT: Anything else?

19          MR. SHEA: No.

20          THE COURT: All right.

21          You can step down.

22          Mr. Shea.

23          MR. SHEA: Just argument, or...?

24          THE COURT: Well, do you want to be heard?

1          I told you before I didn't believe you were

2     entitled to a *Daubert* hearing on fingerprints.  But

3     out of an abundance of caution, I've given you the

4     opportunity to put before the Court, on the record,

5     what it is that you think I should consider before I

6     make the government go forward, if I should make the

7     government go forward.

8          Do you want to be heard?

9          MR. SHEA: Yes.

10          What I would point out is that in

11     fingerprint identification, it is not a science.  And

12     in the decision before you, the Court has found, in

13     the federal court, that it is not a science.

14          Now, I know you're aware of the prior

15     opinion.  This is Judge Pollak's revisiting of the

16     issue in which, to be frank, he did let the evidence

17     in.  But he did let it in under what was -- under the

18     *Kumho Tire* standard.  And what he basically said was

19     fingerprint evidence is not a science.  He let it

20     come in under the technical expert prong of *Kumho*

21     *Tire*.

22          And what Mr. Deakin and I have been

23     battling out today, through Dr. Cole, is the question

24     of whether it is a science.  And the brunt of the

1    attacks on Dr. Cole was his credibility and ability

2    to state whether, in fact, this --

3              THE COURT:  You're arguing two different

4    things here.  One, you're telling me not to let it in

5    because it's not a science, but now you're telling me

6    it is -- if I do let it in, it comes in as a

7    technical field, therefore, it's admissible and

8    you're client should be allowed to testify.

9              MR. SHEA: No.  There's two things.  One,

10   I'm not saying it's admissible technically.  I'm

11   saying, to be honest, so that I don't misrepresent,

12   that that's what Judge Pollak found.

13             However, even -- I believe Judge Pollak is

14   wrong not that it isn't a science, but that even as a

15   technical tool, it is not subjected to testing by its

16   peer group.  Even in a case like *Kumho Tire*, that

17   expert was kept out because within the range of tire

18   experts, his opinion didn't make sense, and also, had

19   not been subjected to adequate testing.

20             And what I would say in fingerprint

21   identification is, it is not subject to adequate

22   testing.

23             The article that is before you shows that

24   the testing that's been done, even commented on by a

1    supporter of fingerprint evidence, has said that the

2    scientific tests have been shoddy, at best.  And what

3    they're asking you to adopt is the standard that,

4    frankly, varies from examiner to examiner, and

5    they're not going to be able to show that it doesn't.

6              They try and act like it's something

7    mathematical.  Mr. Deakin, I guess, was equating it

8    to the certainty of dropping a coin from his hand to

9    the floor.  It is not so simple.  The ACE-V system

10   says that what we do is we take the latent print, and

11   we're going to look at the latent print first.  And I

12   expect that if --

13             THE COURT: Why don't you hang on one

14   second.  It's past one o'clock.  We're going to break

15   for the luncheon recess at this time.  I'll see you

16   at two o'clock.

17             THE COURT OFFICER: All rise, please.  This

18   court will stand in recess.

19                  (Luncheon Recess)

20             THE COURT OFFICER: This court is back in

21   session.  Please be seated.

22             THE COURT: Let me ask you a question.  You

23   offered this opinion about Judge Pollak.

24             MR. SHEA: Yes.

1          THE COURT: Was that supposed to be marked?

2          MR. SHEA: That would make sense, yes, your

3     Honor.  I apologize for that.

4          THE COURT: Well, I'm glad.  Because I read

5     it, so I just want to --

6          MR. SHEA: Thank you.

7          THE COURT: Which begs the question, after

8     reading that, what makes you think I should rule in

9     your favor?

10          MR. SHEA: Okay.  Well, I'll go through a

11     couple of different points.

12          One, we're not, for the purpose of this

13     hearing, disputing the issue of uniqueness.  So, the

14     idea of uniqueness we're not attacking for the

15     purpose of this hearing.

16          Now, as to Dr. Cole, what he's arguing,

17     what we're arguing, is that the reliability needs to

18     be tested.  And there is no test.  And Judge Pollak's

19     decision says just that, that they have yet to

20     adequately test the reliability.

21          Now, it's true, Dr. Cole isn't a

22     fingerprint examiner.  He's not a purveyor of

23     scientific studies.  He doesn't hold himself out as

24     that, and hasn't at any point held himself out as

1    that.   He holds himself out as a historian of

2    science, which is what he is.

3              And his analysis is of how do certain facts

4    become believed in.   And fingerprints have become

5    something of an article of faith, not of science.

6    And we're trying to show, and Judge Pollak, while he

7    didn't adopt the whole argument, it's true, did, at

8    least, start attacking the article of faith that this

9    is a science.

10             And he came down clearly saying that it is

11   not a science.   And --

12             THE COURT: It doesn't have to be a science

13   to be admissible.

