COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUPERIOR COURT
                                                      NO. SUCR2000-10994

COMMONWEALTH OF MASSACHUSETTS

v.

OWEN McCANTS

-----------------------------------------

Tuesday, April 23, 2002
Before: Spurlock, J.
Boston, Massachusetts
Day 4 - Trial

-----------------------------------------

MARYANN MCDONALD
Official Court Reporter
617.788.6180

APPEARANCES:


David Deakin
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
617.619.4000
            Counsel for the Commonwealth


Mark Shea
Attorney at Law
875 Massachusetts Avenue
W. Cambridge, MA 02139
627.864.3943
            Counsel for the Defendant

3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| ██████████████ | | | | |
| (By Mr. Deakin) | 72 | --- | | |

EXHIBITS

| NUMBER | | PAGE |
|--------|--|------|
| 1 | Photograph | 123 |

4

PROCEEDINGS

1

2

3        THE COURT OFFICER: This Court is back in

4    session.   Please be seated.

5        THE CLERK: Will the jurors remain

6    standing, please.

7        Jurors, would you all raise your right

8    hand.

9        Jurors, you shall well and truly try and

10   make true deliverance between the Commonwealth and

11   the defendant at the bar, which you have in your

12   charge, according to the evidence, so help you God?

13       Please respond "I do."

14       THE JURORS: I do.

15       THE CLERK: All right, Jurors.   You may be

16   seated.

17       Owen McCants, would you please rise, sir.

18       Members of the jury, harken to five

19   offenses.   Docket No. 2000-10994, Offense 001,

20   charges Owen McCants with kidnapping.   The

21   Commonwealth of Massachusetts, Suffolk, ss., at the

22   Superior Court, Department of the Trial Court for

23   Criminal Business, begun and holden at the City of

24   Boston, within and for the County of Suffolk, on the

1    first Monday of September, in the year of our Lord

2    two thousand.

3              The jurors for the Commonwealth of Mass.

4    on their oath present that Owen McCants, on or about

5    July 13, 2000, without lawful authority, did

6    forcefully confine or imprison one ████████████

7    within this Commonwealth, against her will, and

8    while armed with a dangerous weapon, did assault

9    ████████████.  A true bill.

10             Offense 002, charging the defendant with

11   rape of child by force.

12             The Commonwealth of Massachusetts,

13   Suffolk, ss., at the Superior Court, Department of

14   the Trial Court for Criminal Business, begun and

15   holden at the City of Boston, within and for the

16   County of Suffolk, on the first Monday of September

17   in the year of our Lord two thousand.

18             The jurors for the Commonwealth of Mass.

19   on their oath present that Owen McCants, on or about

20   July 13, 2000, did have sexual intercourse or

21   unnatural sexual intercourse with ████████████, a

22   child under sixteen, and compel said child to submit

23   by force and against her will, or compel said child

24   to submit by threat of bodily injury.  A true bill.

6

1          Offense 003, charging the defendant with

2     assault to rape a child.

3          The Commonwealth of Massachusetts,

4     Suffolk, ss., at the Superior Court, Department of

5     the Trial Court for Criminal Business, begun and

6     holden at the City of Boston, within and for the

7     County of Suffolk, on the first Monday of September,

8     in the year of our Lord two thousand.

9          The jurors for the Commonwealth of Mass.,

10    on their oath, present that Owen McCants, on July

11    13, 2000, did assault ██████ ███████, a child under

12    the age of sixteen, with intent to commit rape.  A

13    true bill.

14          Offense No. 004, charging the defendant

15    with drugging a person for sexual intercourse.

16          The Commonwealth of Massachusetts,

17    Suffolk, ss., at the Superior Court, Department of

18    the Trial Court for Criminal Business, begun and

19    holden at the City of Boston, within and for the

20    County of Suffolk, on the first Monday of September,

21    in the year of our Lord two thousand.

22          The jurors for the Commonwealth of Mass.,

23    on their oath, present that Owen McCants, on or

24    about July 13, 2000, applied, administered, or

1    caused to be taken by ██████████, a drug matter

2    or a thing with intent to stupify or overpower ██████

3    ██████ to have sexual intercourse or unnatural

4    sexual intercourse with ██████████.   A true bill.

5            Offense 005, charges the defendant with

6    assault and battery by means of a dangerous weapon.

7            The Commonwealth of Massachusetts,

8    Suffolk, ss., at the Superior Court, Department of

9    the Trial Court for Criminal Business, begun and

10   holden at the City of Boston, within and for the

11   County of Suffolk, on the first Monday of September,

12   in the year of our Lord two thousand.

13           The jurors for the Commonwealth of Mass.,

14   on their oath, present that Owen McCants, on or

15   about July 13, 2000, did commit an assault and

16   battery upon one ██████████, by means of a

17   certain dangerous weapon, to wit: a knife.  A true

18   bill.

19           To these five indictments, this defendant

20   at the bar has pled not guilty; and places himself

21   upon his country, which country you are.  You are

22   sworn to try the issues.  If he is guilty, you will

23   so; if he is not guilty, you will say so, and

24   nothing more.  Members of the jury, harken to the

8

1       evidence.

2                   You may be seated, sir.

3                   THE COURT: All right.  Good morning,

4       ladies and gentlemen.  As I told you last week, one

5       of the first things that -- well, the first thing

6       that you're going to do this morning is to take a

.7      view in this case.

8                   Now, you're about to visit a place that

9       you will be hearing testimony about during this

10      trial.  In court terminology, we call this taking a

11      view.

12                  The purpose of the view is to better

13      understand the evidence that you will hear during

14      the trial, and to help you appreciate the location

15      and its surroundings.

16                  The view that you will take is part of

17      this case.  The observations that you make while on

18      the view may be used and considered in your

19      deliberations in reaching a verdict.  The place that

20      you will view is an area in the Allston/Brighton

21      section of Boston, on Fidelis Way and some of the

22      surrounding areas there.

23                  The attorneys and I will accompany you --

24      well, actually, I'll accompany you, but the

9

1   attorneys will meet you there.  The attorneys may

2   point out to you the arrangement of the scene and

3   the items that they want you to take notice of.

4   But, otherwise, they may not discuss anything in

5   regards to this case.

6           While you are on the view you are not to

7   make any notes or sketches.  You are not to conduct

8   any independent investigation while we are there, or

9   at any other time during this trial. You are not to

10  return to the scene, or ask anyone else to do so,

11  until this case is over. Your responsibility on the

12  view is to see the places, observe them carefully,

13  and remember what you see.

14          During your trip to and from the place you

15  will view, you are not to discuss this case, or

16  anything about it, amongst yourselves or with anyone

17  else, and you are not to permit anyone to talk to

18  you about this case.

19          You will be under the supervision of the

20  court officers at all times, and you will remain

21  together until you are returned to court, unless the

22  court officers direct you otherwise.

23          I'm going to have the clerk swear in the

24  court officers.  Listen to the oath that they take,

1          because it will guide them and you on this view.

2                    Where's the other court officer?

3                    I'll see counsel at side-bar for a moment.

4

5     SIDE-BAR CONFERENCE:

6                    THE COURT: Your client doesn't have a

7          right to be on the view.              .

8                    MR. SHEA: I've researched that, and that

9          appears to be true.  We'd still ask that he be

10         brought on the view.

11                   THE COURT: If he's brought, he goes in

12         handcuffs and leg irons, because I can't take him

13         out without that security.

14                   MR. SHEA: Given that, he would decline to

15         go.

16                   MR. DEAKIN: Your Honor, did your Honor

17         suggest that we're not going on the bus?

18                   THE COURT: Yeah.

19                   MR. DEAKIN: I didn't realize that.  I

20         guess, in the past, we've always ridden, sort of

21         separately on the bus.  Because I didn't make

22         arrangements.  I mean, I guess we could go in the

23         police cruiser.

24                   THE COURT: It'll cost you 50 cents to ride

1    our bus.

2              MR. DEAKIN: That's more than I make in a

3    week.

4              THE COURT: You can go on the bus, but you

5    wait until everybody else is on the bus and you all

6    can sit in front.

7              MR. SHEA: Just to -- I continue to object

8    to the view.  I don't see it as necessary in this

9    case.

10             The other thing is, that the one place

11   that would be useful for my defense in the view is

12   the one apartment we're not able to go into.

13             MR. DEAKIN: I told defense counsel that we

14   made an effort, last week, to try and get into both

15   apartments.  We can get into Polly Taylor's

16   apartment without trouble.  The residents, the new

17   residents there -- they have nothing to do with this

18   case, they just came in later -- of the other

19   apartment are in Puerto Rico, and we couldn't -- the

20   management company won't open it up.

21             THE COURT: All right.

22             MR. DEAKIN: I told defense counsel, for

23   the record, that, you know, what I could suggest is

24   that we not go into either apartment, if he feels it

1   would prejudice him by going into Polly Taylor's but

2   not going into 545.  We could just not go into

3   either apartment, just go see --

4                THE COURT: Do you have diagrams of the

5   apartments?

6                MR. DEAKIN: We have diagrams of the

7   apartments.

8                THE COURT: You can point out where the

9   apartment is.  Let's go.

10               MR. DEAKIN: Just so I'm clear, should we

11   go into Polly Taylor's apartment, or go into

12   neither?

13               THE COURT: Well, whatever you want them to

14   do.

15               MR. SHEA: I'm interested in, at least,

16   them seeing how small the apartments are.

17               MR. DEAKIN: They're roughly the same size

18   on the diagram.

19               THE COURT: You're going to have people

20   testify.

21               (End of side-bar conference.)

22

23               THE CLERK: Officers, please stand and

24   raise your right hand.

1           Do you solemnly swear that you will take

2       the jury upon the premises in question and suffer

3       them to view the same or any property, place, or

4       thing bearing upon the issues in this trial as the

5       parties may deem necessary; that you will not permit

6       the parties to enter into a debate in the hearing of

7       the jury, or any person to speak to the jury, unless

8       it be the Assistant District Attorney David Deakin

9       on the part of the Commonwealth, and Attorney Mark

10      Shea on the party of the defendant, then only to

11      point out such places or things as they may deem

12      expedient for the determination of the issues; that

13      you will keep the jury together until they shall

14      return into court, unless the Court shall otherwise

15      order, so help you God?

16              THE COURT OFFICERS: I do.

17              THE COURT OFFICER: Jurors, can you please

18      rise.

19              (Whereupon, at 9:45 a.m. the view was

20      taken.)

21

22                          VIEW

23

24              THE COURT OFFICER: Okay, counsel.

1          MR. DEAKIN: Ladies and gentleman, you've

2     met me before.  My name is David Deakin.  I'm going

3     to ask you to please direct your attention to a

4     number of things outside here, then we're going to

5     go into the building at 34 Fidelis Way.

6          Please draw your attention to the building

7     here labeled 32 Fidelis Way and 34 Fidelis Way and

8     the entrances to each of these buildings here on

9     Fidelis Way.

10          If you could, direct your attention that

11     way to the tan-colored brick building there, and off

12     to the right of the building you'll see a pathway

13     with sort of a break in the fence or a gate or a

14     cut-through.  And beyond that, please direct your

15     attention to the monastery in the background.

16          Direct your attention, as much as you can,

17     to the building off to the right there, behind the

18     bus, and then we'll actually, after we come out of

19     the building, be walking around this way to the

20     right.

21               THE COURT: Mr. Shea.

22               MR. SHEA: Nothing further.

23               MR. DEAKIN: Ladies and gentlemen, while

24     you're here --

1          THE COURT OFFICER: Hold on, counsel, one

2     second, please.

3          MR. DEAKIN: Just direct your attention to

4     the entryway and the elevator.  I'd just ask

5     everybody to take a look around the entryway, get

6     yourself oriented.

7          Ladies and gentlemen, if you can fill in

8     here, because you need to be able to see here.

9     We're going to go into an apartment in a moment, but

10    before we do, I want to direct your attention to the

11    apartment door here, with the number 545.  The

12    stairwell door here; we'll actually be going down

13    those stairs to get down.  And then this doorway of

14    the apartment we're going to enter, Apartment 546.

15         I'm going to ask you to go into Apartment

16    546 and just take a look around, orient yourself.

17    When you feel like you've had enough time to see the

18    layout of the apartment, let the court officer know

19    and you can come back out here to wait.

20         MR. SHEA: Just as to Apartment 545, you

21    would be seeing this except that the people who live

22    there are away, and so it was unable to be arranged

23    for you to have a view of that apartment.

24         THE COURT OFFICER: Jurors, follow me,

16

1          please.   Why don't you squeeze in a little bit more.

2                    MR. DEAKIN: Ladies and gentlemen, what I'd

3          like you to do on the way down, we're going to be

4          walking down -- the court officer will lead the way

5          -- to the first level, the front entryway where we

6          initially came in.  On the way down, I'd like you to

7          take note of the lighting on the wall and the

8          presence or absence of windows in this stairwell as

9          you go down.

10                   And, then, Bobby, just keep them in that

11         front entryway, because there are a couple of more

12         things I want to show them.

13                            THE COURT OFFICER: Okay.

14                   MR. SHEA: Nothing.

15                   MR. DEAKIN: Ladies and gentlemen of the

16         jury, I'd ask you to direct your attention, first of

17         all, to this door, Apartment 545, which we will not

18         be going into because, as defense counsel pointed

19         out to the last group, the family that resides here

20         now is out of the country and we're not able to gain

21         entrance to it.  Otherwise, you'd be going into this

22         apartment, as well.

23                   But, please take note of this doorway, No.

24         545, the door to the stairwell here, and then this

17

1        door with the label Apartment 546.  And please take

2        note of the relationship of all these doors as to

3        where you came off the elevator.

4              You are going to be going with the court

5        officer to Apartment 546, and what I would ask you

6        to do is just look around, get a sense of the layout

7        of the apartment, familiarize yourself with that

8        layout, and then, when you feel like you've had

9        enough time to do that, let the court officer know

10       and he'll bring you back out.

11             THE COURT OFFICER: Jurors, step in,

12       please.

13             MR. DEAKIN: Members of the jury, the court

14       officer is now going to take you through the door to

15       the stairwell and down the stairs to the first floor

16       entry area where we came in.  I'm going to ask you,

17       as you walk down the stairs, to take note of two

18       things: the lighting on the walls, or any lighting

19       that you can find, and the presence or absence of

20       windows on the stairwell.

21             THE COURT OFFICER: Jurors, follow me,

22       please.

23             MR. DEAKIN: Ladies and gentlemen, I'd just

24       like you to notice, now, on the way out, the

1    relationship of the elevator door to the stair door

2    that you just came out.  I'd also like you to note

3    the door that the court officer is standing next to

4    and the buzzer mechanism out in the -- as you go out

5    you'll pass the buzzer mechanism that buzzes this

6    door.

7           Then we're going to gather again out at

8    the front of the building and we'll walk around the

9    building.  As we're doing that, I'm going to direct

10   your attention to a couple of things as we go.

11          MR. SHEA: If you could just take the

12   opportunity to look up at the windows and up to the

13   fourth floor.

