COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
NO. SUCR2000-10994

COMMONWEALTH OF MASSACHUSETTS

v.

OWEN McCANTS

Thursday, April 25, 2002
Before: Spurlock, J.
Boston, Massachusetts
Day 6 - Trial

MARYANN MCDONALD
Official Court Reporter
617.788.6180

APPEARANCES:

David Deakin
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
617.619.4000
Counsel for the Commonwealth

Mark Shea
Attorney at Law
875 Massachusetts Avenue
W. Cambridge, MA 02139
627.864.3943
Counsel for the Defendant

INDEX


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Rasheena Johnson | | | | |
| (By Mr. Deakin) | 4 | | 81 | |
| (By Mr. Shea) | | 67 | | |
| Joseph Murray | | | | |
| (By Mr. Deakin) | 83 | | 124 | |
| (By Mr. Shea) | | 116 | | |
| Tahisha Skeen | | | | |
| (By Mr. Deakin) | 127 | | | |
| (By Mr. Shea) | | 140 | | |
| Harry Byrne | | | | |
| (By Mr. Deakin) | 148 | | | |


EXHIBITS


| NUMBER | | PAGE |
|---|---|---|
| 7 | Photograph | 26 |
| 8 | Photograph | 26 |
| 9 | Package containing Lauryn Hill nightshirt | 29 |

PROCEEDINGS

(Jurors enter at 10:30 a.m.)

THE COURT OFFICER: This court is back in session. Please be seated.

THE COURT: Good morning, ladies and gentlemen. How are you this morning?

Has anyone talked about this case or allowed anyone to talk to them about it, seen any newspaper or radio or television account of this trial?

All right. Are your notes in the same condition today as they were last night when you placed them in the envelopes?

You've all checked your notes. Okay.

All right. Go ahead, Mr. Deakin.

MR. DEAKIN: Thank you, your Honor.

RASHEENA [redacted] PREVIOUSLY SWORN

RESUME DIRECT EXAMINATION

Q (By Mr. Deakin) Ms. [redacted], when we left off yesterday afternoon, you were describing that you, after speaking to Polly Taylor and going with her to her apartment, that you went outside to search for

your daughter.

As you went outside to search, did anyone join you?

A Yes.

Q Who was that?

A My fiancé.

THE COURT: Excuse me. You've got to sit forward, speak into the microphone, and keep your voice up.

THE WITNESS: Okay.

Q And what's your fiancé's name?

A Terry Cousins.

Q How did he know -- if you know, how did he know what was going on there?

A While I was en route, I called him from my cell phone.

Q When you were en route to 34 Fidelis Way?

A Yes.

Q Where did you meet him?

A I met him in front of Polly Taylor's house.

Q And could you tell how he had gotten there?

A He drove his car.

Q What did the two of you do?

A At first we drove to go ask some of the other kids,

had they seen [redacted]. And then they were saying that they seen her playing down the park. So, we had -- he said, Down the park. We'll let's go park our cars and go on foot to go look for her.

Q I'm going to ask you, Ms. [redacted] --

MR. DEAKIN: I'm sorry, your Honor. May I approach?

THE COURT: Yes.

Q I'm going to ask you, Ms. [redacted], to take a look at this overhead view and ask you if you recognize the area that it's an aerial view of.

A 34 Fidelis Way.

Q And can you step off the stand for one moment, with the Court's permission --

THE COURT: Yes.

Q -- and indicate, if you can, is this the building that's -- actually, I need you to stand on the side so the jurors can see.

Is this the building that's 34 Fidelis Way here?

A Yes, it is.

Q And is this the front entrance of 34 Fidelis Way?

A Yes, it is.

THE COURT: Excuse me. Your back is to the

stenographer. You have to keep your voice up.

Q Can you indicate on this diagram where the park was that you went to look for her, where you had heard she had been?

A It was over here. This park, right here.

Q This park, right here, by the tennis courts?

A Uh-huh.

Q Please resume the stand.

What did you find when you got to the park?

A It was -- there was no kids down there playing.

Q Did you -- well, did you learn the identity of the girls she had been playing with earlier?

A Yes, I did.

Q And who were they?

A One of her friends Lolla, and two twins, Taisha and Maisha.

Q And is Lolla -- is her full name Shalana Wright?

A Yes, it is.

Q And do you know Taisha and Maisha, how they spell their first names?

A I do not know.

Q Okay. I'm going to ask you, if you would, to move the microphone so you're speaking right into it. If you need to pull it -- you can tilt it up.

You do not know Taisha and Maisha's last name?
A No, I do not.
Q Do those girls live in the Fidelis Way/Jetty Court development?
A Yes, they do.
Q Okay. Did you try to locate those girls?
A Yes, I did.
Q Did you locate them?
A Yes, I did.
Q And where were they when you located them?
A They went home.
Q And could you tell -- did you know what they were doing at home?
A Their mothers had told me that they were in bed, sleeping.
Q Did you ever see either of those girls that night? Any of the three of those girls that night?
A Yes, I did.
Q And was that -- when was that in relation to when you went looking for them?
A When I first got there in -- the first little girl's mother said that her daughter was upstairs in bed, sleeping, and she would get her. So she woke her,

brought her down to me, and that's when I asked her about [redacted].

Q Did she give you any information about [redacted] whereabouts at that time?

A No.

Q At the time, then? [redacted] whereabouts as you were looking for her? I don't mean her whereabouts earlier. Did she give you any information about where [redacted] was right now?

A No, she didn't.

Q Did you speak to Maisha and Taisha?

A Yes, I did.

Q Actually, let me step back. Did Shalana Wright give you any information about [redacted] whereabouts earlier that day?

A Yes, she did.

Q And you said you spoke to Maisha and Taisha?

A Yes, I did.

Q Did they give you information about [redacted]s whereabouts earlier that day?

A Yes, they did.

MR. SHEA: Your Honor, may we approach side bar?

SIDE-BAR CONFERENCE:

MR. SHEA: I assume we're headed towards the territory of what they told her.

MR. DEAKIN: No, no. That's why I'm asking her just "yes" or "no" questions. I'm leading her to avoid that.

MR. SHEA: Okay. I apologize.

(End of side-bar conference.)

Q And did Maisha or Taisha give you any information about [redacted] whereabouts then? That is, at the time you were looking for her.
A No, they did not.
Q What's the next thing that you did?
A I walked around, looking some more, for her. Then I went to -- I went back to the apartment to check to see if she had came back there.
Q And had she?
A No, she had not.
Q What's the next thing that you did?
A I left directly back out and went to Ruby Williams' apartment.
Q Where is Ruby Williams' apartment?
A Building 16.

Q Is that part of Jetty Court, the Jetty Court Development?
A It is -- well, it's a part of Fidelis Way.
Q Okay. Can you, with the Court's permission, step down from the stand and just point to where that building is, if it appears on the diagram? If you can.
Step around to the side. You can step around this side, but just -- I don't think all the jurors can see. There you go.
A The building over here.
Q And just so that the jurors -- for a frame of reference, can you point to 34 Fidelis Way again?
A 34 is over here.
Q I'm sorry. Is that -- if this is Fidelis Way here, is this 34?
A Yes.
Q Step to the side again, and point so the jurors can see.
A This is 34 here, and the building is here. Sixteen.
Q Please resume the stand.
And when you say Ruby Williams's house, is it actually an apartment?
A It's an apartment, yes.

Q Who was there when you got there?

A Her granddaughter, Michelle, and Ruby Williams.

Q What's her granddaughter's name?

A Michelle.

Q Michelle?

A Yes.

Q Do you know her last name?

A Williams, I believe.

Q Okay. How is -- is Ruby Williams Michelle's maternal or paternal grandmother?

A Paternal.

Q Paternal?

A Yes.

Q So Ruby Williams' son is Michelle Williams' father?

A Yes.

Q How is Ruby Williams related to the defendant Owen McCants?

A It's her brother.

Q How old is Ruby Williams?

A I'm unsure.

Q What would you estimate?

A Probably about maybe 60.

Q And how old is Michelle Williams?

A She's about 18.

Q Is that now or then?

A Now, she is.

Q Okay. So, then, she would have been approximately 16?

A Yes.

Q Did you speak to them?

A Yes, I did.

Q Whom did you speak to first?

A Michelle.

Q Okay. And was she able to give you any information about [redacted] whereabouts, either earlier in the day or then?

A She was not.

Q Did you speak to Ruby Williams yourself?

A Yes, I did.

Q Okay. And was she able to give you any information about [redacted] whereabouts, either earlier that day or now -- or then?

A No, she was not able to.

Q Could you hear her -- I assume you could hear her speaking, if you were talking to her.

A Yes.

Q Where was she speaking to you from, if you could tell?

A She was in the bed, in her bedroom.

MR. SHEA: Objection.

THE COURT: Overruled.

Q How long did you spend at Ruby Williams' apartment?

A About three minutes.

Q And then what did you do?

A Me and my boyfriend left back out. And we walked around some more, looking for [redacted]

Q Okay. How long would you say that you spent walking around looking for [redacted] that time?

A About 45 minutes.

Q Did you find any sign of her?

A No, I had not.

Q And in the course of the entire time that you were there, until the point that we're now talking about, did you see Owen McCants at all?

A I did not, no.

Q After the 45 minutes of searching the parks, what did you do?

A I went back to the apartment, Polly Taylor's apartment, to check to see if she had came back there.

Q Had she come back at that time?

A She had not.

Q Did you speak to anybody there at that time?
A I spoke to Polly Taylor.
Q Did you speak to any men at that time?
A Yes.
Q Whom did you speak to?
A A gentleman by the name of "Mister."
Q Do you know him -- had you known him before that time? Is that somebody that you know?
A No, it's not.
Q Even as a child, you don't believe that you know him?
A I've seen him, but, no.
Q Okay. And where have you seen him?
A Around Fidelis Way.
Q When you spent summers at Polly Taylor's home, did you ever see him then?
A Yes.
Q So, you've known of him, or at least known who he is, for quite some time; is that right?
A Yes. Uh-huh.
Q And you said his name is "Mister." Do you know his given name, his formal name?
A I do not, no.
Q What did you talk -- just what did you discuss with him?

A There was some -- I went to ask him if he had brought [redacted] directly to my Nana at that time.

Q Was that the subject of your conversation with him, him walking your daughter back to Aunt Polly's earlier in the evening?

A Yes, it is.

Q When you talked to him, did he appear to you to be nervous or apprehensive in any way?

A No, not at all.

Q After you spoke to him, do you know if he remained in the area for some time?

A Yes, he did.

Q Did you see -- just yes or no -- did you see whether he spoke to the police while he was in the area?

A Yes, he did.

Q Okay. And did you actually observe him speaking to the police?

A Uh-huh.

Q When he spoke to the police, did he seem nervous or apprehensive in any way?

A No, he did not.

MR. SHEA: Objection. Motion to strike.

THE COURT: Sustained.

Q What's the next thing that you did?

A We walked around some more, looking for her. We were talking, speaking with the police, to see if they had any more information than what we had started out with. Then we went back upstairs to Polly Taylor's apartment again.

Q Did you, at any point, go into the stairwell of that apartment building?

A Yes. We used the stairwell each time, coming down.

Q Are you familiar with that stairwell from prior experience?

A Yes, I am.

Q Did you notice anything unusual about the stairwell when you were in it that night?

A It was pitch black.

Q Had you ever seen it -- was it pitch black all the way up and down?

A No, it was not.

Q Where was there light?

A On the sixth floor.

Q So, two floors above the floor of Polly Taylor's apartment?

A Yes.

Q But below that, no light?

A No light.

Q Had you ever seen it, in any of your past experience with it, had you ever seen it darkened five floors going, you know, five floors all the way down like that?

A Never.

Q Did you -- while you were in the stairwell did you find any sign of [redacted]?

A Once, one of the girls from the building, she came and she said that the lights might be unscrewed. Her name is Thomasina. And she screwed some of the lights in. When she did that, at that point, we seen -- we found [redacted] scrunchie that was in her hair.

Q You recognized it?

A Yes, I did.

Q What did you do after going back to Polly Taylor's apartment that time?

A We went downstairs and gave the scrunchie to the sergeant.

Q What was the situation like outside of 34 Fidelis Way by this time?

A It was tons of people. A lot of families had came out of their homes to help look for [redacted]. Tons of cops.

Q Excluding police officers for a moment, by that time how many people would you say were in the area immediately outside 34 Fidelis Way and on the street, Fidelis way?

A Probably about 100 residents. There's a lot of residents.

Q And what was the atmosphere of the crowd at that point?

A They were just -- disbelief. They couldn't believe it, that it happened.

Q What's the next thing that you did?

A I placed the scrunchie on top of the police cruiser, and we were waiting for the dog to come on the premises.

Q And what happened next?

A We were just walking around, waiting. Waiting. Then we were waiting for the building manager to come to open the basement to the building.

Q What's the next thing that you did?

A When they found -- the manager came on the premises, they opened the basement, and there was nothing there. They came back out and we were just wondering if the dog had arrived. The dog was there, at that point, but something was wrong where he couldn't pick

up the trail. Or something -- the dog was sick or something, and they never put the dog on the case.

Q What's the next thing that happened?

A We were just waiting, waiting for the cops.

Q When you say "waiting for the cops," what do you mean by that?

A They were putting together a search, a method to search the perimeters around Fidelis Way and to search Fidelis Way again. Search teams.

Q How many officers, by that point, would you say were on the scene?

A By that time they had at least two available officers from each unit of Dorchester, and all over, to come and assist in the search. So there was probably about maybe 150 to 200 officers.

Q Is that an exact number, or are you estimating?

A I'm estimating.

Q And where were those officers congregating to organize the search?

A Right outside 34 Fidelis Way, in the parking lot.

Q The parking lot across the street from Fidelis Way?

A Uh-huh.

Q Okay. Between Fidelis Way -- well, actually, maybe I can save us some time.

This parking lot here? This is 34 Fidelis and --
A Yes. Yes, that parking lot.
Q Could you hear what they were doing as they were organizing the search?
A I could not, no.
Q What's the next thing that happened?
A We were just waiting, you know, to see what was going to be the next step.
Q And at some point, did something happen that attracted your attention?
A Yes.
Q What was that?
A [redacted] came running out of the officers -- the crowd, the parking lot where the officers were.
Q Do you know, specifically, what time she came running out? Exactly, I mean.
A It had to be about 1:45 or two o'clock.
Q And are you saying that because you were looking at your watch at that time, or because you're estimating how long you had been there?
A Estimating how long I was there.
Q Okay. Where was [redacted] when you first caught sight of her?

A Running through the CTA parking lot.
Q Is that the parking lot where the police were forming for a search?
A Yes.
Q And describe -- you said she was running. Describe her as she ran, how she appeared to you as she ran.
A She was kind of like galloping, and she was just, like, swaying from side to side, crying, kind of crying.
Q Describe her physical appearance. That is, how she appeared to you as you saw her running.
A Her hair was all over the place, and her eyes were just big and glassy. And she was just galloping. Her toes had blood on them.
Q How was her hair usually?
A It's usually in a scrunchie or some form of a braid. It's never out.
Q Had you ever seen her looking anything like that before?
A Never.
Q What was she wearing when you saw her?
A She was wearing a T-shirt, a Lauryn Hill T-shirt.
Q And is that a T-shirt that was the right -- a proportionately-sized T-shirt for a girl her size?

A No. It was a T-shirt, an adult-sized T-shirt.
Q And do you know what she wore that T-shirt for, typically?
A For bed, typically.
Q What did she do when she came running?
A She came running out, and she stopped and she looked, and when she spotted me, she just yelled, "Mommy, Mommy," and she ran towards me.
Q When she ran towards you, what did she do?
A She just started crying.
Q And what did you do?
A I just -- I said, "[redacted], where were you? What happened?"
Q Did you have any physical contact with her at all?
A Yes, I did.
Q What was the -- describe that contact.
A I looked at her and I said, "What happened to you?" Because her T-shirt was inside out, and she had blood on her T-shirt. And I said, "You're bleeding. Where are you bleeding from?" like that. And I pulled her hair back and I seen that she was bleeding from here (indicating).
I asked her --
Q Hang on one second, Ms. [redacted].

I'm going to show you two photographs and ask you if you recognize what's depicted in those photographs.

A That's [redacted] -- one of the cuts that was on [redacted] neck.

Q And what about the bottom photograph?

A The bottom is the front side of her throat where she had cuts.

Q And do you know when these photographs were taken?

A The next day after.

Q And are these photographs a fair and accurate representation of how her neck and the area under her ear appeared the day after, when these photographs were taken?

THE COURT: Excuse me. Let me ask a question.

When you said "the day after," you said that this was two o'clock in the morning when you saw her; is that right?

THE WITNESS: Yes.

THE COURT: So, is it the next morning that they were taken, or was it a full 24 hours -- did another day pass and then they were taken?

THE WITNESS: I'd say six o'clock that

evening.

THE COURT: So, it was six o'clock that evening of the day that you first saw --

MR. DEAKIN: Friday --

THE WITNESS: Yes. Friday.

MR. DEAKIN: Friday, the 14th.

THE WITNESS: Yes.

Q And are these fair and accurate representations of how her injuries appeared at six o'clock that evening?

A Yeah.

Q You're hesitating. Can you explain why you're hesitating?

A Because the cut was a lot bigger than that, and I guess it's the lighting. You can't really see.

Q Aside from the lighting, is that a fair and accurate representation? Is that, in fact, where the cut was and generally how it appeared?

A No. It was bleeding.

Q I'm asking about when the photograph was taken.

A Yes. Yes, it was.

MR. DEAKIN: I'd move to introduce these.

MR. SHEA: May we go to the side bar?

SIDE-BAR CONFERENCE:

MR. SHEA: I don't really want to object, but when she's saying that it's not -- she's saying it's not accurate, that's the problem.

MR. DEAKIN: I think she's saying accurate, except the light makes it look smaller than it --

THE COURT: Overruled.

(End of side-bar conference.)

MR. DEAKIN: I'd move to introduce these. I believe that it's going to be Exhibit....

THE COURT REPORTER: Seven.

MR. DEAKIN: I think there may be a seven from yesterday.

THE CLERK: No. Seven and eight.

MR. DEAKIN: Seven and eight.

(Whereupon, two photographs marked and admitted into evidence as Exhibits No. 7 and 8.)

Q Ms. [redacted], does your daughter, [redacted], currently have a scar on her neck?

A Yes, she does.

Q And where is that located?

A Behind her left ear.
Q In the same place -- is the scar a result of the cut that's demonstrated in that picture?
A Yes, it is.
Q Did she have any scar there prior to Thursday, July 13th of 2000?
A No, she did not.
Q You say that when you saw her she was bleeding from that area?
A Yes.
Q Can you describe how profusely she was bleeding in that area?
A She had, like, three trickles of blood. They were probably, like, tear-sized.
Q Tear-sized?
A Tear drop sized.
Q Did you see any drying or what appeared to you to be drying or dried blood anywhere?
A Yes. Running down her neck, a couple of dry blood spots, and over here (indicating).
Q What about -- did you examine her hair?
A In her hair she had blood, as well.
Q How much blood was there?
A Probably about, maybe, about this much of it had

dried blood on it (indicating).

