COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                               NO. SUCR2000-10994


COMMONWEALTH OF MASSACHUSETTS

v.

OWEN McCANTS


---

Friday, April 26, 2002
Before: Spurlock, J.
Boston, Massachusetts
Day 7 - Trial


---

MARYANN MCDONALD
Official Court Reporter
617.788.6180

APPEARANCES:


David Deakin
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
617.619.4000
          Counsel for the Commonwealth


Mark Shea
Attorney at Law
875 Massachusetts Avenue
W. Cambridge, MA 02139
627.864.3943
          Counsel for the Defendant

3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Harry Byrne | | | | |
| (By Mr. Shea) | | 6 | | |
| (By Mr. Deakin) | | | 20 | |
| Elisabeth G. Schainker | | | | |
| (By Mr. Deakin) | 26 | | | |
| (By Mr. Shea) | | 43 | | |
| Gael Rosen | | | | |
| (By Mr. Deakin) | 51 | -- | | |
| Brandon Sowers | | | | |
| (By Mr. Deakin) | 57 | | | |
| (By Mr. Shea) | | 81 | | |
| Benjamin Haughey | | | | |
| (By Mr. Deakin) | 88 | | 123 | |
| (By Mr. Shea) | | 117 | | |
| Albert Elian | | | | |
| (By Mr. Deakin) | 139 | | 154 | |
| (By Mr. Shea) | | 150 | | |
| Shirley Braithwaite | | | | |
| (By Mr. Deakin) | 155 | | 189 | |
| (By Mr. Shea) | | 184 | | 191 |
| William Kelley | | | | |
| (By Mr. Deakin) | 192 | | | |

4

EXHIBITS

| NUMBER | | PAGE |
|--------|---|------|
| 10 | Photograph | 22 |
| 11 | Package containing rape kit box | 42 |
| B | Package containing stocking | 213 |

1                          PROCEEDINGS

2

3               THE COURT OFFICER: This court is back in

4     session.  Please be seated.

5               THE COURT: Good morning, ladies and

6     gentlemen.  How are you this morning?

7               Has anyone talked about this case, or

8     allowed anyone to talk to them about it?

9                    (No response.)

10              Have you see any newspaper, radio, or

11    television account of this trial?

12                   (No response.)

13              All right.  Are your notes in the same

14    condition this morning as they were last night when

15    you put them in the envelopes?

16                   (No response.)

17              All right.  Mr. Shea.

18              MR. SHEA: May we approach?

19

20    SIDE-BAR CONFERENCE:

21              MR. SHEA: I just wanted, for the record, to

22    object that I'm not being able to impeach him with

23    the current case in the federal court.

24              THE COURT: Well, he hasn't said anything

1          that would lead me to believe that you could even get

2          that in at this point.  But also for the reasons that

3          were stated earlier.

4                        MR. SHEA: Thank you.

5                        (End of side-bar conference.)

6

7                 .      HARRY BYRNE, PREVIOUSLY SWORN

8

9                        CROSS-EXAMINATION

10    Q    (By Mr. Shea) Good morning.

11    A    Good morning.

12    Q    Now, Tahisha Skeen.  You had Tahisha Skeen go and

13         speak to                    ?

14    A    Yes.

15    Q    And you went to have her speak with                    to

16         get as much information as she could, correct?

17    A    Yes.

18    Q    And Tahisha did that, correct?

19    A    Yes.

20    Q    And Officer Skeen reported back to you, correct?

21    A    Yes.

22    Q    And you spent a long time with Officer Skeen going

23         over all the specific details of everything the girl

24         had said, correct?

```
 1    A    Yes.

 2    Q    Now, you wrote a police report in this matter,

 3         correct?

 4    A    Yes.

 5    Q    And in that police report you included some of the

 6         details that Officer Skeen had provided to you,

 7         correct?

 8    A    Yes.

 9    Q    Now, you testified earlier about a description that

10         was put out of a suspect while ▮▮▮▮ was missing,

11         correct?  A description went out while ▮▮▮ was

12         missing.

13    A    Yes.

14    Q    And you said that the description was that the person

15         had on a green shirt, correct?

16    A    Green T-shirt.

17    Q    And so the description was the person had green T-

18         shirt, correct?

19    A    Correct.

20    Q    In your -- you wrote up a report on this case.   You

21         actually wrote up two reports, correct?

22    A    Yes.

23    Q    And there's a part in your report for special

24         characteristics, including clothing, of what the
```

1      perpetrator was wearing, correct?

2   A   Yes.

3   Q   And in that column, just that column, you wrote,

4      "green T-shirt," correct?

5   A   Yes.

6   Q   Now, you said that when you first saw Owen McCants he

7      was sweating or damp?  Damp?

8   A   Damp.

9   Q   It was a July night, correct?

10   A   Yes.

11   Q   This apartment was not centrally air-conditioned, was

12      it?

13   A   No.

14   Q   And just yesterday, when you were trying to read your

15      *Miranda* card, you said that it was damp, correct?

16   A   Yes.

17   Q   Now, you looked into the room that Mr. McCants was

18      in, and you said you saw a tray of white powder.

19   A   A mirror --

20   Q   A mirror.

21   A   -- with white powdery residue on it.

22   Q   Okay.  You know that residue -- you know that that

23      residue was sent off to be tested, right?

24   A   Yes.

1    Q    And you know that it came back to be no narcotic

2         substances at all, correct?

3    A    Correct.

4    Q    Then you said there was a bottle in the room, a

5         bottle of rum?

6    A    It was a brandy snifter.

7    Q    Brandy.  Sorry.  And how large was that brandy

8         snifter?

9    A    It was maybe this size (gesturing).  It wasn't a

10        really big one, but it was a medium-sized.

11    Q    And there was also -- and when you say "brandy

12        snifter," you mean the glass that holds brandy?

13    A    One of those round, bulbous-like, with a stem, glass.

14    Q    And you also saw a bottle of alcohol in the room?

15    A    I don't remember that.

16    Q    Now, you said you'd been out interviewing people in

17        the crowd?  Some of the people around?

18    A    We were out there gathering evidence, looking for the

19        little girl.

20    Q    Did anyone tell you of a man walking through -- and

21        how large would you estimate the crowd to have been?

22    A    Fifty-plus people.

23    Q    Did anyone tell you of a man walking through the

24        crowd of 50-plus people with a brandy snifter and a

1      tray of white powder -- and a glass mirror of white

2      powder?

3    A    No.

4    Q    Now, when ███████████ emerged and then was back

5         with her mother --

6    A    Right.

7    Q    -- you wanted to make sure that she was with -- in

8         the company of a police officer from then on,

9         correct?

10   A    I just wanted her to feel that she was safe.

11   Q    Right.  But, I mean, you believed there was evidence

12        to collect, correct?

13   A    Yes.

14   Q    Potentially, from her body.

15   A    Right.

16   Q    Okay.  So, it would be important to keep her with

17        police near her, correct?

18   A    Right.

19   Q    Okay.  That way, you could make clear that the

20        evidence was preserved.

21   A    Correct.

22   Q    And, so, you know she was with an officer from the

23        moment from Fidelis Way over to Monastery, correct?

24   A    Yes.

11

1    Q    From Monastery over to LaRose Place?

2    A    Yes.

3    Q    From LaRose Place back to Monastery.

4    A    Yes.

5    Q    From Monastery, again, back to LaRose Place, correct?

6    A    Yes.

7    Q    And then from there to Children's Hospital.

8    A    Yes.

9    Q    Now, when you talked to Tahisha Skeen, part of the

10        evidence that you incorporated into your report was

11        that she told you that the perpetrator was wearing a

12        green T-shirt, correct?

13   A    Yes.

14   Q    Now, to go back over some of the time frame -- it's a

15        little confusing -- you got there around 11:30.

16   A    Yes.

17   Q    All right.  At that point your testimony was, your

18        best memory, was about a half hour later you called

19        them, meaning the EDT unit.

20   A    Right.

21   Q    And then it took them about half an hour to get

22        there?

23   A    Yes.

24   Q    And when EDT units arrived, you instructed them to

| | | |
|---|---|---|
| 1 | | secure the perimeter of the housing complex, correct? |
| 2 | A | Well, I already had units doing that. |
| 3 | Q | Okay. |
| 4 | A | From District 14, or from Area D.  It could have been |
| 5 | | 4 or 14.  I don't know exactly who it was. |
| 6 | Q | So, could you just point out -- I know it gets a |
| 7 | | little disoriented on the size -- could you just |
| 8 | | point out where you had the units on the perimeter of |
| 9 | | the housing complex? |
| 10 | A | I had one here. |
| 11 | Q | That's the monastery, I take it -- I mean, the -- |
| 12 | | Fidelis -- |
| 13 | A | Fidelis Way and Washington.  And then, over here, |
| 14 | | Commonwealth Ave. |
| 15 | Q | And there's a little access road off of Comm. Ave. |
| 16 | | here; is that right? |
| 17 | A | Yes.  There's an access road which runs parallel to |
| 18 | | Commonwealth Ave. and up Commonwealth and Fidelis. |
| 19 | Q | Okay.  And these are the two points of access and |
| 20 | | egress from Fidelis Way and Jetty Court. |
| 21 | A | Right. |
| 22 | Q | And about what time did you have perimeters set up at |
| 23 | | those two points? |
| 24 | A | Right when I responded. |

1    Q    Right when you responded?

2    A    Give or take a couple of minutes either way.

3    Q    Okay.  And, so, you responded at 11:30.  You got

4         there at 11:30.

5    A    Around 11:30.

6    Q    Okay.  So, sometime, give or take a few minutes --

7    A    Right.

8    Q    -- after 11:30?

9    A    Right.

10    Q    The perimeter was to check for people coming in and

11         out?

12    A    Yes.  No one in, no one out.

13    Q    No one in, no one out.

14    A    That was my order to them.

15    Q    And to the best of your knowledge, your order was

16         carried out.

17    A    Yes.

18    Q    And you didn't hear from any officer who you had on

19         the perimeter that they let anyone in after that

20         point?

21    A    No.

22    Q    Now, did you -- taking you to the stairwell in the

23         building where the girl was taken from, did you hear

24         from anyone that the lights might have been

```
 1              unscrewed?  Well, I'll build a little.

 2                   You heard the lights were out, right?

 3       A    Well, I observed that myself.

 4       Q    Okay.  Did you hear from anyone, or did you check

 5            yourself, to see that some of the lights were

 6            unscrewed?

 7       A    I didn't actually check them myself, but someone had

 8            mentioned that the lights were just unscrewed.

 9       Q    Okay.  And just to be clear about this, they're

10            flourescent tubes, right?

11       A    They are now.  I don't know if they were flourescent

12            tubes then.  I think they were just regular bulbs.

13       Q    And in unscrewing them, one would put, one would

14            guess, someone would put their hand on them, correct?

15       A    Yes.

16       Q    Did you take those lights as evidence to have them

17            fingerprinted?

18       A    No.

19       Q    Now, Officer Murray gave you a police report,

20            correct?

21       A    Yes.

22       Q    And do you have that police report?

23       A    No.

24       Q    Where is that police report?
```

15

```
1    A    I misplaced it.

2    Q    And Officer Murray is the person that you first

3         placed ████████ with, correct?

4    A    And Sergeant Merner.

5    Q    And Sergeant Merner.  Now, when -- taking you back up

6         to when you came up to see Owen McCants -- when you

7         went up to that apartment -- it was Christine Isaac's

8         apartment?

9    A    Yes.

10   Q    Okay.  And Christine Isaac was there?

11   A    Yes.

12   Q    And Polly Taylor was there?

13   A    Yes.

14   Q    And they were sitting in the kitchen/dining room

15        area?

16   A    Right.

17   Q    Now, this area, they were sitting -- the table was

18        about here, correct?

19   A    Right.

20   Q    And they were sitting at the table?

21   A    Christine Isaac was sitting here --

22             THE COURT:  Speak up.  Speak up.  Keep your

23        voice up.

24   A    Christine Isaac was sitting here, facing this way.
```

16

1          Polly Taylor was over here at the table.

2    Q     Okay.  All right.  And just so we're clear about the

3          size of the place, it's not an eat-in kitchen,

4          correct?

5    A     It didn't appear to be, no.

6    Q     Okay.  And just to appearance, the table people were

7          eating at was out right here, correct?

8    A     Right in this area.

9    Q     And the space between here and here was not a large

10         space, was it?

11   A     No.

12   Q     Thank you.  Now, your testimony is that when you were

13         -- when you came in, Owen McCants came over to that

14         area.  Was he already out in that area, or did he

15         come out?

16   A     He came out.

17   Q     And he then -- he invited you back to his room.

18   A     Not right away.

19   Q     No, not right away, but when you started asking him

20         questions, he invited back to his room.

21   A     Right.

22   Q     And did you tell Detective McDonough that when you

23         looked into Mr. McCants' room that you saw what

24         appeared to be a used condom in the breast pocket of

17

1      one of the shirts?

2   A   No.

3   Q   Did you review an affidavit that was created by

4       Detective McDonough?

5   A   No.

6   Q   Now, your testimony is that you left the room with

·7      Mr. McCants, the room at 545, correct?

8   A   What do you mean, I left?

9   Q   Well, after you had had your conversation with him,

10      you looked around.  And how many other officers were

11      with you?

12  A   Probably five.  Maybe six.

13  Q   And you basically said you asked him to step out of

14      the room.

15  A   I told him that we were leaving.

16  Q   You told him you were leaving.  But you also made

17      clear that you wanted to seal that room up, right?

18  A   After he said he wanted to go with the police to

19      District 14.

20  Q   It was only after he said he wanted to go with the

21      police --

22  A   Right.

23  Q   -- that you went to seal up the room.

24  A   Correct.

1   Q   So you sealed up the room with yellow tape.

2   A   Yes.

3   Q   And you left two officers there.

4   A   Yes.

5   Q   And did you take any evidence out of the room at that

6       point?

7   A   Nothing at all.

8   Q   Okay.  Did you take a small, brown bag of evidence

9       out of the room at that point?

10  A   No.

11  Q   Now, Mr. Deakin asked you on direct if anything was

12      ever taken out of that room before they went back

13      with a search warrant, right?

14  A   He could have.  I don't remember.

15  Q   And you answered nothing -- basically, nothing was

16      taken.

17  A   Nothing was taken out of the room.

18  Q   But you left at that point, with Mr. McCants.

19  A   No.

20  Q   Okay.  Well, you left the building with him.  You

21      walked out about the same time.

22  A   No.

23  Q   Where did you go?

24  A   I stayed and talked with Polly Taylor and Ms. Isaacs,

1        and made sure that the room was sealed properly, and

2        that the officers knew they were to stay there until

3        they were properly relieved.  And Mr. McCants --

4                THE COURT: Just a minute.  Just a minute.

5        Let the siren pass.

6                All right.  Go ahead.

7    Q   How long after Owen McCants left did you leave?

8    A   I don't have the approximate time.  But, maybe, ten

9        minutes.

10   Q   Now, after that ten minutes, you can't account for

11       whether -- you, yourself, personally, cannot account

12       for whether anyone went into that room, correct?

13   A   I don't understand the question.

14   Q   After you left, after that ten minutes --

15   A   Right.

16   Q   -- when was the next time you, personally, were at

17       Apartment 545?

18   A   Later on that afternoon.

19   Q   Okay.  And, so, how many hours later?

20   A   Maybe 18.

21   Q   Okay.  In those 18 hours, you, personally, cannot

22       say, from your own observation, that no one went into

23       that room.

24   A   Not from my observations, no.

1    Q   Now, in asking Mr. McCants if he wanted to go with

2        you, you pointed out to him that the crowd had

3        threatened another man they were going to kill

4        earlier, correct?

5    A   Correct.

6    Q   And, so, it was clear to you somebody was getting

7        this crowd riled up, correct?

8    A   Yes.

9              MR. SHEA: Nothing further.

10             THE COURT: Mr. Deakin.

11             MR. DEAKIN: If I may approach, your Honor?

12             THE COURT: Yes.

13

14             REDIRECT EXAMINATION

15   Q   (By Mr. Deakin) Sergeant Byrne, I'm going to show you

16       that and ask you if you recognize what that is?

17   A   It appears to be a brandy snifter with a brown liquid

18       in it.

19   Q   Have you seen that brandy snifter before?

20   A   Yes.

21   Q   Where have you seen that brandy snifter before?

22   A   In the bedroom, on the bureau of Owen McCants'....

23   Q   And is that a fair and accurate representation of the

24       brandy snifter that you saw there?

1    A   Yes.

2    Q   By the way, you said, "on the bureau of Owen

3        McCants'..." and I interrupted you.

4    A   Bedroom.

5              MR. DEAKIN: I would move to introduce this.

6              THE COURT: Any objection?

7              MR. SHEA: Could we approach?

8

9   SIDE-BAR CONFERENCE:

10             MR. SHEA: I objected to the evidence of the

11      brandy snifter, so I'm just making clear that I still

12      object.

13             THE COURT: You what?

14             MR. SHEA: I objected to the testimony of

15      the brandy snifter coming in at all, but now that

16      it's in, I'm not objecting to the fact that this is a

17      fair and accurate representation.

18             THE COURT: When did you object to the

19      brandy snifter coming in?

20             MR. SHEA: I think yesterday when he went on

21      about what was on the mirror and the brandy snifter.

22             THE COURT: All right.

23             (End of side-bar conference.)

24

22

1           (Whereupon, photograph

2           marked and admitted into

3           evidence as Exhibit No. 10.)

4   Q   Sergeant Byrne, you listed a number of things

5       yesterday that caught your attention when you went

6       into Owen McCants' bedroom.  Do you recall any piece

7       of paper that caught your attention?

8   A   Yes.

9   Q   And what was the piece of paper that caught your

10      attention?

11          MR. SHEA: Objection.

12          THE COURT: Sustained.

13  Q   You mentioned that -- Sergeant Byrne, you mentioned

14      that there was a man that the crowd threatened

15      earlier --

16  A   Yes.

17  Q   -- when Mr. Shea had asked you questions.

18  A   Yes.

19  Q   Who was that man?

20  A   Marvin Ampey.

21  Q   And you spoke to Marvin Ampey?

22  A   Yes, I did.

23  Q   At some point did the crowd stop threatening Marvin

24      Ampey?

23

1    A   Yes.

2              MR. SHEA: Objection.

3              THE COURT: Sustained.

4              MR. DEAKIN: I'm sorry?

5              THE COURT: Sustained.

6    Q   Did anyone take action against Marvin Ampey after you

7       spoke to him?

8              MR. SHEA: Objection.

9              THE COURT: Sustained.

10   Q   At the time you went to Owen McCants' bedroom were

11      you aware of anything that suggested to you that

12      Marvin Ampey was in danger from the crowd?

13            MR. SHEA: Objection.

14            THE COURT: Sustained.

15   Q   Was Marvin Ampey placed -- taken into custody that

16      night?

17            MR. SHEA: Objection.

18            THE COURT: Overruled.

19   Q   Was he taken into custody?

20   A   No.

21   Q   Was he detained by police in any way?

22   A   No.

23   Q   Mr. Shea asked you whether you ever told Detective

24      McDonough that you saw a used condom in the pocket of

1      a shirt in Mr. McCants' bedroom.  Do you recall him

2      asking you that?

3   A   Yes.

4   Q   And you said no.  Did you tell Detective -- Sergeant

5      Detective McDonough anything about a condom in the

6      pocket of Mr. McCants' shirt?

7   A   I don't remember.

8   Q   So, when you said no, what leads you to say no, and,

9      now, that you don't remember?

10  A   Because he said it was a "used" condom.

11  Q   And you did not say that?

12  A   No.

13  Q   And do you recall whether you said anything to

14     Sergeant McDonough about a condom in general?

15  A   No.

16  Q   No, you don't remember?

17  A   I don't remember.

18  Q   When you left the bedroom, when you left the

19     apartment, Apartment 545, what was the condition of

20     the door in Mr. McCants' bedroom?

21  A   It was closed, and it was Xed off with yellow crime

22     scene tape.

23  Q   And was there anybody there, when you left, in charge

24     of that door?

1    A    Yes.

2    Q    Who was that?

3    A    Officer Paul Downey and Officer Dan MacDonald.

4    Q    When you returned later, was that for the execution

5         of a search warrant, 18 hours later?

6    A    Yes.  I actually came after that.

7    Q    After that?

8    A    After the search warrant was executed.

9    Q    Okay.  So, did you see the door again before the

10        search warrant was executed?

11   A    No.

12            MR. DEAKIN: Nothing further.

13            THE COURT: You may step down.

14            Next witness.

15            MR. DEAKIN: Your Honor, the people of the

16   Commonwealth of Massachusetts call Dr. Elisabeth

17   Schainker.

18            THE COURT OFFICER: Stand there, raise your

19   right hand, please.

20            THE CLERK: Do you solemnly swear the

21   testimony you're about to give this jury concerning

22   the matter between the Commonwealth and the defendant

23   is the whole truth and nothing but the truth, so help

24   you God?

1              THE WITNESS: Yes, I do.

2              THE COURT OFFICER: Please be seated.

3

4              DR. ELISABETH G. SCHAINKER, SWORN

5

6                   DIRECT EXAMINATION

7    Q   (By Mr. Deakin) Dr. Schainker, if I could ask you,

8        please, to just pull the microphone as close to you

9        as you can, and adjust it so that you're speaking

10       directly into it.

11              Can you state your name, please, and spell

12       your last name for the court reporter?

13   A   Elisabeth Schainker, S-C-H-A-I-N-K-E-R.

14   Q   And how are you employed, Dr. Schainker?

15   A   I'm employed as a pediatric resident at Boston

16       Medical Center and Children's Hospital.

17   Q   So you're a physician?

18   A   Yes.

19   Q   Can you, just briefly, tell the jury about your

20       educational background?

21   A   I attended Haverford College.  I went to Johns

22       Hopkins University for medical school and now I'm

23       doing my residency in the Boston Combined Residency

24       Program.

1   Q   And that's -- the Combined Residency Program is those

2       two hospitals where you work?

3   A   Correct.

4   Q   Do you hold any faculty appointments?

5   A   I hold a teaching appointment at both Boston Medical

6       Center and at Children's Hospital.  I will obtain a

7       faculty appointment at Boston Medical Center in July,

8       when I graduate.

9   Q   Were you working at Children's Hospital on Friday

10      morning, the early morning hours of Friday morning,

11      July 14th of 2000?

12  A   Yes, I was.

13  Q   And where were you working?

14  A   I was working at Children's Hospital, in the

15      Emergency Department.

16  Q   What were your responsibilities there at that time?

17  A   To see patients as they came in, and treat them for

18      whatever medical conditions they had.

19  Q   Was a girl named ██████████ brought in early that

20      morning?

21  A   Yes, she was.

22  Q   And when did she arrive?

23  A   She arrived at approximately 2 a.m.

24  Q   When did you first see her, if you recall?

1    A    Probably around 2:30 or three.

2    Q    And where did you first see her?

3    A    She was in Room 14 in the Emergency Department.  I

4         saw her in the room.

5    Q    Do you remember her demeanor?

6    A    She was -- yes, I do.  She was quiet.  But if you

7         asked her a question, she answered it without any

8         difficulty.

9    Q    What did you do when you first saw her?

10   A    I introduced myself.  I told her I was going to be

11        the doctor taking care of her and I asked -- I asked

12        to find out more about what had happened that

13        evening.

14   Q    Did you -- so that was the first step, was asking her

15        more about what happened that evening?

16   A    Uh-huh.

17   Q    And how do you -- let me ask you, first, to step back

18        a minute.

19             Can you please describe the stages of a

20        standard exam that you would do in a case like this?

21   A    Sure.  I would, I guess, first find out the patient

22        needs to be taken care of.  I put my name up on the

23        board.  I would read the nurse's note explaining kind

24        of what the reason the patient is here.  I would go

1          into the room.  I would ask the patient to tell what

2          happened.  And --

3    Q    And how do you do that?  When you ask them to tell

4          what happened, is it in a free narrative form, by way

5          of questioning?  How do you do that?

6    A    I always begin by giving them an opportunity to make

7          a free narrative form, asking an open-ended question,

8          so that they can tell me, in their words, what

9          happened.  And then, if I have any questions, I'll

10         ask specific things at the end.

11   Q    And what do you do next?

12   A    Then I would -- in this case, we had to collect

13         evidence, so I went through the steps of the rape

14         collection kit, and collecting them in the order that

15         is explained on the kit.

16   Q    At some point, either before or after that, do you

17         perform a physical examination?

18   A    Generally, while I'm collecting the evidence, I

19         intersperse the physical exam, as appropriate.

20   Q    And is a general examination a part of the physical

21         examination?

