COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
NO. SUCR2000-10994

COMMONWEALTH OF MASSACHUSETTS

v.

OWEN McCANTS

Monday, April 29, 2002
Before: Spurlock, J.
Boston, Massachusetts
Day 8 - Trial - Morning Session

MARYANN MCDONALD
Official Court Reporter
617.788.6180

APPEARANCES:

David Deakin
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
617.619.4000
Counsel for the Commonwealth

Mark Shea
Attorney at Law
875 Massachusetts Avenue
W. Cambridge, MA 02139
627.864.3943
Counsel for the Defendant

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| William Kelley | | | | |
| (By Mr. Deakin) | 10 | | 19 | |
| (By Mr. Shea) | | 16 | | 23 |
| John McDonough | | | | |
| (By Mr. Deakin) | 24 | | | |
| (By Mr. Shea) | | 91 | | |

EXHIBITS

| NUMBER | | PAGE |
|---|---|---|
| 12 | Photocopy of photograph of defendant | 15 |
| 13 | Photograph | 21 |
| 14A | Package containing mirror | 44 |
| 14B | Certificate of analysis | 44 |
| 14C | Photograph | 44 |
| 15A | Package containing rolled nylon stocking | 47 |
| 15B | Photograph | 47 |
| 16 | Package containing green short-sleeved shirt | 48 |
| 17 | Package containing long-sleeved green shirt | 50 |
| 18 | Package containing Durex condom | 51 |
| 19A | Package containing hammer holder | 52 |
| 19B | Photograph | 52 |

EXHIBITS, CONT'D.

| NUMBER | | PAGE |
|---|---|---|
| 20A | Package containing bottle of Brugal Rum | 54 |
| 20B | Photograph | 54 |
| 21A | Package containing leafy substance | 56 |
| 21B | Certificate of analysis | 56 |
| 21C | Photograph | 56 |
| 22A | Package containing EZ Wider rolling papers | 58 |
| 22B | Photograph | 58 |
| 23A | Package containing green hat | 60 |
| 23B | Photograph | 60 |
| 24A | Flyer-type envelope from Brookline Cooperative Bank | 61 |
| 24B | Business envelope from Brookline Cooperative Bank | 61 |
| 24C | Photograph | 62 |
| 25A | Package containing roll of gray duct tape | 63 |
| 25B | Photograph | 63 |
| 26 | Package containing duct tape | 64 |
| 27 | Photograph | 69 |
| 28 | Photograph | 70 |
| 29 | Package containing mesh basket | 77 |
| 30 | Package containing took kit with duct tape | 77 |
| 31 | Package containing duct tape recovered from trunk | 78 |

EXHIBITS, CONT'D.

| NUMBER | | PAGE |
|---|---|---|
| 32 | Package containing duct tape recovered from driver's side | 78 |
| 33 | Package containing duct tape recovered from trunk | 79 |
| 34 | Photograph | 87 |
| 35 | Photograph | 87 |
| 36 | Registry of Motor Vehicles Registration History/Title Inquiry | 91 |

PROCEEDINGS

THE CLERK: *Commonwealth v. Owen McCants*, case on trial.

MR. DEAKIN: Good morning, your Honor. Dave Deakin for the Commonwealth.

Your Honor, there's a witness issue that happened last night that raises two related problems. Luana Hoskins, who is the FBI fingerprint analyst who examined the letter, which is Exhibit 6, flew in yesterday afternoon. I met with her yesterday afternoon and evening. And she called me late last night to tell me that she had to fly home to be seen on an emergency matter.

Her six-month-old granddaughter apparently had been involved in an accident; she was dropped from her mother's arms and hit her head about a week ago. And while she appeared to be fine for several days, I guess her condition is deteriorated and she's hospitalized, and I guess that there's a lot of concern. She told me she had to get home for her daughter.

The FBI has agreed to send a man named Terry Ambergie, who is the individual who verified

the work; that is each FBI analyst, when they do an examination, they're double checked. And another person has to do the examination separately. And he, therefore, has done the same examination that she has. And he will be available to us first thing tomorrow morning. He's flying up this afternoon.

That causes -- the two issues are, one, I expected to have enough witnesses today to carry us through the day. Without Luana Hoskins' testimony, I may run short of witnesses because I've summonsed more people for tomorrow. I apologize to the Court.

THE COURT: Can't you call some of those people --

MR. DEAKIN: I can try. I certainly will try, your Honor, but I'm not sure that they're going to be available.

THE COURT: Try. Try to get somebody here.

MR. DEAKIN: The other thing is, your Honor, I'm asking the Court's leave to substitute Mr. Ambergie for Ms. Hoskins, given the extraordinary nature of the emergency.

THE COURT: Mr. Shea?

MR. SHEA: Well, just to be clear, obviously, as I did with the pre-trial motion, I'm

objecting to any fingerprint evidence coming in.

Even if Ms. Hoskins were here, I was going to object to her testimony, because of the late discovery; I believe Mr. Deakin was late in receiving it, as well. But the point is I was late. And I've never really received anything I can review, in terms of the fingerprint evidence, from the FBI.

So, I had an objection to that. I mean, I did get two faxed pieces of evidence that one I could review, the other was pretty much unintelligible.

So I would be objecting to her testimony anyway.

As to the substitution, I think we need to at least do a voir dire to see that this person has reviewed -- to what extent this person has reviewed the evidence before he's allowed to speak to the jury about the evidence.

That's about it.

THE COURT: You can substitute him.

MR. DEAKIN: Thank you.

THE COURT: Now, what juror is it?

THE COURT OFFICER: I think she's No. 3.

THE COURT: All right. Juror No. 3, the one who is pregnant, is -- No. 4 -- called this morning. She's at her doctor's office. The doctor's put her on bed rest, ordered her to bed rest. So she's not going to be able to be with us today, or the rest of the trial. I just want to let you know that we're going to be missing No. 4.

MR. DEAKIN: Thank you, your Honor.

THE COURT: Bring the jury in. Grab her notes.

THE COURT OFFICER: She's No. 6.

THE COURT: All right. Want to bring the jury in.

(Jurors enter at 10:10 a.m.)

THE COURT OFFICER: This court is back in session. Please be seated.

THE COURT: Good morning, ladies and gentlemen. How are you this morning? Good. Did you have a good weekend? Good.

Has anyone talked about this case or allowed anyone to talk to them about it?

(No response.)

THE COURT: Read any newspaper or seen any television or heard any radio account of this trial?

(No response.)

THE COURT: All right. Thank you very much.

Now, we've lost a juror. And I hope the remainder of you will be here to continue on. We'll get started at this time.

Mr. Deakin.

MR. DEAKIN: Thank you, your Honor.

WILLIAM KELLEY, PREVIOUSLY SWORN

RESUME DIRECT EXAMINATION

Q (By Mr. Deakin) Good morning, Mr. Kelley.

A Good morning.

Q Officer Kelley. Officer Kelley, I asked you yesterday -- Friday, sorry -- about a sock that you recovered. Remind me where you recovered it?

A In the front doorway. It seemed to be holding the door open, the front doorway.

Q The main front door that's open to the public?

A Yes. The first floor.

Q And what did you do with the sock?

A I remember placing it in the trunk of our police

car.

Q And your police car was -- just to remind us, was actually what we think of as a standard police car?

A No, it wasn't. It was a Ford Crown Victoria, dressed up as a taxicab.

Q Dressed up as a taxicab. And after you put it in the trunk, what did you do with it?

A I left it in the trunk.

Q On purpose?

A No.

Q And what happened after that? What happened to that taxicab?

A That taxicab has since been reassigned to our fleet management.

Q Have you been able to locate the sock?

A No, I haven't.

Q Now, you were also testifying, I believe, when we left on Friday, that your attention was drawn to an automobile?

A Correct.

Q And remind the jury, who drew your attention to the automobile?

A Initially, my partner, Arthur Whitken, and then a Mr. Brandon Sowers.

Q And where was the automobile that he drew your attention to?

MR. SHEA: Objection.

THE COURT: Where was the automobile? Overruled.

Q Where was the automobile that he drew your attention to?

A It was in the parking lot, to the rear of the building if you're facing the building.

Q Which building?

A 34 Fidelis.

Q And is that the parking lot immediately adjacent to, or sort of between the two buildings, 34 Fidelis and the nearest building on the other side?

A I'm sorry?

Q That was not a good question.

There are two buildings. One building is 34-32 Fidelis Way, and there's a courtyard in the back of that building, and another building that's a mirror image of it on the other side of the courtyard.

Where is the parking lot in relationship to those two buildings?

If it helps you to leave the stand, with

the Court's permission --

THE COURT: Yes.

Q -- if you could point that out.

A The parking lot is right here.

Q And where was the automobile within that parking lot?

A In the area of the white car, or next to it. In that area.

Q Please resume the stand.

And remind the jury, if you would, the type of car that it was.

A It was a Pontiac Grand Am or Grand Prix.

Q And what color was it?

A Green.

Q What shade of green?

A A darker green.

Q And after your attention was drawn to that automobile, what did you do?

A We notified Sergeant Byrne.

Q And how did you notify Sergeant Byrne?

A By radio.

Q What did he do?

A I believe Sergeant Merner responded to the scene in his place, and I believe, on his orders, had us

secure the vehicle.

Q And what did you -- how did you secure the vehicle?

A We placed yellow crime scene tape across the parking lot from about two car-lengths up from that, and maintained -- didn't let anybody pass that yellow crime scene tape.

Q And what did you do after you did that?

A We waited for a tow truck to tow the motor vehicle.

Q Did the tow truck come?

A Eventually, yes.

Q And what was your understanding of where it was going to be towed to?

A We were following it to police headquarters.

Q Did you follow it to police headquarters?

A We did.

Q Is that where it went?

A Yes, it did.

Q Whereabouts at police headquarters did it go?

A Last we saw it, it was being secured in the garage, in back of police headquarters.

MR. DEAKIN: Your Honor, may I approach the witness?

THE COURT: Yes.

Q Mr. Kelley, I'm going to show you a photocopy of a

photograph. Do you recognize what that's a -- the individual depicted in that photograph?

