Volume:   I
Pages:    56
Exhibits:  Per Index

## COMMONWEALTH OF MASSACHUSETTS

Suffolk County

SUPERIOR COURT
DEPARTMENT OF
THE TRIAL COURT

---------------------------------
                                    *
Commonwealth                        *
          Plaintiff                 *
                                    *
vs.                                 *   C.A. No. 00-10994
                                    *
Owen McCants                        *
          Defendant                 *
                                    *
---------------------------------



* * * * * * * * * *
FOR TRIAL BEFORE:
SPURLOCK, J.
WITH A JURY
* * * * * * * * * *

Suffolk Superior Courthouse
Boston , Massachusetts
April 29, 2002

LESLIE A. D'EMILIA
Court Reporter

**APPEARANCES:**

David Deakin, on behalf of the Commonwealth.
One BulFinch Place
Boston, Ma 02114


Mark Shea, on behalf of the Defendant.
Shea Law Office
One Commercial Way Wharf North
Second Floor
Boston, MA 02110

# I N D E X

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| John McDonough | | | | |
| by Mr. Deakin | | | 12 | |
| by Mr. Shea | | 4 | | |
| Victoria Coburn | | | | |
| by Mr. Deakin | 19 | | | |
| by Mr. Shea | | | | |
| Rosemary McLaughlin | | | | |
| by Mr. Deakin | 23 | | | |
| by Mr. Shea | | | 50 | |

# E X H I B I T S

| Nos. | | In Evid. | For Ident. |
|---|---|---|---|
| 37 | Masking tape/Duct tape | 14 | |
| 38 | Photo | 35 | |
| 39 | Photo | 36 | |

```
 1                         PROCEEDINGS
 2                 (In open court at 2:15 p.m.)
 3                 (John McDonough resumed the stand.)
 4                      CROSS-EXAMINATION
 5      BY MR. SHEA:
 6      Q.  Good afternoon.
 7      A.  Good afternoon.
 8      Q.  Now, Shirley Braithwithe.  Do you remember Shirley
 9          Braithwithe?
10      A.  Yes.
11      Q.  And you met with her on August 8th of 2001?  This in
12          reference in your report?
13      A.  Yes, sir.
14      Q.  Just--are you sure that's the right date, because at
15          the end of that paragraph you say 7/13/2001, the
16          date of the incident, and the incident was in 2000.
17      A.  No, the 8801 is correct, sir.  That 7/13 should
18          be '00.
19      Q.  Okay.  Now, she never gave you an identification of
20          what she believed Owen McCants was wearing that
21          night?
22      A.  No.
23      Q.  And if she had, if she had told you, "Detective, I
24          saw him wearing a green shirt and jeans."  That's
```

```
 1        not some insignificant detail, is it?
 2   A.   No.
 3   Q.   That's a critical detail that you would include in
 4        your report, isn't it?
 5   A.   That's correct.
 6   Q.   That's nowhere in your report, is it?
 7   A.   No.
 8   Q.   And that's because she never told you?
 9   A.   No.
10   Q.   And you took a statement from her.  Nowhere in that
11        statement of what she says Owen McCants said to her
12        did she say that he said, "The elevator is broke.
13        It's not working."
14   A.   No.
15   Q.   And if she had said that to you, you would have
16        taken down what she said?
17   A.   Probably, yes.
18   Q.   Okay.  That's what you did your best to do in your
19        report; correct?
20   A.   Yes, sir.
21   Q.   And in your report, you put that she was awaken
22        sometime after 10 p.m.; correct?
23   A.   Yes.
24   Q.   Not sometime after 12 p.m.; right?
```

1   A.   That's correct.

2   Q.   And that was again in your effort to be accurate in

3        your interview with her?

4   A.   Yes.

5   Q.   Now, as to the search of Mr. McCants' room, there

6        was other tape in that room you didn't take; right?

7   A.   Yes.

8   Q.   There's other clothing in that room you didn't take?

9   A.   Yes.

10  Q.   And there's other evidence in the bag that Mr.

11       Deakin didn't introduce?

12  A.   That's correct.

13  Q.   Okay.  There was a blue shirt taken from the car?

14  A.   Yes, there was.

15  Q.   And a green shirt taken from the car?

16  A.   Yes, sir.

17  Q.   There was hair from a package.  This would be a hair

18       taken from the car?

19  A.   Yes.

20  Q.   Okay.  And the tape lift from the driver's side?

21  A.   Yes.

22  Q.   A tape lift from the passenger side?

23  A.   Yes.

24  Q.   And some duct tape from the passenger side, interior

1    bottom of the door?

2    A.   Yes, sir.

3    Q.   Yes.  You pretty much took whatever duct tape you

4         could find anywhere on that car; right?

5    A.   Yes, sir.

6    Q.   And you took whatever duct tape you could find in

7         his room that was of the color gray?

8    A.   Yes, sir, samples of them.

9    Q.   Now, Mr. Deakin introduced a condom.  That condom

10        was found in the pocket of the long-sleeved green

11        shirt?

12   A.   Yes, sir.

13   Q.   Okay.  And you found it down inside of the pocket?

14   A.   Well, in the pocket, sir.

15   Q.   In the pocket.  Okay.  And the pocket has a flap

16        over it; right?  Yes?  You can use your glasses if

17        you want to.

18   A.   That is a flap.

19   Q.   Okay.  Now, the letter, you had the letter from July

20        of 2000 until September of 2001?

21   A.   Yes.

22   Q.   And you made a copy of it on the copying machine?

23   A.   Yes.

24   Q.   And did you find out how many hands that letter had

1      travelled through?

2   A.  No.

3   Q.  And at what point after you had put it on a copy

4       machine, did you put it into a sealed plastic

5       evidence bag?

6   A.  I made a copy for Ms. Taylor.  I made a copy at my

7       office.  As far as making other copies, I don't

8       believe I did.

9   Q.  Okay.  At any time point did you put it in an

10      evidence, plastic evidence bag?

11  A.  No, sir.  I held it in a manila envelope in my

12      office.

13  Q.  And when you sent it to the FBI, you sent it in an

14      envelope, in that envelope inside another envelope?

15  A.  Yes, it was.

16  Q.  Now, going back to the ID.  The--Rasheena ██████

17      told you that the ID took place when she and ██████

18      were watching the news; is that right?

19  A.  Yes.

20  Q.  And that that was at about 7:30 a.m.?

21  A.  Yes.

22  Q.  And--now, part of what you had been trained on, I

23      assume, is questioning of child victims?