14             MR. SHEA: I understand that.   But that's

15   really where we start out with what Dr. Cole's been

16   after in these hearings, and in this hearing.   It's

17   to study how the courts --

18             THE COURT: Well, is this about what Dr.

19   Cole wants or...?

20             MR. SHEA: No.   But in some ways he was

21   under attack at the hearing -- not by you --

22             THE COURT: Excuse me?

23             MR. SHEA: I said he was under attack at the

24   hearing in some ways; not by you.   Rightfully, by the

1    Commonwealth, because he's a witness who's on the

2    other side from them.  But I'm just trying to make

3    clear that what he's worked on is to get at the

4    question of how courts came to accept fingerprints.

5    And the courts, in the Pollak decision, have started

6    to see that there is a problem with calling it a

7    science.

8              THE COURT: So don't call it a science.

9    What's the problem?

10             MR. SHEA: Okay.  Well, if we don't call it

11   a science, I would point out that it still is

12   subjected, as in *Kumho Tire*, should be subjected to

13   testing by -- in terms of reliability.

14             Because the question isn't are there -- are

15   all fingerprints identical.  I mean, can we find a

16   fingerprint that is identical to another out of the

17   randomness of everything.  That's not really the

18   question.  The question is are there fingerprints

19   that are similar enough to be misidentified with one

20   another.  And that has never been studied.  And

21   there's been really no effort to find that out.

22             And given that that hasn't been looked

23   into, that's why we think the entirety should be

24   excluded.  And in looking at particular tests, the

1    ACE-V test, part of what Dr. Cole talked about was

2    the history, and that there was a points of

3    identification.  And that went out the window.  And

4    it failed in Britain, and while they still somewhat

5    use it as a fail-safe to get up to 12, they really

6    have rejected it because they can't --

7              THE COURT: Excuse me.  Excuse me.  Excuse

8    me a second.

9              How many points of identification were made

10   in this case?

11             MR. SHEA: I haven't had that turned over to

12   me.

13             MR. DEAKIN: Your Honor, I am not certain of

14   that.  I know that it's -- I shouldn't say I know.  I

15   am virtually certain that it is more than 12.

16   Because that is the sort of quality assurance

17   standard that the FBI relies on.

18             THE COURT: Now, wait a minute.  Wait a

19   minute.  Last Thursday we came in here and we spent

20   the entire day to impanel a jury.  This case has been

21   around at least since July of last year, because I

22   did the motion to suppress on it.  So from July of

23   last year until today, there's no report as to --

24             MR. DEAKIN: I produced the report to the

130

1    defense.  The report is not a breakdown, point-by-

2    point analysis.  It states that she found five

3    fingerprint matches for Owen McCants.  That's been

4    produced to defense counsel.  There was no request

5    for any additional information.  And in discussing

6    the case with Ms. Hoskins, the examiner, many months

7    ago, she told me how many points.  I didn't write it

8    down.  Incidently, I don't recall how many points.

9    But I believe that in each -- she identified five

10    prints from four different fingers of Owen McCants.

11    Each print, each identification, I believe, is more

12    than 12 points.  But exactly how many, I am not

13    certain.

14          MR. SHEA: I'd be happy to turn over what I

15    was given in discovery and have the Court --

16          THE COURT: Because in looking -- in reading

17    that decision by Judge Pollak, I'm in agreement with

18    much of what he wrote, and, in particular, even

19    though, you know, it's my inclination to deny your

20    motion, to exclude the fingerprint testimony, it's

21    still my responsibility that once they take the

22    witness stand, or once the Commonwealth proceeds to

23    present it, that it is of such a quality that is

24    going to be helpful to the jury.

1       And that's the reason why I was asking

2   about what the points were.  Because at a certain

3   point, it would certainly be within the Court's

4   discretion not to allow it, depending upon what the

5   quality of it is.

6       And you still have your objection on that

7   basis.

8       MR. SHEA: And I think your question about

9   the report gets at exactly my argument here, though,

10  Judge, which is what they did was, and what Dr. Cole

11  said, I think it's a very salient point, which is

12  faced with the fact that they had kind of arbitrarily

13  picked 16, 14, 12, 10 points of identification as

14  sufficient, and then having that found to be not

15  always accurate, having experienced

16  misidentifications, they didn't up the standard, they

17  did away with the standard.

18      And so now what you get in discovery and

19  you see what the reports are, they don't give you

20  anything, right.  They just basically say -- and this

21  is what they're taking for expert testimony -- is

22  take it as an article of faith that this person has

23  been trained, and because she's been trained, she

24  doesn't have to say any standard, she got it right.

1        And the reason that that is so dangerous,

2   particularly as to fingerprints, is there is a

3   certain mystique about them.  And, now what they've

4   done is really eliminated the ways to even attack the

5   mystique.  And they're asking to parade that in front

6   of the jury without ever giving any reason as to why

7   this is accurate.  They basically say, she looked at

8   it.  After looking at it, under these three -- you

9   know, looking at the latent, looking at the known,

10  looking at ridge detail, she didn't have set points

11  of identification, she reached the conclusion, at the

12  conclusion phase, that it was the same.  That's it.

13        There's no showing ever that -- and there's

14  no test to do this, that's ever been done, which

15  takes even ten experts, gives them the same material,

16  and finds at which point they make a conclusion.