14          That's it.  Thank you.

15          MR. DEAKIN: Ladies and gentlemen, I'd just

16   ask you, if you would, to focus your attention

17   across the way and the buildings here on Jetty

18   Court.  To just get a sense of their layout.

19          I'd just ask you, if you would, to look

20   this way over to Jetty Court, past the building

21   that's labeled "Commonwealth Development."  You

22   noticed that building before when you looked, the

23   sort of slate-colored building.  To the right of

24   that are some buildings in Jetty Court.  And as we

1    walk around this building that's 32-34 Fidelis Way,

2    I'd just ask you to take note of the layout of the

3    buildings around.

4                Ladies and gentlemen, I'm going to ask

5    you, if you would, to direct your attention to the

6    area of this little patio stairs.  I'm not sure the

7    right words for it, but this area right in here with

8    particular reference to the stairs, the two sets of

9    stairs there, and the little retaining wall that

10   runs between them.

11               After you've had a chance to look at that,

12   I'd ask you to direct your attention to this parking

13   lot here behind you, where the court officer is, and

14   just note the layout of that.

15               Take a look here and when everyone's had a

16   chance to look, we're going to walk around the

17   building.  I'll point out one more location to you,

18   and then we're going to get back on the bus.

19               Ladies and gentlemen, this may not be the

20   easiest thing to see, but if you can't see it from

21   where you are now, as you pass by, I want to direct

22   your attention to the patio area here.  There's a

23   staircase going down that -- I'm actually asking you

24   to direct your attention to the patio area where

1    there's a folded up umbrella.  Just as you go by,

2    look at it as best you can.

3                    * * *

4        MR. DEAKIN: Ladies and gentlemen, we're at

5    the LaRose Place, looking onto a private way called

6    Nantasket Avenue here.  I expect you'll hear

7    testimony about both of those streets.

8        What I'd ask you to do here, at this part

9    of LaRose Place, is to, first of all, look at the

10    fence with particular attention to this segment of

11    fence here, and the rocks piled up on the other

12    side.

13        I'd also ask you to observe streetlights

14    on Nantasket Ave. there, streetlights on Nantasket

15    Ave. here where I'm pointing, and the streetlight on

16    Nantasket Ave. that's a little hard to see over past

17    that tree, if you can just make it out.

18        We'll be going onto Nantasket Ave. as

19    well, so I'd like you to look at 29 Nantasket Ave.,

20    this large white house here, and that sort of, for

21    lack of a better term, little parking area here on

22    the other side of Nantasket Ave. from 29.

23        Take whatever time you need and then we'll

24    be walking up, actually, into somebody's back yard.

1              I want to point out to you, too, since

2    we're here, the house here at 26 and 24 LaRose

3    Place; the sort of grey and green two-tone house.

4              I'd draw everyone's attention, at this

5    point, to -- I'm not sure you can all see it, but

6    there's a statue there in a blue background.

7    There's a stone barbeque grill here with a hose

8    draped over it.  We're going to go further up into

9    the yard, but I just want everybody to see the

10   layout of the yard from here.

11             I'd like you to just orient yourselves

12   here.  Take particular note of the fact of the

13   barbeque grill here.  And then I'd like everybody,

14   if they would, to look out toward LaRose Place from

15   this area.  Look out to the street, you'll see the

16   bus is there in the foreground.

17             And I want everybody to note the view onto

18   LaRose Place from this location and see what you can

19   see and what you can't see.

20             I think we're done here.

21                        * * *

22             MR. DEAKIN: Now, ladies and gentlemen, I

23   would like, now, everyone standing in the middle of

24   LaRose Place to look over at that area next to the

1    barbeque where we were standing before and see what

2    the view is from LaRose Place into that area.

3            We'll walk up to one more location.

4                        * * *

5            MR. DEAKIN: Now, ladies and gentlemen,

6    we're at No. 3 and 5 LaRose Place, a white duplex.

7    I'd like you to take note of the house itself.  In

8    particular, I'd like you to note in the doorway

9    areas the presence or absence of what appear to you

10   to be doorbell ringers, and I'd also like you to

11   take particular notice of the iron, the black iron,

12   sort of fence work in the front.

13           Once you've had a chance to look at that,

14   we'll get back on the bus.

15                       * * *

16           MR. SHEA: As you can see we're now on the

17   other side.  So just from this perspective, take

18   note of the fence, particularly the lower left

19   quadrant, the lighting.

20           MR. DEAKIN: And, ladies and gentlemen, I'd

21   just ask you to take note of the streetlight that's

22   sort of -- it's a little easier to see than it was

23   from the other side of the fence.  Take note of this

24   streetlight here, the parking area that I pointed

1    out to you before, and then the house here at 29.

2         (Whereupon, at 12:01, the view concluded.)

3              (Recess)

4              THE COURT: All right.  Ladies and

5    gentlemen, now that you've been sworn and you've

6    been on this view, I'll give you some preliminary

7    instructions to guide you in your participation in

8    this trial.

9              It will be your duty to find, from the

10   evidence, what the facts are.  You and you alone are

11   the judges of the facts.  You will then have to

12   apply those facts to the law as I will give it to

13   you, and you must follow that law whether you agree

14   with it or not.

15             The evidence from which you will find the

16   facts will consist of the testimony of witnesses,

17   documents and other things admitted as exhibits, and

18   any facts the lawyers agree or stipulate to.

19             Certain things are not evidence and must

20   not be considered by you.  Statements, arguments,

21   and questions by lawyers are not evidence.

22   Objections to questions are not evidence.  Lawyers

23   have an obligation to their clients to make an

24   objection when they believe evidence being offered

1  is improper under our rules of evidence.  You should

2  not be influenced by the objection or by my ruling

3  on it.  If the objection is sustained, ignore the

4  question and any assertion of fact that it might

5  contain.  If it is overruled, you treat the answer

6  like any other.

7          As an example, a witness is asked, Isn't

8  it true that you were in New York on September 19th?

9  Objection.  Sustained.  The question and answer have

10  been excluded.  You are not to assume or speculate

11  that the witness was, in fact, in New York on

12  September 19th or that the witness was not in New

13  York on September 19th.

14          Where the witness happened to be on that

15  particular day, if it is relevant, will simply have

16  to wait until admissible evidence is offered.

17          Testimony that I exclude or instruct you

18  to disregard is not evidence and must not be

19  considered.  If I instruct you that some item of

20  evidence is received for a limited purpose only, you

21  may only consider it for the purpose that I define

22  for you.

23          Now, occasionally, an item of evidence

24  will be marked for identification and given a

1   letter, such as A for Identification.  That is done

2   so that there will be some reference to the item in

3   the official record of the trial.  If an item marked

4   for identification is not eventually received as an

5   exhibit and given an exhibit number, it is not

6   evidence and must not be considered.

7          Anything you may have seen or heard

8   outside this courtroom is not evidence and must be

9   disregarded.  You are to decide this case solely on

10   the evidence presented here in the courtroom, except

11   for the view.  You can consider that in making your

12   decision.  It's not evidence, per se, but you'll

13   hear about it testified to during the trial, and it

14   will help you understand the evidence that is

15   introduced at trial.

16          Now, there are two kinds of evidence:

17   Direct evidence and circumstantial evidence.

18          Direct evidence is direct proof of a fact,

19   as, for example, from the testimony of an

20   eyewitness.  Circumstantial evidence is proof of a

21   fact or a set of facts from which you could infer or

22   conclude that another fact exists, even though it

23   has not been proved directly.

24          As an example, assume that when the court

1   clerk arrived for work this morning he did not find

2   me in my office.  Nevertheless, the lights were on,

3   my coat was hanging in the closet, the work I had

4   taken home last night was spread out on the desk

5   with a copy of today's newspaper.  From that set of

6   facts the court clerk could infer or conclude that I

7   had arrived for work sometime earlier, and was

8   somewhere else in the building.

9        I will give you further instructions on

10  what is meant by direct and circumstantial evidence

11  at the end of the case.  But, keep in mind that

12  neither type of evidence, direct or circumstantial,

13  is considered inferior or superior to the other.

14  You may consider both in arriving at your verdict.

15       Now, from time to time during the course

16  of the trial it will be necessary for me to talk to

17  the lawyers privately by meeting with them at the

18  other side of the bench.  The purpose of these

19  conferences is not to keep relevant information from

20  you.  Rather, it is to decide how the information

21  should be presented in a way that is permitted by

22  the rules of evidence.

23       I will do what I can to keep these

24  conferences to a minimum.  But, please remember,

1        that while they may, at times, tax your patience,

2        they are intended, in the long run, to speed up the

3        orderly flow of evidence.

4             Now, judging the credibility of witnesses

5        is perhaps the most important task you will face as

6        jurors.  It will be up to you to decide which

7        witnesses to believe, which witnesses not to

8        believe, how much of any witness' testimony to

9        accept or reject.  I will give you some guidelines

10       on how to approach this important task at the end of

11       the case, but for the time being you may want to

12       consider the following factors, among others:

13            The witness' ability to have seen or heard

14       the things the witness testifies to; the degree of

15       intelligence the witness shows, and whether his or

16       her memory seems accurate; the impression a witness

17       makes on the witness stand; whether the witness was

18       contradicted by anything he or she said before

19       trial; whether the witness has any motive or bias

20       for testifying in a certain way; and whether the

21       witness' testimony seems probable or improbable in

22       light of all the other evidence in the case.

23            Now, as you know, this is a criminal case.

24       And there are three basic rules about a criminal

1       case that you must keep in mind.  I alluded to them

2       earlier during the impanelment procedure, but they

3       are so important I want to repeat them now.

4                First, the defendant is presumed innocent.

5       As he sits there before you today, he is innocent,

6       unless and until proven guilty.  The indictments

7       brought by the Commonwealth against the defendant

8       are only accusations.  They are a formal notice to

9       him that he faces trial on the allegations contained

10      in the indictments.  An indictment is not proof of

11      guilt or anything else.  The defendant begins a

12      criminal trial with a clean slate.

13               Second, the burden of proof is on the

14      Commonwealth, that is Mr. Deakin, to the very end of

15      the case.  The defendant has no burden to prove his

16      innocence, to testify, or to present any evidence.

17               Third, the Commonwealth must prove the

18      defendant's guilt beyond a reasonable doubt.  This

19      is the highest standard of proof in our system of

20      law.  I will define what is meant by proof beyond a

21      reasonable doubt at the end of the case.  But, until

22      then, keep in mind that the standard of proof is

23      much higher than the preponderance of the evidence

24      or the more likely than not standard that you might

1    be familiar with in civil cases.

2           Now, in this case the defendant is charged

3    with kidnapping, rape of a child by force, assault

4    to rape a child, and drugging a person for sexual

5    intercourse, and assault and battery by means of a

6    dangerous weapon.

7           I will give you detailed instructions on

8    the law at the end of the case, and those

9    instructions will control your deliberations and

10   decision.  But in order to help you follow the

11   evidence, I will give you a brief summary of the

12   elements of the offenses that the Commonwealth must

13   prove to make its case.

14          On the kidnapping, the Commonwealth must

15   prove beyond a reasonable doubt that Owen McCants,

16   without lawful authority, forcibly confined or

17   imprisoned ██████████, somewhere within this

18   Commonwealth, against her will, while armed with a

19   dangerous weapon.

20          On the charge of rape of a child by force,

21   the Commonwealth must prove that on or about July

22   13th of 2000, Owen McCants did have sexual

23   intercourse or unnatural sexual intercourse, with

24   ██████████, a child under sixteen, and compelled

30

1          ████████████ to submit, by force, and against her

2     will, or compelled ████████ to submit by threat

3     of bodily injury.

4               On the assault to rape, the Commonwealth

5     must prove beyond a reasonable doubt that on or

6     about July 13th that Owen McCants did assault one

7     ████████████, a child under sixteen years, with the

8     intent to commit rape.

9               On the drugging a person for sexual

10    intercourse, the Commonwealth must prove beyond a

11    reasonable doubt that on or about July 13th of 2000,

12    Owen McCants applied, administered, or caused to be

13    taken by ████████████, a drug, matter, or thing,

14    with the intent to stupify or overpower ████

15    ████████ to have sexual intercourse or unnatural

16    sexual intercourse with ████████████.

17               On the assault and battery by means of a

18    dangerous weapon, the Commonwealth must prove beyond

19    a reasonable doubt that on or about July 13th of

20    2000, Owen McCants did commit an assault and battery

21    upon one ████████████ by means of a certain

22    dangerous weapon.  That is, a knife.

23               Now, a few words about your conduct as

24    jurors.  First, I instruct you that you are not to

1    discuss this case or anything about it with each

2    other or anyone else.  Until you retire to the jury

3    room at the end of this case to deliberate on your

4    verdict, you are simply not to talk about this case.

5         Second, do not read or listen to anything

6    touching upon this case in any way.  If you should

7    happen to encounter a newspaper, radio or television

8    account of this trial, you must turn away and not

9    read or listen.  If anyone should try to talk to you

10   about this case, I want you to inform one of the

11   court officers promptly so that it can be brought to

12   my attention.

13        And third, do not try to do any research

14   or many any investigation about this case on your

15   own.  Please do not go back to the area where we

16   took the view today.

17        And, finally, do not form any opinion

18   until all of the evidence is in.  Keep an open mind

19   until you begin your deliberations at the end of the

20   case.

21        Now, as most of you know, the deliberating

22   jury in an American criminal case consists of 12

23   jurors.  You will already have noticed that 16 of

24   you have been impaneled.  At the end of the trial,

1    lots will be drawn and four jurors will be chosen to

2    serve as alternates.  The jurors in seats 15 and 16

3    should not assume that they are the alternates.  If

4    my math is correct, each juror has a three out of

5    four chance of being chosen as part of the

6    deliberating jury.

7            .The reason we provide alternates is that

8    in the event of some emergency a juror is unable to

9    continue service during the trial or deliberations,

10   the alternate jurors' job, until the verdict is

11   returned, is obviously an important one.

12           Now, in a moment, the trial will begin.

13   First, the Commonwealth will make an opening

14   statement.  Following the Commonwealth's opening

15   statement, defense counsel may, but does not have to

16   make an opening statement.  Opening statements are

17   not evidence, nor are they arguments.  They are

18   simply outlines of the evidence that the lawyers

19   anticipate will be introduced at trial.

20           At the end of the case, both lawyers will

21   have an opportunity to argue to you their view of

22   the evidence that has actually been presented.

23           Now, as I told you before -- well, not as

24   I've told you before.  The schedule that I

1    anticipate we will follow is that we will sit from -

2    - well, we'll go through the opening statements of

3    counsel.  After the opening statements, we'll break

4    for lunch.  We generally have lunch from one until

5    two in this courthouse.  And at two, we'll come

6    back, and we'll sit from two until four in the

7    afternoon.  That's pretty much the schedule we'll

8    follow until this trial is over.  We'll start at

9    nine, have a morning recess, morning break, and then

10   have lunch from one until two, and then come and sit

11   from two until four in the afternoon.  Maybe a short

12   break in the afternoon, depending upon what the

13   weather's like inside.  Sometimes it's too hot,

14   sometimes it's too cold.  It depends on what it's

15   like inside.