Q Did you see any -- what appeared to you to be dried blood anywhere else?

A On the shirt, there was blood.

Q Ms. [redacted], I'm going to show you an item that's in a plastic bag that's been labeled, for the Boston Police purposes, Item 18.

Do you recognize what this is?

A That's the nightshirt that [redacted] was wearing.

Q And do you see either on the front section, the sleeve, or the sleeve that's folded in the back, the areas that look to you like dried blood?

A The sections there.

Q You're indicating some sections on the sleeve of the shirt that is No. 2 and an arrow?

A Yes. And over here (indicating).

Q And you're indicating some stains in an area of the left sleeve that also has an arrow with what appears to be a "1" hand-marked on there.

A Uh-huh.

Q And this is the shirt that [redacted] wore that night.

A Yes, it is.

MR. DEAKIN: I would move to introduce this.

THE COURT: Any objection.

MR. SHEA: No.

(Whereupon, package containing Lauryn Hill nightshirt marked and admitted as Exhibit No. 9.)

Q As you were looking at and talking to [redacted], did you notice anything else about her clothing, other than that the shirt was on inside out?

A I noticed that her underclothes were missing, her bra and panties.

Q And did she typically wear, to bed, a bra-type garment and underpants?

A Yes.

Q And other than the shirt, did she have any clothes on when she returned?

A She did not, no.

Q Did she have any shoes on her feet?

A She did not, no.

Q You said that you asked her "What happened to you?" When you were asking those questions, was she still upset in the way that you described?

A Yes, she was.

Q How did she respond to you when you asked her that question?

A She just was crying and saying that a man took her. And she just kept crying.
Q What happened next?
A She was telling -- my fiancé had picked her up, and he was told to get in the police cruiser.
Q Were there news cameras, television news cameras, in the area when she came back?
A Yes. They were chasing after us.
Q What was the atmosphere like in the crowd as she came back?
A It was just a lot of screaming, crying. It was just crazy.
Q Do you recall where the police cruiser was that you got into?
A No. It was parked, like, in front of Taisha and Maisha's house, which is next to Fidelis Way.
Q Who was in the -- who got into the cruiser?
A Me, [redacted], my fiancé, and two officers.
Q And where were you and [redacted] and your fiancé sitting?
A In the back seat of the cruiser.
A She was sitting on my lap.
Q Was she facing out, toward the front of the cruiser, or back toward you?
A She was facing -- her back was to the front of the

cruiser.

Q Where did you go?

A He said that they just wanted to take us away so the cameras wouldn't be filming us. So they took us over to the back side of the monastery, or the front side of the monastery.

Q When you got there, as you were driving -- it's a fairly short distance -- were you talking to [redacted]?

A Yes, I was.

Q And describe that conversation.

A She was -- I was asking her stuff. My fiancé was asking her questions, and she was just crying. And I said, "Well, what happened?" The officers were saying, "You have to tell me where you just came from, honey." And I asked her, you know, "Who did this?"

Q And how did she answer when you said, Who did this to you?

A She said, "The man. The man took me."

Q What did you say when she said that?

A I said, "What man?"

Q And how did she respond?

A She said, "The man."

Q And I said to her, "Was it Sonny?" at that time.

Q You asked her, "Was it Sonny?"
A Yes, I did.
Q At the time that you asked her, "Was it Sonny?" had she mentioned -- well, first of all, when you say "Sonny," whom are you referring to, or whom were you referring to?
A Owen McCants.
Q At the time that you first asked her, "Was it Sonny?" had she mentioned either the name Sonny or Owen McCants?
A She had not.
Q What was it that made you ask her, "Was it Sonny?"

THE COURT: Excuse me. Side bar.

SIDE-BAR CONFERENCE:

THE COURT: What's she going to say?

MR. DEAKIN: She's going to say that the girl, [redacted], described a man to her and as she was hearing that description, she --

THE COURT: That's what she's going to say? If she says something different from that, you have a problem.

MR. SHEA: I still have an objection, because it shouldn't be -- it's effectively

confirming the description. It's allowing in hearsay in the back door.

MR. DEAKIN: There are two exceptions that apply. One is a statement of identification --

THE COURT: What if -- excuse me.

Do you want to take the jury out for a second.

(Jurors exit at 11:00.)

THE COURT: I'm going to ask her directly, because I don't know what she's going to say.

MR. DEAKIN: May I just -- before your Honor does that, may I interrupt for one second.

The full answer to that question --

THE COURT: I want to know.

MR. DEAKIN: Your Honor, if I may, I want to let the Court know what I've instructed her.

The full answer to that question, she would say -- if there were no rules of evidence -- she would say she described him to me --

THE COURT: Excuse me.

What was it that made you ask "Was it Sonny?"

THE WITNESS: Well, me and my fiancé --

THE COURT: Speak up, speak up.

THE WITNESS: Me and my fiancé were asking her, What did the man look like? in reference to that, and she was telling us what the description of it. And when he asked her a question, that's when I, in turn, said to her, "Was it Sonny?"

THE COURT: What was the description that she told you?

THE WITNESS: She told me that he had -- she said he was brown-skinned, light brown skin. She said he had curly black hair. She said he had a long nose with beady eyes. That's the description that she had given us.

THE COURT: And what's your objection?

MR. SHEA: My objection is that she could have testified as to what the description is herself. This is hearsay as to what her description is.

THE COURT: That the young girl could have testified --

MR. SHEA: The young girl, yeah.

THE COURT: All right.

MR. DEAKIN: For what it's worth, she was an eleven-year-old girl with cocaine in her system, who had just been raped. Your Honor had a chance to see, some of her recall was difficult.

THE COURT: The problem I have is that, you know, this witness testified yesterday that there was a description given to her by her daughter that the guy had a mask.

MR. DEAKIN: That's the description of the man she saw outside earlier in the evening. She never saw that man's face. The girl said she thought it was the same man, but she was giving the description of the man she saw earlier. This is the description of the man who abducted her, which I think is the same man.

MR. SHEA: Well, I mean, her testimony isn't --

THE COURT: Excuse me. The objection is overruled. She may answer the question.

MR. SHEA: Note my objection, for the record.

MR. DEAKIN: May I state one thing, just for the record, your Honor, so it's clear, this is what I wanted to tell the Court.

I believe her complete answer, if your Honor asked her was there anything else that made her ask if it was Sonny is her prior history --

THE COURT: No. We're not going to --

MR. DEAKIN: Understood. In fact, your Honor, I have instructed her --

THE COURT: That's the reason why I stopped.

MR. DEAKIN: The reason she only told you that answer is I instructed her that unless somebody asks you really specifically did he do something to you when you were a child, you may not bring something forward.

So I just want the record to reflect there was actually two things that made her think that. She's only answering the one, because of my instruction to her.

THE COURT: He's objected to both, but....

MR. SHEA: Right. But I also just want to make clear that if Mr. Deakin's argument is that we should let this description in because the young girl was under the influence of cocaine, and we can't trust that memory coming from her, why should we trust it coming through a second party?

THE COURT: Excuse me. It's not really a description other than that somebody had some light brown skin. And she asked her "Was it Sonny?" She hasn't gotten into a description of him.

MR. SHEA: Eyes, nose, hair. That's what

she's given. And we haven't even got that from the young girl on the stand. We have no description in terms of eyes, nose, or hair from the young girl.

MR. DEAKIN: Your Honor --

THE COURT: Overruled.

(End of side-bar conference.)

THE COURT: You want to bring the jurors back in.

MR. SHEA: Just so we're clear, I don't have to stand up and object again in the presence of the jury.

THE COURT: No.

MR. SHEA: Thank you.

(Jurors enter 11:05.)

THE COURT OFFICER: This court is back in session. Please be seated.

THE COURT: You may answer the question, ma'am.

Q What was it that made you ask her "Was it Sonny?"

A Well, we had been asking her questions about what the person had looked like, and she gave a couple of

details.

Q What were the details that she gave you?

A She said that he had black curly hair, and she said that he had had beady eyes. And she also said that he also had a long nose, like a long, pointed nose.

Q Did she describe his skin coloration?

A She said that he was -- she said light brown skin.

MR. SHEA: Objection.

THE COURT: Overruled.

Q I'm sorry. Could you repeat that answer?

A She said that he was light brown skinned.

Q Did she describe his height?

A She said he was tall, as well.

Q And based on that description, you asked her, "Was it Sonny?"

A Yes.

Q How did she respond when you asked her, "Was it Sonny?"

A She told me, "Yes."

Q Was there any hesitation in that answer?

MR. SHEA: Objection.

THE COURT: Sustained.

Q Did she appear to you to hesitate at all in saying "Yes"?

MR. SHEA: Objection.

THE COURT: Sustained.

Q When you got to the monastery area, what happened?

A The officer instructed her to take him where she had just came from.

Q Did she -- was she seen by emergency medical technicians at all before that happened?

A Yes, she was.

Q And where did that take place?

A Right in front of the monastery.

Q And was it -- where -- what was -- where was she when she was being examined in front of the monastery?

A She was inside the ambulance.

Q Okay. How long was she inside the ambulance at that time?

A Probably about two minutes.

Q Two minutes?

A Yes.

Q And then what happened?

A They had taken her back out because they wanted to know where it was that she had just came from.

Q Who's "they"?

A The officers.

Q So, what did you do?

A We came out of the ambulance, we got in the car, the cruiser, and we went to where she had just came from.
Q Was it all the same people in the cruiser?
A Yes, it was.
Q In the same places where they were before?
A Yes, they were.
Q Was she still seated on your lap, facing you?
A She was turned around at that point.
Q And did the officers ask her to give directions?
A Yes, they did.
Q Okay. Did she give directions?
A Yes, she did.
Q Did she give them directly to the officers?
A Yes.
Q She didn't give them to you?
A No. She gave them to the officers, but she kind of told them to go this way, and then, when that was the wrong way, she said, "No, Mommy, it's that way." And that's when I said, "No, she said to go this way."
Q So you assisted her in giving directions to the police?
A Yes.
Q Did she make -- did you make any false turns? Did the car actually turn the wrong way?

A Yes, it did.

Q Okay. Up to this point, what did you understand about what had happened -- that is, what had [redacted] told you, up to this point, about what had happened to her?

A She said that -- I was asking her questions, whether or not --

MR. SHEA: Objection.

THE COURT: Sustained.

Q Was she still -- at this point, was she still -- what was her emotional condition at this point? How did she appear?

A She was still just upset. Not crying, but she was, like, whining, in and out.

Q And what had she told you up to that point about what had happened to her?

A She --

MR. SHEA: Objection.

THE COURT: Sustained.

MR. DEAKIN: May we approach, your Honor?

THE COURT: Yes.

SIDE-BAR CONFERENCE:

MR. DEAKIN: Your Honor, relying on my memo,

I would argue that this is still admissible as an excited utterance, substantively.

THE COURT: As to what happened?

MR. DEAKIN: What happened to her -- her statement of what happened to her is an excited utterance. She's still, clearly, under the emotional sway of an exciting event. She has not had time to fabricate.

MR. SHEA: She's giving directions, Judge. She's reflecting on which way to go. She's thinking, Is this the right way? No, Mommy, that's not the right way. It's this way. That's someone who's thinking rationally and clearly, and making choices. This is not under the influence of an exciting event.

MR. DEAKIN: Your Honor, I've cited case law in my memo --

THE COURT: Excuse me. What difference does it make?

MR. SHEA: What difference does it make?

THE COURT: Yeah.

MR. SHEA: Why is he trying to get it in? To further confirm the story. And the fact is that --

THE COURT: But you don't dispute her story

that she was raped.

MR. SHEA: Well, I dispute -- what becomes important for my case is that she's telling all sorts of different stories. I don't need her mother to further backup her story.

THE COURT: So, what is it she's going to testify to?

MR. DEAKIN: Well, at this point she's going to testify that she said a man took her. I think she's going to testify he gave her something to smoke, sniff -- or smoke, drink and snort. And took her and touched her "down there."

THE COURT: All right. Overruled.

MR. SHEA: Your Honor, the other thing is, I mean, is this coming in -- the other area is he trying to get in fresh complaint?

MR. DEAKIN: Well, your Honor, my position is it's either admissible substantively, as excited utterance, or, at least, at a minimum, it's admissible -- it's clearly admissible as fresh complaint.

MR. SHEA: Well, no, it's not clearly admissible as that. And I'll be very clear. I have a case on it which says if the testimony of the

person varies from the testimony of the alleged victim, then the fresh complaint --

THE COURT: That's right.

MR. DEAKIN: That's true.

MR. SHEA: -- doesn't come in. But Mr. Deakin would have to tell you that Deakin doesn't have a single witness who says the individual's penis was hard when inside her.

MR. DEAKIN: She's not going to testify to that, but that's exactly the point.

THE COURT: All right. The objection's overruled.

(End of side-bar conference.)

Q As of this point, as you were driving, trying to find the route back, what had she told you happened?

A She just kept, like, crying. And then she said that, He made me sniff something. She, like, was yelling, "He made me sniff something, he made me sniff something."

Q Had she, at that point, told you anything else that happened?

A That's when my fiancé had asked her, "What did he do to you, [redacted], what did he do to you?"

Q And how did she answer that question?
A She said that he had -- she said he stuck his finger in her.
Q In her?
A Yes.
Q Did she say where in her he stuck his finger?
A She said that he stuck his finger in her private.
Q Did she say anything else that happened?
A She said that he had put his private down by her private.
Q And did she say what, if anything, he did with his private when he put it down by her private?
A She said that he rubbed it down there.
Q Rubbed it?
A Yes.
Q Was she -- as you were driving in the car, at this point, was she telling you things in a narrative fashion? That is, from beginning, middle, and end, in that fashion?
A She was, like, all over. Just -- she would say one thing and then she would go, He made me drink something, and he made me smoke something. She was just, like, hysterical.
Q Okay. Where did you get to? Where did you drive?

A We drove to LaCross Street.

Q Are you sure the name is LaCross Street?

A I'm not sure -- LaRose, actually.

Q Okay. And how far away was LaRose Place from 34 Fidelis Way?

A Not that far.

Q Were there any other -- when you went there, were there any other vehicles with you?

A The ambulance was following us.

Q Okay. What happened when you got to LaRose Place?

A We got out of the car, and the officer said to [redacted], Show me where it is that you just came from.

Q And where did she -- in response to that, did she indicate a place?

A Yes, she did.

Q What did she indicate?

A She indicated -- she pointed to a house that had a yard on the side of it. So we walked in the yard. And then there was, like, a grass area, and she pointed up to the back of, like, a -- there was like a Mother Mary, or like an oven-type thing, brick wall with a statue in it.

MR. DEAKIN: May I approach?

THE COURT: Yes.

Q Ms. [redacted], I'm going to show you what's been labeled -- two photographs that have been labeled -- I'm going to put them up on the screen here -- Exhibits 4 and 5.

Do you see that? Can you see the photo from where you are?

A Yes.

Q And do you recognize what that's a photograph of?

A That's the yard where she had said she was.

Q And that's the location you're describing that you were walking around?

A Yes.

Q Actually, I just want to make clear, can you see in this photograph the grassy area where she said he touched her? In this photograph?

A You cannot see the grassy area, no.

Q Where would it be -- if you recall, where would it be in relationship to where this photograph is?

A It would be back behind the brick wall there, where the trees were.

Q Right here?

A Yes.

Q Did you actually -- did you go back to that area and look around?

A We walked directly back to the entrance, and then the cops told us to come out.
Q When you came out, what's the next thing that happened?
A We walked back down to the street, and she pointed out the duct tape that she had pulled off of her.
Q Did you see it when she pointed it out?
A Yes, I did.
Q And what happened to the duct tape?
A It was left there for the officers to collect.
Q Did you see whether officers collected it?
A I did not, no.
Q Did she indicate to you -- did she tell you how long she was in the area, sort of the general area of that photograph, and the part sort of behind it and to the left? Did she tell you how long she was there?
A No, she did not.
Q Did she tell you whether Sonny had stayed there the entire time with her?
A Most of the time.
Q And what did she tell you happened after the end of "most of the time"?
MR. SHEA: Objection.
THE COURT: Sustained.

Q Did she tell you where he went when he was not there anymore?

A She said that she was just left there.

MR. SHEA: Objection.

THE COURT: Overruled.

Q Did she tell you where she stayed when she was left there?

A No. She said she was told to sit by the -- in the back of the statue, and that he was going to come back to get her.

Q Did she tell you whether he did that?

A She said he did not come back.

Q What happened -- how long did you spend in that area that's depicted in the photograph on LaRose Place?

A Probably about ten minutes.

Q And what happened next?

A We got into the ambulance.

Q And who got into the ambulance with you?

A Me, [redacted], and two officers.

Q The same two officers?

A No.

Q Okay. Who were the two officers?

A Actually, it was just me, [redacted], and the ambulance people at that time.

Q And what happened then?
A Then we went over to the monastery.
Q Okay. And what happened when you got to the monastery?
A The two officers got in.
Q Did you continue talking to [redacted], asking her questions, in the ambulance?
A Yes, we were.
Q And did she continue to answer them?
A Yes, she was.
Q What was her demeanor like in the ambulance?
A Just fidgety. And she was still upset and really fidgety.
Q What happened when you got back to the monastery area in the ambulance?
A That's when they said that they were going to take her to the hospital. And we went -- I told them that I had to grab something, so we had went back to Fidelis Way so I could grab something before we went to the hospital.
Q Did you go back -- did the ambulance go back to Fidelis Way?
A Yes, they did.
Q What happened there?

A They stopped, like, down the road so that I could get like a little bit back this way. Fidelis Way is here. So I could get my pocketbook with my insurance information and stuff.
Q Then what happened?
A Then we went to Children's Hospital.
Q While you -- while the two officers were with you in the ambulance and with [redacted], was anybody questioning [redacted]?
A Yes.
Q Who?
A Tahisha Skeen. Tahisha Skeen.
Q Is that one of the officers?
A Yes.
Q Did you know her at all before that night?
A Yes, I did.
Q And where had she come from, if you know that?
A She had came from one of the other area police stations over in Dorchester.
Q Did you know which area?
A I think -- no, I do not know.
Q Okay. But you think it was in Dorchester?
A Yeah.
Q Did you have any idea that she was there until she

came into the ambulance?

A I did not, no.

Q How do you know her?

A We grew up together.

Q Did she know [redacted]?

A Yes, she did.

Q Can you describe -- well, first of all, was [redacted] answering the questions in the ambulance?

A Yes, she was.

Q Was she answering questions, as I asked before, in a narrative way; that is, beginning, middle, end, walking, step-by-step, through what happened?

A No, she wasn't.

Q Were you able to gather from her answers a chronology of what she said had happened to her?

A Yes.

MR. SHEA: Objection.

THE COURT: Overruled.