22   A    Yes, it is.

23   Q    Where did the examination in this case take place?

24   A    It took place in her exam room, in the Emergency

```
 1              Department.

 2       Q      Do you recall who else was present during that time?

 3       A      The nurse who was also taking care of ████ was

 4              there.  Gail.

 5       Q      Gail Rosen?

 6       A      Uh-huh.

 7       Q      Anyone else present when you did the examination?

 8       A      No.  I did the examination in multiple parts.  And it

 9              was just -- yes.  It was just Gail and I for the

10              whole examination.

11       Q      How did ████████████ appear to you physically, her

12              physical appearance?

13       A      She looked disheveled.  Her hair was out of place.

14              She was in a hospital gown.  She had a cut on her

15              neck, a cut on her elbow and her finger.

16       Q      How long did the examination take from start to

17              finish?

18       A      From start to finish -- so, if she went into the room

19              at approximately 2 a.m., she didn't finish until

20              about 6 a.m.

21       Q      And was that entire time the examination?

22       A      No.

23       Q      What happened?

24       A      I was seeing many patients in the Emergency
```

31

| | | |
|---|---|---|
| 1 | | Department that night.  And so I would do parts of -- |
| 2 | | I would group parts of the exam together, such that I |
| 3 | | was going in and out of the room, probably two or |
| 4 | | three times to get all the information I needed for |
| 5 | | the kit. |
| 6 | Q | And to the extent that you can answer this question, |
| 7 | | do you know what ████████████ was doing during the |
| 8 | | times that you were not in the room? |
| 9 | A | Her family was there.  And so she was with her |
| 10 | | family. |
| 11 | Q | And you said that the first step, or one of the first |
| 12 | | steps in the examination was to take a history.  Did |
| 13 | | you take a history at the outset of this |
| 14 | | investigation? |
| 15 | A | Yes, I did. |
| 16 | Q | And do you recall -- did you ask ████████████ to |
| 17 | | tell you what happened? |
| 18 | A | Yes, I did. |
| 19 | Q | And what did she tell you? |
| 20 | A | She told me that she was at her grandmother's house, |
| 21 | | that a man came into the house, grabbed her by the |
| 22 | | neck. He had a knife.  And took her outside.  Told |
| 23 | | her if she screamed, he was going to hurt her |
| 24 | | grandmother.  He put tape over her eyes and her |

1      mouth, and then brought her into a car.

2            Once he brought her into a car, he asked

3      her to drink something, to snort something, and also

4      had some smoke for her to breathe.

5            Then he brought her to some park or wooded

6      area type of a place.  She had the blindfolds on.  He

7      had asked her to take off her clothes.  And I guess

8      he had her lie on the ground and he put his finger

9      inside her vagina.  He said that --

10           MR. SHEA:  Objection.

11           THE COURT:  Overruled.  Go ahead.

12  Q    You can answer.

13  A    She said that she could feel his penis on the outside

14     of her vagina.  He told her this was an initiation.

15     And then he walked away.  After a few minutes, she

16     took the tape off of her eyes and her mouth, and went

17     to find help.

18  Q    Did you make a record of what she said?

19  A    Yes, I did.

20  Q    And what form did that record take?

21  A    Two forms.  The first form was as part of the rape

22     kit.  It asks you to write down the story from the

23     patient's words.  And the second one is in the chart

24     from the Children's Hospital.  I also wrote it in

33

```
 1         there.

 2    Q    And you mentioned that the rape kit has forms to fill

 3         out; is that right?

 4    A    Yes.

 5    Q    Did you complete those forms as you were doing --

 6         when you say gathering evidence to the rape evidence

 7         protocol, that's also called a "rape kit"; is that

 8         right?

 9    A    Yes.

10    Q    Did you complete those forms as you were doing the

11         kit?

12    A    Yes.  I didn't bring the forms in with me.  I wasn't

13         filling them out in front of        , but I was going

14         -- I took the history, found out what happened, and

15         filled in what I could fill in.  And if there was any

16         other information missing, I would ask her

17         specifically, and fill out the information.  Such

18         that by the end of it, I was able to put -- fill out

19         all the information and put it together.

20    Q    You said that you performed a physical examination of

21         her; is that right?

22    A    Yes.

23    Q    And describe your findings of the physical

24         examination.
```

1    A    My findings of the physical examination, as I

2         mentioned, she did have a cut on her neck that looked

3         like it could have been a wound from a knife.  She

4         had a cut on her elbow and her finger.  According to

5         the rest of her physical exam, she was quite

6         tachycardic, which means a fast heart rate.  Other

7         than that, there was not anything outside of normal

8         limits.  Her heart was normal.  Her abdomen was

9         normal.

10   Q    I'm sorry, did you say her heart was normal?

11   A    I'm sorry.  Her heart was beating fast.  That's

12        right.

13   Q    That's what you mean, "tachycardic"?

14   A    That's right.

15   Q    I want to direct your attention, if you would, to --

16        I don't know if you have this with you, or before

17        you, but Form 2 of the Commonwealth of Massachusetts

18        Sexual Assault Evidence Collection Kit.  Do you have

19        that with you?

20   A    I don't have that in front of me.

21             MR. DEAKIN: May I approach the witness,

22        your Honor?

23             THE COURT: Yes.

24             MR. DEAKIN: Actually, with the Court's

1       permission, may I put this on the screen?

2              THE COURT: Any objection?

3              MR. SHEA: No.

4              MR. DEAKIN: I know this is going to be

5       difficult.  May I approach and stand here.  It's

6       going to be difficult, I know, for the jury to read

7       from there.  Perhaps I could sort of highlight for

8       them what I'm pointing to.  So if they have trouble

9       reading it --

10             THE COURT: If she's going to tell them,

11      what difference does it make?

12  Q   This is Form 2.  Did you complete this form as part

13      of your examination of ██████████?

14  A   Yes, I did.

15  Q   And it indicates some biographical; a year of birth,

16      gender, race, et cetera?  Things like that.  Did you

17      complete that information?

18  A   Yes, I did.

19  Q   Do you recall, as you were completing this form, were

20      you speaking with her as you were completing it?

21  A   No, I was not.  I filled it out after I left the

22      room, with the information she had told me.

23  Q   Now, there's a section here that says, "Assailant

24      information."  And I'll actually read it.  "Did the

1      patient voluntarily report any of the following

2      relationships with the assailant?"  And then there

3      are a number of categories.  Parent, step-parent,

4      spouse, partner, ex-spouse, partner, parents --

5      parent's live-in partner, other relatives, stranger,

6      boyfriend, ex-boyfriend, something else,

7      acquaintance, friend, other. ·And there's a category

8      for male and female of each of those.

9              Did you make a mark or a one with a check

10     mark by "stranger" there?

11  A  Yes, I did.

12  Q  And how, if you recall, did you ask ████ -- well,

13     first of all, did you go through this check list with

14     her and ask her each of these items on the check

15     list?

16  A  No, I did not.

17  Q  How did you obtain the information that led you to

18     mark "stranger" on the form?

19  A  I asked ████ if she knew this person who had taken

20     her out of her grandmother's home.

21  Q  And how did she answer that?

22  A  She said no.

23  Q  And you've also made check marks -- there's another

24     section here, "Acts described by the patient"; is

1    that right?

2  A  Yes.

3  Q  And you made a check mark, "Was there penetration,

4     however slight, of" and you made a check mark for

5     "vagina."  Is that right?

6  A  I can't see it.

7  Q  I'm sorry.

8  A  Yes, I did.  "Penetration of the vagina with the

9     finger" is how I marked it here.

10 Q  And did you also, in your narrative note, also note

11    that she had described that she had touched his penis

12    to her vagina?

13 A  I believe so, yes.

14 Q  And so that we're clear, Doctor, after you asked her

15    whether she knew him, the person who took her, and

16    she said no, did you ask her any follow-up questions,

17    like, Had you ever seen him before?  Anything like

18    that?

19 A  I did.  Because it seemed strange to me that this

20    person would enter her grandmother's house.  She said

21    that he entered without force.  It just seemed like a

22    funny story to me.  So I repeated, Do you know this

23    person?  Have you see him before?  And she said no.

24 Q  You said that part of the physical exam involved a

1        genital exam; is that right?

2    A   Yes.

3    Q   And what is involved in the genital exam that you

4        performed on her?  What was involved?

5    A   It was at the end of the exam.  I had her lying on

6        the bed with her knees open such that I could see her

7        vagina.  I pulled back her labia majora so that I

8        could look at the entire external genitalia.  And

9        that's what I did.

10   Q   And what did you find when you performed that

11       examination?

12   A   I found that it looked normal.  I didn't see any

13       evidence of blood.  I didn't see any evidence of

14       swelling or bruising.

15   Q   Did you perform a pelvic or cervical examination with

16       a speculum?

17   A   I did not do an internal genital exam, no.

18   Q   And why is that?

19   A   Based on what she had told me happened, and based on

20       the fact that her external exam appeared normal, I

21       did not believe it was necessary to do that.

22   Q   And did you draw any conclusion, based on your

23       findings, the normal findings from the genital exam,

24       did you draw any conclusion from that about whether

1        she had, in fact, been penetrated by a finger or had

2        her vagina touched, her genitals touched, by a penis?

3    A   I couldn't make, I guess, an assessment, one way or

4        the other, based on what I had seen.

5    Q   And why is that?

6    A   Because it would be possible that these things would

7        have happened, but that there would have been no

8        evidence of blood or bruising or swelling from what

9        she told me had occurred.

10   Q   You said that you performed the rape evidence kit.

11       Briefly, what is involved in performing the rape

12       evidence kit?

13   A   It's a procedure, basically.  You obtain -- whenever

14       someone comes in with a history of a sexual assault

15       -- it's a box, and you open it up, and there's a

16       booklet inside, and it goes through directions of how

17       to obtain the different types of samples, as well as

18       the papers or the tubes or whatever you need to

19       collect those different samples.

20   Q   And what do you do with those samples as you collect

21       them?

22   A   Once you collect them, you seal them and --

23   Q   I'm sorry.  I think I skipped a step or two.

24                What sort of samples is it that you're

1       collecting?

2    A   Lots of different samples.  You collect blood

3        samples.  You collect hair samples.  You collect

4        samples of anything from under the nails.  You

5        collect swabs of the genitalia, many samples.

6    Q   And what do you do with the samples as you collect

7        them?

8    A   You put them in whatever receptacle that they've

9        given you to put them in.  Whether it's a piece of

10       paper that you fold over, and put....

11   Q   And what happens to all those samples once they're

12       collected?

13   A   So once all the samples from the box are collected,

14       you put everything back in the box and then -- along

15       with all the paperwork that you do with -- that I

16       have filled out.  And it goes into the box and it

17       gets sealed and put in a safe place until the police

18       can pick it up.

19   Q   And did you seal the box in this case?

20   A   I do not believe that I sealed the box.

21   Q   I'm going to show you this and ask you if you

22       recognize that.

23   A   Yes, I recognize this.  I filled this out.

24   Q   And what is that?

1    A    This is the evidence collection kit.  This is the

2         rape kit.

3    Q    And do you see that the seal, the evidence seal on

4         the side here is dated?

5    A    I dated it, and it has my initials, yes.

6    Q    Does that indicate to you whether you sealed it,

7         or...?

8    A    Not necessarily.  It could be that I signed it and

9         dated it, but that the nurse put on the seal.  We

10        work together.

11   Q    I see.  Okay.  In any event, my question may have

12        been misleading.

13             Were you present when it was sealed?

14   A    Again, I'm not positive I was present when it was

15        sealed, but I can say I participated in putting it

16        together so it could be sealed.

17   Q    And do you, of your own knowledge, know what happened

18        to it after it was sealed up?

19   A    I gave it to Gail, and Gail, from there, put it to

20        wherever you're supposed to put it in the Children's

21        Emergency Room Department to keep it safe, in a

22        locked area.

23   Q    And just so the record's clear, those are your

24        initials and your handwriting, dating 7/14 --

42

1    A    Yeah.  That's certainly my handwriting.  I signed and

2         dated that.

3                   MR. DEAKIN: Move to introduce that as

4         Exhibit 11.

5                   THE COURT: Any objection.

6                   MR. SHEA: No.

7                   THE COURT: Okay.

8

9                                  (Whereupon, package

10                                 containing rape kit box

11                                 marked and admitted into

12                                 evidence as Exhibit No. 11.)

13

14   Q    Dr. Schainker, as part of the examination in this

15        case, did you order a toxicology screen be done?

16   A    I don't remember if I ordered it, or if the -- if it

17        was part of triage when the patient came in.  I don't

18        remember.  But it was done.

19   Q    Let me ask you another question, then.  A toxicology

20        screen was done?

21   A    Correct.

22   Q    And what is a toxicology screen?

23   A    A toxicology screen is a -- takes a sample of blood

24        or urine and looks for different substances in the

43

1    blood or urine.

2    Q    And what did the results -- why did you do one in

3         this case?

4    A    It certainly was appropriate in this case, given that

5         she gave a history of drinking something, smoking

6         something, and having -- I'm sorry.  Drinking

7         something, smelling some smoke, and snorting

8         something.

9    Q    And did you review the results of the toxicology

10        screen?

11   A    Yes, I did.

12   Q    And what did they show?

13   A    It showed that she had cocaine in her body.

14   Q    And what did the -- you've answered that.

15            MR. DEAKIN: No further questions.

16            THE COURT: Mr. Shea.

17

18                    CROSS-EXAMINATION

19   Q    (By Mr. Shea) Good morning.

20   A    Good morning.

21   Q    Now, on that same sheet that Mr. Deakin went through

22        with you, in the area where there's -- "Acts

23        described by patient.  Was there penetration, however

24        slight?" is the question.

44

1    A    Yes.

2    Q    Under "vagina," you checked "yes."

3    A    Yes.

4    Q    And you checked the category for "finger."

5    A    Yes.

6    Q    Okay.  You didn't check the category for "penis,"

7         correct?

8    A    No, I did not.

9    Q    And you didn't check the category for "penis" because

10        she told you that the penis did not enter her, even

11        however slight.

12   A    That's what she told me.

13   Q    Okay.  And if she had told you that the penis had

14        entered her, would you have done a more rigorous

15        internal exam?

16   A    It's possible.  Given that I didn't see any evidence

17        of trauma when I looked at her external exam, I

18        believe it's still less likely that the internal exam

19        would have shown anything that would have changed my

20        interpretation.  And that is actually pretty

21        traumatic to put children through.  So we do that as

22        little as possible.

23   Q    The --

24   A    Of course, I discussed this with my attending, Dr.

45

```
 1                Krauss, at the time.  So it's all hypothetical.  I
 2                can't say for sure what I would have done.
 3       Q        I mean, what you did was based on the information you
 4                were given that day.
 5       A        Correct.
 6       Q        Okay.  Is there more likely to be physical evidence
 7                if there is penetration by the penis?  And what I'm
 8                getting at is, I'm not really interested in the
 9                trauma part that you've already talked about, but
10                physical evidence that you could collect of who the
11                person was.
12       A        I can't say.  Certainly, if the person ejaculated,
13                you would be able to, theoretically, collect some
14                sample of semen.  But, also, I can imagine there
15                could have been penetration without ejaculation, so I
16                don't know that you can say for sure that there would
17                have been more physical evidence if that had
18                happened.
19       Q        Okay.  Does the length of time of the event affect
20                the amount of physical evidence?
21       A        The length of time of the sexual event?
22       Q        Yes.
23       A        I can't say one way or the other.
24       Q        Okay.  Just going down the list.  One of the
```

1          categories is, "Did the assailant touch the patient

2          with bare hands or fingers?"  "Yes," is checked.

3    A    Yes.

4    Q    Why is that important?

5    A    Why would it be important if he touched her with bare

6          fingers versus without bare fingers?

7    Q    Yes.  In terms of evidence collection.

8    A    We don't collect fingerprints off patients, so I

9          can't imagine what -- I'm trying to think of what a

10        finger would leave behind.  A finger actually doesn't

11        leave much evidence behind.  If you scratch someone,

12        that would be evidence behind.

13    Q    Okay.  All right.

14    A    But I filled out the form as it was stated.  So,

15        that's why I filled it out.

16    Q    Okay.  Now, in the -- you talked about part of what

17        your doing in the evidence collection kit is looking

18        for blood, correct?

19    A    (Witness nods.)

20    Q    Hair?

21    A    Uh-huh.

22    Q    How do you collect the hair?

23    A    You collect all the patient's clothes.  So that was

24        all collected and put in a bag.  There could have

1        been hair on there.  We collect -- anyplace you can

2        find hair.  But we also collect some of the patient's

3        hair, which means cutting some out as well as

4        plucking some out so that it can be -- so if there's

5        any hair found on the patient and in any of the other

6        areas that we collect evidence, it can be compared to

7        the patient's hair.

8    Q   Okay.

9    A   So that's what I meant by collecting hair.

10   Q   Okay.  And in terms of collecting hair, for instance,

11       she told you that the person, even though the penis

12       did not enter her vagina, that he had placed it

13       outside her genitalia?

14   A   That's what she told me.

15   Q   Okay.  And, so, part of what you'd be looking for in

16       an exam would be if that person had left behind any

17       pubic hair; is that --

18   A   Certainly.

19   Q   Okay.  Did you locate any hair or anything that you

20       were able to collect?

21   A   No, I did not.

22   Q   Okay.  It has -- going on to the next page -- and

23       I'll just run through it with you -- since the time

24       of the assault, has the patient -- and it asks a

48

1       number of questions.  And I'll just run through them.

2               Do you have a copy in front of you?

3   A   I don't.

4   Q   Okay.  If you remember, yourself, just answer the

5       question.  If you need to refer to the check list,

6       refer to the check list.

7   A   Sure.

8   Q   So, you asked the patient, "Since the time of

9       assault, have you changed your clothes?"

10  A   I asked her that.

11  Q   Okay.  And the answer was, "No"?

12  A   It was, "No."

13  Q   You asked her if she had bathed or showered, and the

14      answer was no?

15  A   The answer was, "No."

16  Q   You asked her if she'd washed off, and the answer

17      was, "No"?

18  A   The answer was, "No."

19  Q   Okay.  You asked her if she had brushed her teeth,

20      and the answer was, "No."

21  A   The answer was, "No."

22  Q   Used mouthwash.

23  A   The answer was, "No."

24  Q   Taken in fluids.

49

| | | |
|---|---|---|
| 1 | A | The answer was, "No." |
| 2 | Q | Vomited. |
| 3 | A | The answer was, "No." |
| 4 | Q | Kind of an absurd one, but, smoked cigarettes. |
| 5 | A | The answer was, "No." |
| 6 | Q | Urinated. |
| 7 | A | The answer was, "No." |
| 8 | Q | Douched. |
| 9 | A | The answer was, "No." |
| 10 | Q | Defecated. |
| 11 | A | The answer was, "No." |
| 12 | Q | And used enema. |
| 13 | A | The answer was, "No." |
| 14 | Q | Okay.  You go through those to see if the person's |
| 15 | | done anything that would have potentially destroyed |
| 16 | | evidence that you're looking for to collect. |
| 17 | A | Correct. |
| 18 | Q | Okay.  And, so, basically, you said you took a swab |
| 19 | | of her genitalia? |
| 20 | A | I did. |
| 21 | Q | Okay.  So you followed all the instructions in the |
| 22 | | evidence kit. |
| 23 | A | Correct. |
| 24 | Q | In an effort to collect as much evidence as you |

1          could.

2     A    Correct.

3     Q    Thank you.

4                    THE COURT: Anything else?

5                    MR. DEAKIN: No.

6                    THE COURT: You may step down.

7                    Next witness.

8                    MR. DEAKIN: Your Honor, the people of the

9          Commonwealth of Massachusetts call Gael Rosen.

10                   THE COURT OFFICER: Face the Court and raise

11         your right hand.

12                   THE COURT: Do you solemnly swear to tell

13         the truth, the whole truth, and nothing but the

14         truth, so help you God?

15                   THE WITNESS: Yes.

16

17

18                   GAEL ROSEN, SWORN

19

20                   DIRECT EXAMINATION

21    Q    (By Mr. Deakin)  Ms. Rosen, can you state your name

22         for the jury, please, and then spell your first and

23         last name for the court reporter.

24    A    My name is Gael Rosen.  And I spell it, G-A-E-L, R-O-

51

1          S-E-N.

2     Q    Okay.  How are you -- first of all, what is your date

3          of birth, Ms. Rosen?

4     A    February 8, 1958.

5     Q    And what do you do for a living?

6     A    I work as a nurse.

7     Q    Where do you work as a nurse?

8     A    Children's Hospital.

9     Q    How long have you been a nurse?

10    A    Since 1981.

11    Q    And how long at Children's Hospital?

12    A    Since 1984.

13    Q    What are your responsibilities at Children's

14         Hospital?

15    A    I work in the Emergency Room, and there's many

16         responsibilities.  I work as a staff nurse and a

17         charge nurse.

18    Q    Were you working on Friday morning, the early morning

19         hours of Friday morning, July 14th of 2000?

20    A    Yes.

21    Q    And what were your responsibilities?  First of all,

22         what shift were you working?

23    A    I was working the 8 p.m. shift to 8 a.m. shift.

24    Q    And what were your responsibilities at that time?

52

1    A    I was the charge nurse that night.

2    Q    What does it mean to be a charge nurse?

3    A    I'm in charge of making sure the patients get into

4         the rooms and picked up by the doctors, and placing

5         all patients into beds that need admissions.

6    Q    Were you also doing triage?

7    A    And I was triaging also.

8    Q    And just briefly explain what triaging means.

9    A    Triaging is making an assessment of the child and try

10        and figure out how sick the kid is, and if he needs

11        to see a doctor right away, or if he can wait a

12        little bit.

13   Q    Was a girl named ▮▮▮▮▮▮▮▮ brought in that night,

14        that morning?

15   A    Yes, she was.

16   Q    Do you recall the time that she was brought in?

17   A    Two o'clock.

18   Q    Okay.

19   A    A.M.

20   Q    What did you do when she came?

21   A    She was brought in by ambulance.  We had gotten a

22        call that she was coming in, and she was brought in

23        by ambulance.  And we were very busy that night, and

24        so I scrambled to make a bed for her.

53

1     And so when the ambulance came in, I was

2    able to put her into a bed. And then I was able to

3    triage her.  And our triage assessments just include

4    going over a physical assessment and vital signs.

5  Q Okay.  You took her vital signs?

6  A I did.

7  Q And what's involved in taking a vital sign?

8  A Temperature, blood pressure, heart rate, and

9    respiratory rate.

10  Q Do you have a specific memory of ▮▮▮▮▮▮▮

11    herself, the girl?

12  A No.

13  Q Okay.  Do you recall whether you were involved in the

14    examination itself?

15  A Just my triaging exam.

16  Q Okay.  Where did the examination take place?

17  A The triage exam, in Exam Room 14.

18  Q And is that also where her examination took place?

19  A I don't know.

20  Q Okay.  Were you responsible for, or did you

21    participate in sending her urine for a toxicology

22    screen?

23  A Yes, I was.

24  Q And did you have any involvement in the either

54

1            collecting or packaging of the rape evidence

2            protocol, or rape kit?

3     A    No.  Not collecting the evidence, no.

4     Q    Did you have anything to do with taking custody --

5            did you take custody of the...?

6     A    I did take -- after the rape kit was completed and

7            sealed, I then took the rape·kit to secure it in·our

8            safe.

9     Q    Who gave it to you?

10    A    Elizabeth.

11    Q    Dr. Schainker, who testified just before you?

12    A    Dr. Schainker, yes.

13    Q    And when she gave it -- well, first of all, let me

14           show you this.  I'm going to show you what is Exhibit

15           11 and ask you if you recognize that.

16    A    Yes.

17    Q    What is that?

18    A    That's our rape kit, the evidence collection kit.

19    Q    Is that --

20    A    Given to us by the state.

21    Q    And do you recognize that specific kit?

22    A    Yeah.  This is the kit --

23    Q    This is the kit in this case?

24    A    Yes.

55

1    Q    When you received that from Dr. Schainker was it

2         sealed?

3    A    Yes, it was.

4    Q    Do you see the seal on there now?

5    A    Yeah.   It's broken.

6    Q    The seal is now broken?

7    A    Uh-huh.

8    Q    When you received the kit, was it sealed in proper

9         fashion?

10   A    Yes.   We follow a protocol.

11   Q    What's the protocol?

12   A    The protocol is, after the evidence is collected and

13        put into the box, it has to be -- it has to have a

14        sticker on it and it has to have the evidence

15        collection on it.   It has to have the proper

16        information in the front of it.

17   Q    Did the rape kit that Dr. Schainker gave you in this

18        case have all that information in it?

19   A    Yes.

20   Q    What did you do with it?

21   A    I took it from her and I placed it in our safe area.

22        And that's when I wrote my signature.

23   Q    And what is the safe area?

24   A    We have a safe in our dirty utility room that's just

1        for rape kit itself, and a book to log it in.

2   Q    Who has access to that safe?

3   A    The nurse with the key.  Anybody can get the key --

4        not anybody.  The nurses can get the key and then

5        whoever is putting the kit into the safe would take

6        the key, the safe key, and put it in.

7   Q    Was there also a toxicology kit in this case?

8   A    Not to my knowledge.

9   Q    You don't remember?

10  A    I don't remember.

11  Q    Okay.

12              MR. DEAKIN: No further questions.

13              THE COURT: Mr. Shea.

14              MR. SHEA: Nothing.

15              THE COURT: You may step down.

16              Next witness.

17              MR. DEAKIN: Your Honor, the people of the

18       Commonwealth of Massachusetts call Brandon Sowers.

19              MR. SHEA: May we approach the side bar?

20

21  SIDE-BAR CONFERENCE:

22              MR. SHEA: What about all these much-wanted

23       breaks we were going to be taking.