A Yes. Mr. McCants.

Q And is that a fair and accurate depiction of how the defendant looked at the time that you saw him on Friday, July 14th of 2000?

A Yes.

MR. SHEA: May we approach side bar?

SIDE-BAR CONFERENCE:

MR. DEAKIN: I thought we were in agreement on this.

MR. SHEA: Right. Well, I just thought we'd -- we're agreeing and stipulating that it's coming in as a fair and accurate representation of his picture that day.

MR. DEAKIN: Okay.

THE COURT: All right.

(End of side-bar conference.)

(Whereupon, photocopy of photograph marked and admitted into evidence as Exhibit No. 12.)

MR. DEAKIN: May I publish this briefly to the jurors, your Honor?

THE COURT: Yes.

(Exhibit published.)

MR. DEAKIN: Nothing further, your Honor.

THE COURT: You said publish it briefly. You want to turn it off.

CROSS-EXAMINATION

Q (By Mr. Shea) Good morning, Officer.

A Good morning, Counselor.

Q Now, you wrote up a report in this case?

A I did.

Q And do you consider it a police report, or what is it?

A It's an inter-department memo.

Q Okay. and your inter-department memos you're to write down information accurately, correct?

A Correct.

Q And it's for passing on information within the department, correct?

A Correct.

Q And in your report you wrote that the victim advised her mother that she had been kidnapped at knifepoint, raped and sexually assaulted by an unknown male, correct?
A Correct.
Q You also wrote in your report that Mr. McCants was properly Mirandized by Sergeant Byrne, and agreed to speak but stated he had no knowledge of the incident, correct?
A Correct.
Q And you wrote those two things in your report because you believed them to be accurate, correct?
A Correct.
Q Now, the sock, you saw this sock, you believe it might be important, correct?
A Correct.
Q When you picked it up, how did you pick it up?
A I believe I used a pen.
Q Okay. What did you place it in? Anything?
A No. I placed it in the trunk of the police car.
Q Okay. So you didn't place it in a plastic bag?
A No, I didn't.
Q And, now, you're trained on how to preserve evidence?

A Some, yeah.

Q And preserving evidence wouldn't be throwing something into a trunk, would it?

A At that time, that was the best means I had available.

Q The point is, you see a number of plastic bags sitting here in front of you, right?

A Correct.

Q And those have evidence in them, correct?

A Correct.

Q And then there are paper bags with evidence, correct?

A Correct, yes.

Q The point being to avoid contamination, right?

A Partially, yes.

Q All right. And you knew that if you wanted to preserve that piece of evidence, you'd be better off putting it in a paper bag, a piece of plastic, something like that?

A That would have been the best option that I had available.

Q Did you call someone, ask them to bring over plastic, paper?

A No, I didn't.

Q Then you just threw it into the trunk of the car.
A Correct.
Q Never to be seen again.
A No.
Q And it was a khaki-colored sock, correct?
A Correct.
Q You described on the back of the door when you were in Mr. McCants' room there was a big bump. You took that to be other clothes, correct?
A Yes.
Q So there were a number of other clothes in his room, correct?
A Well, that's what I believed was under there, correct.
Q Right. But there were clothes, other clothes, in his room, too, correct?
A Yes.
Q Okay. and you didn't see a green T-shirt, did you?
A I didn't, no.

MR. SHEA: Nothing further.

REDIRECT EXAMINATION

Q (By Mr. Deakin) Officer Kelley, I show you this and ask if you recognize it? Yes or no.

A Yes, I do.

Q What is that a photograph of?

A The shirt that I observed hanging on the back of the door.

Q And is that a fair and accurate and precise representation of how the shirt appeared to you when you saw it?

A Yes.

MR. DEAKIN: I'd move to introduce this into evidence as Exhibit 13.

SIDE-BAR CONFERENCE:

MR. SHEA: Obviously this wouldn't be in evidence if the motion to suppress had been granted. So I'm objecting to it on those grounds.

THE COURT: Well, it's also beyond the scope of cross.

What's this have to do with his cross-examination?

MR. DEAKIN: He asked if there was a lump of clothes -- he was asking about the lump of clothes that he saw that he took to be other clothes underneath that shirt. So I want to show the jury what he's talking about.

THE COURT: He didn't say this was under a lump of clothes.

MR. DEAKIN: Yes, he did. He said, in his testimony on Friday, he saw the green shirt, and underneath it he saw a lump, which he took to be other clothes.

THE COURT: He didn't ask him about that on cross-examination.

MR. DEAKIN: He did. He asked him, you saw a green shirt and you saw other clothes that you took to be -- you saw a lump underneath that you took to be other clothes.

MR. SHEA: I didn't ask if he saw -- if there were clothes under the green shirt.

MR. DEAKIN: He also asked if there were clothes under the green shirt.

MR. SHEA: Okay.

(End of side-bar conference.)

(Whereupon, photograph marked and admitted into evidence as Exhibit No. 13.)

Q Officer Kelley, when did you write your report?

A Maybe five o'clock in the morning, in that neighborhood.

Q And what information did you have at the time you wrote the report, about whether [redacted] had named an assailant?

A At that time I didn't have a name. I just had the fact that an unknown male had --

Q So you wrote -- why did you write "unknown"?

A Because the information we had was, at the time, we didn't know.

Q When you say "we," I need you to be precise. Whom are you speaking of?

A Me, my partner, and some of the other officers I was working with.

Q Had you spoken to Sergeant Byrne on that point?

A I don't recall. No.

Q Had you spoken to Sergeant Detective McDonough on that point?

A I don't recall.

Q So, just so we're clear, why did you write "unknown" in this report? Were you suggesting it was unknown to any police officers, or only to you?

A I believed it to be known to some, but not me.

MR. SHEA: Objection.

THE COURT: Sustained.

Q Did you know who -- did you know -- at the time of this report, did you know whether [redacted] had named an assailant?

A It was unknown to me if she had named an assailant.

MR. DEAKIN: Nothing further.

RECROSS-EXAMINATION

Q (By Mr. Shea) You wrote the report at 5 a.m.?

A About that time, correct.

Q You wrote "unknown male."

A Correct.

THE COURT: You may step down.

Next witness.

MR. DEAKIN: Your Honor, the people of the Commonwealth of Massachusetts call Sergeant Detective John McDonough.

THE CLERK: Do you solemnly swear the testimony you're about to give this jury concerning the matter between the Commonwealth and the defendant is the whole truth and nothing but the truth, so help you God?

THE WITNESS: I do.

JOHN MCDONOUGH, SWORN

DIRECT EXAMINATION

Q (By Mr. Deakin) Sergeant, could I ask you, please, once you've arranged your things, to pull your chair forward as close as you can to the microphone and adjust it so you're speaking as directly into it as you can.

Can you please state your name and spell your last name for the court reporter?

A Sergeant Detective John M. McDonough, M—C-D-O-N-O-U-G-H.

Q How are you employed?

A I'm a sergeant with the Boston Police Department.

Q How long have you been with the Boston Police Department?

A Seventeen years.

Q How long as a sergeant?

A Ten.

Q How long as a detective?

A I'm in my sixth.

Q What is your current assignment?

A I'm at the Sexual Assault Unit.

Q And I want to direct your attention to Friday, July

14th of the year 2000, the early morning hours of that day. Were you working on that day?

A At that time I was the on-call supervisor for the unit.

Q What does that mean?

A That means that any overnight sexual assaults that come in that need to be investigated, I would be the contact person.

Q And are there regular detectives who work overnight in the Sexual Assault Unit?

A No, there are not.

Q Did you receive a call that morning?

A Yes, I did.

Q What time was that?

A About 1:50 a.m.

Q One-five-oh?

A Yes, sir.

Q And who was the call from?

A Our operations division.

Q What was the call about?

A A sexual assault that had occurred at Fidelis Way in Brighton.

Q Did you have the specific address at Fidelis Way?

A Yes, I did. 34 Fidelis Way.

Q What did you do when you got the call?
A I sought out Sergeant Harry Byrne, who was the supervisor at the scene.
Q Let me ask you to step back for a moment. How did you get to the scene?
A I drove, in an unmarked cruiser.
Q And approximately what time did you arrive there?
A About 3 a.m.
Q What did you do once you got there? I think you already started your answer to this question. But what did you do?
A I sought out the supervisor at the scene, who was Sergeant Harry Byrne, and --
Q Is that the same Harry Byrne who testified several days ago in this trial?
A Yes, it is.
Q Where did you speak to him?
A In his cruiser.
Q And how long was that conversation?
A About ten minutes.
Q Did he discuss with you things that had happened before you arrived?
A Yes, he did.
Q In particular, did he discuss with you whether he

took anything into evidence?

A Yes, he did.

Q What did he tell you?

A He took some duct tape into evidence.

Q Did he tell you where he had found that?

A Yes, he did. On LaRose Place.

Q Did you have an opportunity, while you were there, to see a bedroom in Apartment 546 in that building?

A Yes, I did.

Q And which bedroom was that?

A Apartment 546 would be Polly Taylor's apartment. And I walked through the apartment.

Q I'm sorry. Let me -- I meant to ask you if you had seen a bedroom in Apartment 545. Thank you.

A Yes, I did. I saw one there also.

Q And which bedroom did you see there?

A I saw the -- Owen McCants'. Mr. McCants'.

Q Is that, from the front of the building, the front bedroom or -- maybe I'll -- let me make reference to it.

MR. DEAKIN: If I may, your Honor?

THE COURT: Yes.

Q With reference to this diagram, which one would be the bedroom that you saw?

A It would be right here.

Q The one that's labeled "Bedroom 2"?

A That's correct.

Q When you saw the bedroom, what was the -- what position was the door in?

A Closed.

Q And what was the -- was there anything around the door?

A Yes. Yellow police tape.

Q And were there any other police officers beside yourself in the room at -- in the apartment at that time?

A There was a number of police officers in the room.

Q And what were the police officers in the room doing?

A At the time, they were securing the scene.

Q Was -- did you have an understanding about whether anyone would be allowed in or out of Bedroom 2?

A Yes. With the door closed, and the yellow tape, it was secured as a crime scene.