24  A.  Yes.

```
 1   Q.   And the care that needs to be taken in not

 2        implanting ideas in a child's mind; correct?

 3   A.   Yes.

 4   Q.   And it would be fair to say it's a more delicate

 5        process interviewing a child than it is an adult?

 6   A.   Yes.

 7   Q.   Now, you've had a chance to view the news footage of

 8        Mr. McCants leaving the building?

 9   A.   Yes, I have.

10   Q.   And he's not handcuffed, but he is surrounded by

11        police?

12   A.   Yes.

13   Q.   And it would be fair to say that an identification

14        in which someone is surrounded by police is a highly

15        suggestive identification?

16   A.   Could be.

17   Q.   Now, bring me to the analysis of different objects.

18        Since you are in charge of the investigation, are

19        you the person who chose what to have analyzed?

20   A.   Yes.

21   Q.   And you sent the long-sleeved shirt off for

22        analysis?

23   A.   Yes, sir.

24   Q.   And did you send the short-sleeved shirt off for
```

1     analysis?

2  A.  It went to the crime lab, sir.  As far as analyzing

3     it, I don't believe they did.

4  Q.  And if you request the crime lab to analyze

5     something, they do?

6  A.  Yes.

7  Q.  And you sent the stocking cap off to the crime lab?

8  A.  Yes.

9  Q.  Did you request analysis on that?

10 A.  Yes.

11 Q.  And nothing came back; correct?

12 A.  Nothing came back meaning what, sir?

13 Q.  Nothing came back tying the cap through physical

14    evidence to anything?

15 A.  No.

16 Q.  Now, as to the long-sleeved green shirt, you

17    received back the report that they believed there

18    was a one in sixteen thousand, DNA experts--

19         MR. DEAKIN:  Objection.  It's the wrong

20    number.  One in eighteen thousand.

21 Q.  (Mr. Shea) One in eighteen thousand chance that it

22    wasn't            blood on that shirt; correct?

23    To the best of your knowledge.

24 A.  To the best of my knowledge, sir.

1   Q.  That's not the part I'm really interested.  The--in

2       that testing they found, they did a cutting and they

3       found other DNA on the shirt to the best of your

4       knowledge?

5   A.  Yes, sir.

6   Q.  All right.  And again to the best of your memory,

7       they didn't find any of Mr. McCants's DNA on the

8       shirt?

9   A.  No.

10  Q.  Okay.  Now, when you got the report back that the

11      green shirt had somebody's DNA on it, but not

12      Mr. McCants, did you request them to do further

13      testing on that shirt?

14  A.  No.

15  Q.  Now, you have access to these DNA database; correct?

16  A.  At the crime lab, sure.  Yes, sir.

17  Q.  Okay.  And you could plug-in the DNA that was found

18      on that shirt into that; correct?

19  A.  Yes, sir.

20  Q.  Did you have that done?

21  A.  I did not sir, no.

22  Q.  Do you know if it was done?

23  A.  No, I do not.

24              MR. SHEA:  Nothing further.

<u>REDIRECT EXAMINATION</u>

1

2      <u>BY MR. DEAKIN:</u>

3    Q.   Sergeant McDonough, Mr. Shea asked you some

4         questions about Page 1 of your notes from the

5         investigation.   Do you recall that?

6    A.   Yes, I do.

7    Q.   In particularly, he asked you about a line in the

8         notes that says, "Rape, question mark."  I can't

9         recall if there's a dash.   Then there's, "Indecent A

10        and B."  And just for all of our sakes, what does

11        that indecent A and B--what's the full name for

12        that?

13   A.   An indecent assault and battery in--

14   Q.   I just need the name.   Indecent assault and battery?

15   A.   Yes.

16   Q.   And there's sort of an asterisk over that?

17   A.   Yes.

18   Q.   When did you make those notes?   When did you make

19        that particular note?

20   A.   That particular note was made at the hospital.

21   Q.   And where did you get--where did the information in

22        that note come from?

23   A.   Sergeant Burn, a phone conversation I had with

24        Sergeant Burn.

1   Q.  Had you yet spoken to Rasheena ███████ or

2       ████████████?

3   A.  Yes.

4   Q.  Had you observed the interview at the District

5       Attorney's Office of the videotape?

6   A.  Yes.

7   Q.  At that time?

8   A.  Oh, not at that time, sir.

9   Q.  Let me start over.  I don't want to mislead you.

10      When you wrote those notes after talking to Sergeant

11      Burn, had you already talked to ██████ and Rasheena?

12  A.  Yes.

13  Q.  Had you seen the interview in the District

14      Attorney's Office?

15  A.  Not at that time, no.

16  Q.  Why didn't you list roaches on the return of service

17      on the--

18  A.  It was a mistake.  I neglected to do so.

19  Q.  And did you--did you send everything to the lab?

20  A.  Yes, sir.

21  Q.  The roaches and the baggy?

22  A.  Yes, I did.

23  Q.  Did you get everything back?

24  A.  Yes, I did.

1   Q.  And who brought all those items here to court today?

2   A.  I did.

3   Q.  I want to ask you about--hopefully to settle the

4      record on this point, what did, and I would like you

5      as best you can to quote her exact words, what did

6      Shirley Braithwithe tell you the defendant said to

7      her about getting into 34 Fidelis Way?  If you'd

8      like to read from your report, you can.

9   A.  Sure.

10  Q.  Whatever you need to do--what did she actually say

11     to you that he said?

12  A.  That he stated, "We can't get in.  Aunt Paula's

13     going to throw keys down to us."

14  Q.  Mr. Shea pulled out the bag and then put it away.

15     Mr. Shea, I think, may have shown you this on

16     direct.  Do you recognize what that is?

17  A.  It's tape from the passenger side, interior bottom

18     of door of the motor vehicle.

19  Q.  Does it show an item number?

20  A.  Yes, it does.

21        MR. DEAKIN:  May I ask that this be marked

22     Exhibit 37.

23        (The masking tape was marked Exhibit No.

24     37 and received into evidence.)

```
 1   Q.   (Mr. Deakin)  Detective, I'm going to ask you--I'm
 2        going to show you a picture I think you've already
 3        identified.  Detective, this picture is Exhibit 15B.
 4        I believe you've seen it before.
 5   A.   Yes.
 6   Q.   Mr. Shea asked you about a hearing, a prior hearing
 7        in this case in which you were asked to testify.  Do
 8        you recall him asking those questions?
 9   A.   Yes, I do.
10   Q.   And he asked you whether you had during that hearing
11        gone through a number of pictures, presented them as
12        the pictures that were taken during the execution of
13        the search warrant and said that there was, as far
14        as you could tell, no picture of the stocking cap;
15        is that right?
16   A.   Yes.
17   Q.   Stocking mask?
18   A.   Yes.
19   Q.   Is this one of the photographs that you were looking
20        through as you were looking to see whether there was
21        a photograph of the stocking mask?
22   A.   Yes.
23   Q.   And why is it that at that time you did not present
24        this photograph and say this is the photograph of
```

1       the stocking mask?