17  Because they act like it's mathematics, but the fact

18  is that the point at which each human being, each

19  expert reaches the conclusion is likely to be

20  different.  Which lends an arbitrariness to this that

21  makes it something that should not be admitted as

22  expert evidence in the court.

23        Now, if the Court is inclined to admit this

24  into evidence, but does not believe that it is

1   science, I would ask the Court to consider giving

2   instructions to the jury on both ends of this

3   testimony that fingerprint evidence is not science.

4   I would also ask the Court to consider that it is

5   subjective analysis, and it is determined via

6   experience and intuition --

7           THE COURT: Well, you can bring that out on

8   cross-examination.  But I will instruct the jury that

9   it's still up to them to decide.  I mean, he can

10   offer his opinion.  It's their opinion.  It's not

11   conclusive.  The jury decides whether or not it's his

12   fingerprint, and whether or not to accept that

13   opinion.

14           MR. SHEA: Well, I'd also ask you to

15   consider not accepting an opinion, that they not be

16   allowed to state the opinion that it is, in fact, his

17   fingerprint.

18           THE COURT: Depends upon what they say.

19           The motion is denied.

20           MR. SHEA: Note my objection.

21           THE COURT: All right.

22           And as to the precluding the testimony of

23   Simon Cole, look, he's an expert on something, but

24   he's not an expert on fingerprint analysis.  So, it

1    depends upon how the evidence develops at trial as to

2    whether or not he has any area of expertise to offer

3    to the trial.

4              MR. SHEA: So you would be holding off a

5    ruling on that until after their evidence is

6    presented?

7              THE COURT: Yes.

8              What else is there?

9              MR. DEAKIN: Your Honor, I think the only --

10             THE COURT: Something you brought up this

11   morning.

12             MR. DEAKIN:  -- remaining matter -- that's

13   right -- is the police photographer Michael Flemmi.

14             THE COURT: Right, right.

15             MR. DEAKIN: I don't anticipate calling him

16   because the detective who was there as he took the

17   pictures and can testify that these are true and

18   accurate depictions of what they're photographs of,

19   and will testify he only clicked the shutter.  That's

20   what he did.

21             And I would --

22             THE COURT: Well, if you're not calling

23   Flemmi, what's he got to do with the case, then?

24             MR. DEAKIN: I just want to make sure --

1    your Honor had allowed a motion as to Sergeant Byrne,

2    that no reference be made to the pending indictment.

3    I would ask that the same order be imposed as to

4    Officer Flemmi.

5              THE COURT: But if Flemmi is not testifying,

6    why do I have to say anything about it?

7              MR. DEAKIN: The reason is this, your Honor.

8    I could anticipate, should it come up in the trial,

9    the identity of the photographer, which it might.

10   The detective could be asked who took the pictures.

11             THE COURT: Wait, wait, wait.  Who took the

12   photographs?

13             MR. DEAKIN: Michael Flemmi.

14             THE COURT: And he's not going to testify?

15             MR. DEAKIN: He's not going to testify.

16             THE COURT: So why does his name have to be

17   mentioned?

18             MR. DEAKIN: Well, I would agree with that.

19   I would certainly agree with that, your Honor.  That

20   goes even further than I was asking the Court to go.

21   But all I'm asking is that defense counsel be

22   precluded from in any way referring to Michael

23   Flemmi's indictment.

24             THE COURT: Mr. Shea.

1    MR. SHEA: Yes, Judge.  I mean, I pretty

2    much understand that to just out of nowhere try and

3    smear Mr. Flemmi during the trial is not appropriate.

4        THE COURT: Fine.  Because if he's not

5    testifying, there's no reason for his name to come

6    up.

7        .    MR. SHEA: I agree.  And if it comes up that

8    he's the photographer, or the guy who took the

9    pictures, he's the guy who took the pictures.

10       THE COURT: All right.  Fine.

11       Tomorrow morning.  Nine a.m.

12       THE CLERK: He's asking for funds for a

13   fingerprint expert.  I don't know if he's waiving it

14   now.

15       THE COURT: Motion for additional funds for

16   fingerprint expert?

17       MR. SHEA: Well, Judge, Dr. Cole met with me

18   yesterday.  He did review a number of transcripts.

19   We're asking for basically what it cost today, and we

20   met from eight until --

21       THE COURT: All right.  Fine.  I thought you

22   meant an additional expert.

23       MR. SHEA: No, no.

24       THE COURT: All right.

137

1                    MR. SHEA: Thank you.

2                    THE COURT: Judge Pollak's opinion was very

3          enlightening.

4                    MR. SHEA: Thank you.

5                    THE COURT: Thanks for offering it.  See you

6          tomorrow, nine a.m.

7

8

9                    (Whereupon, the Court adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

138

CERTIFICATE

I, Maryann McDonald, Official Court Reporter, do hereby certify that the foregoing record, pages 1 to 137 inclusive, is a true and accurate transcript of my system tapes, to the best of my knowledge, skill and ability.

*Maryann McDonald*

Maryann McDonald, Notary Public

My commission expires:  April 1, 2005

The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying Reporter.