16           That will be our schedule until all the

17   evidence is in in this case.

18           Now, in the Commonwealth of Massachusetts,

19   the party who has the burden of proof goes first and

20   last.  Since the burden of proof is on the

21   Commonwealth to prove beyond a reasonable doubt Owen

22   McCants guilty of these offenses that he's charged

23   with, they will go first in opening statements and

24   last in closings.

1       Commonwealth.

2              MR. DEAKIN: On a warm summer night in July

3       2000, almost two years ago, 11-year-old ████

4       ████████ was kidnapped by a man at knife-point in an

5       apartment where she was staying in Brighton.

6              She was taken from the building, she was

7       walked around the building, the man holding a knife

8       to her neck.  She was taken to a location near the

9       parking lot where he put duct tape over her eyes and

10      her mouth.  She was taken to a waiting car and while

11      the man drove away, he told her to take off her

12      underwear and her bra, and give it to him.

13          He then drove her to an unknown location where

14      he gave her something to drink, something to smoke,

15      and something to snort.  And after she did that, he

16      took her to a secluded area in someone's back yard,

17      and he sexually assaulted her.

18              When he had had enough, he left her there

19      to find her way home.

20              ████████████████ stumbled around and finally

21      did find her way back to the apartment where she was

22      staying in Brighton.  There, she was met by police

23      officers, family members, and concerned neighbors

24      who had been looking for her.  She ran into her

1    mother's arms, and she began to tell her mother what

2    had happened to her.

3            What happened to ███████████ that night

4    is what you will hear about during the course of

5    this trial.  And when you have heard all the

6    evidence in this trial, you will know, beyond any

7    reasonable doubt, precisely what happened to ██████

8    ████████.  And you will know that the man who did

9    this to her is the man sitting right here.  This

10   defendant, Owen McCants.

11           As you know, ladies and gentlemen, I've

12   introduced myself to you twice before.  My name is

13   David Deakin.  I'm an assistant district attorney in

14   Boston.  And on behalf of the people of the

15   Commonwealth of Massachusetts, I will present the

16   evidence against the defendant.

17           Before we begin with the evidence,

18   however, I want to thank each and every one of you

19   for coming here and serving on this jury.  Each of

20   you has left behind important obligations, at work,

21   home, school.  And I know that this isn't easy for

22   any of you to do.  But by coming here to serve as

23   jurors, you are performing the most important

24   obligation that our society imposes on its citizens.

36

1    You are here to do justice.

2            To understand how something as awful as

3    this could happen to 11-year-old ███████, we

4    have to all look back up her family tree.  And it

5    starts with Polly Taylor.  Poly Taylor is an 82-

6    year-old woman who lives in Apartment 546 at 34

7    Fidelis Way.  The apartment you each went into and

8    looked around this morning.

9            In the 1960s, Polly Taylor took in a 16-

10   year-old boy named Owen McCants.  She had been

11   married to his uncle, who died.  And when Owen

12   McCants needed a place to live at 16, she took him

13   in.  He lived with her for several years before

14   moving out.  They developed a close relationship.

15   And she came to view him as a son.

16           Around the same time that Polly Taylor

17   took in Owen McCants, she took in two other children

18   who needed a home.  They were Alphonso Southerland,

19   who is a few years younger than McCants; and his

20   younger sister, Shirley.

21           They -- Alphonso Southerland and Shirley,

22   lived with Polly Taylor for several years.  And

23   during many of those years, Owen McCants was also

24   living in the household.  They developed, each of

1   them, Shirley and Alphonso, a very close

2   relationship with Polly Taylor, as well.  Each of

3   them coming to view her as their mother.  And they

4   also came to view Owen McCants as an older brother.

5           Alphonso Southerland, when he grew up, had

6   a daughter or his own.  Her name is Rasheena

7   ███████.  But you'll hear most people in this trial

8   will call her Nicki.

9           As she was growing up, she viewed Polly

10  Taylor as her grandmother, because Polly Taylor had

11  raised her father, Alphonso Southerland.  And in

12  many summers, Rasheena ████████, or Nicki, spent

13  summers, almost the entire summer, living with her

14  grandmother, Polly Taylor.

15          Rasheena ████████, or Nicki, went on to

16  have a daughter of her own.  And that girl, ██████

17  ███████, who is now 13, was the 11-year-old girl who

18  was kidnapped and raped in this case.

19          In July of 2000, 11-year-old ███████████

20  was spending the summer at Polly Taylor's home at 34

21  Fidelis Way, just as she had the two previous

22  summers, and just as her mother, Nicki, had in many

23  summers when she was a girl.

24          ████████████ attended day camp with a

1      number of other girls from that development, just

2      across the street in the building that you saw when

3      we went on the view.  And she would spend her days

4      at day camp and come home and spend the evening with

5      Polly Taylor.

6              During that time, on July 13th of 2000,

7      ███████████  had been living with Polly Taylor for

8      about four days that summer.  She had just started

9      spending the summer with Polly Taylor.  And over the

10     course of those four days, she met, on one, or two,

11     or three occasions, it's not entirely clear, this

12     defendant, Owen McCants, that everyone in his family

13     calls Sonny.

14             He was staying in the apartment next door,

15     Apartment 545.  You saw the door to that apartment,

16     but not the apartment itself.  He was living there

17     with Polly Taylor's even older aunt, Christine

18     Isaacs, who, unfortunately, is now deceased.  But he

19     was staying in a bedroom in her apartment.  And over

20     the course of several days, ███████████ met him on

21     one, or two, or three occasions.

22             On July 13th of 2000, which was the date

23     that you heard in the indictments was a Thursday,

24     and on that Thursday ███████████ went to day camp

1    just as she always had, and she came home about five

2    o'clock, came inside, had a snack with Polly Taylor,

3    and then, as she always did, went back outside and

4    played with her friends until dark.  Polly Taylor's

5    rule was you come in when the streetlights come on.

6             As it was getting dark and the

7    streetlights came on, ███████████ came back to

8    Polly Taylor's building.  But she was stunned as she

9    approached 34 Fidelis Way, the building that we went

10   into today, when she saw a man with a stocking mask

11   over his face, what appeared to be a ladies'

12   stocking, obscuring his face, the features of his

13   face, attempting, as far as she could tell, to get

14   into the building.

15            She was, of course, very frightened by

16   this, and ran back across the street to an area that

17   we looked at today, and asked some adults, who were

18   there, across the street, for help.  A man

19   volunteered to walk her back.  Having seen how

20   frightened she was and having heard what she had to

21   say, he volunteered to walk her back and take her up

22   to Polly Taylor's apartment.  Which is exactly what

23   he did.

24            He took her back inside the building, up

40

1   in the elevator to Polly Taylor's apartment, where

2   both he and ████████████ told Polly Taylor what she

3   had seen.  He then left her there with Polly Taylor,

4   and she went on with her evening.

5               She had supper, █████ called her mother,

6   they watched some television.  And eventually Polly

7   Taylor needed to go next door to her elderly aunt's

8   apartment.  Her elderly aunt was not in good health.

9   Polly Taylor was one of her primary care-givers.

10  She had to go next door at the end of the night,

11  before bed, to put drops in her elderly aunt's eyes.

12              But because █████ was so shaken by what

13  she had seen, the man she had seen lurking outside

14  the building, Polly Taylor made sure to lock her

15  apartment door on the way out, and told ████ not to

16  open the door for anyone.  ████████████ was sitting

17  on the couch in the apartment, watching the ten

18  o'clock news, when her aunt Polly went out to the

19  next apartment.

20              Shortly thereafter, ██████████████ was

21  stunned to fine that there was a man in the

22  apartment.  The man had let himself into the

23  apartment.  And she only saw a fleeting glimpse of

24  him before he raced into the bathroom to hide.  When

1   she approached the bathroom, she couldn't see him,

2   but he said to her, "Where is your Nana?"  She told

3   him that her Nana was over at Christine Isaac's

4   apartment, next door.  He said, "Go get your Nana."

5   And so she did.

6           She left the apartment, she went across

7   the hall to Christine Isaac's, Apartment 545,

8   knocked on the door and said, "Nana, Nana."  But

9   before she could do anything else, the man came up

10  behind her, put a knife to her neck, and dragged her

11  into the stairwell.

12          And she was stunned to find that the

13  stairwell, which was lit 24-hours a day, was black.

14  It was completely dark.  It was like that all the

15  way down from the fourth floor to the ground level.

16          The man then dragged her down the stairs,

17  while Polly Taylor, who had heard ██████ calling for

18  her, knocking, and who will testify that her voice

19  sounded frightened, terrified, like she never heard,

20  came out and saw that the door was still closing to

21  the stairwell, looked into the stairwell and called

22  out, "Nea, Nea," which is what she calls ██████.

23          She could barely hear muffled sounds from

24  the stairwell, but couldn't hear any answer from

1   ▓▓▓▓.  She continued to call and call.  By this

2   time she was, of course, quite concerned.

3          When she couldn't hear any answer she

4   shouted down the stairwell, "I'm going to call the

5   police."  And that's exactly what she did.  The

6   elderly woman made her way back from the stairwell

7   into her apartment, and dialed 9-1-1.

8          Meanwhile, the man who had taken ▓▓▓▓

9   ▓▓▓▓, who she could now tell was the same man she

10  had seen lurking outside the building with the

11  stocking mask and who, indeed, had the stocking mask

12  still over his face, took her all the way down the

13  stairs, out the front door of 34 Fidelis Way, and

14  around the building in the way that we walked this

15  morning, back between the two buildings and that

16  courtyard, and walked her to a secluded area off to

17  the side of the parking lot.

18          There, he sat her down under a tree and

19  some very green bushes.  They were, as you can

20  imagine, quite a bit more lush in July 2000 than

21  they are now in the early spring.  He sat her down

22  there.  Actually, I need to go back a bit.

23          Before he got her around the building, she

24  tried to break away from him and run.  And she was

43

1      cut under the ear.  She still has a scar here, to

2      this day, from the cut that she received as she

3      pulled away from the man, and the knife that he was

4      holding cut her neck.

5             He then walked her to the secluded area,

6      sat her down under a tree and some bushes, and took

7      . pre-cut strips of duct tape from somewhere on his

8      body.  Put one strip over one eye, one strip over

9      the other eye, one strip over her mouth.  He then

10     walked her the short distance from that area under

11     the tree and the bushes that you saw today to his

12     waiting car in the parking lot area that you also

13     saw.

14           As you can imagine, ▮▮▮▮▮▮▮▮▮ couldn't

15     see very well with the duct tape over her eyes, but

16     the duct tape didn't actually fit completely over

17     her eyes and she was able to see a little bit out

18     the bottom.  She got a look at the color of his car.

19     She also got a look at the color of the interior of

20     his car.

21           The defendant pushed her into the car,

22     through the driver's seat, over to -- through the

23     driver's door, over to the passenger's seat, and

24     then got in himself, and drove away.  As he drove

44

1       away, he told her to take off her underwear and sort

2       of a pre-training bra that she was wearing at the

3       time, and give them to him, which she did.

4                He then drove a short distance.  And ████

5       doesn't know where he drove to because she couldn't

6       see with the duct tape over her eyes.  But he

7       stopped the car somewhere, and took the duct tape

8       off of her mouth.  He then offered -- gave her a

9       bottle and told her to drink from it.  And as he was

10      doing so, lifted the stocking mask up over his face.

11      As she took the bottle and drank from it, and as she

12      continued to do other things after that, she could

13      see his face, and she was struck immediately by the

14      fact that he was familiar to her, although she

15      couldn't immediately place where she had seen this

16      man before.  But she recognized him.

17               She will describe to you what it felt like

18      to drink the liquid.  She'll describe that it burned

19      her throat.

20               He then lit some sort of cigarette and

21      told her to smoke from it, which she did, although

22      it appears that she wasn't very successful at

23      smoking from it.

24               And then finally, he passed her something

1    with a light-colored powdery substance, and told her

2    to snort it into her nose.  She did that, and when

3    she testifies, she'll tell you about the burning

4    sensation in her nose as she sniffed that.

5         When these things had happened, the

6    defendant put the duct tape back on her mouth and

7    drove the car to another location.  And she didn't

8    know where she was at the time, but the testimony

9    will show that where he drove her to was that

10   parking area on Nantasket Ave. that you all saw this

11   morning on the view.

12        He parked the car there, dragged her out

13   of the car, and walked her up through a hole in the

14   fence between Nantasket Ave. and LaRose Place.  It

15   was the fence that you saw today.  That hole has

16   since been repaired.  You'll see photographs of how

17   it appeared at the time.  But at the time you could

18   actually walk through the hole from Nantasket Ave.

19   onto LaRose Place.

20        The defendant took ███ up through the

21   side yard of 26 LaRose Place where you walked this

22   morning on the view, and took her to that overgrown

23   area under what appears to be a grape trellis where

24   we stood today and we looked out at LaRose Place

1    from it.  And that area was even more -- the

2    testimony, I believe, will show was much more

3    overgrown then than it is now.  It's been pruned

4    back quite a bit.

5        When they got to that area, this man, Owen

6    McCants, told ███████ to take off her nightshirt -- so

7    she was now naked -- lay the nightshirt on the

8    ground, and then lie on top of the nightshirt.  She

9    did that.  And when she did that, the defendant laid

10   down next to her, took his finger, put it inside of

11   her vagina, and moved it around for a period of

12   time.

13       When he finished doing that, he got on top

14   of her, and he rubbed his penis against her vagina

15   for another period of time.

16       When he was gone, the defendant got up,

17   told ██████ to put her nightshirt back on, which she

18   did, and then told her -- walked her over to the

19   back of the barbeque grill that you all saw, the

20   stone barbeque grill in the side yard there.  He

21   told her to sit there and to wait for him, and that

22   he would come back for her.  He told her that if she

23   told anyone about what had happened, he would hurt

24   her Nana.

47

1          ████████████ did as she was told.  The

2     11-year-old girl sat there behind that barbeque

3     while the defendant walked away, went back to his

4     car, got in, and drove back to 34 Fidelis Way.

5          She waited there for what seemed to her

6     like a very long time.  And when he didn't come

7     back, she got up, she stumbled with what vision she

8     had, out into LaRose Place.  As she was stumbling on

9     LaRose Place, she took off the duct tape from her

10    mouth and her eyes, balled it up, and threw it on

11    the ground.  She had no idea, at this point, where

12    she was.  So she started looking for help.

13         She ran to a house, which I think the

14    evidence will show, was No. 3 and 5, that duplex,

15    that white duplex that you saw today, and looked for

16    doorbell ringers.  She couldn't find one so she

17    banged on the screen door.  When no one came, she

18    walked up LaRose Place trying to get her bearings.

19         When she got to the top of LaRose Place

20    she looked both ways.  When she looked left, she

21    could see the monastery, which is something that she

22    recognized from having spent summers with her --

23    with Polly Taylor.

24         When she saw the monastery she made her

1    way for it.  She went around the monastery, cut

2    through along the fence -- you saw the sort of

3    opening in the fence across from 34 Fidelis Way --

4    and ran back to the 34 Fidelis Way.