Q As best you can for this jury, please recount what [redacted] said happened to her, as she was in the ambulance, heading for the hospital. Or, actually, in the ambulance, heading for the scene -- at any point in the ambulance.

MR. SHEA: Objection.

THE COURT: Sustained.

Q Can you recount for the jury what [redacted] had told you from the time that Officer Skeen entered the ambulance until you reached the hospital?

MR. SHEA: Objection.

THE COURT: Sustained.

MR. DEAKIN: Your Honor, may we approach?

THE COURT: Yeah.

SIDE-BAR CONFERENCE:

MR. DEAKIN: Your Honor, even if this is not admissible, this information, as an excited utterance, and I would argue that it is, but even if it's not, it's as fresh a fresh complaint as you can get.

THE COURT: Objection sustained.

MR. DEAKIN: Is the Court saying I won't be allowed to introduce fresh complaint evidence at all?

THE COURT: Not anymore. I'm not going to do it two times.

MR. DEAKIN: Your Honor, in the ambulance, and then at the hospital, [redacted] described, in detail, for her mother and for Officer Skeen, what this defendant did to her. And her mother has a pretty

good recollection of it. It corroborates the girl's testimony --

THE COURT: The objection is sustained.

(End of side-bar conference.)

Q Were you able -- just yes or no -- to get a sense of what [redacted] was saying had happened to her from the beginning until she came back to where you were that night?

A Yes.

Q Did she tell you where she was when she was taken?

A Yes, she did.

Q And where did she tell you she was?

A She told me she was taken to the grassy area.

Q I'm sorry. I'm asking you where she was -- I think you misunderstood my question.

Did she tell you where she was when she first was taken? That is, where she was taken from?

MR. SHEA: Objection.

A Yes, she did.

THE COURT: Sustained.

Q Did she give you a description of the automobile that Sonny took her in?

MR. SHEA: Objection.

A Yes.

THE COURT: Sustained.

MR. SHEA: Motion to strike.

THE COURT: Stricken.

Q What did you -- how long did it take to get to the hospital?

A Probably about ten minutes.

Q And what happened when you got to the hospital?

A She was taken into the room that she was told -- they were looking for a johnny big enough for her to put on.

Q About what time would you estimate you arrived at the hospital?

A It had to be about 2:35, 2:45.

Q And where was she taken?

A Back to one of the rooms, the emergency rooms.

Q Were you with her the entire time?

A Yes, I was.

Q Was she interviewed by anyone while at the hospital?

A Yes, she was.

Q Who was that?

A A Detective Sergeant McDonough.

Q Was she interviewed by any hospital personnel first?

A Yes, she was.

Q Do you recall who interviewed her?
A One of the doctors there.
Q Was it a male or a female doctor?
A Female.
Q And how long did that interview last?
A About an hour.
Q Did you hear that interview?
A Some of it, I did hear. At times, they asked me to step out.
Q How long did it take between the time you got to the hospital and the time that she was interviewed?
A Probably about 30 minutes.
Q Did the doctor perform an examination?
A Yes, they did.
Q Were you there for the examination?
A Yes, I was.
Q Describe, if you would, briefly, what happened in the examination.
A They drew some blood from [redacted] and they had what they called a rape kit that they had opened up. It consisted of a lot of different types of exams that they did.
Q Did you see whether they performed a genital exam?
A Yes, I did.

Q Had [redacted], at that time, ever had a genital exam before?
A Never, no.
Q Did [redacted] express any -- let me ask you this: Before the examination, did [redacted] wash herself in any way?
A Yes, she did.
Q What did she wash?
A She kept washing her hands.
Q How many times would you say she washed her hands?
A About twice.
Q What was her demeanor like during the examination in the hospital?
A Uncomfortable.
MR. SHEA: Objection.
THE COURT: Overruled.
Q Uncomfortable?
A Yes.
Q Were you present when Sergeant Detective McDonough interviewed her at the hospital?
A Yes, I was.
Q What was her demeanor like during that interview?
A Just couldn't sit still.
MR. SHEA: Objection.
THE COURT: Overruled.

Q How long did -- first of all, what time was it when she was released from the hospital?
A It was about seven. Between 6:45 and 7:30.
Q When -- were you there the entire time?
A Yes. No. I left, and I had came back.
Q Why did you leave and come back?
A They could not find a johnny big enough for her to put on, so they wanted to take the T-shirt that she had. And they asked if she had had a change of clothing.
Q And did you go to get her a change of clothing?
A Yes, I did.
Q Where did you go -- were you there with [redacted] when she was released from the hospital?
A Yes, I was.
Q And where did the two of you go?
A We went home.
Q Was anyone with you when you went home?
A Driving; it was me, [redacted] and my fiancé.
Q And when you got home, who actually -- did he go home with you, your fiancé?
A No, he didn't.
Q So, just the two of you went home?
A Yes.

Q Was anyone else at home when you got home?
A My mother was there briefly, but then she left out to go to work.
Q What did the two of you do when you got home?
A I had her wash her hands and her face, and I changed her into pajamas and we got into bed.
Q Which bed did you get into?
A Mine.
Q And is that something that you would typically do then, get into the same bed together?
A No. She often slept in her own room.
Q Did you fall asleep?
A Yes, I did.
Q Do you know whether [redacted] fell asleep?
A I do not.
Q Was there a television on in that room where you were?
A Yes, there was.
Q Where was it located in relationship to the bed?
A Down at the foot of the bed, off to the right.
Q Could you see -- if you had been awake, could you see the television from where you were?
A Yes, I could.
Q Could [redacted] see the television from where she was?

A Yes, she could.
Q Was the sound on on the television?
A No, it was muted.
Q The mute button was on?
A Yes. It was muted.
MR. SHEA: Objection.
THE COURT: Overruled.
Q At some point, were you awakened?
A Yes.
Q And what awoke you?
A [redacted]
Q How -- what did she do to awake you?
A She had, like, shook me, and she said, "Mommy, Mommy" --
MR. SHEA: Objection. Could we have a side bar?
THE COURT: Yes.

SIDE-BAR CONFERENCE:

THE COURT: I just want to continue my objection that I wasn't given the motion to suppress on the issue of ID, I wasn't given a voir dire on the issue of ID. The other thing is we just had testimony from a woman saying that the volume wasn't

on and the mute button was on, and then we heard that she woke up.

THE COURT: She said in response to her shaking her.

MR. SHEA: Well, how could she say the mute button was on?

THE COURT: Because she didn't hear the television on.

MR. SHEA: It seems to me that if you're asleep, you can't testify to what's going on with the television.

MR. DEAKIN: When you wake up, you can.

THE COURT: She can testify to whether or not she heard it.

(End of side-bar conference.)

Q So that we're clear, Ms. [redacted], what woke you up?
A [redacted] woke me up.
Q And what was she doing to wake you up?
A She had sat up in the bed, and she had shook me. She said, "Mommy, Mommy."
Q And what did you do when she woke you and she shook you and said, "Mommy, Mommy"?
A I opened my eyes and I said, What's wrong, [redacted]?

Q And what did she say or do?
A She pointed at the TV, and she said, "That's the man that took me."
Q I'm sorry. Say that again.
A She pointed at the television, and she said "That's the man that took me."
Q What did you -- did you look at the television at that time?
A Yes, I did.
Q What did you see?
A I seen the police escorting Owen McCants out of Fidelis Way.
Q Did you recognize him?
A Yes, I did.
Q When you say "escorting," were they holding him in any way?
A No. There was two officers behind him. One was in front.
Q Was he in handcuffs or restrained in any way?
A No, he was not.
Q Was there any doubt in your mind that the man who was on television was Owen McCants?
A No, there was not.
Q What was [redacted] demeanor like when she said, "That's

the man who took me"?

A She was just, like, like shocked. Like, "Mommy, Mommy." Upset.

MR. SHEA: Objection.

THE COURT: Sustained.

Q What happened later that day?

A A lot of different family members came over. The detective had came to question [redacted]

Q Which detective?

A Detective McDonough.

Q Did he question her at that time?

A He had actually taken pictures, and he asked her a couple of questions.

Q So the photographs that are now Exhibits -- I believe it's 7 and 8; is that right? The photographs?

Are those two of the photographs that were taken by Sergeant Detective McDonough?

A Yes.

Q Did you do something the next day, that is, Saturday, the 15th of July, in connection with this case?

A Yes, I did.

Q What was that?

A We went back to Fidelis Way.

Q Who went back?

A Detective McDonough, my mother, [redacted], my aunt, and another officer with a camera.
Q And what, if anything, happened at that time?
A They wanted [redacted] to show them exactly how she was -- how she came out of the house, was taken, and where she wound up.
Q Did she do that?
A Yes, she did.
Q Were the officers -- well, let me ask you: Were the things that she showed you consistent with what she told you the night before, or the day before?
A Yes, they were.
Q Were photographs taken during that walk-through?
A Yes, there was.
Q And was a video made of that walk-through?
A I'm not sure of that. I know photographs were taken.
Q A couple of quick points I want to just ask you about before we finish.
Are you familiar with the layout of Polly Taylor and Christine Isaac's apartment at 34 Fidelis Way?
A Yes, I am.
Q And what part of the outside does Polly Taylor's apartment look out on? That is, if you look out her

windows, say, in her living room, what will you see?
A It looks down between the two buildings. There's like a little park there.
Q And what about if you look out her bedroom or kitchen windows?
A If you look out her bedroom, you'll see -- it's like the entrance coming into the parking lot. Out of her kitchen, you see parked cars and some of the park.
Q Now, Christine Isaac's apartment, No. 545, if you look out of her living room windows, what will you see?
A The living room, you see the front side of Fidelis Way.
Q The front entrance area?
A Yes.
Q And in order to gain -- in order to go from the outside of Fidelis Way, the entryway, inside, and get into an apartment, say, Polly Taylor's apartment, how many keys do you need?
A There's one key for the downstairs door, and there's one key for Polly Taylor's door.
Q Are those separate keys?
A Yes, they are.
Q So, if you have the key to an apartment in Fidelis

Way, just a key to Polly Taylor's apartment, can you get in the front door without being buzzed in? If you just have an apartment key?

A No.

Q Okay. Sometime after this happened, were you called to testify in the grand jury?

A Yes, I was.

Q And did you do that?

A Yes, I did.

Q Also, at some point after this happened, did you learn -- just yes or no -- anything about a letter sent by the defendant to Polly Taylor?

A Yes, I did.

MR. SHEA: Objection.

THE COURT: Overruled.

Q And who -- without saying what they said -- who notified you about that letter?

A My Nana called me.

MR. SHEA: Objection.

THE COURT: Overruled.

Q That's Polly Taylor?

A Yes, it is.

MR. DEAKIN: No further questions.

THE COURT: Mr. Shea.

CROSS-EXAMINATION

Q (By Mr. Shea) Good morning.
A Good morning.
Q Now, Mr. Deakin just alluded to the fact that you testified before the grand jury.
A Yes, I did.
Q And you remember testifying before the grand jury?
A Yes, I do.
Q And that was a long time ago, now, right?
A Pretty much, yes.
Q And it was right around -- not shortly after the events, correct?
A It was somewhat after the events.
Q Okay. Now, you testified -- has Mr. Deakin ever showed you your grand jury testimony?
A Yes. I do have a copy of it.
Q He gave you a copy of it?
A Yes.
Q And he told you to read it over in preparation for your testimony here, didn't he?
A Yes. You could say that.
Q Okay. And how many times did you meet with Mr. Deakin in preparing for trial?
A I'm not sure.

Q Okay. Now, anywhere in those 62 pages of grand jury testimony do you mention the descriptive detail that the person had black, curly hair?

A I did not.

Q Anywhere in those 62 pages of grand jury testimony where, by the way, you're under oath, aren't you, at the grand jury?

A Yes.

Q Anywhere in those 62 pages did you mention that the person had beady eyes?

A I did not.

Q Again, anywhere in the grand jury testimony did you mention that the person had a long nose?

A I did not.

Q And, lastly, did you mention that the person had light brown skin?

A I did not.

Q Now, you were asked a number of questions by Mr. Deakin, correct?

A Yes, I was.

Q Did you not think that the description of the perpetrator was something important to share with the grand jury?

A Well, on the grand jury, when I was being asked the

questions, I was only told to answer the questions I was asked. And that was not some of the questions that I was asked.

Q So, you are saying that you were not asked whether there was a description of the individual?

A Not on the grand jury.

Q Okay. At the grand jury, on page 76, you testified that she looked back, meaning your daughter, and seen his face. Correct?

A Yes.

Q Okay. So you believed, from your testimony, that she had seen the person's face, correct?

A Yes.

Q Okay. And you were asked the question, "Did you ask whether she recognized the face?" Do you recall being asked that question?

A Yes.

Q Okay. And you answered, "No, I didn't. Not at the time." Correct?

A I'm not sure.

Q Okay. If I show you the portion of your testimony, would that refresh your recollection?

A Yes.

Q Line 17.

A Yes, it does.

Q Okay. And so now you remember saying, "No, I didn't. Not at the time."

A Yes.

Q Okay. You met with -- you were in the automobile with -- initially with two officers.

A Yes.

Q And did you tell those officers of the description?

A No, I did not.

Q Did you tell those officers that she had, "said it was Sonny"?

A No, I did not.

Q Okay. Then you went to the scene -- then you went to the ambulance, correct?

A Yes.

Q Just so we get the progression right. You went to the ambulance. Did you give anyone at the ambulance the description?

A No, I did not.

Q Okay. And from the ambulance, where did you go?

A Children's Hospital.

Q Well, didn't you go out to the location of LaRose Place?

A We went in the cruiser.

Q Okay. And so you went in the cruiser over to LaRose Place after you had gone to the ambulance and Monastery.
A Yes.
Q And when you went in the cruiser to Monastery -- I mean, to LaRose Place, did you tell the officers the description then?
A No, I did not.
Q Did you tell the officers that she had said it was Sonny?
A No, I did not.
Q Now, you're over at LaRose Place. Some other officers come by, correct?
A Yes.
Q Okay. They were waiting to have an officer come who could pick up the tape and put it in an evidence envelope?
A I'm not sure.
Q Okay. And when those officers arrived, did you tell them the description?
A I didn't speak with those officers.
Q Okay. So, then you went back to -- from LaRose Place, did you get in the cruiser, in the ambulance with Tahisha Skeen, or where did you get in the

ambulance with her?

A I got in -- we left LaRose and we went back to the monastery. That's when Tahisha Skeen got in the ambulance.

Q Okay. And on the ride back from LaRose to Monastery you were accompanied by the police then. You were in a cruiser, right?

A Excuse me?

Q On the ride back from LaRose Place to Monastery, you were accompanied by the police.

A No. I was in the ambulance.

Q Okay. And there were police with you in the ambulance, correct?

A Yes.

Q Did you tell the police in the ambulance the description?

A I did not, no.

Q Did you tell -- so, then, from the ambulance, that's when Tahisha Skeen got in, over at Monastery.

A Yes.

Q And you said you knew Tahisha Skeen.

A Yes.

Q So you were comfortable with her.

A Yes.

Q I mean, more comfortable than with an officer you didn't know.

A Yes.

Q All right. And did you tell her she said -- that [redacted] had said it was Sonny?

A I believe I did not.

Q And did you give her the description?

A No. They were asking [redacted] questions, trying to figure out or put together what happened, and how she got out of the apartment, how she got to where she was. So, it wasn't like we were riding, you know, in silence or what have you.

Q But they were asking [redacted] for a description of the person that did this, weren't they?

A No, they did not.

Q So your testimony today, under oath, is that Tahisha Skeen and none of the police officers, up until you get to Children's Hospital, asked for a description of the person who had done this.

A They asked her if she knew who did this, and she said she did not know. And then they went in to ask her other things. In terms of, you know, give me a face-to-face description, they did not ask her that.

Q So, you didn't hear them ask [redacted] for any

descriptive details, any of the officers?
A No. I don't recall that.
Q Al Sutherland is your father?
A Yes, he is.
Q Okay. And he's a friend of "Mister"?
A I'm not sure.
Q Now, bringing you back to July 10th. You dropped [redacted] off at Polly Taylor's that day, correct?
A Yes, I did.
Q And you saw Owen McCants.
A Yes, I did.
Q And you weren't happy to see him, were you?
A I wouldn't say I wasn't happy. I was shocked to see him.
Q Do you recall being asked in the grand jury, page 34, "And when you saw him," meaning Owen McCants, "at your grandmother's, at Polly Taylor's, were you happy to see him, or not happy to see him?"
Do you recall answering, "Not happy"?
A I might have.
Q If I were to show you your testimony, would that refresh your recollection?
A Sure.
Q Does that refresh your recollection?

A Yes, it does.
Q And you testified at the grand jury that you were not happy, correct?
A Yes, I did.
Q Now, as soon as you arrived, you asked Polly, "Where's Sonny," correct?
A Yes, I did.
Q And your next stop was to go to Sonny's sister's house, Ruby Williams, correct?
A No.
Q I'm sorry. My mistake. You went out and looked -- drove around in your truck for a bit, looking for [redacted].
A Yes.
Q After that, you went to Ruby Williams' place.
A No.
Q When did you go to Ruby Williams' place?
A After -- I went to Shalana Wright's house, then I went back to my grandmother's house to see if she came back. And then, when I left there, I went to Ruby Williams' place.
Q And when you went back to Polly's house, you asked her again, "Where's Sonny," correct?
A Yes.

Q All right. Then you went to Ruby Williams' house.
A Yes.
Q All right. And you asked her, "Where's Sonny," correct?
A No. I asked Michelle if she had seen Sonny.
Q And Michelle was the young girl, the granddaughter, at Ruby Williams' house?
A Yes.
Q Okay. And you testified before that Ruby was in bed?
A Yes. She was speaking to me from her bed.
Q From her bedroom, right?
A Yes.
Q The door was closed?
A No. It was open.
Q It was open. So you could see her through the crack in the door?
A Yes.
Q Okay. Then you went back to Polly Taylor's.
A Yes, I did.
Q And you asked her where Sonny was.
A Yes.
Q Did she know?
A No.
Q And did she make any effort to find him at that time?

A No.
Q At that point, your fiancé's friend had arrived.
A Yes.
Q And what was his name?
A Raymond Scott. Tony Hurston (phonetic).
Q Okay. And Raymond Scott, when was he with [redacted]?
A On a number of occasions.
Q On that particular evening, after [redacted] had gotten back.
A He wasn't with her.
Q He wasn't.
A No.
Q After 2 a.m., between 2 and 6 a.m., say, on July 14th, when was the next time -- his name is Raymond?
A Yes.
Q When was the next time [redacted] saw Raymond?
A I'm not sure. It was a while, though. Because he was away on business.
Q Okay. When you say "a while," just -- you don't have to give an exact date, but how long?
A I'm not sure.
Q Was it more than a week?
A It could have been. I'm not sure.
Q Well, what's the fewest amount of days it was? You

just said he was out of town on business.

A I'm not sure. Raymond Scott's not a friend that we see on a daily basis.

Q Okay. So, if you don't see him on a daily basis, was it a week, two weeks, a month?