24              THE COURT: We'll break -- we didn't get

1        started until ten o'clock.  Let's go.

2                    MR. SHEA: All right.

3                    (End of side-bar conference.)

4

5                    THE COURT OFFICER: Raise your right hand

6        and face the clerk, please?

7                    THE CLERK: Sir, do you solemnly swear the

8        testimony you're about to give this jury in the

9        matter now pending between the Commonwealth and the

10       defendant is the whole truth, nothing but the truth,

11       so help you God?

12                   THE WITNESS: Yes.

13

14                   BRANDON SOWERS, SWORN

15

16                   DIRECT EXAMINATION

17   Q    (By Mr. Deakin) Mr. Sowers, can you please state your

18       name -- first of all, I'm going to ask you to scoot

19       the chair forward as much as you can, pull the

20       microphone as close to you as you can, so you're

21       speaking as directly as you can into the microphone.

22                   Mr. Sowers, can you state your name,

23       please, and spell your first and last name for the

24       court reporter?

58

1    A    Brandon Sowers.  Spell my last name, you say?

2    Q    First name, as well.

3    A    First name, B-R-A-N-D-O-N; Sowers, S-O-W-E-R-S.

4    Q    And how old are you, Mr. Sowers?

5    A    Twenty.

6    Q    Where do you live?

7    A    Jetty Court, 1210 Jetty Court.

8    Q    Twelve -- I'm sorry.  What?

9    A    1210 Jetty Court.

10    Q    And how long have you lived there?

11    A    For my whole life.

12    Q    Who lives with you there?

13    A    My grandparents.

14    Q    Where is 1210 Jetty Court in relation to 34 Fidelis

15        Way?

16    A    It's, like, across the street, around the corner.

17    Q    There's a diagram to your left.  With the Court's

18        permission, if I may -- well, actually, I'll wait for

19        a moment.

20                Do you go to school?

21    A    Yes, I do.

22    Q    Where do you go to school?

23    A    I'm in college right now.  I go to Fisher College.

24    Q    And what are you studying in college?

1    A    Computer technology.

2    Q    What year are you in school?

3    A    Sophomore.

4    Q    Do you also work?

5    A    Currently, I don't.

6    Q    Sometimes when you've been going to college, do you

7         work part-time jobs?

8    A    Yeah.  Work-study just recently ended.

9    Q    And what were you doing for work-study?

10    A    I was working in the library.

11    Q    In the course of -- well, let me ask you this:

12         Say, in the year 2000, so we're talking two

13         years ago, now, you were living, obviously, at Jetty

14         Court, 1210 Jetty Court.

15         Did you get to know or did you come to know

16         of a man named Sonny?

17    A    I came to know of him.  I didn't know him personally.

18    Q    How well -- how acquainted with him were you?

19    A    Just -- before then?

20    Q    Yeah.  Before the night that this trial is all about.

21    A    Well, I didn't know him personally, but, just, like,

22         I say hi and bye to everybody in the community, so, I

23         probably just came across him a couple of times.

24    Q    How did you know his name was Sonny?

60

1   A   I just heard his name was Sonny.  I didn't know him.

2   Q   Do you know where -- do you see the man you know as

3       Sonny in the courtroom today?

4   A   Yes.

5   Q   Can you point him out, please, and describe an

6       article of his clothing?

7   A   An article of his clothing?

8   Q   Something he's wearing on his body.

9   A   A tie.

10   Q   You've pointed in the direction of two gentlemen, an

11       African American gentleman and a Caucasian gentleman.

12       Which one are you pointing to?

13   A   Oh, sorry.  African American.

14       MR. DEAKIN: May the record reflect the

15       witness has identified the defendant Owen McCants?

16       THE COURT: Yes.

17   Q   Do you know where Sonny was living in the summer of

18       2000?

19   A   No, I don't.

20   Q   Did you see him -- is there an area where you saw him

21       most often when you'd see him?

22       MR. SHEA: Objection.

23       THE COURT: Sustained.

24   Q   In the times when you would see him, where did you

1          typically see him?

2     A    Just -- I'm not sure.  I'm definitely not sure.

3     Q    Around the development?

4     A    Yes.

5                    MR. SHEA: Motion to strike.

6                    THE COURT: Overruled.

7     Q    I'm going to ask you about the late evening or the

8          night hours of Thursday, July 13th of 2000.  Do you

9          remember that night?

10    A    Yes.

11    Q    What were you doing in the evening?

12    A    A couple of friends and I was playing basketball and

13         then we stopped playing that, and then we finished

14         playing hide and go seek.

15    Q    Hide and seek?

16    A    Yeah.

17    Q    I'm going to ask you, if you would, Mr. Sowers, if

18         you could speak as directly into the microphone as

19         you can, and keep your voice up nice and loud so the

20         jury can hear you.

21              Where were you playing basketball and then

22         hide and seek?

23    A    Well, we were playing at the basketball court in our

24         neighborhood, and we was playing hide and go seek in

1    the neighborhood, just around the whole thing.

2  Q   And at some point that night, did police officers

3      approach you?

4  A   Yes, they did.

5  Q   Where were you when they approached you?

6  A   I can't say it off the top of my head.  I can point

7      it out to you.

8  Q   Okay.  I'm going to ask you -- when you're done

9      testifying, I'll ask you to point some things out on

10     the overhead.  So I'll ask you then where that was.

11         What did they do -- do you recall what time

12     it was when they approached you?

13 A   It was around, I think, eleven o'clock.  I'm not for

14     sure of the time.

15 Q   So that's an approx -- that's your best approximation

16     is about eleven o'clock?

17 A   Yes.

18 Q   And what did the police officers do when they

19     approached you?

20 A   They asked me -- they asked me and a couple of

21     friends of mine to -- they showed a picture and they

22     asked us have we seen this little girl.

23 Q   Was the picture of the little girl?

24 A   Yes.

63

```
 1    Q    Did you recognize her?

 2    A    I had seen her before, yes.

 3    Q    Did you know who she was by name?

 4    A    Not by name, but I knew who she was.

 5    Q    Did the police tell -- well, the police told you she

 6         was missing?

 7    A    Yes.

 8    Q    And how long was your conversation with the police

 9         officers?

10    A    Not that long.  About five -- between five and ten

11         minutes.

12    Q    And what did you do after that?

13    A    We looked for the girl.

14    Q    Where did you look for the girl?

15    A    Well, we split up and we -- well, I went down the

16         park, the basketball court, and the woods.  And I

17         looked down there and then I looked on Warren Street,

18         'cause there's another basketball court down there,

19         and there's woods, and I checked that area.  And then

20         after that, I checked Washington Street.  I went to

21         Washington Street.

22    Q    Did you -- when you were searching did you find any

23         sign of the missing girl?

24    A    No.
```

1   Q   At some point in your search, did you find yourself

2       on Fidelis Way?

3   A   Yes.

4   Q   And where were you coming from or -- where were you

5       coming from and going to when you found yourself on

6       Fidelis Way?

7   A   I was coming from Warren Street, headed towards

8       Washington Street.  Because I walked through Fidelis

9       Way and I was bouncing my basketball, walking down

10      the street, heading towards Washington Street, next

11      to St. Gabriel's, kind of.

12  Q   How much -- about what time would you say it was that

13      you found yourself on Fidelis Way coming from Warren

14      Street and going to Washington Street?

15  A   About 12:30.

16  Q   Is that a precise time, or your best estimate?

17  A   My best estimate.

18  Q   You said that you were bouncing your basketball?

19  A   Yes.

20  Q   Did you see anything that attracted your attention?

21  A   Well, as I was bouncing the basketball, I was in the

22      middle of the street, and I seen a green car, like,

23      coming towards me.

24  Q   It was coming towards you on what street?

1    A    On Fidelis Way.

2    Q    Had you seen where that green car was coming from?

3    A    As I was coming down, as I was coming down the

4         street, it was coming from my right.  I didn't see

5         where it was coming from.

6    Q    Did you see what street -- did you see the car turn

7         onto Fidelis Way?

8    A    Yes.

9    Q    And where did it turn onto Fidelis Way from?

10   A    It was on Washington Street, coming towards....

11   Q    And in the area of Fidelis Way where you were, how

12        was the lighting at that time?

13   A    It was dim.

14   Q    Dim?

15   A    Dim.  But there were streetlights.

16   Q    Where were you, in relationship to the nearest

17        streetlight, when you saw the green car coming?

18   A    I was right, like, kind of near it.  I was in the

19        middle of the street.

20   Q    What -- as the car got closer to you -- did the car

21        actually get closer to you?

22   A    Yeah.

23   Q    Where did the car go?

24   A    Where did it go?

```
1    Q    Yes.

2    A    Well, it went to the parking lot.

3    Q    Which parking lot?

4    A    Behind 34 Fidelis Way.

5    Q    So that would require it to go up -- it went up

6         Fidelis Way and then turned into the parking lot?

7    A    Yes.

8    Q    As the car went -- so it would have gone right by

9         you; is that right?

10   A    Yes.

11   Q    As the car went by you, were you able to determine

12        the green car, what make of car it was?

13   A    Yes.

14   Q    What kind of car was it?

15   A    Green Grand Am.

16   Q    Grand Am?

17   A    Yes.

18   Q    As the car went by you, did it go -- well, you say

19        you were in the middle of the street.

20   A    Yes.

21   Q    Did it go between you and the sidewalk?

22   A    No.  I had to get out the way.

23   Q    And when you got out the way, did you get out of the

24        way toward the other side of the street, or toward
```

67

1          the parking lot?

2     A    Towards the parking lot side of the street.

3     Q    As you got out of the way, how far away was the car

4          from you?  At its closest point, as the car came

5          toward you, how close to you was it?

6     A    I don't know an estimate of how close, but it was

7          pretty close.  Like, I could see through it.

8     Q    Did you note at the time -- by the way, you said it

9          was a green Grand Am.  How light or dark was the

10         shade of green?

11    A    It was pretty dark.

12    Q    Did you know at that time whom the car belonged to?

13    A    I didn't know who the car belonged to.

14    Q    I'm just going to ask you to answer that question.

15         One at a time.

16              You didn't know, at the time, who it

17         belonged to?

18    A    No.

19    Q    Do you know now, from your own knowledge, whom that

20         car belongs to?

21              MR. SHEA: Objection.

22    A    Now?

23              THE COURT: How do you know?

24              MR. DEAKIN: He said, No, I think.

68

1           THE WITNESS: Excuse me?

2           THE COURT: Do you know who the car belonged

3      to?

4           THE WITNESS: Now.  Now I do.

5    Q   I'm saying from your own knowledge.  Not things you

6        may have heard, but from your own knowledge.  Do you

7        know who the car belongs to?

8    A   No.

9    Q   As the car went by you, could you see if there were

10       people inside of it?

11   A   Yes.

12   Q   How many people were inside?

13   A   I only saw one person.

14   Q   Where was that person seated?

15   A   In the driver's....

16   Q   Could you see that person's face?

17   A   Yes.

18   Q   And did you recognize that person's face?

19   A   Yes.

20   Q   Who was the driver of the car?

21   A   Sonny.

22   Q   The same man that you pointed out in court here

23       today?

24   A   Yes.

1    Q    Could you see whether he saw you?

2    A    Yes, he saw me.

3    Q    How do you know he saw you?

4             MR. SHEA: Objection.

5             THE COURT: Sustained.

6             MR. SHEA: Motion to strike.

7             THE COURT: Stricken.

8    Q    Did you make eye contact with him?

9    A    Yes.

10            MR. SHEA: Objection.

11            THE COURT: Overruled.

12    Q    Did you notice anything unusual about him?  Anything

13        that attracted your attention?

14    A    Well, as I was in the middle of the street, like,

15        bouncing the ball, you know, he was driving.  And,

16        like, I don't know, it seemed like he was bobbing his

17        head back and forth.

18    Q    What did it appear to you he was doing as he bobbed

19        his head back and forth?

20            MR. SHEA: Objection.

21            THE COURT: Sustained.

22    Q    Was he sitting up normally behind the steering wheel?

23    A    It seemed like he was slouched over.

24    Q    Could you see him --

1              MR. SHEA: Objection.  Motion to strike.

2              THE COURT: Overruled.

3    Q    Could you see -- did you see his clothing?

4    A    No.

5    Q    Where did -- how -- where did the car go?  I'm sorry.

6         You said it went in the parking lot; is that right?

7    A    Yes.

8    Q    Did you see the car actually park in the parking lot?

9    A    No.  As I moved out of the car's way, I turned and I

10        seen it, like, turning into the parking lot, and then

11        I just kept on my way.  I didn't see it park.

12   Q    As the car -- after you went on your way, did you

13        tell anybody, at that time, about what you'd seen?

14   A    No.

15   Q    Did you discuss it with anybody?

16   A    Just the person I was with.

17   Q    Who's that?

18   A    Miguel.  That's about it.

19   Q    Is he a friend of yours?

20   A    Yes.

21   Q    And why did you discuss it with Miguel?

22   A    It just -- I was bouncing the basketball and I seen

23        him, you know, bobbing his head, so I was just, like,

24        -- and even he noticed it too.  So, we was just

1    talking that.

2                    MR. SHEA: Objection.

3                    THE COURT: Sustained.

4    Q    Did you tell the police -- there was a significant

5         number of police in the area; is that right?

6    A    Yes.

7    Q    Did you tell the police about it?

8    A    Not at that time, no.

9    Q    At the time that you saw the car pull in, was there a

10        police car down at the end of Fidelis Way stopping

11        people going in and out?

12   A    No.

13   Q    At any time later did you see a car at the end of

14        Fidelis Way, a police car, stopping people going in

15        and out?

16   A    I don't know.

17                    MR. SHEA: Just, can you repeat the answer.

18                    THE WITNESS: Which answer?

19                    THE COURT: The last one.

20                    THE WITNESS: I said, "I don't know."

21   Q    What did you do after you saw the car pull into the

22        parking lot?

23   A    What did I do?  I continued searching for the girl on

24        Washington Street.

72

1 Q Down on Washington Street?  Down Fidelis Way onto

2   Washington Street?

3 A Yes.

4 Q How long after you saw the car pull into the parking

5   lot did you continue to search for the girl?

6 A For about 20 minutes.

7 Q And did you find any sign of her?

8 A No.

9 Q Why did you stop searching?

10 A Because we just wanted to.  I don't know.  We just

11   stopped.

12 Q Did you make your way back to 34 Fidelis Way area?

13 A Yes.

14 Q How long did it take you to get back there after you

15   stopped searching?

16 A Like, five minutes.

17 Q At some point did you learn that the girl had

18   returned?

19 A Yes.

20 Q How much time went by between when you saw the green

21   car pull into the parking lot, the green car, driven

22   by Sonny, pull into the parking lot, and the time

23   that you learned the girl had come back?

24 A I don't know.

73

1    Q    Was it more than 20 minutes that you stopped

2         searching?

3    A    I don't know.

4    Q    Did you see Sonny any more that evening, after you

5         saw him driving the car into the parking lot?

6    A    Just when he came out with the police.

7    Q    And were you in the area when the -- when he came out

8         with the police?

9    A    Yes.

10   Q    Was the person that the police brought out the same

11        man that you had seen in the car?

12                    MR. SHEA: Objection.

13                    THE COURT: Overruled.

14   A    Yes.

15   Q    After you saw the police bring Sonny out of the

16        building did you approach the police at all?

17   A    No.

18   Q    Did you tell a police officer about what you had seen

19        earlier, about the car?

20   A    Yes.

21   Q    And do you recall the police officer's name that you

22        told?

23   A    No.

24   Q    Do you remember if it was a white police officer --

1          Caucasian or African American police officer?

2    A     I'm not sure.

3    Q     And when you told the police officer what you had

4          seen, did you point out the car to them that you had

5          seen drive in?

6    A     Yes.

7    Q     Do you know what the police did, after you pointed

8          out the car, with the car?

9               MR. SHEA: Objection.

10              THE COURT: Yes or no?  Do you know?

11   A     No, I don't.

12              MR. DEAKIN: Nothing further.

13              THE COURT: Mr. Shea.

14              MR. DEAKIN: Oh, I'm sorry.  I apologize,

15         your Honor.  May I -- I did want to just ask him to

16         show a few things on the diagram.  I just neglected

17         to do that.

18              THE COURT: All right.

19

20   Q     (By Mr. Deakin) Mr. Sowers, with the Court's

21         permission, if you would, could you stand up and

22         maybe if you could stand -- actually, why don't you

23         stand over here.

24              Do you recognize what this is an aerial

75

1    diagram of?

2    A    Yes.

3    Q    What is this an aerial diagram of?

4    A    The community, Fidelis Way.

5              THE COURT: You've got to keep your voice

6         up, sir.

7    A    Fidelis Way, the community.

8    Q    And stand over to the side so all the jurors can see

9         the diagram.

10             Can you show me on this diagram, or

11        wherever it would be on the diagram, where your home

12        at 1210 Jetty Court is?

13   A    Right in there.

14   Q    And when you were hanging out -- well, strike that.

15             You said you were playing basketball?

16   A    Yeah.

17   Q    And where were you playing basketball earlier in the

18        evening?

19   A    (Witness indicates on diagram.)

20   Q    And then you said you stopped playing basketball and

21        played hide and seek.  Where did you play hide and

22        seek?

23   A    (Witness indicates on diagram.)

24   Q    All in the Jetty Court area?

1    A    Yeah.

2    Q    Now, you've said that at some point the police

3         officers, or a police officer, approached you and

4         showed you a picture of a girl that was missing.  Can

5         you show me where you were when they approached you?

6    A    (Witness indicates on diagram.)

7              MR. DEAKIN: May the record reflect he's

8         indicating another location in Jetty Court?

9              THE COURT: Yes.

10   Q    Now, you've also said that after you learned the girl

11        was missing you began searching, I believe you said,

12        by the basketball court and by the park where you

13        were playing hide and seek.  Is that in the same

14        area?  Where was that?

15   A    (Witness indicates on diagram.)

16   Q    So it was around the same area where you had been

17        playing basketball earlier; is that right?

18   A    Yeah.

19   Q    It's a basketball court or area that's sort of above

20        Jetty Court on the aerial view?

21   A    Yeah.

22   Q    And after you finished searching there you said you

23        went to search somewhere else.

24   A    I searched another basketball court down further.

1          It's not on the map.

2     Q    Off the diagram?

3     A    Off the diagram.

4     Q    And then where else did you search after that?

5     A    After that, I searched Washington Street.

6     Q    Can you indicate the location on Washington Street

7          where you searched?

8     A    I searched this area and some of the side streets.

9     Q    So you're indicating Washington Street, below Fidelis

10         Way on the diagram?

11    A    Yes.

12    Q    And that's the first time that you were searching on

13         Washington Street?

14    A    Yes.

15    Q    Where did you go after you left Washington Street,

16         after you stopped searching on Washington Street?

17    A    I went back to the front of 34 Fidelis.

18    Q    Keep your voice up nice and loud.  You went back in

19         front of 34 Fidelis Way?

20    A    Yes.

21    Q    And where did you go from there?

22    A    I was just there the whole time, until the police

23         left.

24    Q    I believe you said, though -- maybe I'm confused.

1       After you searched the second basketball court you

2       searched --

3   A   Washington.

4   Q   -- Washington Street.  Was that after you saw --

5       before or after you saw somebody driving the green

6       car in the parking lot?

7   A   That was after I saw.

8   Q   So, where were you coming from?  I think you said you

9       were coming from Warren Street --

10  A   I was coming from Warren Street, and there's a little

11      cut opening in the fence, which is a shortcut.  So I

12      cut through the fence and I walked through the area

13      where the basketball court is, and I came up, and

14      then I walked -- like, these are the stairs.  I

15      walked up the stairs and I walked this way.  And then

16      I cut -- I was just walking through and then --

17  Q   Walking through Jetty Court?

18  A   Yes.

19  Q   Okay.  And then show where you went from there.

20  A   I walked this way.  This is the office and I walked

21      straight down here, which is near 34 Fidelis Way.

22      And I kept walking and then this is Washington

23      Street, and this is where I started searching, over

24      here.

1     Q    Now, was it as you were coming out Fidelis Way to go

2           to Washington Street that you saw Sonny driving the

3           green car?

4     A    Yes.

5     Q    And can you indicate -- there's a shadow over the

6           road here, I know.  A shadow from the photograph.

7           But can you indicate where you were on the road?

8     A    I was right here in the middle of the street.

9     Q    You're indicating an area sort of just level with the

10         edge of the building below --

11    A    There.  Right where the shade's at, I was right

12         there.

13    Q    And where was the green car that Sonny was driving

14         when you first saw it?

15    A    It was right here when I first saw it.  Coming from

16         this way.

17    Q    Did you actually see it turn from Washington Street?

18    A    Yes, I did.

19    Q    And which side of Washington Street was it turning

20         from?

21    A    Coming from this direction.

22    Q    So you're indicating from Washington Street toward

23         Monastery Road?

24    A    Yes.

80

1          MR. SHEA: Objection.

2          THE COURT: Sustained.

3    A    I just saw it coming from this way.

4    Q    So it made a left-hand turn onto --

5          MR. SHEA: Objection.

6          THE COURT: Sustained.

7    Q    What direction of a turn was that that it made from

8         Washington onto Fidelis?

9    A    As I was coming out --

10         MR. SHEA: Objection.  It's already planted,

11        the --

12         THE COURT: Overruled.

13   Q    Which direction did he turn onto Fidelis?  What kind

14        of turn did he make?

15   A    He made a left.

16   Q    And can you show the path that the green car traveled

17        on Fidelis Way?

18   A    This way.

19   Q    And can you indicate where it turned into the parking

20        lot?

21   A    It turned into -- I saw it turn right here.

22   Q    Okay.

23   A    And that's the parking lot right behind the building.

24   Q    That's the parking lot that's right next to -- right

81

1    behind 34 Fidelis Way?

2    A    Yes.

3    Q    You can resume the stand.

4              MR. DEAKIN: Nothing further, your Honor.

5    Thank you.

6              THE COURT: Mr. Shea.

7

8                    CROSS-EXAMINATION

9    Q    (By Mr. Shea) Good morning, Mr. Sowers.

10   A    Good morning.

11   Q    How are you doing?

12   A    Good.

13   Q    Now, you just testified that after you saw the man

14   you believed to be Sonny pull in to park the car, you

15   went back to searching --

16   A    Yes.

17   Q    -- for the little girl, right?

18   A    Yes.

19   Q    Okay.  And you said you went on searching for 20 more

20   minutes, correct?

21   A    Yes.

22   Q    Okay.  And then you stopped searching.

23   A    Yes.

24   Q    Okay.  And you stopped searching because when you

82

1           came back from Warren Street, everybody told you the

2           little girl had come running in and that she was

3           home.

4   A   No.  I didn't say Warren Street.  After I came back

5           from Washington Street.

6   Q   Okay.  Do you recall testifying in the grand jury on

7           this matter on August 21st of 2000?

8   A   Yes.

9   Q   Okay.  And do you recall, when you were asked, in the

10          grand jury, what made you stop searching, you

11          answered -- at the bottom of 10 and onto 11 -- "Well,

12          when we came back from Warren Street, everybody had

13          told us that the little girl had come running from

14          Monastery in a shirt, and then they said that she's

15          home, and we saw her in the ambulance."

16   A   That's what they told me.  I came back from

17          Washington Street.

18   Q   No, no.  Just, do you remember testifying to that

19          before the grand jury?

20   A   I don't remember saying Warren Street at all.

21   Q   All right.  If I were to show you the transcript of

22          your testimony at the grand jury, would that refresh

23          your recollection as to whether you said Warren

24          Street?

83

1    A    Yeah, if you show me.

2    Q    Okay.  Read that to yourself.

3              I said Washington Street.  I didn't say

4         Warren Street.  There's a mistake in the word.  I

5         said Washington Street.

6    Q    But you see the word "Warren Street" on here?

7    A    I see it.  But I said Washington Street.

8    Q    Okay.  So you're basically saying the transcriber

9         from the -- who did your testimony from the grand

10        jury mixed up Warren and Washington?

11   A    Yes.

12   Q    Okay.  But anyway, moving beyond that point, the

13        point was that what made you stop searching was when

14        you came back from, be it Washington or Warren

15        Street, you heard the young girl was back.

16   A    Yes.

17   Q    Okay.  And Mr. Deakin, when he asked you about that,

18        said, basically, after you had seen the car that you

19        believed Sonny was in pull in, you went about

20        searching 20 more minutes.

21   A    Can you repeat the question?

22   Q    Sure.  Mr. Deakin asked you, after you saw the man

23        you believed to be Sonny pull in --

24   A    Yes.

84

1    Q    -- that you went about searching.  And you said you

2          went back to searching, right?

3    A    Yes.

4    Q    And then you said you searched for 20 more minutes,

5          and then you stopped.

6    A    No.  Right -- no.

7    Q    You didn't tell Mr. Deakin that you searched for 20

8          more minutes and then stopped?

9    A    I don't remember saying that.  After I finished

10        searching for the girl -- oh, after I finished

11        searching for the girl, I came back, and they said

12        that she was found.