Q And what did you understand the purpose of the securing of that crime scene to be?

A That I was going to seek a search warrant for items in that room.

Q Did you learn, at some point during your time at 34

Fidelis Way at this time, something about a car that had been towed?

A Yes.

Q What did you learn?

A I learned that Owen McCants' car had been found in a rear parking lot, and that it was secured and towed to Boston Police Headquarters.

Q And did you later see the car that was towed?

A Yes, I did.

Q What make and model car was it?

A It was a green Pontiac Grand Am, Mass. registration 3693EM.

Q E-M?

A Yes, sir.

Q And did you run that registration through the computer?

A Yes, I did.

Q And what did you learn?

A It belonged to Owen McCants.

Q How long did you spend at -- oh, let me ask you first, you said it was a green Grand Am. What shade of green?

A Dark.

Q Did you have an opportunity, when you later saw the

car, to note the color of the interior upholstery of the car?

A Yes.

Q What was that?

A Gray.

Q And did you note the material in the upholstery?

A Gray cloth seats, yes, sir.

Q Where did you go from 34 Fidelis Way?

A I went to the Children's Hospital Emergency Room.

Q And what did you find there?

A I found ██████████, along with her mother and boyfriend. There was a couple of police officers present.

Q Where was -- who were the police officers; if you know?

A Officer Stots, Jessie Stots, and Officer Tahisha Skeen.

Q Where was ██████████ when you first saw her?

A She was in an emergency room, you know, at the emergency room. An examining room, I guess is what you'd call it.

Q And who was with her there?

A Her mother.

Q Describe -- had you ever met ██████████ before

this day?

A No, I had not.

Q Describe her physical condition when you saw her.

A I know she was very tired, very scared.

Q I'm going to ask you, first --

MR. SHEA: Objection. Nonresponsive.

THE COURT: Overruled.

Q First, if you would, describe her physical condition, her appearance.

A Disheveled. Her hair was Disheveled. She had on a white, long T-shirt that was dirty. She had some cuts to her body.

MR. DEAKIN: If I may approach, your Honor?

With the Court's permission, may I inquire from here?

THE COURT: Yes.

Q Officer, I want to show you what's been labeled, marked in evidence as Exhibit 9. Do you recognize that?

A Yes, I do.

Q What is that?

A That's the shirt that [redacted] had on.

Q When you saw her at the hospital?

A Yes, sir.

Q Describe, if you would -- oh, you mentioned that she had cuts on her neck?

A Yes.

Q Where did you see cuts on her neck?

A The left side of her neck; around her left ear as well.

Q Do you recall any other cuts?

A Yes. She had an abrasion in her mouth. I believe her elbow.

Q Describe her demeanor when you first saw her.

A Tired, scared. At first, a little hesitant to talk.

Q What led you to believe she was scared? What did you observe that led you to believe that she was scared?

A Well, her physical -- she was scrunched up in a sort of a fetal position at first, laying in bed. It's four in the morning.

Q Did you speak -- well, did you speak, at some point, to [REDACTED]?

A Yes, I did.

Q Before you spoke to [REDACTED], did you speak to anyone else?

A Yes. Her mother, Rasheena. Also known as Nicki.

Q And is that the same Rasheena or Nicki [REDACTED] who

testified in this trial several days ago, now?

A Yes.

Q What did Rasheena [redacted] tell you?

MR. SHEA: Objection.

THE COURT: Sustained.

MR. DEAKIN: Your Honor, may we go to side bar on this?

THE COURT: Yes.

SIDE-BAR CONFERENCE:

MR. DEAKIN: Your Honor, defense counsel cross-examined Rasheena [redacted] on the question of what she said to her daughter when she said, "Was it Sonny?" and [redacted] said, "Yes."

He also cross-examined Officer Murray on the question of whether he ever heard Rasheena [redacted] say, "Was it Sonny?" He also cross-examined -- I guess that's it. Those two.

Certainly leaving the impression that she had not said what she had said she said. I think I'm entitled to elicit from him a contemporaneous consistent statement that she, in fact, said --

THE COURT: Objection sustained.

(End of side-bar conference.)

Q Did Rasheena ██████ give you any information about possible -- a possible perpetrator in this case?

MR. SHEA: Objection.

THE COURT: Overruled. Yes or no.

A Yes.

Q And did she give you a name?

A Yes.

Q What was the name that she gave you?

MR. SHEA: Objection.

THE COURT: Sustained.

Q Prior to her giving you that name -- well, strike that question.

How long did you speak to Rasheena ██████?

A Probably about five minutes.

Q And after you spoke to her, what's the next thing that you did?

A I spoke with ████.

Q And how did that conversation go?

A I asked questions and she stated -- she told me, in a narrative form, what occurred. I asked questions, as well.

Q Did she describe for you the automobile that she had been taken in?

A Yes, she did.

MR. SHEA: Objection.

THE COURT: Did [redacted]?

THE WITNESS: [redacted] did, yes, sir.

THE COURT: Fine. Overruled.

Q You may answer.

THE COURT: He said, yes, she did.

A Yes, she did.

Q And how did she describe the automobile?

A As a dark --

MR. SHEA: Objection.

THE COURT: Sustained.

Q Did she tell you the narrative account from start to finish? That is, from beginning to end, all the way through?

A No.

Q How long did your interview with her last?

A Probably about 15 to 20 minutes.

Q Did you ask [redacted] for a description of the person who had taken her?

A No, I did not.

Q Did you ask [redacted] for the identity of the person who had taken her?

A No.

Q And why was that?

A I had that information.

Q And what was the source of that information?

MR. SHEA: Objection.

THE COURT: Overruled.

Q What was the source of that information?

A Sergeant Byrne and Rasheena [redacted]

Q And with specific reference to Rasheena [redacted] --

MR. SHEA: Objection. Motion to strike.

THE COURT: Let me see you at side bar for a second.

SIDE-BAR CONFERENCE:

MR. SHEA: I thought -- I mean I thought we had --

THE COURT: Well, I keep getting confused by your objections here in this case. On one hand you're saying it was suggested to the little girl, and at the same time you're keeping out the times when it was suggested. So, I don't know what you want to do.

MR. DEAKIN: He wants to bring it out himself on cross.

MR. SHEA: This is true.

MR. DEAKIN: I'm allowed to draw --

THE COURT: Look, you keep trying the same case over and over. We've been having the same testimony for an entire week now. At some point we've got to get to an end in this case. You all decide what you want to do.

You decide, you and the defendant.

And you decide how you're going to prosecute.

(End of side-bar conference.)

Q Did Rasheena [redacted] tell you the source of her information?

A Rasheena [redacted]

Q Yes.

A From her daughter.

MR. SHEA: Objection.

THE COURT: Sustained.

Q Did you speak to anyone else at the hospital after speaking to Rasheena and [redacted]?

A Yes.

Q Who is that?

A I spoke with the two officers, Stots and Skeen.

Q And did one or the other, or both of them, brief you

on what they had done?

A Officer Skeen did, yes.

Q And just yes or no, did she brief you on information she had received from [REDACTED]?

A Yes.

Q Did you know at that time whether a rape evidence protocol and a toxicology kit were done at the hospital?

A It was going to be done, yes.

Q It had not yet been done?

A I'm not quite sure if the doctor had been in yet at that time.

Q And what, if any, steps did you take with respect to the rape evidence protocol and toxicology kit?

A I'm sure that it was picked up later in the day and brought and logged in.

Q And who did that?

A Officer Tom Lembo. Excuse me. Detective Tom Lembo of the Sexual Assault Unit.

Q And he did it later that afternoon?

A Yes.

Q Where did you go from the hospital?

A I went to the Sexual Assault Unit to begin preparations for an affidavit for a search warrant

of Mr. McCants' room.

Q Did you begin preparations -- was it just for the one search warrant?

A No.

Q Were there additional search warrants?

A Well, I was going to be searching his car, as well, sir.

Q On Friday, the same day, later in the day, Friday, July 14th of 2000, did you visit [redacted] home?

A Yes, I did.

Q And what did you do there?

A I took pictures of the cuts that I described, that I observed at the Children's Emergency Room.

Q And I'll show you Exhibits 7 and 8, and ask you if you recognize them?

A Yes, I do.

Q And what are those?

A Two of the pictures that I took of [redacted] at her home. One shows a laceration to her neck area, and one to the side of her neck. I should say one to underneath the neck, and one to the side.

Q What were you doing during the day on Friday, July 14th?

A Preparing a search warrant for Mr. McCants' room.

Q Did you obtain a search warrant?

A Yes, I did.

Q Did you serve that warrant?

A Yes, I did.

Q When did that happen?

A About 9:55 -- 8:55 that night.

Q Of July 14th of 2000?

A Yes.

Q Who went with you?

A Lieutenant Gary French, who is from the Sexual Assault Unit. Also, Sergeant Lorraine Henshaw; Detective John Joyce. I should say that all three of these that I mention, they were from the Sexual Assault Unit. Along with a photographer from the Identification Unit. And we met Officer Robert Butler there.

Q And what was Officer Butler doing there when you met him?

A He was guarding the room, Mr. McCants' bedroom.

Q Okay. Of the people you've just mentioned who went with you, are any of them female?

A Yes.

Q Who is a female?

A Sergeant Lorraine Henshaw.

Q And I gather -- well, did you remove items from Mr. McCants' bedroom pursuant to the search warrant?

A Yes.

Q And when you took items from the room, what were you carrying them in?

A Paper bags. Brown, paper bags.

Q And about how large are those brown paper bags?

A I'd describe them as a typical grocery bag. Probably about 28 inches high, ten inches wide, I would estimate.

Q And can you tell the jurors, please, what you found when you went into Owen McCants' bedroom?

THE WITNESS: Your Honor, could I check my notes?

THE COURT: Yes.

MR. DEAKIN: And, your Honor, with the Court's permission, may I inquire from over to the side, because I'll be showing him a number of items?

THE COURT: Fine.

SIDE-BAR CONFERENCE:

MR. SHEA: Just so I don't have to get up and object and come up here every time, obviously,

I'm objecting to all this evidence coming in.