2   A.  Because of the condition of the photo.  The color

3       was off from the color that I knew the stocking cap

4       was.  I didn't recognize it.

5   Q.  And what did you do after that hearing with respect

6       to this photograph or with respect to all the

7       photographs?

8   A.  I went over them again.

9   Q.  And why was that?

10  A.  Because I had knowledge that we had taken a picture

11      of it and to find it and clarify it.

12  Q.  And when you went back through it, what did you

13      find?

14  A.  That I did, indeed, have a photo of that stocking

15      cap, nylon stocking.

16  Q.  And in your opinion, why is it that the color is off

17      in that photograph?

18          MR. SHEA:  Objection.

19          THE COURT:  Sustained.

20  Q.  (Mr. Deakin)  Is that--let me ask you, Detective, do

21      you see a document in that--by the way, what is that

22      photograph?  I know you've identified the stocking

23      mask.  What are we seeing in that photograph?

24      May be I'll zoom in a little bit.  What's the

1    location of this photograph?

2  A. That's in a draw in the dresser.

3  Q. And can you see any part of the draw itself in the

4     photograph?

5  A. Yes, I believe that's part of the draw.

6  Q. Is there a document of some kind sort of lying under

7     the stocking mask?

8  A. There's some paper on there with writing on it.

9  Q. I'm not asking you to do this now, but having looked

10    at the photograph, if you look closely at the

11    photograph, can you read the writing in the darkened

12    portion of the shelf where the shadow is?  No, I

13    don't mean you have to do it now, but having looked

14    at the photograph yourself, can you make out some of

15    the letters there?

16 A. I can make out some writing.

17 Q. And is there a point in that document at which the

18    letters essentially appear to disappear?

19 A. Yes, in the light.  In the shade you can see it, in

20    the light you can't.

21 Q. At the hospital, what did ███████████ tell

22    you--I'm sorry, what did Rasheena █████ tell you

23    that her daughter had told her about who did this to

24    her?

1          MR. SHEA:  Objection.

2          THE COURT:  Sustained.

3          MR. DEAKIN:  May we approach sidebar, Your

4     Honor?

5          THE COURT:  No.  Sustained.

6          MR. DEAKIN:  I would ask, Your Honor,

7     please, that we approach sidebar.

8          THE COURT:  Sustained.

9  Q.  (Mr. Deakin) When Rasheena ▓▓▓▓ gave you the name

10    Sonny at the hospital, just yes or no, did she tell

11    you the source of her information, where she had

12    gotten that name?

13         MR. SHEA:  Objection.

14         THE COURT:  Sustained.

15         MR. DEAKIN:  Nothing further.

16         THE COURT:  You may step down.  Next

17    witness.

18         MR. SHEA:  Judge, if I might?

19         THE COURT:  Next witness.

20         MR. DEAKIN:  Your Honor, the People of the

21    Commonwealth of Massachusetts call Victoria Coburn.

22         MR. SHEA:  Am I being declined a sidebar?

23         THE COURT:  Yes.

24         MR. SHEA:  Can I take down the exhibit I'm

1     not going to get to recross on?

2                     THE COURT:  Excuse me, Mr. Shea, sidebar.

3                              BENCH CONFERENCE

4                     THE COURT:  Mr. Shea, I don't need your

5     speeches in front of the jury.  Understand that?

6     Move on.

7                           END OF BENCH CONFERENCE

8                              VICTORIA COBURN,

9     called as a witness on behalf of the Commonwealth,

10     having been first duly sworn, testified as follows:

11                          **DIRECT EXAMINATION**

12     **BY MR. DEAKIN:**

13  Q.  Ms. Coburn, I'm going to ask you to scoot your chair

14     up as close as you can and adjust the microphone so

15     you're speaking as directly into it as you can.

16     Could you please introduce yourself to the jury, and

17     spell your last name for the court reporter.

18  A.  My name's Victoria Coburn.  C-O-B-U-R-N.

19  Q.  And Ms. Coburn, do you work?

20  A.  No, presently not.

21  Q.  What do you do?

22  A.  Presently, I'm a medical student at Boston

23     University School of Medicine.

24  Q.  What year are you in school there?

1   A.   First year.

2   Q.   How were you employed in July of the year 2000?

3   A.   I was a forensic technologist for the Boston Police

4       Crime Lab.

5   Q.   And very briefly, what is a forensic technologist?

6   A.   It is an employee of the Boston Police Crime Lab who

7       analyzes evidence.

8   Q.   And did you at that time as a forsenic

9       technologist--is that right?

10   A.   Yes.

11   Q.   As a forsenic technologist, did you process rape

12       evidence, protocols, things commonly known as rape

13       kits?

14   A.   Yes.

15   Q.   And what was--if you would please tell the jury what

16       the protocol was at that time for analyzing a rape

17       kit?

18   A.   When we would receive the rape kit, we would--the

19       first thing we would do is check to make sure all

20       the seals were intacted and that all the information

21       on the front of the rape kit was filled out properly

22       by the hospital personnel.  We would give the kit a

23       case number, and then we would proceed to open the

24       rape kit and separate biological evidence from

21

```
 1         nonbiological evidence.
 2    Q.   And what would you do--what is biological evidence?
 3    A.   Biological evidence would be considered blood, the
 4         swabs that might contain semen, anything that could
 5         possibly degrade.
 6    Q.   And what's nonbiological evidence?
 7    A.   Things like hairs or clothing that they might submit
 8         with the rape kit.
 9    Q.   Did you--and what did you do with the biological
10         evidence?
11    A.   We would type the blood, and then we would make a
12         swatch of the blood so that it could be properly
13         stored for any further testing, and then any swabs
14         that were submitted, we would test them for the
15         presence of semen.
16    Q.   And what did you do with the nonbiological evidence?
17    A.   That was usually just stored for any possible
18         further testing.
19    Q.   Did you have occasion to process the rape kit
20         submitted in the case of a sexual assault of ███████
21         ███████?
22    A.   Yes.
23    Q.   On or about July 13th of 2000?
24    A.   Yes.
```

```
 1   Q.   And you have a specific memory today as you're
 2        testifying of processing that particular rape kit?
 3   A.   No.
 4   Q.   How is it that you know that you prosecuted that
 5        one--that you processed that one?
 6   A.   It's documented in my notes.
 7   Q.   Do you have the exhibit before you; that is, the
 8        rape kit box in this case?
 9   A.   Yes.
10   Q.   And is that the kit that you processed?
11   A.   Yes.
12   Q.   How do you know that?
13   A.   Because I've sealed it with my initials and the date
14        that I closed it.
15   Q.   So you--after you closed it, you had sealed it with
16        more tape?
17   A.   Yes.
18   Q.   Did you follow the protocol that you just set up for
19        us in this case, in the case that you processed this
20        kit?
21   A.   Yes.
22   Q.   Do your notes reflect that there was any tampering,
23        any apparent tampering with the seals on the box?
24   A.   No.
```

```
 1   Q.   And what conclusion do you draw from that?
 2   A.   That the seals are intacted.
 3   Q.   The seals on the rape kit, are they specially
 4        designed?
 5   A.   The adhesive, the sticker is supposed to be designed
 6        to be tamperproof.
 7   Q.   And what does it mean that they are tamperproof?
 8   A.   That if somebody were to try and open it, that it
 9        would be apparent.
10   Q.   And you saw that no signs of--your notes reflect
11        that you saw no signs of tampering in this case?
12   A.   Correct.
13             MR. DEAKIN:  Nothing further.
14             THE COURT:  Mr. Shea.
15             MR. SHEA:  Nothing.
16             THE COURT:  You may step down.  Next
17        witness?
18             MR. DEAKIN:  Your Honor, the People of the
19        Commonwealth of Massachusetts call Rosemary
20        McLaughlin.
21                  ROSEMARY MCLAUGHLIN,
22        called as a witness on behalf of the Commonwealth,
23        having been first duly sworn, testified as follows:
24                  DIRECT EXAMINATION
```