5         Waiting for her there was a huge crowd

6    with police officers who had been looking for her,

7    family members, including her mother, who was

8    desperate to find her, and concerned neighbors who

9    had been helping the police and family members try

10   to conduct this search.

11        When ▆▆▆▆ spotted her mother and she ran

12   into her arms, she was crying, she was scared, she

13   was upset.  And ▆▆▆▆▆▆▆▆ s mother Nicki will

14   testify that she was stunned by several things.  She

15   was stunned by her daughter's appearance, she was

16   stunned by her demeanor, and what specifically

17   stunned her was that her daughter's underwear was

18   missing, and that she had a cut -- she had more than

19   one cut on her neck.

20        ▆▆▆▆, her mother, her mother's fiancé,

21   were whisked into a police cruiser.  And as they

22   were putting them in the police cruiser, ▆▆▆▆▆

23   mother started to ask her, What happened, what

24   happened?  Now, it might be difficult for you to

1      imagine the chaos that was the scene when ████

2      ████ came back.  But ████ began giving a

3      disjointed account of what happened to her, jumping

4      from thing to thing, to item to item, that stood out

5      in her mind.  But as she started to tell her mother

6      about the man who had taken her, her mother asked

7      her, ."Was it Sonny?" the name by which the family

8      members know Owen McCarits.  And ████ said

9      yes, that it was.

10               ████ was taken over to a parking

11     lot of the monastery where she was quickly checked

12     out by emergency medical technicians.  When they

13     determined that she didn't have any life-threatening

14     injuries, the police asked ████ to go back

15     in the police cruiser and to show them where she had

16     come from.  She directed the police officers by the

17     route that she had taken to come back because she

18     wasn't able to tell them the route she had taken to

19     get there.  She hadn't been able to see.  But she

20     took them on the route back, back to that area of

21     LaRose Place that you saw on the view today.

22               And she actually had to take them back

23     twice.  You will hear testimony that the EMTs asked

24     her to come back and check her out before she went.

1    But when she went the second time, she showed the

2    officers the area of the street where she believe

3    she had thrown the duct tape.  The police officers

4    found the duct tape and seized it as evidence.

5         From that scene ████████████ was taken to

6    Children's Hospital for treatment.  But back at 34

7    Fidelis Way police officers were struggling to do

8    two things.  First of all, they were struggling to

9    sort out the confusion and to calm down an angry

10   crowd.  And at the same time, they were trying to

11   determine who had done this to ████████████.  Who

12   had taken her and raped her.

13        Because, at the time, the officers at 34

14   Fidelis Way didn't know that she had identified the

15   defendant, Owen McCants.  The only person who knew

16   that, at the time, was ████████████ mother,

17   Nicki.  Obviously, the police found out about it

18   later.  But at that time, they didn't know.

19        The attention of the police -- the police

20   turned their attention fairly quickly to Owen

21   McCants.  And a young woman who told them that she

22   was his niece took them up to Apartment 545, told

23   them that that's where he was staying and that's

24   where he could be found.

51

1          The police went into the apartment; the

2     door was already open.  And there were several

3     police officers there, as you might imagine.  And

4     there, they saw, two older women.  Christine Isaac,

5     who lived in that apartment, and Polly Taylor, her

6     niece, who was four years younger, or so.  The aunt

7     was 86 and the niece was 82.  And they were both in.

8     the room there.

9          The police began to ask them if they knew

10    where Owen McCants or Sonny was.  And as they were

11    asking them, the defendant emerged from the back of

12    the apartment toward the area where his bedroom was.

13    And the police asked him if they could speak with

14    him.

15          They explained to him that there was an

16    angry crowd outside, but that he was not under

17    arrest, that they wanted to ask him some questions

18    about what had gone on that night.  When the

19    defendant heard that, and with the two elderly women

20    in the room, he gestured to the police to come back

21    into his bedroom, which they did.  And you'll hear

22    testimony about what happened then.

23          The police began to ask him questions

24    about his whereabouts that night.  Questions that

1    seemed, to the police, the defendant didn't want to

2    answer.  And as the police were asking him

3    questions, they looked around his bedroom and

4    noticed things that struck their attention.  Several

5    officers looked inside an open dresser drawer of the

6    defendant's and saw a ladies' stocking, or a piece

7    of a ladies' stocking, knotted at the top.

8              Other officers saw a green shirt hanging

9    behind a door.  And they remembered that ▮▮▮▮▮

10   ▮▮▮▮▮▮ had told Polly Taylor that the man she had

11   seen lurking outside the apartment earlier that

12   evening had been wearing a green shirt.

13             Officers saw a white powdery substance on

14   a mirror on the defendant's dresser, which they

15   believed to be cocaine.  Subsequent testing proved

16   by the police, by authorities, proved that it was

17   not cocaine.  But at the time, that's what the

18   police thought it was.

19             And as they looked around the room, you'll

20   hear the testimony that they saw several other

21   things that raised their suspicion, including a roll

22   of duct tape in an open bag on the floor of the

23   defendant's room.

24             The police told the defendant that they

1     were going to have to ask him to leave the bedroom.

2     They taped it up with yellow police crime scene

3     tape.  They sealed off that bedroom until a search

4     warrant could be obtained later.

5           As they led the defendant out of his

6     bedroom, they told him that he was not under arrest,

7     but that they were concerned for his safety with the

8     crowd outside.  They explained to him that they

9     could take him to the police station and from there

10    he could make his own arrangements, and he readily

11    agreed to go with them.

12           Several police officers then escorted the

13    defendant outside.  They didn't hold him.  They

14    didn't carry him.  He wasn't in handcuffs.  They

15    simply took him outside, they walked him to a

16    waiting police cruiser where they took him to the

17    police station.

18           After further investigation revealed more

19    incriminating evidence later that night, the

20    defendant was arrested at the police station and

21    charged with these crimes.

22           ██████████, as I mentioned, was taken

23    to Children's Hospital.  And when she arrived at

24    Children's Hospital she had to wait some time.  But

54

1       she had a full physical examination.  And part of

2       that examination was a toxicology screen of her

3       blood, because of the report that she made about

4       being given something to drink, something to smoke,

5       and something to snort.  And that toxicology screen

6       showed the presence of cocaine in her system.

7           A subsequent blood toxicology screen done

8       at the state police crime -- toxicology laboratory

9       confirmed the presence of cocaine in her system that

10      night.  She was 11 years old.

11          Now, you may or may not be surprised to

12      learn that there was no test or examination that the

13      doctors at Children's Hospital could perform to

14      verify that she had been raped; that the defendant

15      had put his finger inside her vagina.

16          Dr. Alice Newton of Children's Hospital

17      will testify in this case.  She will explain to you

18      the physiological reasons for this, and why it is so

19      unlikely that there would be any evidence, medical

20      evidence, of that type of penetration.

21          After her long night at the hospital,

22      early in the morning,                was released,

23      and went home with her mother.  When they got home,

24      after they settled down,               and her

1    mother got into her mother's bed and tried to sleep.

2    Not long after that, ██████ mother was awakened by

3    ██████ sitting straight up in bed, pointing to the

4    television screen and saying, "That's him.  That's

5    the man who took me."

6              When her mother looked at the television

7    screen, there was footage of the defendant, Owen

8    McCants, as he was being led away from that

9    apartment.

10             After this, the police continued their

11   investigation.  And you will hear about the results

12   of that investigation.  You will hear, for example,

13   that when the search warrant was executed on the

14   defendant's bedroom and on his car, the police

15   found, in both locations, duct tape with a similar

16   manufacturer as the duct tape that had been

17   recovered when ██████ had thrown it on the ground.

18             In one case, in his bedroom, there was a

19   roll of such duct tape.  In another case, in the

20   car, there were strips of duct tape that were

21   attached to sort of -- I'm not even sure what type

22   of tool it was, but it was some kind of tool.

23             Now, criminalists tried to match the tape

24   endings up.  It's a very technical area of forensic

1   science.  You'll hear testimony from a criminalist

2   about it.  But because the specific manufacturer of

3   the tape and the condition of it was found in, they

4   were unable to make a match of the tape to the roll.

5              However, they were able to say that the

6   tape in the street was of similar manufacturer and

7   might, indeed, ·have come from the roll seized in the

8   defendant's room, as could the tape that was found

9   in his car.

10             You will also hear that police

11   fingerprinted a number of items in the defendant's

12   bedroom, many of which bore his fingerprints, which

13   is, of course, no surprise to anyone.  All of items

14   in our bedrooms bear our fingerprints.

15             They also fingerprinted his car.  And you

16   will learn that they did not find ▐▐▐▐▐▐▐▐

17   fingerprints in the car.  You will also learn that

18   they did not find the defendant's fingerprints in

19   the car, even though the evidence will show that at

20   the time, the car was registered to him, it was

21   parked outside 34 Fidelis Way, and a witness who

22   knew him saw him driving that car into Fidelis Way

23   shortly before -- from Washington Street, shortly

24   before ▐▐▐▐▐▐▐ came back.

1          And then, among other things, ladies and

2     gentlemen, you will hear that police seized two

3     green shirts that were hanging on a hook behind a

4     door in the defendant's bedroom.  You'll have a

5     chance to see these shirts.  One's long-sleeved and

6     one's short-sleeved.  You'll have a chance to see

7     that they looked virtually identical except for the

8     length of the sleeves.

9          And you will hear that police criminalists

10    examined both shirts.  And when they examined the

11    long-sleeved shirt, they found blood stains.  They

12    tested those blood stains for DNA against samples of

13    both the defendant's blood and ███████████████

14    blood, and the blood samples proved to be a match to

15    ███████████████ DNA.  It's a specific DNA profile,

16    and you're going to hear a lot of technical

17    information about DNA profiles that can be expected

18    to be found at random in the African American

19    population in one out of every 18,000 African

20    Americans.  That's the probability of randomly

21    picking an African American person who will have

22    that DNA profile.

23          If you expand the possibility into

24    Hispanics to Latinos and Latinas, into Caucasian

58

1    Americans, the numbers are astronomically higher.

2    But even limiting it to an African American

3    population, it's a one in 18,000 probability of a

4    random match.

5            Now, you will also hear that as they were

6    processing the shirt, cutting what's called a

7    "control patch," not looking for anyone else's DNA,

8    just cutting a control patch, criminalists found

9    trace amounts of someone else's DNA on the tail

10   section of the shirt.  That DNA, ███████████ is

11   not the source of that DNA, and this defendant is

12   not the source of this DNA.

13           Listen very carefully when the DNA experts

14   explain to you the possible ways that trace amounts

15   of a third party's DNA could get onto the shirt

16   seized from Owen McCants' bedroom.  It's a very

17   important point.  So listen very carefully to that.

18           Two weeks after he was arrested on these

19   charges, the defendant wrote a letter to Polly

20   Taylor.  And you will read that letter.  In that

21   letter, the defendant began by apologizing to Polly

22   Taylor for the pain that he had caused her, as well

23   as █████ and her mother.

24           He went on to explain that he had an

1    addiction to alcohol and cocaine, drugs that he

2    sometimes mixed with marijuana to increase the high.

3    It's a long letter.  But toward the end, the

4    defendant then pleaded -- and I use that word

5    advisedly -- pleaded with Polly Taylor not to

6    cooperate with the investigation or the prosecution.

7    And he pleaded with her to encourage █████ and her

8    mother not to cooperate either.

9              █████████ will testify in this case.

10   In fact, she'll testify this afternoon.  And she

11   will describe to you her experience as she lived

12   through the ordeal that this man put her through.

13   And when you have heard from █████████, and when

14   you have heard from all the witnesses, when you have

15   heard all the evidence and you examine the

16   scientific evidence, you will know not only beyond a

17   reasonable doubt, beyond any doubt, what happened to

18   her and who did it to her.

19             And then, after the judge instructs you on

20   the law, and how to apply it to these facts, you

21   will retire to the jury room for your deliberations.

22   And when you come back from that jury room, you will

23   know what happened to █████████.  You will know

24   what the truth is, and you will know where justice

60

1    lies.  And you will come back into this courtroom,

2    as is your duty, and you will return a guilty

3    verdict.  And you will do justice.

4              THE COURT: May I see counsel at side bar

5    for a second.

6

7    . SIDE-BAR CONFERENCE:

8              THE COURT: We've only got about 15

9    minutes, so do you want to wait until the afternoon.

10             MR. SHEA: Sure.  Though I don't think I'm

11   going to be much longer.  But I'd like to make

12   objections, maybe if you broke, and I can stand and

13   make my objections on the record.

14             THE COURT: Okay.  What's your objection?

15             MR. SHEA: Let's see.  Starting out with

16   the appeal to the jury about their home and the

17   appreciation of their time.  The references to angry

18   crowd outside, that they focused on Owen McCants,

19   though there's nothing to show why they focused on

20   Owen McCants.

21             The statement, He was asked questions he

22   did not want to answer, which is a violation of his

23   Fifth.  That they went and escorted him from the

24   building because they were concerned for his safety,

61

1          again, implying that the mob had already made a

2          decision and letting the jury know the mob's

3          feeling.

4                    Reference to duct tape, which shouldn't

5          even really, in terms of -- that it might indeed be

6          of a similar manufacture.  Evidence that really

7          shouldn't even come in.  And it's prejudicial.

8                    The other thing, at the end, to say this

9          is an ordeal this man put her through, that the jury

10         has a duty and their duty is to convict, all of that

11         is objectionable.

12                   THE COURT: That's your objection.  Okay.

13         Overruled.

14                   So do you want to give your opening now,

15         or do you want to wait until after lunch?

16                   MR. SHEA: I'll wait until after lunch.

17                   THE COURT: All right.  The other thing is

18         that they want to take notes.  The court officer

19         said that they might want to take notes.

20                   Anybody have an objection to them taking

21         notes?

22                   MR. DEAKIN: No.

23                   MR. SHEA: No.

24                   THE COURT: All right.  Fine.

1          (End of side-bar conference.)

2

3          THE COURT: Ladies and gentlemen, I'm going

4     to -- we only have about ten more minutes left

5     before the lunch hour, so I'm going to let you go to

6     lunch at this time and ask that you return to the

7     jury room by two o'clock, and we'll start promptly

8     at that time with the opening statement of defense

9     counsel.

10          But before you leave, I forgot to do

11    something this morning, and that is, Mr. Nagle is

12    the courtroom clerk in front of me, who sits right

13    here.  He's the one who keeps me busy in this

14    courtroom.

15          To his left is Maryann McDonald, who is

16    the courtroom stenographer, the most important

17    person in the courtroom.  She takes down everything

18    that's said in here.  Without her, we can't do

19    anything.

20          Mr. Anthony Simms, the courtroom deputy;

21    Bobby Johnston is also a courtroom officer; and

22    Candy Papile, who is also a courtroom officer.  If

23    you have any problems or have any questions, or you

24    need to ask someone something, ask one of the court

1       officers.

2                   If you should happen to see any of the

3       parties in the corridor while you're coming to and

4       from this courtroom, they can't talk to you.  So,

5       there's no sense in asking them any questions,

6       because they're going to tell you they can't talk to

7       you.  So you have to ask one of the court officers.