A I'm not sure.

Q Was Raymond Scott with [redacted] in your presence between 6 a.m. on the 14th and July 17th, in the afternoon?

A I don't believe so.

Q Now, after Raymond had arrived, you went back to Polly's and you asked again where was Sonny.

A Yes.

Q Then, there was an altercation between your fiancé and a guy known as "Mister."

A Yes.

Q And your fiancé had made an accusation against Mister, correct?

A Yes.

Q Now, going ahead to when [redacted] came back, when she came back, you pretty much immediately went into a police cruiser; is that fair to say?

A Yes.

Q And there were two officers in that cruiser, correct?

A Yes.

Q And [redacted] was giving them directions to the location.
A Yes, she was.
Q Occasionally interpreted by you.
A Yes.
Q And this is the point at which you say you asked, "Was it Sonny?"
A Yes.
Q Just to be clear, your daughter had not offered that up, had she?
A No.
Q Now, at the hospital, you met with Detective McDonough.
A Yes.
Q And you, not your daughter, gave him the name Owen McCants.
A Yes.
Q And you did that in front of your daughter.
A Yes.
Q Until that meeting with Detective McDonough, at the hospital, you had not seen fit to relay a description to any police officer, correct?
A I wasn't asked to give a description.
Q No --
A I was told that the detective was going to meet with

me and all that would transpire and take place.

Q But you did not give a description to a police officer.

A No, I did not.

Q And you did not give the name of the person you felt to be the perpetrator, did you?

A No, I did not.

MR. SHEA: If I could just have a moment.

THE COURT: Yes.

Q Is it your testimony today that in that meeting with Detective McDonough, you told him that the individual had beady eyes?

A Excuse me?

Q Is it your testimony here today that in that meeting with Detective McDonough you told him that the individual had beady eyes?

A I'm not sure.

Q Did you tell him that the person had a long nose?

A I'm not sure.

Q And in that meeting, you are very sure that you were to give a description of the person who had done this, aren't you?

A In the meeting with Detective McDonough?

Q Yes.

A At the hospital or afterwards when we met?
Q At the hospital.
A No, I was not instructed to give a description at that time.
MR. SHEA: Nothing further.

REDIRECT EXAMINATION

Q (By Mr. Deakin) Ms. [redacted]n, did you testify in the grand jury that you asked [redacted], "Was it Sonny?"
A Yes, I did.
Q Did you testify in the grand jury that --
MR. SHEA: Objection. Side bar.

SIDE-BAR CONFERENCE:

MR. SHEA: Prior consistent testimony, I'm not even sure some of the past stuff should come in. But prior consistent testimony is not uniformly allowed in. And she hasn't been impeached on that. And so to allow in prior consistent testimony on whether she's been impeached -- on something she hasn't been impeached on, it definitely --
MR. DEAKIN: He asked her about a statement she made in grand jury one -- before she testified "Was it Sonny?" that said, Did you ask her if he

looked familiar to you? And she said, No.

The next line asks her, "At any point, did you ask her, 'Was it Sonny?'" And she said, "Yes." The girl said "Yes." The next line after what she was asked --

THE COURT: The objection is sustained.

(End of side-bar conference.)

MR. DEAKIN: Nothing further, your Honor.

THE COURT: You may step down.

Next witness.

MR. DEAKIN: Your Honor, the people of the Commonwealth of Massachusetts call Joseph Murray.

(Pause)

MR. DEAKIN: The people of the Commonwealth would call Tahisha Skeen.

(Pause)

MR. DEAKIN: I'm really embarrassing myself. If I could -- could I ask that Officer Murray be called, Joseph Murray. I apologize to the Court.

THE COURT OFFICER: You want Officer Murray?

MR. DEAKIN: Officer Murray.

THE COURT OFFICER: Face the clerk and raise your right hand, please.

THE CLERK: Officer, do you solemnly swear the testimony you're about to give the jury concerning the matter between the Commonwealth and the defendant is the whole truth and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT OFFICER: Please be seated.

JOSEPH MURRAY, SWORN

DIRECT EXAMINATION

Q (By Mr. Deakin) Would you please -- I'm going to ask you, if you would, to pull the microphone as close to you as you can, and point it up so that you're speaking as directly into as you can.

Officer, can you introduce yourself to the jury, please, and spell your first and last name for the court reporter.

A Yes. My name is Joseph Murray. J-O-S-E-P-H, M-U-R-R-A-Y.

Q How were you employed on Thursday, July 13th of 2000?

A Employed by the Boston Police Department.

Q And how long had you been a police officer at that time?

A Twelve years.
Q Do you recall -- well, first of all, what station were you assigned to?
A District 14.
Q And that's in the Brighton station, the police station in Brighton?
A Yes. Brighton/Allston.
Q And where, specifically, is it located?
A 301 Washington Street, Brighton.
Q What shift were you working that night?
A Four to 11:45 p.m.
Q So, four in the afternoon to 11:45 at night?
A Yes.
Q And what sort of duty were you on? Were you in plain clothes, or in uniform?
A I was in uniform.
Q And were you in a car?
A Yes.
Q Did you receive a radio call at approximately 11:05 p.m.?
A Yes.
Q And where did you -- where were you when you received that call?
A I don't recall the exact --

Q Were you in your cruiser at the time?
A Yes.
Q And what was the call about?
A It was for a missing child.
Q Did the call instruct you where to respond?
A Yes.
Q And where was that?
A To 34 Fidelis Way.
Q What did you do when you got that call?
A We -- my partner and I responded to 34 Fidelis.
Q Was this your regular partner for that shift?
A No.
Q Who is your regular partner for that shift?
A That was Brendan Walsh.
Q Who responded with you that evening?
A Officer Paul Downey.
Q Were you in the same car, or separate cars?
A The same car.
Q How long did it take you to get there?
A No more than two minutes.
Q What did you find when you got to 34 Fidelis Way?
A When we arrived on scene, there was an elderly woman out in front of 34 Fidelis.
Q In the front, outside the apartment building?

A Yes.
Q How did she appear to you?
A She was very distraught, very upset.
Q What was it about how she was acting or what she was doing that made you think that she was distraught or upset?
A Her mannerisms, her tone of voice, the way she was pacing around out front.
Q Did you learn her name, subsequently?
A Yes.
Q What was her name?
A It was Polly Taylor.
Q Had you ever met her before, that you knew of?
A No.
Q Did Polly Taylor tell you something at that time?
A Yes.
Q What did she tell you?
A She told us that her granddaughter was missing.
Q Did she give you any other details at that time?
A I don't recall.
Q Okay. Did she give you any information about her granddaughter? For example, did she give you her granddaughter's name?
A Yes.

Q And what was her granddaughter's name?
A [redacted].
Q Did she give you any information about -- well, strike that.
Did she tell you -- give you any information about what had happened to lead up to her calling the police? Did you determine that she, in fact, was the one who called the police?
A Yes.
Q Did she give you any information about what had happened to lead up to her calling the police?
A Yes.
Q What did she tell you?
A She told us that she was in her apartment and she went next door to, I believe it was her aunt's apartment, to assist in some way. And while she was in that apartment, she heard her granddaughter yelling, "Nana, Nana." And with that, she came out of the apartment. And she thought that her granddaughter was going down the stairwell.
Q Did she tell you what she did then?
A At that point she called 9-1-1.
Q Did she give you all this information when you had just met her, right sort of out in front of 34

Fidelis Way?

A Not all the information, no.

Q How long did you speak to her just in the area of 34 -- out front of 34 Fidelis Way?

A Just a minute or two.

Q And what did you do next?

A At that point we had proceeded up the stairwell.

Q You and who else?

A Officer Downey.

Q What did Polly Taylor do, if you saw?

A She got on the elevator and went up to her apartment.

Q Did you -- as you proceeded up the stairwell, did you notice anything unusual about it? Anything that struck your attention?

A Well, at the bottom of the stairwell there was a broken light. There was glass all at the entrance of the door there. And the hallway up to the fourth floor was in complete darkness.

Q And where did you and Officer Downey go?

A I proceeded up to the fourth floor, and Officer Downey proceeded up to the roof.

Q When you got to the fourth floor, what did you do?

A At that point, I spoke further to Polly Taylor.

Q And what did the two of you talk about?

A Basically, she went back over what had happened. And she further went on to tell us what her granddaughter told her earlier in the evening.
Q And what did she tell you that her granddaughter had told her earlier in the evening?
A Earlier in the evening her granddaughter had been out playing with some friends, and it got to a time where the granddaughter had to go home, and as she got to 34 Fidelis, she observed someone in the foyer area.
Q And did she -- did Polly Taylor tell you whether her granddaughter had described the man she saw in the foyer area?
A Yes.
Q And how did she tell you her granddaughter had described him?
A Described this person as a tall, black male, wearing a dark stocking over his face. He had a green T-shirt and blue jeans.
Q And when you got that information, did you make note of that information?
A Yes.
Q And at some point thereafter, did you communicate that information to other police officers?
A Yes.

Q How did you do that?

A I broadcast a description over Channel 5, to the units on the district.

Q And so that we're clear, the description you were broadcasting was a description that Polly Taylor had given you of a man that her granddaughter, [redacted] had apparently seen earlier that evening; is that right?

A Yes, sir.

Q It was not a description -- Polly Taylor was not intending to describe to you the person who took [redacted] Just for the sake of clarity.

MR. SHEA: Objection.

THE COURT: Objection sustained.

Q Did Polly Taylor ever give you any information about who, if anyone, she believed had taken her daughter (sic) out of the apartment later that night? Just yes or no.

MR. SHEA: Objection.

THE COURT: Overruled.

Q Did she ever give you any information about that individual?

A Yes.

Q I'm not asking about the man earlier in the evening, I'm asking was she able to tell you anything about

the person -- did she say that she had seen the person who took her granddaughter?
A No.
Q Did she tell you approximately what time her granddaughter had said she had seen the man near the front entrance earlier that night?
A It was approximately 7:45.
Q And did she tell you whether someone had escorted her granddaughter home earlier that evening?
A Yes.
Q Was she able to identify him for you?
A Yes.
Q And how did she identify him, the man who walked her granddaughter home?
A Well, there were several people that walked.
Q Okay. I'm only asking about the man who walked her home.
A Yes. He was identified as "Mister."
Q Did you understand that to be a given name or a street name?
A That was a street name.
Q Did you subsequently learn the name of the person known as Mister?
A Yes.

Q And who did you learn Mister is?
A It was Marvin Ampey.
Q Did you learn his address?
A Yes.
Q What was that?
A It was 32 Fidelis Way, Apartment 535.
Q Jumping ahead a little bit, now, sir, did you speak with Marvin Ampey that night?
A Yes.
Q And what did he tell you?
MR. SHEA: Objection.
THE COURT: Sustained.
Q Where was the conversation? Where did you have a conversation with Marvin Ampey?
A Out in front of 34 Fidelis Way.
Q And what was his demeanor like during that conversation?
A I don't recall.
Q Anything stand out in your mind about his demeanor? Anything unusual?
A I don't remember.
Q Did you speak to Polly Taylor further when you got up to her floor? You said you went up to her floor.
A Yes.

Q And how long did you speak to her?
A Maybe four or five minutes.
Q And what did you do after you spoke to Polly Taylor?
A We proceeded back outside.
Q And what did you -- both you and Officer Downey?
A Yes.
Q Were you together?
A Yes.
Q And what did you do when you got outside?
A Once we were outside, we were met out front by another woman who identified herself as [redacted] mother.
Q And did you talk to -- well, first of all, have you seen that woman here in court today?
A I don't really recall what she looked like.
Q Did you learn her name?
A I believe it was Rasheena [redacted].
Q And did you speak to her?
A Yes.
Q What did she tell you?
A She basically gave us a quick description of her daughter, and also gave us a picture.
Q And it was the picture of her daughter?
A Yes.

Q What did you do with the picture?
A At that point, myself and Officer Downey, we proceeded to sort of a sweep of the development, just going door-to-door and showing the picture and asking if they had seen her.
Q And which area of the development did you do a sweep of?
A I believe we headed first over to 29 Jetty Court.
Q And that's up Fidelis Way a bit from 34 Fidelis Way?
A Yes.
Q And how were you finding people to show the picture to?
A There was many people outside that night. It was a hot, humid, summer night.
Q Where do you recall people -- people were out. Where do you recall people being out?
A They were sitting on the front stairs, they were playing in the street. Just walking about.
Q Is that in the area of Jetty Court where you were walking, or Fidelis Way, or both?
A Both.
Q Did you show the picture to individuals?
A Yes.
Q And did anyone recognize the picture that you showed

them?

A Most individuals recognized it.

Q Okay. Did anybody that you showed the picture to give you information about [redacted] whereabouts that evening?

A Yes. Two young girls came forward.

Q Do you recall their names?

A Shalana Wright and Michaela Shelton (phonetic).

Q And were they able to give you information about [redacted] whereaoubts at that time, say, around 11:00 or 11:05? Where she had been? Or did they give you information about her whereabouts earlier?

A They had given information about where she had been earlier.

Q Did they tell you whether they had been with her earlier?

A Yes, they had been playing with her earlier.

Q As you were doing the sweep of the development, did any other police officers come to help you?

A Yes. Other units were arriving at that time.

Q And at that time, where were those units coming from?

A At that time, they were coming from District 14.

Q That's your station?

A Yes.

Q And how many other police officers would you say came to help you?
A I believe there was three other units that arrived. Maybe four to five officers.
Q And were you able to tell what they did when they came to help you?
A No.
Q How long -- let me ask you this: At some point, did a supervisor come onto the scene?
A Yes.
Q And who was that supervisor?
A That was Sergeant Harry Byrne.
Q And was he a sergeant in your station at D-14?
A Yes.
Q Do you know approximately what time he arrived there?
A I believe it was sometime around midnight, shortly after.
Q And what did -- do you know what he did?
A I don't know what he did, no.
Q At some point, was a call put out for more assistance?
A Yes.
Q And who put out that call?
A That was done by Sergeant Byrne.

Q And how was he able to call for other assistance?
A He called out the Emergency Deployment Teams.
Q And what are Emergency Deployment Teams?
A Those are regular units assigned to other districts, who, in case of emergency, can be called out to respond to anyplace in the city.
Q Now, let me ask you, by the time Sergeant Byrne had arrived there, what was the situation in the area of 34 Fidelis Way, and the street, Fidelis Way, outside?
A At that time, there were several -- there was a large group of people that were interested in looking for the girl.
Q And what was the atmosphere in that large group of people?
A They were agitated and angry.
Q About how many people would you say were there when Sergeant -- well, later on, when Sergeant Byrne arrived? If you can be specific in that way.
A Maybe 15 to 20 at that time.
Q And did the size of that crowd or group grow over time?
A Yes.
Q And when it got to its largest, how big would you say it got at its largest?

A Fifty to 60. Maybe more.

Q Now, you say that Sergeant Byrne called out the Emergency Deployment Teams. Do you know at what time -- do you know, yourself, at what time that call was put out?

A I'm not sure exactly. I believe it was sometime maybe after 12:30.

Q And let me ask you, just in general, as you were doing things, were you making note of times, looking at your watch and making note of time as you were doing things?

A Unfortunately, I didn't have a watch on that night.

Q How long would you say it took from the time -- by the way, how is it that you knew that the call went out for Emergency Deployment Teams?

A You could hear it on the radio.

Q Is that call put out over all the channels, all the police channels?

A Yes. The supervisor notifies the dispatcher, who broadcasts citywide over all channels.

Q How long did it take for Emergency Deployment Team people to come into that area?

A Some units were there within minutes. Other units 15 to 20 minutes.

Q And what did the Emergency Deployment Teams do as they arrived there?
A Well, as they arrived, they just basically stood by until there was enough of us together, that the supervisor wanted me to brief them on the situation.
Q Where were they standing by when they were standing by?
A Adjacent to 34 Fidelis Way.
Q About what time would you say it was when enough Emergency Deployment Teams personnel were there, that it was time to brief them?
A Sometime after eleven.
Q And you said that the supervisor, Sergeant Byrne, asked you to brief them?
A Yes.
Q Why was it that he asked you to brief them?
A I had all the current information; the description of the girl, the last known whereabouts.
Q Did you brief the Emergency Deployment Teams?
A I was in the process of briefing them, yes.
Q Okay. About how many officers would you say were -- that you were briefing?
A Twenty to 25.
Q Would that include officers from your station D-14 or

was that just Emergency Deployment officers?
A That was all units on the scene.
Q And you said that you were in the process of briefing. And did something happen as you were in the process of briefing?
A Yes.
Q What was that?
A Out of the crowd, a young girl came running to the crowd, to Rasheena [redacted].
Q Where did she come running from?
A From the vicinity of the parking lot of St. Gabriel's.
Q The monastery?
A Yes.
Q And where was she when you first saw her?
A I just caught a glimpse of her, within a few feet of her mother.
Q And how did -- how did the girl appear to you when you first saw her?
A Her hair was all disheveled. She was crying. She had a --
Q Did you make note of what she was wearing?
A Yes. She had on a long, white T-shirt, that's several sizes too big for her.

Q Did she have on any shoes that you noticed?
A No shoes.
Q What did she do -- you say you saw her a few steps from her mother. What did she do after you saw her?
A Basically, her mother grabbed hold of her, and within a few seconds Sergeant Merner stepped forward and escorted the mother and daughter over to a cruiser.
Q Who is Sergeant Merner?
A He's a supervisor assigned to Area B.
Q That's a police station in Roxbury?
A Yes.
Q And what was he doing there?
A He was a supervisor for the Emergency Deployment Teams.
Q So he is one of the people that had been summonsed there when the call was put out to the Emergency Deployment Teams?
A Yes.
Q And you said that Sergeant Merner put people into a cruiser?
A Put the mother and daughter into a cruiser.
Q Was anybody else with the mother and daughter in the cruiser?
A There was another gentlemen. I believe it was the

mother's boyfriend.
Q And whose cruiser did Sergeant Merner put them in?
A That was my cruiser.
Q Who else got into the cruiser when they got into the cruiser?
A Sergeant Merner got into the front seat.
Q And who was driving?
A I was.
Q Where were [redacted], her mother, and her mother's boyfriend?
A They were in the back.
Q And could you see where [redacted] was sitting?
A She was sitting next to the mother. I don't know whether she was sitting on her lap. She was very close to her mother.
Q What did you do?
A At that point, there was an ambulance standing by, and we proceeded from 34 Fidelis over to the parking lot of St. Gabriel's, where the ambulance was.
Q When you say the ambulance was standing by, had it been standing by all this time that you were searching, over at the monastery?
A I don't know.
Q Where was the ambulance located?

A It was in the parking lot of St. Gabriel's.

Q What happened when you got to the parking lot of St. Gabriel's?

Well, actually, let me stop you. As you drove over from Fidelis Way to the parking lot at St. Gabriel's, could you hear whether there was any conversation in the back of the cruiser?

A I could hear conversation.

Q Who was having conversation, as far as you could tell?

A It was between the mother and the daughter.

Q Could you hear what both of them were saying?