13    Q    What I'm trying to get at is the time frame between

14        when he -- asked you between the time you saw the car

15        you thought Sonny was in pull in Fidelis Way and how

16        much longer you went on searching.

17    A    Oh, yeah, it was 20 minutes.  Twenty more minutes.

18    Q    Twenty minutes.  That's what you testified to.

19    A    Yes.

20    Q    Okay.  Now, do you recall, at the grand jury, when

21        you were asked, "How long would you say" -- again,

22        page 10.

23             "How long would you say you continued to

24        search after you saw Sonny in the Grand Am, green

85

1    Grand Am?"

2              You answered: "About an hour-and-a-half."

3    A    I don't remember saying that.

4    Q    If I were to show you that portion of the transcript,

5         would that help you remember?

6    A    Yes.  But I still don't remember saying that.

7    Q    Okay.

8    A    Yeah.  But I didn't say that.

9    Q    So, you read the transcript of the grand jury

10        testimony to yourself, yes?

11   A    Yes.

12   Q    And you see that in response to the question how long

13        you say you continued to search after you saw Sonny

14        in the green Grand Am, that you answered, "About an

15        hour-and-a-half."  You saw that, right?

16   A    Yeah, that's what it says.  But I didn't say that.

17   Q    You're saying you didn't say that before the grand

18        jury?

19   A    I don't remember saying that.

20              MR. SHEA: May we approach side bar?

21

22   SIDE-BAR CONFERENCE:

23              MR. SHEA: I'd ask to move the statement

24        into evidence as a prior recorded statement under

1              oath.

2                        THE COURT: It's already before the jury.

3              It's there, he just doesn't remember saying it.

4                        MR. SHEA: I think it should be moved into

5              evidence.

6                        THE COURT: No.  It's already in evidence.

7                        (End of side-bar conference.)

8

9         Q    Now, you spoke to the police about this, correct?

10        A    Yes.

11        Q    All right.  Did the police ever ask you to look at a

12             photo array?

13        A    No.

14        Q    Did they ever give you a lineup, tell you to look at

15             a bunch of guys and pick one out?

16        A    No.

17        Q    Okay.  The person who drove, who you say drove by,

18             now, was he wearing a wool cap?

19        A    No, I didn't see a wool cap.  I just saw his face.

20        Q    So you didn't see any hat?

21        A    No.

22        Q    Did you see any stocking mask?

23        A    No.

24        Q    Okay.  And you testified that you didn't know Sonny,

87

1          Owen McCants, personally, correct?

2     A    Correct.

3     Q    And your testimony is you came across him a couple of

4          times; you're not sure.

5     A    I came across him a couple of times, just to say hi,

6          like I say hi to everybody in the community.

7     Q    Right.  You say hi and bye to people in the

8          community.

9     A    Yes.

10    Q    Okay.

11                    MR. SHEA: Nothing further.

12                    THE COURT: Anything else?

13                    MR. DEAKIN: Nothing further.

14                    THE COURT: Okay.  You may step down.

15               We're going to take the morning recess at

16          this time.

17                    THE COURT OFFICER: All rise, please.

18               (Recess 11:45 a.m. to 12:05 p.m.)

19

20                    THE COURT OFFICER: This court is back in

21          session.  Please be seated.

22                    MR. DEAKIN: Your Honor, the people of the

23          Commonwealth of Massachusetts call Benjamin Haughey.

24                    THE CLERK: Sir, would you raise your right

88

1    hand.

2              Do you swear the testimony you're about to

3    give this jury concerning the matter between the

4    Commonwealth and the defendant is the whole truth and

5    nothing but the truth, so help you God?

6              THE WITNESS: I do.

7              THE CLERK: Please be seated, sir.

8

9              BENJAMIN HAUGHEY, SWORN

10

11             DIRECT EXAMINATION

12   Q    (By Mr. Deakin) Mr. Haughey, I'm going to ask you to

13        scoot your seat in as close as you can get it, pull

14        the microphone as close -- I'd like you to sit as

15        forward as you can so you're speaking right on the

16        microphone, if you could.

17             Can you please state your name and spell

18        your last name for the court reporter?

19   A    It's Benjamin John Haughey, H-A-U-G-H-E-Y.

20   Q    And what's your date of birth?

21   A    1/18/83.

22   Q    What town do you live in?

23   A    Brighton.

24   Q    Whom do you live with in Brighton?

1  A  My parents and my brothers.

2  Q  How long have you lived in Brighton?

3  A  My whole life.

4  Q  Always in the same home?

5  A  No.  I moved once.

6  Q  Is your home in the general vicinity of LaRose Place,

7     Nantasket Ave., that area of Brighton?

8  A  Yes.

9  Q  And do you work, Mr. Haughey?

10  A  Yes, I do.

11  Q  What do you do?

12  A  I deliver flowers and I work at a car dealership.

13  Q  What do you do at the car dealership?

14  A  I move cars and pick up customers and stuff.

15  Q  What kind of dealership is it?

16  A  It's a General Motors.

17  Q  Do you recall Thursday, July 13th of the year 2000?

18  A  Yes, I do.

19  Q  Okay.  What were you doing that summer, generally?

20     First of all, were you still in school at that time?

21  A  Yes, I was.

22  Q  All right.  And where were you attending school when

23     school was in session?

24  A  Trinity Catholic.

90

1    Q    And what were you doing for the summer?

2    A    I was working.

3    Q    Where were you working?

4    A    MVP Sports.

5    Q    And had you had that job during the school year as

6         well?

7    A    Yes, I did.

8    Q    What year, what grade in school had you just

9         finished?

10   A    Junior year.

11   Q    So eleventh grade?

12   A    Yeah.

13   Q    Do you recall where you were the evening of Thursday,

14        July 13th of 2000?

15   A    I was at my friend's house.

16   Q    What's your friend's name?

17   A    Daniel Leone.

18   Q    And how does he spell his last name?

19   A    L-E-O-N-E.

20   Q    Where does he live?

21   A    He lives in Billerica.

22   Q    Were you in Billerica?

23   A    No, I wasn't.

24   Q    Whose home were you at?

91

1    A    He was at his uncle's house.

2    Q    And what's his uncle's name?

3    A    Daniel Leone.

4    Q    Same name?

5    A    Same name.

6    Q    Spelled the same way?

7    A    Yeah.

8    Q    And where does Daniel Leone, the uncle, live?

9    A    He lives on LaRose Place.

10   Q    And that's LaRose Place that intersects with

11        Monastery --

12   A    It's right there.

13   Q    Is that the one that dead-ends sort of onto Nantasket

14        Ave.?

15   A    Yes, it does.

16   Q    Do you know the number of his, Daniel Leone's, home?

17   A    It's 9 LaRose --

18   Q    9 LaRose Place?

19   A    LaRose Place.

20   Q    And what were you doing that evening?

21   A    We were just hanging out, pretty much.

22   Q    Who was -- whom were you hanging out with?

23   A    Just Daniel, Dan.

24   Q    Did you leave the Leone home?

1    A    Yeah, I did.

2    Q    And what time did you leave the Leone home?

3    A    About quarter to twelve.

4    Q    Okay.  Where were you -- how do you remember the time

5         that you left?

6    A    Because I had to be home at twelve o'clock.

7    Q  · And you were heading home?

8    A    Yeah.

9    Q    Just in general terms, how would you get -- how would

10        you go to get from LaRose Place to your home.  You

11        can stop at Nantasket Ave., if you want, but how

12        would you get to LaRose Place?

13   A    Coming out of the driveway, take a right down LaRose

14        Place, and then there was a hole in the fence where

15        we used to -- me and my friends cut a hole in the

16        fence and we'd hop through there.  That's how I'd go

17        home and go down Nantasket Ave.

18   Q    Okay.  Mr. Haughey, on the screen to the side of you

19        is Exhibit 2, a photograph.  Do you recognize that?

20   A    Yes, I do.

21   Q    What is that?

22   A    That's the hole in the fence.

23   Q    Okay.  Now, on this evening, as you walked down

24        LaRose Place -- first of all, tell me if you would,

1      on LaRose Place, as you walked down from No. 9, what

2      the lighting is like?

3   A  There's not much lighting.  It's -- there's a light

4      post right over there, and then there's one to the

5      right, and then there's another one to the left as

6      you --

7   Q  And -- I'm sorry.     .

8   A  -- as you come through the hole in the fence.

9      There's two on Nantasket Ave. and one on LaRose

10     Place.

11  Q  So, as you go through the hole in the fence -- when

12     you go through the hole in the fence, coming from

13     LaRose Place onto Nantasket Ave., what kind of area

14     is there as you come down through the hole in the

15     fence?

16  A  It's a driveway.

17  Q  When you say a driveway, is it sort of wider than it

18     is --

19  A  Well, I mean, it's not, like -- it's -- several cars

20     could park there.

21  Q  It's sort of a parking area, for lack of a better

22     term?

23  A  Yeah.

24  Q  As you went through the hole in the fence on that

```
 1                night, approximately quarter to midnight, did

 2                something catch your attention?

 3      A    Yes.

 4      Q    What caught your attention?

 5      A    I saw a gentleman pulling a little girl out of a car

 6           by her hair.

 7      Q    Okay.  Now, you talked about a car.  Was the car

 8           moving or parked?

 9      A    It was parked.

10      Q    Where was it parked?

11      A    Right up against that wall.

12      Q    The wall that's showing on the left side of Exhibit

13           2?

14      A    Yeah.  But it wasn't -- it wasn't right up against

15           the fence.  It was sort of -- it was down more.

16      Q    About how many feet away from the edge of the hole in

17           the fence would you say it was?

18      A    It was about ten feet away from the hole.

19      Q    Was it parked front in or back in?

20      A    It was backed in.

21      Q    So the front was facing onto Nantasket Ave.?

22      A    Yeah.

23      Q    And the back was facing the hole --

24      A    The back was facing the hole in the fence.
```

1    Q    You said that you -- tell the jury again what you say

2         you -- what you saw that caught your attention.

3    A    I saw a black man pulling out this little black girl

4         by the hair.

5    Q    By the hair?

6    A    Yeah.

7    Q    Where was the black man when you first saw him?

8    A    He was out of the car.

9    Q    And where was the black girl when you first saw her?

10   A    She was sitting in the passenger seat.

11   Q    And how did he pull her out of the car?

12   A    Like I said, by her hair.

13   Q    Did she actually come out of the car while you were

14        watching?

15   A    Yes, she did.

16   Q    Were you walking as you saw this, or were you

17        standing still?

18   A    I was walking.

19   Q    At any point, did you stop walking when you saw this?

20   A    For about four seconds.  I stopped and we made eye

21        contact.

22   Q    Did you see -- could you see the automobile as you

23        were watching the man pull the girl out of the car?

24   A    Yes, I could.

96

1   Q   Where was your attention primarily focused as you
2       watched the man pull the girl out of the car?
3   A   What do you mean by that?
4   Q   What were you looking -- where was your vision
5       primarily -- where were you looking the most as you
6       saw the man pull the girl out of the car?
7   A   I was looking through a window.
8   Q   Okay.  Could you tell what kind of a car it was?
9   A   Yes, I could.
10  Q   And what kind of a car was it?
11  A   It was either a Grand Am or a Grand Prix.
12  Q   And are those both made by Pontiac?
13  A   Yes.  They're the same.
14  Q   And why is it that you say either Grand Am or Grand
15      Prix?
16  A   Because they were both similar.  They look alike.
17  Q   And you say you were looking through a window.  Why
18      were you looking through a window?
19  A   Because I wasn't totally at the driver's side.  Like,
20      I saw him pulling her out and I was looking at, like,
21      the passenger seat, as this happened, through a
22      window.
23  Q   Which window of the car were you looking through?
24  A   The back window.  Not the back window, but, like, the

97

```
 1          fourth-door window, right down.
 2     Q    And what's your memory of that window, in terms of
 3          size?  How big or small was that window?
 4     A    It was fairly big.
 5     Q    Were you paying close attention to the car itself?
 6     A    Well, I saw it.
 7     Q    What were you paying the most attention to?
 8     A    To what was happening.
 9     Q    Could you see the color of the automobile?
10     A    Yes.
11     Q    What color was the Grand Am or Grand Prix?
12     A    It was a dark green.
13     Q    Did you -- I think you may have answered this.  I
14          apologize if I'm repeating a question.
15               Did you see the girl actually come all the
16          way out of the car?
17     A    Yes, I did.
18     Q    Where were you in relationship to the car when she
19          came all the way out of the car?
20     A    I was right at the driver's door.
21     Q    And you said that you made eye contact with the man
22          who was pulling the girl out of the car; is that
23          right?
24     A    Yes, I did.
```

98

1    Q    And you said he's an African American man?

2    A    Yes.

3    Q    As you made eye contact -- how long did you make eye

4         contact with the man?

5    A    Not long at all.

6    Q    What would you estimate?

7    A    Probably two to four seconds.

8              MR. SHEA: Could we approach the side bar?

9              THE COURT: Yes.

10

11   SIDE-BAR CONFERENCE:

12             MR. SHEA: I'd object to the identification

13        as the African American man because I didn't think

14        there'd be any identification.  And I didn't want to

15        jump up right then to highlight it for the jury.

16             MR. DEAKIN: My understanding of the

17        agreement is that Benjamin Haughey will not be asked

18        to --

19             MR. SHEA: Keep your voice down.

20             MR. DEAKIN: I'm sorry.  I apologize.

21             My understanding of the agreement is that

22        Benjamin Haughey will not be asked, Do you see the

23        man in the courtroom today?  He will not point to

24        that man.

1          I think I am fully entitled to elicit a

2     description of the man that he saw.  That's not an

3     identification, it's a description.  He will not be

4     asked to identify the man.

5          THE COURT: Objection overruled.

6          MR. SHEA: Just let me be clear.  I brought

7     a motion to suppress on his ·identification.  Mr.

8     Deakin represented to the clerk that we didn't need

9     to have that motion heard because he understood --

10         THE COURT: So what's the basis for a motion

11    to suppress on the identification?

12         MR. DEAKIN: There is --

13         MR. SHEA: The basis was they showed him the

14    front of <u>The Herald</u>.

15         THE COURT: The what?

16         MR. SHEA: They showed him the front of <u>The</u>

17    <u>Herald</u>.

18         MR. DEAKIN: And he told the police officer

19    that what he had seen, the police officer held up a

20    newspaper and said, "Is this the guy?"

21         THE COURT: Said what?

22         MR. DEAKIN: "Is this the guy?"  And Haughey

23    said, That looks like him.  I can't say from the

24    picture.

100

1              I even looked into whether there was

2        sufficient evidence of an independent basis to argue

3        that despite the impermissible --

4              THE COURT: He said he couldn't be sure.  So

5        there's no identification --

6              MR. DEAKIN: No, no.  I'm not going to ask

7        him to make any kind of identification, but I think

8        he should be allowed to describe the man as he did.

9              THE COURT: Objection overruled.

10             MR. SHEA: Note my objection.

11             (End of side-bar conference.)

12

13   Q    As you made eye contact with the man, can you

14        describe the expression on his face?

15   A    He was shocked.  He seemed like he was shocked.

16   Q    Were you able to get a sense of his height?

17   A    He was probably like five-foot-eight.

18   Q    How tall are you?

19   A    I'm five-seven.

20   Q    And he was close --

21   A    He was probably, like, an inch or two taller than me.

22   Q    Were you able to see what he was wearing?

23   A    Yes, I was.

24   Q    What was he wearing?

1    A   He had a knitted hat on, and he had a dark jacket.

2    Q   Were you able -- okay.

3           What was the weather like that night?

4    A   It was warm.  It was a warm night.

5    Q   And were you able to look at the girl as she was

6        pulled out of the car?

7    A   Yes.

8    Q   And describe her appearance.

9    A   She was really frightened.  She was crying.  That was

10      all I could really see about her.

11    Q   How much time did you spend looking at her?

12    A   About a second.

13    Q   Did you notice anything unusual about her face during

14      the second that you got to look at her?

15    A   No, I didn't.

16    Q   What happened after you finished making eye contact

17      with the man?

18    A   I started to walk away.  And I watched him go through

19      the hole in the fence with the girl.

20    Q   And how did they get through the hole in the fence?

21    A   Well, he kind of shoved her through, and then went up

22      right behind her.

23    Q   After that happened, did you pay anymore attention to

24      the car?

102

1    A   No.   I went to my friend's house that lived --

2    Q   Did you -- at some later point were you asked to

3         describe the car?

4    A   Yes, I was.

5    Q   And when you were asked to describe the car, how many

6         doors did you say it had?

7    A   I said it had four.

8    Q   Is that because you specifically recall seeing a

9         four-door car?

10   A   No.

11   Q   Why did you say four doors?

12   A   Because, by looking through the back window, not the

13        back window but the side window --

14   Q   The rear side window?

15   A   Yeah, the rear side window.   It seemed a little too

16        big to be a two-door.

17   Q   So you were basing your estimate on the number of

18        doors on the size of the left rear window?

19   A   Uh-huh.

20   Q   Now, you said -- how long would you say you observed

21        the car, the man, and the girl from the time that you

22        first saw them coming through the hole in the fence

23          -- well, first of all, where did they go, if you

24        could see, after they went through the hole in the

1          fence?

2     A    Where did they go?

3     Q    Yes.

4     A    They went straight.  I didn't really see them after

5          the street.  Once they got through the hole in the

6          fence, I didn't really see where they went after

7          that.

8     Q    Why is that?

9     A    Why?  Because I was pretty nervous, actually.

10    Q    Okay.

11    A    And then I went to my friend's house.

12    Q    And which friend's house did you go to?

13    A    Jessie Cedrone.

14    Q    So it's not the same -- you didn't go back to Daniel

15         Leone's house.

16    A    No.

17    Q    Where does Jessie Cedrone live?

18    A    He lives -- well, should I show you from the picture,

19         like?  Like, once you get out of the hole in the

20         fence, his house is directly in front.

21    Q    Now, what color is this house?

22    A    It's white.

23    Q    Do you recall the number of his house?

24    A    It's 29 or 27.

1    Q    Now, there's a large white house opposite that that's

2         29, and then a smaller white house next to it that's

3         29A.  Which house does Jessie Cedrone live in?

4    A    He lives in the larger one, white.

5    Q    And when you got into his house, who was there?

6    A    Him and his father.

7    Q    Did you tell them anything -- just yes or no, did you

8         tell them about what you had seen?

9    A    Yes.

10   Q    How long did it take you to tell them about what you

11        had seen?

12   A    About five minutes.

13   Q    At the end of those five minutes, what's the very

14        next thing that happened?

15   A    I was -- I just hung out with my friend for a while.

16   Q    Do you know what -- you said that Jessie and his,

17        Paul, were home; is that right?

18   A    Yes.

19   Q    Do you know what, if anything, Paul Cedrone did while

20        you hung out with Jessie Cedrone?

21   A    Well, he went outside and walked up LaRose Place.

22   Q    Is that something that you saw him do, or do you know

23        it because he told you?

24   A    I saw him do this.

105

1    Q    Did you actually watch him walk all the way up LaRose
2         Place?
3    A    Well, no.  I saw him leave the house.
4    Q    And how long was he gone?
5    A    He was gone for about five to ten minutes.  Not even.
6    Q    Were you still at the Cedrone home when he got back?
7    A    Yes, I was.
8    Q    How long did you stay at the Cedrone home before
9         something else happened?
10   A    I was there for about half an hour to 45 minutes.
11   Q    At some point, did you hear or see something that
12        attracted your attention?
13   A    Well, I heard a car start.
14   Q    And where, if you could tell, where was that sound of
15        the car starting coming from?
16   A    In front of the driveway.
17   Q    Which driveway?
18   A    Well, right in front, where the car was parked.
19   Q    When you heard the sound of the engine start, what
20        did you do?
21   A    I went to the window that looks out to the fence.
22   Q    And what did you see?
23   A    I saw someone in there, driving away.
24   Q    Could you see the person who was in the car?

106

1    A    Not really, no.

2    Q    And how did the car drive away?

3    A    It drove slowly.  It kind of -- at one point it

4         seemed like it was debating whether or not to go to

5         Union Street or to go to Washington Street.

6    Q    Are those the cross streets of Nantasket Ave.?

7    A    Yes.  See, I'll show you, actually.

8              MR. DEAKIN: May he get down?

9              THE COURT: Yes.

10   Q    Go ahead.

11   A    This chair's so heavy.

12   Q    If you need a moment, take your time.

13   A    Well, here's Nantasket Ave.

14   Q    Okay.  Can you stand to the side of the map --

15   A    Oh, sorry.  Here's Nantasket Ave. right here.  And

16        this is Union, Union Street.  And that's Washington

17        Street.  And here's LaRose.  Like, his car was parked

18        right here.  And it seemed like he stopped right

19        here, and it seemed like he was going to -- he was,

20        like, debating on whether or not to go down this way

21        or that way.

22   Q    Is that as the car was pulling out?

23   A    Yes.

24   Q    You can resume the stand, Mr. Haughey.  Go back up on

1     the stand.

2                    Which way did the car go after it seemed to

3     you as if it was debating which way to go?

4  A  It went to Washington Street.

5  Q  And did you -- by the way, let me ask you, at any

6     point during this did you note the license plate

7     number of the car?

8  A  No, I didn't.

9  Q  As the car -- did you watch the car all the way up to

10    Washington Street?

11 A  No.  I just -- I watched it turn in that direction,

12    then it went down that way.  And that was that.

13 Q  Okay.

14                   MR. DEAKIN: Excuse me.  If I may have one

15    moment, your Honor.

16                        (Pause)

17 Q  As the car was driving away, as you watched it drive

18    away, could you see whether anyone was in the

19    passenger seat?

20 A  No, I couldn't.

21 Q  So you couldn't tell -- you couldn't see, or...?  You

22    couldn't see?

23 A  I didn't see anyone in the passenger seat.

24 Q  Could you see into the passenger seat?

108

1    A    I could, yes.

2    Q    And was there anyone in the passenger seat?

3    A    No, there wasn't.

4    Q    After the car left, what's the next thing that you

5         did?

6    A    I just hung out with my friend for another, like, ten

7         minutes, and then I went home.

8    Q    And what time was it, approximately, when you left

9         there?

10   A    It was about one o'clock.

11   Q    So you were late on your curfew?

12   A    Yeah.

13   Q    What, if anything -- well, let me just ask -- strike

14        that.

15             Just yes or no.  Did you discuss what you

16        had seen with either your friend Jessie or his father

17        Paul?

18   A    Yes, I did.

19   Q    And at that time, just after you saw it, did you

20        report to any kind of authority, to police, or

21        anybody else, what you had seen?

22   A    No, I didn't.

23   Q    Why not?

24   A    I don't know.  At first I was -- I don't know.  I

1        just didn't -- I didn't think anything of it.  I

2        thought it was probably her father, you know, little

3        girls get, you know, get spankings sometimes, and you

4        cry, you know what I mean.   And I just didn't think

5        anything of it.

6                   And then, the next morning I saw --

7    · Q  I'm going to stop you there.  When you got home, did

8        you go to bed?

9    A   Yes, I did.

10   Q   Did you tell anyone in your family about what you had

11       seen before you went to bed?

12   A   No, I didn't.

13   Q   At the time -- well, at the time you went to sleep,

14       had you seen any television news prior to going to

15       sleep?

16   A   No.

17   Q   I'm going to ask you, now, about the next day,

18       Friday, July 14th of 2000.  Did you tell anyone the

19       next day about what you had seen?

20                   THE COURT: Yes or no.

21   Q   Yes or no.

22   A   Yes.

23   Q   Whom did you tell?

24   A   I told my parents.

1    Q    Do you recall what time of day it was when you told
2         your parents?
3    A    It was, like, early afternoon.
4    Q    And at the time that you told your parents, had you
5         seen any television news, or, actually, I should
6         broaden the question; radio news, read a newspaper,
7         at that time?
8    A    No, I didn't.
9    Q    At the point when you told your parents, did you have
10        any knowledge of any crime committed in that area of
11        Fidelis Way the prior evening?
12   A    No.
13   Q    At some point during that day -- just yes or no --
14        did you learn about reports of a crime that had
15        happened in that area involving a man and a girl?
16   A    Yes, I did.
17   Q    And whom or how did you hear that news?
18             MR. SHEA: Objection.
19             THE COURT: Sustained.
20   Q    After you learned that news, did you discuss -- just
21        yes or no -- with anyone, the news that you had
22        heard?
23   A    Yes.
24   Q    Whom did you discus it with?  Not what you discussed,

1           but just whom did you discuss it with?

2    A    My friend and his father.

3    Q    Which friend?

4    A    Jessie and his father -- Jessie Cedrone and his

5           father, Paul Cedrone.

6    Q    When you heard the news about the crime, what, if

7           anything, did you think about what you had seen the

8           night before?  Just what you thought.

9    A    I thought that what I saw had something to do with

10          what was on TV.

11    Q    And when you thought that, did you come forward and

12          tell the police right after you learned the news that

13          day what you had seen?

14    A    No.

15    Q    Why not?

16               MR. SHEA: Objection.  Could we approach

17          side bar?