THE COURT: Yes.

(End of side-bar conference.)

MR. DEAKIN: With the Court's permission, may I use the edge of her desk?

THE COURT: Ask her.

THE COURT REPORTER: Sure.

Q You were going to tell the jurors you found.

A Yes, sir. A glass with brown-colored liquid.

Q Where did you find a glass with brown-colored liquid?

A It was in a smaller of two dressers, a dresser drawer, in the room. It was on the top of the smaller dresser.

Q And I'll show you what's been labeled Exhibit 10. Do you recognize that?

A Yes, I do.

Q What is it a picture of?

A That's a picture of a glass with a brown-colored liquid in it.

Q And is that a fair and accurate representation of the brandy snifter that you saw that night?

A Yes, it is.

Q Did you make any observations, other than seeing it, of that glass?

A Yes. We collected two vials of that.

Q And did you make any observations with your own senses besides looking at it?

A Oh, yes, sir. We smelled it. It was a strong smell of alcohol.

Q What's the next thing that you found?

A A small mirror with a white substance, which was on the smaller dresser.

Q And do you have that mirror with you?

A Yes, I do.

Q Would you produce that mirror, please? Do you have the mirror?

A Yes.

Q And did you make any observations of this mirror as you collected it?

A Yes, sir.

Q What were your observations?

A That there was some white powder on it, we believed to be cocaine.

Q And what, if anything, did you do with this mirror?

A It was sent to the Mass. police lab for analysis.

Q And was it, in fact, analyzed?

A Yes, sir.

Q And what were the results of the analysis?

A That no narcotic or illegal drug was found.

Q May I -- do you have a certificate to that effect?

A I do.

MR. DEAKIN: Your Honor, at this time the Commonwealth would move to introduce the mirror, the certificate and the photograph as I believe it would be Exhibits 14A, B and C.

THE COURT: Fine.

MR. SHEA: Objection.

THE COURT: Overruled.

(Whereupon, package containing mirror marked and admitted into evidence as Exhibit No. 14A; certificate of analysis marked and admitted into evidence as Exhibit No. 14B; photograph marked and admitted into evidence as Exhibit 14C.)

Q Detective McDonough, what's the next thing that you found?

A We found a rolled nylon in a top drawer of the larger dresser.

Q Were there any distinctive features of that nylon beside the fact that it was rolled?

A Yeah. It was rolled and knotted, like in a cap.

Q I'm going to show you what's been labeled Exhibit B for identification. Do you recognize that?

A Yes, I do.

Q And what is that?

A This is the nylon stocking cap that we found.

Q I'm going to show you a photograph and ask you if you recognize that.

A Yes, I do.

Q What is -- what is that a photograph of?

A It's a picture of this nylon.

Q And where -- it's a picture of that nylon where?

A It was in the -- it was found in the top drawer of the larger dresser.

Q And is that a fair and accurate representation of the nylon as you saw it in the dresser?

A Well, this photograph shows it much lighter, as if the photographer's flash brightened it too much.

It's darker than this.

Q Aside from the issue of color, besides that, is it a fair and accurate representation of the nylon as you saw it?

A Yes, it is.

MR. SHEA: Objection. Side bar.

SIDE-BAR CONFERENCE:

MR. SHEA: If it's not a fair and accurate representation, I don't believe it comes in.

MR. DEAKIN: He said it's fair and accurate, but for color, which I think --

THE COURT: Is this the same stocking that he just introduced?

MR. DEAKIN: I'm sorry. Yes. I have a reason for putting photos in as well as the exhibits, your Honor. I expect the defense is going to argue mishandling of evidence, and I think the jury needs to see not only the exhibit, but where it was found and the surrounding location. I think it's very important.

THE COURT: The objection is overruled. Excuse me. Only on the basis that it's the same stocking they've already put in evidence.

MR. SHEA: Which I'm obviously objecting to.

(End of side-bar conference.)

MR. DEAKIN: Your Honor, the Commonwealth would move to introduce in evidence what has been labeled Exhibit B for identification, and a photo of Exhibit B, which I would ask be Exhibit 16A and B.

I apologize. 15A and B.

(Whereupon, package containing rolled nylon stocking marked and admitted into evidence as Exhibit No. 15A; photograph marked and admitted into evidence as Exhibit No. 15B.)

Q Did you also recover a short-sleeved shirt?
A Yes, I did.
Q And where did you find the short-sleeved shirt?
A It was hanging on a hook on the wall in the bedroom.
Q And, actually, I'm sorry, I just have to go back

briefly. The rolled nylon that's now Exhibit 15A, what did you do with that after you recovered it?

A We bagged it, and kept it for evidence.

Q And what did, eventually, you do with it?

A It was forwarded to the crime -- our crime lab.

Q Now, you say you found a green short-sleeved shirt. Where did you find the green short-sleeved shirt?

A Hanging on a hook on the wall in the bedroom.

Q I'm going to show you this item and ask you if you recognize this.

A Yes. It's the green short-sleeved shirt that I mentioned.

MR. DEAKIN: Your Honor, I'd move to introduce this item as Exhibit 16.

MR. SHEA: Continuing objection.

THE COURT: Overruled.

(Whereupon, package containing green short-sleeved shirt marked and admitted into evidence as Exhibit No. 16.)

Q Detective, I'm going to show you -- Detective, I'm

going to --

MR. DEAKIN: May I publish this to the jury, your Honor?

THE COURT: Yes.

MR. DEAKIN: It's Exhibit 13.

Q Do you recognize that photograph?

A Yes, I do.

Q What is that a photograph of?

A Two green shirts that were recovered from Mr. McCants' bedroom.

Q And is it, in fact -- the photograph is a photograph of two shirts?

A Yes, it is.

Q And is one of them already the short-sleeved shirt that's in evidence?

A Yes.

Q And what is the other green shirt that you found?

A We recovered a long-sleeved green shirt on the same hook.

Q I show you an item, Detective, and ask you if you recognize that?

A Yes, I do.

Q What is that?

A That's the long-sleeved green shirt.

MR. DEAKIN: I'd move to introduce this in evidence. I think it's 17.

(Whereupon, package containing long-sleeved green shirt marked and admitted into evidence as Exhibit No. 17.)

Q What's the next thing that you found, Officer -- Sergeant?

A We found a Durex condom -- that would be a brand name -- in the pocket of the large green shirt.

Q When you say "large" --

A Excuse me. The long-sleeved green shirt. Pardon me, sir.

Q Is that the same long-sleeved green shirt that's now Exhibit 17?

A Yes, it is.

Q Okay. I'm going to show you this item and ask you if you recognize what that is?

A That would be the condom that was recovered, sir.

MR. SHEA: Objection.

THE COURT: Overruled.

MR. SHEA: Different grounds.

THE COURT: Yes.

MR. DEAKIN: I'd move to introduce this into evidence as Exhibit 18.

(Whereupon, package containing Durex condom marked and admitted into evidence as Exhibit No. 18.)

Q What is the next item that you found?
A A hammer holder with gray duct tape on it.
Q I'm going to show you this item and ask you if you recognize what that is?
A Yes, sir. That's the hammer holder.
Q Now, it appears that the hammer holder no longer has the duct tape on it.
A No, it doesn't, but you can see where some was.
Q And is there duct tape also included in this package?
A Yes.

MR. DEAKIN: I'd move to introduce this -- oh, I'm sorry.

Q Where did you find that?

A On the window sill in the bedroom, in Mr. McCants' bedroom.

Q I'm going to show you a photograph and ask you if you recognize that? Do you recognize that?

A Yes, I do.

Q And what is that?

A The hammer holder that I just looked at, that you have here.

Q Is that a fair and accurate representation of how the hammer holder looked that night?

A Yes, it is.

Q It appears to have duct tape on it. Is that how it appeared when you saw it that evening?

A Yes.

MR. DEAKIN: I'd move to introduce these items as Exhibits 19A and B.

(Whereupon, package containing hammer holder marked and admitted into evidence as Exhibit No. 19A; photograph marked and admitted into evidence as

Exhibit No. 19B.)

Q What's the next item that you found -- I'm sorry.

What's the next item that you found? I'm sorry.

Let me ask you, as to the two shirts and the hammer holder, what did you do with them?.

A They were bagged as evidence, and brought to our crime lab for analysis.

Q What is the next thing that you found?

A A half-filled bottle of Brugal rum, a quart bottle.

Q I show you this item and ask you if you recognize that?

A Yes, I do.

Q What is that?

A The bottle of Brugal rum.

Q And I'm going to show you a photograph and ask you if you recognize what's depicted in that photograph?

A The Brugal rum, where we found it in Mr. McCants' bedroom.

Q Is that a fair and accurate representation of the Brugal rum -- where did you find it?

A We found that on the floor, at the tall dresser.

Q And is that a fair and accurate representation of

how the bottle looked when you found it?

A Yes, it is.

MR. DEAKIN: I'd move to introduce these items as Exhibits 21A and B -- I'm sorry. 20A and B.

(Whereupon, package containing bottle of Brugal rum marked and admitted into evidence as Exhibit No. 20A; photograph marked and admitted into evidence as Exhibit No. 20B.)

Q What is the next thing that you found?

A A small plastic bag of a green, leafy substance.

Q And do you have that bag with you today?

A Yes, I do.

Q Could you produce that bag, please?

A (Witness complies.)

Q Where did you find that bag?

A On the small dresser in Mr. McCants' bedroom.

Q I'm going to show you a photograph and ask you if you recognize what's depicted in that photograph?

A The bag of green herb that we found.

Q Is that a fair and accurate representation of that bag when you found it?

A Yes, it is.

Q What did you do with the bag?

A It was collected as evidence and forwarded to the Mass. crime lab for analysis.

Q And was there an analysis performed on that bag?

A Yes, there was.

Q The contents of that bag?

A Yes, sir.

Q And what were the results of the analysis?

A The vegetable matter was found to contain marijuana.

MR. DEAKIN: We move to introduce, your Honor --

Q Just so that I'm clear, or the record is clear, Sergeant, there appear to be two plastic bags that you're giving me. One has the bag with the green, leafy substance that's marijuana, and one has -- I can't even tell -- a plastic --

A It's a napkin, it seems, with some marijuana in it, as well.