1    **BY MR. DEAKIN:**

2    Q.   Ms. McLaughlin, will you introduce yourself to the

3         jurors please, and spell your last name for the

4         court reporter.

5    A.   My name is Rosemary McLaughlin.

6         M-C-L-A-U-G-H-L-I-N.

7    Q.   And how are you employed, Ms. McLaughlin?

8    A.   I am a Boston police officer presently assigned to

9         the identification unit.

10   Q.   And what are your responsibilities in the

11        identification unit?

12   A.   My present responsibilities in the unit are in the

13        latent print room, which entails processing evidence

14        submitted by area detectives for possible latent

15        fingerprint evidence and also responding to crime

16        scenes when requested by the investigating officers

17        to process that scene for potential latent

18        fingerprints.

19   Q.   Have you had any special training in the field of

20        latent fingerprint identification?

21   A.   Yes, sir, I have.

22   Q.   Please describe that training.

23   A.   In addition to basic fingerprinting and collection

24        and preservation of evidence courses, I have had

1       40-hour courses with the Criminal Justice Training

2       Council in the collection and preservation of

3       evidence in sexual assault cases, advanced latent

4       fingerprints, advanced ridgology, and a course in

5       crime scene photography, and I am presently a member

6       of the New England Division of the International

7       Association of Identification.

8   Q.   And what is the International Association of

9       Identification?

10   A.   It is a worldwide organization of those individuals

11       affiliated with forsenic technologies, mostly law

12       enforcement, but not restricted to law enforcement.

13   Q.   How long have you worked in the field of latent

14       fingerprint identification?

15   A.   I've been assigned to the identification unit since

16       1988.

17   Q.   Could you tell the Court please, what is a latent

18       fingerprint?

19   A.   A latent fingerprint is the impression of the ridge,

20       the friction ridge skin that is found only on the

21       palmar surface of the hands and the soles of the

22       feet.  The impression that's left of the ridges and

23       furrows contained in that friction skin is a result

24       of the natural moistures and organic matter that's

1     found within the tissue, skin and the latent results

2     when an item is touched or comes in contact with the

3     tissue, skin.

4   Q.  Is a latent fingerprint left behind every time

5     somebody touches something?

6   A.  No, sir, not necessarily.

7   Q.  What decides--what factors go into whether a latent

8     fingerprint is left when someone touches something?

9   A.  There are many variables.  First of all, the skin

10     tissue itself.  Dry skin has very little moisture,

11     and some individuals don't secrete enzymes and amino

12     acids in amounts sufficient to leave an impression

13     of the ridge detail when an item is touched.

14       Speaking about moisture.  Climate conditions can

15     effect it.  In very cold weather, there's little

16     humidity in the air and our skin tends to become

17     dry, whereas in the warmer weather, particularly in

18     the summer, when the humidity is high, we tend to

19     perspire more so that there may be too much moisture

20     in the skin which would wash away the impression of

21     the ridge detail that might be left.

22       Other factors can be the way that we handle

23     items, remembering that it's the impression of my

24     skin coming in contact with the surface.  If I touch

1    an item very delicately or quickly, only a small

2    amount of my ridge detail may come in contact with

3    the surface, whereas if I grab it, more of the area

4    of my skin is coming in contact so the probability

5    would increase that I may leave identifiable ridge

6    detail.

7    Another factor would be the type of surface that

8    the item has.  In most circumstances, a smooth,

9    clean surface is the most optimum for obtaining

10    identifiable ridge detail, but often times a surface

11    will be grainy, such as vinyl or leather, items such

12    as the dashboard in your car or your pocketbook.

13    These surfaces are raised and almost like hills and

14    valleys, so that the skin tissue only comes in

15    contact with those raised portions.  Other factors

16    could be, again, handling items.  If I have an item

17    that's small enough to hold in my hand, and I put it

18    into my pocket, just coming in contact with the

19    material of my pocket can damage or destroy ridge

20    detail that may be present, because in its own

21    state, ridge detail is very fragile.

22  Q.  How long do latent fingerprints last?

23  A.  There's no real way to determine how long a print

24    will last.  It depends, again, on how an item is

1    handled, and the conditions affecting the print and

2    the item itself.

3  Q.  What is an inked fingerprint?

4  A.  An inked fingerprint is a deliberate recording of

5    the ridge detail in a controlled setting usually

6    performed--that most people are familiar with is

7    applying a thin layer of printer's ink and then

8    applying the finger in a rolling motion against a

9    contrasting background such as a fingerprint card.

10   In modern technology, inked prints have been

11   replaced by large-scale computer images which are

12   effective in basically the same way without the ink

13   and the finger is rolled against a specially-treated

14   plate on a computer scanner.

15  Q.  In course of your career, how many latent

16   fingerprints have you examined?

17  A.  I'd say tens of thousands, if not more.

18  Q.  In the course of your career, how many inked

19   fingerprints have you examined?

20  A.  Hundreds of thousands.

21  Q.  In the course of your career, how many crime scenes

22   have you processed for fingerprints?

23  A.  Scenes themselves, I would estimate 50 to 60.

24  Q.  How do you locate latent fingerprints?  How do you

1       find them?

2    A.  Initially, we do a visual examination of items.

3        Often times a fingerprint may be visible to the

4        naked eye, not necessarily, but it may be.  But in

5        order to enhance ridge detail that may be present,

6        certain processes can be used.  One that most people

7        are familiar with is just dusting with fingerprint

8        powder.  Other methods are Cyanoacrylate fuming or

9        SuperGlue fuming, chemical processes such as

10       Ninhydrin or silver nitrate, but the process would

11       depend upon the type of item that you're processing.