8                   Also, I forgot Laura Angelini, who is a

9       law intern with me this semester.

10                  I'll see you at two o'clock, and we'll

11      begin with the opening statement of defense counsel

12      at that time.

13                  THE COURT OFFICER: Please rise, jurors.

14                  (Luncheon recess 1:00 to 2:10 p.m.)

15                  THE COURT OFFICER: All rise.

16                  THE COURT: Commonwealth.

17                  MR. DEAKIN: Judge, I neglected to bring

18      this to the Court's attention yesterday.  There was

19      a pending motion to require the defendant to conform

20      his appearance to his appearance at the time of his

21      arrest, on the reasoning that a 13-year-old girl is

22      going to be asked to identify him.  He looks quite a

23      bit different today than he did at the time of his

24      arrest.

1           And I regret that I didn't ask the Court,

2       remind the Court of that issue, yesterday.

3           I think defense counsel has sort of a

4       related issue that he wants to raise regarding the

5       seating of the defendant during the victim's

6       testimony.  I think -- if the Court's inclined to

7       allow the motion for the defendant to conform his

8       appearance, we could fashion some arrangement

9       whereby the victim could testify outside, so that

10      she wouldn't be asked to see the defendant at this

11      time, or to identify him, and then he could get his

12      hair cut between now and tomorrow, and shave his

13      beard to the length that it was at the time of the

14      arrest.

15           MR. SHEA: Judge, we're not agreeing to

16      conform his appearance.  The law, as I read it in

17      the case cited by the Commonwealth, is conform his

18      appearance so he could be part of a court-ordered

19      lineup.  If the Court's ordering the lineup, that

20      would put us in a different posture.

21           And I don't hear Mr. Deakin suggesting

22      that.

23           The other thing was I would ask that until

24      she describes the alleged perpetrator, that my

65

1       client be held from her view.  The other thing I
2       would point out is that, just taking it a little out
3       of order before my opening, but just for the sake of
4       time, renewing my request for a voir dire of █████
5       █████████ regarding the identification procedure.
6                       THE COURT: Okay.  All motions are denied.
7                       Bring the jury in.
8                          (Jurors enter 2:12 p.m.)
9                       THE COURT: Defendant.
10                      MR. SHEA: Good afternoon.  Thanks for your
11      time.
12                      What we're here about isn't whether this
13      was a horrific event.  The question is do they have
14      the right guy.  It's an identification case.  And
15      what we're telling you, and what we're asking you to
16      just look critically at in this case, is the
17      identification in the matter.
18                      Now, Mr. Deakin has told you that it's a
19      family, and that █████ was staying with her great, I
20      guess, grandmother in the parlance that's being
21      used.  And that Owen was staying across the hall --
22      and you saw the close proximity of the apartment
23      today.  And that she met him, I believe he said,
24      one, two, or three times.

1          We expect the evidence to show that she

2     knew him from a prior occasion, as well.  So that he

3     was known to her.  What's significant about that?

4          Well, what is significant about that is

5     that when ████ returns, she doesn't say, It was

6     Owen, or use the name Sonny.  She doesn't say, It

7     was Sonny.  And the evidence will show that she had

8     a look at the person's face.  And the -- I think the

9     evidence will show that she had a long period of

10     time to look at the individual's face.

11          One of the people you're going to hear

12     from is a guy named Ben Haughey.  I may be mangling

13     his last name, but he was walking home, or walking

14     to a friend's house, down by LaRose Place and

15     Nantasket, and the hole that's no longer in the

16     fence, that's in the bottom quadrant, is one, I

17     think, either his friend cut for him or he cut for

18     his friend, that he used to go through.

19          So he comes through the hole in the fence,

20     and he sees an individual with the young girl, and

21     senses that there's something wrong.  And he

22     eventually, later, he contacts the police, the

23     police find him because of this case.

24          Now, what's interesting about his

1 testimony relating to identification is, one, he is

2 not going to identify this gentleman.  But, more

3 importantly, he's going to testify, I believe, that

4 he could see ███████████ face because what he

5 was doing was -- what drew his attention was that

6 the young girl seemed upset.  That he could see her

7 face.  Meaning, not taped, not obscured, not vision

8 obscured.  And he could see the individual who had

9 her by the arm without mask, without face obscured.

10  Which is a good amount of time to look at

11 the person.  And when ██████ returns, she doesn't

12 say, It was Sonny, or It was Owen.  And you're going

13 to hear from an Officer Tahisha Skeen, and I believe

14 you're going to hear that what they did was right

15 after ██████ returned to the scene and ran to her

16 mother, that she was -- the police obviously are

17 letting her be with her mother, kept an eye on her;

18 they needed to bring her to the hospital to do

19 testing.  And that she then -- what they did was

20 they found a female officer that they thought she

21 would be more comfortable with, and had her go with

22 that female officer.  And Tahisha Skeen is the

23 female officer.

24  And you're going to hear from Ms. Skeen

1       that she stayed with ████ until she was at

2       Children's Hospital, for a while.  That she talked

3       with her about the case.  She had her describe, in

4       detail, the events that had occurred.  And you're

5       going to hear from her that nowhere in her report

6       does she say "Sonny" or "Owen."

7              And so the claim by the Commonwealth that

8       she reports it to her mother on return, doesn't jibe

9       with the idea that her being with the officer right

10      afterwards.  And the officer's report, getting the

11      details of the incident, does not mention an

12      identification of my client.

13              Further, I expect to show that ████ does

14      not remember her mother asking -- at one point did

15      not remember her mother asking, in the immediate

16      aftermath, as claimed by the Commonwealth, whether

17      Sonny was her assailant.

18              Further, I expect to show that she did not

19      recall whether she answered the question she doesn't

20      remember being asked in the affirmative.  So, as

21      recently as November 7, 2001, she was not

22      identifying my client from that -- what the

23      Commonwealth has claimed in its opening.

24              Further, the Commonwealth has mentioned a

69

1    shirt, the DNA evidence.  Both sides are going to

2    present experts on DNA.  And one of the things that

3    was attempted to be mitigated early on by Mr. Deakin

4    was the oddity that three people's DNA are found on

5    this shirt.  And that is something I'm just going to

6    ask you to be aware of, and to listen critically to

7    both experts, and to think about when you have some

8    more information on it.

9         Furthermore, one thing not mentioned, in

10   the -- about the automobile.  There's two things.

11   One, I expect that there will be testimony that

12   shows that the automobile used in the case does not

13   match my client's automobile and is different.

14   Second, the printing of my client's automobile

15   didn't show any fingerprints of ████████████, and,

16   furthermore, showed the fingerprints of a third

17   party, who, apparently, was not investigated.

18        Now, I'm not going to run through the

19   whole case for you.  That's why you're going to be

20   here for the next week or two.  But what we're

21   asking you to do is to look at the case, look at the

22   identification, remember that it's a family, and

23   think about it logically.

24        And we are confident that when all the

1    evidence is in, you will see that Owen McCants is

2    not guilty.

3          Thank you.

4          THE COURT: All right.  Ladies and

5    gentlemen, some of you have asked the court officer

6    whether or not you'd be able to take notes.  I'm

7    going to have him pass out envelopes to each of you

8    with the juror number on it, with paper and pencil

9    inside.

10         By providing you with paper and pencil, I

11    am not suggesting that you must take notes.  On the

12    contrary, you should do whatever makes you feel

13    comfortable.  It may be that your memory will

14    suffice, or that you do not want to be distracted by

15    note-taking.

16         Therefore, if you decide not to take

17    notes, for whatever reason, that is your business.

18    But I did want to give you the choice.  And, in any

19    event, whether you take notes or not, please

20    remember that the manner in which a person testifies

21    is often as important to you as what the witness

22    says.  That is, the witness' demeanor on the witness

23    stand, the way in which the witness delivers

24    testimony, may contribute to your verdict with as

1        much significance as the content of the witness'

2        testimony.

3                Accordingly, you are instructed not to let

4        your note-taking divert you from an appreciation of

5        all the evidence.  That is, the testimony, the

6        demeanor, the documents, and, in short, the entirety

7        of the evidence that the parties will offer you.

8                Each night, those will be collected from

9        you, and they will be kept, by the court officer,

10       and they will be passed out each morning.  At the

11       end of the trial, after your deliberations, they

12       will be returned to the court officer and they will

13       be destroyed.

14               Go ahead.

15               The court officer will move the podium a

16       little bit so we can make sure the jurors at that

17       end can see.

18               MR. DEAKIN: Thank you, your Honor.  May it

19       please the Court.  The people of the Commonwealth of

20       Massachusetts call ████████████.

21               THE COURT OFFICER: Raise your right hand.

22               THE CLERK: Ms. ██████, do you solemnly

23       swear the testimony you're about to give this Court

24       is the whole truth and nothing but the truth, so

1        help you God?

2                    THE WITNESS: So help me God.

3                    THE COURT OFFICER: Please be seated.

4

5                    ███████  ███████, SWORN

6                    DIRECT EXAMINATION

7   Q    (By Mr. Deakin) Ms. ████████, I'm going to ask you to

8        scoot your chair as close as you can to the front,

9        and sit nice and forward so that your voice is

10       picked up on that microphone and everyone can hear.

11  A    Uh-huh.

12  Q    Can you please state your name, and spell your last

13       name -- actually, spell your first and last name for

14       the court reporter.

15  A    My name is ████████████████, ████████████████

16       and██████████████.

17  Q    How old are you, ████ ████████?

18  A    Thirteen.

19  Q    What's your date of birth?

20  A    ████████████ ██████.

21  Q    I'm going to ask you to speak as clearly as you can,

22       because you tend to talk a little quickly, and it's

23       hard for the court reporter to get everything down.

24                    Can you repeat your date of birth, a

73

1          little slower?

2    A     November 1, 1988.

3    Q     Thanks.  Where do you live, Ms. ██████?

4    A     28 Ferndale Street.

5    Q     And is that Ferndale, F-e-r-n-d-a-l-e?

6    A     Yes.

7    Q     Whom do you live with there?  .

8    A     My grandmother and my mother.

9    Q     And what's your grandmother's name?

10   A     Lorene ██████.

11   Q     How does she spell Lorene?

12   A     L-o-r-e-n-e.

13   Q     And what's your mother's name?

14   A     Rasheena ██████.

15   Q     How does she spell Rasheena?

16   A     R-a-s-h-e-e-n-a.

17   Q     Does your mother, Rasheena, have a nickname that

18         most people call her?

19   A     Nicki.

20   Q     Nicki.  Do you go to school?

21   A     Yeah.

22   Q     Ms. ██████, if you could, you need to say "yes" or

23         "no" for the court reporter.

24   A     Yes.

74

1    Q    What grade are you in school?

2    A    Sixth.

3    Q    Do you have a favorite subject in school?

4    A    No, not really.

5    Q    Do you have a least favorite subject?

6    A    Math.

7    Q    What kind of grades do you get in school?

8    A    I got a couple of A's.

9    Q    Okay.  What kinds of things do you like to do for

10         fun when you're not in school?

11    A    Go to Chez Vous.

12    Q    Chez Vous?

13    A    Uh-huh.

14    Q    And what kind of place is Chez Vous?

15    A    Skating rink.

16    Q    Roller skating or ice skating?

17    A    Roller skating.

18    Q    Do you go there with your friends?

19    A    Uh-huh.

20    Q    Ms. ███████, where were you born?

21    A    I don't know.

22    Q    In Boston?

23    A    Yes.

24    Q    And have you always lived in the Boston area?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Do you know Polly Taylor? |
| 3 | A | Uh-huh. |
| 4 | Q | Who is she? |
| 5 | A | My Nana. |
| 6 | Q | And when you say your Nana, what's the more formal |
| 7 | | word for her relationship to you? |
| 8 | A | She's, like, an aunt. |
| 9 | Q | An aunt.  Is she your grandfather's sort of adopted |
| 10 | | mother? |
| 11 | A | Yes. |
| 12 | Q | That would make her, like, your great grandmother? |
| 13 | A | Uh-huh. |
| 14 | Q | How long have you known Polly Taylor? |
| 15 | A | All my life. |
| 16 | Q | I'd like you, if you would, to describe your |
| 17 | | relationship with her, in the summer of 2000.  What |
| 18 | | was your relationship with her like then? |
| 19 | A | What do you mean? |
| 20 | Q | Were you close to her? |
| 21 | A | Yeah. |
| 22 | Q | How much time would you usually spend with her back |
| 23 | | then? |
| 24 | A | A lot. |

1    Q   What kinds of things did the two of you like to do

2        together?

3    A   Talk and eat.

4    Q   What does Polly Taylor call you?

5    A   ███.

6    Q   Does she sometimes call you by a nickname or a pet

7        name?

8    A   No.

9    Q   What do you call her?

10    A   Nana.

11    Q   Nana.  Did you used to spend summers with Polly

12        Taylor?

13    A   Yes.

14    Q   How old were you when you started spending the

15        summers with her?

16    A   Like, six.

17    Q   Where did she live?

18    A   In Brighton.

19    Q   Brighton.  Do you know the address there?

20    A   354.

21    Q   And what's the name of the street?

22    A   I don't know.

23    Q   Is it Fidelis Way?

24    A   Uh-huh.

1    Q    Is it actually 34 Fidelis Way?

2    A    (Witness nods.)

3    Q    What did you used to do when you would spend the

4         summers staying with her?

5    A    Go to camp.

6    Q    Go to camp?

7    A    Uh-huh.

8    Q    Is that day camp or sleep-away camp?

9    A    Day camp.

10   Q    And where was the day camp located?

11   A    Across the street.

12   Q    Who ran the day camp?

13   A    I think the community.

14   Q    And was that -- did it have the initials CTA?

15   A    Uh-huh.

16   Q    When you would go and spend the summers with Polly

17        Taylor, would you spend all week at her house?

18        Like, would you spend the entire summer at her

19        house?