A I could hear the mother, but the daughter was unrecognizable.

Q Was there anything between you and the back seat in that cruiser that would affect your ability to hear?

MR. SHEA: Objection.

THE COURT: Overruled.

Q Is there anything between you and the front seat -- back seat -- that would affect --

A Yes. There's a half metal/half plexiglass partition that separates the front from the back.

Q And what effect, if any, does that have on your ability to hear what's said in the back?

A People in the back have to really speak up for people in the front to hear them.
Q Were you or Sergeant Merner asking anybody in the back questions as you drove over to the monastery?
A No.
Q When you got to the monastery, what happened?
A At that point, the EMTs took the girl into the ambulance.
Q And how long was she in the ambulance?
A Five to ten minutes.
Q Then what happened?
A At that point, Sergeant Merner requested that the girl take us back to the scene, if she could.
Q And was that done?
A Yes.
Q How did she get back to the scene?
A She directed Sergeant Merner on which streets to take.
Q When you say "she," you're talking about [redacted]
A Yes.
Q And how was she able to direct you what streets to take?
A She directed him directly. It was straight --

Q Was she speaking directly to Sergeant Merner, herself?
A I couldn't see. I couldn't hear her.
Q Okay. Where did she take you to? Where did she direct you to?
A She directed us to 24 LaRose Place.
Q And is that a street that you're familiar with from working in that area?
A Yes.
Q What happened when you got there?
A At that point, Sergeant Merner and the girl -- I'm not sure if the mother was with her, but they proceeded to the back yard.
Q What did they do there, if you could see?
A I wasn't with them. I stayed with the cruiser.
Q Was there anybody -- any other police officer -- were there any other police officers with you in that area other than you and Sergeant Merner at that time?
A I don't recall.
Q How long did you stay there?
A Maybe ten to 15 minutes.
Q Then what happened?
A At that point, Sergeant Byrne radioed that the EMTs wanted to go back to the ambulance.

Q What did you do?
A She was driven back to the awaiting ambulance.
Q Did she go back -- was it still at the monastery?
A Yes.
Q Did she go back into the ambulance?
A Yes, she did.
Q And how long was she in the ambulance?
A Maybe another 15 or 20 minutes.
Q Could you see whether there were any police officers with her in the ambulance when she was in there at that time?
A I know for certain there was one.
Q Who was that?
A It was -- I believe it was Officer Skeen.
Q Do you know her first name?
A I don't.
Q I gather she's a woman.
A Yes.
Q Is she an African American or a Caucasian woman?
A African American.
Q What happened when -- what happened next, after those ten or 15 minutes?
A At that point, the girl, [redacted], was asked again to go back to the scene on LaRose Place.

Q And who went that time?
A There were several units that responded at that time.
Q Were you one of them?
A Yes.
Q Where did you go?
A I went directly to 24 LaRose Place.
Q What happened when you got back there?
A At that point, the girl was pointing out some evidence that was on the street.
Q What did she point out?
A There was some duct tape in the middle of the street.
Q Did you see that yourself?
A Yes.
Q What happened to the duct tape?
A Sergeant Byrne recovered it.
Q Did you have any role, yourself, in recovering the duct tape?
A Just the fact that it was placed in my cruiser.
Q What was it in when it was placed in your cruiser?
A I believe it was placed in a paper bag.
Q How long did you spend at 24 -- at LaRose Place the second time when you went back?
A Twenty minutes, maybe a half hour.
Q Then what happened?

A At that point, I was directed to go back to 34 Fidelis Way.
Q Who directed you?
A Sergeant Byrne.
Q What was the situation when you got back to 34 -- well, first of all, do you know what -- where [redacted] went after that?
A She was taken by ambulance to Children's Hospital.
Q What was the scene at 34 Fidelis Way when you got back there?
A At that time, there was a large crowd out in front of 34 Fidelis.
Q And what was the atmosphere in the crowd?
A They were angry. They were pretty agitated.
Q What was your assignment when you got back to 34 Fidelis Way?
A It was for crowd control.
Q And what does that mean "crowd control"?
A Just make sure nobody acts out; just to try to keep the peace.
Q At some point after you arrived back at 34 Fidelis Way, was someone brought out of 34 Fidelis Way?
A Yes.
Q And did you come to learn who that person -- did you

see that person being led out?
A Yes.
Q And who was that?
A It was the gentleman sitting there.
MR. DEAKIN: May the record reflect the witness has identified the defendant, Owen McCants?
THE COURT: Yes.
Q When he was -- where were you when he was taken out, or he was escorted out of 34 Fidelis Way?
A I was right in front of the doorway to 34 Fidelis.
Q And when he came out, were any of the officers holding him or restraining him in any way?
A No.
Q Did he have handcuffs on, or any other kind of restraint?
A No.
Q How were the officers configured with respect to the defendant?
A I believe there was one in front, and several behind him.
Q Were you involved in escorting the defendant out of the building?
A No.
Q What happened -- what happened next, after he was

taken out, after he was escorted out of the building?
A That, I don't know.
Q Did you see where he went when he left the building?
A No.
Q Did you see -- well, I mean, immediately, as he walked out of the building, where did he go from there? Did he go into any kind of vehicle, or...?
A I couldn't tell you. I don't know.
Q Okay. What did you do next?
A At that point, I was directed by Sergeant Byrne to proceed to Children's Hospital.
Q And what was your assignment to go to Children's Hospital to do?
A To document any statements that were given by [redacted] to Officer Skeen.
Q So that we're clear, were you sent to interview [redacted]?
A No.
Q You were sent to speak to Officer Skeen?
A Yes.
Q Did you talk to Officer Skeen?
A Yes.
Q And what did you talk about?
A I asked her what [redacted] told her.

Q And did she give you an account of that?
A Yes.
Q How long did you spend speaking to Officer Skeen?
A Five to ten minutes.
Q Were you by yourself at this point?
A Yes.
Q After that five- to ten-minute conversation, what did you do?
A At that point, I proceeded back to District 14.
Q And what were you going to do at District 14?
A At that time, I was to write a report, an incident report.
Q Did you write an incident report?
A Yes.
Q And what time -- as best you can estimate, what time was it when you arrived back at Area D-14?
A I'm not certain.
Q But you were now -- you were now well over your shift; is that right?
A Yes.
Q Is that -- how common is it for you to be held over your shift in a situation like this?
MR. SHEA: Objection.
THE COURT: Sustained.

Q When you got -- you say you wrote an incident report?
A Yes.
Q And how did you write it? Did you write it by hand, or type it, or...?
A It was handwritten.
Q Is that the preferred procedure, for a report to be handwritten?
A At that time, yes.
Q Okay. What did you do with the report once you wrote it?
A Once it was completed, it was handed to Sergeant Byrne.
Q And why did you hand it to Sergeant Byrne?
A He's the supervisor.
Q And do you know what he did with your report?
A No, I don't.
Q Did you know whether Sergeant Byrne subsequently wrote a report himself?
A Yes.
Q And had you -- did you have a chance to review that report --
A Yes.
Q -- soon after it was written?
A Yes.

Q Did he incorporate, in his report, information --

MR. SHEA: Objection.

THE COURT: Sustained.

MR. DEAKIN: May we approach side bar, your Honor?

THE COURT: Yes.

SIDE-BAR CONFERENCE:

MR. DEAKIN: Your Honor, I'm trying to draw the statement here. I turned over to defense counsel in discovery what I learned about it. Information that Sergeant Byrne had taken this man's report, had incorporated much of it into his own report, and then discarded this man's report. I turned that over because it's, arguably, you know, destruction of evidence, whatever you want to call it. It was, you know, something I felt I had to turn over as exculpatory evidence.

I expect the defense attorney to question this officer about that, and I'd seek to withdraw the statement, which I think I can, if defense counsel says he's not going to inquire in that area, then I'll stop. I don't think he's going to say that.

MR. SHEA: Of course I'm going to inquire in

that area, given, now, that the report that I didn't know, until the prior testimony, that's been destroyed, is the report that would be about the time that she supposedly identified Sonny.

So I'll be making --

THE COURT: Objection overruled.

MR. SHEA: Note my objection.

(End of side-bar conference.)

Q Officer Murray, when you wrote your report, did you have any information about the identity of the alleged perpetrator? By that I mean any information from Officer Skeen about anything the victim had said about an alleged perpetrator?

A Not that I recall.

Q When you -- did you have a chance to review the report that Sergeant Byrne subsequently wrote --

A Yes.

Q -- about this incident?

A Yes.

Q In your opinion, had he incorporated the material from your report in his report?

A Yes.

MR. SHEA: Objection.

THE COURT: Overruled.

Q And did you subsequently testify --

MR. DEAKIN: I'm sorry, your Honor. If I may have a moment.

(Pause)

Q Officer Murray, did you subsequently testify on Tuesday, September 5th before the grand jury in this matter?

A Yes.

Q Did Sergeant Byrne incorporate every detail of your report in the report that he wrote?

A No.

Q Is there anything that you can think of that was in your report that Sergeant Byrne didn't incorporate that you did not testify to either in the grand jury or before this jury today?

A I don't know. I don't have a copy of that report.

Q Is there anything that you can think of, from that report, that you didn't testify to here today or in the grand jury?

MR. SHEA: Objection. He already answered.

THE COURT: Overruled.

Q Please answer.

A No.

MR. DEAKIN: No further questions.

THE COURT: Mr. Shea.

CROSS-EXAMINATION

Q (By Mr. Shea) So you wrote up a police report?
A Yes.
Q Where is it?
A Where is my report?
Q Yeah.
A I handed it off to the supervisor.
Q Do you have a copy with you today?
A No, I don't.
Q Did Officer Byrne ever give you a copy back?
A No.
Q So your report has been destroyed?
A I don't know. Not that I know of.
Q Well, Mr. Deakin asked you to try and find a copy of that report. Did he?
A Did he ask me to try to find a copy of that report?
Q Or to find the original, find your police report.
A Was I asked that?
Q Yes.
A No.
Q The district attorney, upon hearing that your police

report had gone missing, didn't ask you to try and find it?

A I don't recall being asked that, no.

Q Now, you had taken down notes, right?

A Yes.

Q Where are the notes?

A I don't have them.

Q So, we don't have any notes, and we don't have a police report.

A I don't keep my notes. I use them to do the report, and they're discarded.

Q And you discard them because you're going to keep the report?

A Not always, no.

Q So, now, you've testified that you drove them from Fidelis Way -- you drove from Fidelis Way, correct?

A Yes.

Q Could you point out where you were on Fidelis Way with [redacted] and her mother? You can get up. Just try not to block the jury.

THE COURT REPORTER: I can't hear what he's saying.

THE COURT: You'll have to keep your voice up.

A I can't tell which buildings are which here.
Q All right. If I were to tell you that this is, I believe, 34, 32 and that's the front street, would that help?
A No.
Q She came out through a whole in the fence along here.
A Yes. I'm a little confused as to the way this map is sitting.
Q Does this look like the monastery?
A Yes.
Q Okay. And this is Fidelis Way?
A Yes.
Q And you drove her from Fidelis Way?
A Yes.
Q To the monastery?
A Yes.
Q To the parking lot?
A Parking lot.
Q To this large area here?
A Yes.
Q And is it fair to say you went down Fidelis to Washington and up?
A Yes.
Q Okay. So, that's a very short distance, isn't it?

A Yes.
Q And how long were you in the car? About, what, a minute? Two minutes?
A Maybe not.
Q Not even that long.
You can sit down.
And in that time, you could hear what the mother was saying, correct? Correct?
A Yes.
Q And you did not hear her say, "Was it Sonny?"
A I did not hear that, no.
Q I just want to clear up one point of confusion from the direct.
You spoke to Polly Taylor when you arrived at the scene.
A Yes.
Q And you took some information from her about what the guy [redacted] had seen in the entryway looked like earlier in the evening.
A At some point, talking to Polly Taylor, yes.
Q Okay. But she didn't give you any information, descriptive information, about what the person looked like who took [redacted] at eleven o'clock.
A No. She gave information on what [redacted] had seen

earlier.

Q Earlier. Okay. Now, you were sent to speak with Officer Skeen to document any statements given by [redacted].

A Yes.

Q Okay. And you were sent there by Sergeant Byrne.

A Yes.

Q Okay. And that was because Officer Skeen had been instructed to question [redacted].

A I'm not sure what her instructions were.

Q Okay. You weren't. Were those given by Sergeant Byrne to Officer Skeen as far as you know?

A I don't know.

Q Okay. But you weren't privy to the instructions.

A No.

Q Okay. And when you spoke to Officer Skeen, did she tell you that Sonny, or Owen McCants, had done this, was the person who had done this?

A I don't recall her telling me who had done it.

Q Okay. And that's a kind of significant detail, the perpetrator of the crime, correct?

A Yes.

Q And you'd remember that detail, wouldn't you?

A Yes.

Q Okay. And you don't remember that detail, do you?
A No.
Q And at no point -- to bring you back, now, to the very short ride between Fidelis Way and Monastery, at no point did Rasheena, Nicki [redacted], turn and say to you, in the front, that, My daughter just told me who did this, did she?
A I don't remember that, no.
Q You'd remember that, wouldn't you?
A I don't remember it now.
Q All right. But, I mean, if the mother had exclaimed that they knew who the perpetrator of the crime that you'd assembled a unit of 20 to 25 officers to deal with was, that would have lodged in your memory, wouldn't it?
A I believe so.
Q You would have incorporated it into your police report, wouldn't you?
A Yes.
Q The description -- going back to the description of the gentleman in the lobby earlier in the day, that description was that he had on a green T-shirt, correct?
A Yes.

Q All right. Do you have a copy, with you, of Sergeant Byrne's report that you reviewed to see if it had the gist of your report within it?

A I have a copy of it.

Q Could you show me that?

A (Witness complies.)

Q Now, this report was made up, was written, written after your conversation with Officer Skeen.

A Yes.

Q And did Officer Skeen relate to you that when [redacted] was asked to describe some details of the person who had taken her, that she had told you the person had on a green -- this is the person who took her from Polly's apartment, not the person in the lobby -- that the person who took her from her Aunt Polly's apartment and up to LaRose Place had on a green T-shirt and dark pants.

A I don't recall that.

Q I'd just ask you to take a look at Sergeant Byrne's report. And I just want you to read one line to yourself.

Now, that line in Sergeant Byrne's report where it says, Description/special characteristics including clothing, green T-shirt, dark pants, did

you tell Sergeant Byrne to put that in his report due to your conversation with Officer Skeen?

A No.

Q Okay. Did you relay that information to Officer Byrne?

A No.

Q But it is there in his report, correct?

A Yes.

Q And if you know, this report was written at what time, to the best that you know?

A Sergeant Byrne's report, or...?

Q Yes.

A That, I don't know.

Q Is there a column for date and time of the report?

A Yes. Unfortunately, the bottom of my report is cut off.

Q It's cut off on all the copies. But if I were to show you my copy, as to at least the date -- the date on that copy is July 14th?

A Yes.

Q Just two quick things. You were with Sergeant Merner this whole time. In the drive from Fidelis to Monastery with Sergeant Merner?

A Yes.

Q Were you with Sergeant Merner in the drive from Monastery over to LaRose?
A The first time, yes.
Q And when you drove from Monastery to LaRose, [redacted] was giving you directions on how to go, correct?
A Not to me directly, no.
Q But to Sergeant Merner?
A Yes.
Q Okay. And he was directing you?
A Yes.
Q Okay.

MR. SHEA: Nothing further.

REDIRECT EXAMINATION

Q (By Mr. Deakin) Officer, so that we're clear, did I ask you if you could give me a copy of your incident report?
A I don't recall.
Q Do you recall telling me that you hadn't seen it again since you gave it to Sergeant Byrne?
A Yes.

MR. DEAKIN: Nothing further.

THE COURT: All right.

MR. SHEA: I would ask to approach. I don't

have any further questions.

THE COURT: You may step down.

Look, we're going to break for lunch at this time. There's only a few more minutes before one. So, I'd ask that the jurors be back in the jury room by two o'clock. We'll start promptly at that time.

(Jurors exit at 12:50 p.m.)

SIDE-BAR CONFERENCE:

MR. SHEA: I want to bring an oral motion to dismiss. And just let me be clear for the record why I didn't have a written one ahead of time.

In the grand jury minutes it's unclear from Nicki [redacted] testimony exactly when the alleged statement of "It was Sonny," the query that's made and response was taken.

So I didn't know when that was until she testified and clarified exactly when it was.

It's at that point that it became clear to me the importance of Officer Murray's report, which is destroyed and taken from us. But this goes to the identification in the case, and whether it even took place, and his observations and notes and memory of

that ride.

I'm not saying it included only that ride, but it certainly would have included --

THE COURT: Well, he said he didn't hear it.

MR. SHEA: Well, he said he could hear the mother, and he didn't hear her say anything. But that would have been critical information to have in a report.

THE COURT: He's already testified that he didn't hear anything. So, the information is before the jury.

MR. SHEA: Am I denied?

THE COURT: Pardon me?

MR. SHEA: Am I denied?

THE COURT: Yes.

(End of side-bar conference.)

(Luncheon recess.)

(Jurors enter at 2:25 p.m.)

THE COURT OFFICER: This court is in session. Please be seated.

THE COURT: Want to call your next witness,

please.

MR. DEAKIN: Your Honor, the people of the Commonwealth of Massachusetts call Tahisha Skeen.

THE COURT OFFICER: Raise your right hand, ma'am.

THE CLERK: Do you solemnly swear the testimony you're about to give this jury concerning the matter between the Commonwealth and the defendant is the whole truth and nothing but the truth, so help you God?

THE WITNESS: I do.

TAHISHA SKEEN, SWORN

DIRECT EXAMINATION

Q (By Mr. Deakin) Would you introduce yourself, please, to the jurors, and spell your first and last name for the court reporter.

A Tahisha L. Skeen, T-A-H-I-S-H-A, Skeen, S-K-E-E-N.

Q And how were you employed on July 13th of 2000?

A I was a Boston police officer, working in District 11.

Q How long had you been a Boston police officer at that time?

A Three years.
Q Where is District 11?
A Dorchester.
Q And what shift were you working? Were you working on Thursday, July 13th?
A Yes.
Q What shift were you working?
A Last half.
Q And what does "last half" mean?
A 11:45 to 7:30 in the morning.
Q At some point -- at some time after midnight, did you receive -- strike that.
Were you part of the Emergency Deployment Team at C-11?
A Yes.
Q And at some point after midnight, did you receive a call to respond to an emergency deployment?
A Yes.
Q And where were you instructed to respond?
A We were instructed to go to 34 Fidelis Way in Brighton.
Q How long did it take you to get there?
A About 20 minutes.
Q Was there a large crowd present when you arrived

there?

A Yes.

Q Were there a number of police officers present when you arrived there?

A Yes.

Q What did you do when you got there?

A When I got there, we were told to go and get orders of what we were doing while we were there.

Q And do you recall where you went to get orders?

A We were on Fidelis Way. I don't remember exactly, but we were on Fidelis Way.