18               THE COURT: Yes.

19

20    SIDE-BAR CONFERENCE:

21               MR. SHEA: This is the problem I have.  It

22          could have been done much more artfully in terms of

23          leading.  I don't mean to critique my colleague here.

24          So now he said, "on TV."  And now Mr. Deakin, I

112

1    assume, is going to want to show the TV tape.

2            MR. DEAKIN: No.  I don't.

3            MR. SHEA: Not now, but later in the trial.

4            THE COURT: You're not going to show a TV

5    tape.

6            MR. SHEA: Okay.  Note my objection.

7            (End of side-bar conference.)

8

9    Q    When you learned or when you thought that what you

10        had seen might have something to do with a crime, you

11        said that you did not come forward right away and

12        tell the police.  Why not?

13   A    I didn't think that I needed to tell the police.  I

14        just thought that if he was caught, there'd be enough

15        evidence --

16           THE COURT: Excuse me, excuse me, excuse me.

17           He didn't think he needed to tell the

18        police.

19           Next question.

20   Q    Is there any other reason?

21   A    No.

22   Q    Were you afraid?

23           MR. SHEA: Objection.

24           THE COURT: Sustained.

113

1      A    You could say that.

2                THE COURT: The objection is sustained.

3      Q    You don't have to answer.  The objection has been

4           sustained.

5      A    Sorry.

6      Q    Did you tell the police, at some point, about what

7           you had seen?

8      A    Yes, I did.

9      Q    When did you tell them?

10     A    It was either Saturday or Sunday, the same week.

11     Q    So that would be July 15th or 16th?

12     A    Yes.

13     Q    So, either, depending on how you count it, either two

14          or three days after the Thursday night, or one or two

15          days after the Friday morning; is that right?

16     A    Yes.

17     Q    So it was the next Saturday or Sunday.

18                And where were you when you told the police

19          about it?

20     A    I was working.

21     Q    Where were you working?

22     A    MVP Sports.

23     Q    And did something happen that was unusual at your

24          work that day?

```
 1    A    Someone pressed the alarm button and the police came.

 2    Q    And -- well, when the police came -- what happened

 3         when the police came?

 4    A    I told them what I saw.

 5    Q    What changed in your mind from a day or two before

 6         when you thought you didn't need to tell the police

 7         until the day when they came to your work and you did

 8         tell them?

 9              MR. SHEA: Objection.

10              THE COURT: Sustained.

11    Q    Did you tell the police about what you had seen?

12    A    Yes, I did.

13    Q    Did you describe the automobile that you had seen to

14         the police?

15    A    Yes, I did.

16    Q    After you spoke to the police officer, did a

17         detective contact you?

18    A    Yes, he did.

19    Q    And how long after you spoke to the police officer

20         was it that a detective contacted you?

21    A    About a week.

22    Q    And was that -- did he contact you by phone, or in

23         person?

24    A    By phone.
```

115

1    Q    And did you tell -- do you remember the detective's

2         name?

3    A    I honestly don't.  McDonough, probably.

4    Q    Do you -- did you tell the detective what you had

5         seen?

6    A    Yes, I did.

7    Q    Did you describe the car for the detective?

8    A    Yes, I did.

9              MR. SHEA: Objection.

10             THE COURT: Overruled.

11   Q    Did you ever -- for the sake of clarity -- tell

12        anybody, police or otherwise, that you had seen a

13        Trans Am?

14   A    No, I didn't.

15   Q    After you spoke to the detective, were you called to

16        testify in the grand jury in this matter?

17   A    Yes, I was.

18   Q    And was that on Wednesday, August 16th of 2000?

19   A    Yes, it was.

20   Q    About a month later?

21   A    Yes.

22   Q    And in the grand jury, did you tell what you had

23        seen?

24   A    Yes, I did.

116

1           MR. SHEA: Objection.  May we approach side

2      bar?

3           THE COURT: Yes.

4

5   SIDE-BAR CONFERENCE:

6           MR. SHEA: He's basically trying to get in a

7      prior consistent statement.

8           MR. DEAKIN: No, I'm not.

9           MR. SHEA: Did you tell them what you'd

10     seen?  Did you tell the cop what you saw?  I mean,

11     it's all --

12           THE COURT: So he's says yes.

13           MR. SHEA: Well, it's a way of getting in a

14     prior consistent statement which is not admissible.

15           THE COURT: How is it inconsistent?

16           MR. DEAKIN: He said "consistent."

17           MR. SHEA: Consistent.  Prior consistent.

18     Which is inadmissible.

19           THE COURT: Sustained.  Come on.

20           (End of side-bar conference.)

21

22           MR. DEAKIN: Nothing further.

23           THE COURT: Mr. Shea.

24

117

CROSS-EXAMINATION

1

2    Q   (By Mr. Shea) Good afternoon.

3    A   Hi.

4    Q   All right.  You were kind enough, once, to meet with

5        me and my investigator at your house, correct?

6    A   Yes.

7    Q   All right.  And we didn't try to put words in your

8        mouth, did we?

9    A   No, you didn't.

10   Q   Okay.  And we asked you about the color of the car

11       you saw that night?

12   A   Yes, you did.

13   Q   And on that occasion, you told us you thought it was

14       red or maroon.

15   A   Yes, I did.

16   Q   Okay.  At one point you thought it was a four-door

17       car, correct?

18   A   I never said it wasn't a four-door.

19   Q   So you think -- the car you saw --

20   A   It could be a four-door, yes.

21   Q   Okay.  To the best of your recollection, you believe

22       it to be a four-door car?

23   A   I really couldn't tell you if it was a two-door or a

24       four-door.  I wasn't really paying attention to that.

118

 1           But I do remember looking through a back window.  It

 2           could have been a four-door; it could have been a

 3           two-door.  I'm not positive.

 4     Q     Okay.  When you talked to us that day, you told us

 5           that the guy had a black leather jacket on.

 6     A     Uh-huh.

 7     Q     Correct?  You've got to just say "yes."

 8     A     Well, I said he had a dark jacket.

 9     Q     All right.  When -- do you remember testifying in the

10           grand jury on this matter?

11     A     Yes, I do.

12     Q     Okay.  And do you remember testifying that -- being

13           asked, "Do you remember anything about his clothing?"

14           and answering, "He had a -- he had a jacket on, a

15           dark jacket.  I'm not sure what kind of jacket."

16                 Do you remember saying that?

17     A     Yeah, I do remember saying that.

18     Q     All right.  The next question is: "Where you able to

19           determine the color?"

20                 Do you remember answering, "It was black"?

21     A     This happened two years ago.

22     Q     That's okay.  I can refresh your recollection.  Would

23           it refresh your recollection to read what you said in

24           the grand jury?

119

1    A    If I said it -- if it's written there, I said it.

2    Q    I know. But courtroom stuff, I've got to go through

3         it.

4    A    All right. All right. Sorry.

5    Q    So, reading to yourself, were you able to --

6    A    Yes, I did say that.

7    Q    Okay. So, in the grand jury, you testified --

8    A    I said it was black.

9    Q    Thank you. Do you remember saying that when you met

10         with me and Mr. Sagrue that day that the gentleman

11         had no facial hair?

12    A    Yes, I did.

13    Q    Also, do you remember saying you could have reached

14         out and touched him, that's how close you were?

15    A    Yes, I did say that.

16    Q    Okay. Now, the man had a cap on that went down over

17         the tops of his ears.

18    A    He had a knit hat on.

19    Q    Okay.

20    A    I don't know if they were covering his ears.

21    Q    Okay. So he had a knit hat on.

22    A    Yes.

23    Q    Okay. And given that he had a knit hat on, were you

24         able to see his hair?

1    A    No.

2    Q    Okay.  Now, the man didn't have any kind of mask on

3         his face.

4    A    No, he didn't.

5    Q    And his face wasn't obscured, correct?

6    A    No.

7    Q    Okay.  The little girl, did she have any tape on her

8         eyes?

9    A    Not that I could see.

10   Q    Okay.  And you were looking at her, correct?

11   A    Yeah.

12   Q    I mean, you looked at the fact that the guy had her

13        by the hair.

14   A    Uh-huh.

15   Q    And, so, obviously, her face is right close to where

16        her hair is, right?

17   A    Yes.

18   Q    And you also saw her get out of the car.

19   A    Yes, I did.

20   Q    Okay.  And you didn't see any tape on her eyes?

21   A    No, I didn't.

22   Q    And you didn't see any tape on her mouth?

23   A    No, I didn't.

24   Q    Okay.  Now, just going back, you were at your friend

121

1              Daniel Leone's place?

2    A    Yes, I was.

3    Q    And you left his place around 11:50 p.m. that

4         night?

5    A    Yeah.

6    Q    Okay.

7    A    I'd say about that time.  Around that time, yes.

8    Q    If I were to show you your testimony --

9    A    I said 11:50 in the grand jury.

10   Q    All right.  And going from Leone's place, you were

11        cutting through the hole in the fence?

12   A    Yes, I was.

13   Q    About how long from the time you left Leone's place

14        till you got to the hole in the fence?

15   A    About two minutes.

16   Q    All right.  So --

17   A    It's fairly close.

18   Q    So, roughly, 11:52.

19   A    Yes.

20   Q    All right.  And you said you guys had cut the hole in

21        the fence?

22   A    Yes.  We did that, like, a year before.

23   Q    And that was to get back and forth between the dead-

24        end street.

122

1    A    Yes.

2    Q    And then who went to Cedrone's, right?  Is that how

3         you pronounce it?  Cedrone's?

4    A    Cedrone.

5    Q    Cedrone.  So you went to Cedrone's place and you were

6         there for a bit.

7    A    Uh-huh.

8    Q    And after about 45 minutes or so, did you hear the

9         car start up?

10   A    Yes, I did.

11   Q    And it's the car you believe that the guy took the

12        girl out of, right?

13   A    Yes.

14   Q    All right.

15   A    Well, it was the same car.

16   Q    And, so, about 45 minutes later that car drove away,

17        and all you could see, at the time, was a guy.

18   A    Yes.

19   Q    And, so, 45 minutes added on to 11:52 places it at

20        about 12:37.  Sometime just after 12:30.

21   A    Yeah.

22   Q    Okay.

23             MR. SHEA: Nothing further.

24             THE COURT: Commonwealth, anything else?

123

1            MR. DEAKIN: Yes, your Honor.

2

3              REDIRECT EXAMINATION

4   Q   (By Mr. Deakin) Mr. Haughey, you testified that you

5       told the police officer who came to your work, either

6       the Saturday or the Sunday after this happened; is

7       that right?

8   A   Yes.

9   Q   Which would be the 15th or 16th?

10   A   Yes.

11   Q   And you can't be more specific than that, I assume,

12       right?  It's one of those two days.

13   A   It's one of those two days.

14   Q   When you spoke to the police officer on that day, did

15       you describe the car that you had seen?

16   A   Yes, I did.

17   Q   And how did you describe the car that you had seen to

18       the police officer?

19   A   It was either a Grand Am or a Grand Prix.

20   Q   And did you describe the color?

21   A   Yes.  I said it was a dark green.

22   Q   Okay.  So you said a green Grand Am or Grand Prix a

23       day or two later.

24             Shortly thereafter, a Detective McDonough

124

1           called you?

2    A    Uh-huh.

3    Q    And asked you what you had seen; is that right?

4    A    Yes.

5    Q    And did you describe the automobile for him?

6    A    Yes, I did.

7    Q    And how did you describe the automobile for him?

8    A    I said it was a Grand Am or Grand Prix, dark green.

9    Q    And about -- give or take, about a month later, you

10         were called to testify in the grand jury; is that

11         right?

12    A    Yes.

13             MR. SHEA: Objection.

14    Q    And you described --

15             THE COURT: Excuse me.

16             MR. SHEA: Objection.

17             THE COURT: Sustained.

18             MR. DEAKIN: Your Honor, may we approach?

19             THE COURT: Yes.

20

21    SIDE-BAR CONFERENCE:

22             MR. DEAKIN: Defense impeached him with a

23    question about the color that he had said the car was

24    when his investigator and he came out there.  That's

1    a prior inconsistent statement.  I'm entitled to

2    rehabilitate him with prior consistent statements,

3    and that's all I'm doing.

4              And I think it's a huge point in this case

5    because he connects a man -- he can't identify him,

6    but a man, to a green Grand Am --

7              THE COURT: Well, you've done it twice.  How

8    many times do we have to do it?

9              MR. DEAKIN:  One more time.

10             MR. SHEA: I'd say that twice is enough.

11             MR. DEAKIN: I think I'm entitled to show

12   that --

13             THE COURT: Twice is enough.

14             MR. DEAKIN: Respectfully, and I don't mean

15   to push a point, he said it the day after, he said

16   it, you know, a few days later when the detective

17   called him, and he said it in the grand jury.

18             He didn't talk about he case with anybody

19   for 18 months, until the defense and his investigator

20   came.  And I think I'm entitled to show that he was

21   always consistent during the time.

22             THE COURT: And I'm entitled to make the

23   rulings in this case.

24             MR. DEAKIN: Understood.

1          (End of side-bar conference.)

2

3     Q    Mr. Haughey, from the time you -- well, first of all,

4          Mr. Shea asked you about a time when he and an

5          investigator came to your house to speak to you,

6          right?

7     A    Uh-huh.

8     Q    And do you recall when that was?

9     A    Not the exact date.  But it was about two months ago.

10    Q    So, the beginning of this year?

11    A    It may be even before -- maybe two to four months.

12    Q    So, end of last year, beginning of this year.

13         Somewhere in that ball park?

14    A    Yeah.

15    Q    So, over a year from the time that you had seen what

16         you saw at the hole in the fence; is that right?

17    A    Yes.

18    Q    And when they came to speak to you, Mr. Shea asked

19         you whether they put words in your mouth, and you

20         said no -- well, let me ask you first, over that

21         roughly year or slightly more from the time you

22         testified in the grand jury till the time that Mr.

23         Shea came to speak to you, had you spoken to anybody

24         in law enforcement -- police officers, district

127

1       attorneys, anybody -- about the case?

2    A   No.

3    Q   Had you gone over to the details of the case with

4        anybody?

5    A   No, I hadn't.

6    Q   When the defense attorney and its investigator came

7        to your home, they told you that they wanted to ask

8        you questions about the case?

9    A   Yes.

10   Q   And one of the questions they asked you was the color

11       of the car you had seen; is that right?

12   A   Yes.

13   Q   And how did you answer them?

14   A   They said it was a red Grand Am or Grand Prix.

15   Q   Did you supply any other alternative color besides

16       red?

17   A   Or a dark maroon.

18   Q   So you said red or dark maroon?

19   A   Yeah.

20   Q   Before they asked you that question, did they offer

21       to allow you to review your grand jury testimony and

22       police reports?  Did they offer to allow you to

23       review anything?

24   A   No.

1    Q    So they just asked you the question, over a year

2         later; is that right?

3    A    Yes.

4    Q    And you answered the question in that way; is that

5         correct?

6    A    Yes.

7    Q    Not long after that did you come to the district

8         attorney's office to speak to me prior to trial?

9    A    Yes, I did.

10             MR. SHEA: Objection.

11             THE COURT: Overruled.  You came to speak to

12        him.

13   Q    And did I begin to ask you questions about the case?

14   A    Yes, you did.

15   Q    Prior to me asking you questions, before I started

16        asking questions, did I show you any reports or the

17        grand jury minutes or anything?

18   A    You showed me my grand jury minutes.

19   Q    Before I started asking questions?

20   A    Oh, no, you didn't.  Sorry.

21   Q    When I asked you the color of the car, before that,

22        how did you answer?

23   A    I said it was red.

24             MR. SHEA: Objection.

129

1          THE COURT: Overruled.

2     Q    What did you say?

3     A    I said it was a red car.

4     Q    And after you said that, did I ask you to review your

5          grand jury minutes?

6     A    Yes, you did.

7     Q    Did you review your grand jury minutes?

8     A    Yes, I did.

9     Q    Having reviewed your grand jury minutes, did you come

10         to a conclusion about whether -- that you had -- did

11         you come to a conclusion about whether you were right

12         in answering that the car was dark red or maroon?

13    A    I was wrong.

14              MR. SHEA: Objection.

15              THE COURT: Overruled.

16    Q    Did you come to a conclusion about that?

17    A    I -- it refreshed my memory looking at my grand jury

18         minutes.

19    Q    Now, Mr. Haughey, you testified today that the car

20         you saw was a dark green Grand Am or Grand Prix; is

21         that right?

22    A    Yes.

23    Q    And as you testify, you understand that you are under

24         oath.

130

1    A    Yes, I do.

2    Q    And as you testify here today, are you sure, or how

3         sure are you that it was a dark green Grand Am or

4         Grand Prix?

5    A    I'm almost positive it was.

6              MR. DEAKIN: No further questions.

7              THE COURT: You may step down.

8              We're going to take the lunch recess at

9         this time, and I'd ask the jurors to be back in the

10        jury room by two o'clock.  We'll start promptly at

11        that time.

12             (Luncheon recess 1:00 to 2:00 p.m.)

13             THE COURT OFFICER: This court is back in

14        session.  Please be seated.

15             THE COURT: So, what's --

16             MR. SHEA: Judge, Mr. Deakin has something

17        he told me that we should share with the Court.

18             MR. DEAKIN: Your Honor, I wanted to make a

19        record about this.

20             If I may have leave just to shut this off.

21        I'm sorry.

22             By way of preface, I want to note that I

23        have turned over -- and I think defense counsel would

24        agree with me on this -- a fairly extensive amount of

1    exculpatory evidence in this case, some of which came

2    in trial preparation with the victim.   There were a

3    number of items that I turned over.

4              I realize, however -- and I don't think

5    this is a major issue, but in preparing a witness

6    today, it occurred to me that I had neglected to do

7    it -- that Officer William Kelly, one of the

8    witnesses for today, told me in a meeting several

9    months ago, quite some time ago, that when he arrived

10   on the scene he was looking around and he found a

11   sock propping open the front door, the buzzer door,

12   of 34 Fidelis Way.

13             It doesn't match the description of a sock

14   that ███████ had said that she saw the unknown man

15   lurking earlier, but he said he saw a sock, he

16   thought this is something, if this is really an

17   abduction, this may be relevant, and he picked it up.

18   He put it in the trunk of his police car, which was

19   actually a taxicab; they were undercover, and he put

20   it in there.

21             He promptly forgot about it, and didn't

22   think about it again until I was talking to him in a

23   meeting several months ago.   And I asked him then,

24   "Where's the sock?" and he said, "It's gone."   The

132

1         taxicab is gone.  They don't have the taxicab

2         anymore, they use different vehicles.

3              I made a mental note.  I may have made a

4         written note although I can't find it to notify

5         defense counsel that there was a sock found and that

6         it's no longer around.

7              As I was preparing Officer Kelly, it came

8         up -- he brought it up again as something he did.  It

9         then occurred to me, at that point, that I had not

10        disclosed it to defense counsel. And I wanted to make

11        a record that I did, today, obviously late.

12             I, frankly, don't think it's a big -- it's

13        not something that I would use in my case-in-chief.

14        I don't think it proves anything.  It's, at least,

15        marginally, arguably marginally exculpatory in the

16        sense that there was a sock taken and it's not

17        available to us.  But I did want to notify the Court

18        of it, and I don't know what, if anything, defense

19        counsel intends --

20             MR. SHEA: I'd make an oral motion to

21        dismiss, Judge.  I can only make an oral one because

22        it just came up.  It's destruction of evidence, which

23        seems to be something that's happened a few times in

24        this case.

133

1           I wasn't notified of the destruction of

2     evidence in a timely fashion.

3           It seems to me, from having listened to the

4     Commonwealth witness, that the entirety of their case

5     is to try and tie the first guy who -- Marvin Ampey

6     -- brings ███████ back to the house after he scared

7     her, that first guy puts the sock in the door,    ·

8     they're trying to say that the perpetrator of this

9     incident is that very same man.  Or at least they had

10    ███████ testify to that fact.

11          She says that --

12          THE COURT: That the person who put the sock

13    in the door is the same person who abducted her?

14          MR. SHEA: Fit the same description.

15          THE COURT: That's what the Commonwealth is

16    trying to prove?

17          MR. SHEA: In many ways, yes.

18          THE COURT: Then we must be listening to two

19    different cases.

20          MR. SHEA: Well, that's my memory of her

21    testimony.

22          THE COURT: I mean, it may be what she said.

23    That's different than saying that's what the

24    Commonwealth is trying to prove.

1          MR. SHEA: Fine.  All I'd say is she's the

2     victim, she says it was the same man.  That makes

3     that a very critical piece of evidence because it --

4     as she said, it's the same man.

5          THE COURT: If it's the same man, then it's

6     not your client.

7          MR. SHEA: Well....

8          THE COURT: So, obviously, the Commonwealth

9     is not trying to prove that it's the same man.

10         MR. SHEA: Well, let's put it this way.

11    It's as to the sock anyway.  The person would have

12    touched the sock, obviously, used their hands on it,

13    sweating in it.  And all of these things can be used

14    to extract DNA: skin, sweat, whether the person had

15    worn the socks.  We would have been able to have that

16    tested to determine whose DNA was on it.

17         The DNA testing that's been done so far in

18    this case has never even connected my client.  So

19    more DNA evidence would have certainly been likely to

20    our benefit.

21         The officer's not preserving but, in fact,

22    in many ways destroying it, he said, well, he

23    recognized it as evidence, so....  You don't hear

24    that he picked it up with tweezers and put it in an

1    evidence bag.  He picks it up, apparently, with his

2    hands.  If not with his hands, with something, and

3    throws it into the back of the taxicab to be forever

4    lost.

5              That is not preservation of evidence under

6    the --

7              THE COURT: So you want me to do what?

8              MR. SHEA: Dismiss this case.

9              THE COURT: Denied.

10             MR. DEAKIN: Your Honor, there's one other

11   matter --

12             THE COURT: Is there anything else you want

13   me -- excuse me.

14             MR. DEAKIN: I apologize.

15             MR. SHEA: I think the only other remedy for

16   me is to show, again, improper police procedure in

17   destroying evidence that's potentially exculpatory.

18             THE COURT: So you want him to testify about

19   the sock and that they threw it away or misplaced it.

20             MR. SHEA: I think that's the best way to

21   address it.

22             THE COURT: All right.  Fine.

23             MR. DEAKIN: Your Honor, one other matter

24   that I wanted to ask the Court, obviously out of the

1    presence of the jury.  I wanted to, your Honor, play

2    about a three- or four-second video clip of Owen

3    McCants walking out of the building with the police

4    officers through Officer Kelly, one of the police

5    officers who --

6              THE COURT: For what purpose?

7              MR. DEAKIN: Several purposes, your Honor.

8    First of all, ▮▮▮▮▮▮▮▮▮ has described that she

9    saw that on the television, him being walked out with

10   the police officers.  To allow the jury to see what

11   it was that she saw.

12             Also, your Honor, when he came out, by all,

13   I think everyone's agreement, he had put on a shirt

14   of his own choosing.  They didn't tell him what shirt

15   to put on.  And the shirt that he had on in the video

16   tape is a long-sleeved shirt.  Which, I think, is

17   significant, because I anticipate the defense is

18   going to argue it was a hot night, everybody said he

19   had a green T-shirt on, at least earlier.  Why would

20   he wear a long-sleeved shirt, which is actually the

21   one that the Commonwealth believes we will prove he

22   was wearing.  And what the video proves is that it's

23   a shirt he selected for himself to walk out of the

24   apartment building, and is, in fact, the long-sleeved

137

1    shirt sort of -- the sleeve sort of hanging out.  I

2    think that's a very important point.

3         Finally, your Honor, it gives the jury the

4    ability to see that the police officers who say that

5    he was not in handcuffs, not restrained, it was not,

6    you know, detained, but, in fact, was being escorted

7    out are, in fact, correct on that point.  He was

8    treated courteously and protected on his way out.

9         I think all those are relevant.

10        THE COURT: Defendant.

11        MR. SHEA: Well, I'll take them --

12        THE COURT: Do you agree or disagree?

13        MR. SHEA: I disagree.

14        THE COURT: All right.  Denied.

15        Bring the jury in.

16        MR. SHEA: So it's not coming in?

17        THE COURT: No, it's not.

18        MR. DEAKIN: May I ask the Court leave --

19   I'd like to ask Officer Kelley to view that tape

20   outside the courtroom, to see if it refreshes his

21   recollection about the length of the sleeves on the

22   defendant's shirt, so at least he can testify about

23   it, if it's not going to be shown to the jury.

24        THE COURT: You can take the tape out.

138

1          MR. DEAKIN: I'll just take the tape out.

2          MR. SHEA: I missed a little bit about that.

3     I'm sorry.

4          THE COURT: He wants somebody to look at the

5     tape outside the presence of the jury.

6          MR. SHEA: Oh, so he can say if it was long-

7     sleeved?

8          MR. DEAKIN: Correct.

9          MR. SHEA: Okay.

10

11          (Jurors enter at 2:20 p.m.)

12

13          THE COURT OFFICER: Face the clerk, raise

14     your right hand.

15          THE CLERK: Do you solemnly swear the

16     testimony you're about to give this jury concerning

17     the matter between the Commonwealth and the defendant

18     is the whole truth and nothing but the truth, so help

19     you God?