Q And these came back -- you sent these together?

A Yes, sir.

Q And they came back together?

A Yes.

MR. DEAKIN: Your Honor, at this time I'd move to introduce the plastic bag with the leafy substance, the certificate, and the photograph as Exhibit 21A, B, and C.

(Whereupon, package containing leafy substance marked and admitted into evidence as Exhibit No. 21A; certificate of analysis marked and admitted into evidence as Exhibit No. 21B; and photograph marked and admitted into evidence as Exhibit 21C.)

MR. DEAKIN: And the bag with the paper napkin in it, and its accompanying certificate as Exhibit 22A and B.

MR. SHEA: May we approach?

SIDE-BAR CONFERENCE:

MR. SHEA: There's two bags and in the return there's only one bag.

MR. DEAKIN: One's a napkin.

MR. SHEA: Well, nowhere in here does it say a napkin with marijuana.

MR. DEAKIN: That's true.

THE COURT: Sustained.

MR. SHEA: Well, I mean, I seek to get into it. I'd ask that it not be admitted but that I be allowed to get into the fact that there seems to be evidence that wasn't listed in the return.

THE COURT: So what else do you want?

MR. SHEA: I want it sustained.

MR. DEAKIN: So we're not going to mark it.

(End of side-bar conference.)

Q What's the next thing that you found?

A Excuse me for one minute. A package of EZ Wider rolling papers.

Q I'm going to show you this, Sergeant, and ask you if you recognize what that is.

A Yes, I do.

Q What is that?

A A package of EZ Wider rolling papers.

Q And, Sergeant, I'm going to show you a photograph, and I direct your attention to the lower right-hand corner of the photograph, and ask you if you recognize what's depicted there?

A Yes. The package of EZ Wider rolling papers.

Q Is that a fair and accurate representation of how that pack appeared when you found it that night?

A Yes, it is.

MR. DEAKIN: I'd move to introduce this in evidence, your Honor, as Exhibits 22A and B.

THE COURT: Fine.

MR. DEAKIN: A being the item, and B being the photo.

(Whereupon, packaging containing EZ Wider rolling papers marked and admitted into evidence as Exhibit No. 22A; photograph marked and admitted into evidence as Exhibit No. 22B.

Q What is the next thing that you found?

A A green hat.
Q And where did you locate that?
A In a white box next to the dresser.
Q By the way, let me -- I apologize for going back.
The package of rolling papers, what did you do with it?
A It was forwarded to our latent print lab.
Q Fingerprint lab?
A Yes, sir.
Q And you said you found a green hat? Where did you find the green hat?
A A white box next to the dresser.
Q I'm going to show you -- first let me show you a photograph and ask you if you recognize what that's a photograph of?
A Yes, sir. The green hat that we recovered.
Q Is that a fair and accurate representation of the green hat that you recovered?
A Yes, it is.
Q And I'll show you this item and ask you if you recognize what it is?
A The green hat that we recovered.
MR. DEAKIN: I'd move to introduce these items, your honor, as Exhibits 23A and B.

THE COURT: Fine.

(Whereupon, package containing green hat marked and admitted into evidence as Exhibit No. 23A; photograph marked and admitted into evidence as Exhibit No. 23B.)

Q What's the next thing that you found?

A Two pieces of mail that were addressed to Mr. McCants.

Q I show you these items and ask if you recognize them.

A Yes, I do.

Q What are they?

A The two pieces of mail that were recovered in the bedroom.

Q And please look at this photograph. Do you recognize that?

A Yes, I do.

Q And what is that a photograph of?

A The pieces of mail that we recovered.

Q Is that a fair and accurate representation of the mail that you recovered?

A Yes, it is.

Q And what did you do with this mail that you recovered?

A We took it into evidence and it was forwarded to our crime lab for fingerprints.

MR. DEAKIN: I'd move to introduce these as exhibits 24A, B and C; with A being a note from Brookline Cooperative Bank; B being a letter from -- well, actually, they're both from Brookline Cooperative Bank.

"A" being a flat flyer-type envelope from Brookline Cooperative Bank, and B being an envelope, business envelope with a window, from Brookline Cooperative Bank, and C being the photograph.

(Whereupon, package containing flat flyer-type envelope from Brookline Cooperative Bank marked and admitted into evidence as Exhibit 24A; business envelope from Brookline

Cooperative Bank marked and admitted into evidence as Exhibit No. 24B; photograph marked and admitted into evidence as Exhibit 24C.)

Q What is the next thing that you found, Detective?

A A Capital No. 1 envelope with writing on it.

Q I'm going to ask you, Detective, to move to the next item that you found.

A A roll of gray duct tape.

Q And where did you find the roll of gray duct tape?

A It was found in a white bag on the closet floor.

Q I'm going to show you this item and ask if you recognize that.

A I do.

Q What is that?

A The gray duct tape that we recovered.

Q And I'm showing you another photo and I'd ask if you recognize what that's a photograph of?

A Yes. It's where we found the gray duct tape in the white bag on the closet floor.

Q Is that a fair and accurate representation of the duct tape as it appeared to you that night?

A Yes, it is.

MR. DEAKIN: Move to introduce these items as Exhibit 25 and 25A. I'm sorry. 25A and B.

(Whereupon, package containing roll of gray duct tape marked and admitted into evidence as Exhibit No. 25A; photograph marked and admitted into evidence as Exhibit 25B.)

Q Now, earlier that day, Sergeant, did you receive any evidenced from Area E-14 police station?

A Yes, I did.

Q What did you receive?

A Tape recovered earlier in the day by Sergeant Byrne.

Q And what did you do with it?

A I entered it into evidence at the Sexual Assault Unit to be forwarded to the crime lab for analysis and fingerprints.

Q And, Sergeant, I'm going to ask you, if you would, to look at this item and tell me if you recognize what it is.

A That's the tape that I entered into evidence that was received at our Sexual Assault Unit.

Q And how is it that you recognize it as the same tape?

A It has my writing on it.

Q Your initials?

A Yes, it does.

MR. DEAKIN: I'd move to introduce this bag of duct tape as Exhibit 26.

(Whereupon, package containing duct tape marked and admitted into evidence as Exhibit No. 26.)

MR. DEAKIN: Your Honor, may I publish Exhibit 26 to the jury?

THE COURT: Yes.

MR. SHEA: Could we approach side bar?

THE COURT: Yes.

SIDE-BAR CONFERENCE:

MR. SHEA: What's the point of publishing the duct tape to the jury?

THE COURT: The who?

MR. SHEA: The duct tape.

THE COURT: It doesn't matter. Let's go.

MR. SHEA: Note my objection.

(End of side-bar conference.)

MR. SHEA: May we approach?

SIDE-BAR CONFERENCE:

MR. SHEA: I'd just like it to be noted when we resumed, the time, and how long the tape was passed through. The tape that's irrelevant that's being passed through is solely for the prejudice of the jury.

THE COURT: Excuse me. He could pass every exhibit that he introduces to the jury when it's introduced.

MR. SHEA: Well, I mean, I have a running objection, obviously. I'm objecting to --

THE COURT: The length of time they take to look at it doesn't have anything to do with this case.

MR. SHEA: But, I mean, the case is really about sealing up their minds from thinking about it,

not using the megaphone of the tape.

MR. DEAKIN: For the record, your Honor, to preserve the record, I expect to show that there was duct tape of a similar manufacturer in both the bedroom and his car.

THE COURT: You keep trying to anticipate what his defense is going to be.

MR. DEAKIN: That's my job.

THE COURT: No, it's not. Excuse me.

Your job is to present a case that proves him guilty beyond a reasonable doubt. If he doesn't choose the defense that you anticipate, you're in trouble.

(End of side-bar conference.)

Q Sergeant, during your investigation, did you become aware of a security camera in the front hall of 34 Fidelis Way?

A Yes, I did.

Q And did you seek to obtain any tape recording made from that security camera?

A Yes.

Q What were the results of that effort?

A I was informed that that camera was not operable.

Q What's the next thing that you did after -- you said you performed the search warrant at 8:55 on Friday, July 14th. What is the next thing that you did after that?

A On July 15th I made a walk-through of the crime scene with [redacted] and her mother.

Q Did she point out specific locations to you?

A Yes, she did.

Q And, Detective, if I may, with the Court's permission, do you see the photograph that's being displayed now?

A Yes, I do.

Q Is that one of the locations that [redacted] pointed out to you?

A Yes.

Q Where did [redacted] take you on the walk-through?

A From the apartment from where she was abducted, down the stairs, the route she took to the car. From there we went to the area where the rape occurred on LaRose Place.

Q And where was the area that she indicated as where the rape occurred?

A It would be 24-26 LaRose Place. The home is owned by the Antonellis family.

Q And where, specifically, in relation to those homes?

A In the back yard, in the back of a -- there's a Madonna statue and a brick barbeque. And in the back there's a grapevine area where it occurred.

Q When you looked in the grapevine area, did you notice anything that struck your attention when you went there?

A Yes, I did.

Q What did you notice?

A There was -- it had a flattened area, in tall grass, that was made flat by some heavy objects being....

Q I'm going to show you a photograph and ask if you recognize that?

A Yes, I do.

Q And what do you recognize that to be?

A That would be the flattened grass, which would be underneath the trellis that was the grapevine in this back yard.

Q Is that a fair and accurate representation of that area as you saw it that day?

A Yes, it is.

MR. DEAKIN: May this be marked, your Honor, as Exhibit 26?

THE COURT REPORTER: Exhibit 27.

MR. DEAKIN: Exhibit 27.

(Whereupon, photograph marked and admitted into evidence as Exhibit No. 27.)

MR. DEAKIN: May I publish this on the monitor, your Honor?

(Photograph published.)

Q Detective, have you been back in that area of the side yard of 24-26 LaRose Place?

A Yes, I have.

Q Recently?

A Yes.

Q And if you stand in that area now and look out toward LaRose Place, is there an obstruction in your view now?

A Not as much as there was before. The undergrowth has been cut.