12   Q.  What do you--well, let me ask you, what is the

13       purpose--what are the purposes of all these

14       processes?  What are you aiming to do with all of

15       these processes?

16   A.  The aim is to develop identifiable ridge detail on

17       items that may lead to the identification of a

18       potential suspect in a criminal act.

19   Q.  What do you do once you've made them visible through

20       one or more of these means?  What do you do with the

21       latent fingerprints?

22   A.  The first thing is, again, a visual examination to

23       see the amount of ridge detail that is available.

24       If the ridge detail is deemed sufficient, the print

1          is photographed or lifted using a fingerprint

2          lifter.

3     Q.   How do you decide which of those to do?

4     A.   Again, it would depend on the type of item and the

5          type of print.  For instance, a blood print cannot

6          be lifted.  It can only be photographed.  Other

7          items such as a piece of paper that has been

8          processed chemically cannot be lifted, because a

9          lift print is absorbed into a coarse item such as

10         paper.

11    Q.   Once you've found latent fingerprints, what do you

12         do with them?

13    A.   I examine them again to see if there's enough ridge

14         detail to allow for a comparison to a known

15         fingerprint or a known exemplar.

16    Q.   Let me ask, do any two people in the world have the

17         same fingerprints?

18    A.   No, sir.

19    Q.   Do fingerprints--

20              MR. SHEA:  Objection.

21              THE COURT:  Overruled.

22    Q.   (Mr. Deakin) Do fingerprint characteristics change

23         over time; that is, will my fingerprints look

24         different ten years from now than they do now?

1    A.    Ridge detail in and of itself is permanent.  It may

2          scar, but the ridge detail itself and the

3          characteristics present within that ridge detail

4          will remain until the tissue decomposes.

5    Q.    Now, you mentioned that you seek to compare latent

6          fingerprints to known exemplars; is that right?

7    A.    That's correct.

8    Q.    How do you go about--well, let me ask you this,

9          you've mentioned the term many times about a ridge

10         detail.  What is ridge detail, and how does it work

11         into your comparison process?

12   A.    Ridge detail is the compilation of the ridges and

13         furrows and all of the details contained therein

14         that are found in friction skin.  There are points

15         of identifications that are called Galton's points,

16         which are, very quickly, reach the end and goes no

17         further; a ridge that divides and becomes two

18         separate and distinct ridges; an enclosure, which is

19         a ridge that divides and then closes back upon

20         itself leaving what appears to be an island or an

21         enclosure within the body of the ridge.  There's

22         also a dot, which is simply a ridge that is as long

23         as it is wide, appearing as a dot.  The combination

24         and the placement of these details, plus the way the

ORIGINAL

1          ridges flow in the print itself, the path that a

2          particular ridge takes within the pattern of the

3          print, all of these facets are used in comparing.

4          The examiner is looking for the same characteristics

5          to be present in each of the two prints in the same

6          relative space or the same relative location in each

7          of the two prints being compared.

8  Q.  If during the course of your--well, let me ask you

9          this, how many points of similarities are required

10         in order to make an identification?

11  A.  There are no set number of prints required.  It is

12         generally accepted that it is that number of points

13         that it takes to assure the examiner, him or

14         herself, that the prints are in fact of one in the

15         same person.

16  Q.  How many points of dissimilarity can there be

17         between a latent print and a known print and still

18         have an identification?

19  A.  There can be no dissimilarity.  No dissimilarity

20         that cannot be explained can lead to an

21         identification between a latent print and a known

22         print.

23  Q.  What are examples of explainable similarities?

24  A.  One explainable would be if I have a inked set of

1    fingerprints, my known fingerprint and not enough

2    ink was used in rolling the print.  A ending ridge

3    may appear to be a bifurcation, but that would only

4    be because of the lack of ink.  Again, if too much

5    ink was used, an enclosure may just look like a

6    bubble with no definition, just look like a blob on

7    a print card.

8    Q.  Were you asked to become involved in the

9        investigation of a case involving the alleged sexual

10       assault of ███████████ in July of 2000?

11   A.  Yes, sir, I was.

12   Q.  And what were you asked to do?

13   A.  The first thing was to process a Pontiac sedan, the

14       color green, for Sergeant, Detective John McDonough.

15   Q.  And how did you go about doing that?

16   A.  After the motor vehicle had been photographed by the

17       main index, I dusted the exterior using fingerprint

18       powder, and then in the interior front compartment,

19       the front seat area of the motor vehicle, I used

20       Cyanoacrylate fuming using a handheld fuming wand.

21   Q.  And what surfaces on the front inside compartment

22       did you fume to try to discover latent fingerprints?

23   A.  The dashboard area, including the radio and the

24       glove box, the steering wheel, the console area, and

1    the windows and door handles.

2    Q.  When you dusted the exterior of the automobile--by

3        the way, did you dust the entire exterior, every

4        square inch of it?

5    A.  Except the front grill.

6    Q.  And when you dusted it, did you locate any latent

7        fingerprints?

8    A.  Yes, sir, I did.

9    Q.  And where did you locate latent fingerprints?

10   A.  Of the eight lifts that I took, seven of them were

11       from the driver's side of the motor vehicle, in

12       particular the driver's window.

13   Q.  And where was the eighth?

14   A.  The eighth print was from the frame, interior frame

15       of the passenger side door, where the frame meets

16       the post inside the window.

17               MR. DEAKIN:  May I approach, Your Honor?

18               THE COURT:  Yes.

19   Q.  (Mr. Deakin) Did you mark the--did you mark the

20       latent fingerprints that you found as you found

21       them?

22   A.  Yes, sir, I did.

23   Q.  And how did you mark them?

24   A.  I use a small white sticker that I can apply to the

1    surface itself which contain my initials and then

2    the plate number of the car.

3  Q.  Ms. McLaughlin, I'm showing this photograph and ask

4    you if you recognize what it is?

5  A.  Yes, sir, that is the driver's side door area of the

6    Pontiac that I processed.

7  Q.  And can you see any of the markers that you left

8    where you found latent fingerprints?

9  A.  Yes, sir.

10 Q.  Just indicate to the jury where those markers are?

11 A.  Most of them are on the driver's window almost in

12    the middle area and on the driver's door.

13 Q.  Is this a fair and accurate representation of how

14    the car appeared after you marked the latent

15    fingerprints that you found?

16 A.  Yes, sir.

17         MR. DEAKIN:  I move to introduce this as

18    Exhibit 38.

19         **(The photograph was marked Exhibit No. 38**

20    **and received into evidence.)**

21 Q.  (Mr. Deakin) And Officer McLaughlin, let me show

22    this.  Do you recognize what that is?

23 A.  Yes, sir, I do.

24 Q.  What is that?

1    A.   That is the passenger side door with the frame, with

2         my mark on--approximately in the center of the

3         frame.