20   A    Just the week, and then home on Saturdays and

21        Sundays.

22   Q    Oh, so you'd spend the weekdays at her house and

23        then you'd go home to your mother on Saturdays and

24        Sundays?

1    A    Uh-huh.

2    Q    Who lived next door to Polly Taylor?

3    A    Aunt Christine.

4    Q    And do you know her whole name?

5    A    Christina Isaac.

6    Q    Isaac.  Okay.  And do you know what relationship

7         Christine Isaac was to Polly Taylor?

8    A    I think -- she was either her mother or aunt.

9    Q    Okay.  And you called her -- people called her Aunt

10        Christine?

11    A    Uh-huh.

12    Q    Was she older than Polly Taylor, or younger?

13    A    Older.

14    Q    In the summer of 2000, the time that this trial is

15        talking about --

16    A    Yeah.

17    Q    -- how was Christine Isaac's physical condition?

18        How was her health?

19    A    It wasn't all that great.

20    Q    Who took care of Christine Isaac?

21    A    My Nana.

22    Q    And that's Polly Taylor?

23    A    Uh-huh.

24    Q    Did Polly Taylor spend time in Christine Isaac's

79

```
 1              apartment to help take care of her?

 2      A      Yes.

 3      Q      Did Christine Isaac spend time in Polly Taylor's

 4              apartment?

 5      A      Uh-huh.

 6      Q      Do you know whether -- did Polly Taylor have a key

 7              to Christine Isaac's apartment?

 8      A      No, not really.

 9      Q      Polly Taylor did not have a key to Christine Isaac's

10              apartment?

11      A      Oh, no.  Yes, she did.

12      Q      Okay.  Did Christine Isaac have a key to Polly

13              Taylor's apartment?

14      A      Not really.  I'm not sure.

15      Q      You're not sure.  Did you spend time with Christine

16              Isaac?

17      A      Uh-huh.

18      Q      Did you spend time in Christine Isaac's apartment?

19      A      Uh-huh.

20      Q      Ms. ████████, I want to direct your attention to July

21              of 2000, specifically the second week in July of

22              2000.  That will be two years ago this coming

23              summer.  Do you recall that summer?  Do you remember

24              that summer?
```

80

```
 1    A    Yeah.

 2    Q    Did you go to stay with Polly Taylor -- did you go

 3         to spend the summer with Polly Taylor that summer?

 4    A    Yes.

 5    Q    And how old were you then?

 6    A    Eleven.

 7    Q    Who brought you there on the first day that you went

 8         to spend with Polly Taylor?

 9    A    My mom.

10    Q    Okay.  And where did you stay -- well, you stayed

11         with Polly Taylor in her apartment.  Where did you

12         sleep when you stayed at Polly Taylor's apartment?

13    A    With my Nana.

14    Q    In the same bed as her -- she?

15    A    Uh-huh.

16    Q    How many bedrooms are there in that apartment?

17    A    One.

18    Q    So, the two of you slept in the same bed?

19    A    Uh-huh.

20    Q    Was that okay with you?

21    A    Uh-huh.

22    Q    I'm sorry.  You need to answer "yes" or "no."

23                   Was that okay with you?

24    A    Yes.
```

1   Q   Were you planning to spend -- have the same

2       arrangement that you had had before where you'd

3       spend the weekdays at Polly Taylor's and go home on

4       the weekends?

5   A   Yes.

6   Q   And were you -- did you go to camp then?

7   A   Yes.

8   Q   Okay.  Did you already know some of the young people

9       who went to that camp?

10  A   Uh-huh.

11  Q   And where did they live?

12  A   Some lived, like, in the back of the building of my

13      Nana.  Some lived up the street.

14  Q   Did they all live in either Fidelis Way or Jetty

15      Court housing developments?

16  A   Yes.

17  Q   And had you gone to camp with some of those kids

18      before?

19  A   Uh-huh.

20  Q   What time of day did you usually meet for camp?

21  A   Like, at eight.

22  Q   Eight in the morning?

23  A   Uh-huh.

24  Q   And how did you get there?

82

1    A    I walked across the street.

2    Q    What kinds of things did you do at camp?

3    A    Go on field trips, and, like, play double dutch and

4         stuff.

5    Q    Double dutch is a jump rope game?

6    A    Uh-huh.

7    Q    How did you like camp?

8    A    It was okay.

9    Q    What time of day did you usually leave camp?

10   A    Like, at six.

11   Q    At six?

12   A    Uh-huh.

13   Q    And how did you get home?

14   A    I walked across the street.

15   Q    What would you usually do after you got home from

16        camp?

17   A    I would eat, and sometimes take a nap.

18   Q    Okay.  and if you didn't take a nap, what did you

19        do?

20   A    Go outside and play.

21   Q    And who would you usually play with when you'd go

22        outside and play?

23   A    My friend Lolla, Taisha and Maisha, and some of my

24        other friends.

83

1    Q   Friends of yours from that area?

2    A   Yes.

3    Q   These are friends that you would know from your

4         previous summers?

5    A   Uh-huh.

6    Q   Was there a rule about -- if you went out to play

7    .   after you came home and had a snack, from camp, was

8         there -- did Polly Taylor have a rule about when you

9         had to be in?

10   A   Uh-huh.

11   Q   What was the rule?

12   A   I had to come in before the streetlights come on.

13   Q   So, if you saw the streetlights come on, the rule

14       was then you had to be inside?

15   A   Uh-huh.

16   Q   At that time, in July of 2000, did you know an

17       individual by the name of Owen McCants?

18   A   Uh-huh.

19   Q   You need to answer that "yes" or "no."

20             You had met him before?

21   A   Yes.

22   Q   Do you see Owen McCants in the courtroom today?

23   A   Yes.

24   Q   Can you point him out, please?

1     A    He's right in front of me.

2                    MR. DEAKIN: May the record reflect that

3               the witness has identified the defendant Owen

4               McCants?

5                    THE COURT: Well, there's two men.  Which

6               man?

7                    MR. DEAKIN: I'm sorry.

8     Q    Which man that's sitting right in front of you?

9     A    The one on the right side, or your right.

10    Q    There is an African American man and a Caucasian

11              man.  Which of the two?

12    A    The African American man.

13                   MR. DEAKIN: May the record reflect the

14              witness has identified the defendant Owen McCants?

15                   THE COURT: Yes.

16    Q    When did you first meet him?

17    A    My Nana introduced me to him, I think, later on that

18              day, or the next day.

19    Q    So, you're talking about the first day that summer

20              that you went there?

21    A    Yeah.  I think.

22    Q    And your Nana, that's Polly Taylor, introduced you

23              to him?

24    A    Uh-huh.

1    Q    Did you meet him -- where was that that she

2         introduced you to him?

3    A    Inside of her apartment.

4    Q    How long did you spend with him the first time that

5         you met him?

6    A    Not that long.

7    Q    Would you estimate it was minutes or hours?

8    A    Minutes.

9    Q    Did the two of you, that is, you and Owen McCants,

10        talk?

11   A    No, not really.

12   Q    Did you see him again after that, before Thursday,

13        July 13th?

14   A    Yes.

15   Q    How many times would you say you saw him after the

16        first time you met him and before the events that

17        this trial is about?

18   A    A couple of times.

19   Q    And where did you see him?

20   A    In my Nana's room.

21   Q    That's Aunt Polly's room?

22   A    Uh-huh.

23   Q    How long did you spend with him on each of those

24        occasions?

86

1    A    Like, two minutes.

2    Q    Did you talk to him on those occasions?

3    A    No, not really.  Just hi and bye.

4    Q    Did you have a chance -- on each of those occasions

5          that you met him, did you have a chance to look at

6          him to see what he looked like?

7    A    Uh-huh.

8    Q    To watch him move around and that kind of thing?

9    A    Uh-huh.

10   Q    You need to answer that "yes" or "no."

11   A    Yes.

12   Q    Did you know where he was living at that time when

13         you were introduced to him?

14   A    No.

15   Q    I want to draw your attention to Thursday, July 13th

16         of 2000.  Do you recall that day?

17   A    I didn't know the date, but I think so.

18   Q    Do you recall a day when something happened to you

19         and the police were called?

20   A    Yes.

21   Q    Did you go to camp that day, earlier that day?

22   A    Uh-huh.

23   Q    I'm sorry -- I apologize to the court reporter --

24         you need to say "yes" or "no."

1    A    Yes.

2    Q    What time did you leave for camp?

3    A    I think around eight.

4    Q    Do you remember what time you got out of camp?

5    A    Six.

6    Q    Was there anything unusual about the camp day that

7         day?  Was it a normal day?

8    A    No.

9    Q    Where did you go when camp was over?

10   A    I went home.

11   Q    To Aunt Polly's apartment?

12   A    Uh-huh.

13   Q    Do you recall who was home, if anybody, when you got

14        there?

15   A    No, I don't remember.

16   Q    Was Aunt Polly home?

17   A    Yes.

18   Q    I need you to sit nice and close to that microphone

19        so you're talking right into it; okay?  I know your

20        voice is quiet.

21             What did you do when you got home?

22   A    I got a snack and went outside.

23   Q    Do you recall, when you went outside, if you played

24        with anybody outside?

1    A    Yeah.

2    Q    Whom did you play with?

3    A    My friend Lolla.

4    Q    That's a nickname, Lolla, right?

5    A    Uh-huh.

6    Q    Is her full name Shalana?

7    A    Uh-huh.  Yes.

8    Q    Whom else did you play with?

9    A    And my other friend.  I don't remember her name.

10   Q    Where were you playing?

11   A    Over from her house, go to the park.

12   Q    And when you say "her house," are you talking about

13        Shalana's house?

14   A    Uh-huh.  Down the street.

15   Q    Down the street.  And where is the park that you're

16        talking about?

17   A    There's a park that you take, like, a right into the

18        park if you walk down.

19   Q    Is it the park right between Aunt Polly's apartment

20        and the CTA, the little kid's park there, or a

21        different park?

22   A    No.  There's a park between two buildings.

23   Q    While you were playing with your friends, did

24        anything -- while you were playing, did anything

```
1          unusual happen?  Before you went back home, just

2          while you were playing.

3     A    No.

4     Q    Do you recall about what time you went home?

5     A    Like, when the streetlights came on.

6     Q    Okay.  Do you recall -- can you estimate when that

7          was, as best you can?

8     A    I guess -- I think the streetlight came on, like, at

9          eight or nine.

10    Q    Eight or nine.  And that's when you went home?

11    A    Uh-huh.

12    Q    Did anyone else walk home with you when you first

13         went home?

14    A    No.

15    Q    When you got in the area of 34 Fidelis Way, where

16         Polly Taylor lives, did you notice anything unusual?

17    A    Yeah.

18    Q    What did you see?

19    A    I seen a guy putting a sock in the door.

20    Q    You saw a guy putting a sock in a door.

21    A    Yeah.

22    Q    Which door was he putting a sock in?

23    A    The door that usually locks, and you have to be

24         buzzed in, to get in the door.
```

1    Q    Is it the door that you have to buzz open at 34

2          Fidelis Way?

3    A    Yes.

4    Q    So that's the second door in.  There's the first

5          door that anyone can go into, then there's the door

6          that you have to buzz into.

7    A    Uh-huh.

8    Q    And you say that the individual you saw was putting

9          a sock there?

10    A    Uh-huh.

11    Q    Can you describe the individual that you saw?

12    A    I think he had, like, a green jacket, and some

13          pants.

14    Q    Do you recall what color the pants were?

15    A    I think they were green too.

16    Q    And could you tell -- I gather it was a man, since

17          you're saying, "he."

18    A    Uh-huh.

19    Q    Could you tell whether it was an African American

20          man or a Caucasian man?

21    A    Yes, I could.

22    Q    What was he?

23    A    He was African American.

24    Q    And could you see his face?

1    A    No.  He had a stocking over it.

2    Q    I'm sorry.  Can you repeat that?  Nice and loud.

3    A    He had a stocking over it.

4    Q    A stocking, like a lady's stocking?

5    A    Yeah.  Like an old lady's stocking that they put on.

6    Q    And it was over his face?

7    A    Uh-huh.

8    Q    And did you actually see his face with the stocking

9         over it?

10   A    No.

11   Q    What I mean -- that wasn't a very clear question, I

12        know.

13             Could you -- did you actually see the face

14        with the stocking over it?

15   A    Yes.

16   Q    Could you see the front of him?

17   A    Kind of.

18   Q    And were you able to -- did you recognize -- could

19        you tell who it was underneath the stocking?

20   A    No.

21   Q    How far away from him were you at that time?

22   A    Like, five feet.

23   Q    Could you tell whether he was tall or short?

24   A    He was, like, tall.

92

| | | |
|---|---|---|
| 1 | Q | And, Ms. ▮▮▮▮, just so I know, do you know how |
| 2 | | tall you are now? |
| 3 | A | Uh-huh.  Like, I'm five something. |
| 4 | Q | Five -- |
| 5 | A | I don't know.  Like, five-two. |
| 6 | Q | And are you tall'er now or shorter now than when you |
| 7 | | were eleven? |
| 8 | A | I'm taller. |
| 9 | Q | What did the man do when you saw him? |
| 10 | A | He didn't see me. |
| 11 | Q | And what did you see him do? |
| 12 | A | I seen him go in the elevator. |
| 13 | Q | The elevator at 34 Fidelis Way? |
| 14 | A | Uh-huh. |
| 15 | Q | Is that the direction that you would have gone, if |
| 16 | | you had been going back to Polly Taylor's? |
| 17 | A | Yes. |
| 18 | Q | I'm sorry? |
| 19 | A | Yes. |
| 20 | Q | Did you see him -- after you went in the elevator, |
| 21 | | did you see him anymore right then? |
| 22 | A | Yes.  I seen the front of him. |
| 23 | Q | I mean, after he got on the elevator, could you see |
| 24 | | him anymore after that? |

93

1   A   Yes.

2   Q   I don't mean later on in the night, I mean right

3       then, when he got on the elevator, did you lose

4       sight of him?

5   A   Yes.

6   Q   Because -- you did not get on the elevator with him;

7       is that right?

8   A   The elevator doors closed.

9   Q   Okay.  How much time would you say that you had to

10      look at him before he got onto the elevator, from

11      the time that you first saw him until he got on the

12      elevator?

13  A   One minute.

14  Q   What did you do next?

15  A   I went -- I closed -- I didn't go anywhere.  I just

16      left and I went to go get help.

17  Q   Where did you go?

18  A   I went to over where Lolla was at.

19  Q   And where is that in relationship to 34 Fidelis Way?

20  A   Like, across the street and, like, a little further

21      down.

22  Q   Okay.  Across the street from the -- across the

23      street from Aunt Polly's building, and then further

24      down.  You mean towards Washington Street, or

1           further in towards Jetty Court?

2       A   Past CTA, like, a little bit.

3       Q   Okay.  Were there -- who was there when you went

4           there?

5       A   A couple of ladies and one guy.

6       Q   Did you know the ladies?

.7      A   I knew one of the ladies.

8       Q   Did you know her by name, or just to say hello to?

9       A   I used to know her by name.

10      Q   And did you know the man who was there?

11      A   No, not really.  But he knew my grandfather.

12      Q   What's your grandfather's name?

13      A   Tucker.

14      Q   And that's his nickname, right?  Tucker?

15      A   Yeah.

16      Q   What's his whole -- what's his proper name?

17      A   Al.

18      Q   Is that Al Sutherland?

19      A   Uh-huh.

20      Q   Did you tell the people there what you had seen?

21      A   Uh-huh.

22      Q   Let me ask you: Why is it -- I'm going to go back a

23          little bit.

24              Why did you go across the street after you

1          saw the man with the stocking over his face?

2     A    'Cause I didn't know if he was dangerous or he could

3          kill me, or something.

4     Q    You were frightened?

5     A    Yeah.

6     Q    When you told people what happened, what did they

7          do?

8     A    They sent a guy with me.

9     Q    Is that the same guy that you had seen there?

10    A    Uh-huh.

11    Q    Do you know his name?

12    A    No, I don't.

13    Q    Did anyone else come with you on the walk back to 34

14         Fidelis Way?

15    A    My friend Lolla and the other girl.

16    Q    Do you remember the other girl's name?

17    A    No.

18    Q    When you got back to -- when you went back to 34

19         Fidelis Way, did you see the man with the mask?

20    A    No.

21    Q    Where did you and the man who walked you home go?

22    A    On the elevator.

23    Q    And where did you take the elevator to?

24    A    Fourth floor.

96

1    Q    Fourth floor?

2    A    Uh-huh.

3    Q    And where did you go when you got off at the fourth

4         floor?