Q And did you actually start to get orders?

A Yes.

Q And who was giving them, if you remember?

A I believe it was Sergeant Byrne, or some sergeant over at 14.

Q All right. And how long after you got there did they bring people together and give orders?

A Well, actually, when I got there, they were already lining people up. We were, like, one of the few -- last people to get there, since our district is probably the furthest away.

Q How long -- well, strike that.

Did you go to get some orders?

A Yes.
Q And did you understand that there was a report of a missing girl?
A Yes.
Q How long after you started getting orders did something attract your attention and stop you from getting orders?
A Not even five minutes.
Q And what was it that attracted your attention?
A They said the little girl was found.
Q Did you actually see her come back?
A I saw her running across the street. We were standing, getting orders, and you heard her crying, and we all turned around and we saw the little girl running across the street.
Q And did you see what happened to her after that happened?
A Yes.
Q What happened to her?
A We were by Monastery Road and they wanted to get her away. There was the media there. And there was other witnesses -- well, not witnesses. People gathering to see what was going on. So they wanted to get her away from all of that. So they brought

her in a cruiser and brought her to the other side of Monastery Road.

Q And when they did that initially, did you go to that area?

A Initially, no.

Q What did you do when they were taking her to Monastery Road?

A We were just all standing around waiting for orders that we were released.

Q At some point, were you getting ready to leave?

A Yes.

Q And about how much time had passed between when she came back and when you were getting ready to leave?

A About five minutes.

Q And then what happened?

A Officer Jesse Stots had came over to me and asked me would I go with the victim to Children's Hospital, because I was the only female that was on the Emergency Deployment Team.

Q And what did you do then?

A I went with him back over to Sergeant Byrne, and he again said the same thing to me; would I go with the victim and speak with her. Just stay with her while we go to Children's Hospital, until Sexual Assault

had arrived.
Q And did you see the girl after that?
A Yes.
Q Where did you see her?
A Inside the ambulance. After I spoke with them, I went over to the ambulance, and I saw her inside the ambulance.
Q When you saw her inside the ambulance, what was happening with her?
A She was being examined by the EMTs at that point.
Q And did you ask her questions while she was being examined by the EMTs?
A Not while she was being examined, not at first, no.
Q What happened after that?
A After they finished examining her, I said to her that they wanted to go back to where the crime scene was, if she remembered where the crime scene was. And she said okay, she'll show us where she came running from.
Q And where did you go?
A LaRosa (sic) Place.
Q Is that a street that you were familiar with before that time?
A No.

Q How did she get there on that occasion?
A How did she get -- we were still in the ambulance when we drove over.
Q Were there other police officers that accompanied you?
A Officer Stots was inside the ambulance with me, and there was other police officers who drove their cruisers.
Q As you were driving over to LaRose Place, did you ask questions of the girl, [redacted]
A Yes. She was just explaining -- she didn't know the name of the street. She was just giving me descriptions of things that I should see that she recalled seeing on the street. And that was her recollection of the street.
Q Did she, in the course of telling you that, mention something about a white Corvette?
A Yes.
Q What did she tell you about a white Corvette?
A She stated that the street, what she remembered on the street was a white Corvette was parked on the street.
Q Was parked on LaRose Place?
A Yes.

Q As you went to LaRose Place, did you note whether there was a white Corvette parked there?
A Yes. When we turned onto LaRose Place, there was a white two-door sports car parked on the left-hand side of the street.
Q Just so that the record is clear, did she ever suggest to you that the white Corvette that she said she had seen had any connection with the crime itself?
A No. She just stated that when she was running up the street, that she saw the white Corvette, and she remembered that being -- the white car being there. That's what she remembered when she was running up the street.
Q That was a landmark for her?
A Yes.
Q On the way over in the ambulance, did she discuss with you what had actually happened to her? Just yes or no.
A No.
Q When you got to LaRose Place, what happened?
A When we got to LaRose Place besides her mentioning the white car, she stated that there was, like, a park area. So we got in the ambulance. She was

holding my hand and she was, like, pulling me down the street, showing me, like, her recollection; this is where I was coming from; this is where I ran from.
Q And when she talked about a park area, what kind of an area was it?
A It was in the back of 24 LaRose Place. It was a large yard. And there was, like, -- to me, it was like a grill.
Q Officer Skeen, I'm going to show you a photograph that's been labeled Exhibit 4 in this trial, and ask you if you can see that. I'm not sure it's completely well-focused. Can you see that photograph?
A Yes.
Q Do you recognize what's in that photograph?
A Yes. That's where she brought us to.
Q And where is the brick grill thing?
A Right there on the left-hand side.
Q As you were on the scene -- just yes or no -- did she start to tell you about things that had happened to her?
A As far as the assault and everything?
Q Yes.
A No.

Q Did she point anything else out to you besides the yard area, the grill?
A Yes. When she showed me the brick, she showed me exactly how she was sitting behind there. She stooped down and said this is where she was sitting at. And then she started to remember that in the back there was a fenced area with a hole in it. And she remembers coming through there.
And she was, like, there was a path where they walked, and she said it was either like grass or something that was rubbing up against her, that she remembers walking through before they got to the brick area.
Q Did she point anything else out to you while you were in that area of LaRose Place?
A Yes. The duct tape that she had on her.
Q And where did she point that out?
A We were going back to the ambulance, and she stated that she had took the duct tape off of her eyes and face, and that she had balled it up and threw it in the middle of the street. And we found it when we were going -- like, the ambulance was kind of on top of it, but you could see it as she pointed it out, that she saw it.

Q When you say "on top of it," do you mean it's wheel was on top of it, or...?

A No. Like, the back of the ambulance, you can see the back of the car. And, like, underneath, it was right there, sticking out, kind of on top of it, but not too.

Q And was that recovered? The duct tape, was that recovered?

A Yes.

Q Do you recall who recovered it?

A Sergeant Byrne.

Q What happened -- how long did you spend there in that area of LaRose Place?

A Twenty minutes to a half hour.

Q And what happened after that?

A Then we went back to Fidelis Way before we went to the hospital.

Q And how long did you spend at Fidelis Way before going back to the hospital?

A Ten minutes, maybe.

Q As you were going to Fidelis Way, did you begin questioning [redacted] about what had happened to her?

A No. I think when we started to go to the hospital was when we started talking about what happened to

her.
Q And when you were asking her questions, was she able to answer them, at some point, in a narrative form; that is, starting at the beginning and moving through to the end?
A Yeah. When we went to the hospital she started telling me from the beginning. I asked her to tell me what happened from the beginning. That's when she began the story from the beginning.
Q And did you subsequently share that information with officers from Area D-14?
A Yes.
Q During the time that you questioned her, did she tell you the name or identity of the man who had taken her?
A No.
Q Did you ask her for the name or identity of the man who took her?
A No.
MR. SHEA: Objection.
THE COURT: Overruled.
Q Why didn't you ask her that?
A Because Sergeant Byrne just wanted me to get information of what had happened. And the detectives

would go over with her further details of who it was, if she could identify the person or not.
Q Did you know which specific detectives, or from what unit detectives would be sent from?
A Sexual Assaults were coming down.
Q Did you ask [redacted] at any -- well, did [redacted], at any point, give you a description of the individual who had taken her?
A Not what he was wearing or anything, no.
Q Did she describe anything about him?
A She described when she first saw him, what he had on his face and on his head.
Q What was that?
A She said he had a stocking cap on over his face, and he had a green, knit, winter-type cap on his head.
Q Did you ask her for any further description?
A No.
Q Why not?
A Because, like I said, that's the detectives' job. They would get into that further with her.
Q And just so things are clear, are you a detective yourself?
A No.
Q Have you ever served as a detective?

A No.
Q Have you ever been trained as a detective?
A No.
MR. DEAKIN: Nothing further.
THE COURT: Mr. Shea.

CROSS-EXAMINATION

Q (By Mr. Shea) Good afternoon.
A Good afternoon.
Q She told you the person had on a stocking cap and a green, knit, winter hat.
A Yes.
Q She didn't tell you any name?
A No.
Q She didn't give you anymore descriptive detail?
A No.
Q Her mother was there, right?
A When it happened?
Q No, no. In the car, with you, on the way to the hospital.
A In the ambulance, yes.
Q And did the mother, when she heard her daughter giving these two points of description you've heard, fill in any other description?

A No. Not that I recall.
Q Did her mother tell you, I know who it is, you don't have to get any description?
A No. She never said that to me.
Q Now, you met with Sergeant Byrne before you went to the ambulance, correct?
A Before I went to -- yes. Before I got in the ambulance, yes.
Q And he was the person who gave you instructions.
A Yes.
Q And didn't he, in fact, instruct you to try to get as much information as she could -- meaning you -- try to get as much information as you could?
A About what happened, yes.
Q Wouldn't getting as much information as you can include getting a description of the perpetrator?
A No. Actually, what he said to me, see if I can get any more information from her, seeing that I'm a female, that she would feel more comfortable speaking to me, being a female. See if I can get anything else out of her about what had happened with the incident.
Q Right. But information -- this was an alleged abduction/kidnapping/rape, correct?

A Correct.
Q A piece of information that would be something the police department was interested in might be the name of the perpetrator?
A I didn't know she knew the perpetrator.
Q Okay. And, so, for as far as you knew, it was never made clear that any name of the perpetrator had ever been mentioned.
A To me, no.
Q That is a significant detail, isn't it?
A Probably.
Q Probably?
A I mean, she knows who he is, yes.
Q That would be of interest to you, wouldn't it?
A Yes, to me.
Q Well, that would be, in terms of the parlance of information the detectives would be happy if you found out, that would be something you would be happy to provide them with, if you could.
A If she were to pass it along to me, yes.
Q Okay. And she didn't pass it along to you?
A No, she didn't.
MR. DEAKIN: Objection. Asked and answered.
THE COURT: Overruled.

Q Now, after you left the hospital you met with Sergeant Byrne?
A Went back to District 14, yes.
Q And you spoke with him.
A Yes.
Q Okay. And you told him that [redacted] had told you that the perpetrator had on a short-sleeved T-shirt, correct?
A No, I never stated that.
Q Now, you're friendly with [redacted] mother?
A Yes.
Q And how long have you known her?
A We grew up together.
Q And do you see her socially?
A This is probably the first time I seen Nicki since November.
THE COURT: Wait a minute. Which is the first time? Now, or...?
THE WITNESS: Yes. Today was the first time since November.
THE COURT: All right.
Q Since November 2001?
A Yes.
Q And when she did give you the limited description of

the cap -- well, of the two caps, basically, the stocking cap and the green, knit cap, that was in response to a question about description?

A No.

Q And, so, that was part of the narrative?

A I asked her to describe to me what had happened, from the beginning, and she started going into a narrative.

Q And that was the only descriptive detail she gave of the perpetrator to you?

A Beside that he had a knife, yes.

Q Okay. Just one other point. She told you she could see the suspect's face?

A She stated that the duct tape was starting to come up and she could see a little. She didn't say she saw his face. And she stated that he asked her could she see, and she said no. But he covered her eyes with more duct tape anyways.

Q So, you're saying she didn't say she could see his face?

A She stated that she -- the duct tape was coming up, and she was starting to see, but she couldn't see a full description of him.

Q Okay. Do you recall writing in your police report

during this time, "The victim stated that the tape on her eyes was beginning to lift up, allowing her to see the suspect's face"?

A Yes.

Q So, you wrote in your police report, yes, there was duct tape coming up, "allowing her to see the suspect's face"?

A She told me she couldn't see his face all the way.

Q You didn't put that in your police report.

A No. Apparently not, no.

Q And your police report, when did you write your police report?

A That's not a police report, it's a Form 26.

Q Okay. The Form 286?

A Twenty-six.

Q Twenty-six. Okay. When did you write the Form 26?

A Later that night, on the 14th.

Q Okay. And I take it, in a Form 26, they want you to be accurate?

A Yes.

Q And you want to be accurate because it's a memorializing your memory, your thoughts, and the information on something that will be kept until a day like today, correct?

A Yes.
Q And it's also important because you're going to pass it on to your supervisors.
A Yes.
Q And you're going to pass it on to people who are taking over the investigation.
A Correct.
Q Okay. And your memory was better on that day than it is today --
A Correct.
Q -- as to these events, correct?
A Correct.
Q Yes?
A Yeah.
Q And in your report, you wrote that she could see the suspect's face.
A Okay. I left out the part that she told me that she didn't -- she could see it, but she couldn't see a full face of the suspect.
Q That is a significant detail, isn't it?
A Yes.

MR. SHEA: Nothing further.

THE COURT: Anything further?

MR. DEAKIN: Nothing further.

THE COURT: All right. You may step down. Next witness.

MR. DEAKIN: Your Honor, the people of the Commonwealth of Massachusetts call Harry Byrne.

THE COURT: Ladies and gentlemen, sometimes when a witness is testifying, I might ask a question. I want you to understand that any question I ask isn't any more important than any other question that's asked. Sometimes, if I'm confused, I think that someone else might be confused, so I just ask the question to clear it up.

And, of course, any question I ask, do not take that to mean that I have any opinion about anything in this case. It's your job to decide this case, not mine.

THE COURT OFFICER: Face the clerk and raise your right hand.

THE CLERK: Do you solemnly swear the testimony you're about to give this jury concerning the matter between the Commonwealth and the defendant is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE CLERK: Please have a seat, sir.

HARRY BYRNE, JR., SWORN

MR. DEAKIN: Your Honor, with the Court's permission, Sergeant Byrne, it's warm in the courtroom. I believe, if you wish to remove your coat, with the Court's permission.

THE COURT: Yes.

DIRECT EXAMINATION

Q (By Mr. Deakin) Sergeant, can you state your name and spell your first and last name for the court reporter?
A My name is Harry, H-A-R-R-Y, A, Byrne, B-Y-R-N-E, Jr.
Q And how were you employed on Thursday, July 13th of 2000?
A A sergeant on the Boston Police Department.
Q What was your assignment -- were you working on that day?
A Yes, I was.
Q Where were you assigned?
A District 14, in the Allston/Brighton section of Boston.
Q And what shift were you working that day?
A 11:45 to 7:30.

Q What was your -- what were your responsibilities on that shift?
A I was the patrol supervisor.
Q What does it mean to be the patrol supervisor?
A I am in charge of all the uniformed men and women in the Allston/Brighton area. If they need me, they call me.
Q And as a result of being the patrol supervisor, do you have to report at a different time from the rest of the shift?
A Yes.
Q When do you report on that shift? Or, when did you report on that shift?
A About 10:30 p.m.
Q Do you recall what the weather was like that night?
A Hot and humid.
Q Did your station receive a radio dispatch shortly after midnight from the 9-1-1 operator?
A Yes.
Q And what was the call for?
A A missing child.
Q Did it say where the missing child was?
A 34 Fidelis Way.
Q Do you recall whether you heard the call when it

initially came in?
A I don't recall.
Q Did you respond immediately when the call came in?
A When I was called, I responded immediately.
Q I mean, first thing when the call came in, did you respond right away? Were you one of the first people to respond --
A No.
Q -- right when the call came in?
A No.
Q Who were the first people to respond?
A It was the Kilo 101, which is just a symbol of one of the units. Essentially a two-man unit, from the Allston/Brighton station.
Q And the Kilo, for those of us less familiar with the police terminology, the Kilo stands for what, when you say "Kilo"?
A District 14. That's just an Alpha designation for our area.
Q Do you mean K? When you say "Kilo," you mean K.
And who was in the car at that time who responded?
A Officer Joe Murray and Officer Paul Downey.
Q And is that the same Joe Murray who testified earlier

today in this trial?
A Yes.
Q After they responded and before -- after they went there and before you went there, did you talk to any of the officers who were on scene at the time?
A Yes.
Q And how were you able to do that?
A I talked to them in person and via radio.
Q And when they had gone there first, and you hadn't gone there yet, how were you able to speak with them? By radio?
A Yes.
Q And what did they tell you?
A They told me that there was an 11-year-old girl that was allegedly abducted from her apartment.
Q And at that time, had they provided either you or anyone else on the police radio with a description of anybody connected with this possible abduction?
A Yes, they did.
Q And do you recall the description that they put out at that time?
A Yes.
Q What was that?
A It was a dark male, green shirt, dark pants, stocking

mask covering his face.

Q All right. Now, have you -- were you subsequently able to determine whom specifically that was a description of? I don't mean what person, I mean where did they get that information.

A They got that information from witnesses that had seen that suspect lurking in the bushes in and around 34 Fidelis Way earlier in the evening.

Q Earlier in the evening?

A Yes.

Q So that that description, was it clear at that time whether that was the same individual who allegedly took [redacted]?

A Yes.

Q It was clear at that --

A No. Not at that time, no.

Q Okay. No, no, no. I'm saying, at that time, when the description was put out, were they describing someone that had been seen actually taking [redacted] or someone who had been seen earlier in the area?

A Just someone who -- they were just giving us a description of someone that had been seen earlier in the evening, in the area.

Q What time did you actually go to 34 Fidelis Way?
A I responded probably around 11:30.
Q And when you say "probably," are you estimating times?
A Estimating.
Q Were you actually looking at your watch during this process to be precise about time?
A No.
Q What did you find when you got to 34 Fidelis Way?
A I responded to 34 Fidelis Way. There was a large crowd outside of 34 Fidelis.
Q And how many people would you say were in the crowd at that time when you got there?
A Probably 50, give or take.
Q And did that crowd grow or shrink in size over the course of the next minutes or hours?
A Well, it just appeared to be a large crowd that stayed constant.
Q What was the atmosphere in the crowd when you first got there?
A It was tense. The people were upset.
Q Did you speak to anybody when you got to 34 Fidelis Way?
A I spoke to a Marvin Ampey. I spoke to another woman

who I don't recall her name. I spoke to a number of, like, 11-, 12-, 13-year-old girls.

Q Did you speak -- when you got there, did you speak, yourself, to Polly Taylor or not?

A Yes, I did.

Q And where did that conversation take place?

A That was up in the apartment at 34 Fidelis.

Q Did you have an occasion -- did you have a chance to observe her apartment?

A Yes, I did.

Q Did you see -- did you have a chance to observe the door and the lock on the door?

A I didn't actually examine it, but I saw the doorknob with the lock.

Q Did you see any signs, as you looked at it, of forced entry at all?

A No.

Q Just yes or no, did Polly Taylor give you information about what had happened earlier that evening?

A Yes.

Q When you spoke to Marvin Ampey, where did that conversation take place?

A Out in front of 34 Fidelis.

Q And how long after you got there would you estimate

that you spoke with Marvin Ampey?
A Within -- less than ten minutes.
Q And what did you talk to him about?
A I had --
MR. SHEA: Objection.
THE COURT: Sustained.
Q As you were talking to him, what was his demeanor like?
A He appeared to be upset.
MR. SHEA: Objection.
THE COURT: Sustained.
Q Did he -- if you know, did he remain in the area after you spoke to him?
A Yes.
Q After you spoke to some people, what did you do?
A At that time, I determined that there was, in fact, a young, 11-year-old girl that had been abducted from her apartment. And time was of the essence. I notified Operations via radio, and via my cellphone. Notified Boston Police Operations that we, in fact, had a possible kidnapping of an 11-year-old girl, and to activate all district EDT units, Emergency Deployment Teams, to 34 Fidelis, to meet me at 34 Fidelis Way.