20          THE WITNESS: Yes, I do.

21          THE COURT OFFICER: Please be seated.

22

23          ALBERT ELIAN, SWORN

24

139

1                         DIRECT EXAMINATION

2     Q     (By Mr. Deakin) Mr. Elian, can I ask you, please, to

3           adjust the microphone, lift it up, so that you're

4           speaking as directly as you can into it.

5                 Please state your name and spell your last

6           name for the court reporter.

7     A     Albert Elian, E-L-I-A-N.

8     Q     How are you employed, sir?

9     A     I work for the state police crime lab in Sudbury.

10    Q     And what is your position at the state police crime

11          lab?

12    A     I am the supervisor of the toxicology unit.

13    Q     Can you please briefly describe your educational

14          background?

15    A     I have a bachelor degree and a master's degree in

16          chemistry from UMass Boston.

17    Q     And how long have you worked as a toxicologist?

18    A     I worked for the last 16 years.

19    Q     And is that all those years at the state police crime

20          lab?

21    A     Yes.

22    Q     Have you published in the field of toxicology?

23    A     Yes, I have.

24    Q     And how many articles have you published in the field

140

1       of toxicology?

2   A   About -- I published, like, a handfull, five.

3           MR. SHEA: I'm not going to dispute his

4       qualifications.

5           THE COURT: Fine.

6   Q   Can you please -- well, first of all, tell us what is

7       a toxicology kit?

8   A   A toxicology kit, it's a carton, it's a box, that has

9       a jar of urine and two gray-topped tubes of blood.

10  Q   And where does your lab get these toxicology kits

11      from?

12  A   From law enforcement.

13  Q   And are they often prepared at hospitals?

14  A   Yes, they are.

15  Q   Are they sometimes prepared in connection and in

16      conjunction with rape evidence protocols or rape

17      kits?

18  A   Yes.

19  Q   What does the packaging look like?

20  A   It's a box, like this one.  Half the size of the

21      sexual assault.

22          MR. DEAKIN: May I approach, your Honor?

23          THE COURT: Yes.

24  Q   I'm going to ask you, if you would --

1          THE COURT: Excuse me.  May I see counsel at

2     side bar for a second.

3

4     SIDE-BAR CONFERENCE:

5          THE COURT: What's this guy going to testify

6     to?

7          MR. DEAKIN: There's cocaine in her system,

8     and that the absence of marijuana or alcohol doesn't

9     mean that --

10          THE COURT: So why don't you get to that

11     point, because I didn't see him object when you asked

12     if the toxicology showed it this morning.

13          MR. DEAKIN: Your Honor, there's another

14     issue, which I don't want to tip my hand to defense

15     counsel -- he may or may not go that way -- in which

16     chain of custody of the rape kit is --

17          THE COURT: Is there some dispute about

18     whether or not she had cocaine?  Are you disputing

19     that?

20          MR. SHEA: No.

21          THE COURT: Move on.

22          MR. DEAKIN: Your Honor, if he wants to

23     stipulate to what his testimony will be, that's fine.

24     But I still have to do the chain of custody material.

142

1        It's in anticipation of the way that the defense

2        might go.

3               THE COURT: Are you challenging the chain of

4        custody?

5               MR. SHEA: There was one place where it

6        broke down, but I'm not really challenging it.  I

7        mean, that they could have handled better, right?

8               THE COURT: Pardon me?

9               MR. SHEA: Show that they could have handled

10       it better.

11              MR. DEAKIN: Your Honor --

12              THE COURT: Excuse me.  This is ridiculous.

13       We keep going over stuff that's been testified to.

14              MR. SHEA: I'm not doing that.

15       (End of side-bar conference.)

16

17   Q   And how is -- with respect -- with reference to

18       Exhibit 11, how does the toxicology kit look compared

19       to that?

20   A   It looks exactly the same thing, but the size is half

21       the size.

22   Q   Okay.  And when you receive them, typically, how are

23       they sealed?

24   A   They're sealed with evidence seal.

```
1    Q    And what is the purpose of the evidence seal?

2    A    To make sure that nobody has tampered with the blood

3         or urine.

4    Q    Okay.  Do you -- did you analyze a toxicology kit in

5         connection -- toxicology kit in connection with an

6         alleged sexual assault on ███████████?

7    A    Yes, I did.

8    Q    And when did the toxicology kit -- well, let me ask

9         you this: When did you, yourself -- well, what

10        happens to a toxicology kit when it comes to your

11        lab?

12   A    The law enforcement will bring it to the evidence

13        room where it's accepted by the evidence room.  And

14        then the evidence tech. will bring it to the

15        Toxicology Unit and put it in the refrigerator.

16   Q    And do you recall when you began working on the

17        toxicology kit in this case?

18   A    Can I refer to my notes?

19              MR. DEAKIN: May the witness refer to his

20        notes, your Honor?

21              THE COURT: Yes.

22   A    I started work on the case on 10/12/2000.

23   Q    October 12th.

24   A    October 12, 2000.
```

144

1    Q    And do you have a protocol that you follow as far as

2         examining the kits, the condition of the kits, when

3         you begin working on them?

4    A    Yes, we do.

5    Q    What is the protocol?

6    A    First we take the case jacket, which has a case

7         number, and you pick up the tox. kit and check the

8         numbers to match.  And then you look at the box to

9         make sure that the seal is not broken.  And then you

10        go ahead.  And then you go ahead and start working on

11        the case.

12   Q    And if the seal, if you see evidence of some

13        tampering with the seal or the box, what do you

14        do?

15   A    Then you make a notation on the -- on your notes,

16        that the seal was broken.

17   Q    Do you have a specific memory today of opening the

18        toxicology kit in this case?

19   A    No.

20   Q    Did you make any notation in your notes about there

21        being a problem with the packaging of the kit?

22   A    No.

23   Q    And what conclusion do you draw from that?

24   A    That the seal was intact.

1   Q   Now, what is the first thing that you did with the

2       toxicology kit after you opened it?

3   A   The first thing that I did, check for blood alcohol

4       content.

5   Q   Blood alcohol content?

6   A   Yes.

7   Q   And, just, in a very -- how do you do that?

8   A   It's a test called diffusion, which is a color test.

9       If there's alcohol, the color would change from

10      yellow to blue/green.

11  Q   And was any alcohol detected in the sample of ███

12      ████████      blood?

13  A   No.

14  Q   What's the next thing that you did?

15  A   We did -- I did what we call the drug panel screen.

16  Q   Drug -- I'm sorry?

17  A   Drug panel screen.

18  Q   Drug panel screen.  And are -- is that a screen for a

19      number of drugs at the same time?

20  A   This is -- actually, it's a urine screen for many

21      different drugs.

22  Q   A urine screen.  And what was the result of the drug

23      panel screen that you did?

24  A   Everything was negative, with the exception of

146

| | | |
|---|---|---|
| 1 | | cocaine metabolite in the urine.  It was positive. |
| 2 | Q | And what is cocaine metabolite? |
| 3 | A | It's the breakdown product when you take cocaine. |
| 4 | Q | And what conclusion can you draw from the presence of |
| 5 | | cocaine metabolite in ███████████ urine? |
| 6 | A | That she has cocaine in her system. |
| 7 | Q | What's the next test that you did? |
| 8 | A | The procedure -- our protocols call for when you have |
| 9 | | a positive finding in the urine to confirm and |
| 10 | | quantitate for the drug in the blood. |
| 11 | Q | And what were the results of that test? |
| 12 | A | It was positive for benzoylcog (phonetic) at 30 |
| 13 | | micrograms per deciliter. |
| 14 | Q | And this -- I can't even say it -- the thing you |
| 15 | | said, is that the cocaine metabolite? |
| 16 | A | That's the cocaine metabolite. |
| 17 | Q | The same thing that you found in her urine? |
| 18 | A | Yes. |
| 19 | Q | Can you draw any conclusion from the fact that |
| 20 | | cocaine metabolite was present in both her blood and |
| 21 | | her urine? |
| 22 | A | The conclusion from the blood is that benzoylcog |
| 23 | | (phonetic) in her blood, that we conclude that she |
| 24 | | was -- she administered cocaine within the last 24 |

1           hours.

2    Q    And how is it that you can know that it was within

3           the last 24 hours?

4    A    Because basically, cocaine and its metabolites stay

5           in your system, in your blood, for 24 hours, and then

6           it leaves.

7    Q    And can you -- could you test, could you do any test

8           to be more precise as to how recently she ingested

9           it, other than within 24 hours?

10    A    No.

11    Q    Mr. Elian, if an 11-year-old girl on the small side,

12           smallish, 11-year-old girl, had one shot of hard

13           liquor, for example, at approximately midnight on a

14           given day, and had her blood drawn, say, two hours

15           later, what result would you expect to find?  What

16           result would you expect to find in terms of alcohol

17           in her blood?

18                  MR. SHEA: Objection.

19                  THE COURT: Overruled.

20    Q    What result would you expect to find?

21    A    It should be negative.

22    Q    If an 11-year-old girl, on the small side, had two

23           shots of hard liquor at approximately midnight and

24           had her blood drawn two hours later, what would you

148

1      expect to find -- well, first -- I'm sorry.

2                Why is it that if this hypothetical girl

3      had a shot of alcohol and then two hours later had

4      her blood drawn that you would expect to find no

5      alcohol in her system?

6    A   Because the -- again, the blood will metabolize --

7      the alcohol will metabolize and it will leave her

8      system.  So it would be down to nothing.

9    Q   And there would be none detected.

10   A   Yes.

11   Q   If a hypothetical 11-year-old girl had two shots of

12     hard liquor at midnight and then had her blood drawn

13     at approximately two, what result would you expect to

14     find in the test for alcohol in her system?

15               MR. SHEA: Objection.

16               THE COURT: Overruled.

17   A   Approximately, it will be about .01 percent.

18   Q   .01 percent?

19   A   Yes.

20   Q   And, finally -- this is the last one I'm going to ask

21     you -- if the same 11-year-old girl drank two shots

22     of hard liquor at around midnight and then had her

23     blood tested at approximately 3 a.m., so three hours

24     later, what level of alcohol would you expect to find

149

1    in her blood when you tested it?

2   A   About .01 percent.

3   Q   I'm sorry.  If she had just two shots tested three

4       hours later?

5   A   About the same.  It would be about the same.

6   Q   Okay.  What, if any -- well, let me ask you this:

7       Does the absence of marijuana in ▓▓▓▓▓▓▓▓▓

8       urine indicate to you that she was not -- never

9       exposed to marijuana within the period prior to her

10      blood being tested?

11          MR. SHEA: Objection.

12          THE COURT: Sustained.

13  Q   Can you draw any conclusion -- let me ask you this:

14      If an 11-year-old girl on the small side inhales a

15      very small amount of marijuana smoke, would you

16      expect to find a positive result?

17          MR. SHEA: Objection.

18          THE COURT: Overruled.

19  A   Small amount of marijuana?

20  Q   Very small amount.

21  A   No.  It would be negative.

22  Q   If the same 11-year-old girl takes marijuana smoke

23      into her mouth, without inhaling it, and then blows

24      it out, would you expect to find a positive marijuana

1        test?

2   A   No.

3   Q   And, again, if I may -- well --

4            MR. DEAKIN: No further questions.

5            THE COURT: Mr. Shea.

6

7                CROSS-EXAMINATION

8   Q   (By Mr. Shea) Different people metabolize different

9       things at different rates?

10  A   Yes.

11  Q   And it depends on the size of the person, often?

12  A   Which?  Drug or alcohol are you talking?

13  Q   Well, let's say, well, alcohol.  The size of the

14      person matters, correct?

15  A   Yes.

16  Q   Okay.  The smaller the person, the slower they

17      metabolize the alcohol?  In the sense -- I'm sorry.

18         The smaller the person, the higher their

19      rate of reading on a smaller amount of it, on an even

20      amount of alcohol?

21  A   The smaller the person, the higher the blood alcohol

22      level will be.

23  Q   Right.  Meaning, if a person who weighed 90 pounds

24      had a beer, and a person who weighed 200 pounds had a

151

1      beer, the reading on the person who was 90 pounds

2      would be higher.

3   A   Yes.

4   Q   Now, marijuana, that stays in the blood for 30 days?

5   A   In the blood, no.  For a day.

6   Q   Marijuana?

7   A   Marijuana, yes, stays in the blood for a day.

8   Q   Just one day?

9   A   Yes.

10  Q   And how long does it stay in the urine?

11  A   Depends on usage.

12  Q   Okay.  Give me the range.

13  A   The person that uses once, three to four days.  A

14     user, three to four weeks.

15  Q   And how much marijuana must be taken in to cause a

16     reading?

17  A   Blood or urine?

18  Q   The more sensitive of the two.

19  A   A cigarette would show.

20  Q   Okay.  Which is more sensitive, blood or urine?

21     Which is more likely to pick it up?

22  A   Urine.

23  Q   Urine.  Okay.  What's the small amount of marijuana

24     you would need to have it show up in urine?

152

1    A    Smoke marijuana, you can see a cigarette.

2    Q    So a cigarette?

3    A    Yes.

4    Q    Less than a cigarette wouldn't show up?

5    A    It depends on the time, too.  If you smoke cigarette

6          during the whole night, or you smoke cigarette in an

7          hour, then it will show more in the one-hour than the

8          whole night.  But if you smoke in an hour, the level

9          will be higher faster.

10    Q    Okay.  So, if a person just took a couple of drags

11          off of a joint at a party, that wouldn't show up in

12          any test?

13    A    Correct.

14    Q    Now, did anybody show you a copy of this letter

15          before?  Just read it to yourself.

16                    Have you read the letter?

17    A    I am reading it.  I don't have my glasses.  To answer

18          your question, I haven't seen this.

19    Q    Okay.  On the evidence collection kit, your signature

20          isn't on here.

21    A    This is not the thing -- this is not the toxicology

22          kit.

23    Q    Okay.

24    A    This is the sexual assault evidence kit.  The

153

1       toxicology kit is a different kit.

2   Q   So they don't send you the whole evidence kit?

3   A   No.

4   Q   Okay.  You receive just the toxicology kit?

5   A   Yes.

6   Q   Okay.  And did you have to -- when you received that

7       kit, did you have make note of whether it was sealed?

8   A   Our procedure doesn't require that.

9   Q   Okay.  And so you don't know if it was sealed when

10      you received it?

11  A   Our protocol requires, if it's not sealed, to then

12      put notation on it.

13  Q   Okay.  And that's not the toxicology kit.  So do you

14      know if there's a notation on the toxicology kit?

15  A   The notation would be in the case folder.

16  Q   Okay.  Do you have the case folder?

17  A   Yes.

18  Q   Is there any notation?

19  A   No.

20              MR. SHEA: Nothing further.

21              THE COURT: Anything else?

22              MR. DEAKIN: If I may, just from my seat,

23      one question.

24

154

1                    REDIRECT EXAMINATION

2    Q    (By Mr. Deakin) People of different sizes metabolize

3         alcohol at the same rate or at different rates?

4    A    Different rate.

5                    MR. DEAKIN: Nothing further.

6                    THE COURT: You may step down.

7                    Next witness.

8                    MR. DEAKIN: Your Honor, the people of the

9    Commonwealth of Massachusetts call Shirley

10   Braithwaite.

11                   MR. DEAKIN: May we approach?

12                   THE COURT: Yes.

13

14   SIDE-BAR CONFERENCE:

15                   MR. DEAKIN: Your Honor, I didn't want to do

16   this in the hearing of the jury.  I'd ask that the

17   envelope that's part of Exhibit 1, that's not in

18   evidence, just be marked A for identification so that

19   I can refer to it, for the record.

20                   THE COURT: Fine.

21                   MR. DEAKIN: Okay.

22                   MR. SHEA: No objection.

23                   (End of side-bar conference.)

24

1          THE CLERK: Ma'am, do you solemnly swear the

2     testimony you're about to give this jury concerning

3     the matter pending between the Commonwealth and the

4     defendant is the whole truth and nothing but the

5     truth, so help you God?

6          THE WITNESS: Yes.

7

8          SHIRLEY BRAITHWAITE, SWORN

9

10          DIRECT EXAMINATION

11   Q    (By Mr. Deakin) Ms. Braithwaite, can you please

12        introduce yourself to the jury and then spell your

13        first and last name for the court reporter?

14   A    Hi.  I'm Shirley Braithwaite, S-H-I-R-L-E-Y, B-R-A-I-

15        T-H-W-A-I-T-E.

16   Q    And what's your date of birth, Ms. Braithwaite?

17   A    November 7, 1956.

18   Q    Where do you live?

19   A    36 Deckard Street, Dorchester, Mass.

20   Q    And whom do you live with there?

21   A    My husband and my three sons.

22   Q    Do you work?

23   A    Yes.

24   Q    What do you do?

1    A    I'm a dispatcher.

2    Q    For whom?

3    A    Frye's Towing.

4    Q    And does your husband work?

5    A    Yes.

6    Q    What does he do?

7    A    He's a driver for Idea Transportation.

8    Q    Where were you born?

9    A    Boston, Mass.

10   Q    And who raised you?

11   A    Polly Taylor.

12   Q    How old were you when Polly Taylor started raising

13        you?

14   A    About 11 years old.

15   Q    And why did you go to Polly Taylor's at 11 years old?

16   A    My mom died when I was nine.

17   Q    Where was Ms. Taylor living when you went to live

18        with her?

19   A    Ward Street.

20   Q    And where is that located?

21   A    In Roxbury.

22   Q    In Roxbury?

23   A    Yes.

24   Q    Did anyone else go with you to live with Polly Taylor

157

| 1 | | at that time? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | Who's that? |
| 4 | A | My brother. |
| 5 | Q | What's your brother's name? |
| 6 | A | Alphonso Southerland. |
| 7 | Q | Does he have a nickname that he's known by? |
| 8 | A | Yes. |
| 9 | Q | What's that? |
| 10 | A | Tucker. |
| 11 | Q | Is he older than you, or younger than you? |
| 12 | A | Older. |
| 13 | Q | By how much? |
| 14 | A | Two years. |
| 15 | Q | So he was approximately 13 when you went to live with |
| 16 | | Polly Taylor? |
| 17 | A | Yes. |
| 18 | Q | When you went to live with Polly Taylor, who else was |
| 19 | | living in her household at that time? |
| 20 | A | Owen McCants. |
| 21 | Q | And how old was he then? |
| 22 | A | About 18. |
| 23 | Q | How long did you continue to live with Polly Taylor? |
| 24 | A | Until I got out of high school. |

1    Q    And how old were you then?

2    A    I graduated at 17.  I stayed home for a year longer.

3         Eighteen.

4    Q    Did Owen McCants live with you the entire time that

5         you lived with Polly Taylor?

6    A    No.

7    Q    And how old were you when he left her household?

8    A    Maybe 14.

9    Q    What do you call Polly Taylor?

10   A    Mom.

11   Q    And is that how you view her?

12   A    Yes.

13   Q    What does Alphonso Southerland call Polly Taylor?

14   A    Mom.

15        MR. SHEA: Objection.

16   Q    Is that how he views her?

17        THE COURT: Sustained.

18        MR. DEAKIN: I'll withdraw that question.

19   Q    While you were living -- well, while you were living

20        in the same household as Owen McCants, did -- first

21        of all, let me ask you -- I apologize -- do you see

22        Owen McCants in the courtroom here today?

23   A    Yes.

24   Q    Can you point him out and describe an article of his

159

1          clothing, please?

2    A   He's sitting right there, with the black tie on.

3    Q   Is he the gentleman with or without a suit coat on?

4    A   Without.

5              MR. DEAKIN: May the record reflect the

6       witness has identified the defendant Owen McCants?

7              THE COURT: Yes.

8    Q   Does he have a name, a nickname, Owen McCants, that

9       he goes by?

10   A   Yes.

11   Q   What's that?

12   A   Sonny.

13   Q   While you were living in the same household for

14      roughly three years with Owen McCants, did you become

15      familiar with his handwriting?

16   A   Yes.

17   Q   And since you -- since he left the household where

18      you were living, did you have occasion, between then

19      and now -- and I'm trying to do the math quickly; I

20      don't know how many years that is, but over those

21      ensuing years -- to see letters written by Owen

22      McCants?

23   A   Yes.

24   Q   And how often would you say you've seen letters

160

1       written by Owen McCants?

2   A   Occasionally.

3   Q   Have you ever seen greeting cards written by Owen

4       McCants?

5   A   Yes.

6   Q   And where would you see those greeting cards?

7   A   In my mother's home.

8   Q   Meaning Polly Taylor?

9   A   Yes.

10  Q   And in those greeting cards, were they generally, the

11      envelopes, handwritten?

12              MR. SHEA: Objection.

13              THE COURT: Overruled.

14  Q   Were they generally handwritten?

15  A   Yes.

16  Q   And on some of those occasions, did they contain

17      messages inside, handwritten messages?

18  A   A few words.

19  Q   And did you continue to become -- over the time

20      seeing those, did you continue to be familiar with

21      Owen McCants' handwriting?

22  A   Yes.

23  Q   I want to direct your attention to the beginning of

24      2000.  So, say, January of 2000 or thereabouts.

1               Where were you living at the beginning of

2     2000?

3    A    914 Jetty Court.

4    Q    Jetty Court.  And that's in the Fidelis Way

5     development?

6    A    Yes.

7    Q    Let me ask you -- actually, I should step back a

8     little bit.  Have you ever lived in the building at

9     34 Fidelis Way?

10    A    Yes.

11    Q    When did you live there?

12    A    About 17 years ago.

13    Q    Okay.  And since living there, have you continued to

14     visit there regularly?

15    A    Yes.

16    Q    Why is that?

17    A    My mother lives there.

18    Q    Are you familiar with that building?

19    A    Yes.

20    Q    And you said that you were living in Jetty Court at

21     the beginning of 2000; is that right?

22    A    Yes.

23    Q    At some point thereafter, did you move?

24    A    Yes.

162

1    Q    When did you move?

2    A    I moved I believe it was May.

3    Q    Of 2000?

4    A    Yes.

5    Q    And after you moved, how often would you visit at 34

6         Fidelis Way?

7    A    Often.

8    Q    How often, say, in a typical week?

9    A    Maybe once.

10   Q    Where would you go when you visited at 34 Fidelis

11       Way?

12   A    My mom's house.

13   Q    Who lived in the apartment?  What was your -- what is

14       your mother's apartment number?

15   A    546.

16   Q    And the apartment, sort of next door, kind of catty

17       corner, if you will, is No. 545; is that right?

18   A    Yes.

19   Q    Who lived in the apartment, Apartment 545, back in,

20       say, spring of 2000?

21   A    Christine Isaac.

22   Q    And she's since passed away?

23   A    Yes.

24   Q    Was she related to Polly Taylor?

```
 1    A    Yes.

 2    Q    How?

 3    A    She was her aunt.

 4    Q    Who cared for Christine Isaac?

 5    A    Polly Taylor.

 6    Q    Did Polly Taylor have a key to Christine Isaac's

 7         apartment?

 8    A    Yes.

 9    Q    Was there a key to Polly Taylor's apartment kept in

10         Christine Isaac's apartment?

11    A    Yes.

12    Q    Now, let me ask you something about the keys in that

13         building.  In order to get into Fidelis Way -- well,

14         there's an initial door, sort of a swinging door

15         outside that anybody can walk into.  Then there's a

16         second door, sort of in the vestibule or the alcove

17         there that's what I call a buzzer door.  Are you

18         familiar with that door?

19    A    Yes.

20    Q    How many ways are there to get in through that door?

21         How can you get in through the buzzer door?

22    A    To be buzzed in, or have a key.

23    Q    And once you're through the buzzer door, there's both

24         -- well, there's a laundry room, but there's also an
```

1              elevator and a stairwell; is that right?

2    A    Yes.

3    Q    Do you need any sort of key to operate the elevator?

4    A    No.

5    Q    Do you need any sort of key to get into the stairwell

6              on the first floor?

7    A    Yes.

8    Q    And is that the same key as the buzzer door, or a

9              different key?

10    A    I'm not sure.

11    Q    Then, once, obviously a tenant gets up to their

12             apartment, there's a key to the front door of the

13             apartment.

14               Does the key to the front door of the

15             apartment also open the buzzer door and the

16             stairwell?

17    A    No.

18    Q    Those are different keys?

19    A    Yes.

20    Q    In the months leading up to the summer of 2000, did

21             you see the defendant Owen McCants?

22    A    Yes.

23    Q    Where did you see him?

24    A    Over my mom's.

1   Q   How frequently did you see him over there?

2   A   Not every time I went over there.

3   Q   Did you know where he was living at that time?

4   A   Yes.

5   Q   Where was he living?

6   A   With Christine.

7   Q   Now, you spent -- how many years did you live at

8       Jetty Court?

9   A   Twelve.

10   Q   And you're, I would assume, therefore, familiar with

11       it, sort of during all seasons of the year?

12   A   Yes.

13   Q   If I could ask you, with the Court's permission, to

14       step down and look at the overhead view.

15             MR. DEAKIN: May she step down, your Honor?

16             THE COURT: Yes.

17   Q   And take time, if you need, to orient yourself on the

18       aerial view.