Q So, there was more obstruction at the time you did the walk-through than there is now?

A Yes.

Q I'm going to show you this and ask you if you

recognizes what that's a photograph of.

A That's the back yard of 24 LaRose Place. It would be looking out to the street there.

Q Looking out to LaRose Place?

A Yes.

Q And is that a fair and accurate representation of the view from the area where [redacted] said the rape occurred out to the street, as it appeared to you that day?

A Yes.

MR. DEAKIN: I'd ask that this be marked Exhibit 28.

(Whereupon, photograph marked and admitted into evidence as Exhibit No. 28.)

MR. DEAKIN: If I may briefly publish this to the jury, your Honor.

(Photograph published.)

Q Detective McDonough, did you have an occasion, after the walk-through, at some point, to speak to a Mr. Benjamin Haughey?

A I did.

Q And how did you do that?

A Officer Bill Kendricken of District 14 and his partner responded to a call at an MVP Sport --

Q Let me just stop you.

A Yes, sir.

Q First of all, just how did you make contact with him? In person? By phone?

A Oh, by phone.

Q And how had he come to your attention? From whom did he come to your attention?

A Two people, actually. Officer Bill Kendricken and Detective Tom Kealy.

Q And when did you speak to Benjamin Haughey?

A I spoke with him on Monday the 17th.

Q And did you prepare a report of your interview of Benjamin Haughey?

A Yes, I did.

Q At one point in your report -- just yes or no -- did Benjamin Haughey describe --

MR. SHEA: Objection.

MR. DEAKIN: Just yes or no.

THE COURT: Overruled.

Q Did Benjamin Haughey describe a motor vehicle that

he had seen on the night of the 13th going into the 14th?

A Yes, he did.

Q And did you write down the make and model of that motor vehicle in your report?

A Yes, I did.

Q At one point in your report did you write down that he had said he had seen a Trans Am?

MR. SHEA: Objection.

THE COURT: Overruled.

A Yes.

Q Did you write down in your report that he had said he had seen a Trans Am?

A Yes, I did.

Q When you wrote that down, was that correct?

A No, that was a mistake.

Q And did you later, in your report, write down that the right make and mode that he told you?

A Yes. Which was a Grand Am.

MR. SHEA: Objection.

THE COURT: Overruled.

Q After you spoke to Benjamin Haughey, did you attend an interview of [REDACTED] at the district attorney's office?

A I did.

Q And how was that interview conducted?

A The interviewer, Ms. Fremetta (phonetic) interviewed [redacted] at a small table, like a kindergarten-type setting. And I sat behind a mirror and observed it. I guess it would be a two-way mirror. They couldn't see me.

Q How long was the interview?

A About two hours.

Q Was a record made of that interview?

A Yes, there was.

Q What was that?

A A video cassette was made of it.

Q Did you seek a search warrant for the defendant's car, automobile?

A Yes, I did.

Q And did you obtain a warrant?

A Yes.

Q Did you execute that warrant?

A I did.

Q And when did you do that?

A That would be Wednesday, the 19th.

Q Who was there when you executed that warrant?

A Myself and Lieutenant French from my unit, Sergeant

Byrne, Criminalist Liz Ziolkowski, Criminalist Mike Gorn. They're both from the BPD, Boston Police Department Crime Lab. And then photographs were taken by Ted Lewis, a photographer with the department, and also Officer Rose McLaughlin.

Q And did you find -- well, could you please -- could you please tell us what you found during that course of that warrant, that search warrant?

A Yes.

MR. SHEA: May we approach side bar?

SIDE-BAR CONFERENCE:

MR. SHEA: Just, again, to protect the suppression as to everything that's coming in from the search of the automobile.

THE COURT: All right.

MR. SHEA: And it's continuing, so I don't have to come up on every piece?

THE COURT: Yes.

(End of side-bar conference.)

Q Detective, could you just describe what you found, and for each item, where you found it?

A Yes.

THE WITNESS: Your Honor, could I use my notes?

THE COURT: Yes.

A A crime lab tape lift for hair and fibers of the driver's seat, including the headrest; one dark hair from the front passenger seat. A crime lab tape lift for hair and fibers of the passenger seat, including the headrest. A mesh basket with gray duct tape on the handle was found in the trunk. A long-sleeved green shirt in the trunk. A tool bit kit with gray duct tape on the bottom was also in the trunk. A clear plastic bag with duct tape on the bottom from the trunk.

A piece of gray duct tape removed from interior bottom of driver's side door. A piece of gray duct tape removed from the interior bottom of the passenger's side door. A piece of gray duct tape removed from the trunk.

Eight fingerprint prints were taken along with photographs of the lifts and location on the car in various places on the outside of the car. A small black plastic container was taken from a console area of the car. One small yellow pill with "P73" printed on it in black lettering was

found on the driver's side floor. A long-sleeved blue shirt.

Q And where did you find those?

A It was found in the trunk.

Q The pill, labeled "P73," what did you do with that?

A That was sent to the -- logged in as evidence and sent to the Massachusetts lab for analysis.

Q And what were the results of that analysis?

A If you'd give me a minute, I'll take it out.

No narcotic or illegal drug was found. The pillow came back that there was not a narcotic or illegal drug.

Q Detective, I'm going to show you this item and ask you if you recognize what that is.

A Yes. This is the mesh basket that I found.

Q And is it in the same condition as when you found it?

A I think there was tape removed from it.

Q Was duct tape removed from it?

A Yes. Yes.

MR. DEAKIN: Your Honor, I'd ask that this be marked Exhibit 29.

(Whereupon, package containing mesh basket marked and admitted into evidence as Exhibit No. 29.)

Q Detective, I'm going to ask you to look at this and ask you if you recognize what that is.

A It's a tool kit that was covered with duct tape.

MR. DEAKIN: I'd ask that this be marked as Exhibit 29.

THE COURT REPORTER: Exhibit 30.

MR. DEAKIN: I'm sorry. Exhibit 30.

(Whereupon, package containing took kit with duct tape marked and admitted into evidence as Exhibit No. 30.)

Q And if you can, you can refer to your notes, please identify this item.

A That would be gray duct tape recovered from the car. I imagine the interior portion, at the side doors.

Q I'm going to ask you, please -- there's a lot of duct tape, obviously -- ask you if that refreshes your recollection?

A Okay. This would be a piece of duct tape that was from -- recovered from the trunk.

MR. DEAKIN: I'd ask that this be marked Exhibit 32.

THE COURT REPORTER: Exhibit 31.

MR. DEAKIN: Exhibit 31.

(Whereupon, package containing duct tape recovered from trunk marked and admitted into evidence as Exhibit No. 31.)

Q I'd ask you if you would please look at that quickly, and if you recognize that.

A Yes. This is gray duct tape collected from the driver's side, interior bottom.

MR. DEAKIN: I'd ask that this be marked Exhibit 32.

(Whereupon, package

containing gray duct tape recovered from driver's side marked and admitted into evidence as Exhibit No. 32.)

Q And, finally, Detective, I'm going to ask you if you recognize that item.

A This plastic bag has duct tape on it, and that was recovered from the trunk.

MR. DEAKIN: I'd move that this be marked Exhibit 33.

(Whereupon, package containing duct tape recovered from trunk marked and admitted into evidence as Exhibit No. 33.)

Q Detective, during the course of executing the search warrants, either in the defendant's bedroom or in his car, did you locate items of girls undergarments?

A No, I did not.

Q And during the search, either of the searches, did you locate a knife matching the description that [redacted] had given you?

A No.

Q Did you initiate any sort of search beyond that for those items?

A No.

Q Why not?

A I really wasn't sure the exact direction Mr. McCants took back to the development. There's a wide area --

MR. SHEA: Objection.

THE COURT: Sustained.

Q Did you --

THE COURT: Excuse me. It's up to the jury to decide whether it was Mr. McCants.

MR. DEAKIN: Understood, your Honor.

Q Asking you not to draw the conclusion that the jury will be asked to assess, why did you not initiate a search?

A I wasn't sure -- there was a very wide area to search.

Q And what are you referring to when you say that? If you can refer to the diagram.

A The information we had was that the car came up Washington Street. And there's this wide area where the where the underwear and knife could have been hidden or thrown. And so I believe it was too wide an area.

MR. SHEA: Objection. Motion to strike.

THE COURT: Sustained. Stricken.

Q On August 8th of 2000 did you go to see Polly Taylor?

A Yes, I did.

Q And why did you do that?

A She had a letter for me from --

Q How did you first learn -- from whom did you first learn that she had a letter for you?

A I got a phone call from Rasheena ██████.

Q And after you got that phone call, what did you do?

A I went to Polly McCants' apartment -- sorry. Excuse me. Polly Taylor's apartment.

Q And what did you do when you got there?

A Ms. Taylor gave me a letter that she received from Owen McCants.

MR. SHEA: Objection.

THE COURT: Sustained. She gave him a letter, period.

Q And what did the letter look like when you got it?

A It has postage on it, a normal letter.

Q What was it in?

A It was in an envelope.

Q I'm going to ask you to look at what has been labeled Exhibit A for identification. Do you recognize that?

A Yes, I do.

Q What is that?

A That's the envelope that the letter came in.

MR. SHEA: Objection.

THE COURT: Overruled.

Q And I ask you, does it appear, is it in the same condition as when you saw it that day?

A No.

Q What's changed?

A Well, it's torn. It has some type of gray powdery substance. It looked like it was treated. It also has an exhibit seal on it.

Q And I'm going to show you what three sheets that were collectively labeled Exhibit 6, and ask you if you recognize those.

A Yes, I recognize it as the contents of the envelope. The letter.

Q Okay. Oh, and I meant to ask you, the letter, is it

in the same condition now as when you saw it that day?

A No, it isn't.

Q What's changed?

A Once again, it sort of has some type of material on it that was used for testing.

Q What did you do with the letter after you got it from Ms. Taylor?

A Brought it to my office.

Q Did you give Ms. Taylor a copy of the letter?

A Yes, I did.

Q Where did you make that copy?

A At District 14 in Brighton.

Q After you brought it to your office, where did you put it?

A I kept it in my files, in my office.