4    Q.   Is that a fair and accurate depiction of the door

5         frame after you had marked the latent print that you

6         found?

7    A.   Yes, sir, it is.

8              MR. DEAKIN:   I move to introduce this as

9         Exhibit 39.

10             **(The photograph was marked Exhibit No. 39**

11        **and received into evidence.)**

12             MR. DEAKIN:   May I post this to the jury,

13        Your Honor?

14   Q.   (Mr. Deakin) Can you indicate for the jurors where

15        your mark is in the interior door frame?

16   A.   Just a little bit higher than the center.   From--

17   Q.   I can point.   Is that it there?

18   A.   Yes, sir, it is.

19   Q.   And in these two photographs that I've shown you,

20        there's a lot of what appears to be dust on the car.

21        What's that?

22   A.   That is fingerprint powder that I used to dust the

23        motor vehicle.

24   Q.   Did you find any fingerprints in the interior

```
 1        driver's compartment?

 2   A.   No, sir.

 3   Q.   In the front passenger compartment?

 4   A.   No, sir, I did not.

 5   Q.   None whatsoever?

 6   A.   None.

 7   Q.   How many automobiles would you say you've processed

 8        for fingerprints in the course of your career?

 9   A.   Probably around 40 to 50.

10   Q.   And of that number, how many would you say you have

11        not been able to locate any fingerprints?

12              MR. SHEA:  Objection.

13              THE COURT:  Sustained.

14              MR. DEAKIN: May we approach sidebar, Your

15        Honor?

16                   BENCH CONFERENCE

17              MR. DEAKIN:  I think defense counsel would

18        like her answers to say about half.  It's very

19        common.  I'm just trying to show that.  It's--I'm

20        not trying to show that--

21              THE COURT:  What he object to?  Objection

22        sustained.

23              MR. SHEA:  I'll withdraw my objection.

24                 END OF BENCH CONFERENCE
```

1    THE COURT:   Is your objection withdrawn?

2    MR. SHEA:   Yes, it is.

3  Q.  (Mr. Deakin) About how many of that number would you

4      say you were able to find no fingerprints?

5  A.  Maybe half.

6  Q.  Why, based on your experience, is it in perhaps half

7      the cases you were unable to locate any fingerprints

8      in cars?

9  A.  In the interior of the cars, it is usually a grainy

10     surface as I earlier described and unless contact

11     has been made with the windows and the rear-view

12     mirror on the interior which is usually one of the

13     better places to locate ridge detail in the motor

14     vehicle, if that hasn't been handled, then the

15     likelihood of finding them in the inside,

16     particularly identifiable prints is minimal.

17 Q.  Did you find--you mentioned that you found eight

18     latent prints on the outside of the car, seven on

19     the driver's side and one on the passenger's door;

20     is that right?

21 A.  That's correct.

22 Q.  And what did you do with those latent prints after

23     you found them and marked them?

24 A.  Each latent was examined to determine if there was

|  |  |  |
|---|---|---|
| 1 |  | enough detail present to compare it to known prints. |
| 2 | Q. | And in how many of those cases was there enough |
| 3 |  | detail to compare them to known prints? |
| 4 | A. | All but one. |
| 5 | Q. | And did you have known prints to compare them to? |
| 6 | A. | Yes, sir, I did. |
| 7 | Q. | Whose fingerprints did you have? |
| 8 | A. | I had fingerprints, major case prints of Mr. Owen |
| 9 |  | McCants, and later I received major case prints of |
| 10 |  | ▇▇▇▇▇▇▇. |
| 11 | Q. | And did you compare the seven latent prints that |
| 12 |  | were comparable to the known prints of the defendant |
| 13 |  | and ▇▇▇▇▇▇▇? |
| 14 | A. | Yes, sir, I did. |
| 15 | Q. | And did you come up with any matches? |
| 16 | A. | No, sir, I did not. |
| 17 | Q. | What is your opinion, therefore, as to whether |
| 18 |  | either Owen McCants or ▇▇▇▇▇▇▇ is the source |
| 19 |  | of any of the fingerprints you could compare on the |
| 20 |  | exterior door of the vehicle? |
| 21 | A. | In my opinion, they are not the source. |
| 22 | Q. | And just so that the record clear, you found no |
| 23 |  | latent fingerprints on the inside of the car; is |
| 24 |  | that correct? |

```
 1    A.    That's correct.

 2    Q.    That's none whatsoever?

 3    A.    None.

 4    Q.    What is the next thing that you did in connection

 5          with this case?

 6    A.    On that same day I received evidence from Sergeant,

 7          Detective McDonough for processing.

 8    Q.    And what evidence did you receive?

 9    A.    I received three envelopes, one with an enclosure, a

10          condom wrapper, an easy wire package.

11    Q.    And was it your understanding that these items were

12          taken during a search, the execution of a search

13          warrant, in the defendant's bedroom?

14    A.    That's my understanding, yes, sir.

15    Q.    And--

16                 MR. DEAKIN:  May we approach briefly, Your

17          Honor, on a procedural point?

18                 THE COURT:  Yes.

19                      BENCH CONFERENCE

20                 MR. DEAKIN:  Your Honor, we've got a

21          strange situation, but we've resolved it by

22          stipulation.  She found identifiable prints on only

23          two items.  One's the bottle of rum and one is an

24          envelope addressed to the defendant in his
```

1    apartment, in his bedroom.  The envelope on the back

2    has some, I don't know how to describe it really,

3    suggestive kind of script that somebody wrote out on

4    the back.  We don't even know if it's him or

5    somebody else, about soliciting girls over the phone

6    or something like that.  It's clearly not admissible

7    in this trial, and I wouldn't seek to admit it, but

8    I do want to put in her testimony about the

9    fingerprint match on that envelope, so we've decided

10   and we've agreed to stipulate that she can testify

11   about the match on the envelope, and we can tell the

12   jury, with Your Honor's permission, that through no

13   fault of anyone's, the envelope is not available to

14   be admitted in evidence, but she can still testify

15   about the fingerprint match that she made.

16              THE COURT:  Is that stipulated to?

17              MR. SHEA:  I am.

18              THE COURT:  Yes?

19              MR. SHEA: Yes.

20              THE COURT:  Okay.

21                   END OF BENCH CONFERENCE

22   Q.   (Mr. Deakin) May I approach briefly, Your Honor?

23        Officer McLaughlin, what did you do with the items

24        that were submitted to you?

1   A.   Following visual examination of the items, I

2        processed them using various processes for potential

3        latent fingerprints.

4   Q.   And what did you use to process--actually let me

5        show you what is now Exhibit 20.  It's actually

6        Exhibit 20A.  Do you recognize that?

7   A.   Yes, sir, I do.

8   Q.   And what's that?

9   A.   That was a bottle of Brugal Dominican Rum that was

10       submitted on the 20th of July for processing.