5    A    To my Nana's apartment.

6    Q    And did the man who walked you home take you all the

7         way back to your Nana's apartment?

8    A    Uh-huh.

9    Q    What happened when you got back to Polly Taylor's

10        apartment?

11   A    He told them what happened, and they was talking.

12   Q    The man who walked you home and Polly Taylor were

13        talking?

14   A    Uh-huh.

15   Q    What were they talking about?

16   A    What happened.

17   Q    What you had seen?

18   A    Uh-huh.  And some other stuff.

19   Q    How long did they spend talking?

20   A    Like, at least five minutes, or a little longer.

21   Q    And then what happened?

22   A    Then, I think, my mother called.

23   Q    And did you speak to your mother?

24   A    Yeah.

1    Q    Did your mother call before or after suppertime?

2    A    I think after.

3    Q    Who made supper?

4    A    Nana.

5    Q    And whom did you eat supper with?

6    A    Nana and Christine Isaac.

7    Q    And where did you have supper?

8    A    On the table.

9    Q    In Aunt Polly's apartment?

10   A    Uh-huh.

11   Q    When you're -- did you call your mother, or did she

12        call you?

13   A    I don't remember.

14   Q    Okay.  But you spoke to your mother on the

15        telephone?

16   A    Uh-huh.

17   Q    What did you talk to her about?

18   A    I told her what happened, and she said next time,

19        just call the cops.

20   Q    Okay.  After supper was done and after -- did Aunt

21        Polly talk to your mother on the phone?

22   A    Uh-huh.

23   Q    I'm sorry.  I need you to say "yes" or "no."

24   A    Yes.

| | | |
|---|---|---|
| 1 | Q | What did you do after supper? |
| 2 | A | Then I went to put my nightgown on, and I was laying |
| 3 | | on the couch. |
| 4 | Q | When you -- what kind of nightgown did you wear that |
| 5 | | night? |
| 6 | A | My Lauryn Hill nightgown. |
| 7 | Q | Lauryn Hill? |
| 8 | A | Uh-huh. |
| 9 | Q | And what does that look like? |
| 10 | A | It has her on the front of it, and her on the back. |
| 11 | Q | Is it -- Lauryn Hill is a singer that you like? |
| 12 | A | Uh-huh. |
| 13 | Q | And is it -- what kind of a nightgown is it? |
| 14 | A | It was, like -- it was long. |
| 15 | Q | Is it a T-shirt-style nightgown? |
| 16 | A | Yeah. |
| 17 | Q | Did you have any clothes on under your nightgown? |
| 18 | A | Yes. |
| 19 | Q | What kind of clothes? |
| 20 | A | My panties.... |
| 21 | Q | Okay.  So, other than the nightshirt and your |
| 22 | | undergarments, did you have any other clothes on? |
| 23 | A | No. |
| 24 | Q | Did you have any shoes or socks on your feet? |

```
1    A    Uh-uh.

2    Q    When you went to watch television, were you ready

3         for bed?

4    A    Uh-huh.

5    Q    Did you do -- were there things that you had to do

6         to get ready for bed other than change your clothes?

7    A    Uh-huh.

8    Q    Brush your teeth, wash up, that kind of thing?

9    A    Uh-huh.

10   Q    Did you do those things before you went to watch TV?

11   A    Uh-huh.

12   Q    Okay.  Did you watch TV by yourself or with anybody?

13   A    By myself.

14   Q    Where was your Aunt Polly?

15   A    She took Christine Isaac over to get her ready for

16        bed and give her her medicine.

17   Q    Okay.  Do you recall what you were watching on

18        television when your Aunt Polly left the apartment?

19   A    The news.

20   Q    And how long had you been watching the news when

21        Aunt Polly took Christine over to the apartment?

22   A    Not that long.

23   Q    Do you know when Polly Taylor left the apartment,

24        whether she locked the door?
```

100

1    A    Yes.

2    Q    How do -- did she lock the door?

3    A    Yes.

4    Q    How is it that you remember, almost two years later,

5         that she locked the door?

6    A    She told me that she was locking the door.

7              MR. SHEA: Objection.  Motion to strike.

8              THE COURT: Sustained.

9    Q    Did she give you any other instructions -- did she

10        say -- did she tell you anything else to do while

11        you were alone in the apartment?

12   A    Not to open the door for nobody.

13   Q    How much time went by before something else

14        happened?

15   A    Like, minutes.

16   Q    And where did you spend those minutes?

17   A    On the couch.

18   Q    And you were watching television?

19   A    Uh-huh.

20   Q    After those minutes went by, what's the very next

21        thing that you remember happening?

22   A    I seen, like -- I thought I saw a bug, at first.

23        But then it kept like moving.

24   Q    Let me ask you --

1          MR. DEAKIN: May I approach the witness,

2     your Honor?

3          THE COURT: Yes.

4     Q    ███████, do you recognize what this is a diagram of?

5     A    Uh-huh.

6     Q    And what is this a diagram of?

7     A    Aunt Polly's house and --

8          THE COURT: Excuse me.  Her mouth -- she's

9     facing away from the microphone.  You're going to

10    have to move the mike.

11         MR. DEAKIN: If I may, your Honor.

12    A    Aunt Polly's house and Aunt Christine's house.

13    Q    And which one is -- there's one that's sort of on

14    the bottom of the diagram, and one that's on the

15    top.  Which one is the bottom?

16    A    Nana's house.

17    Q    That's Polly Taylor's house?

18    A    Uh-huh.

19    Q    And these are actually apartments; is that right?

20    A    Uh-huh.

21    Q    And this one, that is Aunt Christine's house?

22    A    Uh-huh.

23    Q    Apartment.  And there's a room here labeled

24    "living/dining room" in Apartment 546, Polly

1      Taylor's apartment.  Is that where you were watching

2      television?

3   A  Uh-huh.

4   Q  And is the couch located -- was the couch located in

5      this area here?

6   A  Yes.

7   Q  And the television located in this area here?

8   A  Yes.

9   Q  And where was it, if you would, that you thought you

10     saw a bug flying around?

11  A  Over by the hallway.

12  Q  In this area here?

13  A  Uh-huh.

14  Q  What was it that made you think you were seeing a

15     bug?

16  A  'Cause it kind of looked black.

17  Q  And how was it moving, what you saw?

18  A  Like, fast.

19  Q  What did you do?

20  A  I really didn't pay it no mind.

21  Q  How long did that go on with you not paying it any

22     mind?

23  A  Like, after it went by, like, twice.

24  Q  Then what happened?

1    A    Then I got up and I said, "Who's there?"

2    Q    What made you change from thinking you had seen a

3         bug to asking who was there?

4    A    'Cause I don't think that many bugs would be coming

5         from one direction like that.  So....

6    Q    Was it something about the way the thing was moving

7         quickly that made you think it was a bug?

8              MR. SHEA: Objection.

9              THE COURT: Pardon me?  I can't hear you.

10             MR. SHEA: Objection.

11             THE COURT: Overruled.

12   Q    Was it something about how it was moving quickly

13        that made you think it was a bug?

14   A    Uh-huh.

15   Q    What happened when you got up and said, Who's there?

16   A    The person ran in the bathroom.

17   Q    The person ran in the bathroom?

18   A    Uh-huh.

19   Q    Could you tell, at that moment, whether it was a man

20        or a woman?

21   A    No.

22   Q    Up till that point, from the time Polly Taylor left

23        the apartment until the time that the person ran

24        into the bathroom, had you heard any noise from the

1         direction of the front door?

2    A    Uh-uh.

3    Q    Did you hear any other sounds prior to that that

4         caught your attention, other than the television?

5    A    No.

6    Q    When the person ran into the bathroom, what did you

7         do?

8    A    I said, Who -- I don't know.

9    Q    Did you speak to the person in the bathroom?

10   A    Yeah.

11   Q    Do you recall what you said?

12   A    No.

13   Q    Did the person in the bathroom say anything to you?

14   A    Uh-huh.

15   Q    And what did the person in the bathroom say to you?

16   A    "Where's your Nana?"

17   Q    "Where's your Nana?"

18   A    Uh-huh.

19   Q    Let me ask you, you testified earlier that you call

20        Aunt Polly, or Polly Taylor, Nana.

21   A    Uh-huh.

22   Q    Who else calls her "Nana"?

23                  MR. SHEA: Objection.

24   Q    As far as you know?  Who are the other people that

1       you know that call her "Nana"?

2                    THE COURT: Overruled.

3                    Have you ever heard anyone else call her

4       "Nana"?

5                    THE WITNESS: Uh-huh.

6                    THE COURT: Have you ever heard anyone else·

7       call her "Nana"?

8                    THE WITNESS: Uh-huh.

9                    THE COURT: Who?

10                    THE WITNESS: Me, my mom, sometimes, my

11      cousin, my Aunt Shirley, and Pop Pop.

12   Q   Who's Pop Pop?

13   A   Al.

14   Q   Al Sutherland?

15   A   Uh-huh.

16   Q   Okay.  Is there anyone else that you've ever heard

17       call her "Nana"?

18   A   No.

19   Q   What do other people call her -- to the extent that

20       you've heard other people call her something, what

21       do other people call her?

22   A   "Aunt Polly" or "Taylor."

23   Q   And when you say "Taylor," that's Ms. -- they call

24       her "Ms. Taylor"?

1    A    Uh-huh.  Or "Polly."

2    Q    Who do you know of who knows that you call Aunt

3         Polly Nana?  Who would know that, that you call her

4         that?

5    A    My mother, my grandmother, my aunt, Al, and my

6         cousins.

7    Q    · Okay.  Do you think that your friends that you go to

8         camp with might know that you call her Nana?

9    A    Uh-uh.

10   Q    I'm sorry?

11   A    No.

12   Q    When the person -- well, let me ask you, when you

13        heard the person say, "Where's your Nana?" could you

14        tell if it was a man's voice or a woman's voice?

15   A    It was a man's voice.

16   Q    What did you say when the person asked you, "Where's

17        your Nana?"

18   A    I don't remember.

19   Q    What's the next -- did the person say anything else

20        after "Where's your Nana?"

21   A    He said, "Go get her."

22   Q    I'm sorry.  Say that again, louder.

23   A    He said, "Go get her."

24   Q    "Go get her"?

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | What did you do? |
| 3 | A | I went and got her. |
| 4 | Q | And how did you go to get her? |
| 5 | A | I walked down the hall and opened the door. |
| 6 | Q | When you got to the front door -- you had to go out |
| 7 | | of Polly Taylor's apartment first; is that right? |
| 8 | A | Uh-huh. |
| 9 | Q | Do you remember whether the door was open or closed? |
| 10 | A | It was closed. |
| 11 | Q | So you opened that door? |
| 12 | A | Uh-huh. |
| 13 | Q | And where did you go from there? |
| 14 | A | I went through the hallway in Christine Isaac's |
| 15 | | house. |
| 16 | Q | And was Christine Isaac's apartment door open or |
| 17 | | closed? |
| 18 | A | Closed. |
| 19 | Q | What did you do? |
| 20 | A | I knocked on the door. |
| 21 | Q | And did you say anything while you were knocking on |
| 22 | | the door? |
| 23 | A | I said, "Nana, open the door." |
| 24 | Q | Okay.  Did you say it in your usual, normal tone of |

1              voice?

2    A    No.

3    Q    What kind of -- what tone of voice do you recall

4         using?

5    A    Like, I kind of yelled it.

6    Q    And why were you yelling?

7    A    'Cause there was a strange man in the house..

8    Q    What happened after you knocked on the door and

9         said, "Nana, open the door"?

10   A    He came from behind and grabbed me.

11   Q    Could you see him when he grabbed you from behind?

12   A    No.

13   Q    How did he grab you?

14   A    Like that (gesturing).

15   Q    You just made a gesture -- because the record won't

16        pick this up -- of putting a hand over your mouth.

17   A    Uh-huh.

18   Q    Was that man's hand over your mouth?

19   A    Uh-huh.

20   Q    And you need to say "yes."  The answer is yes.

21   A    Yes.

22   Q    And what did he do with his other hand?

23   A    Like, he grabbed me.

24   Q    What happened next?

1    A    I was holding onto the doorknob.

2    Q    And then what happened?

3    A    Then he told me, "Let go," and then he pulled me off

4         the thing, and he went in the stairwell.

5    Q    And is the stairwell door between Christine Isaac's

6         apartment door and Polly Taylor's apartment door?

7    A    Excuse me?

8    Q    The door to the stairwell, is that between the two

9         apartment doors, Christine Isaac's and Polly

10        Taylor's?

11   A    Yes.

12   Q    When he took you into the stairwell, did you notice

13        -- did you notice the light, the lighting situation

14        in the stairwell?

15   A    Uh-huh.

16   Q    What did you see?

17   A    It was off.

18   Q    Are you familiar with that stairwell from spending

19        summers there before?

20   A    Uh-huh.

21   Q    Have you ever seen it dark like that in the

22        stairwell there?

23   A    No.

24   Q    What happened next, after he took you into the

1           stairwell?

2    A      He told me to be quiet.

3    Q      Did he say anything else to you at that time?

4    A      I don't recall.

5    Q      Where did you go in the stairwell?

6    A      Behind a door.

7    Q      Behind the door where it opens, or down the stairs?

8    A      Behind the door where it opens.

9    Q      And what happened when you went behind the door?

10   A      He was looking out the window.

11   Q      The window of the door?

12   A      Uh-huh.

13   Q      What did you see?

14   A      My Nana come out.

15   Q      And did you move or stay still when your grandma

16          came out?

17   A      We moved.

18   Q      Where did you move to?

19   A      He moved, like, over there where this, like, red box

20          was.

21   Q      Where is that in the stairwell?

22   A      On the left-hand side.

23   Q      Had you gone down any stairs yet at that time?

24   A      No.

1    Q    Was that farther away from the door, where he moved?

2    A    No, not really.

3    Q    Then what happened next?

4    A    And then I yelled for my Nana.

5    Q    And what happened next?

6    A    My Nana said, "Where are you?"

7    Q    Where was she in relationship to the door?

8    A    She was in the house, then she came out.

9    Q    But when she yelled, "Where are you?" where was she?

10   A    In the house.

11   Q    In her -- in Christine Isaac's apartment?

12   A    Uh-uh.  In her apartment.

13   Q    Oh, she had gone into her apartment?

14   A    Uh-huh.  Looking for me.

15   Q    And what did you do when she said, "Where are you?"

16   A    I was just -- I said, "In the stairwell."

17   Q    Did you get that out clearly with the hand over your

18        mouth?

19   A    No, not really.

20   Q    What happened next?

21   A    I tried to bite his hand.

22   Q    And what happened when you tried to bite his hand?

23   A    It didn't really work.

24   Q    Why is that?

1    A    Because I couldn't really bite.

2    Q    What happened next?

3    A    Then my Nana said, "Where are you?"  And then I

4         said, "In the stairwell."  And as she came to the

5         stairwell, he started going down the stairs.