Q Let me ask you, Sergeant Byrne, prior to that notification, had you requested, or had anyone else requested additional officers from Area D-14 to come to the scene?
A Yes, they did. I had the units from D-14 and I had units from D-4 respond.
Q And did D-14 and D-4 -- are they under sort of a coordinated command?
A Yes.
Q Are they two stations in the same area?
A Two stations in the same area.
Q And before calling out the EDTs, approximately how many officers from D-14 and D-4 had come to the scene?
A I want to say between 12 and 20.
Q And what were those officers doing as they arrived?
A I had them search the area of St. Gabriel's, the church area, down towards St. Elizabeth's, and you can cut through there and there's roadways through there.
I had the entrance, the two roadways into 34 Fidelis housing area blocked by police; nobody in, nobody out.
Q Was that after the Emergency Deployment Teams came,

or before?
A Before.
Q Okay. What did you -- did you search 34 Fidelis Way at all?
A The original officers -- we had searched the hallway going up to the roof, and the basement of 34 Fidelis, and the perimeter of that building..
Q What time was it, if you recall, that you put out the request for the Emergency Deployment Team?
A I would say probably a half an hour to 45 minutes after I had arrived on the scene.
Q And how long did it take for Emergency Deployment Team officers to come?
A They got there pretty quick. I'd say, because they were coming from all parts of the city, maybe a half an hour for all of them to get there.
Q And what time was it, would you say, when all the Emergency Deployment Team officers were there?
A Between 1:30 and 1:45.
Q As you -- 1:30 and 1:45?
A Somewhere in that -- about 12:30 to one something. It wasn't that long a period of time.
Q I'm confused by the time frames. When was it that you think they got there?

A Well, I got there around 11:30, and I probably called them around twelve, somewhere in that area. They were probably there by 12:30.

Q And were you making notes of the times, at that time?

A No.

Q What happened once all the Emergency Deployment Team officers were there?

A I had all the cars line up, and I had them stand roll call.

Q And where did that take place?

A Outside of 34 Fidelis Way, in the parking lot.

Q In the parking lot?

A Yes.

Q Is that the parking lot right across the street from Fidelis Way? If it would help you to show on the diagram, please, with the Court's permission.

THE COURT: Yes.

A (Witness complies.)

Q I think Fidelis Way is --

A This is 34 right here.

Q Actually, if I may, I can draw your attention, here. This is Fidelis Way here, labeled.

A The parking lot was actually right in this little area here.

Q And what was your purpose in having them stand for roll call?
A So I could give out the assignments.
Q And was anybody assisting you in briefing the Emergency Deployment Team people?
A Sergeant Robert Merner.
Q Okay. Did Joe Murray assist you, as well?
A He was there, yes.
Q And how long -- as you were giving out assignments -- what kind of assignments were you giving out?
A Well, I had a lighting truck respond. I had canine units respond. As I was giving out -- I was just about to give out the directions to go to each individual building. I was going to send teams to each individual building and start -- have a guy on the bottom and have the rest of them go up to the top and work their way down, and go door-to-door, knocking door-to-door. And just at that moment, that's when the little girl came running out of St. Gabriel's.
Q And did you note approximately what time it was when she came running out?
A I think it was around 1:45, 1:50..
Q Is there something that could refresh your

recollection on that point?

A I'd have to look at my report.

MR. DEAKIN: With the Court's permission, may I approach the witness?

THE COURT: Yes.

Q Sergeant, if I may ask you to read this paragraph. You have a copy there. Just to yourself.

A Okay.

Q When you've finished reading, let me know.

And does that help refresh your memory as to approximately when [redacted] returned to the area?

A Yes.

Q And when was that?

A 1:20 a.m.

Q Now, just briefly, working backward from 1:20, I think you had said that it was as all the EDT officers had arrived -- by the way, how many EDT officers would you say were there?

A There was three from every area. So you have Area A, B, C, D --

MR. SHEA: Objection. Motion to strike.

THE COURT: Overruled.

A You have three patrolman and one sergeant per EDT

unit. And there's five areas. So 15 plus five more bosses. So 20 more. I would actually think there might have been more.

Q Okay. So you suggested that it was as they were all gathering that she came back, it was around 1:20. I believe you testified it had been about a half an hour for all of them to arrive.

A Right.

Q Does that help you pin down when you put out the call for the EDTs to come?

A Right. So it would be around 12:15.

Q Okay. And, again, these are approximate times?

MR. SHEA: Objection.

THE COURT: Overruled.

Q These are approximate times?

A I'm -- yeah. I'm estimating.

Q Did you see the girl as she came back?

A Yes, I did.

Q Okay. Where did you -- where was she when you first saw her?

A She was running with her arms up in the air.

Q And where was she when you first saw her?

A She had come from --

Q You can --

A There's a fence here. She came out of the fenced-in area and down this parking-lot here.
Q What was her physical condition when you saw her? How far away from her were you?
A As far as I am from you.
Q What would estimate this distance to be?
A Twenty or 25 feet.
Q And were you able to observe her physical condition?
A Yes.
Q What was it?
A She was very upset, crying.
Q Did you get closer to her as she came back?
A Yes.
Q A little bit closer. And as you got closer, what, if anything, did you observe about her condition?
A She was -- she had no shoes on. She was clad only in a -- it appeared to be a large white T-shirt.
Q And how was she acting?
A She was very upset. She was crying.
Q What did she do when she got back in the area of 34 Fidelis Way?
A She saw her mother, and she ran into her mother's arms.
Q What, if anything, did you do at that point?

A I escorted her mother and the little girl and her mother's boyfriend into a waiting police car operated by Officer Murray. In the passenger seat was Sergeant Merner. And they took the family over to St. Gabriel's, where I had the H&H staged, which was a lot more private, away from the press and --
Q That's the ambulance?
A Yes.
Q And had you called the ambulance when she returned?
A Yes.
Q Did you also go to the area by the monastery, St. Gabriel's monastery?
A Yes, I did.
Q And what happened -- did you get there first, or did the cruiser -- Officer Murray's cruiser get there first?
A Officer Murray and Sergeant Merner were there.
Q What happened when they got there?
A The little girl was given a checkup.
Q And who did that?
A The Emergency Medical Technicians.
Q And where was that done?
A Inside the back of the ambulance.
Q How long would you say that took?

A Ten to 15 minutes.
Q Were you in the ambulance when she was being checked out?
A No.
Q What happened next?
A She was -- she had no serious injuries, so they took her over to -- she took us over to LaRose Place.
Q Did you go with her that trip?
A No. I think just Sergeant Merner and Officer Murray did.
Q Okay. And what did you do during that time?
A At that time, I went back to 34 Fidelis.
Q Were you in touch with Officer Murray's car while they were on the way to take her where she had been?
A Yes.
Q And how long were they gone?
A I don't know the exact time. It wasn't that long, though.
Q And where did they go after that?
A After they went to LaRose Place?
Q Yes.
A They came back to St. Gabriel's Monastery.
Q Why did they come back to St. Gabriel's Monastery?
A I don't remember why they came back.

Q When they came back, where did [redacted] go?
A Back in the ambulance.
Q Okay. And at the time she went back in the ambulance, did you direct anyone to join her in the ambulance?
A I had a female officer, Officer Tahisha Skeen, go in and try to get some information.
Q Why did you pick Officer Skeen?
A She was the only female working at the scene that I remember.
Q Okay. Did you -- did Officer Skeen, in fact, go into the ambulance?
A Yes.
Q Do you remember whether you also went in the ambulance for any period of time?
A I could have put my head in, just to see where they were going.
Q Did you speak to Officer Skeen at some point after she went into the ambulance, right there at the monastery?
A Did I speak to Officer Skeen?
Q Yes. At that location.
A Yes.
Q Okay. Did Officer Skeen give you information at that

time about what [redacted] was telling her?
A Yes.
Q Okay. What -- how long was [redacted] in the ambulance that second time?
A It wasn't long before they left for the hospital.
Q Before going to the hospital, did they go anywhere else?
A We went back to LaRose Place.
Q And when you say "we," who went back to LaRose Place?
A I went back. There was other police officers with me. The ambulance went back. [redacted]
Q How did [redacted] get back to LaRose Place?
A In the ambulance.
Q In the ambulance. And was Officer Skeen still with her?
A Yes.
Q What did you do when you got to LaRose Place?
A She got out -- [redacted] got out of the ambulance and showed me where she had been duct taped. And it was rolled up on the street.
Q And what did you do?
A I collected the duct tape. I used a pen to maneuver it into a cardboard box and put it in the trunk of my cruiser.

Q At some point, later, did you turn it over to someone else?
A It went over to evidence -- it was logged in in the Evidence Management System.
Q Did you note the time when you collected the tape?
A I probably did. It was probably around 1:50.
Q Let me ask you, you say "probably." Is there something you could consult to refresh your memory on that?
A Yes. Probably my report.
Q Would it help to consult -- would it help refresh your memory to consult your grand jury testimony?
MR. SHEA: I'd just ask the he not read the report until he's directed to.
THE COURT: Yes.
MR. DEAKIN: May I approach the witness, your Honor?
THE COURT: Yes.
Q Would it assist you to review your grand jury testimony?
A Yes.
Q I'm going to ask you to look at page 12, carrying over to page 13. Read that to yourself. When you're done, let me know.

Does that refresh your recollection?
A Yes.
Q When, in fact, did you pick up the duct tape?
A At 1:50 a.m.
Q So you were correct when you thought it was 1:50.
What did you do after picking up the duct tape?
A I secured it in the trunk of my police car.
Q And where did you go from there? First of all, where did [redacted] go from there?
A She was taken to the Children's Hospital.
Q And where did you go?
A I went back to 34 Fidelis Way.
Q At the time that you left LaRose Place and [redacted] and headed for 34 Fidelis Way, had you identified a suspect at that time?
A No.
Q When you got to 34 Fidelis Way, what did you find?
A That the large crowd was still there.
Q And what was the atmosphere in the crowd?
A Tense.
Q What, if anything, did you do in response to the tense crowd situation?
A I had the other officers try to get everybody just to

move along.

Q At some point during that process, was your attention directed to an Owen McCants, also known as Sonny?

MR. SHEA: Objection.

THE COURT: Sustained.

MR. SHEA: Motion to strike.

THE COURT: Stricken.

Q What -- how long did you spend doing -- trying to disburse the crowd there at 34 Fidelis Way before something else happened?

A While we all were disbursing the crowd, two of my officers --

Q Can I just ask you, Sergeant Byrne, just how long did you spend trying to disburse the crowd there before something else happened?

A A short time.

Q Did you receive information from your officers regarding the situation at 34 Fidelis Way?

A Yes.

Q Who are the officers you received information from?

A Officer William Kelly and Officer Arthur Whitkens.

Q And after receiving that information, did you speak to anyone -- not police officers; civilians -- in the crowd?

A Yes.
Q And just who was it that you spoke to?
A I spoke to Owen McCants' niece.
Q Did you know, when you spoke to her, that she was Owen McCants' niece, initially when she approached you?
A She told me she was.
Q Okay. Can you describe her? Generally, what she looked like?
A Just a black -- young, black female.
Q Okay. About how old would you estimate that she was at that time?
A Sixteen to 18.
Q Did she tell you her name?
A She might have, but I just don't remember it.
Q After -- how long was your conversation with her?
A I talked to her for a while.
Q And after speaking with her, what is the next thing that you did?
A She invited us into her apartment at 34 Fidelis Way.
Q Her apartment?
A She said it was her apartment.
Q And where did -- how did you get into 34 Fidelis Way?
A She opened the door.

Q I'm asking how did you get into the building?

A The front door.

Q And how were you able to gain entrance? Was that open? Was that kept open?

A It was kept open.

Q And when you went in with this young woman, were there other officers with you?

A Yes.

Q Do you recall which other officers were with you?

A Officer Kelly, Officer Whitkens, Sergeant Merner, Officer Dan MacDonald, Officer Joe Murray, Officer Paul Downey, Officer Chris Curtin, Officer Mike McManus.

Q And where did you go?

A We went to Apartment 544 -- 545 and 546.

Q And I'm going to show you a diagram here. How did you get up to that -- by the way, is that actually the fourth floor, although the numbers are five?

A Yes.

Q How did you get up to the fourth floor?

A We were going to take the elevator, but it didn't work. So we walked up the stairs.

Q And as you get off the stairs, you went to an apartment?

A Yes.

Q Which apartment did you go to, please? Point to it on the diagram.

A Right here.

Q That's the apartment labeled 545?

MR. SHEA: Can we approach side bar?

SIDE-BAR CONFERENCE:

MR. SHEA: Two things. One, I anticipate that he may be trying to get into my client's statements, at this point. So I'd ask for a voir dire of any statements outside of the range of the jury, so I can sort this out.

MR. DEAKIN: We had a motion hearing, and on a motion to suppress he testified at the motion to suppress. He testified that the defendant was *Mirandized*, that he asked him basically one question, which was, How long have you been here? He said -- the defendant said, "Fifteen minutes. No twenty, no thirty minutes." He then said, "I'm not going to ask you anymore questions."

I don't think there's any basis for a voir dire.

THE COURT: I'm not going to what?

MR. DEAKIN: He said, "I'm not going to ask you anymore questions." He felt that he was being evasive, and didn't want to ask anymore questions. I don't see any basis for a voir dire.

MR. SHEA: Well, under the law there's a basis. Which means any time, if I ask for one, I get one.

THE COURT: Voluntariness, right?

MR. SHEA: Yeah. But, I mean, we at least see if it was voluntary --

THE COURT: Pardon me?

MR. SHEA: We at least hear from the officer if it was voluntary, out of the range of the jury.

MR. DEAKIN: I think the issue of voluntariness as being raised by the defense. There's no basis for any suggestion that his statement was anything but voluntary. Until it's fairly raised, I don't think there's a reason for a voir dire.

MR. SHEA: The case law is very clear that it doesn't have to be by a motion to suppress statements. It can be at trial, right now, asking to have it checked on. And I'm asking to have it checked on before this goes before the jury.

MR. DEAKIN: I think there has to be some suggestion by defense that the statement was not voluntary.

THE COURT: Overruled.

MR. SHEA: The other thing I'd like to get into is it's kind of left hanging there as to why the niece, I guess, of my client brought the police up to the apartment. I'm just curious what testimony you expect to elicit.

THE COURT: Well, he's not going to testify to what somebody else told him.

MR. SHEA: Okay.

MR. DEAKIN: I don't know what else I can do.

(End of side-bar conference.)

Q Who directed you, Sergeant, to Apartment 545?

A The female. Owen McCants' niece. I don't remember her name.

Q When you got there, do you recall if the door to the apartment was open or closed?

A It was open. It was ajar.

Q And did you enter the apartment?

A Yes, we did.

Q Did the young woman enter the apartment, as well?
A Yes.
Q Did she enter before you, or after you?
A She was ahead of us.
Q When you came into the apartment, what did you see?
A I noticed an elderly woman sitting at a small counter or table in the kitchen area. She appeared to be in her eighties, maybe late eighties. And another woman sitting more towards the dining room, which appeared to be in her seventies.
Q Did you subsequently learn the identify of these women?
A Yes.
Q Who were they?
A The elderly -- the older of the two, on the right, was Christine Isaacs, and the other woman was Polly Taylor.
Q And had you ever met either of them before? Did you know them?
A No.
Q What did -- what, if anything, did you do when you got into the apartment and saw the two women there?
A They were just talking to the girl. She had asked her some questions.

Q After you had that -- how long was that conversation with the girl?
A It started outside and worked its way up to the apartment.
Q How long was the conversation, all told, starting outside?
A Probably five minutes.
Q And at the end of that conversation, what's the next thing that happened?
A I observed a black male come out from the back bedroom area.
Q Down what appears to be a bit of a hallway there?
A Yes.
Q A small hallway. When the black male came out, what was he doing?
A He appeared to be getting dressed, drying off. In the process of getting dressed.
Q When you say "drying off," you mean with a towel?
A Yes.
Q Okay. Was he -- when you say "getting dressed," what was he getting dressed with?
A He was -- he had his shirt unbuttoned.
Q Was he actually -- was he buttoning the shirt?
A Yes.

Q Did you actually see a towel, or was he buttoning -- were you assuming he was drying off with a towel?
A That's what I thought he was doing was drying off.
Q What made you think he was drying off?
A Just what he was doing with the shirt.
Q Did he appear damp at all?
A Yes.
Q Could you tell whether that was --
MR. SHEA: Objection. Motion to strike.
THE COURT: Overruled.
Q Could you tell whether that was from bathing or from sweating, or what was damp? I'll rephrase the question.
Could you determine what was the source of the dampness?
A No.
Q When you saw the African American male come out from back there, what did you do? What's the next thing that happened?
A I just asked him if I could talk to him.
Q Did you know who he was?
A No.
Q Okay. Had he been identified to you by anybody?
A No.

Q Did you -- what made you think you wanted to talk to him?
A The young girl said that her uncle --
MR. SHEA: Objection.
THE COURT: Sustained.
Q Did somebody direct your attention to him as being the person you were looking for?
A The young girl.
MR. SHEA: Objection.
THE COURT: Sustained.
MR. SHEA: Motion to strike.
THE COURT: Stricken.
Q Did somebody direct your attention to him?
A Yes.
Q Who was that?
A The niece.
MR. SHEA: Objection.
THE COURT: Sustained.
Q Did you subsequently determine the identity of the African American male you saw coming from the back? Did you subsequently learn who he was?
A Yes.
Q And who did you learn that he was?
A Owen McCants.

Q Do you see that individual that you saw coming out from the back on that day here in court today?
A Yes.
Q Could you point him out, please, and describe an article of his clothing?
A Right there.
Q Describe an article of his clothing, if you would, so we know --
A White shirt, black tie.
MR. DEAKIN: May the record reflect the witness has identified the defendant, Owen McCants?
THE COURT: Yes.
Q Is his appearance today -- does he appear virtually identical to the way you saw him that day?
A No.
Q What's changed?
A His hair.
Q How was his hair on the day that you met him?
A It was shorter.
Q Okay. How short would you describe it?
A Just shorter than it is now. A lot shorter than that.
Q Okay. And what about his facial hair?
A I don't think he had any. I'm not really -- I really

don't remember.
Q Did he have his --
A He didn't have as much facial hair as that.
Q Okay. When you saw him, what, if anything, did you do or say?
A I asked him if I could talk to him.
Q Okay. And how did he respond to that?
A He agreed.
Q Did you say anything further to him at that time?
A Yes.
Q And what did you say to him?
A I asked him if I could talk to him, and he agreed. And then I said, Well, before I talk to you, I would like to read you your rights. I told him --
Q Did you, in fact, read him his rights?
A Yes.
Q And what did you read him his rights from?
A A *Miranda* card.
Q And did you read them verbatim from the card?
A Yes.
Q All right. Do you have a *Miranda* card with you?
A Yes.
Q Is it identical to the card that you read to him from?