19             Do you see where 34 Fidelis Way is?

20   A   Yes.

21   Q   Could you point out 34 Fidelis Way?

22             I can point out to you where Fidelis Way,

23       the road, is labeled.

24   A   Fifteen -- okay.  This is Fidelis Way.  Thirty-four

1        is right here.

2     Q    Okay.  And if you could, please indicate where your

3        residence and Jetty Court would be on that.

4     A    Okay.  That would be right here.

5     Q    Okay.  So, it's almost -- a little bit off the map,

6        to the right?

7     A    Yes.

8     Q    Let me ask you, on nice summer nights, do people tend

9        to hang out outside?

10    A    Yes.

11    Q    And where do they tend to hang outside in the

12       development?

13    A    Down here, the park area.  Here, some benches.  And

14       right here is a park.

15    Q    Please resume the stand, Ms. Braithwaite.

16            Do people tend to congregate -- on warm

17       summer nights, do people tend to congregate in the

18       area of 34 Fidelis Way, that building?

19            MR. SHEA: Objection.

20    Q    Based on your experience.

21            THE COURT: Overruled.

22    Q    Do people tend to congregate there?

23    A    Not really.

24    Q    I want to ask you, now, some questions, draw your

167

```
 1              attention to Thursday night, July 13th, going into

 2              the early morning hours of Friday, July 14th of 2000.

 3              Do you recall that night/early morning?

 4     A        Yes.

 5     Q        What did you do that night?

 6     A        That night I watched TV, went to bed kind of early.

 7     Q        Do you recall what time you went to bed?

 8     A        Around 9:30 or ten.

 9     Q        Were you awakened sometime after you fell asleep?

10     A        Yes.

11     Q        What woke you?

12     A        The telephone.

13     Q        And do you know what time that call came?

14     A        Not exactly.

15     Q        If you had to estimate, when would you estimate that

16              call came?

17     A        After midnight.

18     Q        And who answered the phone?

19     A        I did.

20     Q        What did you hear?

21     A        My mother trying to speak.

22     Q        And what did she say?

23     A        She said, "Shirley, they took our baby."

24     Q        Did she say anything else?
```

168

1    A    And I said, "What do you mean?"  And she said, "Nea's

2         gone."

3    Q    Did she say anything else?

4    A    Not that I can recall.

5    Q    How did she sound?  What was the tone of her voice

6         like as she was saying that?

7    A    I thought she was having a heart attack.

8    Q    Had you ever heard her sound like that before?

9    A    Years ago.

10   Q    So, it had been years since you heard that?

11   A    Yeah.

12   Q    How long did you talk to Polly Taylor?

13   A    A minute.

14   Q    And what did you do next?

15   A    I sat on the bed, and I was contemplating to go over

16        there.

17   Q    And did you, in fact, go over there?

18   A    Yes.

19   Q    How much time went by from the time that you hung up

20        the phone with Polly Taylor until the time that you

21        left to go over there?

22   A    Twenty minutes.

23   Q    And just so that we're clear, I should have asked you

24        this earlier -- well, never mind.

1              You said 20 minutes.  And how did you get

2       over there?

3   A   Taxi.

4   Q   How long is the taxi ride from your home to 34

5       Fidelis Way?

6   A   Ten, twelve minutes.

7   Q   What did you see when you got to Fidelis Way?

8   A   A crowd of people.

9   Q   When you got to Fidelis Way, was the cab stopped by

10      police officers at any point, or did anybody say you

11      couldn't go in?

12   A   It couldn't go in.

13   Q   And why was that?

14   A   There was too many people in the street.

15   Q   And how many people, would you say, were in the crowd

16      there?

17   A   Hundreds.

18   Q   What did you do?

19   A   I got out the cab and walked through the crowd.

20   Q   Where did the cab -- how far could the cab go?

21   A   Probably to the first parking lot.

22   Q   The first parking lot?

23   A   Yes.  Before --

24   Q   And that's where you got out?

170

1    A    Yes.

2    Q    And before you got to that point, did any police

3         officers stop the cab or anything like that?

4    A    I can't recall if they stopped him, but we couldn't

5         go any further.

6    Q    What did you do when you got there?

7    A    Made my way through the crowd, people were stopping

8         me, trying to get upstairs.

9    Q    Did you see people that you knew?

10   A    Yes.

11   Q    And just yes or no, did you talk to them?

12   A    Yes.

13   Q    Did they talk to you?

14   A    Yes.

15   Q    You say you were trying to get upstairs.  Where did

16        you go?

17   A    I walked up the pathway, up to 34.

18   Q    The front door?

19   A    Yes.

20   Q    And what, if anything, did you see at the front door?

21   A    I saw Owen standing there.

22   Q    That's Owen McCants --

23   A    Yes.

24   Q    -- the person you've identified?

171

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And what was he doing? |
| 3 | A | Waiting for someone to throw the key out of a window. |
| 4 | Q | And how did you know that's what he was doing? |
| 5 | A | He told me. |
| 6 | Q | What did he say? |
| 7 | A | · I went to go in and he said the elevator wasn't |
| 8 | | working, and he's waiting for someone to throw the |
| 9 | | key out of the window. |
| 10 | Q | What was he wearing? |
| 11 | A | Jeans, green top. |
| 12 | Q | Did he have anything on his head that you could see? |
| 13 | A | I don't recall. |
| 14 | Q | How did he appear to you? |
| 15 | | MR. SHEA: Objection. |
| 16 | | THE COURT: Sustained. |
| 17 | Q | What was his demeanor? |
| 18 | A | Anxious. |
| 19 | | MR. SHEA: Objection.  Motion to strike. |
| 20 | | THE COURT: Sustained.  Stricken. |
| 21 | Q | Did you observe anything about his actions or |
| 22 | | movement that struck you? |
| 23 | | MR. SHEA: Objection. |
| 24 | | THE COURT: Sustained. |

1    Q    And, I'm sorry, I know you just answered this, but
2         what did he say to you?
3    A    He said the elevator was broke, and he was waiting
4         for someone to throw the key out the window.
5    Q    And what connection, if any, did you draw between the
6         elevator being broken and somebody having to throw
7         the key out the window?
8    A    Because you have to go up the stairs, and you need a
9         key.
10   Q    To get into the stairwell?
11   A    Yes.
12   Q    Did Owen McCants say anything else to you at that
13        time?
14   A    No.
15   Q    Did he make any comment about the presence of a crowd
16        at 34 Fidelis Way?
17   A    Not that I recall.
18   Q    Would you think you would remember if he did?
19   A    Yes.
20   Q    Did he make any comment to you about ▇▇▇▇▇▇▇
21        disappearance?
22   A    No.
23   Q    What did you do?
24   A    When?

173

1     Q    After he said to you that he was waiting for someone

2           to throw the key down?

3     A    I waited with him, and somebody tossed the key out.

4           He unlocked --

5     Q    Let me stop you.  How much time went by between when

6           you got to the front door and spoke to him and the

7           time somebody threw a key out?

8     A    A minute.

9     Q    And who collected the key?

10    A    He did.

11    Q    What happened after he collected the key?

12    A    He went to open the door.

13    Q    Which door did he go to open?

14    A    The hall.  The stairwell.

15    Q    The stairwell door?

16    A    Yes.

17    Q    And was he able to open the stairwell door?

18    A    Yes.

19    Q    Was there any delay and hesitation on his part in

20          opening the stairwell door?

21    A    Yes.

22    Q    What was that?

23    A    I don't know.  Like it was stuck or it wouldn't open

24          right away.

174

1    Q    And what did you do?

2    A    I was rushing him.

3    Q    Why were you rushing him?

4    A    Because I wanted to get upstairs to see how my mother

5         was doing.

6    Q    Was he able, ultimately, to open the door?

7    A    Yes.

8    Q    And what did you do after the door was open?

9    A    Flew past him and ran up the stairs.

10   Q    Did you notice anything unusual about the stairwell

11        at that time?

12   A    It was dark.

13   Q    How far up was it dark?

14   A    All the way, I believe.

15   Q    Are the stairwells normally dark?  Is that stairwell

16        normally dark?

17   A    No.

18   Q    Had you ever seen it dark like that all the way up?

19   A    No.

20   Q    Did anyone come up the stairs behind you that you

21        know of?

22   A    Yes.

23   Q    Who was that?

24   A    Owen.

1    Q    Anyone else?

2    A    There could have been.  There were more people

3         downstairs.

4    Q    Does Owen McCants -- just parenthetically -- does

5         Owen McCants have a niece?

6    A    Yes.

7    Q    And what's her name?

8    A    Michelle?

9    Q    You have to answer.  I can't.

10             MR. SHEA: Asked and answered.

11             THE COURT: Sustained.

12   Q    And who's her mother?

13   A    I'm not sure.

14   Q    Do you know where she lives?

15   A    No.

16   Q    Where did you go when you got upstairs?

17   A    In my mother's apartment.

18   Q    Did you see where the defendant went after he was

19        behind you?

20   A    Yes.

21   Q    And where did he go?

22   A    In Christine's apartment.

23   Q    Did you see him anymore that night after he went into

24        Christine's apartment?

176

| | | |
|---|---|---|
| 1 | A | Not until he came outside later. |
| 2 | Q | Who was in your mother's apartment when you got |
| 3 | | there? |
| 4 | A | Lorraine ████ |
| 5 | Q | Who's that? |
| 6 | A | That's Rasheena's mother. |
| 7 | Q | So Nicki's maternal grandmother.  I'm sorry. ████ |
| 8 | | maternal grandmother? |
| 9 | A | Yes. |
| 10 | Q | Who else? |
| 11 | A | I think Ruby Williams was in there, but I'm not |
| 12 | | certain. |
| 13 | Q | Anybody else that you recall? |
| 14 | A | No. |
| 15 | Q | Were there people in the hallway, outside of her |
| 16 | | apartment? |
| 17 | A | Yes. |
| 18 | Q | Do you recall who they were? |
| 19 | A | No. |
| 20 | Q | What did you do when you got to your mother's |
| 21 | | apartment? |
| 22 | A | I tried to talk with my mother.  She couldn't speak. |
| 23 | Q | Were you ultimately able to speak with her? |
| 24 | A | Yes. |

```
1    Q    What did you talk to her about?

2    A    Tried to find out what happened.

3    Q    And how long did you talk to her?

4    A    Not long, because I wanted to go help look for Nicki,

5         so, five minutes or so.

6    Q    Look for Nicki?

7    A    I'm sorry.  Nea.  Excuse me.

8    Q    And then what did you do?

9    A    I told her I was going downstairs, and I would come

10        back to let her know when I found something out.

11   Q    Was anyone with you when you went downstairs?

12   A    No.  I went down by myself.

13   Q    What happened when you got downstairs?

14   A    I had to wait and make my way back through the crowd.

15        People were still stopping me.

16   Q    And at some point, as you were making your way

17        through the crowd, did something catch your

18        attention?

19   A    Yes.

20   Q    What was that?

21   A    I heard somebody say, Nea's right here.

22   Q    Did you see her yourself?

23   A    No.

24   Q    Did you see where she went from there?
```

1    A    No.

2    Q    Did you later find out where she went?

3    A    Yes.

4    Q    And whom did you find out from?

5    A    From Nicki.

6    Q    How much time passed between you got to 34 Fidelis

7         Way and when you heard that ███ was back?

8    A    Maybe 15 minutes.

9    Q    And what did you do after you had found out she was

10        back?

11   A    I went back upstairs to inform my mother.

12   Q    And after you did that, what did you do next?

13   A    I went back downstairs and rode to the hospital.

14   Q    When you got to the hospital, was ███ there yet?

15   A    I'm not sure.

16   Q    You said, I think, that -- well, let me ask you,

17        before you went to the hospital, I think you had

18        mentioned that you saw the defendant later, when he

19        came out; is that right?

20   A    Yes.

21   Q    And where were you when he came out?

22   A    Standing in the street.  He was coming down the path

23        of 34.

24   Q    How much time had past between when ███ came back

179

1    and when they brought him out?

2              Are you having difficulty --

3    A    Fifteen minutes, maybe.

4    Q    Is that -- how confident do you feel in that

5         estimate?  Are you having difficulty answering that

6         question?

7    A    Yes.

8    Q    If you don't know, it's acceptable to say that you

9         don't know.

10   A    Okay.

11   Q    When the defendant came out, was there anybody with

12        him?

13   A    Yes.

14   Q    And who was with him?

15   A    Some officers.

16   Q    Were they holding him?

17   A    No.

18              THE COURT: Excuse me.  Who has a telephone?

19   Q    So they weren't holding him.  How were they -- where

20        were they positioned with respect to him?  How were

21        they -- where were they in relationship to him?

22              MR. SHEA: Objection.

23              THE COURT: Sustained.

24   Q    Was he, was the defendant handcuffed or restrained in

180

1        any way that you could see?

2              MR. SHEA: Objection.

3              THE COURT: Sustained.

4    Q    When you -- at some point did you see ▮ at the

5        hospital?

6    A    Yes.

7    Q    Did you speak to her there?

8    A    Yes.

9    Q    What was her demeanor like at the hospital?

10    A    Very fidgety.

11    Q    Did she talk freely to you?

12    A    Somewhat.

13    Q    Just yes or no, did she tell you what had happened to

14        her that night?

15              MR. SHEA: Objection.

16              THE COURT: Yes or no.

17    Q    Yes or no.

18    A    Yes.

19    Q    How long did you spend at the hospital?

20    A    I was there all morning.

21    Q    And was ▮ still there when you left?

22    A    Yes.

23    Q    Have you seen ▮ since then?

24    A    Yes.

1     Q    Sometime after these events, did your mother show you

2          a letter?

3     A    Yes.

4     Q    And about how long after this event happened did she

5          show you a letter?

6     A    I'm not certain.

7     Q    And did you read the letter?

8     A    Yes.

9     Q    I'm going to show you, first, what's been marked A

10         for identification.  Do you recognize that?

11    A    Yes.

12    Q    What is that?

13    A    An envelope addressed to my mom.

14    Q    And have you seen that envelope before?

15    A    Yes.

16    Q    When did you see it?

17    A    When my mother gave me the letter to read.

18    Q    I'm going to show you three items in plastic that

19         collectively are labeled Exhibit 6.  Take as much

20         time as you need to look through them, then I'll ask

21         you, when you're done, if you recognize them.

22    A    Yes.

23    Q    And what is that?

24               MR. SHEA: Objection.

182

```
 1                    THE COURT: Overruled.

 2    Q    What is that?

 3    A    Letters written to my mom.

 4    Q    And have you seen those before?

 5    A    Yes.

 6    Q    When did you see them before?

 7    A    At my mom's, when she gave them to me to read.

 8    Q    And did you read the letter?

 9    A    Yes.

10    Q    Actually, letter in two parts.

11              Were you able to understand -- just yes or

12         no -- were you able to understand the contents --

13    A    Yes.

14    Q    -- the references?

15                    MR. SHEA: Objection.

16                    THE COURT: Overruled.

17    Q    The letter is address to "Aunt Polly."  Who is Aunt

18         Polly?

19    A    My mother.

20    Q    There's a reference, in the letter, to "Ruby."  Whom

21         do you take that to be a reference to?

22                    MR. SHEA: Objection.

23                    THE COURT: Sustained.

24    Q    I'm going to read you a list of names and ask you if
```

183

1    you are familiar with these names.

2              MR. SHEA: Could we approach side bar?

3              THE COURT: Yes.

4

5    SIDE-BAR CONFERENCE:

6              MR. SHEA: The person that wrote the letter

7    knows what the names refer to.  Polly testified as to

8    what she thinks they referred to.  That was allowed

9    in over my objection.  But for this witness to try

10   and say what the writer meant by the names in the

11   letter is going too far.  It's getting inside the

12   head of the writer.

13             MR. DEAKIN: I think it's admissible to show

14   that she is familiar with the content.  Very few

15   people in this world would be familiar with all that

16   content.

17             THE COURT: Objection sustained.

18             Look, you called her to identify his

19   handwriting.  Let's get to the point here.

20             (End of side-bar conference.)

21

22   Q    Do you recognize the signature on the letter?

23   A    Yes.

24   Q    Whose signature is that?

184 of 220

1    A    Owen's.

2              MR. SHEA: Objection.

3              THE COURT: Overruled.

4    Q    Do you recognize the handwriting in the letter?

5    A    Yes.

6    Q    Whose handwriting is that?

7    A    Owen's.

8    Q    And when you say "Owen," you mean Owen McCants?

9    A    Yes.

10             MR. SHEA: Objection.  Motion to strike.

11             THE COURT: Overruled.

12             MR. DEAKIN: Nothing further.

13             THE COURT: Mr. Shea.

14             MR. SHEA: Thank you.

15

16                   CROSS-EXAMINATION

17   Q    (By Mr. Shea) Were you called to testify before the

18        grand jury?

19   A    No.

20   Q    Now, you spoke with a Detective McDonough, correct?

21   A    Yes.

22   Q    And you spoke with him in August of 2001, correct?

23   A    Yes.

24   Q    All right.  And you never told Detective McDonough

185

1      that you saw Owen McCants wearing jeans and a green

2      shirt, did you?

3    A    I don't recall.

4    Q    If you -- what would refresh your recollection?

5    A    I don't remember him asking me the question.

6    Q    Did you -- that's not the answer.

7          What would help you recall?

8    A    I don't know.

9    Q    Would his police report help you recall?

10   A    Sure.

11   Q    Just read it to yourself.

12          Now, nowhere in that report does it mention

13   a description, correct?

14          MR. DEAKIN: Objection.

15          THE COURT: Overruled.

16          MR. DEAKIN: May we approach, your Honor?

17          THE COURT: Yes.

18

19

20   SIDE-BAR CONFERENCE:

21          MR. DEAKIN: He showed her the report to

22   refresh her recollection, to see if that would help

23   her remember what she said.  She read the report.

24   The proper question now is, Does that refresh your

186

1    recollection? not whether it's in the report or not.

2                  THE COURT: Sustained.

3                  (End of side-bar conference.)

4

5    Q    Did reading the report refresh your recollection?

6    A    Yes.

7    Q    And it's nowhere in the report, correct?

8    A    Correct.

9                  MR. DEAKIN: Objection.

10                 THE COURT: To that form of the question.

11   Q    You didn't tell Detective McDonough that Owen McCants

12        was wearing jeans and a green shirt, correct?

13   A    Not there.

14   Q    Okay.  He was interviewing you, gathering evidence,

15        wasn't he?

16   A    Yes.

17   Q    Okay.  Now, when you spoke to him, you said after you

18        got the call from Polly, Aunt Polly, you didn't

19        really meditate on it, you said you immediately

20        traveled by cab to 34 Fidelis Way, correct?

21   A    Yes.

22   Q    Okay.  And when he talked to you, you told him that

23        you were awoken sometime after 10 p.m., not after

24        midnight, correct?

1   A   I was awoken, yes, after ten.

2   Q   After ten.  Your testimony today was after midnight.

3       Yes?

4   A   Midnight's after ten.

5   Q   And the ride was ten or 12 minutes?

6   A   Yes.

7   Q   Okay.  Now, you couldn't get into Fidelis Way,

8       correct?

9   A   Yes.

10  Q   So you got out of the cab.  Was it on the access road

11      to Comm. Ave. or the access -- or on Washington

12      Street?

13  A   I got out at the first parking lot entering Fidelis.

14  Q   Okay.  Off of Washington Street?

15  A   Off of Fidelis.

16  Q   Fidelis is off of Washington and/or Comm. Ave.  You

17      got out of the cab off of Washington part or off of

18      Comm. Ave. part?

19  A   Off of Washington.

20  Q   Now, when you spoke to Detective McDonough, you

21      didn't tell him that Mr. McCants said, The elevator's

22      broke, it's not working, did you?

23  A   It doesn't say so, no.

24  Q   Okay.  In fact, what you said to him was -- and is

188

| | | |
|---|---|---|
| 1 | | your testimony that Mr. McCants was alone? |
| 2 | A | Yes. |
| 3 | Q | Okay.  Your statements to Detective McDonough were |
| 4 | | that Mr. McCants said to you, "'We' can't get in. |
| 5 | | Aunt Polly's going to throw the keys down to 'us,'" |
| 6 | | correct? |
| 7 | A | Okay. |
| 8 | Q | Is that correct? |
| 9 | A | Yes. |
| 10 | Q | You then told him that Polly Taylor dropped a set of |
| 11 | | keys to "them," correct? |
| 12 | A | I don't now if I said, "them." |
| 13 | Q | Would reading his report refresh your recollection? |
| 14 | A | Probably an error.  It should say "him." |
| 15 | Q | But it does say, "them," doesn't it? |
| 16 | A | It does. |
| 17 | Q | And that's plural, isn't it?  Isn't it? |
| 18 | A | Uh-huh. |
| 19 | Q | And "we" is plural, isn't it? |
| 20 | A | Yes. |
| 21 | Q | And "us" is plural, isn't it? |
| 22 | A | Yes. |
| 23 | | MR. SHEA: Nothing further. |
| 24 | | THE COURT: Anything else? |

189

1              MR. DEAKIN: Yes.

2

3                    REDIRECT EXAMINATION

4      Q    (By Mr. Deakin) Ms. Braithwaite, was anyone else with

5           Owen McCants that you could see?  Was anyone else

6           with him?

7      A    No.

8      Q    When he said, We can't get in, someone has to throw

9           the keys down to us, or something like that, who did

10          you take him to mean by "we"?

11     A    Me and him.

12     Q    And when you -- and in Detective McDonough's report,

13          which was just shown to you by defense counsel, the

14          statements, "We can't get in, Aunt Polly's going to

15          throw the keys down to us," that's in quotation

16          marks, is that right?

17     A    Yes.

18     Q    And that's because he was writing down what you said,

19          correct?

20     A    Yes.

21     Q    And then when he said, when he writes -- let's see --

22          Polly Taylor dropped a set of keys to them through

23          Ms. Christine Isaac's apartment window, that's not in

24          quotation; is that right?

190

1    A    Right.

2    Q    That's where Sergeant McDonough is writing in the

3         third person.  That is, Sergeant McDonough, about

4         what you said; isn't that right?

5    A    Yes.

6    Q    So that when you say, just so that the record is

7         absolutely clear, "We can't get in, Aunt Polly's

8         going to throw the keys down to us," in quotation

9         marks, that is what you said, correct?

10   A    Yes.

11   Q    But when he writes, Polly Taylor dropped a set of

12        keys to them through Christine Isaac's window --

13             MR. SHEA: Objection.  May we go to side

14        bar?

15             THE COURT: Yeah.

16

17   SIDE-BAR CONFERENCE:

18             MR. SHEA: This is outrageous.  It says, "He

19        stated."  I'll show it to you, your Honor.  "He

20        stated."  It's not that he stated, "We can't," but --

21             MR. DEAKIN: But that's a quotation from

22        her.

23             MR. SHEA: No, it's not.  It's a quotation

24        of what she's saying he said.

191

1          MR. DEAKIN: Which is fine.

2          THE COURT: He said, she said.

3          (End of side-bar conference.)

4

5          MR. DEAKIN: Nothing further.

6          THE COURT: You have a question, Mr. --

7          MR. SHEA: I do.

8          THE COURT: Okay.  Ask it.  Let's go.

9          MR. SHEA: I'm just waiting for Mr. Deakin.

10

11                   RECROSS-EXAMINATION

12   Q    (By Mr. Shea)   The sentence begins, "He stated"

13        quote, from you, "We can't get in, Aunt Polly's going

14        to throw the keys down to us."

15               This is a statement you are saying Owen

16        McCants stated to you, right?

17   A    Right.

18          MR. SHEA: Nothing further.

19          MR. DEAKIN: Your Honor, I'd move to

20        introduce the report that we've both been citing as

21        evidence at this point.  I think this cross-

22        examination merits the introduction of this report.

23          THE COURT: Overruled.  Sit down.

24          You're excused.

192

1          Call your next witness.

2              MR. DEAKIN: Your Honor, the people of the

3     Commonwealth of Massachusetts call Officer William

4     Kelley.

5              THE COURT OFFICER: This way.

6              THE CLERK: Officer Kelley, do you solemnly

7     swear the testimony you're about to give the jury

8     concerning the matter between the commonwealth and

9     the defendant is the whole truth and nothing but the

10    truth, so help you God?

11             THE WITNESS: Yes, I do.

12

13             WILLIAM KELLEY, SWORN

14

15             DIRECT EXAMINATION

16    Q    (By Mr. Deakin) Officer Kelley, I'd ask you to keep

17         your voice up nice and loud.

18             Please introduce yourself to the jury, and

19         spell your last name for the court reporter.

20    A    Good afternoon.  I'm Officer William Kelley, that's

21         K-E-L-L-E-Y, for the Boston Police Department.

22    Q    And how long have you been a police officer, Officer

23         Kelley?

24    A    Six years.

Q All that time with Boston Police Department?
A Correct.
Q Where are you currently assigned?
A District 14, which is the Allston/Brighton neighborhood of the city.
Q And is that where you were assigned on Thursday night, July 13th of 2000?
A It is.
Q Were you on duty that night?
A I was.
Q What shift were you working?
A It's called the last half. That's 11:45 p.m. to 7:30 a.m.
Q And is that when you began your shift that night, 11:45?
A Correct.
Q Upon beginning your shift, did you receive information about a missing girl at 34 Fidelis Way?
A I did.
Q And when did -- did you, in fact, go to Fidelis Way?
A I did. I was instructed from roll call to go directly to Fidelis Way.
Q And did you do that?
A I did.