Q And is your office, the Sexual Assault Unit office, a secure office? Can people walk in off the street to your office?

A No.

Q Did Owen McCants have access to your files at any time after July 14th, 2000?

MR. SHEA: Objection.

THE COURT: Overruled.

Q Did he have access to your files at any time?
A No.
Q Did you take the letter out of your office at any point after that?
A Yes, I did.
Q When was that?
A August 16th.
Q And why did you take it out of your office?
A It was brought to the grand jury hearing.
Q And did it leave your possession during the grand jury hearing?
A Yes, it did.
Q Where did it go?
MR. SHEA: Objection.
Q Where did you see it go?
A Into the grand jury session.
Q And did it come back in your possession after that?
A Yes, it did.
Q Was Owen McCants present during the grand jury session?
A No.
Q What did you then do with it?
MR. SHEA: Objection.
THE COURT: Overruled.

Q What did you do with it after that?

A Brought it back to my office.

Q And where did you put it when you brought it back to your office?

A Back in my file.

Q Did it leave your possession after that?

A Yes, it did.

Q And when was that?

A About September of 2001.

Q And where did it go then?

A I brought it to -- it went to the FBI in Washington for analysis.

Q And did you get it back from the FBI?

A Yes.

Q When?

A In the spring of 2002.

Q And when did you first see the letter in the condition that you see it today with the dark material on it?

A In the spring of 2002.

Q And has the letter been in your possession ever since, until the beginning of this trial?

A Yes, it has.

Q Did you, at some time, cause a sample of the

defendant's blood to be taken?

A Yes.

Q And when was that?

A It was August 30th of 1999 -- 2000, excuse me.

MR. SHEA: Objection. Side bar.

THE COURT: Excuse me. Why don't we take the morning recess at this time.

You want to take the jury out.

THE COURT OFFICER: Jurors, please rise.

(Jurors exit at 11:40 a.m.)

THE COURT: Mr. Shea.

MR. SHEA: I just don't like the categorization of "caused the blood to be drawn." It was done, you know, without objection. Though we objected to the order.

THE COURT: So, rephrase your question.

(Recess.)

(Jurors enter at 12:15 p.m.)

THE COURT OFFICER: This Court is back in session. Please be seated.

THE COURT: Excuse me. Mr. Shea, have a seat.

I forgot to ask you this morning, for the record, just so it's clear. Were your envelopes,

this morning, in the same condition they were on Friday when you turned them in?

THE JURORS: Yes.

THE COURT: Thank you.

Go ahead.

Q (By Mr. Deakin) I want to ask you if you recognize these two photos, what's depicted in those two photos?

A Mr. McCants' motor vehicle.

Q And where were those photographs taken?

A At Boston Police Department Headquarters.

Q Are those both true and accurate, a fair and accurate representation of how the motor vehicle looked on the day that you saw it?

A Yes.

MR. DEAKIN: I'd move to introduce that as Exhibits 34 and 35.

(Whereupon, photograph marked and admitted into evidence as Exhibit No. 34; photograph marked and admitted into evidence as Exhibit No. 35.)

Q Did you arrange for Mr. McCants to give a sample of his blood in this case?
A Yes.
Q And when was that done?
A August 30th.
Q Of 2000?
A Yes, sir.
Q And what was the purpose of doing that?
A To get his blood to -- to know the type of his blood, sir.
Q Was there another purpose for using his blood typing?
A Yes. There was -- we found blood on a shirt taken from his apartment. We wanted to know if it was his.
Q Did you interview other individuals in connection with this case?
A Yes, I did.
Q Did you interview Shirley Braithwaite?
A Yes.
Q And is that the same Shirley Braithwaite who testified earlier in this trial?
A Yes.
Q When did you interview her?

A August 8, 2001.

Q And did you prepare a report about your interview with her?

A Yes, I did.

Q In your report, did you quote her quoting the defendant Owen McCants?

THE WITNESS: Your Honor, could I reference that report, please?

THE COURT: You can look at it, yes.

A Yes, I did.

Q And in that report, what did you quote her quoting Owen McCants saying about getting into the apartment?

MR. SHEA: Objection.

THE COURT: Sustained.

MR. DEAKIN: Your Honor, may we approach?

THE COURT: No. Sustained. Let's move on.

Q Did Shirley Braithwaite say to you that Owen McCants had said to her that Polly had --

MR. SHEA: Objection.

Q -- threw the keys down to them.

THE COURT: Sustained.

Q Did you interview Marvin Ampey in connection with this case?

A Yes, I did.

Q And when was that?

A April 11th of 2002.

Q Of this year?

A Yes.

Q And did you have a chance to observe him while you were interviewing him?

A Yes.

MR. SHEA: Objection.

THE COURT: Observed (sic).

Q You could see him?

A Oh, yes.

Q How would you describe his skin tone?

A He was a dark male. Dark, black male.

MR. DEAKIN: No further questions.

THE COURT: Mr. Shea.

MR. DEAKIN: Oh, actually, your Honor, if I may, I wanted simply to move to introduce into evidence a Massachusetts Registry of Motor Vehicles certificate.

THE COURT: Any objection?

MR. SHEA: Yes.

THE COURT: Side bar.

SIDE-BAR CONFERENCE:

MR. SHEA: Just so we're clear, I'm not objecting to him getting one more -- doing one more action standing up, but I'm just objecting to these coming in. This is an active registration from April 13, 1997 through 9/11 of 2000.

THE COURT: So what's your objection?

MR. SHEA: Relevance.

THE COURT: Pardon me?

MR. SHEA: Relevance.

THE COURT: That it's his car?

MR. SHEA: Yeah.

THE COURT: Overruled.

(End of side-bar conference.)

(Whereupon, Registry of Motor Vehicles Registration History/Title Inquiry marked and admitted into evidence as Exhibit No. 36.)

CROSS-EXAMINATION

Q (By Mr. Shea) Good afternoon, Detective.

A Good afternoon.

Q Now, first thing, the shirt, the Lauryn Hill shirt, there's blood on that shirt, right?

A Yes.

Q And blood on the outside of the shirt, correct?

A Yes.

Q And one of the reasons you wanted to check the car was to see if there was any of that blood that was running from this wound into the car, correct?

A Yes.

Q You didn't find any of [REDACTED] blood in the car, correct?

A That's correct.

Q In fact, you had hairs taken from the car, correct?

A Yes.

Q You had the car fumigated and every kind of test you could think of, correct?

A Yes.

Q You had fingerprint powder put on the outside, inside, correct?

A Yes.

Q And you didn't find a scintilla of evidence tying her to that car, correct?

A Correct.

Q Now, you didn't find Mr. McCants -- what you did was that car was stood over by some officers, right, as far as --

A "Stood over," meaning what, sir?

Q That they kept an eye on the car and made sure nobody touched it.

A Yes.

Q It was then taken, towed to the Boston Police Department.

A To the headquarters, yes, sir.

Q Headquarters. And with the idea, obviously, that nobody touched the car.

A Yes, sir.

Q And fingerprinting was done on the car.

A Yes.

Q And there were a couple of fingerprints located on the outside of the car, correct?

A Yes.

Q And those fingerprints were of -- not [redacted], correct?

A Correct.

Q Not Owen McCants, correct?

A Correct.

Q They were of some third individual?

A That would be apparent, sir, yes.
Q Okay. Well, they were human fingerprints.
A Yes.
Q Now, in this case, did you ever show [redacted] a photo array?
A No, I did not.
Q Did you ever present a lineup?
A No.
Q And just for the jury, what would -- how would you construct a photo array, generally?
A A photo array would be up to about nine to eleven pictures of men that look like Mr. McCants, and done --
Q Not like Mr. McCants, but like the person you suspect --
A Like the person we suspect of committing the crime. And have a victim pick out who they believe committed the crime against them.
Q Similarly, a lineup would be of individuals of similar height and look, but that would be a live process?
A That's correct.
Q And you've been trained in how to do that, correct?
A Yes, sir.

Q And where were you trained?

A Boston Police Academy.

Q Okay. And as a detective, it's something you'd have to utilize, correct?

A Yes, sir.

Q And you didn't utilize it in this case?

A No, I didn't.

Q When you went to the hospital -- was it Children's Hospital?

A Yes, it was.

Q Okay. You spoke to [redacted].

A Yes, I did.

Q And you spoke to her for about 15 or 20 minutes.

A Yes, sir.

Q And she never told you "Sonny" or "Owen McCants" did this crime.

A She did not, no.

Q In fact, the only person who told you that Owen McCants did this crime was her mother, Nicki.

A No.

Q That the only person at the hospital who told you --

A Yes.

Q It was your earlier testimony, I believe, that Sergeant Byrne had related that information.

A Yes.

Q Now, you wrote up a report after interviewing [redacted]

A Yes, I did.

Q Okay. And in your report you wrote that the assault occurred in two locations, correct?

A Yes.

Q And one of the locations was in the car.

A Yes, sir.

Q And that in the car, the person had asked her to take off her bra and panties, correct?

A Yes.

Q And that the person placed his thing against her, and she pointed to her genital area, correct?

A Yes.

Q And that's what she told you occurred in the car.

A Yes. Correct.

Q And you didn't find any evidence of anything like that occurring in Mr. McCants' car, correct?

A No.

Q Now, to go back to the identification procedure. Now, I'm going to show you a portion of tape. Now, you were present at this interview.

A Yes.

Q Okay. And I want to show you a portion of tape and

then ask you about the identification.

(Tape played.)

Q Okay. Now, you were present for that interview?

A Yes.

Q And when you were sitting there and she was asked, you know, did you ever see him again, and she's saying no and then she inquires, continues to kind of lead her on, and then she says --

MR. DEAKIN: Objection to the form of that question.

THE COURT: Sustained.

Q Did anyone tell you anything, you know, and she says, Sonny, you know, about it being Sonny? And she says, well, the cops and stuff.

Now, you're in charge of the investigation at this point, correct?

A At what point, sir?

Q The point that this tape is taking place.

A Oh, yes.

Q Four days later. And did you -- it would concern you if an officer planted something in an identification witness' mind, wouldn't it?

A Yes.