11  Q.   And did you process that item?

12  A.   Yes, sir, I did.

13  Q.   What procedures do you use to process that item?

14  A.   With this item I used Cyanoacrylate fuming and

15       dusting with fingerprint powder.

16  Q.   And did you uncover any latent fingerprints?

17  A.   Yes, sir, I did, one.

18  Q.   Did you process the other items that you've

19       described receiving?

20  A.   Yes, sir, I did.

21  Q.   And did you find latent fingerprints on any of the

22       other items?

23  A.   On one envelope.

24  Q.   And what process did you use on that envelope?

1    A.   On the paper items, I used the chemical ninhydrin.

2    Q.   And is it your understanding that by stipulation

3         that envelope is no longer available, through no

4         fault of anyone's, is no longer available to be

5         admitted into evidence?

6    A.   Yes, sir, I do.

7    Q.   When--did you perform a comparison of the latent

8         fingerprint that you found on the bottle of Brugal

9         Rum to any known exemplar?

10   A.   Yes, sir, I did.

11   Q.   And whose known exemplar did you compare it to?

12   A.   Owen McCants.

13   Q.   And did you--have you brought along any luster of

14        aid that would help you explain the process of that

15        comparison?

16   A.   Yes, sir, I have.

17   Q.   What did you bring?

18   A.   I brought a fingerprint chart.

19              MR. DEAKIN:  And with the Court's

20        permission, Your Honor, may I ask that the witness

21        step down off the stand and approach the jury,

22        perhaps over on the side so that defense counsel and

23        defendant can see as well with her fingerprint

24        chart.

1          THE COURT:  Yes.

2          MR. DEAKIN:  Perhaps you can stand over--I

3     don't know where you're most comfortable, but you

4     need to be somewhere where the defense can see as

5     well.

6          THE WITNESS:  Your Honor, is this okay?

7          THE COURT:  That's fine.

8          THE COURT:  You have to keep your voice

9     up.

10         THE WITNESS:  Yes, Your Honor.  This is

11    what's called a fingerprint chart.  It is simply a

12    visual aid to explain how a comparison is

13    accomplished in an identification effective when

14    you're comparing a latent print to a known print.

15    In the first case, as I mentioned earlier, the

16    latent print is examined for ridge detail and to see

17    if there's enough detail present.  The examiner will

18    examine the flow of the ridges and if it's

19    available, the pattern type.  Often times, not

20    enough of the ridge detail would allow you to

21    determine what type of pattern it is.  There are

22    three patterns:  Loops, arches, and rurals.

23         In this particular case, because of the flow of

24    the ridges, a delta area here and a double recurve,

1    I know that this is a rural pattern.  Examination of

2    all of the details present--if the ridges and the

3    space in between ridges.  Prior to a comparison, I'm

4    going to look for an item or something within the

5    latent print that draws my attention to it that I

6    can focus on.  In this particular case, at the core

7    of the print is a spike more easily seen on the

8    inked fingerprint.  The core of the print is spiked.

9    I'm going to focus, after determining that I have

10   enough ridge detail for a comparison, I'm going to

11   compare it to a known fingerprint.

12        Using my spike as a point of reference, my

13   beginning point, I'm going to count thirteen ridges

14   in an upward direction toward my right to an ending

15   ridge, that's a ridge that comes up and stops and

16   goes no further.  I go to my inked fingerprint,

17   again reaching with my point of reference and count

18   up thirteen ridges to the ending ridge.  From this

19   ridge, if I count in a downward direction five

20   ridges, I come to another ending ridge.  On my

21   latent, if I count down five intervening ridges in a

22   downward direction, I have another ending ridge, a

23   ridge that goes no further.  On my latent, if I

24   follow that ridge in a downward direction, all the

1    way down, I come and count one ridge over to my

2    left, I have another ending ridge which I marked as

3    Point No. 3.

4        Going back to my inked print, I follow from

5    Point No. 2, my ending ridge, and follow the ridge

6    in a downward direction counting over my intervening

7    ridge and find another ending ridge which I had also

8    marked as Point No. 3.  From this point, if I count

9    over two intervening ridges to my third ridge, I

10   find another ending ridge ending in a downward

11   direction towards the bottom of my print.  Going

12   back to Point No. 3 on my known fingerprint and my

13   ending ridge, counting over two intervening ridges

14   to an ending ridge in a downward direction.  And

15   this comparison is completed using the same steps

16   until I have come to the conclusion in my mind that

17   the prints are in fact one in the same.

18   Q.  (Mr. Deakin) Now, Ms. McLaughlin, you have just

19       explained by my count six points of similarity; am I

20       right?

21   A.  It would be eight points.  It's actually four mark.

22   Q.  Okay.  Four mark.  You have ten numbers on each of

23       the charts?

24   A.  That's correct.

1   Q.   And what do those remaining six numbers represent?

2   A.   They are additional points of identification that

3        are--that correspond, that are similar points of

4        identification located in the same area within each

5        of the two prints.

6   Q.   And is that the number of points of similarity that

7        you found when you did your comparison of the latent

8        fingerprint on the bottle to the inked fingerprint

9        on the fingerprint card for Owen McCants?

10  A.   No, sir.

11  Q.   How many points of similarity did you locate within

12       each of those prints?

13  A.   There's a total number of 17 points of

14       identification.

15  Q.   Are there any points of dissimilarity?

16  A.   No, sir, there are not. There could not be an

17       identification if there were a dissimilarity.

18  Q.   So that we're clear, it's easier for me to see the

19       ridge detail on the left than it is on the right.

20       Why is that?

21  A.   Again, an inked fingerprint or a known fingerprint

22       is a deliberately recorded impression of the

23       characteristics found within the ridge detail.  A

24       latent fingerprint is the result of the skin tissue

1      coming in contact with another.  It may not always

2      be clear.  If I had a latent print that was that

3      clear, I'd be ecstatic.  It does not usually happen

4      because of the conditions of skin.

5   Q.  If I may ask you to resume the stand, Officer

6      McLaughlin.  If I may have the fingerprint chart.

7              MR. DEAKIN:  I move that this be admitted

8      in evidence as--

9              MR. SHEA:  I'd object.

10              THE COURT:  Sidebar.

11                        BENCH CONFERENCE

12              THE COURT:  Mr. Deakin, where is this

13      from?

14              MR. DEAKIN:  It's a bottle in his bedroom.

15              MR. SHEA:  I honestly don't care about the

16      bottle found in the bedroom, but I'm just concerned

17      because that's not the definition of fingerprint--

18              THE COURT:  So why do you need this one

19      in?