6    Q    And it was dark in the stairwell?

7    A    Uh-huh.

8    Q    Could you see what your -- what Polly Taylor did as

9         you started going down the stairs?

10   A    She opened the door.

11   Q    Could you see her when she opened the door?

12   A    Uh-huh.

13   Q    By what light?

14   A    From the back hall light.

15   Q    The hallway on her floor?

16   A    Uh-huh.

17   Q    Okay.  And what happened when she came to the

18        doorway?

19   A    He started skipping steps and going down the stairs.

20   Q    What happened next?

21   A    And then she said -- she tried to run down the

22        stairs, and then she said she was too old, and then

23        she said she was going to call the cops.

24   Q    She tried to go down the stairs?

1    A    Uh-huh.

2    Q    And then what is it she said when she tried to go

3         down the stairs?

4    A    She said, "I'm going to call the cops."

5    Q    You said something about "too old for this"?

6    A    Yeah.

7    Q    She said that?

8    A    Uh-huh.

9    Q    Where were you when she -- where were you and the

10        man when she said that she was going to call the

11        cops?

12    A    On, like, the second flight.

13    Q    Could you tell whether he had any sort of --

14        anything in his hands?

15    A    No.

16    Q    At that time, you could not.  Did he say anything to

17        you as he took you down the stairs?

18    A    He said something about me being quiet.

19    Q    About what being quiet?

20    A    Me being quiet.

21    Q    Did he say anything to you about what would happen

22        if you weren't quiet?

23    A    Uh-huh.

24    Q    What did he say?

1    A    He said he's going to hurt my family.

2    Q    As you went down -- as he took you down the stairs,

3         were the stairs -- was there any light in the

4         stairs?

5    A    Uh-uh.

6    Q    Had you ever seen it like that before, with the

7         lights out all the way down?

8    A    No.

9    Q    How far down the stairs did you go?

10   A    All the way down the stairs, until we came out the

11        stairwell door.

12   Q    Is that in the front entranceway where the elevator

13        -- where you're buzzed in?

14   A    Uh-huh.

15   Q    What happened when you got down to that level?

16   A    We went out the door.

17   Q    Could you see him as you were going out the door at

18        this point?

19   A    No.

20   Q    Could you tell, by any means, whether this was the

21        same man you had seen earlier that night?

22   A    No.

23   Q    As you went out the door, was he still holding you?

24   A    Uh-huh.

1    Q   How was he -- I'm sorry.  You need to say "yes" or

2         "no."

3    A   Yes.

4    Q   How was he holding you?

5    A   He was holding me, like, in a headlock.

6    Q   In a headlock?

7    A   Uh-huh.

8    Q   With your arm around -- with his arm around your

9         head?

10   A   Uh-huh.

11   Q   Where did you go?

12   A   Around the building.

13   Q   And did you go around the building -- well, let me

14        ask you, which way did you go around the building?

15   A   The front way, and went around to the back.

16   Q   Okay.  Ms. ████████, I'm going to ask you is this the

17        entrance -- well, first of all, do you recognize

18        what this is a schematic diagram of?

19   A   Yes.

20   Q   Lean forward so they can hear you.

21   A   Yes.

22   Q   What is this a schematic diagram of?

23   A   Of Aunt Polly's house, building.

24   Q   Building.  And when you came out of here, you said

1    you went around the building.  Did you go around

2    this way, or around this way?

3  A  Around this way.

4  Q  The second way I just indicated, like this?

5  A  Uh-huh.

6  Q  As you came around the building this way, were you

7    walking close to the building, or far away from the

8    building?

9  A  At first -- we cut through the grass.  And then we

10   was close to the building.

11  Q  Close to the building.  And as you came around the

12   end of the building here --

13  A  Uh-huh.

14  Q  -- did something happen?

15  A  I got away, but then he caught my shirt.

16  Q  How did you get away?

17  A  I put my head up, like that (gesturing), and I ran

18   that way.

19  Q  Were you injured in any way when you pulled away?

20  A  Uh-huh.  I got a cut on my neck.

21  Q  I'm sorry?

22  A  I got a cut on my neck.

23  Q  And how did you get a cut on your neck?

24  A  From his knife.

1    Q    Did you know he had a knife up to that point?

2    A    Uh-huh.

3    Q    When did you first realize that he had a knife?

4    A    When he had it at my throat.

5    Q    And when was that?

6    A    When we came out.

7    Q    Out of the building?

8    A    Uh-huh.

9    Q    Do you -- you say you had a cut on your neck?

10    A    Uh-huh.

11    Q    Do you still have a scar where that cut is?

12    A    Yes.

13    Q    Can you, if you could -- I don't know if the jurors

14         are going to be able to see it from there -- show

15         the scar that you still have.

16              THE COURT: She can step down and walk over

17         in front of the jury box.

18    Q    I'm going to ask you, Ms. ▮▮▮▮▮▮ can you come down

19         off the stand for a moment.

20    A    (Witness complies.)

21    Q    Maybe, if you could, Ms. ▮▮▮▮▮, start over here.

22         Make sure you hold your hair back so people can see.

23    A    (Witness displays neck.)

24              THE COURT: Slow down.  Slow down.

1           MR. DEAKIN: Slow down.

2    Q    Ms. ███████ if you would, hold your hair back so

3         people can see.

4                    Is it under your left ear?

5    A    Yeah.

6    Q    Turn your body a little more.

7                    .THE COURT: Why don't you have her point to

8         it.

9                    MR. SHEA:  May we approach side bar?

10                   THE COURT: Yes.

11

12   SIDE-BAR CONFERENCE:

13                   MR. SHEA: Just to object to the view, for

14        the record.

15                   THE COURT: What?

16                   MR. SHEA: I would object to the view, for

17        the record.

18                   THE COURT: All right.

19                   (End of side-bar conference.)

20

21   Q    Ms. ███████, I'm going to ask you, if you can, to

22        sit forward.

23                   Did you have that scar before Thursday,

24        July 13th of 2000?

119

1    A    No.

2    Q    You said that you pulled away, and were able to get

3         away.  Did you actually get free from the man?

4    A    Uh-huh.

5    Q    And how -- what happened after you got free?

6    A    He grabbed my shirt.

7    Q    And then what happened?

8    A    And he, like -- he grabbed me, like that

9         (gesturing).

10   Q    Like how, Ms. ████?

11   A    In a headlock.

12   Q    Was there anyone else around when this happened?

13   A    Yeah.  A white car was going by, and a lady looked

14        out and she was, like, Oh, my gosh, and they pulled

15        off.

16   Q    So they didn't stop?

17   A    They stopped, like, a second, like.  They was

18        driving slow.  And then they pulled off.

19   Q    Do you know who -- I'm asking, now, if you know who

20        was in that car?

21   A    I think it was Ruby's mother.

22   Q    Who's Ruby?

23   A    Ruby, she lives in --

24                    MR. SHEA: Objection.  Nonresponsive.

1                    THE COURT: Sustained.

2    Q    I'm asking not what you think, but if you know who

3         was in that car, for certain?

4    A    No.  I wasn't sure.

5    Q    When you pulled away from the man, were you able to

6         see him more?

7    A    Uh-uh.

8    Q    Could you tell, as he was holding you, whether he

9         was an African American man, a white man, or...?

10   A    An African American man.

11   Q    Could you tell how tall or short he was?

12   A    He was like six-something.

13   Q    Could you tell -- when you say six-something, are

14        you being precise, or are you saying he was tall?

15   A    He's tall.

16                   MR. SHEA: Objection.  Motion to strike.

17                   THE COURT: Overruled.

18   Q    Could you see his face as you pulled away from him?

19   A    Uh-uh.  He still had a stocking over it.

20   Q    The man who took you also had a stocking over his

21        face?

22   A    Uh-huh.

23   Q    Did you have an opinion, as you pulled away from

24        him, whether this was the same man you had seen

1           earlier that night, or a different man?

2    A    No.

3    Q    Do you recall what he was wearing, the man who took

4           you?

5    A    Green, blue, or black.  It was a dark color.

6    Q    Are you talking about his shirt, his pants, both?

7    A    Yeah.

8    Q    Both?

9    A    Both.

10    Q    What happened after he grabbed your shirt and put

11           you back in a headlock?

12    A    We finished walking around the building.

13    Q    Where did you walk around to?

14    A    The back of the building of 545, over there where

15           Taisha and Maisha live.

16    Q    And is that close to the parking lot area?

17    A    Uh-huh.

18                 MR. DEAKIN: Your Honor, I apologize that

19           our overhead projection system isn't working, so

20           I'll have to show her the pictures.

21                 THE COURT: Fine.

22    Q    Ms. █████, I'm going to show you a picture and ask

23           you if you recognize what area is in that

24           photograph.

```
 1      A    That's over where Taisha and Maisha live.

 2      Q    Is this the area where the man took you?

 3      A    Uh-huh.

 4      Q    I'm going to ask you, if you would -- I know it's

 5           going to be hard for the jurors to see, this, and

 6           I'll ask the Court to allow you to get closer --

 7           where was it that he asked you to -- that he took

 8           you to?

 9      A    He took me to this stump, right there.

10      Q    I'm sorry.  Are you saying "stump"?

11      A    Or....

12      Q    This wall here?

13      A    Yeah.

14      Q    Between two sets of stairs?

15      A    Uh-huh.

16      Q    Ms. ▇▇▇▇▇▇, is this a fair and accurate

17           representation of the area where he took you near

18           the parking lot as it appeared on that night, aside

19           from the light, obviously?

20      A    Uh-huh.

21      Q    Is this a fair and accurate representation?

22      A    Uh-huh.

23                MR. DEAKIN: I'd move to introduce this as

24           Exhibit 1.
```

123

1          THE COURT: Defendant.

2          MR. SHEA: No objection.

3          THE COURT: All right.

4                    (Whereupon, photograph

5                    marked and admitted into

6                    evidence as Exhibit No. 1.)

7          MR. DEAKIN: May this be published to the

8     jury, your Honor?

9               (Photograph published.)

10    Q    Ms. ████████, while the jurors are looking at the

11         photograph, can you have me point to the area where

12         that photograph was taken?

13    A    Right --

14    Q    Here?  In this area?

15    A    Yeah.

16    Q    You had said where Apartment 546 is?

17    A    Yes.

18    Q    When you -- as you walked around the building, you

19         described seeing a white car with people in it when

20         you pulled away.

21    A    Uh-huh.

22    Q    Aside from those people, as you walked around the

23         building, did you see anybody in the area where you

24         were?

1    A    No.

2    Q    When you came to that area that's described in the

3         photograph that's Exhibit 1, or that's portrayed in

4         there, were there other people in that area right

5         then?

6    A    No.

7    Q    What happened --. you said he had you sit on that

8         wall area?

9    A    Uh-huh.

10   Q    What happened after he had you sit on that wall

11        area?

12   A    He put tape over my eyes and mouth.

13   Q    Before he put tape over your eyes and mouth, were

14        you able to get a look at his face?

15   A    A little.

16   Q    Did he still have the stocking over his face?

17   A    Uh-uh.  He took it off.

18   Q    When did he take it off?

19   A    When we were sitting down.  And I tried to look at

20        his face and he said, "Don't look at my face."  So I

21        seen from his lips all the way up to his nose.

22   Q    You could see sort of half his face, up to his nose?

23   A    Uh-huh.

24   Q    And you say that he put duct tape on you.  Where did

125

1                he put duct tape on you?

2        A      Over my eyes --

3        Q      And where else?

4        A      -- and my mouth.

5        Q      I'm sorry.

6        A      My eyes and my mouth.

7        Q      And where did he get the duct tape from?

8        A      His stomach.

9        Q      Did he have to take out a roll of duct tape and cut

10               it, or how...?

11       A      He lifted up his shirt and pulled it off his

12               stomach.

13       Q      So it was already cut?

14       A      Uh-huh.

15       Q      You need to say "yes" or "no."

16       A      Yes.

17                      MR. SHEA: Objection.

18                      THE COURT: Overruled.

19       Q      When he put the duct tape over your mouth, could you

20               still breathe?

21       A      Uh-huh.

22       Q      Could you breathe -- I'm sorry.  I need you to

23               say --

24       A      Yes.

1    Q    Thank you.  Could you breathe through your mouth or

2         only through your nose?

3    A    Through my nose.

4    Q    When he put the duct tape over your eyes, were you

5         completely blinded?

6    A    No.

7    Q    How could you see?

8    A    From the bottom.

9    Q    And how much of a field of vision did you have on

10        the bottom?

11    A    A little.

12    Q    And why was it that you could see out the bottom of

13        the duct tape?

14    A    If I looked down I could see, like, where I was

15        walking.

16    Q    How long did you spend on the wall in that area?

17    A    Like, ten minutes, or a little less.

18    Q    What happened next?

19    A    We got in a car.

20    Q    Where was the car?

21    A    In the parking lot.

22    Q    The parking lot that's right next to that area where

23        you sat on the wall?

24    A    And I think within the second or third parking

1       space.

2   Q   And when you're counting the parking spaces, Ms.

3       ████████, are you counting them from here as one,

4       two, three, or from here, one, two, three?

5   A   From the right side.

6   Q   Starting from here, one, two, three?

7   A   Uh-huh.

8   Q   And you think the car was in the second or the third

9       spot?

10  A   Uh-huh.

11  Q   Okay.

12          THE COURT: We're going to recess for the

13      day.  It's kind of warm in here this afternoon and I

14      wanted to take a break so people could get water.

15      But by the time we did all of that and got back,

16      there wouldn't be much left to the day anyway.

17          So I'm going to break at this time, and

18      ask that you be back in the jury room by nine --

19      well, make it 9:30 in the morning.  And we'll start

20      at that time.

21          I want you to take your notes and the

22      pencils and put them back into the envelope.  The

23      court officer is going to collect them.  He'll have

24      charge of them overnight.  In the morning, he will

128

1    pass them out to you, and I will ask you in the
2    morning if your packets are in the same condition in
3    the morning as they are tonight that you gave them
4    to us.  Because I have to have some control and know
5    that your notes are there and no one has disturbed
6    them.

7              So, put them back, and turn them into the
8    court officer.  And I'll see you at 9:30 in the
9    morning.

10             THE COURT OFFICER: Leave the notebooks in
11   your seats, and I'll collect them from there.

12             Jurors, please rise and follow me.

13

14             (Whereupon, the Court adjourned.)

15

16

17

18

19

20

21

22

23

24

129

1                          CERTIFICATE

2

3

4              I, Maryann McDonald, Official Court

5       Reporter, do hereby certify that the foregoing

6       record, pages 1 to 128 inclusive, is a true and

7       accurate transcript of my system tapes, to the best

8       of my knowledge, skill and ability.

9

10

11                    Maryann McDonald

12                    Maryann McDonald, Notary Public

13

14              My commission expires:   April 1, 2005

15

16

17

18

19

20

21              The foregoing certification does not apply

22       to any reproduction of the same by any means unless

23       under the direct control and/or direction of the

24       certifying Reporter.