A Yes.

Q Could you please, with the Court's permission, read from the *Miranda* card for the jury what you read to Mr. McCants?

A Before we ask you any questions, you must understand your rights. You have the right to remain silent. If you give up this right, anything you say can be used against you in a court of law and other proceedings. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him or her with you during questioning. If you cannot afford a lawyer, and you want one -- you want a lawyer, one will be provided for you by the Commonwealth.

If you decide -- it's getting kind of damp. I can't make it out. Plus, my glasses, I can't read it.

Q Do you recall what the substance of the last right was that you read to him? Would it help you to change glasses?

A Yes. If you decide to answer any questions, without a lawyer present, you will still have the right to stop answering at any time until you have a lawyer present.

And then there's just a thing for him to sign.

Q And at that time, did you ask him to sign anything?

A No.

Q Did you advise Mr. McCants whether he was, at that time, under arrest?

A I told him he wasn't under arrest.

Q After you read him the rights, what did you do?

A He -- I asked him a question.

Q And what question do you recall him asking? What question did you ask him?

A I asked him how long he had been in the apartment.

Q And how did he respond to that?

MR. SHEA: Objection.

THE COURT: Overruled.

Q How did he respond to that?

A He responded -- he gave me a time, and then he changed the time.

Q What was the time he initially gave you?

A I want to say 20 minutes.

Q And what did he change it to?

A To half an hour.

Q What did he say after that?

A No. More like 45 minutes.

Q What did you say or do at that time?
A At that time I told him, I said, I'm not going to ask you anymore questions.
Q What -- let me ask you, where did that questioning take place, when you asked him those questions?
A That took place in the dining room area.
Q What happened next?
A He just -- he wanted to talk to -- he said he would talk to us.
Q And what kind of gesture did he make?
A He waved us -- he wanted us to go into the back bedroom, No. 2.
Q And who went first in the back bedroom?
A Owen McCants.
Q That's Bedroom No. 2 that's labeled in that diagram there?
A Yes.
Q Okay. And did you follow him into that room?
A Yes.
Q Where did he go when he came into the room?
A His --
MR. DEAKIN: With the Court's permission, may be?
THE COURT: Yes.

A The bed was like this. He came out here like this. And there's a bureau and a desk.
Q Where did he go?
A I asked him if he'd sit on the end of the bed.
Q Actually, keep your voice up nice and loud so we can hear you.
A I asked him if he would sit at the end of the bed.
Q Where did you go in the room?
A I was just at the end of the bed, standing up.
Q Did any other officers come into the room at that time?
A Yes.
Q All right. Who came into the room that you recall?
A Officer Dan Downey --
Q Officer...?
A I mean Dan MacDonald, Paul Downey, William Kelley. Chris Curtin was straddling the doorway. He didn't come all the way in. Mike McManus and Sergeant Merner.
Q Did you talk further to the defendant when you were in the bedroom?
A Yes.
Q What did you say to him?
A I just asked him why the people downstairs wanted to

hurt or kill him.

Q And how did he respond to that?

MR. SHEA: Objection.

THE COURT: Sustained.

Q You talked to him further?

A Yes.

Q And as you were talking to him, did you notice anything in the room that caught your attention?

A Yes.

Q What did you notice?

A I noticed a green shirt hanging on a rack.

Q Where was that located?

A To my right. To the right, when you walk into the room.

Q And what was it about the green shirt that attracted your attention?

A It appeared to be damp.

Q Could you tell, in addition to the green shirt -- first of all, do you recall whether the shirt that you saw was a long-sleeved shirt or a short-sleeved shirt?

A I don't remember.

Q Could you tell whether, in addition to the shirt that you saw, there were any other clothes hanging in the

same area?

A No.

Q You don't recall?

A I just recall the shirt. That was the only thing that was on the --

Q Could you see whether there was anything under the shirt?

A No, I couldn't see if there was anything.

Q What else attracted your attention?

A I saw a round mirror. It looked like a makeup mirror with a white --

MR. SHEA: Objection.

THE COURT: Overruled.

Q Continue.

A It had a white residue powder on it.

Q Okay. And did you have -- why did that attract your attention?

A Part of the description we got was that the little girl was forced to put white powder in her nose.

Q And did you -- what -- did you subsequently learn -- well, first of all, did you have an opinion at that -- what, if anything, did you think that white powder might be when you saw it?

MR. SHEA: Objection.

THE COURT: Sustained.

Q Did you subsequently learn whether that white powder was a narcotic or not? After the fact.

A After the fact?

Q Yes.

A There wasn't enough to....

Q Did you, in fact, learn that it was tested and was not cocaine?

A Right.

Q What else attracted your attention?

A I saw a sharp object. I saw --

Q What was the sharp object that you saw?

A It was a chisel.

MR. SHEA: Objection.

THE COURT: Overruled.

Q Where was the chisel located?

A That was on a desk.

Q And why did that attract your attention?

A Part of the description that we received, the little girl stated that the person used a sharp object against her neck.

Q Did you subsequently learn that she had described a knife that was different from a chisel?

A Yes.

Q But you didn't know that at the time; is that correct?
A No.
Q What else attracted your attention?
A There was a brown liquid in a brandy snifter glass, and the description the little girl stated that she was forced to drink a --
MR. SHEA: Objection.
THE COURT: Overruled.
Q Go ahead.
A She was forced to drink a funny-tasting liquid.
Q Okay. Did you notice anything else that attracted your attention?
A The top bureau drawer was open, hanging down, and right on top was a stocking, which could be pulled down over the face.
Q On top?
A On the top of the -- in other words, the bureau of the drawer was open and it was inside the drawer.
Q Okay. And why did that attract your attention?
A The description of the black male, green shirt, dark pants, stocking mask.
Q Did you notice anything else that attracted your attention?

A I don't remember.
Q After you observed these things -- by the way, could you tell whether -- strike that.
After you observed these things -- how long were you in the bedroom while you were making these observations?
A Ten or 15 minutes.
Q And what did you do after the end of that ten or 15 minutes?
A I told Mr. McCants that we were leaving, the police were leaving.
Q And as you told him -- well, strike that.
Did you allow him to remain in the room?
A Yes.
Q Did you ask him, at some point, to leave the room? At some point.
A Later on, yes.
Q Okay. At some point, did Mr. McCants leave the room?
A Yes.
Q And was that at your direction? Did you direct him to leave the room?
A No. He left on his own.
Q But, I mean, I don't mean leaving the apartment, I mean leaving the room. Did you instruct him to leave

the room?

A Well, I told him we were leaving, and as we were leaving, he just followed us out.

Q What steps did you take -- did you take any steps to secure the bedroom?

A Yes.

Q What steps did you take to secure the bedroom?

A I had two officers cordon off the room with yellow crime scene tape.

Q And what was the purpose in cordoning off the room with yellow crime scene tape?

A To secure a search warrant.

Q And what was the -- why would you secure it with yellow crime scene tape in order to secure a search warrant?

A Why would I do that?

Q Yes.

A I didn't want to violate his rights. I mean, he --

Q I guess what I'm asking, a simpler question -- and maybe I'm not being clear -- what is the purpose of putting yellow crime scene tape up and posting officers there?

A To gather evidence.

MR. SHEA: Objection, your Honor. The

question assumes a fact not yet in evidence.

THE COURT: Sustained.

MR. DEAKIN: I'm sorry.

Q Did you, after putting yellow crime scene tape on the bedroom, did you instruct any officers to do anything with respect to the bedroom?

A I told the officers nobody's to go in the room, and to wait until they came with the search warrant.

Q Okay. And why do you post officers outside the room to wait for the detectives to come with the search warrant?

A To keep the integrity of the crime scene.

Q And is the point that no one can come in or go out --

A Right.

Q -- until they come with a search warrant?

A Right.

Q Do you recall the officers that you posted?

A Paul Downey and Dan MacDonald were the first officers.

Q And did you make arrangements that there would be -- that they would be relieved over time, and that other officers would come?

A Yes.

Q Was that done?

A Yes.

Q After you left the bedroom and Mr. McCants left the bedroom while you were there, did anyone go into that bedroom before the detectives came with a search warrant?

MR. SHEA: Objection.

THE COURT: Sustained.

Q While you were there. While you were there, before you left the apartment, did anyone go in or out of that bedroom, after it was taped?

A No.

THE COURT: Excuse me a second. I meant to tell the jury this a little earlier. That you heard evidence from this witness regarding statements that allegedly were made or attributed -- made by or attributed to Mr. McCants concerning what took place that night.

I'll instruct you in more detail at the end of this about -- at the end of this case about the matter, but, however, I want you to understand, at this time that this statement is offered in evidence that before you may consider the content of any such statement by the defendant as evidence, you are going to have to make a preliminary determination about

whether or not it can be considered as evidence at all.

In your deliberations at the end of the case, you are not to consider any such statement by the defendant as evidence, even though it is presented to you through a witness called at trial, unless from all of the evidence presented in this case, you first determine that the Commonwealth has proven beyond a reasonable doubt, first, that the defendant has made the statement that he is alleged to have made; and second, that he made it voluntarily, freely and rationally.

You may continue.

Q Did you have an opportunity, while you were speaking to the defendant, to observe his physical condition?

A yes.

Q And what observations did you make?

MR. SHEA: Objection.

THE COURT: Overruled.

Q What observations did you make?

A He appeared to be -- he appeared to be drinking.

Q What observations did you make that led you to that conclusion?

MR. SHEA: Objection.

THE COURT: Overruled.

A He had a smell of alcoholic beverage on his breath.

Q Did he appear to you to be drunk?

A No.

Q Did he seem to understand things that you said to him when you said them?

MR. SHEA: Objection.

THE COURT: Overruled.

Q Did he appear to understand the things that you said to him?

A Yes.

Q Were you able to understand his answers, or the statements when he made statements to you?

A Yes.

Q Did he appear to be confused or disoriented in any way?

A No.

MR. SHEA: Objection.

THE COURT: Overruled.

Q As you were leaving, did you have a discussion with the defendant about your leaving?

A Yes.

Q And how long was that discussion?

A A short time. I don't know the exact duration of it.

Q And at the end of that conversation, did Mr. McCants arrive at a decision about whether he would stay or leave?

I'll withdraw that. I'll rephrase that question.

At the end of that conversation, did you leave the apartment?

A Yes.

Q Did other officers leave the apartment with you?

A Yes.

Q Was the defendant still in the apartment when you left?

A No.

Q Did he, in fact, leave with you?

A He didn't leave with me, no.

Q Well, did he leave with other officers?

A Yes.

Q Did you see the other officers who left with him?

A Yes.

Q Were any of the other officers holding Mr. McCants as they left the building?

A No.

Q And how did they get out of the building?

A They either walked or took the elevator.

Q And were they -- when Mr. McCants left, was he restrained in any way with handcuffs or any other form of restraint?

A No.

Q Had you placed Mr. McCants under arrest at that time?

A No.

Q Did you give instructions to the officers as to where to take Mr. McCants?

A Yes.

Q And where was that?

A District 14.

Q Was he under arrest as he was taken to District 14?

A No.

Q How did he get to District 14, if you know?

A He was given a ride by one of the police vehicles.

Q At some point after he was at District 14, was he placed under arrest?

A Yes.

Q And was that at your direction?

A Yes.

Q After you left the apartment, was your attention drawn to another location in the area of 34 Fidelis Way?

A Yes.

Q Who drew your attention to that location?
A Officer Kelley and Officer Whitkens.
Q And what did they draw your attention to?
A A motor vehicle.
Q A car?
A Yes.
Q And where was that car located?
A It was on the -- right in this area.
Q The parking lot area next to 34 Fidelis Way?
A Yes.
Q Do you recall, if you number the spaces, if you were to number the spaces from, like, one, two, three four, starting with the one closest to Fidelis Way, which space it was in, if you can?
A Starting from right here?
Q Starting -- right. Yes. Starting from right there.
A I would say it was right around here. Right where these two red cars -- right around here.
Q Do you recall -- you may resume the stand.

Do you recall --

MR. SHEA: Excuse me. Could we mark that?

THE COURT: Pardon me?

MR. SHEA: Could we mark that little space?

THE COURT: Fine.

MR. DEAKIN: Sure.

Q Do you want to circle the car that you think is in the closest position to where it was? You can put a circle around it.

A (Witness complies.)

Q Sergeant Byrne, can you describe the automobile that your attention was drawn to by Officers Whitkens and Byrne -- and Kelley?

A It was a green Pontiac.

Q Do you remember what model?

A I want to say a Grand Prix.

Q Is there something you could consult to refresh your memory on that?

MR. SHEA: Objection.

THE COURT: Sustained.

MR. DEAKIN: He said he wanted to say.

MR. SHEA: And he did.

MR. DEAKIN: I'd ask --

THE COURT: The objection is sustained.

MR. DEAKIN: May I have a moment, your Honor?

THE COURT: Yes.

Q Did you -- what, if anything, did you do -- did you take any steps with respect to determining the

ownership of that automobile?

A The officers ran a routine NCIC check.

Q And what did you find? What did that show about the ownership of that automobile?

A It was Owen McCants'.

Q What, if anything, did you do after you learned that?

A Cordoned it off with yellow crime scene tape.

Q And what was the significance to you of the fact that -- how did you describe the car? I want to make sure I don't....

A Green.

Q -- the green, what you thought was a Grand Prix, what was the significance to you of the fact that that was owned by Owen McCants?

A What was the significance?

Q Yes.

A The description from the little girl was --

MR. SHEA: Objection.

THE COURT: Overruled.

A -- that she was driven away in a green car with a shifter in the middle console, and a darkish gray color interior.

MR. SHEA: Objection. Can we go to side bar?

THE COURT: Yes.

SIDE-BAR CONFERENCE:

MR. SHEA: He's now testifying to all these things that shouldn't come in about the interior of the car, her testimony on the exterior of the car was it's gray, black or blue.

MR. DEAKIN: Green, black --

MR. SHEA: Green, black, or blue. Now, why is he being allowed to parse out her description? We don't even know where he got that from. It's not a prior inconsistent statement. I don't think he's impeached --

THE COURT: She testified it was green, black, or blue, and it had a gray interior.

MR. DEAKIN: Smoke gray, she said.

THE COURT: She said gray. I remember that. I don't remember how much of a gray.

MR. SHEA: But she didn't say anything about the center console.

THE COURT: I know. She didn't.

MR. SHEA: But, I mean, I don't like to have them bringing in more descriptive details --

MR. DEAKIN: I wouldn't expect him to say

anything. I would expect him to say the color of the car matched the description.

THE COURT: So his objection is sustained.

MR. SHEA: And it be stricken?

THE COURT: Yes.

(End of side-bar conference.)

THE COURT: The defendant's objection is sustained. The answer is stricken. The jury is to disregard it.

Q Did the color of the automobile correspond to the description that you had from [redacted] of the color of the automobile she was taken in?

A Yes.

Q And did it correspond -- did the color of the interior --

MR. SHEA: Objection.

THE COURT: Overruled.

Q Did the color of the interior correspond to the information that you had from [redacted] with regard to the interior car?

A Yes.

MR. SHEA: Objection.

THE COURT: Overruled.

Q Did you have that information directly from [redacted]? That is, was she telling you those things, or someone else?
A She told somebody else.
Q And you got that information from another officer?
A Right.
Q And what did you do with respect to the automobile after you learned that it was registered to Owen McCants?
A Cordoned it off with yellow crime scene tape and had it towed, on a flatbed tow truck, to Boston Police headquarters crime scene garage.
Q At some point, did a detective arrive to take over the investigation?
A Yes.
Q Do you recall approximately when that was?
A In the early morning hours.
Q And how was he notified?
A Operations notified him.
Q And what was his name?
A Sergeant Detective John McDonough.
Q Did you know where he came from? What unit he came from?
A Sexual Assault.

Q Did you brief him on the steps you had taken up to that point?
A Yes.
Q Did you show him any of the locations that you described in your testimony?
A Yes.
Q What did you show him?
A Just 34 Fidelis Way, where the little girl came out from.
Q Did you show him the apartment upstairs?
A Yes. We went up at a later time.
Q And when you went up at a later time, was the yellow crime scene tape still in place?
A I think there's certain -- when I went up there with him, I think the search warrant had already been served, but I don't recall.
Q The search warrant was served not 18 hours later --
MR. SHEA: Objection.
THE COURT: Sustained.
Q Did you prepare reports in this matter?
A Yes.
Q When did you do that?
A Right after the -- as soon as I got back to the station.

Q And where -- did you do that at the station?
A At District 14.
Q And what kind of report did you prepare first?
A I gathered all the information and wrote a 1-1, Boston Police 1-1 report.
Q What does 1-1 mean, for those of us who may not deal with it?
A It's just a report for any type of service the police -- we have to put everything in reports.
Q And where did you gather information from?
A From all the officers and witnesses.
Q What was your purpose in writing the report?
A To consolidate everything into a report.
Q Were you attempting to put every detail of everything that happened that night in your report?
A No.
Q How long is your report?
A The report's two pages.
Q Had you talked to Sergeant Detective McDonough again before writing the report?
A No.
Q Did you have any other officer's -- written information from any other officers before you wrote your report?

A Yes.
Q Who's that? Who did you have written information from?
A The original responding officer, Officer Joe Murray.
Q And what did he prepare?
A He just prepared a report that he submitted to me.
Q And was his report typewritten or handwritten?
A Handwritten.
Q Did you review his report before preparing your report?
A Yes.
Q Did you include information from Officer Murray's report in your report?
A Yes.
Q Did you include everything from -- every single thing from his report in your report?
A No.
Q Why not?
A I didn't think it was necessary.
Q Did you leave out anything that, in your mind, was significant at the time?
MR. SHEA: Objection.
THE COURT: Sustained.
Q Were you called to testify before the grand jury in

this matter on Tuesday, September 5th of 2000?

A Yes.

Q And were you also called to testify at a hearing in this case in May 2001?

A Yes.

Q And in both instances did you testify at those hearings, both the grand jury and at the hearing?

A Yes.

MR. DEAKIN: Nothing further.

THE COURT: All right. Look, why don't we break at this time and we'll start cross-examination in the morning. We'll let the jury go at this time.

Why don't you put those things back in your envelopes and leave them on your chairs and the court officer will collect them.

Don't talk about this case or allow anyone to talk to you about it. If you should happen to see a newspaper, radio, or television account of this trial, do not read or listen. I'll see you at 9:30 in the morning.

THE COURT OFFICER: Jurors, please rise.

(Whereupon, the Court adjourned.)

CERTIFICATE

I, Maryann McDonald, Official Court Reporter, do hereby certify that the foregoing record, pages 1 to 206 inclusive, is a true and accurate transcript of my system tapes, to the best of my knowledge, skill and ability.

Maryann McDonald, Notary Public

My commission expires: April 1, 2005

The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying Reporter.