1    Q    About what time would you say you got to Fidelis Way?

2    A    About 11:50.  But definitely before midnight.

3    Q    Were you by yourself?

4    A    I was not.

5    Q    Who was with you?

6    A    My partner, Arthur Whitkens.

7    Q    And how do you spell Whitkens?

8    A    W-H-I-T-K-E-N-S.

9    Q    Were you in a normal police car?

10   A    No, I wasn't.

11   Q    What were you in?

12   A    Assigned to a plain-clothes unit.  That night we were

13        using a taxicab.

14   Q    And that was -- you were in your regular civilian

15        clothes?

16   A    Correct.  It's a plain-clothes unit.

17   Q    And when you got there, to Fidelis Way, what did you

18        see?

19   A    When I got there there was several crowds of people

20        in the area of 34, and some of my fellow colleagues

21        were on scene, as well.

22   Q    What did you do when you got there?  What was the

23        first thing that you did?

24   A    Initially went to the front of 34 and into a lobby

1      area.  At that time there was, like I said, a couple

2      of my co-workers were doing some things in there.  My

3      partner and I decided to exit and go search the

4      neighborhood for the missing girl.

5    Q   And did you do that?

6    A   I did.

7    Q   What area did·you search?

8    A   I walked out the front door and took a right turn out

9      of the building.  And there's an area where there's a

10     circle area.  We walked around, partially walked;

11     some walking, some driving around that circle.

12   Q   And is that circle called Jetty Court?

13   A   It is.

14   Q   What did you do as you were walking and driving

15     around that circle?

16   A   Approaching people that were out, asking if they knew

17     who ▮▮▮▮ was, if they had seen her, when the last

18     time they had seen her.  Stuff to that effect.

19   Q   How long did you conduct that sort of search for?

20   A   Maybe 45 minutes to an hour.

21   Q   And during that time, during the 45 minutes to an

22     hour, did you pick anything up, seize any -- take

23     anything as evidence?

24   A   I did.

1    Q    When was that?

2    A    As I was exiting the apartment to begin that search

3         that I just spoke about, there was like a khaki-

4         colored what looked to me to be like a sock -- I'm

5         sorry -- a sock for your foot holding the very front

6         door open.

7    Q    The very front door?

8    A    Yes.  The initial -- there's one, two, two doors to

9         get in.  One is an open door that anybody can get

10        open.  That first door.

11   Q    It was holding that door open?

12   A    Correct.

13   Q    All right And is that door -- you say that's a door

14        that anyone can open?

15   A    Yes.

16   Q    So that that's not a door that will lock after you --

17   A    No.

18   Q    And did you have any idea at the time who had put the

19        sock there?

20   A    I didn't.

21   Q    Okay.  What did you do with the sock?

22   A    I thought it was odd that it was there.  I thought it

23        may be of value later.  I picked it up with a pen and

24        put it in the trunk of the unmarked police car, which

1    was actually a taxi.

2   Q    And then you went out and conducted your search?

3   A    I did.

4   Q    When you completed your search after, you said, 45

5        minutes to an hour, what did you do?

6   A    I don't understand.

7   Q    Where did you end up after the 45 minutes or an hour?

8   A    Back at the front of 34 Fidelis Way.

9   Q    And we're now talking, give or take, 12:30 to 12:45?

10  A    Correct.

11  Q    As you were doing your search, at any point, either

12       -- well, when you got back to 34 Fidelis, did you see

13       any police units at either end of Fidelis Way, that

14       is, the Washington Street end or the Commonwealth

15       Ave. end stopping incoming or outgoing cars?

16  A    No, I didn't.

17  Q    Were you -- I just asked you what you were aware of.

18       Were you aware of any order to do so?

19  A    I wasn't.

20                   MR. SHEA: Objection.

21                   THE COURT: Overruled.

22  Q    When you got back to 34 Fidelis, the front, do you

23       know, at that point, whether emergency deployment

24       teams had yet been called?

1    A    They were.

2    Q    And at -- do you know approximately when they were

3         called?

4    A    About an hour after; 45 minutes to an hour after.

5         About the same time I ended my search.

6    Q    And at the time you ended your search were emergency

7         deployment teams, had any of them arrived yet?  Had

8         they begun coming?

9    A    I'm sorry?  From the time they were called?

10   Q    Well, I'm asking, when you got back to 34 Fidelis

11        after 45 minutes to an hour, were some of them

12        already on scene?

13   A    It was right about the same time that they were

14        ordered to assemble and come there.

15   Q    And what were you doing after you finished -- what

16        were you and your partner doing after you finished

17        your 45-minute to an hour search?

18   A    We were standing out front of 34 Fidelis --

19   Q    Actually, let me stop you for one second.  During

20        your search did you develop any information about

21        █████████ present whereabouts, that is, where she was

22        now?  Did you find anyone who knew where she was?

23        Did you find her?

24   A    No.

1    Q    You said that after you got back -- what was the next

2           thing that happened after you got back?

3    A    EDT teams were called, and there was a crowd

4           gathering.  Like I said, initially there seemed to

5           be, like, three or four small crowds.  They appeared

6           to have become almost one crowd now.  We stood by,

7           still asking people in that crowd and waiting further

8           instructions from Sergeant Byrne.

9    Q    What's the next thing that happened?

10    A    It was about -- I think some of the last remaining

11          EDT teams arrived and suddenly the victim, █████

12          returned.

13    Q    And what were you doing when the girl returned?

14    A    I was talking to an unknown person in that large

15          group that I was talking about.

16    Q    What time was it -- were you keeping close note of

17          the time as you were doing these things?

18    A    No, I wasn't.

19    Q    Do you have an estimate of what time it was that

20          █████ came back?

21    A    1:15.  Between 1:15 and 1:30.

22    Q    And how did you first learn that she was back?

23    A    I was speaking with, like I said, an unknown

24          individual, and the crowd erupted, yelling,

1      basically, She's back.  There she is.  She's here.

2  Q   And did you see where she went from there?

3  A   She went into a police cruiser.

4  Q   And could you see where the cruiser went?

5  A   I know it left Fidelis Way out the Washington Street

6      exit.  But I don't know where it went.

7  · Q  And after the cruiser left, what was your

8      responsibility?

9  A   We were told to regroup and go over to the St.

10     Gabriel's parking lot, which is adjacent to the

11     building, and go from there.

12  Q  The -- I actually -- I neglected to ask you -- well,

13     I'll start again.

14              At the time -- well, let me ask you this:

15              From that point on, from when       came

16     back, on, until whenever you were through with your

17     work that night --

18  A   Okay.

19  Q  -- did you know whom, if anyone,       had identified

20     as the person who did this to her?

21  A        no.

22  Q  So, did you have any information, until you went

23     home, about whom       had said, if anyone, had done

24     this to her?

201

1    A    No.  Word had gotten to us that ▓▓▓ had said that

2         somebody did, but we didn't know the name.

3    Q    The --

4           MR. SHEA: Motion to strike.

5           THE COURT: Overruled.

6    Q    The -- sorry.  How long did you spend after ▓▓▓

7         came back staying in that crowd?

8    A    Well, not long.  We were there for maybe a couple of

9         minutes.  We went over to the St. Gabriel's lot, and

10        then I had made a decision, based on the crowd, to go

11        back and get my taxicab, which was left unattended in

12        front of 34 Fidelis Way.

13    Q    What did you do with your taxicab?

14    A    Well, I went over to get it, and on my way over to

15        get it --

16    Q    Let me stop you there.  Just, what did you do with

17        the taxicab?  Did you do anything with the taxicab?

18    A    I actually moved it into the St. Gabriel's lot.

19    Q    What was the atmosphere of the crowd after you were

20        coming back from the St. Gabriel's lot?  What was the

21        atmosphere?

22          MR. SHEA: Objection.

23          THE COURT: Sustained.

24    Q    What did you do -- well, let me ask you this:

202

1          At some point did you accompany other

2      officers into 34 Fidelis Way?

3   A   Yes, I did.

4   Q   And how much time had passed between the time when

5      ███████ came back and the time when you accompanied the

6      other officers into Fidelis Way?

7   A   I guess between 15 to 20 minutes.

8   Q   And whom did you accompany into Fidelis Way?

9   A   I'm certain that I accompanied Sergeant Byrne, Dan

10     MacDonald, Paul Downey, and Chris Curtin.  Otherwise,

11     I wouldn't remember.

12  Q   Is it possible there were other officers that you

13     don't recall?

14  A   I believe there was.  I just don't recall.

15  Q   Was there anyone else with you?  Any nonpolice

16     officers with you as you went up?

17  A   Yes, there was.

18  Q   Who was that?

19  A   I knew her as Gina, who claims she was a niece of Mr.

20     McCants.

21  Q   And was she Caucasian or African American?

22  A   African American.

23  Q   How old did she appear to you to be?

24  A   Maybe anywhere from 14 to 17.

203

1    Q    When you went upstairs, where did you go?

2    A    We went to -- geez, it's the apartment next to

3         ▇▇▇▇▇ apartment.  I believe it's Apartment 545.

4    Q    And when you got there, was the door open or closed?

5    A    I'm pretty certain that the young girl named Gina

6         opened it.

7    Q    Do you know whether -- well, never mind.

8              What happened after she opened it?

9    A    She opened it.  We were let in.  And we spoke --

10        well, Sergeant Byrne spoke to -- I don't know her

11        name; I'm sorry.  But a frail, elderly lady, and then

12        another older, but not quite as old as the frail,

13        elderly lady.

14             MR. DEAKIN: May I approach, your Honor?

15             THE COURT: Yes.

16   Q    I'm showing you a diagram.  There's a label for

17        Apartment 545.  Now, where were those conversations

18        with the elderly women taking place?

19   A    In the area where it says, "Dining Room."  Right next

20        to the kitchen.

21   Q    And were you in that area at the time?

22   A    Initially, yes.

23   Q    Did anyone else come into that area from anywhere

24        else in the apartment?

204

1   A   Eventually, Mr. McCants came from what I believe is

2       the bathroom area?

3   Q   And what was he doing -- first of all, did you know

4       him then?  I mean, you've referred to him as Mr.

5       McCants.  Did you know him at that time?

6   A   No.  I don't believe I had ever met him before.

7   Q   So you subsequently learned his name?  You learned it

8       later who he was?

9   A   I learned it later who he was, correct.

10  Q   And what, if anything, was Mr. McCants doing when he

11      came out from the area of the back?

12  A   He was buttoning up a shirt, a dress shirt.

13  Q   I'm sorry?

14  A   He was buttoning up a shirt.

15  Q   Do you recall whether that -- well, first of all, do

16      you recall the sleeve length on that shirt?

17  A   I don't.

18  Q   Did you make any observations of his physical

19      condition?

20  A   Yes.  He was -- his forehead area was wet.  I didn't

21      know if it was from a shower or sweating, but he had

22      a wetness to his forehead area.

23  Q   All right.  What's the first thing that happened when

24      the defendant came into that area?

1    A    Sergeant Byrne identified himself, stated his reason

2         for being there.

3    Q    What did he say?

4    A    He --

5    Q    Actually, I'm going to ask you not to answer that.

6         I'm going to withdraw that question.

7    Q    What did he say after stating his reasons for being

8         there?

9    A    He stated that his niece was concerned about his

10        safety, and that --

11                   MR. SHEA: Objection.

12                   THE COURT: Sustained.

13   Q    At some point, did Sergeant Byrne advise the

14        defendant of rights that he had?

15   A    He did.

16   Q    And did Sergeant Byrne tell the defendant, either

17        before or -- either before or just after that,

18        whether the defendant was under arrest?

19   A    Never said he was under arrest.

20   Q    And how was Sergeant Byrne able to advise the

21        defendant of his rights?

22   A    Sergeant Byrne asked the defendant if -- told the

23        defendant that there was an incident in the

24        development and that he would like to ask him some

1        questions --

2                    MR. SHEA: Objection.  Nonresponsive.

3                    THE COURT: Sustained.

4    Q    He told him that he wanted to ask him some questions?

5    A    Correct.

6    Q    What, if anything, did the defendant do when Sergeant

7         Byrne said that?

8    A    He replied, "Yes."

9    Q    And was there a questioning?

10   A    There was.

11   Q    Where did that take place?

12   A    Initially in the -- in that same area.

13   Q    And --

14                   MR. SHEA: Could we approach side bar?

15

16   SIDE-BAR CONFERENCE:

17                   MR. SHEA: I didn't know Mr. Deakin was

18        going to try and draw out my defendant's statement

19        through this person.  There's one sentence in here

20        where he says, "McCants agreed to speak.  Stated he

21        had no knowledge of the incident."  That's all --

22                   MR. DEAKIN: That's what he's going to say.

23                   THE COURT: Objection sustained.

24                   (End of side-bar conference.)

207

1    Q    At some point did you move into a different area of
2         the apartment?
3    A    Yes, we did.
4    Q    And why was that?
5    A    Mr. McCants motioned to Sergeant Byrne and asked him
6         if he could move it into the bedroom.  He felt more
7         comfortable in there.
8    Q    And did you go into the bedroom?
9    A    Yes, we did.
10   Q    Who went in the bedroom first?
11   A    Sergeant Byrne followed Mr. McCants in with I believe
12        it was Danny MacDonald.
13   Q    And did you enter the room?
14   A    I did.
15   Q    Where -- well, who else was in the room once you were
16        in there?
17   A    Once we were in there, it was Sergeant Byrne, Danny
18        MacDonald, Paul Downey, myself, and Chris Curtin.
19   Q    And where was the defendant located?
20   A    Right about the D or the R in the "Bedroom" of
21        "Bedroom 2."
22   Q    Was he standing or seated?
23   A    Initially standing.
24   Q    And what -- you say "initially."  Did that change?

1    A    Yes.

2    Q    What happened?

3    A    Once he got in, he reached under his bed for

4         something.  Sergeant Byrne had asked him not to do

5         that and to sit on the bed.

6    Q    And did the defendant sit on the bed at that time?

7    A    Yes, he did.

8    Q    Was there conversation between Sergeant Byrne and the

9         defendant?

10   A    Yes.

11   Q    As that conversation was going on, where were you?

12   A    In the upper right-most corner of the diagram, above

13        the "Bedroom 2," right above the 2.  In that corner.

14   Q    What were you doing?

15   A    Just monitoring Sergeant Byrne, monitoring the group,

16        and looking around the room.

17   Q    Did anything catch your attention as you were looking

18        around the room?

19   A    Yes.

20   Q    What caught your attention?

21   A    In the opposite corner, by that little hash mark that

22        I believe defines the door, behind that door there

23        was a green shirt hanging on the door.

24   Q    And did you notice the sleeve length of the green

1        shirt?

2    A    I did.

3    Q    When you say there was a green shirt, could you tell

4        what kind of hook it was hanging on, or what it was

5        hanging on?

6    A    I recall it hanging on a hook over some other

7        clothes, on the back of the door.

8    Q    And when you say "over some other clothes," could you

9        see other clothes?

10    A    No.  But it was a big ball.  The only thing that

11        would make that bump, to me, would be other clothes.

12    Q    So you assumed there were other clothes underneath,

13        from what you saw?

14    A    Correct.

15    Q    What caught your attention about a green shirt?

16    A    The suspect was wearing a green shirt and blue pants.

17    Q    Did you notice anything else?

18    A    From that vantage point?

19    Q    Yes.

20    A    No, I didn't.

21    Q    At any other vantage point did you notice anything

22        else?

23    A    Yes, I did.

24    Q    What did you notice?

210

1    A    I believe it was Officer Curtin had pointed out to me

2          some items that were on the desk -- not a desk, a

3          bureau drawer.

4    Q    And what were those items?

5    A    One was a glass with what appeared to be a liquid, a

6          mirror with a powdery substance on it; a white piece

7          of paper with the name ▮▮▮▮▮▮ and a phone number,

8          as well as a mask inside an open top bureau drawer.

9                MR. SHEA: Objection.  Motion to strike.

10               THE COURT: Overruled.

11    Q    What was it that -- well, first of all, let me --

12               MR. DEAKIN: May I approach, your Honor?

13               THE COURT: Yes.

14    Q    Do you recognize this, please?

15    A    Yes, I do.

16    Q    What's that?

17    A    That's the piece of paper with the name ▮▮▮▮▮ on

18          it.

19    Q    Is that a fair and accurate representation of that as

20          it appeared to you on that night?

21    A    Yes, it is.

22               MR. DEAKIN: I want to introduce this.  I

23          believe it's Exhibit 12.

24               MR. SHEA: I'm objecting on relevance.

211

1              THE COURT: I'll see you at side bar.

2

3      SIDE-BAR CONFERENCE:

4              THE COURT: Let me see this.

5              MR. DEAKIN: That's the first four letters

6      of her name.  I don't think it has --

7              THE COURT: Excuse me.  Whose phone number

8      is that?

9              MR. SHEA: It's the phone number of another

10     women he called.  Detective Byrne calls up.  Some guy

11     answers and goes, And who's looking for her?

12             MR. DEAKIN: I'll stipulate.  We'll

13     stipulate to that.  It's not a big issue in the case.

14     I just want to clean it up for housekeeping, because

15     the search warrant detectives are going to testify

16     that it was there.  So, I'm not going to argue that

17     it has tremendous probative value.

18             THE COURT: It doesn't have any probative

19     value.

20             Objection sustained.

21             (End of side-bar conference.)

22

23             THE COURT: Objection sustained.  It's

24     stricken and you are to disregard that testimony

1       about that piece of paper.

2    Q  What was it about -- first of all, where was the --

3       you said that you saw a stocking of some kind?

4    A  Correct.

5    Q  Where was that located?

6    A  In an open drawer on the bureau.

7              MR. SHEA: Objection.  It's a

8       mischaracterization of what he said.  I believe he

9       said "mask."

10             THE COURT: Sustained.

11   Q  Sorry.  You said you saw a mask.  What was the mask

12      made out of?

13   A  Like a cloth, like a beige kind of cloth.

14   Q  And what is that cloth usually used for in your

15      experience?  What did it look like to you?

16             THE COURT: Well, do you have it?

17             MR. DEAKIN: I have it.

18             MR. SHEA: Objection.

19             THE COURT: Pardon me?

20             MR. SHEA: Objection.

21             THE COURT: Excuse me.  Did you say

22      "objection" or "no objection"?

23             MR. SHEA: I said "objection."

24             THE COURT: All right.  I'll see you at side

213

1       bar.

2

3       SIDE-BAR CONFERENCE:

4               THE COURT: You've got to speak up.  I

5       didn't know what you were saying.

6               MR. SHEA: Sorry.  It's just something from

7       the search that I had a prior motion in on.  So I

8       wanted to object.

9               THE COURT: On the basis of the search.

10              MR. SHEA: Yeah.

11              THE COURT: Okay.

12          (End of side-bar conference.)

13

14              MR. DEAKIN: Could I ask, your Honor, that

15      this be marked B for identification?

16              THE COURT: Yes.

17

18                              (Whereupon, package

19                              containing stocking marked

20                              as Exhibit B for

21                              identification.)

22

23      Q    Officer Kelley, I'm going to show you what's now been

24           labeled Exhibit B for identification and ask you

214

1          whether you recognize that?

2   A      I do.

3   Q      What does that appear to you to be?

4   A      Some type of pantyhose stocking.

5   Q      And is that similar to or dissimilar to what you saw

6          in the drawer?

7   A      Similar.

8                      MR. SHEA: Objection.

9                      THE COURT: Overruled.

10  Q      This item shows -- has a knot in the end of it.  Did

11         you see a knot in the end of it?

12  A      I don't recall seeing a knot.

13  Q      Officer, how long were you and the other officers in

14         the defendant's bedroom?

15  A      Ten, fifteen minutes, maybe.

16  Q      And what happened at the end of that time?  Can I ask

17         you, was there conversation during that time between

18         the defendant and any of the police officers?

19  A      No.

20  Q      Not with Sergeant Byrne?

21  A      Sergeant Byrne, correct.

22  Q      That's right.  I'm sorry.

23  A      I'm sorry.  Other than Sergeant Byrne, no.  But

24         Sergeant Byrne had --

1    Q    Was that an ongoing conversation with Sergeant Byrne

2         at that time?

3    A    Yes.

4    Q    And what happened at the end of that ten or fifteen

5         minutes?

6    A    Sergeant Byrne decided to end the conversation and

7         advised Mr. McCants that we would be leaving.

8    Q    And was there then a discussion between the defendant

9         and Sergeant Byrne about what the defendant would do?

10   A    Yes.   Sergeant Byrne expressed --

11             THE COURT: Excuse me.   Excuse me.

12   Q    Just yes or no.

13             THE COURT: The answer was yes?

14             THE WITNESS: I'm sorry?

15   Q    Just answer yes or no.

16   A    Repeat the question.

17   Q    Was there a conversation between the defendant and

18        Sergeant Byrne about what the defendant would be

19        doing?

20   A    Oh, yes.

21   Q    And as a result of that discussion, what did the

22        defendant do?

23   A    He elected to be transported to District 14.

24   Q    And how did he leave the apartment where his bedroom

216

| | | |
|---|---|---|
| 1 | | was, Christine Isaac's home? |
| 2 | A | On his own will, but with us with him. |
| 3 | Q | Were any of the officers holding him or restraining |
| 4 | | him in any way? |
| 5 | A | No. |
| 6 | Q | Was he handcuffed or in any other way restrained? |
| 7 | A | No. |
| 8 | Q | What was your purpose in having him go out -- well, |
| 9 | | strike that. |
| 10 | | When you left the building -- did you, in |
| 11 | | fact, leave the building? |
| 12 | A | Yes. |
| 13 | Q | And where did the defendant go as you left the |
| 14 | | building? |
| 15 | A | Directly to a police car out front. |
| 16 | Q | As he -- did you see where the police car went after |
| 17 | | he left? |
| 18 | A | It exited, again, toward Washington Street. |
| 19 | Q | At any point before he got in the police car, was he |
| 20 | | held or restrained by the officers in any way? |
| 21 | A | No. |
| 22 | Q | What did you do after you left the building? |
| 23 | A | Once he was in the police car and driving away, my |
| 24 | | partner got my attention. |

1    Q    And did your partner give you some information?

2    A    He did.

3    Q    After getting that information, what's the next thing

4         that you did?

5    A    I went with him to the -- if you're facing the front

6         of the building, to the right there's an entrance

7         driveway to a parking lot that is beside that

8         building.  We went to that parking lot.

9    Q    Is that the parking lot that is sort of against the

10       -- well, let me ask you, if you would, indicate where

11       on this diagram the parking lot is.

12    A    Right here.

13    Q    So you indicated a parking lot where there's two dark

14       cars; one appears to be a red car --

15    A    Red car, white car, and a blue car.

16    Q    At the back corner of 34 Fidelis Way?

17    A    Correct.  Opposite 135 Wash.

18    Q    Please resume the stand.

19           And what did you see when you got there?

20    A    Two individuals that had pointed to a parked

21       Pontiac --

22         MR. SHEA: Objection.

23         THE COURT: Sustained.

24    Q    After you spoke to your partner, did you speak to

218

1        other individuals?

2    A   I did.

3    Q   Who were they?

4    A   Miguel Rodriguez and --

5                MR. SHEA: Objection.

6                THE COURT: That he spoke to two other

7        people?  Overruled.

8    Q   Who did you speak to?

9    A   Miguel Rodriguez and Brandon Stowers or Sowers.

10   Q   Have you seen the individual named Brandon here in

11       court today?

12   A   I did.

13   Q   And did he testify this morning in this trial?

14   A   I believe so, yes.

15   Q   Did the individual named Brandon or the other person

16       with him direct your attention to anything?

17   A   They did.

18   Q   What was that?

19   A   A green Pontiac.

20               MR. SHEA: Objection.

21               THE COURT: Overruled.

22   Q   And where was that Pontiac located?

23   A   In that same parking lot, in the area of where that

24       white car was parked in that group.  About halfway in

219

1    between.

2            THE COURT: All right.  Hold it right there.

3    We're going to break for the day at this time.

4            Do you want to put your notes back in your

5    envelopes, leave them on your seats.

6            Don't talk about this case or allow anyone

7    to talk to you about it.  If you should happen to see

8    a newspaper, radio, or television account of this

9    trial, do not read or listen to it.  And, please,

10   over the weekend, do not try to do any investigation

11   about this case on your own.  And I'll see you Monday

12   morning at 9:30.  Have a good weekend.

13

14           (Whereupon, the proceedings adjourned.)

15

16

17

18

19

20

21

22

23

24

220

CERTIFICATE

I, Maryann McDonald, Official Court
Reporter, do hereby certify that the foregoing
record, pages 1 to 219 inclusive, is a true and
accurate transcript of my system tapes, to the best
of my knowledge, skill and ability.

Maryann McDonald

The foregoing certification does not apply
to any reproduction of the same by any means unless
under the direct control and/or direction of the
certifying Reporter.