Q And from what she's saying, some cop planted

something in her mind about who had done this, correct?

A Well, I don't interpret it that way, no.

MR. DEAKIN: Objection as to him interpreting.

THE COURT: Sustained.

Q All right. She had been asked if someone had told her it was Sonny, and she said the cops and stuff, correct?

A I believe people were talking outside the residence.

Q Not people talking outside, okay?

A Okay.

Q You just watched the tape. I can run it for you again. She said, "cops," right?

A Yes.

Q Common parlance would be cops, police, right?

A Sure.

Q Did you look into what officers might have told her this?

A No. I don't believe that someone was telling her that Sonny did this. I think she was talking about

Q Not -- answer the question.

Did you look into --

A No, I did not. I answered that, sir.

Q Okay. Now, also, you heard that Ray told her, "Sonny did it," right?

A Yes.

Q And that would be planting someone's name in the child's head, wouldn't it?

A I don't know. I don't think so. Once again, I don't interpret it that way, as to how she said it. I interpreted it as to her listening to people talk --

Q Let's just go back to your training on identification.

Now, when you've been trained to do an identification, are you trained to suggest a name before you have the person do an identification?

A No.

Q In fact, you're not -- the whole idea of an identification is to not introduce something to that person that might bias the identification, correct?

A That's correct.

Q Now, at this interview -- this was on the 17th --

A Yes.

Q -- of July?

A Correct.

Q And at that interview, in your report you said that what she gave for a description was it looked like Sonny, correct?

A Yes.

Q And you've written down a description of the person as having black curly hair, correct?

A Yes.

Q Being light-skinned, correct?

A What report is that from, sir?

Q I'll show it to you.

A Do you have an update number there?

Q The back page, the next to the last sentence.

A I see that.

Q Okay. Nowhere in your report do you include a description of the person's eyes, correct?

A That's correct.

Q And you don't include a description of his nose, correct?

A Correct.

Q And in none of your reports do you have a description of the person's eyes.

A I don't believe I do.

Q And you don't have a description of the person's nose. And if that had been given to you, you would

include that in your report, wouldn't you?

A Yes.

Q You said you'd taken -- you took duct tape from Mr. McCants' room, correct?

A Yes.

Q And this is the roll of duct tape, correct?

A Yes, sir.

Q And in it it says, "Tape It, Bay Shore, New York"; is that right?

A Yeah. Yes, it does.

Q Did you call up Tape It in Bay Shore, New York to see how many places they sold their duct tape in Massachusetts?

A No, I didn't.

Q And this duct tape, it was found in a tool box, wasn't it?

A Yes, it was.

Q Is it unusual for someone to keep tape in their tool box, Officer?

A No.

Q Now, directing you to your handwritten notes, page 1 -- do you have those with you? You can look at my copy.

A Starting off with Victor 911, V911?

Q Halfway down that page. You've written, "Rape" with a questionmark, correct?

A That's correct.

Q Then you put a little slash. Then, next to that, you wrote, "Indecent A&B," right?

A Yes.

Q And you have a big kind of star next to that, right?

A Yes.

Q And you have it underlined, correct?

A Yes.

Q And, so, I take it that on your earliest information in this case you believed you were dealing with an indecent A&B.

A Yes.

Q And fair to say, Officer, that an indecent A&B does not involve any penetration of the vagina?

A Correct.

Q Now, you said when you met with [redacted] at the hospital you didn't ask for a description.

A Correct.

Q You didn't ask for a name.

A Correct.

Q Did you talk to the doctor to find out what information she had gotten? Just yes or no.

A No.

Q Now, when you spoke with Sergeant Byrne and got information, you learned from him that the perpetrator had on a green T-shirt, correct?

A Yes.

Q Now, this isn't a T-shirt, is it?

A No, it's not a T-shirt.

Q It's a button-down shirt. And this isn't a T-shirt, is it?

A No.

Q This is a T-shirt.

A Yes, it is.

Q Did you take any T-shirt out of Mr. McCants' room?

A No.

Q Did you take any T-shirt out of Mr. McCants' car?

A No.

Q And, in fact, the T-shirt that's described, that was put out describing the suspect was a light green T-shirt, wasn't it?

A I'm not sure, sir.

Q If I were to play a brief portion of that --

MR. DEAKIN: Objection to the basis of knowledge.

THE COURT: Sustained.

MR. SHEA: May we approach?

THE COURT: Yes.

MR. SHEA: Well, actually, I'll try and lay a foundation.

Q You listened to what descriptions were given out, correct?

A Yes.

Q All right. And right now your memory is exhausted as to whether that description included a light green T-shirt.

A Right, sir. Yes.

Q And if I were to play that for you, that would refresh your recollection?

MR. DEAKIN: Your Honor, my objection being that he would have to play it for himself.

THE COURT: Yeah.

MR. SHEA: Well, your Honor --

THE COURT: Do you have an earphone for him to listen to it?

MR. SHEA: I don't.

Could we take a moment, then?

THE COURT: No. Let's go.

(Whereupon, Mr. Shea begins to play tape.)

THE COURT: The objection is sustained.

Turn it off.

MR. SHEA: All right.

THE COURT: The objection is sustained. Do you have another question for the officer? Ask him the next question.

MR. SHEA: It was my confusion. I apologize. I think we can get this right.

THE COURT: Don't play that tape.

MR. SHEA: I'm not -- I'm about to hit rewind. If I might, your Honor -- can we approach side bar?

THE COURT: Yes.

SIDE-BAR CONFERENCE:

MR. SHEA: I'm happy to have him step from the room and play the tape for himself for a second.

THE COURT: Tell him to step outside.

(End of side-bar conference.)

Q Would you step outside with this for a moment, listen to it, see if that refreshes your recollection?

(Witness exits courtroom. Witness returns to courtroom.)

Q Does that refresh your recollection?

A I heard "light green T-shirt."

Q Okay. And that was played over dispatch?

A Yes.

Q And this is dark green?

A Yes, it is.

Q And that is dark green?

A Yes, it is.

Q Now, in getting the search warrant, you filled out an affidavit.

A Yes, sir.

Q And in your affidavit, did you write that Sergeant Byrne, when he observed the green long-sleeved shirt, it had what appeared to be a used condom in the breast pocket?

A Yes, sir.

Q You wrote that?

A Yes, sir.

Q And that was not correct.

A It was not.

Q But you wrote it and signed it under the penalties of perjury, believing it to be correct.

A That's correct.

Q Now, in that same affidavit, you say that you spoke

with Rasheena [REDACTED] and that she stated that her daughter saw the guy she believed that had done this on TV at 7:30 in the morning.

A Yes.

Q Okay. And that information, just to be clear, was related to you by Rasheena, Nicki, [REDACTED], not [REDACTED]

A That's correct.

Q Now, in the search warrant for the room, you were looking for a green wool cap.

A Yes.

Q Did you locate the green wool cap?

A No.

Q Mr. Deakin's already been over the knife.

Did you get any jeans, take any jeans from Mr. McCants?

A No.

Q When you return a search warrant, you're obligated to fill out a return of the items you found, correct?

A Yes.

Q And in your return, you wrote that there was a small plastic bag of a "green leafy substance believed to be marijuana." Line 10.

A Yes.

Q And when you came here -- you don't list a second bag of marijuana on that return, do you?

A No, I don't.

Q And you don't list roaches on that return, do you?

A No, I don't.

Q Now, when you came here today, you have two bags of marijuana, don't you?

A Well, the bag of marijuana and the roaches, yes, sir.

Q Okay. But the roaches are taken, believed to be marijuana, correct?

A Yes, sir.

Q And since you differentiate between the two, let's just again, looking down your return, is there anywhere on your return that you mention these roaches?

A No.

Q Now, [REDACTED] has told you that the person smoked something with her, correct?

A Yes.

Q And so roaches wouldn't be a minor thing that you'd be looking for, would it?

A No.

Q And just to be clear, you didn't find any marijuana or roaches in the car of Mr. McCants, right?

A No.

Q And knowing that that was an important piece of evidence, and writing -- signing an inventory that says, "I swear that this inventory is a true and detailed account of all the property taken by me on this search warrant," you signed off on that search warrant return, and nowhere are those roaches that you brought in here to court today listed.

A No, they're not listed.

Q They're not mentioned, right?

A No.

Q I show you Exhibit 15B. And what is Exhibit 15B?

A The nylon stocking from Mr. McCants' bedroom.

Q Okay. And you testified at a prior hearing, correct?

A Yes, I did.

Q And at that prior hearing you brought all the photos you had in this case, correct?

A Yes.

Q And you used some of those photos at that hearing, correct?

A Yes, sir.

Q And you went through all those photos, correct?

A Yes, sir.

Q And you were asked at one point at that hearing, to the best of your knowledge, is that the entirety of all the photos that were taken at the scene that day, correct?

A Yes.

Q And you were the officer in charge of directing that search that day, weren't you?

A Yes, I was.

Q And you were directing that officer to take pictures of the relevant items, correct?

A Yes.

Q And you would want him to take pictures of things you thought had the most evidentiary value.

A Yes.

Q And you were asked at that hearing, "From the same photos, could you please pick out the nylon stocking that's shaped like a cap?" Were you asked that question?

A I'll take you for your word, sir.

Q Don't take it for my word. I'll show you. Page 40.

A Yes.

Q And your response to that question was, "There is

not one," correct?

A Correct.

Q And so, again, that was a hearing where you were under oath like today.

A Yes, sir.

Q And you were asked about all the photos, right?

A Yes.

Q And you said that there isn't, was not, a photo of the stocking cap, correct?

A Correct.

THE COURT: Why don't you hold the next question. We're going to break for lunch at this time. I'd ask that the jury be back in the jury room by two o'clock, and we'll start promptly at that time. Have a good lunch.

(Whereupon, the luncheon recess was taken at 12:55 p.m.)

CERTIFICATE

I, Maryann McDonald, Official Court Reporter, do hereby certify that the foregoing record, pages 1 to 111 inclusive, is a true and accurate transcript of my system tapes, to the best of my knowledge, skill and ability.

Maryann McDonald, Notary Public

The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying Reporter.