20              MR. DEAKIN:  Your Honor, I expect the

21      defense, either through cross-examination or

22      possibly by asking a court-appointed expert or to be

23      allowed to call an expert, to attack the validity of

24      fingerprint evidence.  I think the jury should have

1     a chance to see for themselves the analysis that

2     goes into them, particularly since fingerprints on

3     the letter have become--

4            THE COURT:   The objection sustained.

5     We'll deal with the fingerprints on the letter

6     later.

7                  END OF BENCH CONFERENCE

8            THE COURT:   The objection's sustained.

9     Q.  (Mr. Deakin) And Officer McLaughlin, did you

10    perform--let me ask you this, did you perform

11    similar comparison involving the envelope that's no

12    longer available?

13    A.  Yes, sir, I did.

14    Q.  And how many points of similarity did you find in

15    that comparison?

16    A.  That had 27 points of identification.

17    Q.  Based on your comparison of the fingerprint on the

18    bottle of rum to the known fingerprint of Owen

19    McCants, do you have an opinion as to the source of

20    the fingerprint on the bottle of rum?

21    A.  Yes, sir, I do.

22    Q.  And what is your opinion?

23    A.  In my opinion the ridge detail came from the No. 2

24    finger or the right index finger of Owen McCants.

1   Q.   And based on your comparison of the known

2        fingerprint of the defendant, Owen McCants, to the

3        envelope found in his bedroom that is no longer

4        available, do you have an opinion as to the source

5        of the latent fingerprint on that envelope?

6   A.   Yes, sir.

7   Q.   And what is that opinion?

8   A.   The palm print that I charted was the right side of

9        the palm of Owen McCants.

10            MR. DEAKIN:  If I may have one moment,

11       Your Honor?  Nothing further.

12            THE COURT:  Mr. Shea.

13                    CROSS-EXAMINATION

14  BY MR. SHEA:

15  Q.   Good afternoon.

16  A.   Good afternoon, sir.

17  Q.   Now, you have seven prints off the outside of the

18       car?

19  A.   Yes, seven.

20  Q.   And then--a total of eight.  One is on the side of

21       the door?

22  A.   That's correct.

23  Q.   And you said Owen McCants wasn't the source of any

24       of those?

1    A.   That's correct.

2    Q.   And ███████████ wasn't the source?

3    A.   That's correct.

4    Q.   Were you given any other prints by the detectives to

5         check, to compare with?

6    A.   No, sir.

7    Q.   None?

8    A.   No major case prints, no, sir.

9    Q.   Now, you said there are different conditions for

10        prints being left, whether a person has dry skin or

11        oily skin.  It matters in terms of them leaving a

12        print; correct?

13   A.   It can, yes, sir.

14   Q.   If someone is under the influence of an exciting

15        event, is nervous, perspiring, are they more likely

16        to have the oils necessary for leaving a print?

17   A.   It's possible.  It's also possible that they might

18        have excess moisture which might wipe out ridge

19        detail that might be left.

20   Q.   And I take it the length of time and activity in the

21        automobile would also be a relevant factor?

22   A.   It's possible.

23   Q.   Now, you were to check--you checked the condom

24        wrapper?

1    A.   Yes, sir, I did.

2    Q.   No prints?

3    A.   No identifiable ridge detail.

4    Q.   Okay.  The easy wider package, no identifiable ridge

5         detail?

6    A.   That's correct.

7    Q.   Now, the interior of the automobile, the process on

8         that, you did fuming?

9    A.   Yes, sir.

10   Q.   Okay.  And did you use powder on the interior as

11        well?

12   A.   Yes, sir, I did.

13   Q.   And you said the third possible process is a

14        chemical process?

15   A.   Yes, sir.

16   Q.   Would that have been something you use in the

17        interior or not?

18   A.   In my experience, no, sir.  Not finding any kind of

19        identifiable ridge detail a chemical process such as

20        diazine would only enhance what's already there, not

21        finding any additional purpose.

22   Q.   Okay.  So the chemical process is better at kind of

23        enhancing what you've found?  Is that what you are

24        saying, that you would have needed to have found

1    something through the powder or the fuming before

2    you would use a chemical process?

3  A.  In certain circumstances, yes.

4  Q.  Now, you said now that you don't need any particular

5    number of points to be able to identify a print?

6  A.  There's no set standard.

7  Q.  No set standard.  There used to be a set standard,

8    didn't there?

9  A.  At one time in Europe, I'm sure.

10  Q.  But in your department?

11  A.  In my department?

12  Q.  You work for the Boston Police Department?

13  A.  Yes, sir, I do.

14  Q.  And there used to be a set number of matches that

15    the Boston Police Department used to require;

16    correct?

17  A.  I'm not familiar with that, sir, since I've been

18    there.

19  Q.  And when did you begin?

20  A.  1988.

21  Q.  So you're saying that you never testified that you

22    were required to have ten or twelve matches before

23    you could say that it was an identifiable match?

24  A.  No, sir.  Ten or twelve, no.

```
 1   Q.   Now, lastly you said that smooth, clean surfaces are

 2        the best for getting a print?

 3   A.   In my experience it is more imitable to moving

 4        identifiable ridge detail.

 5   Q.   The exterior of the automobile was a smooth surface?

 6   A.   Yes, sir.

 7   Q.   Are there other smooth surfaces in the interior of

 8        the automobile that you tried?

 9   A.   Yes, sir.

10   Q.   Could you just state what they are?

11   A.   The interior glass, the rear-view mirror, items of

12        that nature.

13   Q.   Did you check--were--the doors were a smooth surface

14        with plastic?

15   A.   The doors were also fumed.

16   Q.   Okay.  With no success?

17   A.   No success.

18               MR. SHEA:  Nothing further.

19               MR. DEAKIN:  Nothing further.

20               THE COURT:  You may step down.

21               MR. DEAKIN:  Your Honor, I apologize to

22        the Court, as I mentioned earlier, because of the

23        situation with one witness who was unavoidable

24        called away, I have run out of witnesses.
```

1          THE COURT:  Okay.  We're going to break at

2     this time for the day.  Ladies and Gentlemen, you

3     are not permitted to talk about this case or allow

4     anyone to talk about it in your presence.  If you

5     happen to see anything on radio and television about

6     this case, you are to disregard whatever you hear or

7     see.  I will see you tommorrow morning at

8     9:30 a.m.

9          (Court adjourned at 3:30 p.m.)

## CERTIFICATE

I, Leslie D'Emilia, a Court Reporter, do
hereby certify that the foregoing record, Pages 1
through 56, is a complete, accurate, and true
transcription of my stenographic notes taken in the
aforementioned matter to the best of my skills and
ability.


_Leslie A. D'Emilia_
LESLIE A. D'EMILIA
Court Reporter


THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

DIRECTION OF THE CERTIFYING REPORTER.


ORIGINAL